Keith L. Altman, P81702
Solomon M. Radner, P73653
Ari Kresch, P29593
EXCOLO LAW, PLLC
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
kaltman@excololaw.com

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| |
|---|
| **TEMUJIN KENSU,** INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> *Plaintiffs*, <br> v. <br><br> **JPAY INC.,** <br><br> *Defendant.* |

## CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES

## JURY TRIAL DEMANDED

**COMES NOW** Plaintiffs, by and through their attorney, EXCOLO LAW, PLLC, and complain and allege on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other allegations against JPAY INC. ("JPAY") as follows:

## INTRODUCTION

1. This class action arises from the predatory and deceptive practices, methods, solicitations, advertisements, promises, extortions, and representations contrived by Defendants, whereby Defendant engaged between 25,000 and 50,000 Michigan prisoners, Plaintiff and Class herein, to make purchases through Defendant's various corrections-related services, including prisoner money transfer, email, video visitation services, and communication and prisoner device services, including MP3 music services, and a specially designed corrections industry tablet services.

2. The class is defined as:

> Individuals who are or were prisoners incarcerated in facilities of the Michigan Department of Corrections and beginning in 2012, purchased products, content, and services from Defendants, represented by Defendant to be of a different kind, quality, and fundamental model than the product, content, or service actually was.

3. Defendant preyed on and conspired to induce Plaintiff and the Class to make millions of dollars' worth of purchases through Defendant's services, while simultaneously engaging in misconduct for the purpose of defrauding, deceiving, and extorting funds from Plaintiff and the Class.

4. Through collusion and conspiracy, Defendant deceptively misrepresented fundamental aspects of their fraudulent services while inducing Plaintiffs' purchases, failing to disclose the deceitful and extortive nature of the services as

a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs and the Class would be deprived of their millions of dollars' worth of digital property.

5. Defendant's collusive tactics led to Defendant JPay holding an abusive monopolistic power over Michigan Department of Corrections ("MDOC") prisoners' access to purchased content, products, and services, restricting Plaintiff and the Class from access to products, content, and services that only Defendant owned an interest in.

6. Defendant engaged in, and continues to engage in, years of urging Plaintiff and the Class to drain their bank accounts, inducing millions of dollars' worth of numerous unnecessary purchases, updates, and repairs into their fraudulent and defective services, resulting in incessant instances of Plaintiff and the Class being denied access to their millions of dollars' worth of purchased content, products, services, and property, all while refusing to provide Plaintiff and the Class with any recourse to remedy the situation.

7. Plaintiff and the Class state that due to Defendant's widespread and intentionally predatory and deceptive practices, methods, solicitations, advertisements, promises, and representations, Plaintiff and the Class were wrongfully and unfairly induced by Defendant into purchasing products, content, and services from Defendant.

8. Plaintiff and the Class state that they justifiably and reasonably relied on the deceptive and fraudulent practices, promises, and misrepresentations of Defendant JPay in their advertisements, solicitations, and representations made as they were inducing Plaintiffs' purchases.

9. Accordingly, Plaintiff and the Class have been extensively damaged, as stated in this Complaint.

## DESCRIPTION OF THE PLAINTIFF CLASS

10.   This class action is brought by Plaintiff Temujin Kensu, individually and on behalf of a Class of similarly situated individuals who are residents and/or citizens of Michigan and since 2012 have purchased money transfer services, email or "eCommunication" services, video visitation services, MP3 players, electronic tablets, content, products, and accessories from Defendant through Defendant's JPay Inmate Services program ("JPay Program").

11. Through its marketing, promises, advertisements, or representations, Defendant preyed on and conspired to deprive individuals of, or will deprive individuals of, millions of dollars' worth of lawfully and permanently owned photographs, email communications, letters, attorney correspondence, digital greeting cards, MP3 music files, and other content, products, accessories, and services, which were purchased through Defendant's JPay Program, through one or more of the following methods:

a. Advertised, solicited, and represented the character, nature, and functionality of the JPay Program as a whole, the quality of the products contained, and the extent to which ownership or access to products purchased would exist, with no intent to disclose the predatory, deceitful, and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiff and the Class would be deprived of their millions of dollars' worth of digital property; and

b. Made false or misleading representations of facts or statements of fact material to Plaintiffs' purchase of money transfer services, email or "eCommunication" services, video visitation services, MP3 players, electronic tablets, content, products, and accessories from Defendant through their JPay Program, including, but not limited to, the promises that the products, content, and accessories they were purchasing:

   i.   were the Purchasers' personal property and theirs to own, forever;

   ii.  would "always be available" at "anytime" the purchaser desired it, extending throughout their entire incarceration as well as upon their release;

      iii.  were of a certain merchantable quality and character;

      iv.  contained certain functionality and services which did not exist or did not function as described.  All of the above were such that the customer reasonably believed the represented product to be other than it actually is; and

   c.  Failed to disclose or concealed the predatory, deceitful, and extortive nature of the services as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiff and the Class would be deprived of their millions of dollars' worth of digital property, deceiving customers and inducing them to believe the products they were purchasing were significantly different and worth substantially less than as represented; and

   d.  Sold customers the undisclosed or less desirable products, content, services, and accessories, rather than the products, content, services, and accessories as represented and promised.

## PARTIES

### A.   PLAINTIFFS

12. Plaintiff Temujin Kensu purchased money transfer services, email or "eCommunication" services, video visitation services, MP3 players, electronic tablets, content, products, and accessories from Defendant JPay Inc. through

their JPay Program from no later than 2012 continuing to this day.  At all times relevant to this action, Plaintiff has been and is currently incarcerated in facilities of the Michigan Department of Corrections.  Plaintiff is a citizen of Michigan.

13. As used herein, Plaintiff and the Class will be collectively referred to as "Plaintiffs."

14. As used herein, "purchasing Plaintiff" shall mean and refer to the Plaintiffs identified herein as someone who purchased JPay Inmate Services ("JPay Program") products, content, services, and accessories from Defendant JPay.

### B.    DEFENDANTS

15. Defendant JPay Inc. ("JPay"), is a Delaware corporation with its principal place of business located at 12864 Biscayne Boulevard, Suite 243, Miami, Florida 33181. JPay is authorized to conduct business in Michigan and may be served by its registered agent The Corporation Company at 40600 Ann Arbor Rd., E STE 201, Plymouth, MI 48170. JPay is a wholly owned subsidiary of Securus Technologies.

16. JPay derives substantial income from doing business in Michigan.

17. Upon information and belief, JPay did advertise, market, and sell correctional-related products, content, services, and accessories to consumers in the State of Michigan.

18. This court has personal jurisdiction over JPay named herein because said JPay has sufficient minimum contacts with the forum state upon which to predicate personal jurisdiction.

## JURISDICTION AND VENUE

19. JPay Inc. is a Delaware corporation, with its principal place of business in Florida, registered as foreign profit corporation in the State of Michigan, among others.

20. At all times relevant to this action, JPay was engaged in substantial business activities in Michigan, including, but not limited to, advertising, marketing, contracting for, and selling corrections-related products, content, services, and accessories to thousands of prisoners in Michigan.

21. At all times relevant to this action, JPay engaged, either directly or indirectly, in the business of marketing, promoting, distributing, and selling money transfer services, email or "eCommunication" services, video visitation services, MP3 players, electronic tablets, content, products, and accessories through their JPay Inmate Services ("JPay Program") within Michigan with a reasonable expectation that the products, content, services, and accessories would be used and relied upon in this state, and thus regularly solicited or transacted business in this state.

22. Plaintiff and all members of the Class are domiciliaries of the State of Michigan, are expected to number in the thousands, the amount in controversy is more than $5,000,000 exclusive of interests and costs, and Plaintiffs are citizens of a different state than Defendant.  Thus this Court has jurisdiction under 28 U.S.C. § 1332(d)(2).

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and because Plaintiffs are residents of this judicial district, Defendant does business within this judicial district, and a substantial part of the events and omissions giving rise to the claims alleged occurred herein.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

24. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

25. Plaintiffs have complied in all respects with the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance process of the MDOC.

26. Plaintiffs have exhausted all administrative remedies.

## COMMON FACTUAL ALLEGATIONS

### A.     DEFENDANT'S ADVERTISED "JPAY PROGRAM"

27. JPay Inc. is a privately held corrections-related service provider that contracts with state Departments of Correction, county jails, and private federal prisons to provide technologies and services to incarcerated prisoners.

28. JPay Inc. has been dubbed "the Apple of the prison system," selling money transfer services, email or "eCommunication" services, video visitation services, MP3 players, electronic tablets, content, products, and accessories to more than one million prisoners across 35 states.[1]

29. Defendant JPay boasts itself to be the "Most Trusted Name in Corrections," providing prisoners and their families "the quickest and most reliable payment options for individuals in community corrections," "the fastest and most secure way to send money; convenient and function-rich inmate email; innovative video visitation and music options; and parole, probation and post-release services."[2]

30. Since no later than 2012, JPay has contracted with the Michigan Department of Corrections ("MDOC") to provide a host of services to prisoners housed in all MDOC correctional facilities throughout Michigan.

31. The services JPay provides to prisoners housed in the MDOC include selling money transfer services, email or "eCommunication" services, video visitation

---

[1] http://www.sfgate.com/business/article/JPay-working-to-be-Apple-of-prison-system-3802432.php
[2] http://www.JPay.com/AboutUs.aspx

services, MP3 players, electronic tablets, content, products, accessories and other services, all within Defendant's JPay Program.

32. Through Defendant's JPay Program, in order to send or receive communication with friends or loved ones, Plaintiff and the Class purchased "Stamps" from Defendant.

33. Plaintiff, the Class, and their families were each charged "Stamps" in order to send their communications. The number of stamps an account was charged per email depended upon how long the email communication was.  For example, each typed page of text costs one stamp. Each attachment cost one stamp.[3]

34. Plaintiff and the Class were forced to pay Defendants for each communication sent through the JPay program.  Defendant charged Plaintiff $5.00 for 20 stamps, $10.00 for 50 stamps, and $20.00 for 100 stamps.[4]

35. In addition to charging Plaintiff and the Class for email and messaging services, JPay provides correctional facilities nationwide a tablet-based media program where prisoners can access the JPay Program's services, products, and content via hand-held tablets.[5]

---

[3] http://www.JPay.com/Facility-Details/Michigan-Department-of-Corrections/Macomb-Correctional-Facility.aspx
[4] *Id.*
[5] http://www.JPay.com/pmusic.aspx

36. The media program component of the JPay Program provides prisoners with entertainment technology through a tablet advertised to help "loved ones pass the time, keep engaged and stay connected to you."[6]

37. The JPay Program began operating in MDOC facilities no later than January 2009 and is still currently servicing MDOC facilities.

38. Defendant's JPay Program allows prisoners to purchase media tablets or other media players from Defendants. These devices allow Prisoners to purchase and listen to MP3 music files, read and write emails, play games they have purchased, view photos and videos, access educational materials, and read the daily news on a hand-held device.[7]

39. Defendant advertises the versatility of their media players, advertising to prisoners features such as "touchscreen and portable," simple to use and easy to understand," an "FM Radio, calculator, stopwatch and other apps," a "rugged device made for use in corrections," and "accessories like earbuds, screen protector and batteries or charger."[8]

40. Additionally, Defendant urged prisoners, and their loved ones, to make purchases through their media store. An example includes: "Give your loved one the joy of music and help them pass the time with ease. With their JP5 Tablet, your loved one can download songs from a music library of more than

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

10 million titles, including hits from today's most popular artists. Just fund their Media Account so they can get started!"[9]



*Figure 1: JP5s Tablet[10]*

41. In addition to MP3 media players and downloadable digital MP3 music content, Defendant advertised and sold other interactive content to prisoners such as education, games, mail, and photos.

42. This other interactive content advertised, promised, and represented to Plaintiff and the Class available through the media players purchased in the Media Program included access to functionality that would allow prisoners to email their loved ones messages and photographs from their purchased handheld devices.

43. The email program component of the JPay Program promised to give "the fastest and most robust email service available to inmates in the country," allowing prisoners to communicate with their loved ones through the tablets, a

---

[9] *Id.*
[10] *Id.*

feature where the prisoner could "respond electronically, view and print your message, and view photo attachments."[11]

44. Prisoners who purchased into Defendant's JPay Program were also promised the ability, through Defendant's VideoGram functionality, to communicate with family and friends via video directly on MP3 players or tablet purchased from Defendant, advertising to prisoners and their families functionality that would "keep you and your friend or relative connected throughout the duration of their incarceration. The inmate email interface is as familiar as the email program you use at home, and just as easy to use."[12]

45. Prisoners who purchased MP3 songs, content, and other email or communication services from Defendant did so directly through the tablet or interactive kiosks inside the correctional facilities called "JPay kiosks."



---

[11] *Id.*
[12] *Id.*

*Figure 2: JPay kiosk[13]*

46.The JPay kiosk allowed prisoners to make purchases of MP3 music content, products, and services, as well as communicate with their loved ones via video or email messaging.  Defendant controlled each purchase and how much each purchase cost.

47.The JPay kiosk also provided inmates with access to the digital content the prisoner purchased. While the individual MP3 players or tablets each had a specific storage capacity, prisoners could load, delete, or store content that they had previously purchased through the JPay kiosk on Defendant's digital network. For example, if a prisoner had an MP3 player or tablet full to capacity with digital content, that prisoner could 'store' additional content he purchased through Defendant's JPay Program, like thousands of dollars' worth of MP3 music, on Defendant's network through the JPay kiosk.  If the prisoner wished to 'swap out' the music on his MP3 player or tablet with the content he owned that that was stored on Defendant's network, he would have to use a JPay kiosk to access the music and load it on his MP3 player or tablet.

## B. THE PREDATORY, FRAUDULENT, DECEPTIVE, AND MONEY-GRABBING SCHEME THAT IS DEFENDANT'S JPAY PROGRAM

---

[13] http://www.gokis.net/self-service/archives/001817.html

48. From the outset of the JPay Program, Defendants engaged in a predatory scheme to target and take advantage of prisoners, seeking monopolistic control over fundamental aspects of a prisoner's daily life.

49. Targeting a surge in admissions to the correctional system, JPay developed and used its services to prey on and take advantage of unsuspecting prisoners who had little recourse to protect themselves.

50. JPay Chief Executive Officer Ryan Shapiro admitted, "Music was a no-brainer because inmates don't have enough music and they all love music."[14]

51. While JPay's predatory practices and defective products take advantage of and harm prisoners and their families, JPay proudly boasts about its business.

52. "We invented this business," said Ryan Shapiro, 37, the company's founder and CEO. "Everyone else tries to imitate what we did, and they don't do it as well."

53. Helping JPay's business is the fact that once JPay contracts with a correctional facility, like the MDOC where Plaintiff and the Class reside, it employs monopolistic tactics to ensure participation in, and maintain control over, the available services that Plaintiff and the Class must purchase into.

54. In 12 years, JPay says it has grown to provide money transfers to more than 1.7 million offenders in 32 states, or nearly 70 percent of the inmates in U.S. prisons.[15]

---

[14] http://www.sfgate.com/business/article/JPay-working-to-be-Apple-of-prison-system-3802432.php

55. For the families of nearly 40 percent of those prisoners, JPay is the only way to send money to a loved one.[16]

56. JPay handled nearly 7 million transactions in 2013, generating well over $50 million in revenue. JPay expects to transfer more than $1 billion this year.[17]

57. Additionally, JPay is protected from other market forces. When correctional facilities contract with JPay and offer its music players and tablet computers for sale to prisoners, they often confiscate radios that are already owned by the prisoners. This leaves prisoners dependent on JPay's music downloads, which can cost 30 to 50 percent more than the same songs on iTunes.

58. These predatory practices have additional effects outside of the correctional system, as it has a substantial monetary effect on the family members who wish to communicate with their incarcerated loved one.

59. Defendant's price gouging tactics are similarly felt by prisoners, who will never be able to afford the increased monopolistic prices of prisoner products, content, and services charged for communication with their loved ones.  This burden is often passed on to prisoner's family members on the outside.

60. Prisoners earn as little as 12 cents per hour in many places, wages that have not increased for decades. The prices they pay for goods to meet their basic needs continue to increase.

---

[15] https://www.publicintegrity.org/2014/09/30/15761/prison-bankers-cash-captive-customers
[16] *Id.*
[17] *Id.*

61. Defendant's JPay Program charges prisoners and their loved ones astronomical prices to simply send messages back and forth.

62. In order to communicate with their loved ones, family members on the outside are forced to pay these astronomical payments just to send letters or speak to their incarcerated friends or relatives.

63. To make payments to JPay, family members often forego medical care, skip utility bills, and ultimately are forced to limit contact with their imprisoned friends or relatives.

64. While the burden of the price gouging fees associated with Defendant's JPay Program invariably impacts both the prisoner and their friends and families outside the prison who pay them, JPay CEO Shapiro somehow claims the company's fees are too low to affect prisoners' families.[18]

65. A joint investigation by the Center for Public Integrity and CNBC found that many families are financially burdened trying to keep up with the tremendous rising costs associated with having a relative or friend behind bars.[19]

66. By contracting with the MDOC to intervene and control essential elements of prisoner communication and daily life, JPay has become a critical financial conduit to ensure that Defendant profits from millions of families with incarcerated loved ones.

---

[18] https://www.cnbc.com/2014/10/01/the-big-business-of-selling-apps-to-prison-inmates.html
[19] https://www.cnbc.com/2014/10/01/the-big-business-of-selling-apps-to-prison-inmates.html

67. JPay gains monopolistic support from the facilities it contracts with as they provide financial kickbacks to the institutions.

68. After charging an exorbitant fee to prisoners for its products, content, and services, JPay provides a financial kickback to the institution it contracts with[20] in order to further ensure the prosperous predatory business relationship at the expense of prisoners and their families.

69. JPay gives the state a cut of its revenue. For example, if JPay charges $3 for a money transfer, the state might get 50 cents, depending on each individual agreement. (The company charges $1.45 to $24.95 per transfer, depending on the amount of money sent.)

70. As JPay as inserted itself into essential services of prisoner life, such as the money transfer service, JPay streamlines the flow of cash into prisons, making it easier for the corrections agency or institution contracted with JPay to take a cut of the funds leeched from prisoners and their families and further the profit sharing at the expense of prisoners.

71. Taken together, the costs imposed by JPay, phone companies, prison store operators and corrections agencies make it far more difficult for families to escape poverty so long as they have a loved one in the system.

---

[20] https://www.publicintegrity.org/2014/09/30/15761/prison-bankers-cash-captive-customers

72. At the outset of the JPay Program, Defendant engaged in a deceptive conspiracy to force Plaintiff and the Class to purchase into the JPay Program, blocking Plaintiff and the Class from purchasing alternative forms of devices and music products.

73. Prior to the JPay Program's initiation, Plaintiffs enjoyed access to a wide range of quality music in multiple forms, including cassette tapes and CDs, as well as quality CD and tape players from well-known brands like Panasonic, Hitachi, and Sony.

74. Throughout the JPay Program, Defendant engaged in conspiracy and abuse, colluding to limit Plaintiff and the Class from access to any alternative forms of music, forcing Plaintiff and the Class to purchase their music from the JPay Program instead.

75. Throughout the duration of the JPay Program, Defendant, through the Michigan Department of Corrections ("MDOC"), restricted Plaintiff and the Class from purchasing Compact Disc ("CD") players, CD music and content, and alternative forms of MP3 players and content that were not owned by Defendant.

76. Plaintiff and the Class were essentially forced into the JPay Program, as after the beginning of the JPay Music Program in 2016 if Plaintiff and the Class wished to listen to or purchase music, the only option available to them was to

make purchases through Defendant's JPay Program. Plaintiff and the Class had no meaningful choice between JPay or a competitor, as there were no competitors available.

77. After cornering the MDOC music market through their monopolistic practices, policies, and coercion, Defendant engaged in price gouging for their content, products, and services. If Plaintiff and the Class wished to make purchases for music-related items, either through the MDOC commissary or Defendant's JPay Program, Plaintiff and the Class were expected to pay exorbitant fees for those items.

78. Defendant charged Plaintiff and the Class exorbitant rates for their headphones, MP3 players, tablets, and MP3 content. Defendant's price gouging extended to charging near-destitute inmates $137.50 for low-grade MP3 players and tablets. Absent a majority of features found on common MP3 players at one-third the price, Defendant's MP3 players and tablets were prone to breakage and malfunction, requiring Plaintiffs to frequently pay for repairs or to buy a new MP3 player or tablet altogether.

79. Defendant's practice and policy of exorbitant price-gouging also extended into the actual MP3 content, as Defendant charged Plaintiffs the unheard-of price of $1.49 per song.

80. In furtherance of Defendant's money-grabbing conspiracy to defraud Plaintiff and the Class out of millions of dollars, Defendant restricted prisoners from any and all access to free music sources, requiring Plaintiff and the Class to purchase music that is often available to consumers for free.

81. While charging Plaintiff and the Class exorbitant rates for this MP3 music content, Defendant purchased this music in outdated "package catalogs" in bulk for fractions of the cost they sold to inmates, permitting Defendant to make millions in revenue at the unnecessary and fraudulent expense of Plaintiffs.

82. Additionally, on information and belief Defendant knowingly transferred and sold Plaintiffs stolen or unauthorized content, including, but not limited to, files exclusively sold on "Sony Zune" and "iTunes" platforms. Often times, these songs were even tagged with security beeps indicating they were illegally copied, downloaded, and sold to Plaintiffs. Many Plaintiffs still have such tagged and marked music on their devices to date.

83. Defendant also banned access to "long songs," often "hits," because they feared Plaintiffs would 'fill' their MP3 players with content and thus be unable to buy more music from Defendant, increasing their profits.

84. While Defendant advertised and marketed the JPay program to consumers to contain "unlimited amounts" of music, Defendant failed to maintain proper, complete and accessible records of Plaintiffs' music purchases, often resulting

in confusion, complaints, and the need for Plaintiffs to repurchase music from Defendant that they had already previously purchased.

85. In a deceitful and deceptive manner, JPay refuses to provide Plaintiff and the Class with any record or receipt of purchases, sales, transactions, line items, descriptions of purchased digital content, etc. Plaintiff and the Class have spent thousands of dollars purchasing electronic stamps for sending emails, digital cards, digital music, and other products, content, and services. JPay has failed to provide a single receipt, digital or physical, for these purchases, nor have they provided any reasonable accounting or record for Plaintiff and the Class' thousands of musical, digital content items.

86. Plaintiff and the Class have an absolute legal right to a full accounting of each and every purchase and the right to receive and retain the same for their records.

87. Furthermore, throughout the duration of the fraudulent JPay Program, Defendant failed to develop or maintain any reasonable "complaint" or "resolution" process for Plaintiffs to find any equitable remedies for issues experienced. From its outset, the JPay Program was plagued with malfunctions and complications with the MP3 content, the MP3 players, the email communications services, the JPay Program accessories, and numerous other products, content, and services purchased by Plaintiff and the Class.

88. After the initial installation of the JPay Program and the prisoner email system, JPay offered a "Trouble Ticket" option which allowed prisoners to lodge complaints or report malfunctions or issues with the JPay program. Upon receipt, the "Trouble Ticket" option allowed prisoners to print both their initial question and the JPay official response.

89. While this option would provide prisoners with an undeniable record of complaints and answers, JPay quickly deactivated this feature and instead created the "Communications Center" forum. This complaint forum contained no way to track or print complaints filed with JPay regarding their JPay Program. The "Complaint Center" told customers that each complaint would be addressed within 14 days of filing.

90. The new "Communications Center" complaint forum was wrought with problems. Mainly, purchasers into the JPay Program could only file one complaint at a time, and only discuss one issue per complaint, within JPay's "Communications Center."

91. Thus, if a customer had a problem with a defective device, in addition to receiving flawed music, a frozen game, or missing mail (all problems common within the JPay Program), he or she would be forced by JPay to "choose" which issue to raise in the "Complaint Center" and wait up to two weeks for a response.

92. This tactic employed Defendants created enormous delays in addressing the concerns, complaints, and defective nature of the products contained in the JPay Program, often resulting in a consumer's warranty on the product to expire prior to JPay even acknowledging the problem.

93. Despite filing a complaint with the designated "Communications Center," Defendant JPay, knowing that the product, device, and software s highly defective, will routinely advise the customer that their warranty has expired and they would need to purchase a new device or product from JPay.

94. Plaintiff and the Class have filed thousands of complaints with JPay and received thousands of denials of claims, and thousands of instances of Defendant's refusal to address or correct issues with the JPay Program.

95. The success of Defendant's JPay Program is predicated upon the belief that consumers were purchasing products they could own and use forever, throughout their incarceration and upon their release. Products purchased throughout the JPay Program would be of substantially less value if they were to expire at the termination of the JPay program or were ever unable for Plaintiff and the Class to access.

96. Defendant's frequent misrepresentations were made through Defendant's advertisements and poster representations to prisoners, as well as through representations made by numerous employees and Defendant's representatives,

whereby Plaintiffs were frequently induced and driven to make purchases through the JPay Program.

97. However, the Media Program Defendant's advertised, marketed, and sold to consumers contained products, content, and services that were not as they were represented to be.

98. The products, content, and services provided by Defendant's JPay Program, which originally was thought to contain permanent and unlimited access to Plaintiff and the Class' property purchased through the program, failed to live up to Defendant's promises and representations that induced Plaintiffs' purchases, as Defendant conspired to induce purchases into a fraudulent and defective program in order to further their own financial gain, leaving Plaintiff and the Class with no recourse to remedy the situation and maintain control and access over content, products, and services purchased through the JPay Program.

99. As with all products, content, and services purchased through the JPay Program, Defendant deceptively failed to disclose throughout the years of the JPay Program running, and collection of fees from Plaintiff and the Class, that the JPay program was actually so defective Plaintiff and the Class would have little if any access to the millions of dollars' worth of content, products, or services that they purchased from Defendant.

## C. DEFENDANT'S JPAY PROGRAM CONTAINED NUMEROUS DEFECTIVE PRODUCTS, CONTENT, AND SERVICES

100.   After cornering the MDOC's music and email market with the monopolistic nature of the MP3 Program, and limited all available options for MDOC consumers to purchase music products, content, and services to those owned by Defendants, as well as controlling all options to send and receive email communications with their loved ones, Defendant sold Plaintiffs and the Class knowingly defective products.

101.   After the initiation of the fraudulent JPay Program, Defendant stopped the sale of quality cassette players, CD players, and radios, restricting Plaintiffs' options to purchase products, content, and services outside of Defendant's control. Defendant "switched" from selling quality, name brand products, to cheap, lesser quality players that were of lesser quality, prone to breakage, and frequently damaged cassette tapes.

102.   Defendant maintained a monopoly on all of their products as prisoners were barred from purchasing better quality content, products, and services after the initiation of the JPay Program.  Plaintiffs were only permitted to purchase the defective products, content, and services from Defendant, which would often only last a matter of days. Plaintiff and the Class had no meaningful choice or other available options outside of products owned by Defendant.

103.   Defendant's deception and sale of knowingly defective products, content, and services extended into charging exorbitant rates for often unnecessary products, content, and services.  This procedure is exemplified in Defendant's process of releasing "new" MP3 players and tablets and marketing these players and their "new" features to Plaintiff and the Class. These "new" MP3 players and tablets were each were riddled with extensive issues and defects.

104.   With the release of each new product, MP3 player, or tablet, Defendant touted its release and advertised extensive new features, most of which were defective, exaggerated, or failed to come close to the advertised quality.

105.   Problems and defects with each system and device were apparent from the beginning, including:

    a.  A cheaply manufactured product would break easily.

    b.  The accompanying JPay kiosk system and software were rampant with glitches and viruses that often ruined or completely shut down tens of thousands of devices, causing numerous issues, including, but not limited to:

        i.  MP3 player or tablet memory being wiped out;

        ii.  Purchased song content unlawfully and unexpectedly removed from the MP3 player or tablet;

        iii.  Shorted batteries;

   iv.  File and download information removed;

    v.  Timing clocks in the players malfunctioning or terminated;

   vi.  Failure to recognize accounts, funds, content, and specific purchases orders;

  vii.  Frequently deleted orders, which were often processed anyway, resulting in an unlawful charge to Plaintiffs without receiving any purchased content;

 viii.  Deletion of emails or other communications sent and received; and

   ix.  Continuously shut down MP3 players, tablets, and JPay kiosks completely, for lengthy periods, during which Plaintiff and the Class were unexpectedly denied access to any and all of their purchased content, products, or services, as well as access to their emails and communications with family members. Because of these defects, the MP3 players' or tablets' "security timers" would constantly elapse, thus depriving Plaintiff and the Class of their paid content, files, information, messages, etc., all while falsely alleging that the system was functioning properly and "delivering" music.

c. The software on Defendant's devices contained multiple defects, including, but not limited to, defects which caused thousands of instances of the unpredictable deletion of Plaintiff and the Class' music as well as unexpectedly removed past paid-for communications with family members.

106. Tens of thousands of Plaintiffs who purchased MP3 players or tablets were not only denied any relief by Defendant but were literally forced to buy another player at the astronomical rates charged by Defendant, for the same device or similar devices that are routinely sold to outside consumers at low, reasonable retail prices, or forever lose access to all of their purchased content. When the MP3 players or tablets sold by Defendants would fail, and all were inevitably doomed to fail, Plaintiff and the Class were forced to purchase another MP3 player or tablet from Defendant in order to simply re-obtain and maintain control of their purchased content, music, products and services.

107. Defendant held Plaintiff and the Class' purchased products, content, and services hostage as they issued thousands of letters refusing to repair or replace flawed devices, all while demanding the Plaintiff and the Class buy another player or tablet and only then would JPay graciously return their musical content.

108.   When pressured with complaints, Defendant's response to these issues was to deny any liability for the failings in their devices, kiosks, adapters, and firmware, and to claim that the thousands of Plaintiffs' players were "out of warranty," repeating the continuous cycle of shameless demand that Plaintiffs simply "buy another player and they would get their music back."

109.   There were also serious flaws with JPay's mail system. A common flaw was known to Plaintiff and the Class as "Black Mail."

110.   When a user's JPay device was hit with the "Black Mail" defect, their mail would in the device would turn "all black" and be shown on the device as being from *the owner of the device*, rather than from the right source.

111.   When this defect would take control of a user's device, they would no longer have access to their mail until the defect was cured.  As explained throughout the complaint, JPay often ignored or failed to address complaints regarding this issue.

112.   The crux of Defendant's defective JPay Program is the JPay kiosk system, which requires Plaintiff and the Class to frequently connect their individual MP3 players and tablets to Defendant's JPay kiosk system anytime they wished to activate, update, purchase content, or receive purchased content.

113.   Defendant's JPay kiosk system is an automated computer kiosk system with multiple USB plugs which Plaintiff and the Class could connect their devices and connect to Defendant's JPay Program network.

114.   Assuming the kiosks were operational that day (which they often were not), once a user would connect his or her MP3 player or tablet to the JPay kiosk, the system would allegedly "run a check" and update the "clock" on the devices to permit the user to continue to use the MP3 player or tablet.

115.   Throughout the duration of Defendant's JPay Program, Plaintiff and the Class were continuously, wrongfully, and without notice, charged for content they did not authorize or intend to be purchased due to defects in Defendant's kiosk system.

116.   Despite charging Plaintiffs astronomical prices and exorbitant fees for content, products, and services through the JPay Program, Defendant's system lacked many basic features that would ensure accurate and effective functioning.

117.   Due to a defective and outdated system, any legitimate or intended purchase would take anywhere from a few days to over a month to charge or "clear" the purchaser's account. This delay in processing caused frequent and incessant problems.

118.   Despite numerous requests for refunds and pleas to fix glitches in the system, Defendant refused to fix JPay kiosk problems, as these issues were a constant stream of revenue for Defendant, leading to hundreds of thousands of unwanted or incorrect purchases, which Defendant would refuse to correct or credit.

119.   The rampant issues across Defendant's JPay Program took advantage of and targeted Plaintiff and the Class.  Many prisoners, having no experience and very limited access to such technology, were abused by constant unwanted, unwarranted, and unnecessary charges, with no recourse to address these issues. Many individuals taken advantage of by Defendant's JPay Program were elderly, mentally hampered in varying ways, and suffered from learning disabilities. Defendant's JPay Program operation, management, and representations to Plaintiffs took none of this into consideration, failing to provide basic instructions on how to use these the devices, products, and services offered. For example, one elderly prisoner mistakenly bought eleven copies of the same song because of the confusing and defective purchase system.

120.   In addition to a defective product purchasing system, Defendant's JPay kiosk system regularly wiped and deleted all purchased MP3 or other media-related content and email communications from Plaintiff and the Class' MP3

players and tablets upon connection to the kiosk system.  After each loss, while Defendant claimed to reimburse and reload the lost content onto Plaintiffs' players, numerous songs were either never returned and worse, Defendant would claim the purchase for a contested song never existed.

121.   Plaintiffs frequently purchased content from Defendant that would never be received by Plaintiffs. Defendant JPay kiosk systems would regularly claim that Plaintiffs received purchased music that they did not receive, claiming the content was "downloaded" previously, or that they had songs on their player that were in fact, not there. This led to frequent disputes which Defendant never addressed.

122.   In several cases, after a protracted, several-month battle, consumers were finally told by Defendant that they would have to delete their content to update the software of their defective MP3 player or tablet. Thus, Plaintiffs' only "option" was to remove all of their purchased content in order to update the defective player. For example, if a consumer had 100 songs on the MP3 player, 100 songs which the consumer paid $1.48 each for, if that consumer wished to continue to participate in the JPay Program and use the defective JPay MP3 player or tablet, they would be forced to delete all the purchased content, lose $148.00 in music, all to update Defendant's defective software.

123.   Even after Defendant claimed they updated and repaired the defective kiosk system, glitches and malfunctions consistently wiped out and erased Plaintiffs' playlists and song selection lists, which were often comprised of weeks or months of searches, ordering, and research, consisting of hours upon hours on the tiny alphabet keyboard on the players, each and every time they plugged in. This, like so many other problems, only worsened over time.

124.   The JPay kiosks viruses transmitted to consumers' MP3 players caused them to fail in other ways. In numerous instances, players would "freeze" each time consumers attempted to search for any large file. This would often result in hours or days of the consumers' device being "locked."

125.   Defendant's JPay kiosks would regularly "freeze" while Plaintiffs' MP3 players were connected. As a consumer's MP3 player or tablet could not be removed before finishing the update process without Defendant's software automatically disabling the player, this "freeze" would then disable the MP3 players or tablets of all those connected. Plaintiffs would thus either remain "trapped" at kiosks for hours on end, hoping their player would "wake up," or because of movement rules in prison, and mandatory limitations on time, Plaintiffs would be forced to disconnect their players, effectively disabling, sometimes permanently, their devices.

126.   While Defendant advertised, represented, and promised any and all content purchased through the JPay program would always be available at any time to Plaintiff and the Class, Defendant refused to ensure that Plaintiff and the Class had sufficient, functioning players to hold all the content they lawfully purchased, as well as access to their lawfully purchased content which held on Defendant's digital network.

127.   The deceitfulness of Defendant's JPay Program furthered by the 'deathclock' technology installed across all of the JPay Program's MP3 players and tablets. Each MP3 player or tablet purchased through the JPay Program contained a "deathclock" program which completely shut down and essentially rendered the MP3 player or tablet permanently disabled if the MP3 player or tablet was not plugged into one of Defendant's JPay Kiosks before the "deathclock" expired.

128.   During the duration of Defendant's JPay Program, Defendant's MP3 players' and tablets' "deathclock" was set to a 30-day period, requiring Plaintiffs and the Class to connect their MP3 players to Defendant's JPay kiosks in order to avoid losing access to all of their products, content, and services.

129.   In the event that a purchaser is released from prison, despite having the ability to permanently disable the "deathclock" program and functionality,

Defendant refused to "disable" the "deathclock," or "unlock" Plaintiffs MP3 players or tablets, unless Plaintiffs agreed to pay Defendant the exorbitant fee for the "privilege" of maintaining access to their lawfully purchased content.

130. Without any notice provided to the purchaser, JPay routinely removes data and purchased content from Plaintiff and the Class' devices.

131. JPay failed to protect Plaintiff and the Class' access to their purchased products, content, and services.

132. Even today, JPay's systems crash and routinely deny Prisoners access. On March 13th, 2018, the JPay System began to crash at regular periods of up to 18 hours or more each day, denying the Class Members access to their mail, both incoming and outgoing. During this period, JPay refused to send any notice to the Class Members or even acknowledge there was any problem when Plaintiffs like Mr. Kensu had them repeatedly contacted by outside sources.

133. These crashes and system failures continued until April 1, 2018, when they were only partially resolved and continue to this date without full resolution or explanation to the Class Members.

134. Yet another "failing" of this system resulted from their alleged "upgrades" locking devices and making them unusable. For hundreds of Class Members this rendered their devices inoperable yet when they would attempt to sync to

the kiosks, the kiosks would show that the devices were in fact "syncing". As they were not, JPay refused to do anything about this problem despite repeated, highly detailed complaints, thus denying numerous Class Members a functioning device. To date, JPay refuses to properly address this issue and either unlock or replace the locked devices.

135.   Defendant's practices and policies outlined throughout this complaint was not disclosed to Plaintiffs prior to, or during, their purchases made within the JPay Program.

136.   This practice of omission of the omission of material facts regarding the JPay Program purchases is common to all products, content, and services purchased from Defendant's JPay Program.

137.   Because Defendant deceptively chose to omit material facts regarding the kind, quality, duration, and function of the products, content, and services they sold in the JPay Program, Plaintiffs were led to believe they were purchasing into a program that offered premium, authentic products, content, and services, available for use indefinitely, when in fact, Plaintiffs were essentially purchasing a much less desirable product.

138.   By following a practice where Defendant represented the products, content, and services purchased through the JPay Program to be of high quality, theirs to own, and available for use indefinitely, while simultaneously failing to

disclose that purchasers would have limited access to any products, content, or services purchased through the JPay Program or used through the services provided by the JPay Program due to its defective nature, as well as refusing to answer direct questions about the JPay Program, Defendant deceived and continues to deceive consumers into believing they are purchasing products, content, and services that are substantially different and less valuable than the product received.

139.   There is a substantial difference between the value of a product, content, or service purchased through the JPay Program that will be available to the purchaser not only throughout the duration of the JPay Program but as well as upon completion of the program and upon release from prison, and the value of a product that will cease to exist, the value of a product the purchaser will have limited access to, or the purchaser will cease to have access to, at the conclusion of the JPay Program, or upon the purchaser's release from prison. The value of a product, content, or service that will cease to exist or the consumer will cease to have access to is substantially less than a product, content, or service that the consumer can utilize and enjoy throughout their lifetime.

140.   This failure to disclose material aspects of the JPay Program leads consumers to believe they were purchasing products, content, and services

which were substantially more valuable and desirable than the product they ultimately received.

141.  Labeling and representing these products to consumers as theirs to own upon purchase is extremely misleading, as consumers are unknowingly induced into purchasing less desirable, less useful products, content, and services, expecting the quality and the implied warranty that these products, content, and services will be accessible to the consumer forever.

142.  Defendant JPay's advertised "leading technology" consists of massive over-pricing (price-gouging) of digital music, the inability to maintain even nominal amounts of Plaintiff and the Class' data, incredibly slow and virus-ridden computer kiosks that seize up constantly, antiquated software filled with "glitches" and viruses, and digital devices that are equally filled with these same "glitches" such that even the most basic utilization of the devices cause the devices to seize up, shut down, freeze, lose files, move apps or disconnect them, black out, lose photographs, and change names on email flies, often resulting in the complete loss of the functionality or purpose the prisoner was induced to purchase and did in fact purchase into the program.

143.  JPay is fully aware of the dozens of serious flaws with their JPay Program system and software, including, but not limited to, their email recording and transmission, their music and game services, their tablet devices, and their

incredible defective software which ruins devices. Despite this, JPay refuses to solve these problems or provide any reasonable relief to Plaintiff and the Class.

144.   Defendant's labels, advertisements, and representations throughout the JPay Program are false, misleading, and reasonably likely to deceive the public.

145.   Accordingly, by failing to specify material aspects of the products, content, services, and features in JPay Program advertisements and representations, and failing to disclose the fraudulent, deceitful, and defective nature of the JPay program as a whole, Defendant misrepresent to consumers that the JPay Program's products, content, and services they are purchasing have the quality, value, accessibility, and usefulness as represented.

146.   Plaintiffs suffered enormous economic loss as well as violations of their fundamental rights throughout the contract period of the JPay Program.

147.   Defendant willfully and knowingly deprived and defrauded Plaintiffs out of millions of dollars in funds, property, and digital content, willfully breached contractual promises, and caused Plaintiffs, grievance, loss, and emotional and mental distress. Defendant refused to take any fair, considerate, or reasonable steps to address their legitimate concerns, losses, and enumerated rights.

148.   As a result of Defendant's conduct, consumers, including Plaintiffs, have purchased products, content, and services from Defendant's JPay Program that misrepresented fundamental aspects of the fraudulent JPay Program while

inducing Plaintiffs' purchases, failed to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs would be deprived of their millions of dollars' worth of digital property.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF TEMUJIN KENSU

149.   During the duration of Defendant's MP3 Program, Plaintiff Temujin Kensu purchased content, products, and services from Defendant via their JPay Program.

150.   Throughout the duration of Defendant's JPay Program, and during the times he purchased content, products, and services from Defendant, Defendant advertised, represented, and induced Mr. Kensu to believe that the content, products, and services he was purchasing were his to own, and would be accessible to him, forever.

151.   Without any notice, JPay removed purchased data, products, and content from Plaintiff's JPay device, including letters and photos from his late wife that were sent to him and purchased through Defendant's stamp system.

152.   After losing his wife to a short battle with cancer, Plaintiff contacted JPay, requesting JPay to return the photos and letters from his wife that JPay had removed from his device without any permission or notification.

153. Plaintiff filed numerous complaints through Defendant's defective "Communication Center" ticket system requesting relief and an equitable solution to the numerous issues contained in Defendant's JPay program. Defendants have failed to provide any reasonable or equitable relief to Plaintiff.

154. JPay has failed to provide Plaintiff with a single receipt, digital or physical, for these purchases, nor have they provided any reasonable accounting or record for the Plaintiff's thousands of musical, digital content items.

155. Throughout the duration of Defendant's JPay Program, JPay failed to provide notice to Plaintiff that he would have limited or no access to his precious mail and photos of his lost wife, granddaughter, and family members.

156. Unknown to Mr. Kensu, the products, content, and services he purchased through Defendant JPay Program were so defective, and the only avenues available to remedy his complaints were so deficient, Mr. Kensu had no reasonable control or access to his lawfully purchased content.

157. Later, Mr. Kensu learned that the products, content, and services he purchased through Defendant's JPay Program would not, in fact, be accessible to him after the termination of Defendant's JPay Program and that Defendants could seize, delete, or restrict his access to the products, content, and services he purchased through the program.

158.   The value of the products, content, and services that contain an expiration date, and will cease to be accessible after a certain point, is substantially less than receiving products, content, and services that are owned and accessible to Mr. Kensu forever.

159.   Defendant marketed, advertised, solicited, represented, and sold products, content, and services through their JPay Program to consumers in a manner that was inconsistent with the manner a reasonable consumer would believe a trusted business would conduct themselves.

160.   As a result of Defendant's deceptive and unfair practices regarding the marketing, advertising, and soliciting of products, content, and services sold through their JPay Program, as well as the defective nature of the products contained in the program and the program as a whole, Mr. Kensu did not receive the quality, usefulness, and expected value of the products he purchased.

161.   Mr. Kensu's dealings with Defendant in connection with the purchase of products, content, and services throughout Defendant's JPay Program is typical of other customers of Defendant's JPay Program.

162.   Mr. Kensu and all other members of the Class overpaid for Defendant's JPay Program content, products, and services, because the product, content, or service received did not provide the benefits promised, as Defendant provided

consumers with lesser grade, less desirable products, content, and services which would cease to be accessible or restricted either by deletion by the defected program, or when the program terminated, despite Defendant representing that consumers were purchasing content, products, and services, that was theirs to own, and would be accessible to them, forever.

163. Defendant's representations as to the ownership and accessibility of MP3 products, content, and services, as well as the email and communications services they sold consumers were a material factor that influenced Mr. Kensu and other members of the Class' decision to purchase the products, content, and services from Defendant's JPay Program.

164. Mr. Kensu and other members of the Class would not have purchased the products, content, and services from Defendant's JPay Program, or would have paid materially less for them, had they known that Defendant's representations of these products, content, and services were false and misleading.

165. Mr. Kensu has continued to do business with Defendant because he is forced to do so as there is no available option. Furthermore, Mr. Kensu still has content maintained by Defendant.

166. Defendant has profited significantly from its false marketing and sale of products, content, and services represented to be of a different kind, quality, and nature, from the product actually received by the consumer.

## <u>CLASS ACTION ALLEGATIONS</u>

167.   Plaintiffs bring this action on their own behalf and on behalf of a proposed

Class of all other persons similarly situated pursuant to F.R.C.P. 23(b)(2) and

23(b)(3). This action is brought by the named Plaintiff on behalf of all

individuals who have been taken advantage of by Defendant's deceptive

practices through their advertisements and representations, specifically,

individuals who:

> Are or were prisoners incarcerated in facilities of the Michigan
> Department of Corrections and beginning in 2012, purchased
> products, content, and services from Defendant's JPay
> Program, represented by Defendant to be of a different kind,
> quality, and fundamental model than the program actually was.

168.   Excluded from the Class is Defendant; any entity in which it has a

controlling interest; any of its parents, subsidiaries, affiliates, officers,

directors, employees and members of their immediate families; members of the

federal judiciary, and counsel for the parties.

169.   Plaintiff reserves the right to expand, limit, modify, or amend this class

definition, including the addition of one or more subclasses, in connection with

Plaintiff's motion for class certification, or at any other time, based on, *inter*

*alia*, changing circumstance and/or new facts obtained during discovery.

170.   *Numerosity:* This class is estimated to be composed of between 25,000 and

50,000 Michigan prisoners who participated in Defendant's JPay Program, and

is therefore so numerous that joinder of all members is impracticable. The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts and is the most practical method for Plaintiff to challenge the policies, procedures, and practices of Defendant.

171. *Existence and Predominance of Common Questions of Fact and Law*: There are questions of law or fact common to the members of the class such that common questions predominate over questions affecting only individual members. Individual questions do not predominate over common questions because (a) each member of the Class was provided with the same or a substantially similar product, content, or service from Defendant's JPay Program; (b) each member of the Class who purchased products, content, or services from the JPay Program through Defendant was provided with less desirable products, content, or services; and (c) each member of the Class purchased products, content, or services represented to be of a certain kind or quality from Defendant's JPay Program which was less valuable, desirable, and usable as represented by Defendant, because Defendant knew, misrepresented, and did not disclose that fundamental aspects of the fraudulent JPay Program were substantially different than represented to be, while inducing Plaintiffs' purchases, and also failed to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality

of the products contained, and how ultimately, without any due process, Plaintiffs would be entirely deprived of their millions of dollars' worth of digital property either due to the defective nature of the program as a whole, or also at the termination of the JPay Program.

172. Furthermore, to assess each individual claim, only the amount of each purchase needs to be assessed. Thus, computation of damages for the Class can be readily conducted.

173. There is a well-defined community of interest in questions of law and fact affecting the Class. These questions of law and fact predominate over individual Class Members, including, but not limited to, the following:

　　a. Whether, during the Class Period, Defendant represented products to be of merchantable kind, quality, and character, and instead, provided consumers with less desirable, cheap, and unnecessary products, content, and services;

　　b. Whether Defendant represented the JPay Program to contain products, content, and services that, upon purchase, would be wholly owned, accessible, and controlled by the purchaser, forever, and instead, in inducing Plaintiffs and class members to purchase into the JPay Program, failing to disclose that either upon the program's termination, or due to the defective products and nature of the JPay program as a

whole, the products purchased could no longer be used, accessed, or controlled by purchasers, leaving them with relatively little or no value;

c. Whether Defendant use of false and deceptive productive labeling constitutes false advertising under Michigan law;

d. Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under Michigan law;

e. Whether Defendant misrepresented and/or failed to disclose material facts about the JPay Program;

f. Whether Defendant has made false and misleading statements of fact concerning the fundamental quality and nature of the products, content, and services represented in the JPay Program manufactured and/or sold by Defendant;

g. Whether Defendant's conduct, as alleged herein, was intentional and knowing;

h. Whether Class Members have been harmed by Defendant's conduct alleged herein;

i. Whether Class Members are entitled to damages and/or restitution; and, if so, what is the amount of revenues and/or profits Defendant

received and/or was lost by Class Members as a result of the conduct alleged herein;

j. Whether Defendant was unjustly enriched by their deceptive practices;

k. Whether Defendant is likely to continue to use false, misleading, or illegal product labeling, advertising, and representations such that an injunction is necessary; and

l. Whether Plaintiffs and Class Members are entitled to an award of reasonable attorney's fees, pre-judgment interest and costs of suit.

174. *Typicality*: The claims of the Class Representative are typical of, and not antagonistic to, the claims, violations of law, and resulting harms suffered by all Class members. Plaintiff and the Class have all been deceived (or were likely to be deceived) by Defendant's representations of the products, content, and services manufactured or sold in Defendant's JPay Program.

175. *Adequacy*: The Plaintiff Class Representative will fairly and adequately assert and protect the interests of the Class. Plaintiff's counsel knows of no conflicts of interest between the Class Representative and absent Class members with respect to the matters at issue in this litigation, the Class representatives will vigorously prosecute the suit on behalf of the Class, and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex

and class action litigation involving the prosecution of consumer fraud and violations of consumer protection statutes.  Plaintiff's attorneys have identified and investigated the claims in this action and have committed sufficient resources to represent the Class.

176.  *Superiority*: The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice. Because of the modest size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress of the wrongs complained herein on an individual basis.   The prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class. Absent class action, Class Members and the general public would likely not recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its misdeeds.

177.  All Class Members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact, including Defendant's claims regarding misrepresenting fundamental aspects of the fraudulent JPay Program while inducing Plaintiffs' purchases, failing to disclose the deceitful and extortive nature of the program as a whole, the

defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs and the Class would be deprived of their millions of dollars' worth of digital property.  Due to the scope and extent of Defendant's consistent scheme, disseminated in a massive, years-long campaign to consumers via memos, posters, and representations to consumers, it can reasonably be inferred that such misrepresentations or omissions of material  fact were uniformly made to all Class Members. In addition, it can be reasonably presumed that all Class Members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's product, content, and service representations when purchasing products, content, or services represented to be other than anticipated from Defendant.

178.  Plaintiff is informed and believes that Defendant keeps extensive computerized records of its customers through the MDOC. Defendant  has one or more databases through which a significant majority of Class Members may be identified and ascertained, and it maintains contact information, including email and home mailing addresses, through which notice of this action could be disseminated in accordance with due process requirements.

179.  A class action is an appropriate and superior method for the fair and efficient adjudication of the controversy given the following factors:

a. Common questions of law and/or fact predominate over any individual questions that may arise, and, accordingly, there would accrue enormous economies to both the Court and the Class in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b. Class members' individual damage claims are too small to make individual litigation an economically viable alternative;

c. Despite the relatively small size of individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation; and

d. No unusual difficulties are likely to be encountered in the management of this class action in that all questions of law and/or fact to be litigated at the liability stage are common to the Class.

180. To the best of Plaintiff's knowledge, no other action is pending on the subject matter of this case in any Court.

181. As such, Plaintiff seeks class certification under F.R.C.P. 23.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

182.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

183.   All purchases of content, products, and services by Plaintiffs constitute an offer by Defendant to enter into a sales contract for Defendant's JPay Program content, products, and services.

184.   By purchasing items from Defendant's JPay Program, Plaintiffs accepted Defendant's offer.

185.   Plaintiffs' tendered payment to Defendant for content, products, and services in Defendant's JPay Program. These payments constitute consideration.

186.   Accordingly, all transactions that are the subject of this Complaint are possessed of the three elements of a contract, i.e., offer, acceptance, and consideration.

187.   The contracts call for Defendant to provide access to Defendant's JPay Program, whereby Plaintiffs purchased products, content, and services intended and represented to be wholly owned, accessible, and controlled by the purchaser, forever. Instead, due to the defective nature of the JPay Program, Defendant removed or limited access, control, and the ability for Plaintiffs to maintain ownership and utilize purchases.

188.   An actual and justiciable controversy exists between Plaintiffs and Defendant concerning whether Defendant actions removing or limiting access and control over lawfully purchased content, products, and services violates Michigan law.

189.   This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et seq.*, seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) that Defendant's practices of removing or limiting access and control over lawfully purchased content, products, and services violates MCL 445.901 *et seq.*; (c) Class members are entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to Plaintiffs is appropriate; and (e) such other and further relief as is necessary and just may be appropriate as well.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

190.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

191.   The previously referenced purchases through Defendant's JPay Program are contracts which have been entered into between Plaintiffs and Defendant.

192.   Pursuant to the referenced contracts and agreements between Plaintiffs and Defendant, Defendant was to provide Plaintiffs JPay Program content,

products, and services that would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever.

193.   Defendant was further obligated pursuant to the contracts and agreements to reimburse Plaintiffs for any defect, malfunction, or issue associated with the content, product, or service purchased through Defendant's JPay Program.

194.   In exchange for these duties and obligations, Defendant received payment for the purchase price of thousands of MP3 songs, MP3 players, tablets, stamp purchases, and other products, content, and services purchased throughout the duration of Defendant's JPay Program.

195.   The Plaintiffs have performed all of the conditions required of them under the contract.

196.   Defendant breached the contract with the Plaintiffs by adopting and utilizing a defective program where a practice where Plaintiffs would maintain limited or entirely refused ownership, access, control, and use over their lawfully purchased products, content and services throughout the duration of the JPay Program, thus resulting in the consumer purchasing a product, content, or service worth substantially less than the product, content, or service Defendant was obligated to provide under the contract.

197.   As a result of Defendant's breaches of the contract, Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION**
**ACT UNDER MICHIGAN COMPILED LAWS § 445.901, ET SEQ.**

198.  Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

199.  The Defendant has, through their conduct described in this Complaint, violated the Michigan Consumer Protection Act, MCL § 445.901, *et seq.*, as unfair, unconscionable or deceptive methods, acts or practices in the conduct or trade or commerce are unlawful. *See* MCL § 445.903.

200.  Plaintiffs are considered "Persons" as that term is defined within MCL § 445.902(d).

201.  Defendant is a "Person" as that term is defined within MCL § 445.902(d).

202.  Defendant is engaged in "Trade or commerce" as that term is defined within MCL § 445.902(g).

203.  The acts, omissions, solicitations, representations, transactions, agreements and contracts at issue herein constitute "Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce" as that term is defined within MCL § 445.903.

204.  Among other things, Defendant have engaged in unfair, unconscionable, and deceptive acts or practices in violation of MCL § 445.903 (1)(c), (1)(d), (1)(e),

(1)(j), (1)(n), (1)(p), (1)(r), (1)(s), (1)(u), (1)(x), (1)(z), (1) (bb), and (1)(cc), when it non-exhaustively:

a. Advertised or represented promises in the JPay Program, including, but not limited to, content, products, and services purchased throughout the duration of the JPay Program would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever; and

b. Made false or misleading representations of facts or statements of fact material to the purchases made during the JPay Program, including, but not limited to, promises that content, products, and services that would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever, such that the customer reasonably believed the represented services to be other than it actually is; and

c. Failed to disclose or concealed the true fraudulent nature of the JPay Program, and the fact due to the defective nature of the JPay Program, consumers would be refused or have limited ownership, access, control, and use over their lawfully purchased products, content and services; and

d. Devices and functionality utilized in the JPay Program were prone to failure, effectively restricting Plaintiffs from any meaningful access,

use, or control over their lawfully purchased content, with no recourse to challenge the effective seizure of their property.

e.  Charged amounts far in excess of the list prices for the various items in an attempt to capitalize on the captive market of prisoners who were provided no meaningful choice of vendor and were those forced to pay these dramatically inflated prices or do without.

205.  Defendant's conduct described herein repeatedly occurred throughout Defendant's trade or business and as such Defendant was capable of deceiving a substantial portion of the consuming public.

206.  The facts concealed or not disclosed by Defendant are material facts in that Plaintiffs and any reasonable consumers would have considered those facts important in deciding whether to purchase products, content, and services from Defendant's JPay Program. Had Plaintiffs known that Defendant would effectively seize or limit any access, use, or control over their lawfully purchased content and products, they would not have purchased the content, products, and services from Defendant's JPay Program.

207.  Defendant intended that Plaintiffs would rely on the deception by purchasing products, content, and services through their JPay Program, unaware of the undisclosed material facts. This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

208.  Defendant's unlawful conduct is continuing, with no indication that Defendant will cease.

209.  As a direct and proximate result of the deceptive, misleading, unfair and unconscionable practices of the Defendant set forth above, Plaintiffs are entitled to actual damages, compensatory damages, penalties, attorney's fees and costs as set forth under the Michigan Consumer Protection Act and Michigan law.

210.  Defendant's deceptive, misleading, unfair and unconscionable practices set forth above were done willfully, wantonly and maliciously entitling Plaintiffs to an award of punitive damages.

## FOURTH CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENTS: RIGHT TO BE SECURE FROM UNREASONABLE SEIZURE

211.  Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

212.  By reason of their acts as set forth in this Complaint, the Defendant acted under color of state law with oppression and malice to subject the Plaintiffs to the deprivation of his rights, privileges, and immunities secured by the Constitution and laws.

213.   The Fourth Amendment protects against unreasonable searches and seizures and the Fourteenth Amendment forbids the denial of life, liberty, or property without due process of the law.

214.   The Fourth Amendment to the United States Constitution prohibits the government from unreasonably destroying or seizing a citizen's property.

215.   The Fifth and Fourteenth Amendments to the United States Constitution guarantees Plaintiffs the right not to be deprived of life, liberty, or property without due process of law.

216.   The Fourteenth Amendments to the United States Constitution guarantees Plaintiffs the right to equal protection of the laws.

217.   Defendant and their employees and agents violated Plaintiff's and the Class' rights to be free from unreasonable seizure of their property by restricting access and depriving Plaintiffs of access to Plaintiffs' purchased products, content, and services, effectively confiscating Plaintiffs' property without due process of law.

218.   These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to secure their property.

219.   Plaintiffs are informed and believe that the acts of the Defendant, their employees, and agents, were intentional in failing to protect and preserve Plaintiffs' property, and, at minimum, Defendant was deliberately indifferent

to the likely consequence that the property would be effectively and unlawfully seized, based on Defendant's past circumstances of similar constitutional and statutory violations of law.

220. As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer the loss of their personal property and are entitled to compensatory damages for their injuries.

## FIFTH CAUSE OF ACTION
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

221. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

222. Plaintiffs entered into consumer transactions with Defendant for the purchase of products, content, and services, intended and represented to be wholly owned, accessible, and controlled by the purchaser, forever.

223. Every consumer transaction imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

224. The Plaintiffs have performed all of the conditions required of them under the transaction.

225. Defendant knew or should have known that the products sold by Defendant in their JPay Program were not wholly owned, accessible, and controlled by the purchaser, forever, and was of lesser quality, and more restrictive, ownership, access, and control.

226.   Defendant's conduct, as alleged above, constitutes a breach of its duty of good faith and fair dealing, in that, among other things, it fraudulently sold and induced Plaintiffs to purchase products, content, and services that would not be owned, access, or controlled, forever, instead of products, content, and services, that would be wholly owned, accessible, and controlled by the purchaser, forever.

227.   As a result of Defendant's conduct, Plaintiffs have been damaged, including as set forth above.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

228.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

229.   Defendant had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of products, content, and services offered through Defendant's JPay Program.

230.   Defendant specifically and expressly misrepresented material facts to Plaintiffs, as discussed above. Defendant was aware that the products represented to be wholly owned, accessible, and controlled by the purchaser, forever, were not, in fact, as such.

231.   Defendant knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by Defendant's misleading and deceptive representations.

232.   Defendant was aware that the posters, memos, and representations made regarding the JPay Program's content, products, and services, representing them to be wholly owned, accessible, and controlled by the purchaser, forever, were not accurate.

233.   Plaintiffs justifiably relied on Defendant's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT

234.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

235.   Plaintiffs conferred a benefit on Defendant by purchasing Defendant's products, content, and services from Defendant's JPay Program

236.   Defendant had knowledge that this benefit was conferred upon it.

237.   Because of its wrongful acts and omissions, Defendant charged a higher price for products, content, and services throughout the duration of the JPay Program and Defendant obtained money which rightfully belongs to Plaintiffs.

238.   Defendant has been unjustly enriched at the expense of Plaintiffs and its retention of this benefit under the circumstances would be inequitable.

239.   Plaintiffs seek an order requiring Defendant to make restitution to them.

## EIGHTH CAUSE OF ACTION
## FRAUD/INTENTIONAL MISREPRESENTATION

240.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

241.   During the Class Period, Defendant was engaged in the business of designing, manufacturing, marketing, distributing, or selling MP3 and other media related products, content, services through their JPay Program, which is the subject of the present litigation.

242.   Defendant, acting through their officers, agents, servants, representatives, or employees, directly marketed and advertised JPay Program products, content, and services to consumers and delivered those products, content, and services to consumers incarcerated in the MDOC through Defendant's network of kiosks and other distribution channels.

243.   Defendant willfully, falsely, and knowingly misrepresented material facts relating to the character, nature, and quality of the JPay Program and products, content, and services contained therein. These misrepresentations were contained in the JPay Program's advertising and other marketing materials disseminated or caused to be disseminated by Defendant, and such misrepresentations were reiterated and disseminated by officers, agents, representatives, servants, or employees of Defendant, acting within the line and

scope of their authority, so employed by Defendant to merchandise and market the JPay Program and the products, content, and services contained therein.

244. These misrepresentations include, but are not limited to:

    a. The nature and qualities of the JPay products and services.

    b. Performance of the MP3 players provided by JPay.

    c. The nature and extent of difficulties with the JPay service.

245. Defendant's representations were made with the intent that the MDOC prisoner population, including Plaintiffs, would rely upon them. Defendant's representations were made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof.

246. In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs purchased products, content, and services from Defendant's JPay Program for their intended and reasonably foreseeable purposes. Plaintiffs were unaware of the existence of facts that Defendant suppressed and failed to disclose. If they had been aware of the suppressed facts, Plaintiffs would not have purchased products, content, and services from Defendant's JPay Program.

247. Plaintiffs are informed and believe, and thereon allege, that Defendant misrepresented material facts with the intent to defraud Plaintiffs. Plaintiffs were unaware of the intent of Defendant and relied upon the representations of

Defendant in deciding to purchase products, content, and services through Defendant's JPay Program.

248. Plaintiffs' reliance on the representations of Defendant was reasonable.

249. In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs purchased products, content, and services from Defendant's JPay Program, the direct and proximate result of which was injury and harm to Plaintiffs because:

    a. They would not have purchased the products, content, and services from Defendant's JPay Program on the same terms if the true facts concerning their character, nature, and quality had been known;

    b. They paid a price premium due to the mislabeling and misrepresentation of the character, quality, and nature of the products, content, and services from Defendant's JPay Program; and

    c. The products, content, and services from Defendant's JPay Program did not have the quality, functionality, or value as promised.

**NINTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

250. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

251. At all relevant times, Defendant expressly warranted that the products, content, and services purchased by Plaintiffs throughout the duration of the

JPay Program would be wholly owned, accessible, and controlled by the purchaser, forever, as indicated throughout the duration of the JPay Program by way of memos, posters, advertisements, and representations to consumers.

252. Defendant, to induce the sales, made certain express warranties and representations to Plaintiffs, both orally and in writing (including, but not limited to, the JPay Program statements contained in numerous bulletins and posters advertised to Plaintiffs, and which Defendant and their affiliates placed on display throughout MDOC facilities) and through their advertising and conduct.

253.  Defendant systematically misrepresented the products, content, and services sold in the JPay Program. Defendant acted with full knowledge that the products, content, and services, were both defective, and additionally, that the defects would cause the usefulness of or access to products, content, and services to cease or become limited. By so acting, Defendant approved of and adopted the misrepresentations in the products, content, and services provided by the JPay Program.

254.  Defendant knew and expected, or should have known and expected, and intended Plaintiff to rely on their warranties.

255.  The representations contained or constituted affirmations of fact or promises made by Defendant to Plaintiff related to the goods, and thus the affirmations

of fact or promises became part of the basis of the bargain, creating an express warranty that the goods shall conform to the affirmations of fact or promises.

256.  In purchasing Defendant's JPay Program products, Plaintiffs reasonably relied on the skill, judgment, representations, and foregoing express warranties of Defendant.

257.  These warranties and representations were false in that Defendant's JPay Program products would not actually be wholly owned, accessible, and controlled by the purchaser, forever.

258.  Because Defendant's products did not conform to Defendant's express representation, Defendant breached the warranties.

259.  As a foreseeable, direct, and proximate result of the breach of express warranties by Defendant, Plaintiffs suffered injuries and damages as alleged herein.

## TENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

260.  Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

261.  Defendant is a merchant with respect to the subject consumer products pursuant to MCL 440.2104.

262.   The products, content, and services Plaintiffs purchased through Defendant's JPay Program were subject to implied warranties of merchantability under MCL 440.2314.

263.   These implied warranties and representations, and the corresponding impressions they created included, but were not limited to, representations that the JPay Program's products, content, and services afforded consumers' the present and continued availability of all products, content, and services purchased through the JPay Program for use indefinitely.

264.   Contrary said warranties and representations, contemporaneous to and following Plaintiffs' purchases, Defendant's defective products limited and restricted access to the purchased products, content, and services of the JPay Program.

265.   As a result, Plaintiffs cannot use the products, content, and services they purchased through Defendant's MP3 Program.

266.   Defendant has been unable and/or have refused to correct this problem or to void the purchases within a reasonable time.

267.   As a direct and proximate result of Defendant's breaches of warranty, Plaintiffs have suffered damages, including the costs of purchasing products, content, and services from Defendant's JPay Program, diminished value of the products, content, and services purchased, interruption in use of the products,

content, and services, and the cost of cover including having to purchase new products, content, and services to replace the products, content, and services taken by Defendant, together with costs and attorney fees incurred in attempting to obtain relief from Defendant's wrongful conduct.

## **PRAYER**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class prays for judgment against JPay, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff and Class of similarly situated individuals:

a. Finding that this action satisfies the prerequisites for maintenance as a class action under Fed. R. Civ. 23(b)(2) and 23(b)(3), and applicable case law and certifying the Class and subclass defined herein;

b. Designating Plaintiff as representative of the Class and their counsel as Class counsel;

c. Pursuant to Plaintiff's causes of action, entering judgment awarding Plaintiff and all members of the Class restitution and/or other equitable relief, including, but not limited to, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs as a result of its unfair, unlawful, and fraudulent business practices described herein;

d. An order enjoining Defendant from continuing to violate the Michigan Consumer Protection Act, MCL § 450.901 *et seq.*

e. A judgment awarding Plaintiff and other members of the Class their costs of suit; including reasonable attorney's fees pursuant to MCL § 445.911 and as otherwise permitted by statute; and pre and post-judgment interest;

f. Such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.


Dated:  April 4, 2018


Respectfully Submitted,


EXCOLO LAW, PLLC


*/s/ Keith Altman*

Keith Altman (P81702)
Solomon Radner (P73653)
Ari Kresch (P29593)
26700 Lahser Road, Suite 401
Southfield, MI 48033
(516) 456-5885
kaltman@excololaw.com

*Attorneys for Plaintiff and the Class*