# EXHIBIT 2

2013 WL 12120519
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Alpina Productos Alimenticios, S.A., a foreign
corporation, Plaintiff,
v.
Logistic Alliance, Inc., a Florida corporation,
Defendant.

CASE NO. 12-23549-CIV-KING/MCALILEY
|
Signed 04/16/2013

**Attorneys and Law Firms**

Paul Augustus Capua, Capua Law Firm, PA, Miami, FL,
for Plaintiff.

Antonio Carmelo Castro, Robert Henry Fernandez,
Infante, Zumpano, Hudson, Miloch, Coral Gables, FL, for
Defendant.

**REPORT AND RECOMMENDATION**

CHRIS MCALILEY, UNITED STATES MAGISTRATE
JUDGE

**\*1** Pending before the Court is Defendant's Motion to
Dismiss [DE 11], referred to me by the Honorable James
Lawrence King. [DE 16]. The motion is fully briefed. [DE
15, 19]. For the reasons set forth below, I recommend that
the motion be granted in part.

**I. Background**
On October 1, 2012, Plaintiff filed a Complaint raising
five claims against Defendant: Count I, breach of
contract; Count II, open account; Count III, account
stated; Count IV, an action for price under Florida
Uniform Commercial Code § 672.709; and Count V,
unjust enrichment. [DE 1]. According to the Complaint,
Plaintiff is a Colombian corporation that manufactures
and exports food products for distribution in the United
States. [*Id.*, ¶ 1]. Defendant is a Florida corporation with
its principal place of business in Broward County, that
imports food products, for distribution and sale in the

United States. [*Id.*, ¶ 2].

According to the Complaint, in late 2007 or early 2008,
the parties entered into an agreement whereby Defendant
became a distributor for Plaintiff, and agreed to purchase
various products from Plaintiff and re-sell them in the
United States. [DE 1, ¶ 6]. Plaintiff describes the parties'
agreement as a "distribution arrangement" [*id.*], and later
as a "purchase contract for the sale of goods." [*Id.*, ¶ 14].
Throughout 2008, Defendant purchased products from
Plaintiff, which Plaintiff shipped to Defendant. [*Id.*, ¶¶ 7-
8]. Plaintiff sent Defendant invoices for the products it
ordered. [*Id.*, ¶ 7]. Plaintiff alleges that in late September
2008, Defendant's payments to Plaintiff became "erratic."
[*Id.*, ¶ 8]. Defendant later failed to pay for products it
ordered in September and October 2008. [*Id.*]. At some
point, Plaintiff contacted Defendant about the past-due
payments and was told by Defendant that payments were
forthcoming. [*Id.*]. In November and December 2008,
Defendant ordered more products, which Plaintiff
delivered; however, Defendant failed to pay for those
goods. [*Id.*]. According to Plaintiff, Defendant owes
Plaintiff $391,636.93 for goods it sold to Defendant from
September 30, 2008 through February 3, 2009. [*Id.*].

Plaintiff alleges that in 2011, Defendant "offered to
resume distribution" for it, "as part of a stated effort to
pay down its outstanding obligation." [DE 1, ¶ 9].
Thereafter, Plaintiff shipped more goods to Defendant, for
which Defendant has not paid. [*Id.*]. Plaintiff claims
Defendant owes $46,837.33 for products it sold to
Defendant from February 28, 2012 through April 30,
2012. [*Id.*]. Defendant's total outstanding debt to Plaintiff
is $438,322.26. [*Id.*, ¶ 10].

Defendant now moves to dismiss Counts I, II, III, and V
for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6). [DE 11].[1] In the alternative,
Defendant requests a more definite statement under
Federal Rule of Civil Procedure 12(e). [*Id.*].

**II. Analysis**

**A. Legal standard**
In reviewing a motion to dismiss, the court must accept as
true "well-pleaded facts and reasonable inferences drawn
from those facts. Unsupported conclusions of law or of
mixed fact and law have long been recognized not to
prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*,
334 F.3d 991, 996 (11th Cir. 2003) (citations omitted);
*Quality Foods de Centro America, S.A. v. Latin American
Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994-5 (11th

Cir. 1983) (court must assume the facts alleged as true and cast them in the light most favorable to the plaintiff). In order to survive a motion to dismiss, a plaintiff must plead enough facts to state a claim that is plausible on its face, and raises the right to relief beyond a speculative level. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-57 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). This standard requires the pleader to do more than recite elements of a cause of action or state legal conclusions. *Twombly,* 550 U.S. at 555; *Sarver v. Jackson,* 344 Fed.Appx. 526, 527 n.2 (11th Cir. 2009) (court may dismiss complaint "if it rests only on conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts.") (citation omitted).

### B. Count I: Breach of contract
**\*2** Defendant raises several arguments for dismissal of Count I. It argues that Plaintiff has failed to state a claim for breach of contract under Florida law because Plaintiff did not attach to the Complaint a copy of the contract or the invoices referenced therein and further, that this claim is vague and ambiguous. Defendant also argues that, to the extent the alleged contract at issue is oral, it is barred by the statute of frauds.

Before considering these arguments, I address the parties' dispute about the applicable law. Defendant states that Florida law applies, as this is a diversity action. [DE 11, p. 3]. Plaintiff asserts that its breach of contract claim is not necessarily governed by Florida law, because it is also subject to the United Nations Convention on Contracts for the International Sale of Goods ("CISG").[2] [DE 15, p. 5-6, n. 1]. In reply, Defendant correctly notes that Plaintiff has not pled this legal theory in its Complaint. [DE 19, p. 3]. Defendant contends that this is reason enough to dismiss this claim; in the alternative, Defendant moves for a more definite statement. [*Id.*].

A complaint must " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The Complaint does not allege that Plaintiff is entitled to recover for breach of contract under the CISG, nor does it allege any facts that plausibly establish that the CISG applies to the parties' agreement.[3] Plaintiff has not asserted a claim for breach of contract under the CISG; accordingly, at this juncture, the Court considers whether the complaint states a claim for breach of contract under Florida law. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132 (11th Cir. 2010) (in a diversity case, the Court must apply the substantive law of the state in which the case arose).

Defendant argues that the breach of contract claim should be dismissed because Plaintiff has failed to attach to the Complaint either the contract or the "goods invoices" referenced in the Complaint. [DE 11, p. 4]. This argument is without merit. While attaching to a complaint a copy of a contract or other documents material to the pleadings may be a requirement under the Florida Rules of Civil Procedure, there is no analogous rule in the Federal Rules of Civil Procedure. *See AGSC Marine Ins. Co. v. Spectrum Underground, Inc.*, No. 8:12-cv-474-T-30TGW, 2012 WL 2087441, \*2 (M.D. Fla. June 8, 2012); *see also Curi v. Pershing LLC*, No. 12-20566-CIV, 2012 WL 3042998, \*3 (S.D. Fla. July 25, 2012) (plaintiff not required to attach contract to complaint in order to state a claim for breach of contract). This is not a reason for dismissal.

**\*3** Next, Defendant contends that the Complaint does not make clear whether the contract was written or oral, and does not specify its terms. [DE 11, pp. 4-5]. It argues that the allegations about the contract are so vague and ambiguous that they do not give it fair notice of Plaintiff's breach of contract claim. [*Id.*, p. 4]. To state a claim for a breach of contract claim in Florida, a plaintiff must allege: (1) the existence of a contract; (2) a material breach; and (3) damages flowing from the breach. *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir. 1999); *Jovine v. Abbott Laboratories, Inc.*, 795 F.Supp.2d 1331, 1341 (S.D. Fla. 2011). I find that Plaintiff has not sufficiently pled the first two elements.

In a confusing fashion, Plaintiff alleges in Count I that the parties entered into a "purchase contract for the sale of goods," pursuant to which Plaintiff was to ship goods ordered by Defendant in exchange for payment. [DE 1, ¶¶ 14, 15]. In the general allegations in the Complaint, which are incorporated by reference into Count I, Plaintiff describes the contract somewhat differently, as a "distribution arrangement," and states that pursuant to the contract, Defendant agreed to purchase goods from Plaintiff and "re-sell them for distribution in the United States." [*Id.*, ¶¶ 6]. The only contractual terms this Court can discern from the Complaint are that Defendant agreed to: become Plaintiff's distributor, purchase goods from Plaintiff and distribute those goods in the United States, bear the cost associated with distributing the goods, and receive a 30% share of the revenue from those sales. [DE 1, ¶ 6]. It is not clear to the Court what the nature of the contract was, or its terms. It also is not clear whether the contract was oral or written.[4] For this reason, Count I should be dismissed, with leave for Plaintiff to file an amended complaint.

Defendant also moves to dismiss the Complaint because the alleged contract violates the statute of frauds. The statute of frauds may be pled as an affirmative defense. Fed. R. Civ. P. 8(c). An affirmative defense may be raised in a Rule 12(b)(6) motion to dismiss "only if the defense is apparent on the face of the complaint." *Westfield Ins. Co. v. Accessibility Specialists, Inc.,* No. 3:10-cv-1140-J-32TEM, 2011 WL 2911528, *3 (M.D. Fla. July 19, 2011) (citation omitted). Here, it is not clear which statute of frauds applies, and given the ambiguities in Count I, whether the alleged contract violates either statute. Thus, the statute of frauds does not cause the dismissal of Count I.

Florida has two statutes of fraud, the general statute, found at Fla. Stat. § 725.01, and the sale of goods statute of frauds in Florida's Uniform Commercial Code, found at Fla. Stat. § 672.201.[5] *See Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters of North America, Inc.,* No. 8:06-CV-421-T-30EAJ, 2008 WL 786319, *5 (M.D. Fla. Mar. 20, 2008). Pursuant to the sale of goods statute of frauds, any agreement for the sale of goods for more than $500 must be in writing to be enforceable. Fla. Stat. § 672.201(1); *see Bonilla v. Crystal Graphics Equip., Inc.,* No. 11-21470-Civ., 2012 WL 360145, *2 (S.D. Fla. Feb. 2, 2012). Some exceptions apply to this rule, which may or may not govern the contract alleged here. *See* Fla. Stat. §§ 672.201(2)-(3); *see also Bonilla, supra* (explaining exceptions). Pursuant to the general statute of frauds, a contract that cannot be performed within one year is unenforceable unless it is in writing. Fla. Stat. § 725.01; *see Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1310 n.49 (11th Cir. 1998).

**\*4** Given the confusing manner in which Count I has been pled, the Court cannot determine which statute of frauds applies, and whether the alleged contract falls within an exception to that statute. Accordingly, this ground for the motion to dismiss Count I should be denied.

### C. Count II: Open account

The elements of a claim for open account are: (1) a sales contract between a creditor and debtor; (2) where the amount claimed by the creditor represents either the reasonable value of the goods delivered or an agreed upon sales price; and (3) the goods were actually delivered. *See Evans v. Delro Indus., Inc.,* 509 So. 2d 1262, 1263 (Fla. 1st DCA 1987); *Supermedia LLC v. Pre Enterprises, LLC,* No. 8:10–cv–000647–T–30TGW, 2010 WL 2734411, *2 (M.D. Fla. July 8, 2010).[6] Plaintiff alleges the first and third elements, namely that: (1) the parties entered into an agreement whereby Defendant purchased

good from Plaintiff [DE 1, ¶ 6] and (2) the goods were delivered. [*Id.*, ¶¶ 7-9]. Plaintiff does not allege that the amount it claims Defendant owes represents either the reasonable value of the goods delivered, or an agreed upon sales price. [*See id.*, ¶¶ 6-10, 22-24]. Plaintiff has failed to state a claim for open account in Count II.[7]

### D. Count III: Account stated

Under Florida law, for an account stated to exist there must be an agreement between the parties that a certain balance is correct and due and an implicit or express promise to pay the balance. *First Union Disc. Brokerage Serv., Inc. v. Milos,* 997 F.2d 835, 841 (11th Cir. 1993); *Mercado v. Lion's Enter., Inc.,* 800 So.2d 753, 756 (Fla. 5th DCA 2001). An account stated may be established through "the practice of periodic billing in the regular course of dealing ... if no objection to the amount of the bill is made within a reasonable time." *First Union,* 997 F.2d at 841 (quoting *FDIC v. Brodie,* 602 So.2d 1358, 1361 (Fla. 3rd DCA 1992)); *see American Moisture Control, Inc. v. Dynamic Bldg. Restoration, LLC,* No. 6:06-cv-1908-Orl-28KRS, 2008 WL 4107131, *4 (M.D. Fla. Sept. 2, 2008) (same).

**\*5** Here, Plaintiff alleges that the parties entered into an agreement wherein Defendant purchased particular goods from Plaintiff and in turn, Plaintiff delivered the goods and billed Defendant. [DE 1, ¶¶ 6-7, 27-28]. Plaintiff further maintains that Defendant never objected to the balance due as reflected in the bills [*id.*, ¶ 29], which totals $438,322.26. [*Id.*, ¶ 30]. Plaintiff has sufficiently stated a claim for account stated in Count III.

### E. Count V: Unjust enrichment

Last, Defendant moves to dismiss Plaintiff's claim for unjust enrichment because under Florida law, a plaintiff cannot pursue a claim for unjust enrichment, a form of equitable relief, while also claiming that an express contract exists.[8] [DE 11, pp. 8-9]; *see Degirmenci v. Sapphire-Fort Lauderdale, LLLP,* 693 F.Supp. 2d 1325, 1347-8 (S.D. Fla. 2010) (recognizing that in Florida, a claim for unjust enrichment cannot stand if an express contract exists) (citing cases). Defendant's argument is unavailing. "Until an express contract is proven, however, a motion to dismiss a claim for unjust enrichment is premature." *Tracfone Wireless, Inc. v. Access Telecom, Inc.,* 642 F.Supp.2d 1354, 1366 (S.D. Fla. 2009) (citation omitted); *see Bonilla,* 2012 WL 360145 at *4; *Wells Fargo Bank NA v. BBMJ, LLC,* No. 1:11-cv-00127-MP-GRJ, 2012 WL 851649, *1 (N.D. Fla. Feb. 9, 2012) (same).

Case 2:18-cv-11086-SFC-PTM   ECF No. 13-3, PageID.309   Filed 06/01/18   Page 5 of 175

Alpina Productos Alimenticios, S.A. v. Logistic Alliance, Inc., Not Reported in F.Supp.2d...

Here, the existence of the alleged contract at issue has not been proven, nor has Defendant admitted to its existence. At this stage, it is premature to require Plaintiff to make a choice between its remedies. *See Bonilla, supra.* Accordingly, Defendant's argument must fail and this claim survives.

## III. Recommendation

For the foregoing reasons, I recommend that Defendant's Motion to Dismiss [DE 11], be **GRANTED IN PART**. Counts I (breach of contract) and II (open account) should be dismissed without prejudice. Counts III (account stated) and V (unjust enrichment) should not be dismissed. Count IV remains, as it is not the subject of Defendant's motion.

## IV. Objections

Pursuant to Magistrate Judge Rule 4(a), the parties may file written objections to this Report and Recommendation with the Honorable James Lawrence King **within fourteen (14)** days of the date of this Report and Recommendation. Failure to timely file objections shall bar the parties from attacking on appeal any factual findings contained herein. *See RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988).

RESPECTFULLY RECOMMENDED in chambers in Miami, Florida, this 16th day of April, 2013.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 12120519

### Footnotes

1    Defendant does not move to dismiss Count IV.

2    Plaintiff states that all remaining claims, Counts II-V, are brought under Florida law and "they should only apply to these proceedings to the extent the CISG were held inapplicable." [DE 15, p. 6, n.1]. It is unclear what Plaintiff means by this, but it would appear that Plaintiff asserts Counts II through V as alternative legal theories for recovery, that Plaintiff will rely upon only if it cannot proceed on its breach of contract claim under the CISG.

3    At least one decision from a court in this District suggests that the CISG applies only if all parties to the contract have their places of business in Contracting States, *i.e.*, a country that has become a party to the CISG. *See Impuls I.D. Internacional, S.L. v. Psion-Teklogix Inc.*, 234 F.Supp.2d 1267, 1270-71 (S.D. Fla. 2002) (citing CISG).

4    In its response to the Motion, Plaintiff suggests there was no written contract between the parties. [DE 15, p. 5 ("a written agreement was not alleged and is not required to support Alpina's breach of contract claim.") ].

5    The parties appear to disagree about which statute of frauds applies. Defendant argues Florida's general statute of frauds bars Plaintiff's breach of contract claim because it could not be performed in one year. [DE 15, pp. 5-6 (citing Fla. Stat. § 725.01) ]. Plaintiff responds that the contract at issue is not barred by the statute of frauds because it satisfies exceptions found in Florida's sale of goods statute of frauds. [DE 15, pp. 7-8 (citing Fla. Stat. §§ 672.201(2)-(3)) ].

6    It would appear that this cause of action may be applicable to a service contract. *See also The Law Offices of David J. Stern, P.A. v. Bank of America Corp.*, No. 11-21349-CIV, 2012 WL 112935, *4 (S.D. Fla. Jan. 12, 2012) (finding cause of action applicable to service contract).

7    Defendant contends this claim should be dismissed for another reason: because Plaintiff has pled a series of transactions between the parties, the first occurring in 2008-2009, and a second series of transactions occurring three years later, in 2012. Defendant posits that the three year gap between the transactions dooms Plaintiff's claim for open account. In doing so, Defendant relies on the *Central Ins. Underwriters, Inc. v. Nat'l Ins. Fin. Co.*, 599 So.2d 1371, 1373 (Fla. 3rd DCA 1992), which defines open account as "one which is based upon a connected series of transactions, and which has *no break or interruption.* " (emphasis added and citation omitted). That case provides no explanation or analysis of the phrase "no break or interruption," nor does it set forth the elements for a claim for open account; it is therefore, not persuasive authority on this issue. In any event, Plaintiff has failed to state a claim for open account for the reasons stated.

8    Defendant does not argue that Plaintiff has failed to state claim for unjust enrichment.

**Alpina Productos Alimenticios, S.A. v. Logistic Alliance, Inc., Not Reported in F.Supp.2d...**

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 12121510
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida,
Miami Division.

Alpina Productos Alimenticios, S.A., a foreign
corporation, Plaintiff,
v.
Logistic Alliance, Inc., a Florida corporation,
Defendant.

CASE NO. 12-23549-CIV-KING
|
Signed 05/07/2013
|
Filed 05/08/2013

**Attorneys and Law Firms**

Paul Augustus Capua, Capua Law Firm, PA, Miami, FL, for Plaintiff.

Antonio Carmelo Castro, Robert Henry Fernandez, Infante, Zumpano, Hudson, Miloch, Coral Gables, FL, for Defendant.

**ORDER DISMISSING COUNTS I AND II WITHOUT PREJUDICE AND AFFIRMING AND ADOPTING THE MAGISTRATE'S R&R**

JAMES LAWRENCE KING, UNITED STATES DISTRICT JUDGE

**\*1 THIS MATTER** comes before the Court upon the April 16, 2013 Report & Recommendation ("R&R") of Magistrate Judge Chris M. McAliley (DE #22), recommending that the Court grant in part Defendant's Motion to Dismiss (DE #11). No Objections were filed in response to the R&R.[1] The Court, having reviewed the R&R and the record, finds that the R&R contains well-reasoned recommendations.

Accordingly, after careful consideration and the Court being otherwise fully advised, it is **ORDERED, ADJUDGED,** and **DECREED** that Defendant's Motion to Dismiss (DE #11) be and is hereby, **GRANTED in part.** It is further **ORDERED, ADJUDGED, and DECREED** that the R&R (DE #22) be, and is hereby, **AFFIRMED and ADOPTED.** Counts I and II are **DISMISSED without prejudice** as factually insufficient. If Plaintiff wishes to re-plead these counts, it **SHALL** file an Amended Complaint within **thirty (30) days** of this Order.

**DONE AND ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 7th day of May, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 12121510

Footnotes

1    Objections were due April 30, 2013. *See* (DE #22, p. 11); S.D. Fla. Mag. R. 4(a)(1).

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

75 Fed.Appx. 382
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Albert BOMER, Plaintiff–Appellant,
v.
ACCESS CATALOG COMPANY; Dennis Sergent,
Grievance Coordinator at Southern Michigan
Correctional Facility, Defendants–Appellees.

No. 03–1315.
|
Sept. 4, 2003.

## Synopsis

State prisoner brought in forma pauperis § 1983 claim, alleging fraud and breach of warranty by prison vendor and prison official's wrongful acceptance of settlement. The United States District Court for the Western District of Michigan, Richard A. Enslen, J., dismissed, and appeal was taken. The Court of Appeals held that: (1) vendor was not acting under color of state law, and (2) official did not violate prisoner's rights by denying grievance.

Affirmed.

## Attorneys and Law Firms

***383** Albert Bomer, pro se, Kincheloe, MI, for Plaintiff–Appellant.

Before SUHRHEINRICH, COLE, and ROGERS, Circuit Judges.

## *ORDER*

****1** Albert Bomer, a Michigan prisoner proceeding pro se, appeals the district court order dismissing his civil rights complaint construed as filed pursuant to 42 U.S.C. § 1983. This case has been referred to a panel of the court pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon examination, this panel unanimously agrees that oral argument is not needed. Fed. R.App. P. 34(a).

Seeking monetary and injunctive relief, Bomer sued Access Catalog Company (Access) of Saint Louis, Missouri, and Grievance Coordinator Dennis Sergent. Bomer alleged that, in transactions in 1999 and 2000, Access sent him the wrong television and replaced his defective cassette player with a cheaper brand, and that Sergent improperly accepted a settlement with Access. Bomer contended that the defendants' actions constituted fraud, a breach of an extended warranty, the denial of due process and equal protection, and cruel and unusual punishment. The district court granted Bomer in forma pauperis status, screened the complaint, and dismissed the complaint for failure to state a claim. *See* 28 U.S.C. §§ 1915(e)(2), 1915A(b); 42 U.S.C. § 1997e(c).

On appeal, Bomer argues that Access was a state actor because the Michigan Department of Corrections approved the company as a prison vendor.

This court reviews de novo a district court's interpretation of the Prison Litigation Reform Act. *McGore v. Wrigglesworth,* 114 F.3d 601, 604 (6th Cir.1997). In reviewing a dismissal of a complaint for failure to state a claim, this court must accept all well-pleaded factual allegations as true. *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 405 (6th Cir.1998). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993) (citation omitted).

[1] [2] Upon review, we affirm the district court's decision for the reasons stated by the district court. First, the district court properly held that Bomer's complaint failed to state a claim for relief against Access. As a vendor selling products to prisoners in the custody of the Michigan Department of Corrections, Access was not acting under the color of state law and was not liable to Bomer under 42 U.S.C. § 1983. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Brock v. McWherter,* 94 F.3d 242, 244 (6th Cir.1996). Moreover, Bomer's complaint failed to allege sufficient facts to establish diversity jurisdiction under 28 U.S.C. § 1332(a). Although the parties are of diverse citizenship, Bomer ***384** did not establish that the amount in controversy exceeded $75,000. Because Bomer's allegations concern a television and a cassette player, "it appears to a legal certainty that the plaintiff in good faith

cannot claim the jurisdictional amount." *Massachusetts Cas. Ins. Co. v. Harmon,* 88 F.3d 415, 416 (6th Cir.1996).

**\*\*2** [3] Second, the district court properly held that Bomer's complaint did not state a claim against Sergent. Bomer alleged that Sergent conspired with Access by agreeing to settle Bomer's claim against the company, and asked for $10,000 in damages against him. Sergent rejected Bomer's grievance concerning his cassette player and informed him that Access had reported that it gave Bomer a new one as settlement of the warranty agreement. Thus, according to Bomer's own documents, it was Bomer, not Sergent, who reached a settlement with Access. Sergent merely rejected Bomer's grievance, and a prison official cannot be held liable under § 1983 for such an action. *See Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999).

Bomer's complaint failed to state a claim against either Access or Sergent. For the foregoing reasons, we affirm the district court's order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

75 Fed.Appx. 382, 2003 WL 22097855

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Brueggemann v. NCOA Select, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 1873651
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Mark BRUEGGEMANN, on behalf of themselves
and all those similarly situated, Plaintiff,
v.
NCOA SELECT, INC., (d/b/a National Cellular
Owners Association); Overstock.Com, Inc., and
Does 1 through 100, inclusive, Defendants.

No. 08–80606–CIV.
|
June 30, 2009.

**Attorneys and Law Firms**

Joseph Anthony Osborne, Babbitt Johnson Osborne &
Leclainche, West Palm Beach, FL, Stuart C. Talley,
Kershaw Cutter & Ratinoff LLP, Sacramento, CA, for
Plaintiff.

Valerie B. Greenberg, Akerman Senterfitt, Miami, FL,
Julie Simone Sneed, Fowler White Boggs Banker, Tampa,
FL, J. Tullos Wells, James E. Perschbach, Natalie C.
Rougeux, Bracewell & Giuliani LLP, San Antonio, TX,
for Defendants.

*OPINION AND ORDER*

KENNETH A. MARRA, District Judge.

**\*1** This cause is before the Court upon Defendant NCOA
Select, Inc.'s Motion to Dismiss First Amended
Complaint (DE 19) and Defendant Overstock.com, Inc.'s
Motion to Dismiss First Amended Complaint, Stay
Pending Arbitration and/or Transfer Venue (DE 22). On
May 8, 2009, the Court heard oral argument on the
motions. The motions are fully briefed and ripe for
review. The Court has carefully considered the motions
and is otherwise fully advised in the premises.

*The First Amended Complaint*

Plaintiff Mark Brueggemann ("Plaintiff"), a California

resident, brings a class-action suit against Defendants
NCOA Select, Inc. ("NCOA") and Overstock.com, Inc.
("Overstock") (collectively "Defendants") for breach of
contract (count one); violation of the Florida Deceptive
and Unfair Trade Practices Act pursuant to Florida Statute
§ § 501.201 and 634.435 (counts two and three); unjust
enrichment (count four); breach of express warranty
(count five) and declaratory relief (count six). The
allegations of the First Amended Complaint are as
follows: On or about January 17, 2007, Plaintiff made an
online purchase of a cellular telephone from Overstock.
As part of the purchase process, Overstock advertised a
number of additional options and accessories, including
an option for insurance. (First Am. Compl. ¶ 15.) After
clicking on the option for insurance, Plaintiff was
informed that the phone would be "covered for repair or
replacement with no deductible" and that covered
incidents included "loss of the wireless device." At the
same time, the "fine print" of the advertisement states that
"negligence, water damage or loss" is not covered. (First
Am. Compl. ¶ 16.) Plaintiff purchased the insurance plan
and, after losing his cellular telephone, reported the loss.
(First Am. Compl. ¶ ¶ 17–18.) The claim was denied
under the "loss, unexplained disappearance, negligent
loss" exclusion. (First Am. Compl. ¶ 19.)

Overstock's website led Plaintiff to believe that the
insurance he purchased was offered by Overstock. Only
after his claim was denied did Plaintiff learn that
Overstock had "secretly redirected" him to a website
known as Inphonic, Inc., the website where Plaintiff
purchased the telephone and insurance issued by NCOA.
(First Am. Compl. ¶ 21.) Overstock and NCOA conspired
to confuse consumers into believing that the NCOA
insurance was an Overstock product. (First Am. Compl. ¶
23.) Neither Overstock nor NCOA was licensed to sell
insurance. (First Am. Compl. ¶ 24.)

In addition, Overstock imposed unconscionable contract
provisions on consumers purchasing through its website
by including the following "fine print:" "By submitting
your order, you are agreeing to our terms and conditions."
The terms and conditions are never specifically disclosed
to consumers. These "oppressive" terms include a
disclaimer of liability for any activities that occur on their
website, requiring consumers to submit their claims to
binding arbitration in Utah and pay the arbitration fees,
prohibiting class actions, and permitting Overstock to
avoid arbitration for certain disputes. Plaintiff never saw
or agreed to these terms. (First.Am.Compl.¶ 22.)

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

### OVERSTOCK'S MOTION TO COMPEL ARBITRATION

**\*2** Overstock has moved to stay the case pending arbitration, claiming that Plaintiff has agreed to participate in a binding arbitration to resolve all disputes arising out of his use of and purchasing from the Overstock website. Overstock has submitted an affidavit from Jonathan Johnson, the president of Overstock. Mr. Johnson states that all retail purchases made from Overstock are conducted through its website, and that when an individual accesses the website, he or she accepts Overstock's terms and conditions which include the arbitration agreement. (Johnson Affidavit ¶ 5, DE 22–2.) In fact, prior to entering the website, individuals are told, "[e]ntering this Site will constitute your acceptance of these terms and conditions. If you do not agree to abide by these terms, please do not enter the Site." (Terms and Conditions, DE 22–2.) The arbitration agreement found in the terms and conditions states, in relevant part, that "[a]ny dispute relating in any way to your visit to the Site or to products you purchase through the Site shall be submitted to confidential arbitration in Salt Lake City, Utah." (Arbitration Agreement, DE 22–2.)

Plaintiff responds that he never agreed to arbitration and that arbitration clause in Overstock's terms and condition are unconscionable. After careful consideration, the Court finds that Plaintiff's claims against Overstock are subject to arbitration.

There is a strong federal policy supporting arbitration agreements. See *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). One of the purposes of the FAA is "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Arbitration agreements must be "rigorously enforce[d]" by the courts and courts must compel arbitration if the parties have agreed to arbitrate the dispute. *Id.* at 221; 9 U.S.C. § 3. Accordingly, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Chastain v. Robinson–Humphrey Co., Inc.,* 957 F.2d 851, 854 (11th Cir.1992) *citing Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *see Telecom Italia v. Wholesale Telecom Corp.,* 248 F.3d 1109, 1114 (11th Cir.2001) (a court cannot require parties to arbitrate disputes that they have not previously agreed to arbitration). Significantly, "[t]he party seeking to avoid arbitration must unequivocally deny that an agreement to arbitrate was reached and must offer 'some evidence' to substantiate the denial." *Wheat, First Securities, Inc. v.*

*Green,* 993 F.2d 814, 817 (11th Cir.1993).

Here, the broad language of the arbitration agreement clearly encompasses Plaintiff's disputes with Overstock. Furthermore, Plaintiff has not provided any sworn statements or evidence in support of his contention that he never saw or agreed to Overstock's terms and conditions. In contrast, Overstock has provided evidence that supports a finding that the parties agreed to arbitrate the type of dispute brought by Plaintiff. Based on this evidence, the Court finds that the dispute is subject to arbitration.

**\*3** Nonetheless, Plaintiff challenges the enforcement of the agreement to arbitrate by arguing that the agreement is procedurally and substantively unconscionable. Specifically, Plaintiff states that the arbitration is prohibitively expensive and that the forum selection clause and class action bar are unconscionable. "Under Florida law, [a][p]laintiff carr[ies] the burden of establishing that the arbitration provision at issue is both procedurally and substantively unconscionable."[1] *Sanders v. Comcast Cable Holdings, LLC,* No. 3:07–cv–918–J–33HTS, 2008 WL 150479, at \* 6 (M.D.Fla. Jan.14, 2008); *Murphy v. Courtesy Ford, LLC,* 944 So.2d 1131, 1134 (Fla.Dist.Ct.App.2006); *Gainesville Health Care Ctr., Inc. v. Weston,* 857 So.2d 278, 288 (Fla.Dist.Ct.App.2003). "The procedural component of unconscionability relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms." *Voicestream Wireless Corp. v. U.S. Communications, Inc.,* 912 So.2d 34, 39 (Fla.Dist.Ct.App.2005). Substantive unconscionability requires a determination that the "the terms of the contract are so outrageously unfair as to the shock the judicial conscience." *Sanders,* 2008 WL 150479, at \* 6.

With respect to procedural unconscionablility, Plaintiff argues that Overstock's terms and conditions constitute an adhesion contract that does not allow consumers to bargain with the terms. In support, Plaintiff cites to *Powertel, Inc. v. Bexley,* 743 So.2d 570 (Fla.Dist.Ct.App.1999). There, the court examined an arbitration clause that was added to a cellular telephone service contract with existing customers. The arbitration clause was sent to customers as an insert to monthly bills and customers could not reject the arbitration provision and continue to use the service plans they had already purchased. Furthermore, those customers had previously purchased equipment and obtained telephone numbers that were compatible only with the company's service. Based on these factors, that court held that the arbitration

clause was procedurally unconscionable. *Id.* at 575. While Overstock admits that the terms and the conditions state that individuals should not enter the website unless they agree to abide by the terms and conditions, that fact does not, standing alone, render the arbitration agreement procedurally unconscionable. *See Rivera v. AT & T Corp.,* 420 F.Supp.2d 1312 (S.D.Fla.2006) (a contract of adhesion is not "automatically" procedurally unconscionable). Significantly, none of the other factors present in *Powertel* are present here. Lastly, although Plaintiff states that consumers are never confronted with the terms and conditions and/or are forced to agree to them, Plaintiff has not produced any evidence for the Court to consider on this point.

Next, the Court will consider the arguments relating to substantive unconscionability. The Court begins by rejecting Plaintiff's argument that the class action bar in Overstock's terms and conditions is unconscionable.[2] The Eleventh Circuit has held that class action waivers in arbitration agreements are valid and enforceable, especially when the plaintiff would still be entitled to attorney's fees awards. *See Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359 (11th Cir.2005) (claims brought pursuant to statutes that provided for an award of attorney's fees); *Jenkins v. First American Cash Advance of Georgia, LLC,* 400 F.3d 868 (11th Cir.2005) (arbitration agreement permitted the prevailing party to receive an award of attorney's fees if allowed by statute or applicable law); *cf. Dale v. Comcast Corp.,* 498 F.3d 1216, 1221 n. 8 (11th Cir.2007) (noting the significance of the ability to recover attorney's fees in determining the enforceability of a class action waiver in an arbitration agreement). Here, Plaintiff has brought a FDUTPA claim, which permits attorney's fees to prevailing plaintiffs. Florida Statute § 501.2105. Thus, the class action waiver is not unconscionable. *Sanders,* 2008 WL 150479, at * 10.

**\*4** Equally unavailing is Plaintiff's contention that the disclaimer of liability in Overstock's terms and conditions is substantively unconscionable.[3] Regardless of whether the limitation of liability is valid under the law, the severability clause[4] contained in Overstock's terms and conditions does not affect the intent of the parties to arbitrate. *Alterra Healthcare Corp. v. Bryant,* 937 So.2d 263 (Fla.Dist.Ct.App.2006) *quoting Voicestream Wireless Corp. v. U.S. Communications, Inc.,* 912 So.2d 34 (Fla.Dist.Ct.App.2005) ("where the contract contains a severability clause, [its] presence does not require a holding that the arbitration agreement is [ ] unenforceable."); *see Healthcomp Evaluation Svcs. Corp. v. O'Donnell,* 817 So.2d 1095, 1098 (Fla.Dist.Ct.App.2002).

Turning to Plaintiff's argument that arbitration is Utah is prohibitively expensive, the Court notes that Plaintiff, not Defendant, bears the burden to show the likelihood of incurring prohibitive costs from arbitration. *Anders v. Hometown Mortgage Svcs., Inc.,* 346 F.3d 1024, 1028 (11th Cir.2003) *citing Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) ("a party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, [ ] bears the burden of showing the likelihood of incurring such costs.") Plaintiff has failed to meet this burden, which mitigates against a finding of substantive unconscionability. This is particularly the case here, where Defendant has offered to pay Plaintiff's arbitration fee, and Plaintiff, who is from California, has chosen to litigate the case in Florida. The Court is hard-pressed to understand how litigating this case in Florida is any less of a financial burden than arbitrating the case in Utah.

Lastly, the arbitration agreement includes a provision reserving Overstock's ability to seek relief for violations of its intellectual property rights.[5] It is true that "where one party is bound to arbitration of its claims but the other is not, there can be substantive unconscionability." *Hialeah Automotive, LLC v. Basulto,* ⎯ So.2d ⎯, 2009 WL 187584, at * 4 (Fla.Dist.Ct.App. Jan.28, 2009); *see Palm Beach Motor Cars Ltd. v. Jeffries,* 885 So.2d 990, 992 (Fla.Dist.Ct.App.2004); *Bellsouth Mobility LLC v. Christopher,* 819 So.2d 171, 173 (Fla.Dist.Ct.App.2002). However, given that Plaintiff has been unable to show the arbitration agreement was procedurally unconscionable, it is unnecessary to address whether this provision renders the agreement substantively unconscionable. *See Sanders v. Comcast Cable Holdings, LLC,,* 2008 WL 150479, at * 6 (Under Florida law, [a][p]laintiff carr [ies] the burden of establishing that the arbitration provision at issue is *both* procedurally and substantively unconscionable.") (emphasis added).

Based on the foregoing, the Court finds that the arbitration agreement is not unconscionable and therefore must be enforced.[6] Thus, Plaintiff is bound to arbitrate his claim against Overstock and the case against Overstock is stayed pending arbitration.

### *NCOA'S MOTION TO DISMISS*

**\*5** NCOA moves to dismiss the First Amended Complaint in its entirety. NCOA argues that the claim for breach of

the covenant of good faith and fair dealing must be dismissed because Plaintiff does not allege an express contract provision. With respect to the FDUTPA claim, NCOA claims that this statute is inapplicable to injuries that did not occur within Florida's borders. Next, NCOA also claims that Plaintiff cannot pursue an unjust enrichment claim when an express contract exists. Furthermore, NCOA contends that the claim for breach of express warranty must fail because Plaintiff has not identified any specific warranty. In addition, NCOA attacks the declaratory claim, contending that declaratory judgment is inappropriate when a plaintiff has not pled that he is uncertain about his rights. Lastly, NCOA challenges the allegations pertaining to the class action.

### Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed.R.Civ.P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (internal citations omitted). When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### Discussion[7]

#### A. Count I

NCOA seeks dismissal of this claim and argues that the claim for breach of the covenant of good faith and fair dealing must be dismissed because Plaintiff does not allege breach of an express contractual provision.

This claim is labeled "breach of contract" and alleges that an insurance contract to replace cellular telephones that

were lost, damaged or stolen existed between Defendants and the class. Plaintiff states that Defendants breached the contract by relying on exclusions in the contract. In addition, Plaintiff also states that Defendants have breached the covenant of good faith and fair dealing. (First Am. Compl. ¶ ¶ 42–44.) After reviewing the First Amended Complaint, the Court has determined that this claim must be re-pled.

To begin, while this claim seeks relief from both Defendants, the factual allegations preceding this count appear to state that Plaintiff entered into the insurance contract with NCOA, not Overstock. (First Am. Compl. ¶ ¶ 12–14, 18–21.) Paragraphs 41 through 46 of the First Amended Complaint, however, are lodged against both Defendants. Given that the claims against Overstock are stayed pending arbitration, this count must be re-pled to identify NCOA as the entity which offered Plaintiff insurance and breached the contract. On the other hand, if Plaintiff intended to bring this claim solely against Overstock, this claim cannot be pursued at this time. Next, although this count is labeled "breach of contract," this count does not allege a breach of contract. Instead, it is alleged that the contract contains exclusions and that Defendants breached the contract by relying on these exclusions. (First Am. Compl. ¶ ¶ 43–44.) Of course, reliance on a contract's exclusion cannot constitute a breach of a contract.

**\*6** Finally, with respect to a claim for the breach of the covenant of good faith and fair dealing, the Eleventh Circuit has held that "a claim for a breach of implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Centurion Air Cargo, Inc. v. United Parcel Svc. Co.,* 420 F.3d 1146, 1152 (11th Cir.2005); *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1316 (11th Cir.1999). The breach of the implied covenant of good faith and fair dealing is not an independent cause of action but attaches instead to the performance of a specific contractual obligation. *Centurion Air,* 420 F.3d at 1151; *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 896 So.2d 787, 792 (Fla.Dist.Ct.App.2005). In addition, a breach of the implied covenant of good faith and fair dealing cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim. *Enola Contracting Svcs, Inc. v. URS Group, Inc.,* No. 5:08cv2–RS–EMT, 2008 WL 1844612, at * 3 (N.D.Fla. Apr.23, 2008); *Trief v. American General Life Ins. Co.,* 444 F.Supp.2d 1268, 1270 (S.D.Fla.2006); *Shibata v. Lim,* 133 F.Supp.2d 1311, 1319 (M.D.Fla.2000). Plaintiff has failed to comply with these legal requirements. If Plaintiff attempts to re-plead this claim, he must identify the

express contractual provision allegedly breached and he must take care not to duplicate the allegations supporting the breach of contract claim.

For the foregoing reasons, the breach of contract claim is dismissed and Plaintiff is granted leave to amend.

### B. Counts II and III

NCOA moves to dismiss Plaintiff's FDUTPA claims, arguing that this statute only applies to claims where the "allegedly illegal conduct took place entirely in Florida." In making this argument, NCOA relies upon *Millennium Communications & Fulfillment, Inc. v. Office of Attorney General,* 761 So.2d 1256 (Fla.Dist.Ct.App.2000). In this case, the Florida Office of the Attorney General brought suit under FDUTPA against a Florida corporation that solicited consumers located outside the state of Florida. *Id.* at 1257. The corporation moved to dismiss on the grounds that FDUTPA was inapplicable to its transactions with non-Florida consumers. *Id.* at 1259. The court rejected this argument, stating that FDUTPA does not limit the Attorney General's enforcement authority to transactions only involving Florida residents. *Id.* at 1261. Furthermore, the court went on to state that FDUTPA seeks to prohibit unfair and deceptive practices "which have transpired within the territorial boundaries of this state without limitation." *Id.* at 1262. The Court does not read this case as prohibiting a FDUTPA claim against NCOA, a Florida corporation, which allegedly solicited consumers outside of the state of Florida with deceptive advertising. Instead, this case provides ample authority to find that Plaintiff can bring a claim against NCOA, a Florida corporation, that allegedly harmed consumers located outside of Florida.[8] *See also Renaissance Cruises, Inc. v. Glassman,* 738 So.2d 436 (Fla.Dist.Ct.App.1999) (FDUTPA is applicable to both in-state and out-of-state residents in a class action).[9]

**\*7** Here, Plaintiff has alleged harm from false advertising; *i.e.,* that the advertisement stated that the device protection service would protect him against loss of his cellular telephone. After making his insurance claim, NCOA informed Plaintiff that "loss" was an exclusion under the policy. As a result, Plaintiff suffered the monetary loss stemming from his purchase of the insurance policy. (First Am. Compl. ¶ ¶ 16–19.) Based on these facts, Plaintiff has stated a cause of action under the FDUTPA. *See Tuckish v. Pompano Motor Co.,* 337 F.Supp.2d 1313, 1320 (S.D.Fla.2004) (to state a claim under FDUTPA, an individual must "allege sufficient facts to show that he has been actually aggrieved by the unfair or deceptive act committed by the seller in the course of trade or commerce").[10]

Based on the foregoing, the Court denies NCOA's motion to dismiss the FDUTPA claims.

### C. Count IV

Plaintiff's cause of action for unjust enrichment alleges that Defendants have been unjustly enriched through the sale of false and misleading insurance policies. According to NCOA, this claim is subject to dismissal because an unjust enrichment claim cannot survive when an express contract exists.

Even assuming that Plaintiff chooses to amend and pursue the now-dismissed breach of contract claim, Plaintiff would not be prevented from pursuing an alternative claim for unjust enrichment. Simply put, NCOA's argument ignores the basic tenet of alternative pleading under Rule 8(d)(2) of the Federal Rules of Civil Procedure. *Mancini Enterprises, Inc. v. American Exp. Co.,* 236 F.R.D. 695, 698–99 (S.D.Fla.2006). While Plaintiff can only recover once for the same actual damages, regardless of the number of alternative theories presented, he is not barred against pleading unjust enrichment simply because he has also pled breach of contract in count one. "Until an express contract is proven, a motion to dismiss a claim for ... unjust enrichment on these grounds is premature." *Williams v. Bear Stearns & Co.,* 725 So.2d 397, 400 (Fla.Dist.Ct.App.1998).

Hence, NCOA's motion to dismiss Plaintiff's unjust enrichment claim is denied.

### D. Count V

Plaintiff alleges that Defendants have breached an express warranty provided by the insurance policy. Notably, Plaintiff does not identify the express warranty allegedly breached by NCOA. Thus, this claim against NCOA must be re-pled and Plaintiff must take care to identify the warranty at issue. The Court will dismiss this claim and grant Plaintiff leave to amend against NCOA.

### E. Count VI

The Declaratory Judgment Act, 28 U.S.C. § 2201 states in pertinent part:

> (a) In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing

Brueggemann v. NCOA Select, Inc., Not Reported in F.Supp.2d (2009)

of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**\*8** 28 U.S.C. § 2201. The Supreme Court has held that "[t]he Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Public Affairs Associates, Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). "The declaratory judgment is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy, and an adjudication would serve a useful purpose." *Allstate Ins. Co. v. Employers Liability Assur. Corp.,* 445 F.2d 1278, 1280 (5th Cir.1971).[11] "The purpose behind the Declaratory Judgment Act is to afford a[ ] form of relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Casualty Indem. Exch. v. High Croft Enter.,* 714 F.Supp. 1190, 1193 (S.D.Fla.1989). The Declaratory Judgment Act "permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty." *See* 10B C. Wright & A. Miller, *Federal Practice & Procedure,* Civil 3d § 2751 (2004).

Plaintiff seeks a declaration that the exclusions in the insurance contract cannot be used to deny the claims of consumers who report having lost their cellular telephones. (First Am. Compl. ¶ 69.) Plaintiff has failed to articulate a rationale for the Court to declare that the exclusions in the insurance contract should not be enforced. Therefore, the Court will dismiss this claim and grant Plaintiff leave to amend this claim against NCOA.

*F. Class Allegations*

After reviewing NCOA's argument relating to the class action allegations and taking into account Plaintiff's concession at the oral argument that the class must be narrowed to only include those individuals who actually made a claim under the insurance policy, the Court will allow Plaintiff to amend the complaint. In so doing, Plaintiff should comply with Local Rule 23.1 of the Southern District of Florida.

*Conclusion*

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) NCOA's Motion to Dismiss First Amended Complaint (DE 19) is **GRANTED IN PART AND DENIED IN PART.**

2) Overstock's Motion to Dismiss First Amended Complaint, Stay Pending Arbitration and/or Transfer Venue (DE 22) is **GRANTED** to the extent it seeks a stay pending arbitration. If appropriate, Plaintiff may seek to enforce an arbitration award that may be awarded in his favor.

3) Plaintiff is granted leave to amend the First Amended Complaint in accordance with the directives set forth in this Order. Moreover, each count shall set forth one claim per count and state with specificity both the factual and legal basis for the claim it sets forth.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 29th day of June, 2009.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1873651

Footnotes

1   "The FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically." *Bess v. Check Express,* 294 F.3d 1298, 1306 (11th Cir.2002) citing *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

2   Specifically, the arbitration agreement states that "no arbitration under this Agreement shall be joined to an arbitration involving any other party subject to this Agreement, whether through class arbitration proceedings or otherwise." (Arbitration Agreement.)

3   This provision states as follows: "Under no circumstances shall Overstock.com or its Associates be liable for any direct, indirect, incidental, special or consequential damages that result from the use of or inability to sue the Site, including but not limited to

reliance by a user on any information obtained at the Site, or that result from mistakes, omissions, interruptions, deletion of files or e-mail, errors, defects, viruses, delays in operation or transmission, or any failure or performance, whether or not resulting from acts of God, communications failure, theft, destruction or unauthorized access to Overstock.com records, programs or services. The foregoing limitation of liability shall apply whether in an action of contract, negligence, or other tortious action, even if an authorized representative of Overstock.com has been advised or should have knowledge of the possibility of such damages. You hereby acknowledge that this paragraph shall apply to all content, merchandise and services available through the Site. Because some states do not allow the exclusion or limitation of liability for consequential or incidental damages, in such states liability is limited to the fullest extent permitted by law." (Terms and Conditions.)

4      The severability clause states that "[i]f any of the[ ] [Terms and Conditions are] deemed invalid, void or for any reason unenforceable, that condition shall be deemed severable and shall not affect the validity and enforceability of any remaining condition." (Terms and Conditions.)

5      "[A]ny dispute relating in any way to your visit to the Site or to products you purchase through the Site shall be submitted to confidential arbitration in Salt Lake City, Utah, except that, to the extent you have in any manner violated or threatened to violate Overstock.com's intellectual property rights, Overstock.com may seek injunctive or other appropriate relief in any state or federal court in the state of Utah, and you consent to exclusive jurisdiction and venue in such courts." (Arbitration Agreement.)

6      The Court need not address the remaining arguments made by either Plaintiff or Overstock, given that the case will proceed to arbitration.

7      Given that the Court is granting the stay as to Overstock, the Court will not consider the merits of any of the claims asserted in the First Amended Complaint against Overstock pending resolution of the arbitration.

8      With respect to Defendant's citation to *Hutson v. Rexall Sundown, Inc.,* 837 So.2d 1090 (Fla.Dist.Ct.App.2003), the Court notes that *Hutson* addressed whether common issues of law existed among members of a nationwide class in a FDUTPA claim. This argument is more appropriate at the class certification stage, rather than at the pleading stage.

9      NCOA points to language in *Millennium* that states "the allegations in this case reflect that the offending conduct occurred entirely within this state" as support for its position. The complete sentence, however, states that "where the allegations in this case reflect that the offending conduct occurred entirely within this state, we can discern no legislative intent for the [Plaintiff] to be precluded from taking corrective measures under FDUTPA even where those persons affected by the conduct reside *outside of the state."* *Millennium,* 761 So.2d 1262 (emphasis added). As such, the Court finds that, at the motion to dismiss state, *Millennium* does not prevent Plaintiff from pursuing his FDUTPA claim.

10     NCOA also raises two arguments in its reply brief that it claims bars Plaintiff's FDUTPA claims. First, NCOA advances the argument that a comparison of Plaintiff's original complaint and the exhibits attached thereto show that Plaintiff never read the insurance contract. Based on that, NCOA states that Plaintiff should therefore not be permitted to bring a claim pursuant to FDUTPA on the basis that the language of the contract was unclear. NCOA also argues that the voluntary payment doctrine bars Plaintiff's claims. Of course, raising an argument in a reply memorandum does not provide Plaintiff with an opportunity to address Defendant's contentions. As such, the Court will not consider these arguments. *See* Rule 7.1(C) of the Southern District of Florida ("reply memorandum shall be strictly limited to rebuttal of matters raised in the memorandum in opposition"); *Tallahassee Mem. Regional Med. Ctr. v. Bowen,* 815 F.2d 1435, 1446 n. 16 (11th Cir.1987) ("it is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief") *citing United States v. Oakley,* 744 F.2d 1553, 1556 (11th Cir.1984).

11     The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit. *See Bonner v. Pritchard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

---

1991 WL 11010342
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan.

DART ENERGY CORPORATION, INC., a
Michigan corporation, and Dart Properties, Inc., a
Michigan corporation, Plaintiffs,
v.
Frank X. VOGEL, an individual, and Tenman
Systems, Inc., an Illinois corporation, Jointly and
Severally, Defendants.

No. 1:91–CV–184.
|
July 18, 1991.

*ORDER*

ENSLEN, J.

**\*1** In accordance with the opinion entered this date;

IT IS HEREBY ORDERED that defendants' motion to dismiss, filed April 8, 1991 (dkt.# 8), is GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that defendant Vogel is DISMISSED as a party to this action;

IT IS FURTHER ORDERED that Counts IV, V, VI and VII asserted against defendant TenMan are DISMISSED for failure to state a claim for which relief can be granted;

*OPINION*

This case is before the Court on defendants' motion to dismiss the bulk of plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(6). In February 1989, plaintiffs filed this lawsuit for breach of contract, negligent misrepresentation, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. On April 1, 1991, plaintiffs filed an amended complaint adding an additional claim that defendants allegedly violated the Michigan Consumer Protection Act. Plaintiffs seek expectation and special damages, as well as attorneys' fees and costs. This Court has jurisdiction over plaintiffs' complaint pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $50,000.

*I. Facts*

In February 1989, plaintiffs entered into a Proprietary Software Perpetual License Agreement with defendant TenMan Systems, Inc. Defendant Vogel is the director, president, secretary, treasurer, and dominant shareholder of Tenman. Plaintiffs allege that they entered the agreement based on TenMan's representations and assurances that the software would meet their expressed requirements. Plaintiffs claim that the software system does not work and that the representations, which TenMan allegedly made with the knowing approval, authorization, or acquiescence of Vogel, are now known to have been false. Plaintiffs accuse defendants of "consciously and deliberately misrepresenting the capabilities of their products to Dart and the consuming public." Brief in Support at 2.

*II. Discussion*

*A. Choice of Law*
The parties agree that in a diversity action, the Court should apply the choice-of-law provision of the forum state. *Klaxon Co. v.. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477, 1480 (1941). The general rule in Michigan is that the parties to a transaction can specify the applicable state law that will govern disputes arising out of the contract. Mich. Comp. Laws Ann. § 440.1105(1); *Homac, Inc. v. DSA Fin. Corp.,* 661 F.Supp. 776, 784 (E.D.Mich.1987). The statute provides in relevant part that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Mich. Comp. Laws Ann. § 440.1105(1). The accompanying "practice commentary" states that the test for determining whether the relationship to the forum state is appropriately related is less rigid than prior tests used to determine governing law. *Id.* Steinheimer, R., *Practice Commentary.*

**\*2** In this case, article VII of the general provisions of the agreement provides that Illinois law shall apply. Illinois is the residence of defendant sellers. Plaintiffs have made no showing that Illinois does not have a "reasonable relation" to the contract in dispute or that they did not voluntarily agree to the choice-of-law provision. Nor have plaintiffs shown that application of Illinois law would violate fundamental public policy in Michigan. Instead, plaintiffs argue that this action should be characterized as an action in tort, not a contract action because defendants' misrepresentations render the contract and its choice-of-law provision unenforceable. Thus, plaintiffs explain, Michigan law should apply because the alleged tortious acts occurred in Michigan.

I disagree with plaintiffs' reasoning that the entire action should be construed as an action in tort. Moreover, the case cited in support of their argument ruled that the place-of-the-wrong rule should *not* automatically apply to choice-of-law determinations. *See Sweeney v. Sweeney,* 402 Mich. 234, 242, 262 N.W.2d 625 (1978) (automatic application of *lex loci delicti* doctrine violates Michigan public policy under certain circumstances). This dispute arises out of a sales or license and maintenance contract between plaintiffs and defendants. At the time of contracting, the parties agreed to a forum-selection clause providing that the "validity, construction and performance of the Agreement and legal relations between the parties to this Agreement shall be governed by and construed in accordance with the laws of the State of Illinois." Agreement, General Provisions, art. VII. This clause is enforceable as long as the State of Illinois has a "reasonable relation" to the dispute at issue in this case.

I find that Illinois law should govern this dispute arising out of the parties' agreement. Plaintiffs are two corporations engaged in business in the State of Michigan. They entered into a sales or license and maintenance contract with the defendant Illinois corporation for the purchase of rights to a software package which would allegedly be instrumental in their business operations in the State of Michigan. The contract is an ongoing agreement and Michigan residents and businesses are affected by its performance. However, despite the state of Michigan's superior interest in the contract, Illinois does have a "reasonable relation" to the transaction because the sellers are residents of Illinois, conduct business under the protection of the laws of Illinois, their success reaps benefits for residents of Illinois, and, likewise, their infractions have negative effects in Illinois. By entering this agreement containing the choice-of-law provision that the parties' legal disputes would be resolved under Illinois law, plaintiffs created the

reasonable expectation that Illinois law would govern any dispute arising out of the parties' agreement. Pursuant to Michigan law, Mich. Comp. Laws Ann. § 440.1105(1), and in the absence of a showing of overreaching, undue influence, or impairment of a fundamental policy in Michigan, the parties' choice-of-law provision is enforceable.

*B. Motion to Dismiss pursuant to Rule 12(b)(6)*
**\*3** Pursuant to Federal Rules of Civil Procedure 12(b)(6), defendants request the Court to dismiss all of the claims asserted against defendant Vogel and all but the breach of contract claim asserted against defendant TenMan. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleading. *Davis H. Elliot Co., Inc. v. Caribbean Utils. Co.,* 513 F.2d 1176, 1182 (6th Cir.1975). Technically, of course, the 12(b)(6) motion does not attack the merits of the case. It merely challenges the pleader's failure to state a claim properly. 5 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1364, at 340 (Supp.1990). In deciding a 12(b)(6) motion, the court must determine whether plaintiff's complaint sets forth sufficient allegations to establish a claim for relief. The court must accept all allegations in the complaint at "face value" and construe them in the light most favorable to plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983); *Amersbach v. City of Cleveland,* 598 F.2d 1033, 1034–35 (6th Cir.1979).

The complaint must in essence set forth enough information to outline the elements of a claim or to permit inferences to be drawn that these elements exist. *Jenkins v. McKeithan,* 869 U.S. 411 (1969); *German v. Killeen,* 495 F.Supp. 822, 827 (E.D.Mich.1980). The court cannot dismiss plaintiff's complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). Conclusory allegations are not acceptable, however, where no facts are alleged to support the conclusion or where the allegations are contradicted by the facts themselves. *Vermillion Foam Prods. Co. v. Gen. Elec. Co.,* 386 F. Supp 255 (E.D.Mich.1974).

*1. Corporate Officer Liability*
Defendants argue that plaintiffs have failed to allege facts to support any legal theory for holding defendant Vogel, the corporate officer of TenMan, personally liable. Therefore, defendants assert, all of the claims against

Vogel should be dismissed pursuant to 12(b)(6).

Plaintiffs allege without dispute that Vogel is "the President, Secretary, Treasurer, dominant shareholder and a Director of TenMan Systems, Inc ....and is the moving active conscious force behind all activities and business decisions of TenMan Systems, Inc." Complaint, ¶ 2. They claim that Vogel "authorized, approved of or knowingly acquiesced in TenMan's representations to Dart though he knew or should have known at the time these representations were made that they were untrue." Complaint, ¶¶ 18 & 31. These are the only allegations expressly asserted against Vogel in the complaint.

Corporate officers, directors, and shareholders are generally protected from being responsible for the liability of a corporation because the corporation is viewed as a separate, legally distinct entity. *McCracken v. Olson Cos., Inc.,* 149 Ill.App.3d 104, 102 Ill.Dec. 594, 500 N.E.2d 487, 490 (Ill.App. 1 Dist.1986). The Illinois Court of Appeals holds that "one who seeks to have the court apply an exception must seek that relief in his pleading and carry the burden of proving actual identity." *Bevelheimer v. Gierach,* 33 Ill.App.3d 988, 339 N.E.2d 299, 303 (Ill.App.Ct. 1 Dist.1975) (citing *Divco–Wayne Sales Fin. Corp. v. Martin Vehicle Sales, Inc.,* 45 Ill.App.2d 192, 195 N.E.2d 287 (Ill.App.Ct. 1 Dist.1963)). *See also Jacobs v. Paynter,* 727 F.Supp. 1212, 1215–14 (N.D.Ill.1989) (claims asserted by corporate officer treated as claims asserted individually where no facts warranting application of the exception pled and where no exceptional circumstances identified). The appeals court explains that a court may disregard the separate identity of the corporation if it is demonstrated that justice requires it. " 'Some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction." ' *Bevelheimer,* 399 N.E.2d at 303 (quoting *American Trading & Prod. Corp. v. Fischbach & Moore, Inc.,* 311 F.Supp. 412, 416 (N.D.Ill.1970)). Thus, there is a two-part requirement that the party seeking application of the exception must satisfy: 1) the corporation is "so controlled and its affairs so conducted that it is a mere instrumentality of another;" and 2) "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chemical and Oil Corp.,* 753 F.2d 565, 570 (7th Cir.1985) (citing *Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (Ill.1981)). "The separate corporate identities will be disregarded only if the condition claimed to be unjust to creditors is a result of the abuses of the corporate form." *Id.* (citing *Macaluso v. Jenkins,* 95 Ill.App.3d 461, 50 Ill.Dec. 934, 940–41, 420 N.E.2d 251,

256–57 (Ill.1981)).

**\*4** I find that plaintiffs have not pled the necessary elements for application of an exception to the general rule of limited liability. Even if alleging that Vogel is the director, officer, and sole shareholder of the corporation were sufficient to plead actual identity between Vogel and the corporation, plaintiffs have not set forth allegations to support a finding that under these circumstances limited liability would sanction fraud or injustice resulting from abuse of the corporate form. Accordingly, I find that plaintiffs have failed to allege facts sufficient to state claims against Vogel based on derivative liability for corporate wrongs.

Derivative liability or piercing the corporate veil is not the only grounds for imposing liability on a corporate officer. The doctrine of limited liability does not protect a corporate officer from liability for his or her own wrongful acts. *Spartech Corp. v. Opper,* 890 F.2d 949, 953 (7th Cir.1989). Plaintiffs claim that Vogel "authorized, approved of or knowingly acquiesced in TenMan's representations to Dart though he knew or should have known at the time these representations were made that they were untrue." Complaint, ¶¶ 18 & 31. To the extent that plaintiffs have alleged a valid misrepresentation claim, I could find that plaintiffs have alleged facts that are sufficient to establish a basis for holding Vogel liable for his own wrongful acts. However, plaintiffs have failed to properly plead a misrepresentation claim. *See infra.* The complaint therefore fails to set forth any basis to hold defendant Vogel personally liable. Plaintiffs have alleged no valid claim to support a finding of wrongful conduct by defendant Vogel. Accordingly, Vogel is dismissed as a defendant in this action.

*2. Negligent Misrepresentation Claim*

Defendants argue that plaintiffs have failed to state a claim for negligent misrepresentation. In count IV, which plaintiffs have headed "Negligent Misrepresentation," plaintiffs allege that 1) TenMan made false representations to Dart regarding the capabilities of its software and compatibility; 2) TenMan knew or should have known that the representations were false; 3) Vogel authorized, approved of or knowingly acquiesced in TenMan's representations although he knew or should have known that the representations were untrue; and 4) Dart relied on TenMan's representations to its detriment. Complaint, count IV.

The Illinois Supreme Court has established the general rule that purely economic losses cannot be relieved in a

tort action. *Moorman Mfg. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 450–51 (Ill.1982). "Tort theory is appropriately suited for personal injury or property damage.... The remedy for economic loss ..., on the other hand, lies in contract." *Id.* at 450. There are several narrow exceptions, including an action for negligent misrepresentation or for fraudulent misrepresentation. *Id.* at 452. Two elements of a claim of negligent misrepresentation are: 1) defendant is in the business of supplying information; and 2) defendant provides the information for the guidance of others in their business relations with third parties. *Gerdes v. John Hancock Mut. Life Ins. Co.,* 712 F.Supp. 692, 696 (N.D.Ill.1989) (numerous citations omitted).

**\*5** In their response to defendants' motion, plaintiffs argue that they have met the pleading requirements, but rather than setting forth the requirements of a claim for negligent misrepresentation, however, plaintiffs assert the elements of a claim of fraudulent misrepresentation. Plaintiffs are evidently confused about what claim they are asserting. I find that plaintiffs have failed to allege facts sufficient to support a finding by any rational fact finder that the elements of a claim of negligent misrepresentation have been satisfied. Accordingly, plaintiffs' count IV claim of negligent misrepresentation is dismissed.

The allegations plaintiffs assert in count IV more closely resemble a claim of fraudulent misrepresentation. The elements of the tort of fraudulent misrepresentation are:

> 1) false statement of material fact; 2) known or believed to be false by the party making it; 3) intent to induce the other party to act; 4) action by the other party in [justifiable] reliance on the truth of the statement; and 5) damage to the other party resulting from such reliance.

*Gerill Corp. v. Jack L. Hargrove Builders, Inc.,* 128 Ill.2d (1979), 131 Ill.Dec. 155, 538 N.E.2d 530, 536 (Ill.) (quoting *Soules v. Gen. Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599 (1980)), *cert. den.,* ___ U.S. ___, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989). A representation is false if the party making it either knew it was false or recklessly disregarded its truth or falsity. *Id.* To state a claim for fraud, the party must allege all the elements in its complaint. *Stamatakis Indus., Inc. v. King,* 165 Ill.App.3d 879, 117 Ill.Dec. 419, 520 N.E.2d 770 (Ill.App.Ct. 1 dist.1987).

Plaintiffs' claim for fraudulent misrepresentation fails to state a claim for which relief can be granted because plaintiffs have not alleged that defendants intended to induce plaintiffs to act. Even if the element of intent could be implied from the facts alleged, plaintiffs' claim for fraudulent misrepresentation would fail because it is not alleged with sufficient particularity. *See Bd. of Educ. of Chicago v. A. C and S. Inc.,* 131 Ill.2d 428, 546 N.E.2d 580, 1989 Ill. LEXIS 146, at 39 (Ill.1989) (affirming dismissal where plaintiff failed to plead claim for fraudulent misrepresentation with sufficient particularity establishing elements of fraud, including what misrepresentations were made, when they were made, who made the misrepresentations, and to whom they were made).

Federal Rules of Civil Procedure 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." In *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court established the basic requirement of "notice pleading:" the complaint must give defendant "fair notice of what plaintiff's claim is and the ground upon which it rests." However, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed R. Civ. P. 9(b). Plaintiffs' pleadings in count IV do not satisfy the particularity requirement of Rule 9(b) and are insufficient to allege a valid claim of fraudulent misrepresentation. Plaintiffs do not allege what particular employee or employees made misrepresentations, when and to whom they made the misrepresentations, or what in particular the misrepresentations were.

### 3. Breach of Warranty Claims

**\*6** In count V of their complaint, plaintiffs allege that defendants breached the implied warranty of merchantability because the "software system TenMan provided to Dart is not merchantable as judged by commercial standards for goods of this kind." Complaint, count V. In count VI, plaintiffs claim that defendants' software system provided to Dart "is not fit for the particular purpose for which it was intended and is not suitable to be used for the particular purpose intended by Dart" and thus TenMan breached the implied warranty of fitness for a particular purpose. *Id.,* count VI.

Defendants argue that plaintiffs have failed to state breach of warranty claims for which relief may be granted because the agreement specifically provides: "ALL OTHER WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, ARE HEREBY

EXCLUDED." Agreement, General Provisions, art. III. Plaintiffs respond that because they entered the contract reasonably relying on defendants' misrepresentations, the contract should be unenforceable. Even if the contract is not unenforceable, plaintiffs contend that the disclaimers are unenforceable under the Magnuson–Moss Act, 15 U.S.C. § 2308(a)(1).

Because plaintiffs have not alleged a valid claim for negligent or fraudulent misrepresentation, there is no basis for the Court to decide that the contract is unenforceable. Barring other legal impediments, the disclaimer provision is thus operant. The parties agree that the Illinois Commercial Code allows for disclaimers of implied warranties of merchantability and fitness for particular purpose under certain circumstances. *See, e.g., Ill.Rev.Stat.,* ch. 26, para. 1–201(10) & 2–316(2) (1989). Plaintiffs do not argue that defendants did not comply with the Illinois statute's requirements. Rather, plaintiffs argue in their brief that defendants' disclaimers are invalid pursuant to federal law, the Magnuson–Moss Act, 15 U.S.C. § 2301, *et seq.* Plaintiffs did not, however, assert the alleged federal law violation in their complaint. Accordingly, I find that plaintiffs have failed to assert a valid claim for any breach of an implied warranty.

### 4. Michigan Consumer Protection Act Claim

Pursuant to my ruling that this action is bound by the agreement's choice-of-law provision stating that the parties' rights and obligations under the agreement shall be governed by Illinois law, I find that the Michigan Consumer Protection Act is inapplicable to the dispute at issue in this case. Accordingly, plaintiffs' count VII claim under the Michigan Consumer Protection Act is dismissed.

### 5. Damages and Attorneys' Fees Claims

In count VIII, plaintiffs seek "damages including, but not limited to, lost profits, reliance damages, consequential damages and exemplary damages," as well as reasonable costs and attorneys' fees. Defendants challenge plaintiffs right of action for such damages pursuant to the contract which limits a licensee's remedies to "replacement of the software or reperformance of services or return or credit of an appropriate portion of any payment made, or to be made, by Licensee." Agreement, General Provisions, art. IV. The agreement further provides: "Under no circumstances shall TenMan be liable to Licensee or any other person for any special or consequential damages of any character, including, without limitation, damages for loss of good will, work stoppage, computer failure or

malfunction, or any and all other commercial damages or losses." Agreement, General Provisions, art. IV.

**\*7** The parties agree that the Illinois Code provides broad latitude in which parties to a contract may limit their remedies. *Ill.Rev.Stat.,* ch. 26, para. 2–719 (1989). Parties may specifically limit or exclude consequential damages where the loss is commercial. *Id.* para 2–719(3). Moreover, parties may limit "the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods and parts." *Id.* para 2–719(1)(a).

Plaintiffs argue that they have a right to consequential damages because the contract is unenforceable due to defendants' alleged fraudulent misrepresentation. Given that plaintiffs have not asserted a valid claim for fraudulent misrepresentation, there is no support for this argument. Plaintiffs next contend that "tortfeasors are liable for *all* injuries (including consequential damages) resulting from their wrongful acts—whether foreseeable or not." Brief in Opposition at 15. Because plaintiffs have failed to assert a claim in tort, this argument is also without merit. Plaintiffs have demonstrated no reason why the Court should not find enforceable the agreement's provision limiting damages to replacement, reperformance, refund or credit. Accordingly, I find that plaintiffs have failed to assert a valid claim for lost profits, reliance damages, consequential damages, or exemplary damages.

Plaintiffs also seek reasonable attorneys' fees. The Illinois courts disfavor assessing fees against a losing party and will not do so in the absence of an agreement or statute providing for such a remedy. *McCormick v. McCormick,* 180 Ill.App.3d 184, 129 Ill.Dec. 579, 536 N.E.2d 419, 437 (Ill.App.Ct. 1 Dist.1988), *app. denied,* 545 N.E.2d 113 (Ill.1989). In this case, the agreement does not provide for an award of fees to the prevailing party and plaintiffs have cited no statute authorizing such an award. Accordingly, I find that plaintiffs have not asserted a valid claim for attorneys' fees.

### III. Conclusion

For all the reasons discussed, I find that plaintiffs' complaint fails to state claims against Vogel individually. Defendant Vogel is thus dismissed as a party to this action. I also find that counts IV, V, VI, and VII against TenMan fail to state a claim for which relief can be granted under the law. Count VIII, moreover, fails to state a claim against TenMan for consequential or other special

damages, or for attorneys' fees. Accordingly, I dismiss counts IV, V, VI, VII, and part of count VIII of plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 41(b).[1]

**All Citations**

Not Reported in F.Supp., 1991 WL 11010342

Footnotes

[1]     From my reading of defendants' brief, I find that defendants seek to dismiss all of count VIII. However, defendants have shown no cause to dismiss plaintiffs' claims for costs and for other relief the Court may deem just and equitable. I, therefore, only dismiss count VIII in part.

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Drew v. Boaters Landing Inc. of Fort Myers, Not Reported in F.Supp.2d (2007)

2007 WL 2700987
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

John DREW and Barbara Drew, Plaintiffs,
v.
BOATERS LANDING INC. OF FORT MYERS, a
Florida corporation, and Four Winns Boats LLC., a
Michigan limited liability company, Defendants.

No. 2:07-cv-252-FtM-29DNF.
|
Sept. 13, 2007.

**Attorneys and Law Firms**

Frank Anthony Pavese, Jr., Pavese Law Firm, Cape Coral, FL, for Plaintiffs.

Gregory N. Woods, Stephanie Marie Scharrer, Porter, Wright, Morris & Arthur, P.A., Naples, FL, Jeffrey D. Smith, Varnum, Riddering, Schmidt & Howlett, LLP, Kalamazoo, MI, for Defendants.

*OPINION AND ORDER*

JOHN E. STEELE, United States District Judge.

**\*1** This matter comes before the Court on Defendant Boaters Landing Inc. of Fort Myers' (BLI) Motion to Dismiss and Alternative Motion for More Definite Statement (Doc. # 22) filed on May 21, 2007. Plaintiff fled a Response in Opposition (Doc. # 25) on June 5, 2007.

**I.**

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). To satisfy the pleading requirements of Federal Rule of Civil Procedure 8, a complaint must contain a short and plain statement showing an entitlement to relief, and the statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A .,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing FED. R. CIV. P. 8). *See also Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (May 21, 2007) (citations omitted); *Erickson v. Pardus,* 127 S. Ct at 2200; *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. at 1964-65 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* at 1965. Plaintiff must plead enough facts to state a plausible basis for the claim. *Id.* Dismissal is warranted under FED. R. CIV. P. 12(b)(6) if, assuming the truth of the factual allegations of plaintiff's complaint, there is a dispositive legal issue which precludes relief. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Brown v. Crawford County,* 960 F.2d 1002, 1009-10 (11th Cir.1992).

**II.**

The First Amended Complaint (Doc. # 16) alleges the following basic facts: On March 10, 2003, plaintiffs entered into a Sales Contract with defendant BLI to purchase a new 2003 Four Winns vessel. Prior to taking delivery of the vessel, plaintiffs inspected it and noted a few defects that needed to be addressed. Plaintiffs took delivery of the vessel on March 28, 2003, and paid BLI $151,573. On seven different occasions between April 2003 to July 2004, plaintiffs notified BLI of various defects on the vessel. (Doc. # 16, ¶¶ 9, 11-16.) Plaintiffs notified BLI of more defects on December 13, 2006, some of which had been brought to BLI's attention in the past. BLI's repairs have been "incompetent or ineffectual," and it has refused to satisfactorily remedy the problems. (*Id.* ¶¶ 17, 21, 23.) Additional facts are set forth below as needed.

**III.**

**\*2** BLI's motion seeks to dismiss Counts I, II and III of the Amended Complaint.[1] Specifically, BLI argues that there are no obligations in the Sales Contract that support Counts I and II, which assert claims for breach of contract and breach of express warranty respectively. (Doc. # 22, ¶ 4.) BLI also asserts that Count III, seeking revocation of acceptance, should be dismissed either because FLA. STAT. § 672.608 does not apply to the instant case, or because plaintiffs have not alleged "a standard of conformity in this case and have failed to allege that such standard has not been met." (Doc. # 22, ¶ 6.)

### A.

The breach of contract claim in Count I of the Amended Complaint alleges that BLI "breached the terms and conditions of the Sales Contract by failing to provide Plaintiff's with a fully-functioning vessel free of defects and by failing to honor the express limited warranty." (Doc. # 16, ¶ 26.) The breach of express warranty claim in Count II of the Amended Complaint alleges that the Sales Contract includes an express limited warranty whereby Four Winns warrants that it will, through its authorized agent BLI, repair or replace defects in materials or workmanship, and that BLI has failed and refused to honor the express limited warranty. (Doc. # 16, ¶¶ 32, 33.)

Because the Sales Contract involves the sale of a good, Article 2 of the Florida Uniform Commercial Code applies. *See* FLA. STAT . § 672.102. Florida law authorizes sellers to exclude warranties, both express and implied, in the sale of goods. *See* FLA. STAT . § 672.316. To properly disclaim an implied warranty of merchantability, "the language must mention merchantability and in case of a writing must be conspicuous; and, to exclude or modify any implied warranty of fitness, the exclusion must be by a writing and conspicuous."   FLA. STAT. § 672.316(2). "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is conspicuous if it is in larger or other contrasting type or color.... Whether a term or clause is conspicuous or not is for decision by the court." FLA. STAT. § 671.201(10).

Paragraph eight of the Sales Contract, which was incorporated into the Amended Complaint (Doc. # 16, ¶ 4; # 18, pp. 1-2), is captioned "Exclusion of Warranties" and states in bold, capitalized print:

[BUYER] UNDERSTAND[s] THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESS OR IMPLIED ARE EXCLUDED BY YOU FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE GOODS SOLD. [BUYER] UNDERSTAND[S] THAT [DEALER] MAKE[S] NO WARRANTIES WHATSOEVER REGARDING THE BOAT OR RIG NOR FOR ANY APPLIANCES OR COMPONENTS CONTAINED THEREIN, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW.

**\*3** The "Exclusion of Warranties" section of the Sales Contract is conspicuous, and the Court finds that BLI effectively disclaimed any express or implied warranties in the Sales Contract.

The claim in Count I is that BLI breached the contract by "failing to provide ... a fully-functioning vessel free of defects and by failing to honor the express limited warranty." (Doc. # 16, ¶ 26.) Since the Sales Contract contained a valid exclusion of warranties as to BLI, and there are no other provisions of the Sales Contract which are alleged to have been violated, Count I fails to state a claim as to BLI. As the Amended Complaint recognized, the Express Limited Warranty was provided by defendant Four Winns, and not BLI. (Doc. # 16, ¶ 6.) Therefore the Motion to Dismiss is granted as to Count I.

Count II alleges that BLI failed "to honor the express warranty." (Doc. # 16, ¶ 34.) As stated above, the Amended Complaint correctly attributes the Express Warranty to defendant Four Winns and not BLI. Therefore BLI cannot be held liable for an express warranty made by another party. Furthermore, the contract explicitly excluded all expressed warranties by BLI. (Doc. # 18, p. 2 ¶ 8.) Since there is no breach of the Sales Contract by BLI's failure to correct the defects as the authorized agent of Four Winns, the Motion to Dismiss is granted as to Count II.

### B.

In Count III plaintiffs seek to revoke their acceptance of the vessel. Assuming the statute applies, under Florida law plaintiffs may revoke their acceptance if: (1) the nonconformity of the vessel substantially impairs its value, and (2) revocation occurs with a reasonable time. *See* FLA. STAT. § 672.608. Revocation of acceptance is

Drew v. Boaters Landing Inc. of Fort Myers, Not Reported in F.Supp.2d (2007)

not available, however, where a seller disclaims all warranties. *See e.g., Frank Griffin Volkswagen v. Smith,* 610 So.2d 597, 599 (Fla. 1st DCA 1992) ("Where a dealer has properly disclaimed all warranties, the delivering, presenting, or explaining of a manufacturer's warranty, without more, does not render the dealer a co-warrantor by adoption, ... nor does it create a contractual obligation which can serve as a basis for a buyer's later revocation of acceptance."); *Gulfwind South, Inc. v. Jones,* 775 So.2d 311, 313 (Fla. 2d DCA 2000) (finding that in order to have a valid revocation of acceptance, there must be a contractual or warranty provision setting a standard of conformity.) Therefore revocation of acceptance is not available to plaintiffs in this case, and the Motion to Dismiss is granted as to Count III.

Accordingly, it is now

**ORDERED:**

1. Defendant Boaters Landing Inc. of Fort Myers' Motion to Dismiss (Doc. # 22) is **GRANTED** as to Counts I, II, and III.

2. Defendant Boaters Landing Inc. of Fort Myers' Motion for More Definite Statement (Doc. # 22) is **DENIED** as moot.

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2700987

Footnotes

1   The Court notes that BLI's motion also seeks the dismissal of Count VII to the extent it applies to them. Plaintiffs' response indicates that Count VII only applies to defendant Four Winns Boats LLC (Doc. # 25, ¶ 3), and therefore the motion is moot as to Count VII.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   3

2008 WL 7759041
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

James D. GENTRY, et al., Plaintiffs,
v.
HARBORAGE COTTAGES–STUART, LLLP, et al.,
Defendants.

No. 08–14020–CIV.
|
Sept. 24, 2008.

**Attorneys and Law Firms**

Owen Schultz, Robert Payne Summers, McCarthy, Summers, Bobko, Wood & Sawyer, P.A., Stuart, FL, for Plaintiffs.

Sandra Jessica Millor, Greenberg Traurig, Miami, FL, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS*

K. MICHAEL MOORE, District Judge.

**\*1** THIS CAUSE came before the Court upon Defendant Harborage Cottages–Stuart, LLLP and Northside Marine Venture, LLC's Motion to Dismiss Plaintiff Charles Whitfield's Complaint (dkt # 36, and Defendant Harborage Cottages–Stuart, LLLP's Motions to Dismiss the Complaints of Plaintiffs Wesley Taber and Hagy Enterprises, Inc. (dkt # 39), Plaintiffs R. Scott Stone, Jr. and Patricia Stone (dkt # 49), and Plaintiff Cesare Palazzolo (dkt # 50).

UPON CONSIDERATION of the Motions, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I. BACKGROUND**
This case involves a group of individuals who contracted to purchase pre-construction condominiums. In February, March and May of 2005, Plaintiffs each entered into a

purchase agreement (the "Purchase Agreements") with Harborage Cottages–Stuart, LLLP ("Harborage") to purchase condominiums in Harborage Yacht Condominiums in Martin County, Florida. Plaintiffs allege that Harborage made a number of misrepresentations in materials provided to the buyers, including the Harborage Site Plan, the Dock–Slip Representations, and marketing and promotional materials, as well as verbal statements.

The alleged misrepresentations include that the condominiums: (1) are a luxury development; (2) are extraordinary; (3) blend tropical charm with contemporary elegance; (4) combine materials and finishes of exceptional quality with timeless craftsmanship; (5) provide spacious patios from which to enjoy glorious sunrises over the water; (6) that Altaian Development Corporation (the corporate parent of the Harborage) consistently delivers products and service of the highest caliber to clients and residents; (7) that no buildings or structures exist in the area to the South designated as the Future Development Site when in fact there is a large corrugated steel building; and (8) that the marketing and promotional materials for Harborage Yacht Club & Marina depict the condominium buildings, yacht club buildings and marina comprising the Harborage Yacht Club & Marina as a single project.

Certain Plaintiffs also paid deposits to Northside Marina Venture, LLC ("Northside"), for Yacht Slip Membership in the Harborage Yacht Club & Marina (the "Membership Agreement"), in reliance on the Dock Slip Agreements, which allegedly led the buyers to believe they would be able to purchase a dock slip at the marina. Plaintiffs claim that dock slips are not available to purchase and that Plaintiffs do not possess ownership in a dock slip but are merely entitled to use the dock slip while a member of Harborage Yacht Club and Marina. Plaintiffs allege they relied on the misrepresentations upon entering into the Purchase Agreements and Membership Agreements (collectively, the "Agreements"). Plaintiffs now seek to rescind the Agreements and recover their deposits because the condominiums and facilities do not conform to representations relied upon by the buyers upon entering into the Agreements and because the Agreements violate state and federal law.[1] Plaintiffs' claims include: (1) violations of the Interstate Land Sales Full Disclosure Act ("ILSFDA"); (2) rescission pursuant to publication of false and misleading information, § 718.506, Fla. Stat.; (3) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") § 501.204(1), Fla. Stat.; (4) breach of contract; (5) declaratory judgment; (6) negligent misrepresentation; and (7) fraudulent misrepresentation.

Defendants seek to dismiss each of Plaintiffs' claims

## II. STANDARD OF REVIEW

**\*2** A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milburn v. United States,* 734 F.2d 762, 765 (11th Cir.1984). On a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir.1988). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). A complaint must contain enough facts to indicate the presence of the required elements. *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1302 (11th Cir.2007). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002). However, as long as the allegations rise above a speculative level, a well-pleaded complaint will survive a motion to dismiss " 'even if it appears that a recovery is very remote and unlikely.' " *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (*overruled on other grounds by Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1959–60, 167 L.Ed.2d 929 (2007) (citation omitted)).

## III. ANALYSIS

### A. Violations of the ILSFDA
Defendants move to dismiss Plaintiffs' ILSFDA claims on grounds that the claims are time barred. Sections 1703(c) and (d) require a purchaser to demand revocation within two years of the date the purchaser signs a purchase agreement. Section 1703(c) states:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or the lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement

shall clearly provide this right.

15 U.S.C. § 1703(c).

Furthermore, under the ILSFDA, any contract in which the seller does not provide (1) a description of the property which makes such lot clearly identifiable in a form acceptable for recording, (2) a means for curing buyer default, and (3) procedures for handling seller default, "may be revoked at the option of the purchaser or lessee for up to two years from the date of the signing of such contract or agreement." 15 U.S.C. § 1703(d). The ILSFDA also provides a statute of limitations within which a purchaser may bring an action to enforce rights provided under various sections of the ILSFDA. With respect to the right to revoke provided in 15 U.S.C. §§ 1703(c) and (d), a purchaser may bring a revocation claim within three years of the date of signing a purchase agreement. 15 U.S.C. § 1711(b).

### 1. Whitfield Complaint
Plaintiff Charles Whitfield ("Whitfield") alleges that Harborage failed to furnish a property report in advance of his signing of the purchase agreement and that the purchase agreement did not inform him of his right to revoke the contract within two years, in violation of 15 U.S.C. 1703(c). Whitfield Compl., ¶ 6 (dkt # 1). Defendant contends that Whitfield's ILSFDA claim is time barred because he failed to revoke the purchase agreement within two years of signing it and because he failed to bring his revocation claim within three years of signing the purchase agreement. Def.'s Mot. to Dismiss, at 6 (dkt # 36).

**\*3** Whitfield signed the purchase agreement on February 15, 2005. Whitfield also alleges in his complaint that he revoked the purchase agreement in letters to Harborage dated January 15, 2008, and April 28, 2008. Whitfield Compl., ¶ 7. Whitfield filed a complaint against Defendants on June 6, 2008. Compl., (dkt # 1). Plaintiff correctly asserts that a factual dispute may not be considered nor resolved on a motion to dismiss. PL's Resp. to Def.'s Mot. to Dismiss, at 7. However, even without considering Defendants' affirmative defense regarding the statute of limitations, Whitfield's own factual allegations, which must be taken as true, attest that the indicated dates of revocation do not fall within a two-year time period from the date Whitfield signed the purchase agreement. *See Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1302 (11th Cir.2007) (holding that no factual dispute exists where plaintiff's complaint contains enough facts to indicate the presence of the required elements). Moreover, Whitfield failed to bring his revocation claim

within three years of signing the purchase agreement, as required by the statute. 15 U.S.C. § 1711(b).

Harborage's failure to provide notice to Plaintiff of his right to revoke within two years does not excuse non-exercise of that right within the statutory two-year period. "[N]othing in the ILSFDA states that failure to disclose the right to rescind in the purchase agreement obviates, tolls or extends the two year deadline for rescission." *Taylor v. Holiday Isle, LLC,* 561 F.Supp.2d 1269, 1274–75 (S.D.Ala.2008). "Nothing in the statute says that the two-year period prescribed by § 1703(c) runs from the date that purchasers discovered or should have discovered they had a right to rescind." *Id.: Pugliese v. Pukka Dev., Inc.,* 524 F.Supp.2d 1370, 1372 (S.D.Fla.2007) (stating that the requirements of 15 U.S.C. § 1703(d) are not mandatory and that "[t]he seller instead is given an in centive: should the seller choose to exclude it, the buyer is permitted to revoke the purchase contract for up to two years after its signing").

The ILSFDA confers upon purchaser the right "to bring any action at law or in equity against the seller ... to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title." 15 U.S.C. § 1709(b). "Thus, § 1709(b) would plainly allow a purchaser to bring claim for damages based on seller's failure to provide the statutorily required notice of rescission." *Taylor,* 561 F.Supp.2d at 1276. Accordingly, it would be improper to read into the statute an additional remedy for a seller's violation of the § 1703(c) and (d) notice requirements. Therefore, Whitfield's ILSFDA revocation claim is dismissed for failure to revoke the purchase agreement within the two-year statutory period and for failure to initiate a claim to enforce a valid revocation within the three-year statutory period. *Caravello v. Am. Airlines, Inc.,* 315 F.Supp.2d 1346, 1348 (S.D.Fla.2004) (quoting *Marshall County Bd. Of Educ. v. Marshall County Gas Dist.,* 992 F.3d 1171, 1174 (11th Cir.1993) (stating that a court must dismiss "when, on the basis of a dispositive issue of law, no construction of factual allegations will support the cause of action").

### 2. Taber and Hagy Enterprises Complaint
**\*4** Taber and Hagy Enterprises seek to revoke the purchase agreement under the notice provisions of the ILSFDA. 15 U.S.C. §§ 1703(c) and (d). Taber and Hagy Enterprises signed the purchase agreement on February 26, 2005, and filed their Complaint on May 15, 2008. Compl., ¶ 7 (dkt # 1, 08–14178–CV–MOORE). Plaintiffs filed their complaint after the expiration of the ILSFDA's three-year statutory period for bringing a revocation claim. 15 U.S.C. § 1711(b). Therefore, Taber and Hagy

Enterprises' ILSFDA revocation claim is dismissed.

### 3. Stone Complaint
Plaintiffs R. Scott Stone, Jr. and Patricia Stone (the "Stones") seek to revoke the purchase agreement under the notice provisions of the ILSFDA. 15 U.S.C. §§ 1703(c) and (d). The Stones signed the purchase agreement on May 16, 2005. Compl., at ¶ 7 (dkt # 1, 08–14179–CV–MOORE). Plaintiffs sent Defendant Harborage a revocation letter dated March 5, 2008. Compl., Ex. C (dkt # 1–3, 08–14179–CV–MOORE). Although Plaintiffs filed their complaint on May 15, 2008, within the three-year statute of limitations period, Plaintiffs' revocation demand was made after the expiration of the ILSFDA's two-year statutory period for seeking revocation. 15 U.S.C. §§ 1703(c) and (d). Therefore, Plaintiffs' revocation demand under the ILSFDA is invalid as a matter of law and the Stones' revocation claim must be dismissed.

### 4. Palazzolo Complaint
Plaintiff Cesare Palazzolo ("Palazzolo") seeks to revoke the purchase agreement under the notice provisions of the ILSFDA. 15 U.S.C. §§ 1703(c) and (d). Palazzolo signed the purchase agreement on March 8, 2005, and filed his Complaint on June 20, 2008. Compl., ¶ 7 (dkt # 1, 08–14222–CV–MOORE). Plaintiff filed his complaint after the expiration of the ILSFDA's three-year statutory period for bringing a revocation claim. 15 U.S.C. § 1711(b). Therefore, Palazzolo's ILSFDA revocation claim is dismissed.

### B. Publication of False and Misleading Information
Section 718.506, Florida Statutes, states, in relevant part:

> Any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a

cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

§ 718.506(1), Fla. Stat. " '[R]eliance on fraudulent misrepresentations is unreasonable *as a matter of law* where the alleged misrepresentations contradict the express terms of the ensuing written agreement.' " *Garcia v. Santa Maria Resort, Inc.,* 528 F.Supp.2d 1283, 1295 (S.D.Fla.1999) (emphasis in original) (quoting *Eclipse Med., Inc., v. Am. Hyrdo–Surgical Instruments, Inc.,* 262 F.Supp.2d 1334,1342 (S.D.Fla.1999)); *Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1428 (S.D.Fla.1996); *Acquisition Corp. of Am. v. FDIC,* 760 F.Supp. 1558,1561 n. 6 (S.D.Fla.1991). "[A] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract." *Garcia,* 528 F. Supp .2d at 1295 (quoting *Rosa v. Amoco Oil Co.,* 262 F.Supp.2d 1364, 1368–69 (S.D.Fla.2003)). Here, the Purchase Agreements contain a provision which states, in relevant part:

> **\*5** This Agreement contains the entire understanding between Buyer and Seller. Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer agrees that Buyer has not relied on them.

Purchase Agreements, ¶ 39. The Purchase Agreements also state that "[n]othing herein shall be deemed to deny or abridge the rights granted under Section 718.506, Florida Statutes." Purchase Agreements, ¶ 14. To the extent that any alleged misrepresentations were oral statements, Plaintiffs cannot have reasonably relied on them given the terms of the Purchase Agreements precluding reliance on oral representation. *See* Purchase Agreements, pg. 1 (first unnumbered paragraph), and ¶ 39; *Garcia,* 528 F.Supp.2d at 1295.

However, at least some of the alleged misstatements were contained in the condominium documents and brochures, including the Harborage Site Plan, the Master By–Laws, the Dock–Slip Representations, and marketing and promotional materials. Therefore, reliance on paragraph 39 of the Purchase Agreements does not preclude

Plaintiffs' claims. Assuming the representations were false for purposes of the motion to dismiss, the statements collectively reach the threshold for alleging a material misstatement. *See Huggins v. Marriott Ownership Resorts, Inc.,* 07–cv–1514–Orl–22KRS (ACC), 2008 WL 552590, at \*3 (M.D.Fla.2008) (reversing grant of motion to dismiss where unit was 90 square feet less than promised); *Klinger v. Zaremba Condominium,* 502 So.2d 1252, 1254 (Fla. 3d DCA 1986) (stating that although developers did not have to complete final phases of construction, if construction was completed, elimination of the jogging path and outdoor track around a lake would be a substantial deviation from developer's representations); *Aaronson v. Susi,* 296 So.2d 508, (Fla. 3d DCA 1974) (finding that conversion of a planned recreational area into an additional apartment was a substantial deviation from developer's initial representation). Therefore, Plaintiffs have sufficiently alleged a claim pursuant to § 718.506, Florida Statutes.

### C. FDUTPA Claims

Section 501.204(1), Florida Statutes, states:

> Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

§ 501.204(1), Fla. Stat. The elements for a FDUTPA claim include: "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F.Supp.2d 1314, 1326 (M.D.Fla.2007). Although the FDUTPA does not define "deception" or "unfair practice," the Florida Supreme Court and the Eleventh Circuit have stated that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Scott v. Capital One Bank,* 08:cv–132–T–30EAJ (JSM), 2008 WL 2157037, \*2 (M.D.Fla.2008) (citing *Zlotnick v. Premier Sales Group, Inc.,* 480 F.3d 1281, 1284 (11th Cir.2007). "Because the [ILSFDA] generally proscribes certain unfair and deceptive trade practices, a violation of the [ILSFDA] is a violation of the FDUTPA as well." *Trotta v. Lighthouse Point Land Co., LLC,* 551 F.Supp.2d 1359, 1367 (S.D.Fla.2008) (internal citation omitted).

**\*6** The provisions of the ILSFDA under which Plaintiffs seek to revoke the purchase agreements required

Gentry v. Harborage Cottages-Stuart, LLLP, Not Reported in F.Supp.2d (2008)

Harborage to provide Plaintiffs with a property report and other material information and notification of rights that Plaintiffs may have relied upon in deciding to sign the Purchase Agreements. *See* 15 U.S.C. §§ 1703(c) and (d). Harborage's failure to provide Plaintiffs with this information may constitute an omission that is likely to mislead the consumer acting reasonably under the circumstances. Plaintiffs' ILSFDA revocation claims have been precluded based on untimeliness in seeking revocation and untimeliness in bringing a claim for revocation. However, the FDUTPA has a four-year statute of limitations. § 96.11(3)(f), Fla. Stat. (four-year statute of limitations applies to an action founded on statutory liability); *South Motor of Dade County v. Doktorczyk,* 957 So.2d 1215, 1217–18 (Fla. 3d DCA 2007) (applying § 96.11(3)(f) to claims under the FDUTPA). Therefore, although Plaintiffs' claims under the ILSFDA are precluded, Plaintiffs may nevertheless seek damages under the FDUTPA if brought within four years. Each of the Plaintiffs filed their complaints within four years of signing the purchase agreements. Moreover, Defendants have raised no arguments suggesting that Plaintiffs' ILSFDA claims fail on the merits aside from being barred by the statute of limitations. Therefore, Plaintiffs have stated a claim under the FDUTPA.

Whitfield also brings an FDUTPA claim against Northside. Whitfield alleges that Northside represented that the dock slips were available for purchase when in fact they were only available for use by members of the Harborage Yacht Club and Marina. Whitfield also asserts that he would not have entered into the Membership Agreement absent his belief that he would have an ownership interest in a dock slip. Compl., ¶ 23. Taken as true, Northside's representations were likely to mislead a consumer acting reasonably under the circumstances, to the consumer's detriment. Therefore, Whitfield has sufficiently stated a claim against Northside under the FDUTPA.

### D. Breach of Contract

Whitfield also brings a breach of contract claim against Harborage. "The elements for an action for breach of contract are: (1) a contract; (2) a breach of the contract; and (3) damages resulting from the breach of contract." *Warfield v. Stewart,* 07–cv–332–T–27DNF (JDW), 2007 WL 3378548, at *6 (M.D.Fla.2007) (citing *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla. 2d DCA 2006). "Parties must also prove performance of their obligations under the contract in order to maintain a cause of action for breach of contract." *Id.* Here, Whitfield alleges that Harborage has breached the terms of the Purchase Agreements through: (1) failing to complete construction

in accordance with the representations made; (2) the poor quality of construction; and (3) the presence of a corrugated steel building on the Future Developments Site. These allegations echo the factual assertions underlying Whitfield's claims that Harborage's misrepresentations induced him to enter into the purchase agreement. However, these allegations fail to explicitly reference a specific term of the purchase agreement that was breached. *See Henrion v. New Era Realty IV. Inc.,* 586 So.2d 1295, 1297 (Fla. 4th DCA 1991) (stating that breach of contract claim was dismissed because allegations did not reference specific obligation in the contract that was breached). Moreover, even after careful scrutiny of the Purchase Agreements, this Court is unable to discern from the pleadings which provision these allegations suggest that Harborage has breached.

*7 On the contrary, the language of the Purchase Agreements give the developer broad leeway to make changes to the construction specifications, including changes relating to plan specifications, dimensions, and square footage. Purchase Agreements, ¶ 14. The Purchase Agreements contain no obligations concerning the quality of interior fixtures such as cabinets, countertops, flooring, etc. Purchase Agreements, ¶ 15. The Purchase Agreements also disclaim any obligations concerning obstructed views. Purchase Agreements, ¶ 30. Therefore, given the vague and factually limited pleadings concerning the breach of contract claim and inability of this Court to discern which of the provisions were allegedly breached, Plaintiff has failed to sufficiently state a claim for breach of contract.

This conclusion is not inconsistent with the finding that Plaintiff has sufficiently pleaded a cause of action under § 718.506. Florida Statutes. Section 718.506 governs representations made to buyers prior to entering into a purchase agreement. The requisite analysis does not require reference to the agreement itself except to ensure that the alleged misrepresentation does not contradict an express term of the agreement. *See Garcia,* 528 F.Supp.2d at 1295. In the case of a breach of contract claim, however, the essence of the claim is that some provision of the agreement has been breached. Where the facts pleaded are insufficient to determine which of the provisions may have been breached, the claim cannot survive a motion to dismiss. However, Plaintiff may replead the breach of contract claim in an amended complaint within ten days of the date of this Order.

### E. Declaratory Judgment Action

The Declaratory Judgment Act "confers on federal courts unique and substantial discretion in deciding whether to

declare the rights of litigants. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 284, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). "Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment. *Old Rep. Union, Ins. Co. v. Tillis Trucking Co., Inc.,* 124 F.3d 1258, 260 (11th Cir.1997). Here, the claim for a declaratory judgment is superfluous because Plaintiff's other claims will resolve all the disputed issues before this Court. Therefore, this Court exercises its discretion to dismiss the action for a declaratory judgment.

### F. Negligent Misrepresentation

"To state a cause of action for negligent misrepresentation, a plaintiff must allege that: (1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making that statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely ... on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation." *Romo v. Amedex Ins. Co.,* 930 So.2d 643, 653 (Fla. 2d DCA 2006); *see Johnson v. David,* 480 So.2d 625, 627 (Fla.1985). Here, Whitfield's Complaint alleges that Defendant Northside made misrepresentations, that Defendants should have known that the representations were false, that Defendants intended to induce Plaintiff to enter the Agreements based on the misrepresentations, and that Plaintiff has sustained injury by justifiably relying on the misrepresentation. Based on these allegations, Plaintiff has sufficiently pleaded a cause of action for negligent misrepresentation.

### G. Fraudulent Misrepresentation

**\*8** "To state a cause of action for fraudulent misrepresentation, a plaintiff is required to allege ... (1) a misrepresentation of a material fact; (2) which the person making the statement knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied

on the misrepresentation to his detriment, and (5) that this reliance caused damages." *Romo v. Amedex Ins. Co.,* 930 So.2d 643, 653 (Fla. 2d DCA 2006). In an action alleging fraud, "a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). Although allegations of fraud must be stated with particularity, "absolute particularity is not required, especially when some matters are beyond knowledge of the pleader and can only be developed through discovery." *Livingston v. H.I. Family Suites, Inc.,* 05–CV–860–ORL19KRS, (PCF), 2005 WL 2077315, at *4 (M.D.Fla.2005). Whitfield has sufficiently alleged that Northside had reason to know that the alleged misrepresentations were false. Accordingly, Whitfield has stated a cause of action for fraudulent misrepresentation.

### IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendant Harborage Cottages–Stuart, LLLP and Northside Marina Venture, LLC's Motion to Dismiss Plaintiff Charles Whitfield's Complaint (dkt # 36), and Defendant Harborage Cottages–Stuart, LLLP's Motions to Dismiss the Complaints of Plaintiffs Wesley Taber and Hagy Enterprises, Inc. (dkt # 39), Plaintiffs R. Scott Stone, Jr. and Patricia Stone (dkt # 49), and Plaintiff Cesare Palazzolo (dkt # 50) are GRANTED IN PART and DENIED IN PART. The Motions are GRANTED with respect to (1) the ILSFDA revocation claims; (2) the breach of contract claim, and (3) the declaratory judgment action. The Motions are DENIED with respect to (1) the claim brought pursuant to § 718.506; (2) the FDUTPA claims; (3) the negligent misrepresentation claim; and (4) the fraudulent misrepresentation claim.

DONE AND ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 7759041

Footnotes

1    Plaintiffs filed four separate complaints. The actions were consolidated by this Court's Order dated July 29, 2008 (dkt # 47).

**Gentry v. Harborage Cottages-Stuart, LLLP, Not Reported in F.Supp.2d (2008)**

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Gentry v. Harborage Cottages-Stuart, LLLP, Not Reported in F.Supp.2d (2008)

2008 WL 7759974
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

James D. GENTRY, et al., Plaintiffs,
v.
HARBORAGE COTTAGES–STUART, LLLP, et al.,
Defendants.

No. 08–14020–CIV.
|
Oct. 8, 2008.

ORDER

K. MICHAEL MOORE, District Judge.

**\*1** THIS CAUSE came before the Court upon Plaintiffs' Motion for Clarification and/or reconsideration (dkt #54). UPON CONSIDERATION of the Motion, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that Plaintiffs' Motion for Clarification and/or Reconsideration (dkt #54) is GRANTED IN PART and DENIED IN PART. With respect to Plaintiffs' motion for clarification concerning the ILSFDA claim of R. Scott Stone and Patricia Stone, the ILSFDA revocation claim was dismissed and the ILSFDA claim for damages remains intact. The Motion is DENIED in all other respects.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 7759974

---

**End of Document**                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 634075
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

GLOBAL FLEET SALES, LLC, R.M. Asia (HK)
Limited, RMA Middle East FZE, RMA Automotive
Co., Ltd., and Kevin Robert Whitcraft, Plaintiffs,
v.
Leonard James DELUNAS and Mohammad
Dawoud ("David") Wahab, Defendants/Counter–
Plaintiffs/Third–Party Plaintiffs,
v.
Kevin Robert Whitcraft, R.M. Asia (HK) Limited,
and RMA Middle East FZE, Plaintiffs/Counter–
Defendants,
and
Thomas Whitcraft and Mark Whitcraft, Third–
Party Defendants.

No. 12–15471.
|
Feb. 18, 2014.

**Attorneys and Law Firms**

Irina Kashcheyeva, Scott T. Seabolt, Foley and Lardner, Detroit, MI, Michael J. Lockerby, Foley & Lardner LLP, Washington, DC, for Plaintiffs.

Edward H. Pappas, Erin M. Pawlowski, Dickinson Wright, Troy, MI, Jason P. Klingensmith, Robert P. Zora, Dickinson Wright, Detroit, MI, for Defendants/Counter–Plaintiffs/Third–Party Plaintiffs.

*OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS IN PART AND DENYING DEFENDANTS' MOTION TO DISMISS IN PART, (2) DENYING THE RMA GROUP PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, (3) GRANTING THE WHITCRAFT THIRD PARTIES' MOTION TO DISMISS, AND (4) DENYING THE RMA COUNTER–DEFENDANTS' MOTION TO STRIKE WITHOUT PREJUDICE*

PATRICK J. DUGGAN, District Judge.

**\*1** This dispute arises out of the pursuit of business

opportunities in the Islamic Republic of Afghanistan in the wake of the NATO campaign against the Taliban and the subsequent souring of the business relationships established to execute those opportunities. Plaintiffs Global Fleet Sales, LLC, R.M. Asia (HK) Limited ("RMA–HK"), RMA Middle East FZE ("RMA–ME"), and RMA Automotive Company, Ltd. ("RMA Automotive") (collectively, the "RMA Group Plaintiffs"), along with Plaintiff Kevin Whitcraft (collectively, the "RMA Plaintiffs"), initiated this action against Defendants Leonard Delunas ("Delunas") and Mohammad Wahab ("Wahab") (collectively, "Defendants") seeking damages and various forms of injunctive and equitable relief in a multi-count complaint. Defendants answered the RMA Plaintiffs' Complaint and also filed a Counter–Complaint naming three of the five original plaintiffs as Counter–Defendants (RMA–HK, RMA–ME, and Kevin Whitcraft) as well as a Third–Party Complaint naming Third–Party Defendants Mark Whitcraft and Thomas ("Tom") Whitcraft (collectively, the "Whitcraft Third Parties"). On the same day, Defendants filed a motion to dismiss the RMA Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Other motions, described below, have also been filed.

A total of four motions, all of which have been fully briefed and argued at the February 6, 2014 motion hearing, are presently before the Court: (1) Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 18); (2) the RMA Group Plaintiffs' Motion for Preliminary Injunction (ECF No. 42); (3) the Whitcraft Third Parties' Motion to Dismiss Third–Party Complaint (ECF No. 36); and (4) the RMA Counter–Defendants' Motion to Strike the Settlement Negotiations Paragraphs from the Counter–Complaint and Third–Party Complaint (ECF No. 26). For the reasons stated herein, the Court grants in part and denies in part Defendants' Motion to Dismiss, denies the RMA Group Plaintiffs' Motion for Preliminary Injunction, grants the Whitcraft Third Parties' Motion to Dismiss, and denies the RMA Counter–Defendants' Motion to Strike without prejudice.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. The Parties**

This action was initiated by five plaintiffs all of which are related to one another through business. The four

corporate plaintiffs are collectively referred to as the RMA Group Plaintiffs even though the RMA Group "is not an actual entity[; rather, the RMA Group] refers collectively to various affiliated companies[ ] ..." that "provide products and services to build and rebuild the local infrastructure in countries that are developing and/or have been plagued with conflict." (Compl. ¶ 5, ECF No. 8.¹) In Afghanistan, "the RMA Group has provided goods and services through various entities that one or more of the RMA Plaintiffs has formed, caused to be formed, and/or funded." (Id. at ¶ 13.) These include: RM Asia Afghanistan ("RMAA"); Asia Trade & Commodities Limited ("ATC"); Global Fleet Sales Limited (Afghanistan) ( "GFSA"); and Insurance Corporation of Afghanistan ("ICA") (collectively, the RMA Afghan Entities). (Id.)

**\*2** Plaintiff Global Fleet is a limited liability company incorporated in Delaware with its principal place of business located in the Eastern District of Michigan, specifically, Southfield, Michigan. (Id. at ¶ 23.) RMA–HK is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China with its principal place of business located in Bangkok, the capital of the Kingdom of Thailand. (Id. at ¶ 24.) RMA–ME is a United Arab Emirates corporation with its principal place of business located in Dubai, United Arab Emirates. RMA Automotive is a Thai corporation with its principal place of business in Bangkok, Thailand. (Id. at ¶ 26.) Lastly, Kevin,² a United States citizen residing in Thailand, is President of Global Fleet and serves as a director of Plaintiffs RMA–HK, RMA–ME, and RMA Automotive. Kevin "holds legal ownership interests in three of the RMA Afghan Entities—RMAA, ATC, and ICA—as nominee on behalf of the RMA Group Plaintiffs." (Id. at ¶ 27.)

Defendant Delunas holds dual citizenship in both the United States and the Republic of Ireland. (Id. at ¶ 28.) According to the RMA Plaintiffs, Delunas was hired to serve as a Country Manager for the RMA Group Plaintiffs in Afghanistan from 2002 through the termination of the relationship in 2011. (Id. at ¶ 29.) In this capacity, Delunas was charged with procuring registration of the RMA Afghan Entities and holding shares of those companies for the ultimate beneficial interest of the RMA Plaintiffs. (Id. at ¶ 30.) Defendant Wahab, a friend and associate of Delunas, possesses dual citizenship in the United States and Afghanistan and resides in the latter. (Id. at ¶¶ 32–33.) Upon registration of the various RMA Afghan Entities, Wahab was listed as a corporate officer and shareholder of record. (Id. at ¶ 33–34.) Pursuant to various Declarations of Trust attached to the Complaint,

however, Wahab allegedly held these shares as trustee.

## B. The Underlying Events

In late 2001, following the tragic events of September 11, 2001, Kevin, who is involved in the business affairs of each of the RMA Group Plaintiffs, and Delunas, who has worked for nearly four decades "as an owner of companies engaged in construction and engineering services and consulting[,]" began discussing various business opportunities that they expected to arise in post-conflict Afghanistan. (Counter–Compl. ¶ 12, ECF No. 19.) As a result of these discussions, according to the RMA Plaintiffs, Delunas was hired pursuant to a contract referred to as "the RMA Afghanistan Country Manager Agreement" sometime in 2002. (Compl. ¶ 14, ECF No. 8.) Although the RMA Plaintiffs did not attach a copy of this contract to their Complaint, they contend that the agreement provided that "Delunas was to manage the operations of the RMA Afghan Entities" and, in exchange for "Delunas's commitment to devote full time to the business of the RMA Afghan Entities and not to engage in other business, the RMA Group Plaintiffs agreed to pay [him] 25% of the net profits from the operations of RMAA, ATC, and GFSA." (Id.) In order to properly incentivize Delunas, the contract also obligated Delunas "to reimburse the RMA Group Plaintiffs for up to 25% of these entities' net losses."³ (Id.)

**\*3** The RMA Plaintiffs allege that Delunas breached this contract in various ways. For instance, despite receipt of millions of dollars over the course of the relationship, Delunas "advanced himself additional funds from the operations of the RMA Afghan Entities." (Id. at ¶ 16.) These advances were used for many unauthorized purposes, such as personal expenses, bonuses, and personal investments in other companies in Afghanistan. (Id.) Although the RMA Plaintiffs do not know the full extent of the monies extracted for personal gain by Delunas, the improper payments of which they are aware of to date exceed one million dollars. (Id.) An accounting is sought to determine the full extent of funds Delunas improperly diverted. (Id.)

Delunas also breached the contract by pursuing various corporate opportunities for his personal benefit. (Id. at ¶ 17.) This not only violated the contract but also constituted a breach of Delunas's fiduciary duties to the RMA Afghan Entities. Delunas allegedly used the funds he advanced himself "to invest in and operate other business ventures from which the RMA Plaintiffs derived no economic benefit." (Id.) Relatedly, Delunas entered

into "contracts on behalf of the RMA Afghan Entities with various entities in Afghanistan in which [he] had an ownership, investment, or other economic interest." (*Id.*) Another example of Delunas's misconduct is that Delunas "informed banks in 2011 to no longer accept the RMA Plaintiffs' authorized signatures for bank accounts of the RMA Afghan Entities[,] fraudulently inform[ing] the banks that he was the sole authorized signatory on [such] accounts." (*Id.*)

Having become aware of the aforementioned conduct, the RMA Plaintiffs notified Delunas in March of 2011 that they had appointed a new Country Manager to manage the operations of the RMA Afghan Entities and were therefore terminating RMA Afghanistan Country Manager Agreement. (*Id.* at ¶¶ 18, 133.) Despite the termination of the agreement, "Delunas seized certain goods sold by the RMA Group Plaintiffs to the RMA Afghan Entities for which the RMA Group Plaintiffs have yet to be paid." (*Id.*) To mitigate the damages caused by Delunas's breaches and other wrongful acts, the RMA Plaintiffs formed two new entities, both of which are wholly-owned subsidiaries of Plaintiff RMA–ME: RMA Group (Afghanistan) Limited ("RMA Group Afghanistan") and Global Star Motors Limited ("Global Star") (collectively, the "RMA Group Mitigating Entities"). (*Id.*) After forming these new entities, "certain payables and contract rights of RMAA, ATC, and GFSA were assigned to the RMA Group Mitigating Entities." (*Id.*)

Further, notwithstanding the termination of the agreement, Delunas "continues to hold himself out to current and prospective customers ... as the authorized representative of the RMA Group in Afghanistan." (*Id.* at ¶ 19.) As evidence of this, the RMA Plaintiffs point to a website operated and controlled by Delunas ("the Offending U.S. Web Site") that directs actual or prospective customers or suppliers who wish to contact the RMA Group's current Country Manager in Afghanistan to Delunas's email address, not the actual current Country Manager. (*Id.* at ¶¶ 19–20.) Delunas's continued operation of this website forms the basis of the RMA Plaintiffs' Counts I (violation of the Lanham Act) and II (violation of the Computer Fraud and Abuse Act).

### C. Court Proceedings

**\*4** The RMA Plaintiffs filed a complaint with this Court on December 13, 2012, thereby instituting the present action. (ECF No. 1.) On May 16, 2013, The RMA Plaintiffs filed a First Amended Complaint.[4] (ECF No. 8.)

Pursuant to a stipulated order extending the time for Defendants to answer the RMA Plaintiffs' Complaint, (ECF No. 14), Defendants filed both their Answer along with a Counter–Complaint and Third–Party Complaint, (ECF No. 19), as well as a Motion to Dismiss the RMA Plaintiffs' Complaint, (ECF No. 18), on August 30, 2013. The Third–Party Complaint names two new parties as defendants: Mark Whitcraft and Tom Whitcraft (collectively, the "Whitcraft Third Parties"). The Counter–Complaint names Plaintiffs Kevin, RMA–HK, and RMA–ME as counter-defendants (collectively, the "RMA Counter–Defendants" or "Counter–Defendants"). The RMA Counter–Defendants answered the Counter–Complaint, (ECF No. 27), and filed a Motion to Strike certain portions of the Counter–Party Complaint, (ECF No. 26), on September 25, 2013. On October 23, 2013, the Whitcraft Third Parties moved this Court to dismiss the Third–Party Complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6). (ECF No. 36.) To conclude what is shaping up to be an epic court battle, the RMA Group Plaintiffs filed a Motion for Preliminary Injunction on November 13, 2013. (ECF No. 42.) Each of the four motions presently before the Court has been fully briefed and oral argument was held on February 6, 2014.

In light of the factual complexity of this case, the intense disagreement as to what the facts really are,[5] and the multiplicity of motions and accompanying briefs, the Court believes that a roadmap of this Opinion and Order is necessary. The Court first addresses the sufficiency of the RMA Plaintiffs' Complaint by way of considering the arguments raised by Defendants in their Motion to Dismiss. Given the relationship between the allegations in the Complaint and the RMA Group Plaintiffs' request for a preliminary injunction, the Court then proceeds to analyze the propriety of granting such relief. The next set of motions the Court addresses are those challenging aspects of the Counter–Complaint and Third–Party Complaint. The Whitcraft Third Parties' Motion to Dismiss is analyzed prior to the fourth, and final, motion, the RMA Counter–Defendants' Motion to Strike.

### II. DEFENDANTS' MOTION TO DISMISS

The RMA Plaintiffs filed this action seeking declaratory, injunctive, equitable, and monetary relief in a seven-count Complaint.[6] These counts include: Count I—Violation of the Lanham Act, 15 U.S.C. § 1125(a); Count II—Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g); Count III—Breach of Contract; Count IV—Breach of Fiduciary Duties; Count V—Tortious

Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)

Interference with Contract and Business Relations; Count VI—Tortious Interference with Prospective Economic Advantage; and Count VII—Unjust Enrichment. (Compl., ECF No. 8.) Defendants seek dismissal of this Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).[7]

## A. Standard of Review

**\*5** A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the standards applicable to motions brought under Rule 12(b)(6). *EEOC v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir.2001) (citation omitted). As with Rule 12(b)(6) motions, a Rule 12(c) motion allows the Court to make an assessment as to whether a plaintiff's pleadings have stated a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555–56, 570, 127 S.Ct. 1955, 1964–65, 1974, 167 L.Ed.2d 929 (2007), a court must construe the complaint in favor of the plaintiff and determine whether the plaintiff's factual allegations present claims plausible on their face. This standard requires a claimant to put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the requisite elements of their claims. *Id.* at 557, 127 S.Ct. at 1965. Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir.2007) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965) (internal citations omitted); *see also* Fed.R.Civ.P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief[.]").

In determining whether a plaintiff has set forth a "claim to relief that is plausible on its face," *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974), courts must accept the factual allegations in the complaint as true, *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965. This presumption, however, does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949. Therefore, to survive a motion to dismiss, a plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters,* 502 F.3d at 548 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65) (internal citations and

quotations omitted).

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of [a legal transgression], the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted). In conducting its analysis, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein. *Bassett v. NCAA,* 528 F.3d 426, 430 (6th Cir.2008) (citing *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir.2001)).

## B. Analysis of Causes of Action Set Forth in the RMA Plaintiffs' Complaint

### *Count I—Unfair Competition in Violation of Lanham Act § 43(a)*[8]

**\*6** Count I of the RMA Plaintiffs' Complaint alleges that Delunas continues to operate a website—the "Offending U.S. Web Site"—that implies his continued affiliation with the RMA Group and his continued role as Country Manager for the RMA Afghan Entities. (Compl.¶¶ 12, 19–20, 155.) Despite termination of the RMA Afghanistan Country Manager Agreement well-over two years ago, Delunas lists his email address and contact information for those seeking to do business with the RMA Afghan Entities and with RMA Group companies in other countries where Delunas was never employed nor affiliated with in any capacity. (*Id.* at ¶¶ 19–20.) According to the RMA Plaintiffs, "[b]y making such false associations, Mr. Delunas is trading upon goodwill that simply does not belong to him." (RMA Pls.' Resp. 8, ECF No. 28.) By engaging in this conduct, Delunas violated the Lanham Act's prohibition against unfair competition as codified at 15 U.S.C. § 1125(a).[9]

Defendants believe that Count I fails for three reasons. First, the RMA Plaintiffs lack standing to assert a claim under the Lanham Act. (Defs.' Br. 10, ECF No. 18.) Second, the RMA Plaintiffs have failed to state a claim for false designation or association under section 43(a)(1)(A) of the Lanham Act. (*Id.* at 11.) Lastly, the RMA Plaintiffs have not stated a claim for false

advertising under section 43(a)(1)(B) of the Lanham Act. (*Id.* at 12.) The Court addresses these arguments *seriatim.*

### 1. Standing

To have standing under the Lanham Act, a claimant must demonstrate " '(1) a reasonable interest to be protected' " and " '(2) a reasonable basis for believing that the interest is likely to be damaged' by a defendant's alleged false association or false advertising. *Static Control Components, Inc. v. Lexmark Int'l, Inc. .,* 697 F.3d 387, 410 (6th Cir.2012) (quoting *Famous Horse, Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 113 (2d Cir.2010)); 15 U.S.C. § 1125(a)(1) ("Any person who[ ]" violates the prohibitions set forth in the Act "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act[ ]").

Defendants argue that the RMA Plaintiffs lack standing because the Complaint alleges that the "Official RMA Group Web Site" is owned by the RMA Group which is "not an actual entity" and cannot, therefore, be a party to this action. (Defs.' Br. 10, ECF No. 18 (quoting Compl. ¶ 5).) According to Defendants, the "Complaint fails to identify any of the legal entities included within the 'RMA Group' and fails to identify the relationship of those entities to the Plaintiffs or the 'Official RMA Group Web Site.' " (*Id.*) This argument lacks merit as the same paragraph of the Complaint that Defendants cite refers to the "[t]he various entities that comprise the RMA Group—including those that are among the RMA Group Plaintiffs[.]" (Compl.¶ 5.) As such, the RMA Group Plaintiffs have sufficiently alleged "a reasonable interest to be protected [.]" *Static Control,* 697 F.3d at 410.

**\*7** The second element of standing a plaintiff must establish is "a reasonable basis for believing that the interest is likely to be damaged" by the defendant's alleged false association or false advertising. *Id.* The Complaint alleges that "[t]he Offending U .S. Web Site is set up so that inquiries intended for the RMA Group Plaintiffs' authorized representative in Afghanistan are instead directed to Mr. Delunas." (Compl.¶ 2.) Construing these allegations as true, the Court believes that the RMA Plaintiffs have satisfied the burden of demonstrating that a cognizable interest in business reputation and business opportunities is likely to be damaged by Delunas's operation of the Offending U.S. Web Site. Accordingly, the RMA Plaintiffs have standing to assert a claim pursuant to the Lanham Act.

### 2. False Association

Section 43(a) (1)(A) of the Lanham Act proscribes the use of false or misleading representations that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person [.]" 15 U.S.C. § 1125(a)(1)(A). The ultimate question is whether consumers are likely to be confused or to falsely believe that the products or services offered by the parties are affiliated in some way. *Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 629–30 (6th Cir.2002) (citations omitted).

Defendants seek dismissal of the false association claim on three separate grounds. First, Defendants argue that the RMA Plaintiffs have not specifically identified the threshold element of a false or misleading statement on the Offending U.S. Web Site. (Defs.' Br. 12, ECF No. 18; Defs.' Reply 3, ECF No. 34.) This is inaccurate, as the following examples demonstrate. The Complaint alleges that Delunas continues to hold himself out as being authorized to represent the RMA Group Plaintiffs and their affiliates in Afghanistan and provides, as an example of this conduct, his continued operation of the Offending U.S. Web Site. (Compl.¶ 2.) The Complaint also alleges that the Offending U.S. Web Site provides an email address for those seeking to obtain the services of the RMA Group's current Country Manager that directs emails to Delunas instead of the individual who replaced him in 2011. (*Id.* at ¶¶ 19–20.) Because the RMA Plaintiffs allege that Delunas is no longer the Country Manager and is no longer authorized to conduct business using the RMA name, Defendants' argument regarding the failure to identify a false or misleading statement necessarily fails.

Defendants' second argument in support of dismissal is that Delunas is actually affiliated with the entities listed on the Offending U.S. Web Site and is therefore not falsely associating himself with those entities. (Defs.' Br. 12, ECF No. 18; Defs.' Reply 4, ECF No. 34.) According to this argument, because the Complaint alleges Delunas is a twenty-five percent (25%) beneficial shareholder in both RMAA and GFSA, it follows that Delunas is affiliated the RMA Group Plaintiffs. (Defs.' Br. 12, ECF No. 18.) Once again, this argument misses the mark as it asks the Court to disregard factual allegations contained elsewhere in the Complaint. The RMA Plaintiffs have alleged that "Delunas'[s] ownership interest in RMAA was limited to the term of the RMA Afghanistan Country Manager Agreement[,]" and that upon the 2011 termination of that agreement, Deluas "was obligated to surrender his ownership interest [.]" (Compl.¶ 113.) They

also allege that Delunas was never entitled to "a permanent ownership stake in the RMAA Old Companies [ (*i.e.,* the RMA Afghan Entities) ]." (*Id.* at ¶ 137.) On the basis of these allegations, which the Court must construe as true, Defendants' argument regarding Delunas's continued affiliation is not well-taken.

**\*8** Lastly, Defendants contend that the Complaint does not contain factual allegations that would permit the Court to infer that confusion among the relevant customer audience is likely to occur. (Defs.' Br. 12, ECF No. 18.) The Court does not agree. The Complaint alleges that Delunas is operating a website that suggests to all who view it that he is the RMA Group's Country Manager in Afghanistan and that directs inquiries to his email address instead of the email address of the current Country Manager. The website references contracts performed by the RMA Plaintiffs' companies and displays icons of companies with which the RMA Plaintiffs conduct business. Such allegations do, in fact, permit the Court to infer that confusion is likely. Moreover, "since the likelihood of confusion is generally a question of fact[,]" "dismissal for failure to state a claim upon which relief can be granted" is rarely appropriate. *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 613 (6th Cir.2009).

### 3. False Advertising

Section 43(a) (1)(B) of the Lanham Act proscribes the use of false or misleading representations of fact which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a) (1)(B). To state a cause of action for false or misleading advertising, a plaintiff must establish (1) that defendant has made false or misleading statements of fact concerning his own product or services or another's, (2) that statement actually or tends to deceive a substantial portion of the intended audience, (3) that statement is material, (4) that advertisements were introduced into interstate commerce, and (5) that there is some causal link between the challenged statements and harm to the plaintiff. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery,* 185 F.3d 606, 613 (6th Cir.1999).

Defendants contend that the RMA Plaintiffs have failed to state a false advertising claim because they "have not identified any false or misleading statements displayed the subject website relating to the 'nature, characteristics, qualities or geographic origin' of any party's products or services." (Defs.' Br. 14, ECF No. 18.) The Court does not agree. As previously mentioned, the Offending U.S.

Web Site appears to contain references and hyperlinks to the RMA Group Plaintiffs' business relationships, locations, and contracts with suppliers and customers. In this Court's opinion, advertising the services, contracts, and customer relationships of another as one's own to deceive customers into believing that "RM Asia" performed work actually performed by the RMA Group Plaintiffs constitutes a false or misleading statement of fact concerning the services and commercial activities advertised on the internet. Further, such false and misleading factual statements relate to the nature, characteristics, and qualities of services and commercial activities Delunas advertises as the statements appear to trade upon the goodwill and established reputation of the RMA Group Plaintiffs.

**\*9** Accordingly, the Court finds that the RMA Plaintiffs have stated a claim under the Lanham Act and therefore denies Defendants' Motion as to Count I.

### Count II—Violation of the Computer Fraud and Abuse Act

In order to state an access claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5), the RMA Plaintiffs must allege sufficient facts demonstrating that Delunas "intentionally accesse[d] a protected computer without authorization," thereby causing damages. 18 U.S.C. § 1030(a)(5) (B)-(C).[10]

Count II of the Complaint alleges that Delunas's continued use and operation of the Offending U.S. Web Site post-termination violates the CFAA because his actions in accessing the website lack the requisite authorization. Defendants do not believe that these allegations suffice to state a claim, specifically arguing that Count II does not allege that the Offending U.S. Web Site is a computer within the meaning of the CFAA and that it fails to allege that any access to that computer by Delunas was done without authorization. With respect to the latter argument, Defendants suggest that the Complaint's factual allegations regarding authorization (or lack thereof) are a red herring because the Complaint plainly states that "the RMA Group Plaintiffs have no affiliation with or control of the Offending U.S. Web Site." (Compl.¶ 156.) Because the authorization argument is dispositive, the Court declines to address the first.

"The plain meaning of 'authorization' is '[t]he conferment of legality; ... sanction.' [ ] Commonly understood, then, a defendant who accesses a computer 'without authorization' does so without sanction or permission." *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.,* 648 F.3d 295, 303–04 (6th Cir.2011) (citing

*LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1132–33 (9th Cir.2009) (first alteration in original) (internal citation omitted); *Id.* at 304 (" '[A] person who uses a computer without authorization has no rights, limited or otherwise, to access the computer in question.' ") (internal quotation marks omitted) (emphasis removed) (quoting *LVRC Holdings,* 581 F.3d at 1133). Although the RMA Plaintiffs "vaguely and cryptically imply ... that they once owned the website or that Mr. Delunas somehow 'misappropriated' it from them[,]"[11] the Complaint does not allege that the RMA Plaintiffs own or control the Offending U.S. Web Site; in fact, the Complaint expressly disclaims any such ownership or control. (Defs.' Reply 14, ECF No. 34; Compl. ¶ 156 ("At this juncture, the RMA Group Plaintiffs have no affiliation with or control of the Offending U.S. Web Site.").) This disclaimer of ownership and control dooms the RMA Plaintiffs' CFAA claim as an entity lacking both qualities simply has no basis for granting or withholding authorization to the website. In other words, any claim that Delunas accessed a protected computer that the RMA Plaintiffs neither own nor control access is not merely implausible, it defies logic. *Cf. Nianni, LLC v. Fox,* No. 2:11–cv–118–FtM–

36DNF, 2011 U.S. Dist. LEXIS 128593, at *10–11, 2011 WL 5357820 (M.D.Fla. Nov. 7, 2011) (unpublished) ("The Computer Fraud and Abuse Act does not contemplate a cause of action in which the defendant accesses a computer not owned by the plaintiff and makes allegedly false statements on that computer or website.")

**\*10** Because the allegations in the Complaint belie any claim that Delunas violated the CFAA, the Court dismisses Count II of the Complaint with prejudice.

### Count III—Breach of Contract
The RMA Plaintiffs' Complaint seeks to state a claim against both Defendants for breaching various contracts. Specifically, and according to the RMA Plaintiffs' Response, five contracts are at issue.[12] The chart below summarizes which contracts were allegedly breached and by whom.

| | | |
|---|---|---|
| ATC Declaration of Trust[14] | | ✓ |
| GFSA Declaration of Trust[15] | | ✓ |
| BMG Declaration of Trust[16] | | ✓ |

To state a claim for breach of contract under Michigan law, a plaintiff must, as a threshold matter, establish the existence of a valid contract. *In re Brown,* 342 F.3d 620, 628 (6th Cir.2003) (citing *Pawlak v. Redox Corp.,* 182 Mich.App. 758, 765, 453 N.W.2d 304, 307 (Mich.Ct.App.1990)). In Michigan, the elements of a valid contract are (1) the identities of parties competent to execute an enforceable contract, (2) a proper subject

matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Hess v. Cannon Twp.,* 265 Mich.App. 582, 592, 696 N.W.2d 742, 748 (Mich.Ct.App.2005). Once the existence of a valid contract has been demonstrated, a plaintiff seeking to state a claim for a breach of contract must then (1) establish the contract's terms, (2) present evidence of a breach of those terms, and (3) show an injury causally related to that breach. *Webster v. Edward D. Jones & Co.,* 197 F.3d 815, 819 (6th Cir.1999).

Defendants set forth a bifurcated argument as to why Count III should be dismissed. First, Defendants contend that the RMA Plaintiffs have failed to establish the existence of valid contracts .[17] This argument has two components: (1) the Complaint fails to identify the specific parties to the various contracts and (2) at least some of the purported contracts are unenforceable for lack of consideration. Defendants' second line of argumentation suggests that even if the RMA Plaintiffs have established the existence of valid contracts, the Complaint fails to articulate the material terms of those contracts and how Defendants' conduct constituted a breach of those terms.

### 1. The RMA Plaintiffs' Complaint Contains Suficient Factual Allegations Identifying the Specific Parties to Each Contract.

The Court is satisfied that the RMA Plaintiffs have provided enough factual content to sufficiently establish the parties to each of the contracts at issue. The Court briefly discusses each contract.

The RMA Afghanistan Country Manager Agreement has not been attached to the pleadings in this case and the Court, therefore, understands why Defendants would argue that the specific parties to this alleged contract have not been identified. The Complaint indicates that "[t]his dispute arises out of a contract whereby the RMA Group Plaintiffs retained Mr. Delunas to manage certain business operations in ... Afghanistan[.]" (Compl.¶ 1.) Interestingly, however, the Complaint also provides that "[t]he so-called 'RMA Group' is not an actual entity but refers collectively to various affiliated companies." (*Id.* at ¶ 5.) Because the Complaint never alleges which named-plaintiff entered into the purported agreement with Delunas, Defendants argue that the Complaint fails to state a claim. The Court, however, is not convinced. Taken in the light most favorable to the RMA Plaintiffs, and read in tandem with this Court's "judicial experience and common sense[,]" *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950, the allegations in the Complaint support a finding that one or more of the RMA Group entities entered into a contract with Delunas in 2002.

**\*11** To the extent Defendants challenge the RMA Plaintiffs' failure to allege the parties to the remaining four alleged contracts, this argument falls flat as a cursory glance at the relevant documentation, which is properly considered on a Rule 12 motion, reveals the parties to each agreement. The parties to the GFSA Declaration, executed on November 12, 2009, are Wahab and Global Fleet (with Kevin signing in his capacity as Director of

Global Fleet). (ECF No. 8–6.) The ATC Declaration, dated November 4, 2007, is between Wahab and Kevin. (ECF No. 8–5.) A copy of the ICA Shareholder Agreement indicates that the parties are Delunas, Kevin, and an individual named Sadat Naderi. (ECF No. 28–2.) Lastly, Wahab and Kevin are parties to the BMG Declaration. (ECF No. 28–3.)

### 2. The RMA Plaintiffs' Complaint Alleges Legal Consideration in Connection with Two of the Three Declarations of Trust to Which Defendant Wahab is a Party.

Defendants half-heartedly argue that the Complaint fails to allege a breach of contract claim against Wahab because the Complaint does not allege the existence of legal consideration. This argument is easily dismissed with respect to the claims involving the ATC Declaration and the GFSA Declaration as the Complaint provides that "Wahab was paid a monthly consulting fee for using his name in the registration of GFSA and ATC[.]" (Compl.¶¶ 35, 120, 151.) However, and despite the RMA Plaintiffs' efforts to construe these consulting fees as adequate consideration for the BMG Declaration, the Complaint does not support any such link. The Court will not infer the existence of legal consideration as it is a fundamental element of a binding contract, the existence of which must be proven as a predicate to stating a claim for a breach of contract.

The Court agrees with Defendants that the BMG Declaration is not supported by consideration. Accordingly, the RMA Plaintiffs may not pursue Count III against Wahab with respect to the BMG Declaration.

### 3. The RMA Plaintiffs Have Suficiently Alleged the Material Terms of the Contracts at Issue and Have Adequately Alleged Breaches of Three of the Four Remaining Contracts at Issue.

#### a. Breach of Contract Claims against Defendant Delunas

i. RMA Afghanistan Country Manager Agreement
Defendants contend that the RMA Plaintiffs have failed to state a viable claim against Delunas for breach of the RMA Afghanistan Country Manager Agreement because the material terms have not been established. Further, without having established the material terms, the Complaint cannot plausibly allege a breach of those terms.

In arguing that the material terms of the RMA Afghanistan Country Manager Agreement have not been established, Defendants point to the fact that the contract itself has not been attached to the Complaint. The failure to attach the contract is not, however, fatal to the breach of contract claim, so long as the Complaint includes the language of specific contractual provisions.[18] *Northampton Rest. Group, Inc. v. First Merit Bank, N.A.,* 492 F. App'x 518, 521 (6th Cir.2012) ("[I]t is a basic tenant of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached.") (quotation omitted). Although Defendants argue that the only material term identified in the Complaint is "Delunas's entitlement to 25% of the profits and his liability for 25% of the losses[,]" arguing as much does not make it so. (Defs.' Br. 20, ECF No. 18.)

**\*12** In delineating the terms of the RMA Afghanistan Country Manager Agreement, the Complaint provides as follows. Delunas's "contractual obligations included helping the RMA Group Plaintiffs establish and operate ... the 'RMA Afghan Entities'[.]" (Compl.¶ 1.) The agreement required Delunas "to help manage the delivery in Afghanistan of goods and services sold by the RMA Group Plaintiffs." (*Id.*) Pursuant to the alleged contract, Delunas reported to Kevin and needed Kevin's approval before entering into any major contracts. (*Id.* at ¶ 104.) In exchange for his managerial services, the contract compensated Delunas by providing him with "25% of the net profit—if any—resulting from the RMA Group's business in Afghanistan and share in the net losses of such operations up to a maximum of 25%." (*Id.* at ¶ 103.) The RMA Afghanistan Country Manager Agreement mandated that Delunas spend his time solely on the RMA Group Plaintiffs' businesses and prohibited him from becoming involved in other businesses in Afghanistan absent permission from Kevin. (*Id.* at ¶¶ 14, 17, 105–06.) In other words, Delunas was barred from competing with the RMA Afghan Entities and if he learned of investment opportunities in Afghanistan that were outside of the core business of the RMA Afghan Entities, Delunas was contractually-obligated to inform Kevin. (*Id.* at ¶¶ 105–06.) The Court finds that these allegations sufficiently establish the material terms of the RMA Afghanistan Country Manager Agreement.

Contrary to Defendants' arguments suggesting otherwise, the Complaint contains sufficient allegations of conduct in breach of the terms set forth above. For example, the Complaint alleges that Delunas is attempting to assert complete ownership and control over various RMA Afghan Entities despite the fact that the RMA Afghanistan Country Manager Agreement explicitly

provided compensation by way of profit and loss sharing, not ownership.[19] (*Id.* at ¶¶ 136–37.) Delunas also wrongfully diverted funds from the RMA Afghan Entities despite termination of the contract, improperly advanced himself funds without obtaining consent, and used those funds to invest in competing businesses. (*Id.* at ¶¶ 141, 144–45.)

In this Court's view, the Complaint sufficiently alleges a cause of action against Delunas for breach of the RMA Afghanistan Country Manager Agreement. Whether the RMA Plaintiffs succeed on this claim is left for another day.

### ii. ICA Shareholder Agreement

Unlike the breach of contract claim discussed above, the Court does not believe that the RMA Plaintiffs have stated a viable claim for breach of the ICA Shareholder Agreement. The Complaint alleges that Delunas was required to invest $605,626 in ICA as a shareholder pursuant to the ICA Shareholder Agreement and that he did not directly contribute these funds. (*Id.* at ¶ 125.) The Complaint then alleges that "[t]he RMA Group paid for Mr. Delunas'[s] shares in ICA ... out of the profit share to which he was entitled pursuant to the RMA Afghanistan Country Manager Agreement." (*Id.* at ¶ 127.) To the extent the alleged breach rests on Delunas's failure to contribute the funds as set forth in the ICA Shareholder Agreement, the Complaint's factual allegations preclude any such claim as it is alleged that his contribution was taken out of profits to which he was otherwise entitled.

**\*13** The Complaint also describes an unauthorized transfer of $2.6 million dollars from RMAA to ICA at Delunas's behest. (*Id.* at ¶ 56.) Not only do the RMA Plaintiffs fail to point to any provision of the ICA Shareholder Agreement that Delunas breached by so doing, but they also fail to even explain any "contractual link between the alleged transfer and Mr. Delunas'[s] obligation to invest funds[.]" (Defs.' Reply 19, ECF No. 34.) Accordingly, the Court dismisses Count III against Delunas in connection with the ICA Shareholder Agreement.

### b. Remaining Breach of Contract Claims against Defendant Wahab

Having previously addressed Defendants' arguments regarding the insufficiency of the allegations in Count III as they pertain to Wahab, the Court need only address Defendants' remaining contention that "the Complaint does not allege that Mr. Wahab 'breached' the purported

Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)

'Declaration of Trust.' " (Defs.' Br. 23, ECF No. 18.)

### i. GFSA Declaration of Trust
The argument for dismissal set forth immediately above is factually frivolous with respect to the GFSA Declaration breach of contract claim as the Complaint alleges that Wahab has wrongfully claimed ownership rights and control over the entity without consent of the beneficial shareholder, RMA Automotive, and has further seized property, contracts, and assets belonging to GFSA. (Compl.¶¶ 150, 152.) The pertinent declaration provides that Wahab holds the shares in GFSA as trustee and that he must therefore "pay and deal with said share(s) ... in such manner as the Beneficial Owner shall from time to time direct." (GFSA Decl. of Trust, Compl. Ex. F, ECF No. 8–6.) The conduct alleged is a breach of the arrangement to which Wahab agreed as he has failed to surrender the shares as requested. (Compl.¶ 22.) As such, the Complaint states a claim of breach of the GFSA Declaration against Wahab.

### ii. ATC Declaration of Trust
Defendants argue that the RMA Plaintiffs have not alleged how Wahab breached the ATC Declaration. According to the RMA Plaintiffs, Wahab breached by "refusing to surrender shares of stock held in trust for one or more of the RMA Plaintiffs." (*Id.*) Reading the Complaint as a whole, the Court is persuaded that the RMA Plaintiffs have sufficiently alleged a breach of contract claim with respect to the ATC Declaration. While the paragraph of the Complaint just quoted does not actually specify which shares Wahab allegedly refused to surrender and even though the portion of the Complaint entitled "Mr. Wahab's Breaches" focuses entirely on the GFSA Declaration (making no reference at all to the ATC Declaration of Trust), (*see generally* Complaint 44), the Court believes that enough has been made of the fact that Wahab held the shares in trust that the allegation in paragraph twenty-two puts Wahab on notice of the claims asserted against him. The Court further believes that sufficient factual matter has been pleaded such that the claim is plausible.

### c. Summary of Breach of Contract Claims
**\*14** In sum, Count III survives the pleading stage although not entirely unscathed. The breach of the RMA Afghanistan Country Manager Agreement claim against Delunas and the claims against Wahab related to the GFSA and ATC Declarations of Trust may go forward.

However, the Court dismisses the breach of the ICA Shareholder Agreement claim against Delunas and dismisses the breach of the BMG Declaration of Trust claim against Wahab.

### Count IV—Breach of Fiduciary Duties
In Count IV, the RMA Plaintiffs allege that Delunas and Wahab breached the fiduciary duties they owed to the RMA Plaintiffs by virtue of their positions as officers, directors, and/or record shareholders of the RMA Afghanistan Entities. Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v. Lutheran Church Mo. Synod,* 237 Mich.App. 567, 580–81, 603 N.W.2d 816, 823 (Mich.Ct.App.1999). When such a relationship exists, "the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.,* 266 Mich.App. 39, 698 N.W.2d 900, 906 (Mich.Ct.App.2005) (per curiam) (citation omitted). A fiduciary is duty-bound "to act for someone else's benefit," and must "subordinat[e] ... personal interests to that of the other person." *Wallad v. Access BIDCO, Inc.,* 236 Mich.App. 303, 307, 600 N.W.2d 664, 666 (Mich.Ct.App.1999) (per curiam) (emphasis, internal quotation marks, and citation omitted). A claim for the tort of breach of fiduciary duty requires a plaintiff to allege: (1) the existence of a duty arising from a fiduciary relationship; (2) a breach of that duty; and (3) an injury that was proximately caused by that breach. *Petroleum Enhancer, LLC v. Woodward,* Nos. 07–12425, 09–10247, 2013 U.S. Dist. LEXIS 24180, at \*19–24 (E.D.Mich. Feb. 22, 2013) (unpublished).

"Michigan courts have recognized fiduciary relationships such as trustees and beneficiaries, guardians and wards, attorneys and clients, and doctors and patients[.]" *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 Mich.App. 290, 294, 307 N.W.2d 761, 763 (Mich.Ct.App.1981). Further, it is axiomatic that "directors of a corporation owe fiduciary duties to stockholders and are bound to act in good faith for the benefit of the corporation." *Wallad,* 236 Mich.App. at 306, 600 N.W.2d at 666 (citations omitted). "Michigan law recognizes a fiduciary duty of loyalty for officers and directors of a corporation." *Simon v. ASIMCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.),* 410 B.R. 765, 777 (Bankr.E.D.Mich.2009) (citing the Michigan Business Corporation Act, Mich. Comp. Laws. § 450.1541a(1)) (additional citation omitted).

As an initial matter, Defendants appear to suggest that Count IV fails to state a claim because no fiduciary duties

arose pursuant to the contracts they contend do not exist. Further, if those alleged contracts are in fact binding, Defendants contend that no fiduciary duties could arise from those contracts as a matter of law. (Defs.' Reply 21, ECF No. 34); *Horizon Painting v. Adams,* Nos. 265789, 266717, 2007 Mich.App. LEXIS 508, at *3, 2007 WL 600686 (Mich.Ct.App. Feb.27, 2007) (unpublished) ("[T]here is no authority for the proposition that a fiduciary relationship exists between parties to contractual agreements[.]"). This argument fails to consider that at the pleading stage, "part[ies] may state as many separate claims or defenses as it has, regardless of consistency." Fed.R.Civ.P. 8(d)(3).

**\*15** Defendants also argue that the existence of any fiduciary relationship has not been alleged. This argument is completely lacking in merit as the Complaint contains allegations that both Wahab and Delunas were officers, directors, and/or record shareholders of the various RMA Afghanistan Entities. (*See, e.g.,* Compl. ¶¶ 33–34, 37, 39, 43–44, 48–49.) Because corporate officers and directors "owe fiduciary duties to stockholders[,]" *Wallad,* 236 Mich.App. at 306, 600 N.W.2d at 666 (citations omitted), the RMA Plaintiffs, specifically RMA–HK and RMA Automotive, (Complaint ¶¶ 40, 45, 50), have stated a viable claim against both Delunas and Wahab for breaching those duties.[20] Moreover, even if Defendants ultimately prevail in their argument that the Declarations of Trust to which Wahab is a party are not contracts, they have not provided any explanation as to why Wahab would not owe the RMA Plaintiffs fiduciary duties as a trustee. *Portage Aluminum,* 106 Mich.App. at 294, 307 N.W.2d at 763 (noting that Michigan courts recognize fiduciary duties arising from a trustee-beneficiary relationship).

Lastly, Defendants contend that Count IV fails because the Complaint does not explain how any of the alleged conduct constitutes a breach of Defendants' purported fiduciary duties. However, the Complaint alleges that the Defendants acted in contravention of the interests of the RMA Afghan Entities by usurping corporate opportunities, siphoning funds from the entities, and refusing to surrender shares held in trust. Taking these factual allegations as true, the Complaint states a claim for relief for breach of fiduciary duties that is plausible on its face. This is sufficient to deny Defendants' Motion to Dismiss with respect to Count IV.

### Count V—Tortious Interference with Contract and Business Relations

The RMA Plaintiffs contend that Defendants tortiously interfered with six specific contracts.[21] Having reviewed

the lengthy factual allegations in the Complaint, the Court believes that the RMA Plaintiffs have stated a claim for tortious interference with two of the six contracts, as discussed below.

The elements of tortious interference with contract in Michigan are "(1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v. Danke,* 216 Mich.App. 343, 350, 549 N.W.2d 56, 60 (Mich.Ct.App.1996). With respect to the third element, "[a] plaintiff must allege the intentional doing of a *per se* wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship. *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.,* 788 F.Supp. 1438, 1447 (E.D.Mich.1992) (citation omitted). "In order to prove the doing of an act 'with malice and unjustified in law,' [a] plaintiff must show specific, affirmative acts which corroborate the unlawful purpose of the interferer." *Id.* (citations omitted).

**\*16** As Defendants argue in their Reply Brief, the RMA Plaintiffs cannot state a tortious interference claim for breach of the various Declarations of Trust. (Defs.' Reply 24, ECF No. 34.) Although Defendants dispute that these declarations are binding contracts, *see supra,* they convincingly argue that this claim fails. First, there are simply no factual allegations suggesting that Delunas somehow instigated Wahab's conduct in refusing to surrender the shares he held in trust. Thus, there is no viable claim against Delunas. Second, in order to state a claim of tortious interference, a plaintiff must allege "that the defendant was a 'third party' to the contract or business relationship." *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 630 (6th Cir.2013). Because Wahab was a party to the various Declarations, it is not possible that he tortiously interfered with those contracts. Accordingly, any tortious interference claim rooted in the Declarations of Trust is dismissed.

The Complaint fails to allege a claim for tortious interference of contract with respect to the RMAA lease entered into with the United States Army. (Compl.¶ 139.) As Defendants point out, none of the RMA Plaintiffs are parties to this contract and, therefore, the RMA Plaintiffs may not bring a claim based on a breach of this contract. (Defs.' Reply 24, ECF No. 34.) The Court will not entertain any tortious interference of contract claim with respect to the United States Army lease and any such claim is therefore dismissed.

Next, with respect to the contract with the cell phone operating company in Afghanistan, the RMA Plaintiffs have not alleged that Delunas's allegedly harassing

conduct induced or caused a breach or termination of the contract or expectancy. *Mino v. Clio Sch. Dist. .,* 255 Mich.App. 60, 78, 661 N.W.2d 586, 597 (Mich.Ct.App.2003). Accordingly, the RMA Plaintiffs' tortious interference with contract claim in connection with the cell phone generator maintenance contract identified in paragraph 142 of the Complaint is dismissed.

The RMA Plaintiffs contend that a viable tortious interference with contract claim exists with respect to an audit conducted by the Defense Contracting Audit Authority. The Court is not persuaded that this audit was a contract. Further, while one could infer from the Complaint that a failure to properly respond to the audit could preclude future business opportunities, the Complaint does not allege any presently realizable damage from any hypothetical breach. Rather, the Complaint merely alleges that "[t]he RMA Plaintiffs face potential losses if they cannot sufficiently reply" to the auditors. (Compl.¶ 143.) While it is possible given the heading of Count V ("Tortious Interference with Contract and Business Relations") that the RMA Plaintiffs meant to include the audit under Count VI ("Tortious Interference with Prospective Economic Advantage") given that no contract has been alleged,[22] the fact that no damage had occurred at the time the Complaint was amended is problematic. At the motion hearing, counsel for the RMA Plaintiffs indicated that the harm in connection with the DCAA audit came to pass since amending the Complaint. In evaluating a Rule 12(b)(6) motion, however, the Court must look to the allegations as presented in the pertinent pleading. For these reasons, the Court dismisses the RMA Plaintiffs' tortious interference with contract claim as it relates to the audit.

**\*17** The remaining tortious interference with contract claims survive Defendants' Motion to Dismiss. These claims relate to the following contracts: (1) the Blanket Purchase Agreement ("BPA") that Plaintiff RMA–HK entered into with the United States Army to supply fuel for the United States Army Kabul Regional Contracting Center (*id.* at ¶¶ 134, 141, 661 N.W.2d 586) and (2) the RMA–HK and Dynocorp fuel supply agreement, (*id.* at ¶ 145, 661 N.W.2d 586).

**Count VI—Tortious Interference with Prospective Economic Advantage**
In Count VI of the Complaint, the RMA Plaintiffs have pleaded a cause of action for tortious interference with economic advantage or expectancy in connection with various business expectancies. In Michigan, the tort of interference with prospective business advantage requires a plaintiff to plead the following: (1) the existence of a

valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the plaintiff. *Lakeshore Comm. Hosp. v. Perry,* 212 Mich.App. 396, 401, 538 N.W.2d 24, 27 (Mich.Ct.App.1995) (citations omitted). Unlike the tort of tortious interference with contract, "an advantageous contractual relationship is sufficient, but not necessary, to state a cause of action." *Bonelli v. Volkswagen of Amer., Inc.,* 166 Mich.App. 483, 496 n. 4, 421 N.W.2d 213, 220 n. 4 (Mich.Ct.App.1988) (citation omitted).

In responding to Defendants' Motion to Dismiss, the RMA Plaintiffs compiled a chart summarizing the tortious interference with prospective economic advantage allegations. The chart, which merely draws its content from the Complaint, indicates that this count is pleaded against Wahab due to his repeated abusive telephone calls to the RMA Plaintiffs' current Country Manager (during which Wahab allegedly threatened the Country Manager with arrest and criminal prosecution if he remains in Afghanistan) as well as his instigation of a meritless and spurious complaint against non-party Global Star in the Afghanistan Ministry of Justice. (Compl. ¶ 153 .) As an initial matter, Global Star is not a party to this action and the RMA Plaintiffs may not bring a tortious interference cause of action on Global Star's behalf. Further, although the Complaint alleges interference with business operations, such conclusory allegations are not entitled to a presumption of truth at the pleading stage. The RMA Plaintiffs have failed to identify any breach or termination of a business expectancy and the allegations against Wahab are, therefore, too speculative to state a viable claim. Accordingly, Count VI is dismissed against Defendant Wahab.

Unlike the allegations against Wahab, the factual allegations in the Complaint are sufficient to state a cause of action against Delunas for tortious interference with prospective economic advantage. The Complaint alleges a broad array of conduct that, if proven, suffices to state an actionable claim. Thus, the Court denies Defendants' Motion to the extent it seeks dismissal of Count VI against Delunas.

**Count VII—Unjust Enrichment**
**\*18** Count VII of the Complaint seeks to state a claim of unjust enrichment against both Defendants. In Michigan, a claim for unjust enrichment requires a plaintiff to show a "(1) receipt of a benefit by Defendant from Plaintiff, and (2) an inequity resulting to Plaintiff because of

Defendant's retention of the benefit." *Belle Isle Grill Corp. v. Detroit,* 256 Mich.App. 463, 478, 666 N.W.2d 271, 280 (2003) (citation omitted). If both elements are shown, courts will imply a contract to prevent unjust enrichment. *Fodale v. Waste Mgmt. of Mich., Inc.,* 271 Mich.App. 11, 36, 718 N.W.2d 827, 841 (2006). However, a contract will not be implied where there is an express contract governing the same subject matter. *Id.*

Defendants' main argument in support of dismissal of Count VII relies on the RMA Plaintiffs' contention that the relationships of the parties are governed by contract. Although Defendants deny that the RMA Afghanistan Country Manager Agreement and Declarations of Trust are contracts, they argue that the RMA Plaintiffs' unjust enrichment claim must fail because contracts will not be implied where express contracts govern the same subject matter. *Id.* In responding to this argument, the RMA Plaintiffs note that Count VII is pled in the alternative to the breach of contract count (Count III) and concede that if successful on Count III, Count VII necessarily fails. (Pls.' Resp. 37, ECF No. 28.) Because pleading in the alternative is permitted at this stage of the proceedings, *see* Federal Rule of Civil Procedure 8(d)(3), and because the Court believes that the Complaint contains sufficient factual allegations in support of Count VII, the Court denies Defendants' Motion to Dismiss with respect to Count VII.

### C. Conclusion

Although the RMA Plaintiffs' 203–paragraph Complaint is far from a model of clarity, *see* note 12, *supra,* having pieced together the allegations contained therein, the Court grants Defendants' Motion to Dismiss in part and denies Defendants' Motion in part. The Court grants Defendants' Motion as follows: Count II (CFAA) is dismissed entirely; Count III (breach of contract) is dismissed as to the ICA Shareholder Agreement claim and the BMG Declaration claim; Count V (tortious interference with contract) is dismissed as to all claims save the BPA with the United States Army Regional Contracting Center and the Dynocorp fuel supply agreement; and Count VI (tortious interference with prospective business advantage) is dismissed against Defendant Wahab only. In addition to those just addressed by implication, the Court denies Defendants' Motion with respect to Counts I (Lanham Act), IV (breach of fiduciary duties), and VII (unjust enrichment).

## II. THE RMA GROUP PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On November 13, 2013, the RMA Group Plaintiffs filed a motion for preliminary injunction. (ECF No. 42.) In this motion, the RMA Group Plaintiffs seek relief by way of an order requiring Defendants to (1) refrain from continuing to operate the Offending U.S. Web Site, (2) restore control of the website to the RMA Group Plaintiffs, turn over the database of emails and other communications sent to or stored on the Offending U.S. Web Site's server, relinquish control of the server on which the website is hosted, and return various documents to the RMA Group Plaintiffs, (3) account for and return documents seized in an alleged July 2012 raid in Kabul, and (4) preserve rather than spoliate documents relevant to any claim or defense in this case.[23] (*Id.* at 2–3, 718 N.W.2d 827.) Defendants responded to this motion on December 9, 2013, (ECF No. 49), and the RMA Group Plaintiffs replied on December 26, 2013, (ECF No. 50). Having considered the arguments presented in the briefs and at oral argument, the Court declines to issue preliminary injunctive relief and denies the RMA Group Plaintiffs' Motion for Preliminary Injunction.

### A. Standard of Review

**\*19** "[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.' " *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1991)); *see also Bonnell v. Lorenzo,* 241 F.3d 800, 808 (6th Cir.2001) ("A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.' ") (quotation omitted). The party moving for the injunction has the burden to show that the circumstances warrant such relief, *Overstreet v. Lexington–Fayette Urban County Government,* 305 F.3d 566, 573 (6th Cir.2002), and must carry the burden of persuasion "by a clear showing," *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (citation omitted) (emphasis removed). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment." *Leary,* 228 F.3d at 739.

When a party moves for a preliminary injunction, district courts consider four factors to determine whether to grant

relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354, 1356 (6th Cir.1985). "Although these four factors must be considered in assessing a request for preliminary injunction, the four factors do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief. Instead, the district court must engage in a realistic appraisal of all the traditional factors weighed by a court of equity." *Id.* Although the Court must balance and weigh the relevant factors, "a finding that there is no likelihood of irreparable harm ... or no likelihood of success on the merits ... is usually fatal." *CLT Logistics v. River West Brands,* 777 F.Supp.2d 1052, 1064 (E.D.Mich.2011) (internal citations omitted). "It follows that a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue." *Id.* (citing *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985)). Here, the Court only considers the first two factors.

### B. Analysis

#### 1. The RMA Group Plaintiffs Have Not Made A Sufficient Showing of Likelihood of Success on the Merits.

A movant's burden on this factor ranges from requiring a "strong" likelihood of success, *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 n. 4 (6th Cir.1977), to merely "raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation," *Six Clinics Holding Corp. v. Cafcomp Systems, Inc.,* 119 F.3d 393, 402 (6th Cir.1997). "The varying language applied to the likelihood of success factor can best be reconciled by recognizing that the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean,* 775 F.2d at 1229. As addressed below, the other most important factor in the preliminary injunction analysis does not weigh in favor of awarding an injunction; therefore, the RMA Group Plaintiffs have the burden to demonstrate a strong likelihood of success on the merits.

**\*20** The RMA Group Plaintiffs contend that they are likely to succeed in establishing that Delunas's continued operation of the Offending U.S. Web Site violates the Lanham Act's prohibition against unfair competition because the Offending U.S. Web Site results in actual customer confusion.[24] As evidence of this confusion, the RMA Group Plaintiffs point to emails Delunas forwarded to the current Country Manager during a brief thawing in tensions occurring around the time of some settlement discussions. These emails support the RMA Group Plaintiffs' confusion argument as the emails were seeking services from the RMA Group Plaintiffs but were sent to Delunas (who uses the same email he used when the Country Manager of Afghanistan), not to the actual Country Manager.

Although the Court previously determined that the Complaint sufficiently stated a cause of action for violation of the Lanham Act such that the count survived Defendants' Motion to Dismiss, *see supra,* the Court does not believe that the RMA Group Plaintiffs have demonstrated a strong likelihood of success on the merits given the number of important factual discrepancies between the parties' positions regarding the ownership of the RMA Afghan Entities.[25] This factor, therefore, does not weigh in favor of issuing a preliminary injunction.

#### 2. The RMA Group Plaintiffs Have Not Demonstrated Irreparable Harm.

To demonstrate irreparable harm, the RMA Group Plaintiffs must show that "they will suffer 'actual and imminent harm' rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir.2006) (quotation omitted). Although the RMA Group Plaintiffs suggest that continued operation of the Offending U.S. Web Site will result in irreparable harm in the form of "[l]oss of good will, client trust, confidence and confidentiality and competitive advantage ... for which there is no adequate remedy at law[,]" the Court is not persuaded that the RMA Group Plaintiffs have satisfied their burden of showing that such alleged harm is actual and imminent. (RMA Group Pls.' Br. 14, ECF No. 42 (quotation omitted).)

Defendants convincingly argue that the RMA Group Plaintiffs' delay in moving for a preliminary injunction precludes a finding of irreparable harm. In the Complaint, the RMA Group Plaintiffs allege that Delunas ceased to be affiliated with them in March of 2011 but has nevertheless continued to operate the website to this very day. (Compl.¶¶ 18, 155.) Despite arguing that the operation of this website has created an ongoing likelihood of confusion among customers and business prospects, the RMA Group Plaintiffs did not seek a

Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)

preliminary injunction until November 13, 2013, over two years after the alleged employment relationship terminated. Moreover, despite instituting the present civil action on December 13, 2012 and amending the underlying complaint on May 16, 2013, the RMA Group Plaintiffs waited until November 13, 2013—nearly a year after filing suit and nearly six months after amending the complaint—to seek preliminary injunctive relief. In the trademark infringement context, courts have explained that "[s]ignificant delay in applying for injunctive relief ... tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *CTL Logistics,* 777 F.Supp.2d at 1071 (quoting *Blockbuster v. Laylco, Inc.,* 869 F.Supp. 505, 516 (E.D.Mich.1994) (quoting *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275–76 (2d Cir.1985))) (internal quotation marks omitted); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.,* 511 F. App'x 398, 405 (6th Cir.2013) ("[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm.") (citation omitted); *Wells Fargo v. When U.com, Inc.,* 293 F.Supp.2d 734, 771 (E.D.Mich.2003) (nine-month delay in seeking preliminary injunction undermined plaintiffs' allegation of irreparable harm). The prolonged delay in this case preponderates heavily against a finding of irreparable harm.

**\*21** For their part, the RMA Group Plaintiffs explain that courts may presume irreparable harm once a likelihood of success has been shown on customer confusion. (RMA Group Pls.' Br. 14, ECF No. 42 (citing, *inter alia, Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir.1999).) Attached to the RMA Group Plaintiffs' Motion is a Declaration of Robert Gannon, the current Country Manager in Afghanistan, which allegedly establishes actual customer confusion with respect to the Offending U.S. Web Site. However, as Defendants point out in their Response, "[t]here is some controversy as to whether the presumption of irreparable harm in trademark cases survived *eBay, Inc. v. MercExchange,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)[,]" wherein "the Supreme Court [of the United States] held that irreparable harm does not necessarily follow from a finding of patent infringement." *CLT Logistics,* 777 F.Supp.2d at 1072. Even if the presumption that the RMA Group Plaintiffs remains viable, it would be inappropriate to apply the presumption in this case given the lingering factual questions surrounding ownership of and right of access to the website as well as the lengthy delay in seeking injunctive relief and the possibility that monetary damages would sufficiently rectify any harm the RMA Group Plaintiffs experience while the Court is able to

adjudicate this dispute on the merits.

For the reasons above, this preliminary injunction factor, like the first factor discussed above, disfavors injunctive relief.

### C. Conclusion

The Court does not believe that the RMA Group Plaintiffs have demonstrated a strong likelihood of success on the merits or that they have demonstrated irreparable harm. Because preliminary injunctions involve the exercise of a power to be applied only in circumstances clearly demanding it, and because the RMA Group Plaintiffs have not demonstrated that this is such a case, the Court denies the RMA Group Plaintiffs' Motion for Preliminary Injunction.

### III. THE WHITCRAFT THIRD PARTIES' MOTION TO DISMISS THIRD–PARTY COMPLAINT

Third–Party Defendants Mark and Tom Whitcraft (the "Whitcraft Third Parties") have moved this Court to dismiss Defendants Delunas and Wahab's claims against them and therefore dismiss them from this action. (Whitcraft Third Parties' Mot., ECF No. 36.) The Whitcraft Third Parties first argue that dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(2) because the Court lacks personal jurisdiction over them. In the alternative, the Whitcraft Third Parties contend that the allegations made against them in the Third–Party Complaint fail to state a claim upon which relief can be granted and that dismissal is therefore proper pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Procedural Background

In answering the RMA Plaintiffs' Complaint, Delunas and Wahab filed a Counter–Complaint against Plaintiffs Kevin, RMA–HK, and RMA–ME as well as a Third–Party Complaint against two additional defendants: Mark Whitcraft and Tom Whitcraft. In the Counter–Complaint/Third–Party Complaint, Delunas and Wahab have pleaded the following counts: Count I—Breach of Partnership Agreement (against all Whitcraft Defendants[26] and/or RMA–HK); Count II—Breach of Fiduciary Duties in Connection with Partnership Agreement (against

Whitcraft Defendants and RMA–HK); Count III—Breach of Fuel Partnership (against Whitcraft Defendants and RMA–HK); Count IV—Breach of Fiduciary Duties in Connection with Fuel Partnership Agreement (against Whitcraft Defendants and RMA–HK); Count V—Accounting; Count VI—Common Law and Statutory Conversion; Count VII—Promissory Estoppel (plead in the alternative); Count VIII—Unjust Enrichment (plead in the alternative); and Counts IX through XI—Breach of Contract—plead in the alternative against the Whitcrafts and RMA–HK). (ECF No. 19.) The Whitcraft Third Parties seek dismissal of these counts against them pursuant to Rule 12(b)(2).

### B. Jurisdictional Facts

**\*22** Mark, the father of Kevin and Tom, is a United States citizen residing in the Kingdom of Thailand pursuant to a permanent resident permit. (Whitcraft Third Parties' Br. 2, ECF No. 36.[27]) In 1958, after serving in the United States military in the Korean War, Mark obtained a job with Goodyear which required that he move to Thailand. (Id. at 3.) Mark has resided in Thailand continuously since 1958 with the exception of a two year period (1966–1968) spent in Hong Kong. (Id.) Mark does not reside in Michigan, is not registered to vote in Michigan, and owns no real property in Michigan.[28] (Id.)

Mark "started the RMA Group[ ]"[29] in 1985 and "was the Chief Executive Officer of the RMA Group until approximately 1996," when his son Kevin succeeded him in that position. (Id.) After Kevin became CEO, Mark transitioned to Chairman of the RMA Group and became "much less involved in day-to-day operational decisions." (Id.) Of the various entities involved in the present action, Mark holds positions in only three: (1) RMA–HK; (2) RMA–HK's parent company, Clipper Holdings, Ltd. ("Clipper"); and (3) Global Fleet. Mark has served as a director of RMA–HK since 1996 and of Clipper since 2007. (Id. at 4.) Neither RMA–HK nor Clipper is located in Michigan. (Id.) Mark serves as both a manager and treasurer of Global Fleet, which has its principal place of business in Southfield, Michigan. (Id.) Mark has "no role in the day-to-day business activities of" Global Fleet. (Id.) With respect to the RMA Afghan Entities, Mark has never held a position with any of the companies, has never been involved in any of the day-to-day business activities of the companies, nor has he owned any stock in the companies. (Id.) Since the RMA Group began operations in Afghanistan, Mark traveled there only once for a three-day period in 2006. (Id.) Lastly, Mark alleges that he has never entered into any agreements with Delunas or

Wahab, (id.), but this Court must accept Third–Party Plaintiffs' factual allegations regarding Mark being a part of various partnerships with Delunas as true.

Tom holds dual citizenship in both the United States and the Kingdom of Thailand. (Id.) He last resided in the United States in 1985 while pursuing post-secondary education. (Id.) Tom is not a Michigan resident, is not registered to vote in Michigan, and owns no property in Michigan. (Id. at 5.) Tom holds positions in the following entities: (1) RMA–HK; (2) Clipper; and (3) Global Fleet. (Id.) Tom has been a director of RMA–HK since 1990 and a director of Clipper since 2007. (Id.) With respect to the only Michigan-based entity—Global Fleet—Tom is a manager; he owns no shares and alleges that he has "no involvement in its day-to-day business activities." (Id.) With respect to the RMA Afghan Entities, Mark has never held a position with any of the companies, has never been involved in any of the day-to-day business activities, nor has he owned any stock in the companies. (Id.) Tom has never been to Afghanistan and claims that he has never entered into any agreements with Delunas or Wahab. (Id.) The Court, however, must construe Third–Party Plaintiffs' allegations regarding Tom's membership in various partnerships with Delunas in their favor.

### C. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

**\*23** The Whitcraft Third Parties raise a jurisdictional issue in their motion seeking dismissal. They contend that this Court does not have personal jurisdiction over them because they have insufficient contacts with the State of Michigan to subject them to either general or limited personal jurisdiction in this Court.

### 1. Applicable Law

When reviewing a Rule 12(b)(2) motion, a federal district court may proceed by relying solely on written submissions and affidavits to resolve the jurisdictional question or it may permit limited discovery or hold an evidentiary hearing in aid of the motion. *Serras v. First Tenn. Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989) (citation omitted). Regardless of which method a court ultimately selects, " 'the plaintiff always bears the burden of establishing that jurisdiction exists.' " *Id.* (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) and *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929 (6th Cir.1974)). "The weight of the plaintiff's burden,

however, depends on whether the trial court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue[.]" *Id.* In this case, the Court will issue a ruling on the written submissions alone as Third–Party Plaintiffs "contend that the record before the Court is sufficient to confer personal jurisdiction over" the Whitcraft Third Parties.[30] (Third–Party Pls.' Resp. 8 n. 1, ECF No. 46.)

When a court "rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, 'by affidavit or otherwise[,] ... specific facts showing that the court has jurisdiction." *Serras,* 875 F.2d at 1214 (quoting *Weller,* 504 F.2d at 930) (alteration in original). Although this places some burden on Third–Party Plaintiffs, this burden is "relatively slight[,]" *American Greetings Corp. v. Cohen,* 839 F.2d 1164, 1169 (6th Cir.1988), and only requires "a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal [,]" *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991). Further lessening the burden is the rule that courts must consider the pleadings and affidavits in the light most favorable to the party seeking to establish jurisdiction. *Theunissen,* 935 F.2d at 1459.

Personal jurisdiction over an out-of-state defendant arises from "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quotation omitted). Personal jurisdiction takes two forms: general personal jurisdiction and specific or limited personal jurisdiction. A court applies principles of general jurisdiction when a claimant's cause of action is unrelated to a defendant's in-state activities. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984) (citation omitted). Specific jurisdiction is applied when a claimant's cause of action arises out of specific instances of a defendant's conduct, such as a defendant's business transactions, within the forum state. *Id.* at 414 n. 8, 104 S.Ct. at 1872 n. 8. In the instant dispute, Third–Party Plaintiffs seek to invoke the doctrine of specific jurisdiction, as evidenced by their argument that the Whitcraft Third Parties are amenable to jurisdiction pursuant to Michigan Compiled Laws § 600.705.[31]

**\*24** Where, as here, subject matter jurisdiction arises out of a federal question, "personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the

defendant[ ] due process.' " *Bird v. Parson,* 289 F.3d 865, 871 (6th Cir.2002) (alterations in original) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 954 F.2d 1174, 1176 (6th Cir.1992)). Because "[t]he Michigan Supreme Court has construed Michigan's Long–Arm Statute to bestow the broadest possible grant of personal jurisdiction consistent with due process," "the two questions become one." *Innovation Ventures, LLC v. N2G Distributing, Inc.,* 635 F.Supp.2d 632, 636 (E.D.Mich.2008) (alteration in original) (quotations omitted).

In order to comport with the strictures of the Due Process Clause, this Court must determine whether the Whitcraft Third Parties have sufficient "minimum contacts" with the State of Michigan such that haling them into this Court comports with " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (quotation omitted). The United States Court of Appeals for the Sixth Circuit has set forth the following three criteria that must be satisfied before a court exercises personal jurisdiction over a non-consenting out-of-state defendant:[32]

> First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.
>
> *Southern Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir.1968); *see also Kerry Steel, Inc. v. Paragon Indus., Inc .,* 106 F.3d 147, 150 (6th Cir.1997) ("Although not the last word on personal jurisdiction, the *Mohasco* test continues to provide a useful starting point for analyzing jurisdictional questions of the sort presented here.") (citations omitted).

### 2. Application of the Mohasco Factors

"The *Mohasco* [C]ourt called purposeful availment the *'sine qua non* for *in personam* jurisdiction.' " *Kerry Steel,* 106 F.3d at 150 (quoting *Mohasco,* 401 F.2d at 381–82). Pursuant to authority from the Supreme Court of the United States, purposeful availment means that an actor has taken advantage "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (quotation omitted).

Third–Party Plaintiffs contend that the Whitcraft Third Parties are subject to this Court's jurisdiction because "it is entirely reasonable and foreseeable that one who forms, owns, manages, operates, and controls a multi-million dollar company with its princip[al] place of business in Michigan may be subject to a lawsuit in this State as a result of the operations of that company." (Third–Party Pls.' Resp. 17, ECF No. 46 (citations omitted).) In other words, Third–Party Plaintiffs suggest that the Whitcraft Third Parties have purposefully availed themselves of the benefits and protections of Michigan law and can therefore be subjected to suit.

**\*25** Third–Party Plaintiffs' argument is unavailing as the Whitcraft Third Parties' purportedly wrongful conduct is divorced from their roles with Global Fleet and, therefore, does not satisfy the requisites of either the Due Process Clause or Michigan Compiled Laws § 600.705. In other words, contrary to the arguments suggesting otherwise, the mere fact that, for example, Global Fleet conducts business in Michigan does not mean that its managers are amenable to suit in Michigan for conduct unrelated to their roles as managers of Global Fleet.[33] Thus, while Third–Party Plaintiffs' argument regarding Mark and Tom's purposeful availment of Michigan opportunities is arguably true in the context of conduct related to their role as managers of Global Fleet, the same is not true here for the reasons explored more fully immediately below.

The second *Mohasco* factor is the real problem for Third–Party Plaintiffs as the causes of action pleaded in the Third–Party Complaint do not arise from the Whitcraft Third Parties' Michigan activities. *Mohasco,* 401 F.2d at 381. Third–Party Plaintiffs contend that the Whitcraft Third Parties' decision to establish Global Fleet, a closely-held limited liability company, and to locate Global Fleet's principal place of business in Southfield, Michigan supports a finding of personal jurisdiction. (Third–Party Pls.' Resp. 15, ECF No. 46.) This is so because both Mark and Tom are managers of Global Fleet and, as evidenced by Global Fleet's Operating Agreement, the managers (of which there are three in total) exercise exclusive authority and discretion regarding Global Fleet's business activities. (*Id.*) Further, Mark, as Treasurer of Global Fleet, is an officer. (*Id.*) Assuming that these roles are sufficient for this Court to exercise limited personal jurisdiction over these individuals, Third–Party Plaintiffs do not seem to appreciate that the allegations in the Third–Party Complaint are completely untethered from Global Fleet's conduct or any conduct Mark and Tom engaged in in connection with Global Fleet.

Although Third–Party Plaintiffs contend that the Whitcraft Third Parties caused Global Fleet "to make significant sales of goods with a final destination of Afghanistan" and that Delunas was deprived of "his share of profits generated by these sales[,]" the alleged agreement regarding the apportionment of profits was, according to the Third–Party Complaint, contained in a Partnership Agreement that Delunas entered into with Kevin and the Whitcraft Third Parties, *not* an agreement with Global Fleet. (*Id.*) While Third–Party Plaintiffs have alleged breaches of various partnership agreements, these agreements were not entered into in Michigan. Moreover, the work to be performed pursuant to the alleged partnership agreements arouse out of business to be performed in Afghanistan, not Michigan. Further, the fact that Mark and Tom are managers of Michigan-based Global Fleet (one of the RMA Group Plaintiffs) does not *ipso facto* make jurisdiction proper, particularly in light of Third–Party Plaintiffs decision not to name Global Fleet as a counter-defendant and the concomitant absence of any allegations against Global Fleet. Although Third–Party Plaintiffs argue that Mark and Tom are named because they are part of the alleged partnerships and Global Fleet is not, as the Whitcraft Third Parties suggest in their Brief, "[i]f the entity that is alleged to be the basis of the Whitcraft Third Parties' jurisdictional ties to the forum is not relevant to the Third–Party Plaintiffs' claims, neither are its officers, directors, managers, or shareholders." (Whitcraft Third Parties' Br. 15–16, ECF No. 36.) Third–Party Plaintiffs' justifications for finding personal jurisdiction are simply too attenuated to satisfy the demands imposed by the Due Process Clause.

**\*26** For the reasons elucidated above, this Court lacks personal jurisdiction over both Mark and Tom and dismissal of the claims made against these parties is proper pursuant to Federal Rule of Civil Procedure 12(b)(1).[34] Accordingly, the Court grants the Whitcraft Third Parties' Motion to Dismiss and Mark and Tom are dismissed from the present action.[35]

## IV. THE RMA COUNTER–DEFENDANTS' MOTION TO STRIKE

The fourth, and final, motion pending before the Court is the RMA Counter–Defendants'[36] Motion to Strike filed on September 25, 2013 pursuant to Federal Rule of Civil Procedure 12(f) and Federal Rule of Civil Procedure 408. (ECF No. 26.) In this motion, the RMA Counter–Defendants ask this Court to strike paragraphs 47, 54, 55, and 56 from the Counter–Complaint on the grounds that the content is immaterial and impertinent pursuant to Rule 12(f) because the facts alleged in the paragraphs, if sought

to be introduced at trial, would be inadmissible pursuant to Federal Rule of Evidence 408.[37] Counter-Plaintiffs contend that the allegations contained in the challenged paragraphs are not inadmissible offers to compromise and that the record is too scant to grant a motion to strike on this basis. (*See generally* Counter–Pls.' Resp., ECF No. 31.)

### A. Summary of Allegations Contained in the Challenged Paragraphs

Paragraphs 47, 54, and 55 of the Counter–Complaint describe a meeting that took place in London, England in September of 2011 between Delunas and Kevin allegedly regarding the conduct, operation, and winding up of what Counter–Plaintiffs describe as various partnerships Delunas entered with the Whitcraft Defendants.[38] (Counter–Compl. ¶ 54, ECF No. 31.) At the September 2011 meeting, Delunas and Kevin allegedly agreed "that from July 31, 2011 forward, the Partnership's share of the profits generated by the Fuel Partnership would be divided as follows: 50% for [ ] Delunas and 50% for the Partnership, such that [ ] Delunas would be entitled to 25% of all profit generated by the Fuel Partnership on and after July 31, 2011." (*Id.* at ¶ 47.) Paragraph 54 provides a series of terms that Delunas and Kevin agreed upon in connection with the dissolution and winding down of the partnerships, including the creation of the RMA Group Mitigating Entities,[39] how employees of the partnerships would be handled, and so forth. (*Id.* at ¶ 54.) Paragraph 55 describes the formation of the RMA Group Mitigating entities.

Paragraph 56 of the Counter–Complaint describes a December 12, 2012 meeting between Delunas and Kevin at which they "discuss[ed] additional terms pursuant to which the Partnership would be wound-down. Those terms included the payment by the Partnership of $8.2 million to [ ] Delunas to partially satisfy a portion of the obligations owed to [ ] Delunas by the Partnership." (*Id.* at ¶ 56.)

### B. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(f), a "court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). As with other motions brought pursuant to Rule 12, in

deciding a Rule 12(f) motion, a court "must accept the matters well-pleaded as true and should not consider matters outside the pleadings." *County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148, 152 (S.D.N.Y.2002).

**\*27** The Sixth Circuit has held that striking a pleading is "a drastic remedy" that "should be sparingly used by the courts." *Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir.1953) (citations omitted). This rule is driven by the "practical difficulty of deciding cases without a [well-developed] factual record[.]" *Id.* Animated by this concern, "[t]he motion to strike should be granted only when the pleading to be stri [c]ken has no possible relation to the controversy." *Id.* (citations omitted); *see also Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 892 (2d Cir.1976) (citing cases). "Evidentiary questions ... should especially be avoided at such a preliminary stage of the proceedings." *Lipsky,* 551 F.2d at 893.

### C. Analysis

Before the bar of Federal Rule of Evidence 408 applies to challenged evidence, "there must first be an actual dispute concerning the validity or the amount of a claim." *ForeWord Magazine, Inc. v. OverDrive, Inc.,* No. 1:10–cv–1144, 2011 U.S. Dist. LEXIS 125373, at \*17, 2011 WL 5169384 (W.D.Mich. Oct. 31, 2011) (unpublished). "Although litigation need not have been threatened, the operation of the Rule applies only where an actual dispute or difference of opinion exists." *Id.* (citing *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.,* 56 F.3d 521, 527 (3d Cir.1995)). Evidence relating to "business negotiations taking place before a dispute arises are not subject to exclusion under Rule 408." *Id.* at \*18 (citing *Walls v. First UNUM Life Ins. Co.,* 982 F.Supp. 929 (W.D.N.Y.1997)).

Counter–Defendants contend that evidence of the facts contained in the challenged paragraphs would be inadmissible at trial pursuant to Federal Rule of Evidence 408. As support, Counter–Defendants rely on the allegations in the Counter–Complaint acknowledging that the parties' business relationship became irreparably broken in March 2011. (Compl. ¶ 133, ECF No. 8; Answer ¶ 133, ECF No. 19. *But see* Counter–Compl. ¶ 51 (providing that "unlawful [ ]" termination of relationship occurred on June 5, 2011).) Further, "the alleged breach by the RMA Counter–Defendants occurred before the September 2011 and the December 2012" meetings. (Counter–Defs.' Resp. 2, ECF No. 39 (citing Counter–

Compl. ¶ 53 ("[O]n June 5, 2011, [ ] Delunas advised the Partnership that Kevin['s] communication constituted a breach of the Partnership Agreement [.]")) (emphasis removed).) According to Counter–Defendants, based on this chronology, a dispute between the parties had already arisen such that the September 2011 and December 2012 meetings are properly considered settlement discussions, not business negotiations as Counter–Plaintiffs contend. (*Id.* 2–3.)

Counter–Plaintiffs, on the other hand, deny that the meetings constitute settlement discussions. Further, even if they are, Counter–Plaintiffs contend that given the lack of an evidentiary record, the Court is not well-positioned to determine whether any evidence related to these meetings will be offered for a prohibited use under Rule 408. (Counter–Pls.' Resp. 17–18, ECF No. 31.) Lastly, Counter–Plaintiffs suggest that the information in the challenged paragraphs set forth facts regarding the existence of a partnership and the terms relating to the winding-up of said partnership and therefore do not relate to an alleged offer to compromise.

**\*28** Although the Court agrees with Counter–Defendants that the timing of the meetings (particularly the December 12, 2012 meeting, which occurred just one day before the RMA Plaintiffs instituted the present action) suggests that these meetings may have been compromise negotiations, and further agree that the Counter–Plaintiffs' argument that the meetings are directly relevant to and support the Counter–Plaintiffs' claims but that the allegations would not be used to prove or dispute the validity or amount of a disputed claim is rather circular, the Court cannot, at this juncture, reach the conclusion that the challenged paragraphs have "no possible relation to the controversy." *Brown & Williamson,* 201 F.2d at 822. Because several opportunities remain to seek exclusion of the challenged evidence prior to the commencement of trial, the Court does not believe that granting Counter–Defendants' Motion to Strike at this time is warranted.

### D. Conclusion

For the reasons above, the Court denies Counter–Defendants' Motion to Strike but does so without prejudice.

### V. ORDER

For the reasons set forth herein, the Court orders as follows:

**IT IS ORDERED** that Defendants' Motion to Dismiss (ECF No. 18) is **GRANTED IN PART** and **DENIED IN PART;** specifically, Count II (CFAA) of the RMA Plaintiffs' (First Amended) Complaint (ECF No. 8) is **DISMISSED WITH PREJUDICE,** Count III (breach of contract) is **DISMISSED WITH PREJUDICE** as to the ICA Shareholder Agreement claim and the BMG Declaration of Trust claim, Count V (tortious interference with contract) is **DISMISSED WITH PREJUDICE** as to all claims save the BPA with the United States Army Regional Contracting Center and the Dynocorp fuel supply agreement, and Count VI (tortious interference with prospective business advantage) is **DISMISSED WITH PREJUDICE** against Defendant Wahab only;

**IT IS FURTHER ORDERED** that the RMA Group Plaintiffs' Motion for Preliminary Injunction (ECF No. 42) is **DENIED;**

**IT IS FURTHER ORDERED** that the Whitcraft Third Parties' Motion to Dismiss Third–Party Complaint (ECF No. 36) is **GRANTED** and that Third–Party Plaintiffs **MARK WHITCRAFT** and **TOM WHITCRAFT** are **DISMISSED** from this lawsuit;

**IT IS FURTHER ORDERED** that Counter–Defendants' Motion to Strike (ECF No. 26) is **DENIED WITHOUT PREJUDICE.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 634075

Footnotes

1    The Court refers to the RMA Plaintiffs' First Amended Complaint, filed on May 16, 2013, simply as the Complaint. The original
     complaint was filed on December 13, 2012. (ECF No. 1.)

2    Although the Court traditionally identifies parties by their last names, the Court uses Kevin's, as well as Third–Party Defendants Mark
     and Tom's given names, as they all share a common last name. The Court intends no disrespect in using the parties' first
     names; rather, the Court is merely attempting to militate against any possibility of confusion.

3     The Court provides a more thorough explanation of the contract terms as alleged in the Complaint in its analysis of Count III (breach of contract).

4     Hereinafter, Plaintiffs' First Amended Complaint will be referred to simply as Plaintiffs' Complaint.

5     The facts recited in the Complaint and the Counter–Complaint, at least with respect to the facts relevant to the various allegations of wrongdoing, could hardly be more disparate. Upon reviewing these pleadings, and being required to construe the factual allegations therein in favor of different parties depending on the motion under consideration, the Court was reminded of the late Senator Patrick Daniel Moynihan's admonition that "[e]veryone is entitled to his own opinion, but not to his own facts."

6     Specifically, the RMA Plaintiffs seek a declaratory judgment, injunctive relief, an accounting and imposition of a constructive trust, compensatory damages, treble damages, punitive damages, costs, and attorneys' fees. (Compl. 2, ECF No. 8.)

7     Because Defendants filed an Answer to the RMA Plaintiffs' Complaint, (ECF No. 19), a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is untimely. *See* Fed.R.Civ.P. 12(b) (explaining that motions filed pursuant to the rule "must be made before pleading if a responsive pleading is allowed"). Insofar as Defendants' Answer constitutes a "pleading" as defined in Federal Rule of Civil Procedure 7(a)(2), the proper motion to file would be a Rule 12(c) motion for judgment on the pleadings. This technical defect is not fatal, however, as the same standard of review governs motions filed under both Rule 12(b)(6) and Rule 12(c). *EEOC v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir.2001) (citation omitted). Accordingly, the Court construes Defendants' post-answer motion to dismiss as a motion for judgment on the pleadings.

8     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits two types of unfair competition. Section 43(a)(1)(A) prohibits "false association" whereas section 43(a)(1)(B) prohibits "false advertising."

9     Title 15 U.S.C. § 1125(a) provides:
      (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
      (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
      (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
      shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

10    Title 18 U.S.C. § 1030(a)(5) provides, in pertinent part, that whoever:
      (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
      (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss ...
      shall be punished as provided in subsection (c) of this section.

11    For instance, the Complaint alleges since the termination of the RMA Afghanistan Country Manager Agreement, "Mr. Delunas no longer has the right to use and operate the Offending U.S. Web Site[ .]" (Compl.¶ 155.) Further implying ownership is the allegation that "Delunas has wrongfully refused to turn over ... the database of all emails and other communications sent to or stored on the server(s) for the Offending U.S. Web Site[.]" (*Id.* at ¶ 149.) Lastly, the RMA Plaintiffs observe that the termination of the RMA Afghanistan Country Manager Agreement did not transfer ownership of the website to Delunas. (Pls.' Resp. 28, ECF No. 28.)
      At the February 6, 2014 motion hearing, the parties seemed to agree that either RMAA and/or ATC owns the website. While this is suggestive of the RMA Group Plaintiffs' ownership given the allegations that Delunas's ownership stake in RMAA was divested upon termination of the RMA Afghanistan Country Manager Agreement, it is this Court's opinion that the allegations contained in this footnote do nothing to undermine the express statement that "the RMA Group Plaintiffs have no affiliation with or control of the Offending U.S. Web Site." (Compl.¶ 156.)

12    The Court cautions counsel that grouping the alleged breach of five separate contracts by two different defendants in one count is disfavored. *See* Fed.R.Civ.P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence ... must be stated in a separate count[.]"). This applies equally to the RMA Plaintiffs' remaining causes of action.

| Contract | Defendant Delunas | Defendant Wahab |
|---|---|---|

Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)

| | |
|---|---|
| RMA Afghanistan Country Manager Agreemen | ✓ |
| ICA Shareholder Agreement[13] | ✓ |

13   The ICA Shareholder Agreement is attached to the RMA Plaintiffs' Response to Defendants' Motion to Dismiss as Exhibit B. (ECF No. 28–2.)

14   The ATC Declaration of Trust is attached to the Complaint as Exhibit E. (ECF No. 8–5.)

15   The GFSA Declaration of Trust is attached to the Complaint as Exhibit F. (ECF No. 8–6.)

16   The Badhakhshan Mining Group ("BMG") Declaration of Trust, executed on May 26, 2009, is attached to the RMA Plaintiffs' Response to Defendants' Motion to Dismiss as Exhibit C. (ECF No. 28–3.)

17   With respect to the RMA Afghanistan Country Manager Agreement, Defendants blatantly claim that "no contract exists[.]" (Defs.' Br. 19, ECF No. 18.) At this stage in the proceedings, however, the Court is bound to accept the allegations contained in the Complaint as true and may not operate under the assumption that the relationship of the parties was one of partnership as alleged in the Counter–Complaint.

18   According to the RMA Plaintiffs, "the RMA Afghanistan Country Agreement requires reference to multiple documents and possibly extrinsic evidence to establish all of its essential terms and conditions." (Pls.' Resp. 30, ECF No. 28.)

19   Somewhat confusingly, the Complaint contains allegations that Delunas owns twenty-five percent (25%) of the shares of various RMA Afghan Entities. (*See, e.g.*, Compl. ¶¶ 39–40.) The RMA Plaintiffs do allege, however, that this ownership interest was limited to the term of the RMA Afghanistan Country Manager Agreement and that upon the 2011 termination of the relationship, Delunas "was obligated to surrender his ownership interest[.]" (*Id.* at ¶ 113.)

20   Although Defendants insist that the RMA Plaintiffs lack standing to assert breach of fiduciary duty claims because the entities of which Defendants were officers or directors are not named plaintiffs, this argument is not well-taken as it is clear that a company's shareholders may assert claims for breach of fiduciary duties against the company's officers and directors. (Defs.' Br. 24, ECF No. 18.)

21   In the RMA Plaintiffs' Response Brief, Counts V and VI are grouped together. In discussing tortious interference in general, the RMA Plaintiffs indicate that Defendants tortiously interfered with the GFS–TACOM Contract, Ford Motor Company's Qualified Vehicle Modifier Program, and the PAE subcontract. (RMA Pls.' Resp. 35, ECF No. 28.) The Court has reviewed the portions of the Complaint cited to in the Response and wishes to note that the mere reference to these contracts or business relationships does not suffice to state a claim of tortious interference. Accordingly, the RMA Plaintiffs may not bring claims with respect to the three aforementioned contracts.

22   In fact, at the motion hearing, the RMA Plaintiffs admitted that the DCAA audit is not a contract but explained that it is a business relationship that Defendants interfered with and that this interference harmed the RMA Plaintiffs' ability to compete for and obtain business in the future.

23   Defendants point out that only the relief related to the website was requested in the RMA Plaintiffs' Complaint.

24   The RMA Group Plaintiffs also make arguments regarding the likelihood of success on the other counts contained in the Complaint. However, the two counts most pertinent to the relief sought by way of the instant Motion for Preliminary Injunction are the Lanham Act count (Count I) and the CFAA count (Count II). Because the Court has determined that the CFAA count does not withstand Defendants' Motion to Dismiss, *see supra*, the Court only touches upon the arguments raised in connection with Count I. The Court further notes that some of the requested relief—primarily as it relates to the requests for documents—seems to be a proper subject for the discovery phase of the proceedings.

25   For instance, Defendants contend that Delunas operates the Offending U.S. Website, which is owned by RMAA, in his capacity of President of RMAA. The RMA Group Plaintiffs, on the other hand, argue that any ownership interest Delunas once possessed in RMA became extinguished upon the termination of the RMA Afghan Country Manager Agreement. If this Court were to issue a preliminary injunction ordering that Defendants stop operating the website and relinquish control over various communications

Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)

sent to the website, it would, in effect, be issuing an opinion on the merits of this dispute without a well-developed factual record. This Court will not do.

26 The "Whitcraft Defendants" refers to Kevin, Mark, and Tom.

27 The jurisdictional facts stated herein are set forth in separate Declarations filed by both Mark and Tom. The Court cites to the Whitcraft Third Parties' Brief which in turn cites the two Declarations.

28 Mark owns a single parcel of real property in the United States; it is located in the State of Hawaii. (Whitcraft Third Parties' Br. 3, ECF No. 36.)

29 The Court is not entirely certain how Mark "started the RMA Group[ ]" and served as its CEO given the allegations made in the Complaint that the RMA Group "is not an actual entity[; rather, it] refers collectively to various affiliated companies[.]" (Compl. ¶ 5, ECF No. 8.)

30 Delunas and Wahab "believe that there exist other, and as of yet undiscovered, contacts and connections between [the Whitcraft Third Parties] and the State of Michigan. As a result, [they] request the opportunity to conduct limited jurisdictional discovery if the Court" is inclined to grant the Whitcraft Third Parties' Motion to Dismiss. (Third Party Pls.' Resp. 8–9 n. 1, ECF No. 46.) The Court does not believe that additional discovery is warranted and therefore denies this request.

31 Michigan Compiled Laws § 600.705, captioned "Limited personal jurisdiction over individuals[,]" provides, in pertinent part:
> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:
> (1) The transaction of any business within the state.
> (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort....
> (5) Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.
> (6) Acting as a director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state....

32 The Court notes that the Whitcraft Third Parties have not consented to jurisdiction; the instant motion constitutes a limited appearance and does not, therefore, imply any such consent. (Whitcraft Third Parties' Br. 8–9, ECF No. 36.)

33 As explained above, the finding of jurisdiction in such a circumstance would be pursuant to the principle of general, not specific, jurisdiction.

34 Because the Court grants the Whitcraft Third Parties' Motion to dismiss on jurisdictional grounds, the Court declines to analyze alternative arguments made pursuant to Rule 12(b)(6).

35 The Whitcraft Third Parties' Motion to Dismiss is the sole motion before the Court challenging the sufficiency of the Counter–Complaint/Third–Party Complaint. As such, the Counter–Complaint survives the pleading stage as to the counter-defendants named therein.

36 For purposes of refreshing recollection, the RMA Counter–Defendants are Kevin Whitcraft, RMA–HK, and RMA–ME. Plaintiffs Global Fleet and RMA Automotive are not named as counter-defendants.

37 Rule 408(a) ("Compromise Offers and Negotiations") provides, in pertinent part, that evidence of the following is not admissible— on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> [Prohibited uses.] (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
> (2) conduct or a statement made during compromise negotiations about the claim .....

38 Delunas contends that his relationship with the RMA Plaintiffs was one of partnership, not contract.

39 These entities include RMA Group Afghanistan and Global Star.

**Global Fleet Sales, LLC v. Delunas, Not Reported in F.Supp.3d (2014)**

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4265824
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Jeffrey GRONSKI, Plaintif,
v.
Kelly M. SIGLER,[1] Defendants.

No. 2:13–CV–13928.
|
Signed Aug. 5, 2014.

**Attorneys and Law Firms**

Jeffrey Gronski, Ionia, MI, pro se.

Kevin R. Himebaugh, Michigan Department of Attorney General, Lansing, MI, for Defendants.

*MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT SIGLER'S MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S MOTION TO DEFER MOTION FOR SUMMARY JUDGMENT (Docs.25, 29)*

PATRICIA T. MORRIS, United States Magistrate Judge.

**I. RECOMMENDATION**

**\*1** For the reasons presented below, **IT IS RECOMMENDED** that Defendant Sigler's Motion for Summary Judgment (Doc. 25) be **GRANTED** and that Plaintiff's Motion to Defer Motion for Summary Judgment (Doc. 29) be **DENIED.**

**II. REPORT**

**A. Introduction**

Plaintiff Jeffrey Gronski filed this *pro se* prisoner civil rights action under 42 U.S.C. § 1983 on September 13, 2013. (Doc. 1 at 1.) Plaintiff alleges that Defendants David Clifton and Mary Ann Bull–Ehinger were deliberately indifferent to his safety needs in violation of the Eighth Amendment by failing to prevent sexual assault/harassment from his psychologist Joell Morrill.[2] (Doc. 1 at 3–5.) During the times relevant to this cause of action, Defendant Sigler was employed by "Marriages That Work" ("MTW"), which was a 501(c)(3) charitable organization but which has since, due to lack of funding, been dissolved. (Doc. 25 at 5.)

Defendant contends that she is entitled to summary judgment because: (1) she was not acting under color of state law since she is a private citizen and was not employed by or an agent of the State of Michigan (Doc. 25 at 8–9); (2) Plaintiff's claims are barred by the two-year statute of limitations set forth in Mich. Comp. Laws § 600.5805(2) (assault and battery) (Doc. 25 at 9–10); and (3) Plaintiff failed to exhaust his administrative remedies. (Doc. 25 at 10–12.) Plaintiff responded, in his motion to defer summary judgment (Doc. 29), and Defendant Sigler replied. (Doc. 30.)

Plaintiff seeks to defer summary judgment (Doc. 29) because he "needs to obtain discovery and obtain the contractual agreement between Defendant Sigler's employer (MTW) and the Michigan Department of Corrections (MDOC)." (Doc. 29 at 3.) Plaintiff's other arguments address the merits of Defendant Sigler's motion for summary judgment.

Therefore, the motions are ready for report and recommendation without oral argument. *See* E.D. Mich. LR 7.1(f)(1).

**B. Standard of Review**

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has " 'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita,* 475 U.S. at 587–88. Summary judgment is also proper where the moving party shows that the non-moving party

is unable to meet its burden of proof. *Celotex,* 477 U.S. at 325.

**\*2** The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street,* 886 F.2d at 1479–80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees,* 980 F.2d 399, 404 (6th Cir.1992).

After examining the evidence designated by the parties, the court then determines " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 251–52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

### C. Defendant Sigler's Motion for Summary Judgment

#### 1. State Actor Requirement

To state a claim under 42 U.S.C. § 1983, a Plaintiff must show: (1) deprivation of a right that is protected by the Constitution or law of the United States; that was (2) caused by a person acting under the color of state law. *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir.2006). In the instant case, Defendant Sigler was a private party employed by MTW, a 501(c)(3) charitable organization. "A private party's actions constitute state action under section 1983 where those actions may be 'fairly attributable' to the state.' " *Chapman v. Higbee Co.,* 319 F.3d 825, 833 (6th Cir.2003). The Sixth Circuit uses three tests to determine whether an action may be considered "fairly attributable to the state": (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Id.*

In the instant case, Defendant Sigler conducted workshops at the JCS prison that were aimed at teaching prisoners how to develop healthy relationships. MTW provided the course materials and paid Defendant Sigler, while JCS/MDOC provided the room in which to conduct the workshop. (Doc. 25, Ex. A, ID 211–212.) MTW did not have a contract with the MDOC. Inmates were allowed to but not required to attend the workshops. Defendant Sigler was not a therapist and if the inmates asked for her advice during the workshops, she would inform them that she could not help, and then would direct them to a prison therapist or psychologist. (*Id.*) Defendant Sigler remembers Plaintiff speaking to her after a workshop in 2009 and she recalls Plaintiff telling her that he was having feelings for Joell Morrill, the prison psychologist. Defendant Sigler reported this conversation to Plaintiff's therapist and to Joell Morrill. (*Id.*) Plaintiff's only allegations against Defendant Sigler are that she "reported to Joell Morrill Plaintiff Gronski's complaints" and that she "did not report the information to management personnel." (Doc. 1 at 3.)

**\*3** Under the public function test, a private party could be considered a state actor if the private party "exercised powers traditionally reserved to the state." *Chapman,* 319 F.3d at 833. Under this test, the power must be more than a grant of some function that is traditionally associated with sovereignty. *Jackson v. Mertropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Here, Michigan prisons have psychologists and therapists on staff but it is unrebutted that Defendant Sigler's role was to conduct workshops for MTW inside the prison, not to be a therapist for prisoners. Therefore, even if providing therapy to prisoners is a power traditionally reserved to the state, Defendant Sigler did not perform that function. I therefore suggest that Defendant Sigler is not a state actor under the public function test.

Under the state compulsion test, a private party becomes a state actor where the state exercised overt or covert coercive power or significant encouragement to the extent that "in law the choice of the private actor is deemed to be that of the state." *Wolosky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992). Here, there is no evidence that the MDOC or state exercised any power at all over MTW or Defendant Sigler's role in conducting the workshops, let alone any allegation that such power was coercive. I therefore suggest that Defendant Sigler is not a state actor under the state compulsion test. *Brown v. Hatch,* 984 F.Supp.2d 700, 708 (E.D.Mich.2013) (holding that a foster parent, who had discretion over day-to-day parenting decisions, was not a state actor under the state compulsion test or any other test).

Under the symbiotic relationship or nexus test, a private party can be considered a state actor if there is a

"sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributable to the state itself." *Chapman,* 319 F.3d at 834. Here, there is no allegation or evidence that MTW, let alone that Defendant Sigler has such symbiosis with the State of Michigan. I therefore suggest that Sigler is not a state actor under this test either. *See Wolosky,* 960 F.2d at 1335 (6th Cir.1992) (holding that the fact that a non-profit receives a significant portion of its funding from the government does not convert it into a state actor under the symbiotic or nexus test); *Falkiewicz v. Mich. Dep't of Corr., et al,* No. 12–14404, 2013 WL 3981568, at *2 (E.D.Mich. July 31, 2013) (holding that American Correctional Association, non-profit organization responsible for inspection of MDOC facilities, was not a state actor).

Accordingly, Defendant Sigler's motion for summary judgment should be granted because the state action requirement of § 1983 claims has not been met.

### 2. Statute of Limitations
Defendant Sigler argues that Plaintiff's claims are barred by the two-year statute of limitations set forth in Mich. Comp. Laws § 600.5805(2) (assault and battery). (Doc. 25 at 9–10.) Defendant notes that the last sexual assault alleged by Plaintiff occurred on September 14, 2011 (Doc. 25 at 10), and Plaintiff filed the instant complaint on September 13, 2013; however, Defendant Sigler last worked at JCS in April of 2010, so the September 2013 filing against her is untimely. (*Id.*)

**\*4** First of all, the statute of limitations for all § 1983 claims filed in Michigan is three years even if the Michigan statute of limitations for the particular tort claim, such as assault and battery, would be shorter. This is so because "[t]he Supreme Court held ... that the statue of limitations for § 1983 actions is the same as the limitations period for personal injury claims under state law," *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), and "[u]nder Michigan law, the limitations period [for personal injury claims] is three years." *JiQiang Xu v. Michigan State Univ.,* 195 F. App'x 452, 455 (6th Cir.2006); *see also* Mich. Comp. Laws. § 600.5805(10).

Secondly, Plaintiff filed the lawsuit within three years (and even two years) of the last alleged sexual assault so the filing of the case itself was timely. *See, Gould Electronics, Inc. v. Livingston Co. Road Comm'n,* No.09–cv–12633, 2012 WL 5817939, at *11 (E.D.Mich. May 25, 2012) (noting the rule in Michigan that where defendant's wrongful acts are of a continuing nature, the period of

limitation will not run until the wrong is abated; but, in dicta, doubting this rule's continuing vitality). The timeliness is not undone by the fact that Defendant Sigler's individual actions that were a part of the ongoing alleged wrongful acts ended more than three years before the action was filed since the limitation period applies to the properly joined claims in the complaint as a whole rather than as applied against each individual defendant.

I therefore suggest that the statute of limitations does not provide a ground for granting the motion for summary judgment.

### 3. Exhaustion of Remedies Law, Background and Analysis
Defendant Sigler also contends that Plaintiff failed to exhaust his administrative remedies. (Doc. 25 at 10–12.)

#### a. Exhaustion of Remedies: Governing Law and Policies
Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") "in response to a sharp rise in prisoner litigation in federal courts." *Woodford v. Ngo,* 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] cases [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock,* 549 U.S. 199, 202, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Congress equipped the PLRA with several mechanisms designed to reduce the quantity and increase the quality of the claims that came to federal court. *Id* . A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000); *see also Woodford,* 548 U.S. at 84 ("A centerpiece of the PLRA's effort 'to reduce the quantity ... of prisoner suits' is an 'invigorated' exhaustion provision.") (quoting *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Courts consider the PLRA's suits 'brought with respect to prison conditions' to include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

**\*5** The *Woodford* Court held that the PLRA's exhaustion of administrative remedies requires (1) that no remedies currently remain available, and (2) that the remedies that

had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. Prior to *Woodford* there were conflicting interpretations of the PLRA's exhaustion requirement. Some circuits interpreted the exhaustion requirement to mean that plaintiffs must have no more administrative remedies available before bringing their cases to federal court. *Id.* Others interpreted it to mean that plaintiffs must have "properly" exhausted their available remedies by following the agency's procedural requirements such as "deadlines and other critical procedural rules." *Id.*

In finding that exhaustion of remedies required "proper" exhaustion, the Court was persuaded by the "striking[ ]" similarities between the language of the PLRA and the doctrine of exhaustion in administrative law. *Id.* at 102. It also considered the purposes behind the exhaustion requirement, reasoning that an interpretation that did not require proper exhaustion would render the PLRA "toothless"—enabling a prisoner to bypass prison remedies by simply disregarding or ignoring deadlines. *Id.* at 95. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id.* at 90. Complaints and appeals must be filed "in the place, and at the time the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1025 (7th Cir.2002)).

In *Jones,* the Court instructs us to look to the prison's policy itself when determining "whether a prisoner has properly exhausted administrative remedies-specifically, the level of detail required in a grievance to put the prison and individual on notice of the claim." 549 U.S. at 205, 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the *prison's requirements,* and not the PLRA, that define the boundaries of proper exhaustion." (emphasis added)). Specifically, the *Jones* Court was determining whether a plaintiff needed to identify the defendant by name during the initial grievance process. Since the MDOC's policy at the time did not require that level of specificity the Court did not find that the PLRA required it. *Id.*[3]

A plaintiff does not need to show proper exhaustion as a part of their complaint. *Jones,* 549 U.S. at 216. Rather, failure to properly exhaust remedies is now an affirmative defense. *Id.* The *Jones* Court struck down the Sixth Circuit's procedural rule placing the burden on prisoners to plead and prove exhaustion in their complaint. *Id.* at 921.

**b. Application and Analysis**

**i. The Michigan Department of Corrections Grievance Policy**

The MDOC provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007). The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, the grievant must attempt to resolve the issue with the person involved "within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control ..." MDOC PD 03.02.130(P).

**\*6** If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(v). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X). If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he must file a Step II appeal within ten business days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a Step II response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF). The Step III response concludes the administrative grievance process.

Any allegations of prohibited sexual conduct involving prisoners falls under the jurisdiction of the Internal Affairs Division. MDOC PD 03.03.140 (requiring the Internal Affairs Division to investigate allegations of prohibited conduct). To properly exhaust remedies, this policy explicitly requires that inmates file grievances through the above 03.02.130 grievance policy *in addition to* Internal Affairs investigations. *Id.*

**ii. Grievances Filed by Plaintiff and the Internal Affairs Investigation**

I will consider all six of Plaintiff's grievances filed from May 2009 to January 2014 that proceeded to Step III. (Doc. 11–5 at 2–3.) Grievance JCS–11–11–2011–19c was about a typewriter that was not returned to Plaintiff after his transfer to the Cooper Street Corrections Facility. (*Id.* at 36.) In the section of the Step I grievance form that asks "[w]hat attempt did you make to resolve this issue prior to writing this grievance?" Plaintiff wrote the following: "[o]n the above date [9–27–11] I informed

Deputy Warden Riley that I did NOT have my Typewriter in the stack of [ ] property that was s[i]tting there for my transfer, and that it was in violation of P.D. 04.07.112v." (*Id.* at 35.) Under the section "[s]tate problem clearly," Plaintiff began by citing several policies. (*Id.*) Then he wrote "Body of the Grievance" in a heading and followed it with "[a]ll of the above being listed as reference; on 9–27–2011, Julie Bridgewater did willfully violate P.D. 04.04.112v, by not transferring my typewriter with me to the next facility." (*Id.* at 38.) He then claims that the destruction of his typewriter was in retaliation for reporting Julie Bridgewater's "friend," Joell Morrill for sexual harassment. (*Id.*) He also states in the body of his grievance that he "hope[s] this matter is not ATTEMPTED to be swept under the rug like my sexual harassment and assault was at the hands of the staff at JCS." (*Id.*)

Grievance JCF–12–03–0589–19c dealt with stolen headphones. (*Id* . at 30.) In the body of the Grievance Plaintiff said that the headphones might have been stolen in retaliation for complaining against Ms. Morrill. (*Id.*)

**\*7** Grievances JCF–12–06–1380–17c and JCS–12–06–0569–19z also dealt with stolen property. (*Id.* at 16, 22.) In the section that asks "[w]hat attempt did you make to resolve this issue prior to writing this grievance," Plaintiff answered with the following:

> This grievance is against the Michigan Department of Corrections; Kelly Sigler; ... JCS Inspector Clifton; ... Grievant can not present all names specifically because of an inability to access files and the aforementioned parties attempts at covering matters up. Grievant tried [to] resolve matters herein by sending written correspondence to Central office/Director's Office on 5–15–12, with no resolution. This is all information 'available' to grievant.

*Id.* In the "[s]tate problem clearly" section, Plaintiff stated the following:

> On 5–15–12, grievant tried to resolve an issue of departmental staff, collectively, withholding grievant's property, consisting of letters, photos and phone conversations, from Joell Morrill to/with grievant. Various

departmental staff, including JCS Inspector Clifton, ... has withheld personal property because of a supposed investigation into a sexual assault that occurred on grievant by psychologist Morrill. Grievant was once again ignored in trying to uncover specific facts to meet 42 USC 1997e(a) mandates. Grievant was sexually assaulted repeatedly by Morrill[ ] over the course of over a year (2009–10), specific dates and times are not available because MDOC staff refuse to release not only grievant's personal property, e.g., personal logs, letters, pictures, cards, etc., but their investigative findings. Morrill [ ] tried to have grievant stabbed after her sexual assaults became the spotlight of investigation. Without the completed investigative reports from all parties grievant cannot meet grievance mandates. It is grievant's contention that, not limited to the aforementioned parties, MDOC staff are attempting to cover these matters up and not return or disclose specifics. Grievant was transferred from JCS because the MDOC's investigation into Morrill's sexual assaults, and later returned to JCS where grievant was again sexually assaulted by Morrill. MDOC personnel knew of these actions and continued to let such transpire and refuse to provide grievant with not only material relevant to proof, but any reports generated by parties to support these repeated sexual assaults transpired. Grievant pleads for specific dates, times, memos, reports. Resolution: Department staff provide grievant with enough information to meet 03.02.130.

(*Id.* at 21.)

The last two grievances, IBC–13–03–0616–27a and JCF–12–09–2075–28e, were completely unrelated to the alleged sexual assault. (*Id.* at 6, 12.) Respectively, they dealt with an alleged retaliation against Plaintiff for

exercising his First Amendment rights and removal of his assignment at the "chowhall" in violation of his due process rights. (*Id.*)

Plaintiff reported the alleged sexual assault to David Clifton, who reported it to Internal Affairs. *See* (Doc. 11–2 at 1.) There was a subsequent Internal Affairs investigation that ended when the alleged assailant left the facility.[4] (Doc. 11–5 at 23 .)

### iii. Exhaustion of Remedies Analysis

**\*8** *Woodford* and *Jones* require inmates to file grievances that conform to MDOC procedures in order to properly exhaust available remedies. 548 U.S. at 93, 549 U.S. at 218. The first question, then, is whether the MDOC's policy requires an inmate to identify the 'issue being grieved' in his or her grievance. If it does, properly identifying the 'issue being grieved' is a part of the MDOC's procedure which must be followed in order to properly exhaust available remedies.

The MDOC grievance policy provides: "The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." MDOC PD 03.02.130(R).

I suggest that the MDOC's policy requires that the grievant properly *identify* the 'issue being grieved' as the same issue that is subsequently complained about in federal court. Since the policy requires that all the information the grievant provides be "facts" that are relevant to the "issue being grieved" it follows that the grievant must first *identify* the 'issue being grieved.' This reading of the MDOC is not only reasonable, but is also bolstered by instructions to "[u]se a separate grievance form for each issue." (Doc. 11–5 at 21.)

The next question is whether Plaintiff identified the 'issue being grieved' in his grievances filed with MDOC as the same issue that he raises in his current complaint. In all of his grievances, Plaintiff identifies within the first few sentences what the 'issue being grieved' is and it is always something other than failure to prevent sexual assault/harassment. In Grievance JCS–11–11–2011–19c, Plaintiff identified the 'issue being grieved' as a violation of the policy that required personnel to transfer his typewriter when he was transferred. In Grievance JCF–12–03–0589–19c Plaintiff did not identify the 'issue being grieved' as failure to prevent sexual harassment/assault, but rather as headphones that were not

returned to the Plaintiff. Plaintiff only mentions the sexual harassment complaint to suggest that the headphones may have been destroyed in retaliation. (Doc. 11–5 at 24.) Likewise, in Grievances JCF–12–06–1380–17c and JCS–12–06–0569–19z he identified the issue as wrongful withholding of property, not as failure to report sexual harassment/assault. While Plaintiff mentioned the fact that sexual harassment occurred, he mentioned it only to explain why he believed his property was being withheld or destroyed.

Because none of the grievances filed by the Plaintiff have as the 'issue being grieved' failure to prevent sexual harassment/assault, and because MDOC policy requires proper identification of the 'issue being grieved,' Plaintiff did not properly exhaust his administrative remedies as required by *Woodford. See Ward v. Luckey,* No. 12–CV–14875, 2013 WL 5595350, at \*2 (E.D.Mich. Oct.11, 2013) (holding that grievance was insufficient to exhaust with respect to claims asserted in the complaint where grievance complained that defendant called plaintiff into the library during his yard time and complaint alleged first amendment violation based on his right to access the library in retaliation for past grievances).

**\*9** I therefore suggest that Defendant Sigler's motion for summary judgment should be granted because the Plaintiff has failed to properly exhaust his administrative remedies.

### D. Plaintiff's Motion to Defer Defendant Sigler's Motion for Summary Judgment

Plaintiff seeks to defer summary judgment (Doc. 29) because he "needs to obtain discovery and obtain the contractual agreement between Defendant Sigler's employer (MTW) and the Michigan Department of Corrections (MDOC)." (Doc. 29 at 3.) I will construe this motion as one under Rule 56(d). Under Rule 56(d), if the nonmovant shows by affidavit or declaration that he cannot present facts essential to justify his opposition to a motion for summary judgment, the court may, among other options, defer considering the motion or deny the motion for summary judgment. In the instant case, Defendant Sigler has indicated that there is no contract between MTW and MDOC. Even if there were, however, it would not affect my analysis under the relevant state actor portion of this Report and Recommendation. I therefore recommend denying the motion because any further discovery on the issue would be futile. *See, Burlington Northern Santa Fe & Co. v. Assiniboine and Sioux Tribes,* 323 F.3d 767, 774 (9th Cir.2003) (noting that courts need not grant a motion under 56(d) if discovery would be futile).

I therefore recommend that Plaintiff's motion be denied.

**E. Conclusion**

For all the reasons stated above, I suggest that Defendant Sigler's Motion for Summary Judgment be **GRANTED** and that Plaintiff's motion to defer Defendant Sigler's motion for summary judgment be **DENIED.**

### III. *REVIEW*

Rule 72(b) (2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.R.Civ.P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435; *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947, 950 (6th Cir.1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4265824

Footnotes

1       Defendants Bull–Ehlinger and Clifton were terminated from the case on July 31, 2014.

2       Joell Morrill is not named in this case because Plaintiff has reached a settlement with her separately. Stipulated Order of Dismissal at 1, *Gronski v. Morrill,* No. 5:12–cv–15191 (E.D.Mich. Oct. 4, 2013).

3       The MDOC has subsequently changed its policy, requiring that in order to properly exhaust remedies plaintiffs need to identify all defendants in the initial grievance that they later name in the subsequent federal complaint. *See infra.*

4       This might be in contravention of MDOC PD for Prohibited Sexual Conduct Involving Prisoners, which states in paragraph R that "[t]he investigation shall not be closed simply due to the resignation, transfer, or termination of the accused staff person." MDOC PD 03.03.140.

**End of Document**                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4272773
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Jeffrey GRONSKI, Plaintiff,
v.
Kelly M. SIGLER, Defendant.

No. 13–13928.
|
Signed Aug. 28, 2014.

**Attorneys and Law Firms**

Jeffrey Gronski Ionia, MI, pro se.

Kevin R. Himebaugh, Michigan Department of Attorney General, Lansing, MI, for Defendant.

***ORDER ADOPTING REPORT AND
RECOMMENDATION***

JOHN CORBETT O'MEARA, District Judge.

**\*1** Before the court is Magistrate Judge Patricia T. Morris's report and recommendation dated August 5, 2014. Plaintiff filed objections to the report and recommendation on August 15, 2014.

With respect to reports and recommendations from magistrate judges, this court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (C). The court "may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

Having reviewed the entire record, the court finds that Magistrate Judge Morris reached the correct conclusions. Accordingly, the court will overrule Plaintiff's objections.

IT IS HEREBY ORDERED that the magistrate judge's August 5, 2014 report and recommendation is ADOPTED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4272773

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

454 Fed.Appx. 425

Editor's Note: Additions are indicated by Text and
deletions by Text.
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Virginia HAUF, Plaintiff–Appellant,
v.
LIFE EXTENSION FOUNDATION, Defendant–
Appellee.

No. 09–1938.
|
Dec. 27, 2011.

**Synopsis**
**Background:** Mother and child sued a health care
foundation alleging false endorsement, false advertising,
and misappropriation of name and likeness under the
Lanham Act, the Michigan Consumer Protection Act, and
Michigan common law in connection with the
foundation's publication of a testimonial about the child's
cancer recovery story in membership drive campaign
materials. The United States District Court for the
Western District of Michigan, 640 F.Supp.2d 901, granted
a defense motion for summary judgment, and plaintiffs
appealed.

**Holdings:** The Court of Appeals, Thomas L. Ludington,
District Judge for the Eastern District of Michigan, sitting
by designation, held that:

[1] document signed by the mother was a "release," not an
"authorization";

[2] scope of the release was not ambiguous;

[3] release authorized the foundation to modify the
language of the testimonial without the mother's
knowledge; and

[4] release was not void as against public policy.

Affirmed

**\*426** On Appeal from the United States District Court for
the Western District of Michigan.
Before: GILMAN and KETHLEDGE, Circuit Judges;
LUDINGTON, District Judge.*

OPINION

THOMAS L. LUDINGTON, District Judge.

**\*\*1** Virginia Hauf, the mother of a child diagnosed with
brain cancer, purchased shark cartilage supplements from
the Life Extension Foundation. Several years later, Hauf
contacted the Foundation and offered to endorse its
products. The Foundation sent her a proposed
"Testimonial" and a "Standard Release of Testimonials &
Photos." Hauf revised the proposed testimonial and
returned it to the Foundation. She also signed and
returned **\*427** the release, which provides that Hauf
grants the Foundation the "irrevocable right" to use her
"name (or any fictional name)" and her image "in all
manners, including composite or distorted
representations, for advertising, trade, or any other legal
purposes." It further provides that Hauf releases "any
right to inspect or approve the finished product, including
written copy."

After the Foundation ascribed a variety of testimonials to
Hauf, she brought suit alleging false endorsement, false
advertising, and misappropriation of name and likeness
under the Lanham Act, the Michigan Consumer
Protection Act, and Michigan common law. Based on the
unambiguous language of the release, the district court
summarily dismissed all of Hauf's claims. We affirm.

I.

Virginia Hauf, formerly Virginia Gorka, is the mother of
Stephen Barrow. As a child, Barrow was diagnosed with
brain cancer; doctors found a tumor in the base of his
brain in 1991. After Barrow underwent surgery to remove
the tumor, Hauf sought alternative treatments for her son.
In May 1991, mother and son traveled from Michigan,

where they resided, to Mexico for "immune augmentative therapy." Hauf also started providing her son with shark cartilage supplements.

In 1993, Hauf contacted the Foundation to purchase shark cartilage supplements. The Foundation, a non-profit Florida corporation, supports itself through membership dues, donations, and royalties from products sold through its "Life Extension Buyers' Club." One of its founders, William Faloon, spoke with Hauf about why she was placing the order. After learning her reasons, Faloon asked Hauf whether she would be willing to publish a letter to the editor in the *Life Extension Magazine* recounting her son's story. Hauf agreed. In 1994, Hauf stopped purchasing shark cartilage from the Foundation; she has not purchased any since. Hauf's letter to the editor was published in 1994. Sometime later, she was asked and agreed to publish an updated letter to the editor. The updated letter was published in 1995.

In 2001, Hauf contacted the Foundation again and offered to endorse its products. She wrote: "i would like to get with you on the life extension foundation. i feel your products are wonderful .... i would like to work out something with you in regards to recommending your products." A Foundation employee, Steven Stahl, faxed Hauf two documents, a proposed "Testimonial" based on Hauf's earlier letters to the editor and a "Standard Release of Testimonials & Photos." Believing that the proposed testimonial contained several errors, Hauf crossed out inaccuracies (struck through below), interlineated additions (bracketed below), and faxed the following back to the Foundation:

> **\*2** ~~In my search for a way to save my son's life, someone referred me to Life Extension.~~
>
> ~~The People at your organization supported my search for different treatment regimens we could try.~~ My thirteen year old son was diagnosed with brain cancer (astrocytoma grade 3) on January 21, 1991, however, they were not able to remove all of it. I sent his records to Sloan Kettering, Mayo Clinic, and several specialists. I also sent his records to a world renowned brian surgeon and his reply was the same as everyone else, "I'm sorry, but there is nothing more to be done. Besides radiation or experimental chemotherapy, this may only give him a little extra time. Just take your son home, make him comfortable, and love him for the remainder of his time."

> **\*428** Steve's prognosis was very grim, six months at the most. I started him on high doses of vitamin C, E, beta carotene, shark cartilage, garlic, selenium, and other nutrients and minerals. I found out about a clinic

called the IAT West Clinic [Dr. Gustavo Andrade] ~~which pioneered a treatment called~~ Immuno Augmentative Therapy. Finally, I decided to take him to Mexico to undergo this type of treatment. Steve has been tumor free for ~~the last year~~ [0 yrs.]. Steve is doing very well. He is [was] back on the track team, wrestling team and football team ... Steve has no limitations at all [and leads a very productive life.]

> EPILOGUE: The tumor was eradicated completely within ~~two~~ [1] years. Steve has been free from cancer for the last ~~8~~ [9] years. The IAT West Clinic is listed in LIFE EXTENSION'S Directory of Innovative Medical Clinics.

These revisions were necessary, Hauf asserts, to accurately recount her son's story.[1]

In a phone conversation with Stahl, Hauf alleges, she also explained that she was supplying the testimonial for publication in a single issue of *Life Extension Magazine* and that it was not to be used for monetary gain. According to Hauf, Stahl assured her that her requests would be respected and that she would be allowed to view and approve the testimonial before it was published. Hauf then signed and returned the following release:

## STANDARD RELEASE OF TESTIMONIALS & PHOTOS

> I ... do hereby give LIFE EXTENSION FOUNDATION AND ALL ITS BUSINESS AFFILIATES, its assigns, licensees, and legal representatives the irrevocable right to use my name (or any fictional name), picture, portrait, digital image, or photograph in all forms and media and in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes, and I waive any right to inspect or approve the finished product, including written copy, that may be created in connection therewith.

> I am over eighteen (18) years of age and have read the above release and authorization prior to its execution.

Instead of being published in a single issue of *Life Extension Magazine,* the testimonial was published more than forty times in various Foundation materials between 2001 and 2005. Its language was modified as well. For example, the following sentence was added: "Through your organization I found out about a

treatment called Immuno Augmentative Therapy." Additionally, notwithstanding Plaintiff's striking through "In my search for a way to save my son's life, someone referred me to Life ExtensionTM" and "The People at **\*429** your organization supported my search for different treatment regimens we could try," these sentences were included in several versions of the testimonial. At Hauf's request in 2005, the Foundation ceased publishing testimonials bearing Hauf's name.

**\*\*3** In 2006, Hauf and Barrow brought suit against the Foundation and Faloon, alleging several claims arising from the publication of the testimonials. Specifically, Hauf and Barrow brought: (1) a false-endorsement claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) a false-advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (3) an invasion-of-privacy claim alleging misappropriation of names and likeness for commercial benefit under Michigan common law; and (4) a false-advertising claim under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1). The Foundation and Faloon, relying on the release, moved for summary judgment. Hauf and Barrow likewise moved for summary judgment.

The district court granted the motion of the Foundation and Faloon and denied the motion of Hauf and Barrow, explaining: "The language of the 'Standard Release of Testimonials & Photos' in this case is unambiguous." *Hauf v. Life Extension Found.,* 640 F.Supp.2d 901, 905 (W.D.Mich.2009). The parties then submitted, and the court entered, a stipulated order dismissing Barrow and Faloon from the litigation. This timely appeal followed.

## II.

### A.

We review a district court's grant of summary judgment de novo. *Farhat v. Jopke,* 370 F.3d 580, 587 (6th Cir.2004). Summary judgment is appropriate when there is no genuine dispute as to any material fact as to an essential element of the nonmoving party's case. Fed.R.Civ.P. 56(a). An issue of fact is "genuine" if a reasonable person could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the initial burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving

party has satisfied its burden, the burden shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B.

Hauf enumerates nine assignments of error on appeal. Appellant's Br. 2–3. On inspection, however, only four distinct issues are identified: (1) whether the court erred in concluding the release is a "release" rather than an "authorization"; (2) whether the court erred in concluding that the scope of the release is unambiguous; (3) whether the court erred in concluding that the release authorizes the Foundation to modify the language of the testimonial without Hauf's knowledge; and (4) whether the court erred in concluding that the release does not violate public policy. Each is addressed in turn.

### 1.

[1] The district court correctly concluded that the document at issue, titled a "Standard Release of Testimonials and Photos" is, as its title suggests, a release. The document begins by stating in bold-faced, capitalized letters that it is a "**RELEASE.**" And it concludes, in the line immediately preceding Hauf's signature, by reiterating that it is a "release."

**\*430 \*\*4** Hauf nevertheless disputes that "release" means release. To interpret the meaning of a disputed term, this Court looks to, inter alia, "the plain language" and "relevant dictionary definitions of the term." *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 586 (6th Cir.2001) (citing *Kerns, Inc. v. Wella Corp.,* 114 F.3d 566, 569 (6th Cir.1997); *N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1278 (6th Cir.1997)).

The plain language, naturally, must speak for itself. In pertinent part, it provides that Hauf grants the Foundation the "the irrevocable right" to use her "name (or any fictional name), picture, portrait, digital image, or photograph in all forms and media and in all manners." She further agrees to "waive any right to inspect or approve the finished product, including written copy." And the document plainly states and restates that it is a "release."

Turning to relevant dictionary definitions, *Webster's* variously defines a release as "a giving up (as of a right or claim)" and "an act or instrument by which a legal right is discharged." *Webster's Third New International Dictionary* 1917 (unabridged ed.1993). Similarly, *Black's* defines "release" as "[a] written authorization or permission for publication" and "[t]he act of conveying an estate or right to another, or of legally disposing of it." *Black's Law Dictionary* 1315–16 (8th ed.2004). As noted above, the document at issue provides a written authorization for the publication of Hauf's name and image "in all forms and media." And the document provides that Hauf releases "any right to inspect or approve the finished product." The district court correctly concluded that the document is what it titles itself as—a release.

### 2.

[2] The district court likewise correctly concluded that the scope of the release is unambiguous. "The general rules governing the construction of contracts are applicable in the construction of written releases." 76 C.J.S. *Release* § 43. "Whether or not a contract is ambiguous is a question of law properly determined by the district court." *City of Wyandotte,* 262 F.3d at 585 (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler,* 146 F.3d 367, 373 (6th Cir.1998)) (applying Michigan law).[2] **\*431** "The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their ordinary and natural meaning." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir.2001) (internal quotation marks omitted) (citing *City of Wyandotte,* 262 F.3d at 585) (applying Michigan law); *see also Holland v. Trinity Health Care Corp.,* 287 Mich.App. 524, 791 N.W.2d 724, 727 (2010) ("We enforce contracts according to their terms, as a corollary of the parties' liberty of contracting." (citing *Rory v. Cont'l Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23, 30 (2005))).

"[A] contract is ambiguous when two provisions irreconcilably conflict with each other, or when a term is equally susceptible to more than a single meaning." *Trinity Health Care Corp.,* 791 N.W.2d at 727 (alterations and internal quotation marks omitted) (quoting *Coates v. Bastian Bros., Inc.,* 276 Mich.App. 498, 741 N.W.2d 539, 543 (2007)). "The rule of contra proferentum (construction of an agreement against its drafter) is used only when there is a true ambiguity and the parties' intent cannot be discerned through all conventional means, including extrinsic evidence." *Coates,* 741 N.W.2d at 543

n. 3 (citing *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 470–71, 663 N.W.2d 447, 454–55 (2003)). "If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing." *Wonderland Shopping Ctr.,* 274 F.3d at 1092 (quoting *Birchcrest Bldg. Co. v. Plaskove,* 369 Mich. 631, 120 N.W.2d 819, 823 (1963)). If the language is unambiguous, parol evidence will not be considered. *See Shay v. Aldrich,* 487 Mich. 648, 790 N.W.2d 629, 640–41 (2010) ("[R]eleases are generally treated as contracts under Michigan law and, thus, subject to the parol evidence rule, which prohibits the use of extrinsic evidence to interpret unambiguous language within a document.").

**\*\*5** In this case, the scope of the release can be separated into three distinct parts—the who, the what, and the how. The release begins by stating to whom Hauf is giving the "irrevocable right": "Life Extension Foundation and all its business affiliates, its assigns, licensees, and legal representatives." Next, the release states what the Foundation may use: "[Hauf's] name (or any fictional name), picture, portrait, digital image, or photograph in all forms and media." Finally, the release states how the Foundation may use Hauf's name and image: "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes." Moreover, the release provides, Hauf agrees to "waive any right to inspect or approve the finished product, including written copy." In sum, the release is unambiguous; its plain language provides that the Foundation may use Hauf's name for advertising, trade or any other legal purposes, including in composite or distorted representations, without Hauf's inspection or approval.

Hauf's arguments to the contrary are unpersuasive. Hauf first argues that "the body of the 'release'/authorization only refers to names, photographs and other images; it is entirely ambiguous whether that language also refers to testimonials." Appellant's Br. 27. Hauf is correct that the body of the release does not expressly reference testimonials. It does not need to. The release provides that the Foundation may use Hauf's name and image "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes." One **\*432** manner of using her name and image is as a testimonial of a satisfied customer. Moreover, this may be the most logical use, as neither Hauf's name nor her image has independent commercial value (Hauf is not a celebrity spokesperson, for example).

Hauf also argues that "there is no indication of exactly

what legal right [she] is relinquishing." Contrary to Hauf's assertion, the release plainly states that Hauf grants the Foundation the right to use her "name (or any fictional name)" and her image "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes," and that Hauf releases "any right to inspect or approve the finished product, including written copy." Simply put, Hauf is relinquishing the advertising rights in her name to the Foundation. The scope of the release is unambiguous.

### 3.

[3] The district court correctly concluded that the release authorized the Foundation to modify the language of the testimonial without Hauf's knowledge. The release expressly grants the Foundation the right to use Hauf's name "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes" and Hauf releases "any right to inspect or approve the finished product, including written copy." Thus, under the release's plain terms, the testimonial Hauf faxed to the Foundation may be modified (or, in the release's distinctive diction, "distorted").

**6 Hauf's argument to the contrary, that waiving "any right to inspect or approve the finished product, including written copy" does not authorize the modification of her testimonial, is unpersuasive. Hauf defines "copy" to mean "duplicate," the "reproduction of an original work." Thus, Hauf reasons, "the release only authorizes defendant to use plaintiff's testimonial and her testimonial alone." Appellant's Br. 31 (emphasis and internal quotation marks omitted). "[I]nstead of reproducing a 'copy' of plaintiff's testimonial," Hauf concludes, "defendant fabricated a new and false testimonial and attributed it to plaintiff." *Id.* at 30.

Hauf is correct that "copy" may mean "duplicate," among other things. In this case, however, the context in which "copy" is used shows that it does not mean "duplicate" but "advertising copy," the written text of an advertisement. In construing a contract, "[t]he court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their ordinary and natural meaning." *Wonderland Shopping Ctr.,* 274 F.3d at 1092 (citing *City of Wyandotte,* 262 F.3d at 585) (internal punctuation omitted). In pertinent part, the release provides that Hauf grants the Foundation the right to use her name "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes" and Hauf releases "any

right to inspect or approve the finished product, including written copy." Thus, under the terms of the release, Hauf gives the Foundation carte blanche in its use of her name for advertising. This means that the Foundation may use Hauf's original testimonial as advertising, or it may modify the language and nevertheless use Hauf's name, or it may create a wholly new "testimonial" and ascribe it to Hauf, as long as its purpose is not illegal. And the Foundation may do all of this without Hauf inspecting or approving the finished product.

Alternatively, Hauf argues, the Lanham Act categorically prohibits modifying the language of a testimonial. In support, Hauf cites a single case, *Facenda v. NFL Films, Inc.,* 542 F.3d 1007 (3d Cir.2008). **433** Her reliance is misplaced. In that case, John Facenda, "known by many football fans as 'the Voice of God,' " signed a release shortly before his death in 2004 giving NFL Films "the unequivocal rights to use the audio and visual film sequences recorded of me ... provided, however, such use does not constitute an endorsement of any product or service." *Id.* at 1011–12. The next year, NFL Films used Facenda's voice in its production of "The Making of Madden NFL 06." *Id.* at 1012. When his estate brought suit alleging the use constituted an endorsement of the videogame, the NFL raised the release as a defense. *Id.* at 1022–23. Considering the issue, the Third Circuit wrote: "In the contract, Facenda waived his rights with regard to any uses that were not endorsements. But if the Estate succeeds in proving the elements of its false-endorsement claim, such a finding by the District Court will demonstrate that the NFL's use of Facenda's voice was an endorsement, falling outside the contract's waiver clause." *Id.* at 1023. "On the other hand," the court explained, "if the Estate's false-endorsement claim were to fail, meaning that the use was not an endorsement, the contract's waiver would apply to that claim. Thus, what falls inside the Lanham Act's prohibitions defines what is outside the contract's waiver." *Id.* The court's holding was based on the plain language of the contract.

**7 Hauf, however, offers a different interpretation of the decision, writing: "As in *Facenda,* if defendants had only used plaintiff's actual testimonial then the release agreement may potentially act as a defense"—but, she argues—"if plaintiff in this case can show that the testimonials published by defendant were not the testimonial provided by plaintiff, then such conduct is not protected by the release regardless of its provisions." Appellant's Br. 31. Contrary to Hauf's assertion, *Facenda* does not stand for the proposition that a court should ignore the express language of a release. Rather, it stands for the opposite proposition. The release's express terms authorize the Foundation to modify the language of the

testimonial without Hauf's knowledge.

#### 4.

[4] Finally, the district court correctly concluded that the release is not void as against public policy. Hauf is quite right that, "as a general proposition, contracts in violation of statutes enacted to protect the public against imposition or fraud are void." Appellant's Br. 33. The plain language of the release, however, does not violate any statutes; rather, its scope is expressly limited to "legal purposes." *See generally* 76 C.J.S. *Release* § 43 ("[W]ritten releases will be construed reasonably and given effect according to their plain terms."). Moreover, the manner in which the release was used does not constitute fraud. Hauf herself concedes that the modifications were principally "changes to the verbiage of the testimonial." Appellant's Br. 4.

First, as matter of long-standing federal policy, "[t]he general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112 (1931), *quoted in FDIC v. Am. Cas. Co.,* 998 F.2d 404, 409 (7th Cir.1993). "The power to deny enforcement of contract terms on public policy grounds is restricted to those situations in which the contract would violate 'some explicit public policy that is well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents and from general considerations of supposed public *434 interest.' " *Am. Cas. Co.,* 998 F.2d at 409 (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

"In defining 'public policy,' " the Michigan Supreme Court similarly cautions, "the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Terrien v. Zwit,* 467 Mich. 56, 648 N.W.2d 602, 608 (2002). Moreover, the Michigan Supreme Court firmly defends the liberty to contract: "[U]nless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Rory v. Cont'l Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23, 26 (2005).

**8 In this case, the release provides that Hauf grants the Foundation the right to use her name "in all forms and media and in all manners ... for advertising, trade or any other legal purposes." By its express terms, the release's scope is thus limited to "purposes" that are "legal." *See generally In re SBC Mich.,* 482 Mich. 90, 754 N.W.2d 259, 273 (2008) (citing *Griffith v. State Farm Mut. Auto. Ins. Co.,* 472 Mich. 521, 697 N.W.2d 895 (2005)) ("As a general matter, words and clauses will not be divorced from those which precede and those which follow. When construing a series of terms we are guided by the principle that words grouped in a list should be given related meaning." (internal punctuation omitted)); 11 Richard Lord, *Williston on Contracts* § 32:6 (4th ed. 1999 & Supp.2010) ("The ancient maxim *noscitur a sociis* summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words."). The release's plain language provides that it extends only to "lawful" purposes. Accordingly, Hauf's observation that "contracts in violation of statutes enacted to protect the public against imposition or fraud are void" is inapposite. By its express terms, the release limits its scope to legal purposes. And Hauf identifies no authority holding that a voluntarily executed release granting the use of an individual's name "for advertising, trade or any other legal purposes" is contrary to public policy. The plain language of the release does not violate public policy.

Likewise, the de minimis alterations to the testimonial do not offend public policy. Hauf directs our attention to three additions, which she contends "created false, inaccurate and misleading testimonials." Appellant's Br. 16. They are: (1) "In my search for a way to save my son's life, someone referred me to Life Extension"; (2) "The People at your organization supported my search for different treatment regimens we could try"; and (3) "Through your organization I found out about a treatment called Immuno Augmentative Therapy." *Id.* at 12–13 n. 4. None of these additions, however, regard the quality or efficacy of the products offered by the Foundation. They do not misrepresent the effectiveness of immuno-augmentative therapy, for example, or create a false impression regarding how the Foundation's products helped Hauf's son.[3] Indeed, *435 they do not reference any of the Foundation's products. In sum, neither the language of the release, nor the additions that it in fact authorized, violate public policy.

The district court's decision is affirmed.

### All Citations

454 Fed.Appx. 425, 2011 WL 6757001

Hauf v. Life Extension Foundation, 454 Fed.Appx. 425 (2011)

Footnotes

\*       The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

1       The surgeon who operated on Barrow on January 21, 1991, Dr. Mark Meyer, disagrees. He testifies that the surgery completely
        eradicated Barrow's tumor and that, moreover, he never told Hauf or Barrow that Barrow had only six months to live—and when
        asked about Barrow by the Make–a–Wish Foundation, Dr. Meyer informed them that Barrow's condition was not life-threatening.
          Dr. Andrade, like Dr. Meyer, similarly disagrees with Hauf's version of events. He testifies that he recommended radiation and
          chemotherapy for Barrow, that the mother and son rejected his advice, and that he never told them that Barrow had only six
          months to live if he did not receive treatment. Dr. Andrade also notes that Hauf did not show him the MRIs and CAT scans
          taken of Barrow following the January 21, 1991 surgery, which Dr. Andrade now agrees show Barrow "was recovering a
          hundred percent."

2       The district court interpreted the document at issue under Michigan law. *See Hauf v. Life Extension Found.,* 640 F.Supp.2d 901,
        905 n. 3 (W.D.Mich.2009) (citing *Cleveland–Cliffs Iron Co. v. Chicago & N.W. Transp. Co.,* 581 F.Supp. 1144, 1149–50
        (W.D.Mich.1984)). On appeal, neither party contests this choice of law—indeed, neither party briefs the issue. As an aside,
        however, we note that the district court was correct. Because the case was brought pursuant to both diversity and federal-question
        jurisdiction, in the case of a conflict in choice of law, we would apply the choice of law rules of the forum state, Michigan. *See
        generally Trinh v. Citibank, N.A.,* 623 F.Supp. 1526, 1530 (E.D.Mich.1985) (holding that a court having both types of jurisdiction
        should apply the forum state's choice-of-law rules, thereby treating the case as one arising under diversity jurisdiction), *aff'd* 850
        F.2d 1164 (6th Cir.1988). Here, however, no conflict exists. Both federal common law and Michigan follow the *Restatement
        (Second) of Conflict of Laws. Compare Med. Mut. of Ohio v. deSoto,* 245 F.3d 561, 570 (6th Cir.2001) (adopting *Restatement* as
        matter of federal common law), *with Chrysler Corp. v. Skyline Indus. Servs., Inc.,* 448 Mich. 113, 528 N.W.2d 698, 702 (1995)
        (adopting *Restatement* as matter of Michigan law). Thus, because the release does not contain a choice-of-law provision, the "most
        significant relationship" test applies. The place of contracting was Michigan, where Hauf manifested her acceptance. The
        negotiation, in contrast, took place "on the cloud"—via email, fax, and phone conversations. The record is silent as to the place of
        performance. The subject matter of the contract, Hauf, is located in Michigan. On balance, Michigan has the most significant
        relationship to the contract, and so Michigan law applies to the contract issues before the Court.

3       Indeed, any substantive misstatements regarding Barrow's story appear to have been made by Hauf herself. Barrow's surgeon, for
        example, testifies that the surgery completely eradicated Barrow's tumor and that he never told Hauf or Barrow that Barrow had
        only six months to live. Likewise, Dr. Andrade testifies that he in fact recommended radiation and chemotherapy for Barrow, but
        that the mother and son rejected his advice, and that he never told them that Barrow had only six months to live if he did not
        receive treatment. Dr. Andrade also notes that Hauf did not show him the MRIs and CAT scans taken following the January 21,
        1991 surgery, which Dr. Andrade now agrees show Barrow "was recovering a hundred percent."
        \* \* \*

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3810301
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Jamal Omari JACKSON, Plaintiff,
v.

Athina SIRINGAS, Kym Worthy, Wayne County Prosecutor's Office, County of Wayne, Charles Zwicker, Detroit Police Department, Mark Amos, City of Detroit, Mark Estrada, Wayne County Sheriff's Department, Benny Napoleon, Marlon Evans, Deborah G. Bledsoe Ford, Richard M. Skutt, Metro Pcs Communications, Donald Ricardo Sims, Drug Enforcement Agency, Clerk of Court for Third Judicial Circuit of Wayne County, Michigan State Attorney General's Office, Michigan Attorney General, Philip Yaeger, Captain Roberson, Sergeant Loving, John Doe Nos. 1–2, and Jane Doe Nos. 1–5, Defendants.

No. 12–15474.
|
July 23, 2013.

**Attorneys and Law Firms**

Jamal Jackson, Jackson, MI, pro se.

Ellen Sharf, Third Judicial Circuit Court, Detroit, MI, for Defendants.

*OPINION AND ORDER ADOPTING IN PART REPORT AND RECOMMENDATION AND DISMISSING COMPLAINT*

DAVID M. LAWSON, District Judge.

**\*1** This matter is before the Court on the plaintiff's objections to a report filed on October 31, 2012 by Magistrate Judge Charles E. Binder recommending that the Court dismiss this prisoner civil rights case on its own motion under 28 U.S.C. §§ 1915(e)(2), 1915A. After giving fresh review to the complaint, the Court agrees with the recommended outcome and finds that the complaint must be dismissed. However, the Court cannot accept the magistrate judge's conclusion that the plaintiff failed to present a "short and plain statement" of his

claims, and that dismissal therefore is warranted under Federal Rule of Civil Procedure 8(a)(1).

The magistrate judge believed that the complaint was too long and cumbersome and laden with detail. At 131 pages containing 431 paragraphs, it certainly is long. But a new pleading regime is in its ascendancy; detail is the order of the day, *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (requiring that a complaint plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face"), and "short and plain" may be no more than aspirational, lest Rule 8(a)'s language, as it is presently conceived, become a trap for the unwary.

Nonetheless, in this case the plaintiff has largely succeeded in presenting a "short and plain statement" of each of the individual claims stated in his complaint. The length of the complaint is due to the fact that the plaintiff raises a great number of claims, which are discussed below. Under the federal rules, that is allowed. "A party asserting a claim ... may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed.R.Civ.P. 18(a).

The plaintiff filed objections to the magistrate judge's report. The Court does not adopt the reasoning proposed by the magistrate judge, but instead concludes after undertaking a fresh review of the pleadings that the complaint must be dismissed because it fails to state any plausible claim for relief. The Court therefore will overrule the plaintiff's objections as moot.

I.

Plaintiff Jamal Jackson is presently confined in the Wayne County, Michigan jail awaiting his second trial on charges of assault, murder, and firearms violations. According to Jackson's complaint, the principal witness against him is Donald Ricardo Sims, who in 2006 pleaded guilty to possession of marijuana after a DEA raid on his house. Jackson asserts that after Sims pleaded guilty, he identified Jackson in a photo lineup and testified at the 2009 trial of Jackson's codefendant, implicating Jackson in the 2006 murder of Sims's brother. Detroit Police arrested Jackson on September 20, 2011 and charged him as noted above. Jackson's first trial started on May 29,

2012, but it ended in a mistrial. At the time the complaint was filed, Jackson was scheduled to be tried again in November 2012. Based on his most recent filings in this matter, it appears that Jackson remains incarcerated and awaiting trial.

**\*2** Jackson filed his complaint under 42 U.S.C. § 1983, claiming that the various defendants have "conspired" to violate his constitutional rights through numerous specific acts and omissions. As mentioned, the complaint is extensive. Paragraphs 1 through 72 recite the chronology of the plaintiff's criminal proceedings and identify the defendants. Paragraphs 73 through 431 contain the substance of the plaintiff's claims. The claims divide broadly into two categories: (1) claims of constitutional errors and violations of Jackson's rights in the course of his criminal prosecution for murder and related crimes; and (2) complaints about the conditions of confinement that the plaintiff alleges he has endured while confined at the Wayne County jail since his arrest.

The Court finds that the claims in the first category must be dismissed because a civil complaint under 42 U.S.C. § 1983 is not a proper vehicle for pursuing them. In addition, a number of the defendants accused in these claims either are immune or otherwise not amenable to suit under the civil rights statute. All of the claims in the second category must be dismissed as well, in most instances because they fail to allege that the plaintiff has suffered actual harm from the conditions about which he complains, and in the remainder because they do not adequately plead conditions that rise to the level of an invasion of the plaintiff's constitutional rights.

## II.

The plaintiff requested and was granted permission to proceed *in forma pauperis.* When a plaintiff asks the court to waive fees and costs because he cannot afford to pay them, the Court has an obligation to screen the case for merit and dismiss it if it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). A complaint is frivolous if it lacks an arguable basis in law or fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *see also Denton v. Hernandez,* 504 U.S. 25, 32, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). "A complaint lacks an arguable basis in law or fact if it ... is based on legal theories that are indisputably meritless." *Brown v. Bargery,* 207 F.3d 863, 866 (6th Cir.2000) (citing *Neitzke,* 490 U.S. at 327–28).

Although a *pro se* litigant's complaint is to be construed liberally, *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), such complaints still must plead facts sufficient to show a redressable legal wrong has been committed, Fed.R.Civ.P. 12(b)(6); *Dekoven v. Bell,* 140 F.Supp.2d 748, 755 (E.D.Mich.2001). "The leniency granted to *pro se* [litigants] ... is not boundless." *Martin v. Overton,* 391 F.3d 710, 714 (6th Cir.2004). The screening mandated by Congress in section 1915(e)(2) includes the obligation to dismiss civil complaints filed by prospective *pro se* filers if they "fail to state a claim upon which relief may be granted." *See* 28 U.S.C. § 1915(e)(2)(B) (ii); *McGore v. Wrigglesworth,* 114 F.3d 601, 604 (6th Cir.1997), *overruled on other grounds by Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. *Sua sponte* dismissal is appropriate if the complaint lacks an arguable basis when filed. *Goodell v. Anthony,* 157 F.Supp.2d 796, 799 (E.D.Mich.2001).

**\*3** "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal,* [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.,* 628 F.3d 278, 280 (6th Cir.2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). Under the new regime ushered in by *Twombly* and *Iqbal,* pleaded facts must be accepted by the reviewing court but conclusions may not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements' " of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal,* 556 U.S. at 681 (quoting *Twombly,* 550 U.S. at 555).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir.2009) (quoting *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir.2006)). The plaintiff must establish the liability of each individual defendant by that person's own conduct. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

## A. Conspiracy

As an initial matter, all of the plaintiff's claims for "conspiracy" must be dismissed because he has failed to plead adequate facts to raise any plausible claim that any of the defendants conspired to violate his rights. The entire conspiracy allegations in the complaint read as follows: "[The prosecutors, judges, and attorney Evans] and others are all working together to impede the legal process to negatively impact plaintiff, Compl. ¶ 154; "the prosecutors, police, judges, and attorney Evans] all know that there is not enough evidence to support any of the charges against plaintiff," Compl. ¶ 155; "[defendants] are all working together individually, collectively, directly, and indirectly to deprive plaintiff of his liberties," Compl. ¶ 198; and "[t]he actions and non-actions of [defendants] suggest they are all conspiring together individually, collectively, directly, and indirectly to deprive plaintiff of his life, liberty, and property and other rights guaranteed by the Civil Rights Act and the United States Constitution," Compl. ¶ 314. These are just the sort of conclusory, unsupported allegations that the Supreme Court in *Twombly* and *Iqbal* admonished district courts not to tolerate. Those conclusory allegations are not entitled to a presumption of truth, and they suggest nothing more than the possibility of illegal behavior. No part of the complaint supplies the necessary specific facts to show conduct that is more than "merely consistent with" illegal behavior, and none of the allegations stated nudge the conspiracy claims over the line from "possible" to "plausible."

## B. Parties

**\*4** With regard to the parties, all of the claims must be dismissed against two groups of defendants, because they either are immune from or are not amenable to suit under 42 U.S.C. § 1983. First, civilian witnesses Donald Sims and Philip Yaeger; Jackson's defense counsel Marlon Evans; and defendant Metro PCS Communications must be dismissed because they are not alleged to be state actors, as they must be in order for their conduct to be subject to the civil rights statute. Second, the prosecutors, judges, and the clerk of court all must be dismissed because they are entitled to absolute prosecutorial, judicial, or quasi-judicial immunity for their conduct

relating to the litigation of criminal charges against the plaintiff.

### 1. Donald Sims, Philip Yaeger, Marlon Evans, and Metro PCS Communications

Defendants Sims, Yaeger, Evans, and Metro PCS all must be dismissed because nothing in the complaint suggests that they are "state actors." In order for liability to attach under § 1983, "the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute. To act 'under color of law' does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." *Id.* at 941 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)) (quotation marks omitted). The plaintiff does not show how, if at all, Sims or Yaeger as civilian witnesses in Jackson's criminal proceedings participated in any "joint activity" with state officials. Likewise, he has pleaded no facts to show that Metro PCS was performing any public function, that it operates under the control of state officials, or that it did anything more than provide private commercial telephone services to jail inmates.

Attorney Evans must be dismissed because it is well established that a defense attorney is not a state actor under 42 U.S.C. § 1983. Absent some plausible and specific factual showing that he acted in concert with state officials to deprive the plaintiff of some constitutional right, a criminal defense attorney is not a "state actor" and is not subject to suit under 42 U.S.C. § 1983. *Elrod v. Michigan Supreme Court,* 104 F. App'x 506, 508 (6th Cir.2004); *accord Bomer v. Muechenheim,* 75 F. App'x 998, 999 (6th Cir.2003) (citing *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). Jackson alleges that Evans failed him as an attorney in numerous ways, but he offers no facts to show that any of those failures were the result of action taken in concert with state officials.

2. Athina Siringas, Kym Worthy, Wayne County Prosecutor's Office, Deborah G. Bledsoe Ford, Richard M. Skutt, and Wayne County Clerk of Court

**\*5** The plaintiff's claims against the prosecutors and the judges involved in his criminal case must be dismissed because they are immune from suit. In *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir.1997), the court determined that judges, when performing judicial functions, are entitled to absolute immunity from suits for money damages. Judicial immunity is abrogated only when a judge is not acting in a judicial capacity, or when the judge takes action in the absence of jurisdiction, which is not alleged here. *Mireles v. Waco,* 502 U.S. 9, 11–12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). "Absolute prosecutorial immunity, like absolute judicial immunity, is a common law principle that shields a prosecutor from § 1983 liability." *Cooper v. Parrish,* 203 F.3d 937, 946 (6th Cir.2000). A prosecutor has absolute immunity for all acts "intimately associated with the judicial phase of the criminal process," such as "initiating a prosecution and ... presenting the State's case." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The Sixth Circuit has held that

> [t]hose acts that occur in the course of the prosecutor's role as an advocate for the state, e.g., acts taken to prepare for the initiation of judicial proceedings or to prepare for trial, are protected by absolute immunity. By contrast, a prosecutor who "performs the investigative functions normally performed by a detective or police officer" such as "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" is entitled only at most to qualified immunity.

*Cooper,* 203 F.3d at 947 (internal citations omitted). As with judicial immunity, the motives of the prosecutor are irrelevant for purposes of immunity. *Eldridge v. Gibson,* 332 F.3d 1019, 1021 (6th Cir.2003).

The claims relating to the plaintiff's pending criminal prosecution focus entirely on the prosecutorial and adjudicative roles of the state prosecutors and judges. Those individuals, therefore, are immune from suit.

The claims against the Wayne County Clerk for refusal to copy and return certain documents also must be dismissed, because the Clerk is entitled to quasi-judicial immunity for official actions taken to carry out the business of the court. "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush,* 38 F.3d at 847. "An official is entitled to absolute quasi-

judicial immunity when that official acts pursuant to a valid court order because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding." *J.P. Silverton Industries L.P. v. Sohm,* 243 F. App'x 82, 89 (6th Cir.2007) (quoting *Cooper v. Parrish,* 203 F.3d 937, 948 (6th Cir.2000)) (quotation marks and alterations omitted).

3. Drug Enforcement Agency, Michigan State Attorney General's Office and Michigan Attorney General

**\*6** Defendant the Drug Enforcement Agency must be dismissed because the complaint simply alleges no wrongful conduct involving the plaintiff or his rights. Other than in the paragraphs stating the conclusory allegations of conspiracy discussed above, the complaint only mentions the DEA in two paragraphs (35 and 373), neither of which assert anything other than historical facts about the agency's actions. The entire allegations of the complaint are that the DEA executed a search warrant at the home of witness Sims, recovered a gun and some drugs, and that Sims later entered into a plea agreement with the government on charges stemming from the evidence recovered. Nothing in the complaint demonstrates how any conduct of the agency was improper, or if it was how that improper conduct affected the plaintiff's rights.

Defendants Michigan Attorney General and AG's office must be dismissed, because the complaint alleges nothing more than that these defendants "knew of" alleged wrongful conduct by various other defendants and "did nothing" to stop it. It is well established that mere knowledge and failure to act do not render a party liable under 42 U.S.C. § 1983. Instead, the plaintiff must show that a defendant "encouraged the specific incident of misconduct or in some other way directly participated in it." *Phillips v. Roane County,* 534 F.3d 531, 543 (6th Cir.2008). It is not enough to show merely that a defendant knew of unconstitutional conduct and failed to act. *Gregory v. City of Louisville,* 444 F.3d 725, 751 (6th Cir.2006). Rather, the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Sheehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999)). The complaint offers nothing to support the required showing as to these defendants.

C. Criminal Prosecution

Paragraphs 73–198, 286–87, 290–373, and 430 include a long list of alleged constitutional defects and violations in the continuing criminal proceedings against the plaintiff. None of those claims is cognizable in an action under 42 U.S.C. § 1983, because they all amount to challenges to the plaintiff's criminal prosecution and incarceration, and the plaintiff has not made any showing that his prosecution has been set aside or declared invalid. "In general, a state prisoner does not state a cognizable claim under § 1983 if a ruling on his claim would necessarily imply the invalidity of his conviction and confinement, until the conviction has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or has been called into question by a federal court's issuance of a writ of habeas corpus." *Reese v. Gorcyca,* 55 F. App'x 348, 349 (6th Cir.2003) (citing *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *Schilling v. White,* 58 F.3d 1081, 1085–86 (6th Cir.1995)). "Moreover, 'the concerns of *Heck* apply pre-conviction as well as post-conviction.' " *Ibid.* (citing *Shamaeizadeh v. Cunigan,* 182 F.3d 391, 398 (6th Cir.1999)). "Thus, '*Heck* precludes § 1983 claims relating to pending charges when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges.' " *Beck v. City of Muskogee Police Dep't,* 195 F.3d 553, 557 (10th Cir.1999). All of the claims relating to the plaintiff's ongoing criminal prosecution therefore must be dismissed.

### D. Jail Conditions

**\*7** Paragraphs 199–289 and 374–431, excepting the specific paragraphs noted above, all concern the plaintiff's claims about the conditions of his confinement at the Wayne County jail since his arrest. Jackson recites a litany of complaints about all manner of generally uncomfortable, unsanitary, inconvenient, annoying, and in some cases plainly disgusting aspects of the accommodations at the jail. He alleges that he has endured eating unpalatable and unidentifiable food; using cloudy and malodorous tap water; wearing the same county issued "greens" uniform for months without access to a laundry; using a single public telephone that was cleaned only "once or twice" since he has been in the jail; sleeping and showering with overflowing toilets and showers that resulted in fetid water standing in cells or bathrooms for days; riding in a shaky and dangerous elevator; dodging wild birds flying around in his housing unit; rooming with mentally ill inmates and inmates sick with contagious diseases such as Methicillin-resistant

Staphylococcus aureus (MRSA); being served "Cool Shots" drinks at every meal, which the plaintiff alleges can cause "kidney problems and cancer," and which, "when spilled on the floor or wall leaves a permanent stain that cannot be removed by any chemical"; and generally abiding day-to-day life in a housing unit, the whole of which "smells like feces, urine, dirty clothes and sweaty genitals."

The Constitution "does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). On the other hand, it does not permit inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The amendment imposes affirmative duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). If the challenged condition is not a criminal penalty, then it may not amount to an " 'unnecessary and wanton infliction of pain' " lest it violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). What constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation. *Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Brooks v. Celeste,* 39 F.3d 125, 128 (6th Cir.1994). Such claims must satisfy both an objective and a subjective test. *See Farmer,* 511 U.S. at 834; *Wilson v. Seiter,* 501 U.S. 294, 297–300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The same rules apply to pretrial detainees via the Due Process Clause. *Bell v. Wolfish,* 441 U.S. 520, 594, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (noting that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"); *Rose v. Saginaw Cnty.,* 353 F.Supp.2d 900, 918–20 (E.D.Mich.2005).

**\*8** The objective prong requires a showing that the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *See McMillian,* 503 U.S. at 8–9; *Rhodes,* 452 U.S. at 349. To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 349. The objective component is contextually driven

and is responsive to " 'contemporary standards of decency.' " *McMillian,* 503 U.S. at 8 (quoting *Estelle,* 429 U.S. at 103).

To satisfy the subjective prong, the plaintiff must show that the officials acted with a sufficiently culpable state of mind; that is, that the conduct was "wanton." *Wilson,* 501 U.S. at 302; *Moore v. Holbrook,* 2 F.3d 697, 700 (6th Cir.1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson,* 501 U.S. at 302–03; *see Estelle,* 429 U.S. at 104–06. Under that standard, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. A prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. *See id.* at 843–44. However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances. *See id.* at 844–45. " 'Deliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice." *Wright v. Taylor,* 79 F. App'x 829, 831 (6th Cir.2003) (citing *Farmer,* 511 U.S. at 835–36; *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc)).

Where the plaintiff alleges "that the conditions of [his] confinement [pose] a serious risk of substantial harm to [his] health, in violation of the Eighth and Fourteenth Amendments[, he] must show that the county [or individual defendants] were deliberately indifferent to that risk." *Bowers v. Livingston County,* 426 F. App'x 371 (6th Cir.2011) (citing *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir.2001)). "[The inmate] must show that [an individual defendant] was personally aware of facts from which he could infer an unreasonable risk of serious damage to [the inmate's] future health, and that he did in fact draw the inference." *Id.* at 372–73 (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

Despite his understandable complaints, the plaintiff has failed to state any plausible claims for relief relating to unsanitary conditions, because in most instances he does not allege that he suffered any actual harm from the conditions he describes, and in those cases where he does allege harm, it is not sufficient to demonstrate a serious risk of substantial harm to his health that would rise to the

level of a constitutional violation.

**\*9** In the case of most of the claims described above, the plaintiff alleges only that the conditions create a "risk" or "danger" to his health, and he does not assert that he has suffered any actual health consequences or injuries. Jackson comes close to describing actual harm where he alleges that as a result of the backed up showers, county maintenance personnel used some form of acid or caustic solution to clear the blocked drains, which generated "reeking fumes" that caused his eyes to water and caused him almost to pass out. Compl. ¶¶ 267–69, 382–83. He does not, however, allege that he suffered any lasting harm to his health from the plumbing incidents, and therefore he has not pleaded that the conditions were sufficient to create a substantial risk of harm or any lasting injury. Jackson also describes "skin irritation," "black spots" on his skin, and "light headedness" that he has developed as a result of showering in areas with black mold and sleeping on a filthy mattress, Compl. ¶¶ 273, 395–96, 387, but these complaints likewise do not demonstrate that he has suffered lasting or substantial harm to his health as a result of the jail conditions.

As to his confinement with inmates having infectious diseases, the Sixth Circuit held in *Bowers* that even plaintiffs who became infected with MRSA, but who were treated for the disease and recovered, could not demonstrate any Eighth Amendment claim "despite the fact that the court of appeals found that "it is undisputed that, once contracted, an MRSA infection can be quite serious ... [the sheriff] knew that there had been MRSA infections in the jail before[,] and ... the jail's lack of preventative measures made infections likely in the future." 426 F. App'x at 373.

Because the plaintiff has failed to establish that any of the conditions he describes posed an unreasonable risk of serious harm to his health, all of the claims relating to the unsanitary and unsavory conditions of his confinement must be dismissed.

E. Insults and Invasion of Privacy

The plaintiff alleges that several of the named or anonymous defendant jail guards verbally insulted him or invaded his privacy. In particular, Jackson alleges that jail guard Jane Doe I(1) responded to a question put to her by the plaintiff by saying, "Don't make me slap the black off you," Compl. ¶ 225; (2) made the plaintiff take down sheets he had hung up for privacy in his cell while he was still using the toilet, Compl. ¶¶ 236–41; and (3) "looked

directly at [plaintiff's] genitals while he was in the shower, Compl. ¶ 409. Those claims, like the plaintiff's other complaints about "invasion of privacy," fail to allege any constitutional violation. A jail inmate does not have a reasonable expectation of privacy in his cell. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[V]erbal insults of an inmate have not been deemed actionable in actions brought pursuant to § 1983." *Roden v. Sowders,* 84 F. App'x 611, 613 (6th Cir.2003) (citing *Ivey v. Wilson,* 832 F.2d 950, 955 (6th Cir.1987)). Moreover, the Sixth Circuit has held that a strip search of a male prisoner in the presence of a female guard does not violate either the Fourth or the Eighth Amendment. *Roden,* 84 F. App'x at 613. The plaintiff also alleges that he was subjected to strip searches at various times, but he does not provide any specific facts to show why the searches were unreasonable in scope or unjustified in the course of jail operations.

### F. Inmate With a Gun

**\*10** The plaintiff claims that jail officials endangered his life when on one occasion they allowed an inmate who had a gun on his person to enter the jail. That claim must be dismissed because, despite the apparent and alarming security breach, the plaintiff does not allege that he or anyone else suffered any harm from the incident. Moreover, the plaintiff does not allege any specific facts that would establish which, if any, of the named defendants was involved in allowing the armed inmate to enter the jail, or that any defendant knowingly did so. Jackson therefore cannot establish that any named defendant deliberately disregarded any risk to his welfare as a result of this event, and negligence by jail officials is not actionable under 42 U.S.C. § 1983. *Daniels v. Williams,* 474 U.S. 327 (1996). Jackson also does not allege that the entry of an armed inmate resulted from any policy, custom, or practice of the County or the jail.

### G. Involuntary Servitude

Jackson complains that on the occasions when the toilets overflowed jail officials told inmates they would have to either clean the mess up or "sleep with it," and that inmates also were compelled to scrub and clean the housing unit area on a routine basis, under threat of losing various privileges if they did not comply. Jackson contends that he thus was subjected to "involuntary servitude." However, as several courts of appeals have held, requiring a pretrial detainee to help clean his living unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment. *Bijeol v. Nelson,* 579 F.2d 423, 424 (7th Cir.1978). "Daily general housekeeping responsibilities" are not inherently punitive and do not violate either the Due Process Clause or the Thirteenth Amendment's ban on involuntary servitude. *Id.; accord Martinez v. Turner,* 977 F.2d 421, 423 (8th Cir.1992). That claim therefore is without merit and must be dismissed.

### H. Telephone and Mail Access

Jackson alleges that at various times he suffered delays in delivery of his "important mail," adding phone numbers to his phone list, and crediting payments to his inmate telephone billing account. He alleges that as a result of those obstacles to his contact with persons outside the jail, his ongoing business enterprises and his personal relationships with family members suffered. Jackson also contends that the "Sheriff's Dept. neglects to give Plaintiff his Detroit newspaper he subscribed to." Compl. ¶ 210.

The Supreme Court has recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and they do not "bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside,' " *id.* at 94–99." Prisoners retain their First Amendment rights to communicate with family and friends, *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir.1994), and "reasonable access to the [use of a] telephone ... is protected by the First Amendment," *ibid.* (quoting *Johnson v. Galli,* 596 F.Supp. 135, 138 (D.Nev.1984)) (quotation marks omitted). "Nevertheless, an inmate 'has no right to unlimited telephone use.' " *Ibid.* (quoting *Benzel v. Grammer,* 869 F.2d 1105, 1108 (8th Cir.1989). " 'The exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions.' " *Ibid.* (quoting *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–64 (D.Kan.1993). Jackson has failed to establish a constitutional injury to his First Amendment rights, because the complaint does not allege that he was denied contact with the outside world altogether, or that he was subject to unreasonable restrictions on his use of the telephone and mail. Moreover, even if he was subject to diminished or delayed contact during some periods, he does not allege that alternative avenues of contact such as direct visitation

were closed to him at those times.

**\*11** Moreover, because he only alleges isolated instances of delays and obstacles in his use of the telephone and delivery of his mail, he has not shown that he suffered a significant injury to his First Amendment rights sufficient to state a claim under 42 U.S.C. § 1983. "[S]hort, non-content based delays in prison mail are not unreasonable and fail to state a constitutional question." *Cotten v. Schotten,* No. 95–4085, 1997 WL 299386, at \*1 (6th Cir. June 4, 1997) (citing *Sizemore v. Williford,* 829 F.2d 608, 610 (7th Cir.1987)). "[I]solated incidents of mail mishandling do not rise to the level of a constitutional violation." *Couch v. Jabe,* No. 11–00034, 2012 WL 3043105, at \*8 (W.D.Va. July 25, 2012). As noted above, to the extent that the plaintiff alleges claims for "breach of duty" by jail officials resulting in the delay or withholding of mail and phone privileges, or "neglecting" to deliver his newspaper, negligence by jail officials is not actionable under 42 U.S.C. § 1983. *Daniels,* 474 U.S. 327.

### I. Access to the Courts

Jackson alleges that his access to the courts was obstructed by various circumstances at the jail, including the departure without replacement of a law librarian, rules that allowed use of the law library only one or two days before a scheduled hearing, policies restricting him to buying only five pencils at a time, and a policy prohibiting use of pens by inmates. Those claims are all subject to dismissal because Jackson has not alleged that any of the impairments resulted in actual prejudice to him in any legal proceeding. "Prisoners have a right of access to the courts." *Pilgrim v. Littlefield,* 92 F.3d 413, 416 (6th Cir.1996) (citing *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). "In order to state a claim for denial of meaningful access to the courts, however, plaintiffs must plead and prove prejudice stemming from the asserted violation. Plaintiffs must demonstrate, for example, that the inadequacy of the prison law library or the available legal assistance caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim." *Ibid.* (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

As the complaint makes clear, Jackson was represented by counsel in his criminal proceeding, and evidently still is. He alleges in vague and conclusory terms that he was prevented from raising a "wide variety of arguments" during his criminal prosecution, and that the jail policy

prohibiting use of pens conflicts with an alleged Wayne County circuit court policy that prohibits the filing of any papers written in pencil. But he alleges no specific facts to show that he missed any deadline, had any pleading or paper refused or dismissed as untimely, or suffered any other substantial prejudice during the course of his criminal case. Indeed, as his lengthy complaint in this matter and numerous subsequent filings demonstrate, the plaintiff's access to the federal district court apparently has not been obstructed in any significant way.

**\*12** Jackson also alleges that the jail refused to release $1,900 cash from his inmate funds account to his mother, which he alleges he had directed her to use to retain a lawyer to represent him in his criminal case. However, as noted above, Jackson was represented by counsel in his criminal proceedings. Despite his obvious dissatisfaction with the performance of his attorney, he has not sufficiently stated any claim that a jail policy on release of inmate funds prevented him from receiving the assistance of counsel for his defense.

### J. Denial of Dental Care

The most serious claim that Jackson raises concerns the alleged denial of dental care for ten months, during a period when he suffered pain due to cavities, "broken fillings," and "bleeding teeth and gums." The complaint alleges as follows:

> 274. Plaintiff put in 2–3 dental kites in 2011 due to broken fillings and bleeding teeth and gums.

> 275. Plaintiff finally saw county dentist in early August of 2012 and after telling them about his cavities, bleeding and pain they told him there was nothing they could do and to take care of it when he got out.

> ...

> 399. The failure of County Jail dentist to answer plaintiff's dental kite until (10) months later citing a broken filling and bleeding teeth and gums though dentist informed plaintiff there was nothing they could do constituting neglect, deliberate indifference towards plaintiff's dental needs, and cruel and unusual punishment....

Compl. ¶¶ 274–75, 399.

The county's failure to provide necessary medical care to prisoners can establish a cause of action under section 1983. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct.

285, 50 L.Ed.2d 251 (1986). The Fourteenth Amendment, by extension of Eighth Amendment jurisprudence, protects pretrial detainees against the deliberate indifference to their serious medical needs by their jailers. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Once again, courts apply a test that has both an objective and subjective component. *Napier,* 238 F.3 d at 742. To succeed on a claim of deliberate indifference, the plaintiff must plead facts on both components: the objective serious medical need, and the defendant's subjective deliberate indifference to it. *Farmer,* 511 U.S. at 834.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897 (6th Cir.2004) (quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990)). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary,* 273 F.3d 693, 707 (6th Cir.2001) (citing *Farmer,* 511 U.S. at 837). The Sixth Circuit further noted that

**\*13** [a]lthough the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways." *Farmer,* 511 U.S. at 842. Thus, the Supreme Court noted that it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* at 842. Moreover, the Court warned, a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n. 8.

*Id.* at 703.

Deliberate indifference is the "equivalent of recklessly disregarding [a substantial risk of serious harm to a prisoner]." *Dominguez,* 555 F.3d at 550 (quoting *Phillips v. Roane Cnty.,* 534 F.3d 531, 540 (6th Cir.2008)). However, the Sixth Circuit also held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." *Terrance v. Northville Reg'l Psychiatric Hosp.,* 286 F.3d 834, 843 (6th Cir.2002). The Sixth Circuit endorsed the standard of "grossly inadequate medical care," under which that element is satisfied when medical treatment is " 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to

be intolerable to fundamental fairness.' " *Id.* at 844 (quoting *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989)). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim. *Sanderfer v. Nichols,* 62 F.3d 151, 154–55 (6th Cir.1995). "Deliberate indifference is not mere negligence," *Watkins,* 273 F.3d at 686, and mere allegations of malpractice are insufficient to state a claim, *Estelle,* 429 U.S. at 106.

If the doctors or nurses that the plaintiff saw were either county employees or private medical treaters acting under a contract to provide medical services to jail inmates, then they were without doubt state actors. It is well settled that a private physician under contract to provide medical services to jail inmates acts under color of law and is subject to suit under section 1983. *See Harrison v. Ash,* 539 F.3d 510, 521 (6th Cir.2008) (citing *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). However, even if the Court assumes that the plaintiff has pleaded that he had an objectively serious medical need, the claims relating to his delayed or denied dental treatment must be dismissed because he has failed to name as defendants—either by proper name or anonymously—any of the dental care providers that allegedly denied him treatment. And he does not allege that any of the defendants that he did name had any part in preventing or delaying his visit to the dentist. Jackson alleges that the dentist he saw told him there was "nothing they could do," but he has not shown that this refusal to treat him involved any deliberate act of one of the named defendants.

**\*14** Moreover, Jackson has not alleged that the refusal was compelled by any policy, custom or practice of the County, the jail, or the sheriff. The complaint refers to a policy that requires inmates to pay \$5 per visit to the dentist, but it does not assert that any inability to pay the fee caused the delay in treatment, or that the plaintiff's dental care was delayed because he refused to pay. The County, the jail, and the sheriff cannot be held liable under 42 U.S .C. § 1983 for the acts of private or public employees providing medical treatment, unless the plaintiff can show that the conduct of the medical treaters was dictated by official policy of an organizational or supervisory defendant. *Doe v. Claiborne Cnty.,* 103 F.3d 495, 507 (6th Cir.1996) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Vereecke v. Huron Valley Sch. Dist.,* 609 F.3d 392, 403 (6th Cir.2010). A claim against a municipality or organizational defendant under section 1983 must be based on the organization's own conduct, meaning that it must spring from its official policies,

customs or practices. *Monell,* 436 U.S. at 691. The plaintiff must plead facts that show that his harm resulted from an organization's policies, customs, or practices in order to establish supervisory liability of an organization that provides medical services to a jail. *Starcher v. Correctional Medical Services, Inc.,* 7 F. App'x 459, 465 (6th Cir.2001) (civil rights liability of contract provider of medical services to prisons cannot be premised on *respondeat superior* ). He has failed to do so.

III.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation [dkt. # 20] is **ADOPTED IN PART,** and the plaintiff's objections [dkt. # 22] are **OVERRULED.**

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the plaintiff's motion for immediate transfer [dkt. # 13] and motion for preliminary injunction [dkt. # 17] are **DISMISSED** as moot.

***MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION PURSUANT TO 28 U.S.C. §§ 1915A(b), 1915e(2)(B), & 42 U.S.C. § 1997e(c)(1)***

CHARLES E. BINDER, United States Magistrate Judge.

**I.** *RECOMMENDATION*
For the reasons set forth below, **IT IS RECOMMENDED** that the case be *sua sponte* **DISMISSED.**[1]

**II.** *REPORT*

**A. Introduction**
Plaintiff Jamal Omari Jackson is currently incarcerated at the Wayne County Jail in Detroit, Michigan, awaiting a second trial on first-degree murder charges.[2] On December 13, 2012, Plaintiff filed a *pro se* Prisoner Civil Rights Complaint pursuant to 42 U.S.C. § 1983. Plaintiff's application to proceed without prepayment of fees pursuant to the *in forma pauperis* statute, 28 U.S.C. §

1915(a)(1), was granted on January 8, 2013. On January 14, 2013, U.S. District Judge David M. Lawson referred all pretrial matters to the undersigned magistrate judge. Prior to the order of reference, Judge Lawson granted a motion by Plaintiff to amend his complaint and set a deadline of February 8, 2013, for the filing of the amended pleading. (Doc. 9.) On February 6, 2013, however, Plaintiff notified the Court that he wished to "retract" his motion to file an amended complaint. (Doc. 12 ¶ 2.)

**\*15** After screening the *pro se* complaint pursuant to 28 U.S.C. §§ 1915A(b), 1915e(2)(B), and 42 U.S.C. § 1997e(c)(1), I conclude that the case is ready for Report and Recommendation.

**B. Governing Law**
This case is subject to screening under several provisions of the United State Code. Pursuant to 28 U.S.C. § 1915A, 28 U.S.C. § 1915(e), and 42 U.S.C. § 1997(c)(1), the Court is to *sua sponte* dismiss the case before service on defendants if it determines that the action is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief.

When the court screens a complaint where a plaintiff is proceeding without the assistance of counsel, the court is required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hahn v. Star Bank,* 190 F.3d 708, 715 (6th Cir.1999). Rule 8(a) sets forth the basic federal pleading requirement that a complaint "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 requires "that the complaint give the defendant fair notice of the claim and its supporting facts." *E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850, 854 (6th Cir.2001).

A civil rights action under 42 U.S.C. § 1983 consists of two elements: (1) the defendant acted under color of state law; and (2) the offending conduct deprived the plaintiff of rights secured by federal law. *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001). Liability of each individual defendant must be based upon that defendant's personal involvement. Thus, plaintiffs must allege that they suffered a specific injury as a result of

specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode,* 423 U.S. 362, 371–72, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

### C. The Complaint

Plaintiff has filed a 431–paragraph, 131–page complaint against 30 defendants, including the prosecuting attorney of Wayne County, Michigan, the judge who presided over Plaintiff's 2012 murder trial, the Detroit Police Department, the Wayne County Sheriff's Department, the sheriff himself, the "Drug Enforcement Agency," the Michigan State Attorney General's Office, the assistant prosecutor at Plaintiff's first trial, and others.

Plaintiff's complaint contains a detailed recitation of the state court criminal case against him, including factual background, procedural pre-trial events, evidence presented at the first trial, and arguments made by the prosecutor. (Compl., Doc. 1 ¶¶ 32–197 .) Plaintiff alleges that several witnesses lied and further alleges that the prosecutors, police officers, witnesses, and judge are "all working together individually, collectively, directly and indirectly to deprive Plaintiff of his liberties." (*Id.* ¶ 198.)

*\*16* Beginning with paragraph 199, Plaintiff alleges that "Wayne County, Sheriff's Dept. and [Sheriff] Napoleon has [sic] a history of creating policies and customs as well as the lack of policies and customs that encourages, allows, and fails to prevent the deprivation of inmates' liberties and constitutional rights." (*Id.* ¶ 199.) The following 89 paragraphs list the conditions at the Wayne County Jail to which Plaintiff objects. He alleges that: his mother was not allowed to remove cash from his jail property; his life was placed in jeopardy on August 10, 2012, when an arrestee was allowed inside the jail facility with a gun; he is not allowed to have ink pens, pencil sharpeners, or erasers; "Sheriff's Dept. neglects to given Plaintiff important mail for weeks or months at a time or sometimes not at all"; at times he was only allowed to use the copy machine if his court hearing was within the next 2 days; he has been "denied access to law library many times since September 2011"; the law library is understaffed and contains out of date books; it takes days for his phone account to be credited when he adds money to it; he has been verbally threatened by a guard; the main elevator jumps and stops suddenly; "Wayne County, Sheriff's Dept. and Napoleon has a policy of strip searching Plaintiff and other inmates coming back to unit from court or medical"; birds are flying around inside the jail and no one does anything about it; the jail serves a type of drink that the guards told him cause kidney problems and cancer; the jail water comes out white and

smells; the laundry isn't done in a timely manner; inmates are not given enough privacy in the shower and toilet; mattresses are torn and dirty; Plaintiff was forced to scrub graffiti off walls that was placed there months before he was even in the jail; the whole unit smells like "feces, urine, dirty clothes, and sweaty genitals"; the telephone in his unit has only been disinfected twice in four months; the unit lacks proper ventilation; there is black mold on the shower walls; the inmates are forced to clean up when the toilets overflow; Plaintiff is forced to be housed with inmates that have infectious diseases; he has been denied adequate dental care; mentally ill inmates are allowed to refuse to take their medication; mentally ill inmates are housed in general population; "Wayne County, Sheriff's Dept. and Napoleon has a policy that allows, encourages, or fails to prevent price gouging from commissary inventory"; and the grievance procedure is faulty.

Beginning with paragraph 290, Plaintiff sets forth in great detail the alleged constitutional violations that occurred before and during his first trial. He asserts the following claims: violation of due process and right to fair trial; actual conspiracy to deprive Plaintiff of his liberties; violation of the right to a speedy trial; violation of the Federal Rules of Criminal Procedure; violation of the right to a fair trial; illegal search and seizure; racial discrimination; violation of the Model Rules of Professional Conduct; violation of the right to equal protection of the laws; fraud on the court; prosecutorial misconduct; intentional infliction of emotional distress; malicious and vindictive prosecution; violation of the right to be free from double jeopardy under the Michigan and U.S. Constitutions; judicial misconduct; ineffective assistance of counsel; defamation of character; obstruction of justice. (*Id.* ¶¶ 290–373.)

*\*17* With regard to the alleged conditions at the Wayne County Jail, Plaintiff asserts claims of: cruel and unusual punishment; denial of access to the courts; involuntary servitude; intentional infliction of mental and emotional injury; deliberate indifference to a serious risk of harm from exposure to bio-hazards; deliberate indifference to serious dental needs; deliberate indifference to safety; racial discrimination; denial of access to the courts; obstruction of justice; and civil RICO violation. (*Id.* ¶¶ 374–431.)

Plaintiff does not seek damages, but rather seeks only declaratory and injunctive relief, including: an order restraining the state court officials from continuing to prosecute the murder case against him, declaratory judgments against all defendants for constitutional violations, and an injunction ordering his immediate release from custody. (*Id.* at 127–131.)

### D. Analysis & Conclusion

Rule 8(a) requires a plaintiff to file a complaint that sets forth "a short and plain statement of the claim...." Fed.R.Civ.P. 8(a)(2). In addition, Rule 8(d)(1) states that "[e]ach allegation must be simple, concise, and direct." Clearly, the 431–paragraph complaint in this case cannot be considered a "short and plan statement of the claim." When a pleading is this verbose, the complaint should be dismissed for failure to comply with the Federal Rules of Civil Procedure. *See Flayter v. Wisconsin Dep't of Corr.,* 16 F. App'x 507, 509 (7th Cir.2001) (116–page 242–paragraph prisoner civil rights complaint "would, because of its length and level of detail, present a challenge to the defendants in filing a responsive pleading" and was a violation of Rule 8(a)(2)); *McHenry v. Renne,* 84 F.3d 1172, 1180 (9th Cir.1996) ("Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint."); *Vicom v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 775–76 (7th Cir.1994) (criticizing district court for declining to dismiss with prejudice pursuant to Rule 8(a); noting that "[a] complaint that is prolix and/or confusing makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation); *Plymale v. Freeman,* No. 90–2202, 1991 WL 54882 (6th Cir. Apr.12, 1991) (affirming dismissal with prejudice for failure to comply with Rule 8). These cases teach that complaints such as that now before the court merit dismissal. Accordingly, I suggest that this case be dismissed for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

I further suggest that Plaintiff not be allowed to amend his complaint to avoid dismissal. The Sixth Circuit has held that, in prisoner cases where the plaintiff is proceeding *in forma pauperis,* "[t]he district court must dismiss a complaint without first affording a plaintiff leave to amend." *Bright v. Thompson,* No. 11–5732, 2012 WL 833662, at *1 (6th Cir. March 13, 2012) (citing *Benson v. O'Brian,* 179 F.3d 1014, 1015–16 (6th Cir.1999)). *See also Cantley v. Armstrong,* No. 09–1092, 2010 WL 3245548, at * 1 (6th Cir.2010) ( "district courts are not to permit plaintiffs to amend a complaint to avoid dismissal"); *Shorter v. Campbell,* 59 F. App'x 673, 675 (6th Cir.2003) ("As the plaintiffs' complaint was dismissible under 42 U.S.C. §§ 1915(e) and 1915A, they did not have the right to amend their complaint prior to dismissal."); *McGore v. Wrigglesworth,* 114 F.3d 601, 612 (6th Cir.1997); *Ashley v. Wilson,* No. 10–10512, 2010 WL 1246525, at *1 (E.D.Mich. March 25, 2010) ("The

Court does not have discretion to allow prisoners filing suit *in forma pauperis* to amend their complaint to avoid *sua sponte* dismissal...."); *Corrion v. Ludwick,* No. 09–11531, 2009 WL 3273737, at *1 (E.D.Mich. Oct.13, 2009) ("prisoners may not alter or amend their complaints to avoid a summary dismissal"); *McGore v. Lutz,* No. 09–13031, 2009 WL 2959874, at *1 (E.D.Mich. Sept. 11, 2009).

**\*18** In addition to being in violation of Rule 8, I also suggest that the complaint is in violation of the rules governing joinder. *See* Fed.R.Civ.P. 18, 20. In *George v. Smith,* 507 F.3d 605 (7th Cir.2007), the plaintiff filed a prisoner civil rights complaint asserting 50 claims against 24 defendants. The Court of Appeals for the Seventh Circuit explained the application of the joinder rules:

> [M]ultiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass [a multiple claim, multiple defendant] suit produce[s], but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g).

*Id.* at 607. *See also Prince v. Elum,* No. 12–15526 (E.D.Mich. Jan. 14, 2013) (order *sua sponte* severing claims in prisoner civil rights case for misjoinder) (J. Rosen).

In this case, Plaintiff has attempted to combine into one lawsuit many unrelated claims against many different defendants. The majority of Plaintiff's claims relate to alleged constitutional violations during the prosecution of his criminal case and are asserted against the prosecutors, judge, and other who participated in that prosecution, while the remainder of Plaintiff's claims assert that the conditions at the Wayne County Jail are unconstitutionally substandard and the defendants in those claims are the sheriff and others responsible for the jail. Clearly, these are "unrelated claims against different defendants [that] belong in different suits." *George,* 507 F.3d at 607.

Jackson v. Siringas, Not Reported in F.Supp.2d (2013)

### III. *REVIEW*

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.R.Civ.P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3810301

Footnotes

1    In the event this Report and Recommendation is adopted, Plaintiff's pending Motion Requesting Immediate Transfer to Different Facility (Doc. 13) will be moot.

2    According to the Wayne County Circuit Court docket, Plaintiff's first jury trial ended in a hung jury on June 5, 2012, and a second trial is scheduled for June 3, 2013. *See State of Michigan v. Jamal Jackson,* Case No. 11–011850–01–FC, athttps://cmspublic.3rdcc .org/CaseDetail.aspx? CaseID=1166842 (viewed on March 12, 2013).

**End of Document**                                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Kajy Hill, Inc. v. Sunoco, Inc., Slip Copy (2015)

2015 WL 12990680
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Kajy Hill, Inc., Plaintiff,
v.
Sunoco, Inc. (R&M), Defendant.

Civil Action No. 15-cv-12613
|
Signed 10/15/2015

**Attorneys and Law Firms**

Christopher J. Ebbott, Richard H. Ebbott, Morrissey, Bove, Ebbott, Flint, MI, for Plaintiff.

Brett Gelbord, James D. Vandewyngearde, Pepper Hamilton, Southfield, MI, Jennifer L. Maher, Pepper Hamilton LLP, Philadelphia, PA, for Defendant.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

BERNARD A. FRIEDMAN, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** This matter is presently before the Court on defendant's Motion to Dismiss [docket entry 3]. Plaintiff has filed a response in opposition and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion on the briefs.

This is a breach of contract action stemming from allegedly defective debit and credit card readers. Plaintiff owns and operates a service station in Flint, Michigan that, pursuant to a contract between the parties, sells defendant's branded motor fuel to its customers. As part of that contract, plaintiff alleges that defendant was obligated to supply plaintiff with certain equipment including card readers and "other systems to allow credit and debit card transactions at the pumps." Compl. at ¶ 6. Plaintiff alleges that in November 2010 these readers malfunctioned and needed to be repaired. Specifically, plaintiff alleges that the readers allowed customers to use their debit and credit cards to purchase gasoline, but these

debit and credit card swipes were never captured on the back end, resulting in nearly $1,000,000 of uncaptured sales. Id. ¶ 16. To recover these uncaptured sales, plaintiff filed the instant three-count complaint. Count I alleges that defendant breached its contractual duty to (1) provide working equipment; (2) check equipment to ensure it was working properly; (3) repair malfunctioning equipment; and (4) supply new working equipment. Id. ¶ 15. Count II alleges a negligence claim and Count III alleges a violation of the Michigan Consumer Protection Act ("MCPA").

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005). In deciding a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all of the complaint's factual allegations as true," Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 512 (6th Cir. 2001).

Defendant argues in its motion that Count I (breach of contract) should be dismissed because plaintiff did not attach the alleged contract to the complaint and has not alleged a contractual relationship with defendant. Def.'s Mot. at 4. Plaintiff cured this deficiency by attaching the contract as an exhibit to its response in opposition to defendant's motion. Although courts must normally disregard matters outside the pleadings in ruling on a motion to dismiss, a document can be properly considered on such a motion when it is "referred to in the complaint and ... central to the plaintiff's claim." Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 514 (6th Cir. 1999). Thus, the Court can properly consider this contract because plaintiff directly referred to the contract in the complaint.

**\*2** Plaintiff and defendant executed the contract in question (entitled "Dealer Supply Franchise Agreement") on September 22, 1999. Pl.'s Resp., Ex. 1. According to the express terms of the contract, the contract was to end on September 5, 2005, and continue "from month to month thereafter, unless sooner terminated." Id. ¶ 1.01.

Plaintiff argues that the contract remained in effect during November 2010 when the debit and credit card readers began to malfunction and continued "until Plaintiff was forced to switch oil companies." Pl.'s Resp. at 1. In its reply, defendant argues that this contract was not in effect during the time that the debit and credit card readers malfunctioned because plaintiff had "assigned" the contract six years prior in May 2004. Def.'s Reply at 2. In support of its position, defendant directs the Court to two documents attached as exhibits to the reply, one entitled "Status Change Notice" and the other entitled "Service Station Information Update." *See* Def.'s Reply, Exs. 1-2. The Court declines to consider these documents in ruling upon the instant motion to dismiss because plaintiff did not refer to or rely upon them in the complaint. The Court shall therefore disregard these documents in deciding the instant motion.

Plaintiff alleges that it notified defendant when the debit and credit card readers first malfunctioned in November 2010. Plaintiff also alleges that the parties had a contract governing the dispute and that plaintiff terminated this contract only after the parties were unable to resolve the card reader problem. Thus, construing the complaint in the light most favorable to plaintiff and accepting all well pled factual allegations as true, plaintiff has plausibly pled a breach of contract claim.

Defendant argues that Count II (negligence) must be dismissed because it is barred by the three-year statute of limitations period governing negligence actions. *See* Mich. Comp. Laws § 600.5805. "The defense of the statute of limitations is covered by [Rule 12(b) ](6), and therefore properly raised by motion." *Berry v. Chrysler Corp.*, 150 F.2d 1002, 1003 (6th Cir. 2003). Dismissal based on a claim being barred by the statute of limitations is "appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). Plaintiff's response concedes that the statute of limitations for Count II is three years. The Court agrees with defendant that Count II is barred by the applicable statute of limitations. Plaintiff alleges that the debit and credit card readers began to malfunction in November 2010. Thus, plaintiff had to file this lawsuit by November 2013. Plaintiff, however, filed the instant action on July 26, 2015. Plaintiff's claim must therefore be dismissed because the face of the complaint clearly shows it is barred by the statute of limitations.

Defendant next argues that Count III (MCPA violation) must be dismissed because the statute does not apply to the facts of this case. The MCPA applies to "conduct of trade or commerce," which is defined as "providing goods, property, or service primarily for personal, family,

or household purposes." Mich. Comp. Laws §§ 445.903(1), 445.902(1)(g). "[I]f an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999). In determining the purpose for purchasing a product, the focus is on the primary use to which the consumer puts the product to use. *Id.* Defendant argues that plaintiff's purchase of "gasoline pumps and credit/debit card readers and the system that uses them" was clearly for a commercial, not personal, use. In response, plaintiff argues that "[t]he ultimate consumer of the gasoline purchased by the plaintiff from defendant for sale to the public is primarily for personal use." Pl.'s Resp. at 4. The Court agrees with defendant and finds plaintiff's argument legally defective. Plaintiff purchased gasoline pumps and debit and credit card readers from defendant for the purpose of facilitating gasoline sales to third-party customers, and the fact that plaintiff's end customers may have purchased gasoline for personal use is of no consequence as those customers are not parties to this case. The Court shall therefore dismiss Count III of the complaint.

**\*3** Finally, defendant argues that Counts II and III must be dismissed for the additional reason that the economic loss doctrine bars such claims.[1] Under this doctrine, "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992). This doctrine draws a line between breach of contract claims arising from commercial transactions, where contract law protects the parties' economic expectations, and tort actions where claims arise as a result of unanticipated conduct that violates a separate duty distinct from contract. This " 'distinction is critical, for the essence of the "economic loss" rule is that contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies.' " *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995) (quoting *Williams Elec. Co. Inc. v. Honeywell, Inc.*, 772 F.Supp. 1225, 1237-1238 (N.D. Fla. 1991)). Otherwise "[t]here is a danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions." *Id.*

Here, the economic loss doctrine supplies an additional reason to dismiss plaintiff's negligence claim (Count II) because the duties defendant allegedly failed to perform in a reasonable manner stem from the contract itself, not tort duties. However, the economic loss doctrine does not

supply an additional reason to dismiss plaintiff's MCPA claim (Count III) because those claims stem from separate statutory duties. Accordingly,

IT IS ORDERED that defendant's motion to dismiss is granted as to Counts II and III and denied as to Count I.

**All Citations**

Slip Copy, 2015 WL 12990680

Footnotes

1        Plaintiff did not provide any argument on the applicability of the economic loss doctrine.

---

        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 1637466
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Anthony D. KYLES, Plaintiff,
v.
KEEFE COMMISSARY NETWORK, LLC d/b/a
Keefe Group and Access Securepak, Defendant.

No. 14–CV–11907.
|
Signed April 13, 2015.

**Attorneys and Law Firms**

Anthony Kyles, Carson City, MI, pro se.

David W. Schelberg, Joseph A. Starr, Starr, Butler, Alexopoulos & Stoner, PLLC, Southfield, MI, for Defendant.

*ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DISMISSING PLAINTIFF'S COMPLAINT*

GERALD E. ROSEN, Chief Judge.

**\*1** This matter having come before the Court on the March 24, 2015 Report and Recommendation of United States Magistrate Judge David R Grand recommending that the Court grant Defendant's Motion for Summary Judgment and dismiss Plaintiff's Complaint, in its entirety, with prejudice; and no timely objections to the Magistrate Judge's Report and Recommendation having been filed; and the Court having reviewed the Magistrate Judge's Report and Recommendation, and the Court's file of this action and having concluded that, for the reasons stated in the Report and Recommendation, Plaintiff's Complaint this case should be dismissed in its entirety, and the Court being otherwise fully advised in the premises,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Magistrate Judge's Report and Recommendation of March 24, 2015 **[Dkt. # 18]** be, and hereby is, adopted by this Court.

IT IS FURTHER ORDERED that, for the reasons set forth in the Magistrate Judge's Report and Recommendation, Defendant's Motion for Summary Judgment **[Dkt. # 14]** is GRANTED and Plaintiff's Complaint is hereby DISMISSED in its entirety, with prejudice.

*REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]*

DAVID R. GRAND, United States Magistrate Judge.

Before the Court for a report and recommendation is Defendant Keefe Commissary Network, LLC's ("KCN") Motion for Summary Judgment. [14]. *Pro se* Plaintiff Anthony Kyles ("Kyles"), an incarcerated person, filed a response to this motion on December 4, 2014.[16]. Defendant submitted a reply on December 9, 2014.[17]. An order of reference was entered on June 10, 2014, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). [6]

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

**I. RECOMMENDATION**
For the following reasons, the Court RECOMMENDS that Defendant KCN's Motion for Summary Judgment [6] be GRANTED and Kyles' complaint be dismissed.

**II. REPORT**

**A. Factual Background**
Kyles is a State of Michigan prisoner currently incarcerated at the Carson City Correctional Facility. [10 at ¶ 3]. He was incarcerated at the Oaks Correctional Facility during all times relevant to his complaint. [1 Ex. A at ¶ 3].

Keefe Group is a "family of companies that ... provide food and commercial goods services ... in the prison

industry." [14 at 1]. KCN is a part of Keefe Group, and Access Securepak ("Securepak"), in turn, is a division of KCN. [14–3, Jennen Aff., ¶ 3]. Securepak "allow[s] family members and friends to send packages [of pre-approved items] to inmates." [Id. at ¶¶ 4, 6]. Securepak also sells and markets goods directly to MDOC inmates. [Id. at ¶ 5]. Such inmate purchases are not made through the prison's commissary. [Id.]. Securepak fulfills all orders at a secure processing center and then ships them to the prison; since the items are all pre-approved, the prison need only verify the quantity of items being received. [Id. at ¶ 6].

**\*2** Keefe Supply is a subsidiary of Keefe Group. [Id. at ¶ 7]. Keefe Supply sells a variety of products directly to the MDOC, which the MDOC in turn sells to inmates in its commissaries. [Id.]. Keefe Supply does not sell or market products directly to MDOC inmates. [Id.].[1]

Kyles asserts that Securepak falsely and maliciously advertised the Keefe-produced instant hot cocoa with marshmallows as being a halal[2] product. [1 Ex. A at 3–4]. In an amended complaint, Kyles further stated that "[i]n April 2013, [he] reviewed an Access securepak book which advertised Keefe Group products such as the instant Hot Cocoa with Marshmallows as a Halaal [sic] product .... [o]n April 16, 2013 [and May 28, 2013], Plaintiff purchased the Hot Cocoa with Marshmallows under the impression that it was Halaal [sic] certified." [10 at ¶ 7–8]. Defendant and Kyles agree that he purchased the hot cocoa product from the "Oaks Correctional Commissary," and not directly from either Keefe Supply or Securepak. [16 at 4; 14 at 6]. Kyles thus seems to argue that Securepak intentionally and falsely portrayed the Keefe hot cocoa product as halal, which prompted him to purchase the hot cocoa from Keefe Supply, and that both Keefe Supply and Securepak are jointly liable for "maliciously disregard[ing] plaintiff's religious tents [sic] in pursuit of corporate profits. [1 Ex. A at ¶ 11].

On November 6, 2014, KCN filed the instant Motion for Summary Judgment [14] in which it argues that Kyles' claims fail both on the merits and because he failed to properly exhaust his claims. Kyles filed a response [16], and KCN filed a reply [17].

In his amended complaint, which is the operative one [12], Kyles brings claims for alleged violations of the United States Constitution and the Michigan Constitution; the Michigan Consumer Protection Act, MCL 445.903(1)(a)(c)(e); MCL 750.297f (which is a criminal statute related to the advertising, labeling and sale of Halal food products); and the portion of the Federal Trade

Commission Act, 15 U.S.C. § 52(a)(1)(2), which prohibits dissemination of false advertisements.[3] [10 at ¶ 1].

### B. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Pittman v. Cuyahoga County Dep't of Children & Family Servs., 640 F.3d 716, 723 (6th Cir.2011). A fact is material if it might affect the outcome of the case under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. See Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir.2006).

**\*3** The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir.2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir.2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor " 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." Caresource, 576 F.3d at 558 (internal quotations omitted).

### C. ANALYSIS

As set forth above, Kyles alleges in his complaint that Keefe Supply and Securepak falsely and maliciously advertised instant hot cocoa as being halal despite knowledge that it did not meet that standard, thereby violating certain of his federal and state rights. [10 at ¶ 1]. Before analyzing the parties' arguments on the merits of Kyles' claims, the Court addresses KCN's argument that he failed to properly exhaust his claims.

*i. Kyles Did Not Properly Exhaust Available Administrative Remedies*

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). KCN argues that Kyles' claims must be dismissed because he failed to exhaust the administrative remedies available to him. [14 at 9]. Specifically, KCN asserts that Kyles did not raise his concerns with MDOC staff, nor did he initiate the written grievance process required by MDOC policy. [14 at 10]. In support of this allegation, KCN submits Kyles' responses to a set of requests for admissions, in which Kyles admits that he "did not discuss [his] alleged concerns about the hot cocoa with marshmallows product with MDOC staff member [sic] at Oaks Correctional Facility within two days after [he] learned that the product was not halal" and that he "never filed a Grievance with the Grievance Coordinator designated for Oaks Correctional Facility regarding the halal status of the hot cocoa." [14 Ex. 3 at 2].

Under the PLRA, a prisoner must exhaust available administrative remedies, even if he would be unable to obtain the specific relief he seeks through the state administrative process. *See Porter,* 534 U.S. at 520; *Booth,* 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the applicable deadlines and other procedural rules. *Woodford v. Ngo,* 548 U.S. 81, 90–91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In determining whether a plaintiff has properly exhausted his claim, the relevant rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 200, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof. *Id.* at 216; *Vandiver v. Corr. Med. Servs., Inc.,* 326 Fed. Appx. 885, 888 (6th Cir.2009).

**\*4** In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130 (the "Grievance PD"). [14 Ex. 7]. State prisoners must first complete the process outlined in the Grievance PD, including pursuing a grievance through "all three steps of the grievance process," before the challenged conduct can be brought as a lawsuit. (*Id.* at ¶ B). A prisoner must attempt to resolve the dispute with the staff member involved within two days; if the issue remains unresolved, he has five business days to file a

written Step I grievance. (*Id.* at ¶¶ P, V). If the prisoner is dissatisfied with the Step I response, he may submit a Grievance Appeal to the Step II Grievance Coordinator within ten business days after receipt of the Step I response, or if no timely response was received, within ten days of the date the response was due. (*Id.* at ¶ BB). If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id.* at ¶ FF). Only after a prisoner has completed each of these steps in the grievance process may he file a lawsuit in compliance with the PLRA. *See Palmer v. Flore,* No. 09–14642, 2014 WL 821309 (E.D.Mich. Mar.3, 2014).

Here, Kyles has admitted that he did not initiate, much less complete, the grievance process. [14 Ex. 4 at 2]. Kyles does not dispute this fact in his response to KCN's Motion for Summary Judgment, but rather seems to argue that: i) he attempted to resolve his complaints through informal channels and thus has followed the spirit of the MDOC Grievance PD, and ii) that following the grievance procedure would have been futile and thus unnecessary. [16 at 6].

Kyles states that he "was a member of the Oaks Correctional Facility Warden forum ... [and that the purpose of the forum] is to bring to the attention of the staff issue [sic] which effect [sic] the prison population which are considered non-grievable issues." [16 at 6.]. He points to subsections (F) and (F)(5) of the Grievance PD, which state that "[g]rievances that raise the following non-grievable issues also shall be rejected: ... Issues not within the authority of the Department to resolve." Kyles alleges that he mentioned his concerns to the Oaks Correctional Facility Warden forum, stating that he

> brought up the issue that the Keefe Instance [sic] Hot Cocoa with marshmallows was not halaal [sic] as advertised. Plaintiff ask [sic] to see if this product could be changed or could someone contact Keefe to see if the Gelatin was a type which made it halal. Staff informed plaintiff that all changes are done through the regional committee and there was nothing that could be done.

[16 at 6]. To whatever extent Kyles argues that he followed the spirit of the Grievance PD by addressing his complaints to the Oaks Correctional Facility Warden forum, he nevertheless failed to complete the specific written grievance process set forth by that policy.

**\*5** Kyles next seems to argue that his failure to follow the MDOC grievance process does not violate the PLRA because filing a grievance would have been futile. Kyles also cites MDOC Policy Directive 04.02.130(I), which establishes the existence of a Store Contract Committee, which "shall be responsible for determining which items shall be sold by each regional store taking into consideration recommendations received from the Wardens of institutions serviced by the regional store." Kyles thus seems to suggest that filing a grievance would be futile because the persons and entities with which he could lodge a grievance at the Oaks Correctional Facility would lack the power to change the halal listing on the offending hot cocoa product.

Kyles' futility argument is unavailing. The Sixth Circuit has found that the PLRA's exhaustion requirement

> is a strong one. To further the purposes behind the PLRA, exhaustion is required even if the prisoner subjectively believes the remedy is not available, *Brock v. Kenton County,* 93 Fed. Appx. 793, 798 (6th Cir.2004); even when the state cannot grant the particular relief requested, *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); and "even where [the prisoners] believe the procedure to be ineffectual or futile...." *Pack v. Martin,* 174 Fed. Appx. 256, 262 (6th Cir.2006).

*Napier v. Laurel Cnty., Ky.,* 636 F.3d 218, 222 (6th Cir.2011). Moreover, the Sixth Circuit has found that no futility exception applies to the PLRA's exhaustion requirement. *Fazzini v. Ne. Ohio Corr. Ctr.,* 473 F.3d 229, 236 (6th Cir.2006). Additionally, it is far from clear that Kyles has established that pursuing the grievance process would have been futile. That a Store Contract Committee determines which products will be available at MDOC commissaries does not necessarily compel a conclusion that a prisoner is unable to challenge the products available in his commissary by filing a grievance.

Because Kyles made no attempt to follow the grievance procedure set forth in the Grievance PD, he failed to properly exhaust his Section 1983 claims, and they should be dismissed.

### ii. Kyles' Has Abandoned Some, But Not All of His Claims for Relief

KCN argues that Kyles' claims are moot and should be dismissed because "the relief he seeks has already been satisfied, *i.e.* the Access Securepak Prisoner Store Catalog

no longer lists the hot cocoa product as halal." [17 at 1]. Kyles admits that "defendants have done what plaintiff set out to do [which] was [to] have them remove the Halal advertisement off their product." [16 at 7–8]. Thus, while Kyles appears to have abandoned his request for prospective injunctive relief against KCN, namely a change to their hot cocoa advertising, nothing in his filings suggests that he has abandoned his request for compensatory damages, punitive damages, and costs. [10 at 4]. Accordingly, his admission moots his claims for injunctive relief, but not for money damages.

### iii. KCN's Merits–Based Arguments

**\*6** Even if the Court found that Kyles' claims are not barred by the PLRA, it would nonetheless recommend granting KCN's Motion for Summary Judgment because none of his claims are cognizable under state or federal law.

### a. Kyles' § 1983 Claims Fail because KCN and its D/B/A's and Affiliates did not Act under Color of State Law

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) he was deprived of a right secured by the Constitution or the laws of the United States; and (2) the deprivation was caused by a person acting under color of state law." *Smith v. Mohr,* No. 12–3241, 2012 WL 10235347, at \*1 (6th Cir. Oct.17, 2012). Private entities that perform traditional state functions such as providing medical services to inmates or operating prisons are regularly found to act under color of state law for § 1983 purposes. *See, e.g., Rouster v. Cnty. of Saginaw,* 749 F.3d 437, 453 (6th Cir.2014); *Braswell v. Corr. Corp. of Am.,* 419 F. App'x 622, 627 (6th Cir.2011); *Hicks v. Frey,* 992 F.2d 1450, 1458 (6th Cir.1993). Similarly, courts have regularly found that private companies which are contracted to take over food services for prisons act under color of state law. *See, e.g., Dotson v. Shelby Cnty.,* No. 13–2766–JDT–TMP, 2014 WL 3530820, at \*13 (W.D.Tenn. July 15, 2014); *Johnson v. Aramark,* No. 3:11CV–P517–M, 2012 WL 219503, at \*2 (W.D.Ky. Jan.25, 2012) aff'd, 482 F. App'x 992 (6th Cir.2012).

However, no Sixth Circuit court has found that a private corporation acts under color of state law by merely supplying products to a department of corrections or selling products directly to prisoners, which is all KCN is accused of here. On the contrary, numerous federal courts have found that corporations involved in such activities did not act under color of state law. *See, e.g., LaPlante v. Lovelace,* No. 2:13–CV–32, 2013 WL 5572908, at \*12

(W.D.Mich. Oct.9, 2013) (finding no evidence that Keefe Supply Company acted under color of state law by selling products to a MDOC commissary, because its conduct could not be "fairly attributed to the state"); *Smith v. Ozmint,* No. CA 9:07–3644–PMD–BM, 2009 WL 692828, at *4 (D.S.C. Mar.12, 2009) aff'd, 356 F. App'x 646 (4th Cir.2009) (finding that a company which produced hygiene products for sale to prison commissaries did not act under color of state law, and stating that "the mere act of selling something to a government entity to be distributed to inmates does not render the manufacturer or distributor state actors"); *Plummer v. Valdez,* No. 3–06–CV–1119–B, 2006 WL 2713784, at *2 (N.D.Tex. Sept.21, 2006) (holding that a private corporation that sold products a jail commissary did not act under color of state law).

Similarly, the Sixth Circuit Court of Appeals has found that "a vendor selling products [directly] to prisoners in the custody of the Michigan Department of Corrections ... was not acting under the color of state law and was not liable ... under 42 U.S.C. § 1983." *Bomer v. Access Catalog Co.,* 75 F. App'x 382, 383 (6th Cir.2003). This position has been long applied by courts within the Sixth Circuit. *See, e.g., Hardin v. Brown & Williamson Tobacco Co.,* No. G87–503 CA1, 1988 WL 288976, at *2 (W.D.Mich. Dec.27, 1988) (holding that a corporation which was permitted to sell tobacco to prisoners was not acting under color of state law). Securepak thus was not acting under color of state law by engaging in selling products directly to prisoners.

**\*7** Because neither KCN nor its d/b/a's or affiliates acted under color of state law, Kyles' § 1983 claims should be dismissed. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) ( "A plaintiff may not proceed under § 1983 against a private party no matter how discriminatory or wrongful the party's conduct") (internal quotations omitted); *Lansing v. City of Memphis,* 202 F.3d 821, 828 (6th Cir.2000) (holding that "a private entity working on its own cannot deprive a citizen of First Amendment rights").[4]

### b. Kyles' FTC Act Claim Fails

Kyles' claim under the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 52(a)(1)(2), should be dismissed. "[P]rivate parties are not authorized to file enforcement actions [under the FTC Act], only the FTC has that authority." *Taggart v. GMAC Mortgage, LLC,* No. CIV.A. 12–415, 2012 WL 5929000, at *6 (E.D.Pa. Nov.26, 2012); *see also Holloway v. Bristol–Myers Corp.,* 485 F.2d 986, 1002 (D.C.Cir.1973) (finding no implied right of private enforcement of the FTC Act; *Friend v.*

*Fryberger, Buchanan, Smith & Frederick,* P.A., No. 11–CV–1584 PJS/LIB, 2012 WL 503796, at *4 (D.Minn. Feb.14, 2012) (same).

### c. Kyles' MCPA Claim Fails

Kyles' claim under the Michigan Consumer Protection Act ("MCPA"), MCL 445.903(1)(a)(c)(e) should also be dismissed. The purpose of the MCPA is to "prohibit certain practices in trade or commerce, and to provide for certain remedies." *Price v. Long Realty, Inc.,* 199 Mich.App. 461, 470, 502 N.W.2d 337 (1993). The MCPA does not apply to "a transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MCL § 445 .904(1)(a). Michigan courts have held that the relevant inquiry in determining whether an exemption applies is "whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Liss v. Lewiston–Richards, Inc.,* 478 Mich. 203, 212, 732 N.W.2d 514 (2007) (quoting *Smith v. Globe Life Ins. Co.,* 460 Mich. 446, 465, 597 N.W.2d 28 (1999). Conduct is "specifically authorized" when it is "explicitly sanctioned" by law. *Liss,* 478 Mich. at 213, 732 N.W.2d 514.

In this case, KCN asserts that it is exempt from liability under the MCPA because Keefe Supply's general conduct of manufacturing and selling food products is authorized by the United States Food and Drug Administration ("FDA") and because Securepak's conduct of selling and marketing products through the MDOC is expressly authorized by the MDOC. [14 at 17–18]. KCN is correct that the Securepak program has been authorized by MDOC policy directives, thus the general transaction of marketing and selling products directly to prisoners is exempt from liability under the MCPA. *See* MDOC Policy Directive 04.02.135 ("Securepak Program") (stating that "[t]he Securepak Program is a Department-approved customized package program that allows family members and others to send authorized items to prisoners while safeguarding against the introduction of contraband ... [p]risoners in general population also may place orders for their personal use ... [a] vendor catalog identifying items available for purchase through the Securepak Program shall be available to prisoners" ... "[t]he Store Contract Committee shall be responsible for determining which items shall be available for purchase through the Securepak Program.").

**\*8** Similarly, the items available at MDOC commissaries are set forth by MDOC policy directive. *See* MDOC Policy Directive 04.02.130 ("Prisoner Store") (stating that

"[the Store Contract] Committee shall be responsible for determining the items to be included on the Department's Standardized Store List, subject to approval of the CFA Deputy Director."). Because the MDOC approves all of the products offered in the Securepak program and through its commissaries, KCN's conduct is authorized by statute or agency action, and Kyles' MCPA claim should be dismissed. To whatever extent Kyles is alleging that Keefe Supply improperly manufactured its hot cocoa product, its general conduct of producing and packaging food is explicitly authorized by federal food regulations, and is thus also exempt from liability under the MCPA. *See Alexander v. Del Monte Corp.,* No. 09–12303, 2011 WL 87286, at *2 (E.D.Mich. Jan.11, 2011) (finding that a food producer was exempt from the MCPA because its conduct of producing, packaging, and holding food products was authorized by the Food and Drug Administration.).

### d. Kyles' Criminal Advertising Claim Fails

Finally, Kyles' claim under MCL 750.297f should be dismissed. MCL 750.297f defines the term halal, and prohibits food sellers from intentionally defrauding shoppers through falsely representing that food is halal. *Id.* A person who violates that statute is guilty of a misdemeanor. *Id.* at § 750.297f(2). "[C]riminal statutes generally do not provide a private right of action to private citizens." *Ssayed v. Western Mich. Univ.,* 2013 WL 3277139, at *3 (W.D.Mich. Jun.27, 2013) (citing *People v. Herrick,* 216 Mich.App. 594, 601, 550 N.W.2d 541 (1996) and *Am. Postal Workers Union, AFL–CIO v.*

*Indep. Postal Sys. of Am., Inc.,* 481 F.2d 90, 93 (6th Cir.1973) (noting that "the general rule is that a private right of action is not maintainable under a criminal statute")). "Although Michigan courts have held that in certain situations a private remedy for damages may be inferred from a criminal statute," *id.* (citing *Lash v. City of Traverse City,* 479 Mich. 180, 192–93, 735 N.W.2d 628 (2007) and *Gardner v. Wood,* 429 Mich. 290, 414 N.W.2d 706 (1987)), Kyles has not argued or shown why the statute in question should be appropriate for a civil remedy. Nor is the Court aware of any case in which that statute has been applied to recover civil damages. Accordingly, this claim should be dismissed.

In sum, because the Court has found that each of Kyles' claims lack merit, KCN's motion for summary judgment should be granted.

### C. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS GRANTING** Defendant Keefe Commissary Network's Motion for Summary Judgment **[14]** and **DISMISSING** Plaintiff Kyles' complaint. **[1].**

Filed March 24, 2015.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1637466

---

Footnotes

1   In his initial complaint, Kyles identified Keefe Group and Access Securepak as "Defendant(s)". [1 Ex. A]. Defendant characterized this suit as against "Keefe Commissary Network, LLC, a Missouri limited liability company, d/b/a, Keefe Group and Access Securepak" in its answer to Kyles' complaint, and has maintained that it is acting as a singular defendant in all state and federal court documents. [1 Ex. B]. Defendant attempted to clarify this issue in its notice of removal, stating that KCN was "incorrectly identified as 'Keefe Group and Access Securepak.' " [1 Ex. C]. Kyles now seems to recognize this distinction, and in his amended complaint and response to Defendant's motion for summary judgment appears to have adopted Defendant's characterization of the parties. [10; 16 at 1–2]. Consequently, the Court will treat Kyles' amended complaint as being lodged against KCN (including its alleged d/b/a's) as a singular entity.

2   Halal foods are those "permissible for Muslims to eat or drink under Islamic law." [14 at 1].

3   Kyles' amended complaint included allegations that Defendant's conduct violated the Lanham Act, 15 U.S.C. 1125(a)(1)(b) and MCL 750.297f. [10 at 1]. In his response to Defendant's Motion for Summary Judgment, Kyles "concede[d] that the Landham [sic] Act or the MCL 750.297(f) [sic] are not proper claims for this action." [14 at 7]. Accordingly, these claims should be dismissed.

4   For the same reasons as just articulated, Kyles' state constitutional law claims should be dismissed. The Michigan Supreme Court has held that the First Amendment to the United States Constitution and Article 1 § 5 of the 1963 Michigan Constitution are coextensive, thus the same analysis applies to both claims. *See Umani v. Michigan Dep't of Corr.,* 432 F. App'x 453, 458 (6th

Cir.2011); *Smith ex rel. Smith v. Mount Pleasant Pub. Sch.*, 285 F.Supp.2d 987, 991 (E.D.Mich.2003); *Jott, Inc. v. Charter Twp. of Clinton*, 224 Mich.App. 513, 526, 569 N.W.2d 841 (1997).

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 2:18-cv-11086-SFC-PTM ECF No. 13-3, PageID.400 Filed 06/01/18 Page 96 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

2010 WL 3788859
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

LILLIBRIDGE HEALTH CARE SERVICES, INC.,
Plaintiff,
v.
HUNTON BRADY ARCHITECTS, P.A., and Heery
International, Inc., Defendants.

No. 6:08–cv–1028–Orl–28KRS.
|
Sept. 24, 2010.

**Attorneys and Law Firms**

Andrew Grant Tretter, Kenneth H. Haney, Quarles &
Brady, LLP, Naples, FL, for Plaintiff.

Frank A. Hamner, Jennifer Ford Knopf, Frank A.
Hamner, PA, Winter Park, FL, Lilburn Rogers Railey, III,
Patrick R. Delaney, Railey, Harding & Allen, PA,
Orlando, FL, for Defendants.

**MEMORANDUM DECISION AND ORDER**

JOHN ANTOON II, District Judge.

**\*1** This action brought by Lillibridge Healthcare Services,
Inc. ("Lillibridge") against Hunton Brady Architects, P.A.
("Hunton Brady") and Heery International, Inc. ("Heery")
was tried to the Court sitting without a jury from May 24–
27, 2010. Upon consideration of the evidence and
testimony presented, argument of counsel, and the
proposed findings and conclusions submitted by the
parties, the Court issues the following opinion as its
findings of fact and conclusions of law in accordance with
Federal Rule of Civil Procedure 52.

*I. Factual Overview and Procedural History*

Lillibridge is in the business of developing and managing
healthcare real estate, and it specializes in ambulatory
care, outpatient services, and medical office buildings.
Hunton Brady is an architectural firm, and Heery is an
engineering firm.

In October 2003, Lillibridge's predecessor, Mediplex
Medical Building Corporation ("MMBC"), entered into
an "Agreement for Architectural/Engineering Services"
("the Contract") with Hunton Brady pursuant to which
Hunton Brady was to provide services in connection with
the design of a four-story medical office building
("MOB") approximately 93,000 square feet in size. (Joint
Pretrial Statement ("JPS"), Doc. 62, ¶ 9(a), (d); Contract,
Joint Ex. 1). The Contract was later assigned to
Lillibridge, which had purchased the assets of MMBC.
(JPS ¶ 9(b)-(c)). The design drawings for the MOB were
completed by a separate architectural firm, Robert M.
Stern ("Stern"), and had been previously approved by
Lillibridge. (*Id.* ¶ 9(e)). Hunton Brady's role under the
Contract was to complete design development and
construction documents for the MOB shell, exclusive of
any tenant finish-out, based on Stern's design drawings.
(*Id.* ¶ 9(f)). As stated in the Contract and as stipulated by
the parties, the MOB shell was to be designed to house an
ambulatory surgery center on the fourth floor.[1] (Contract
at "Page 1 of 11"; JPS ¶ 9(g)).

The Contract stated that Hunton Brady would retain an
Engineering Consultant agreeable to Lillibridge to
provide the engineering services for the MOB shell, and it
is undisputed that Lillibridge directed Hunton Brady to
retain Heery—then known as HLM Design—for that
purpose. (Contract at "Page 9 of 11"; JPS ¶ 9(i)).
Accordingly, on November 7, 2003, Hunton Brady
entered into a "Standard Form of Agreement Between
Architect and Consultant" ("the Subcontract") with
Heery[2] pursuant to which Heery was to provide
mechanical, electrical, plumbing, fire protection, and
structural engineering services for the project.
(Subcontract, Joint Ex. 2; JPS ¶ 9(j)). The Subcontract
incorporates the terms of the Contract, both by general
and specific reference. (Subcontract at 2; JPS ¶ 9(k)). The
Subcontract required Heery to "provide [Hunton Brady]
with [the professional services enumerated therein] in the
same manner and to the same extent as [Hunton Brady] is
bound by the [Contract] to provide such services for
[Lillibridge]." (Subcontract at 2).

**\*2** Pursuant to the Contract and Subcontract, Hunton
Brady and Heery provided architectural and engineering
drawings, respectively, for the MOB shell. The plans
were completed in August 2004 and were submitted to
and approved by the Osceola County Building
Department. Construction began in December 2004, and
the MOB shell was substantially completed by 2006.
During construction and tenant fit-out of the MOB, three

problems arose that resulted in increased costs being incurred by Lillibridge. Lillibridge blames Defendants for each of these issues—referred to by the parties and herein as "the HVAC error," "the GFI error," and "the porte cochère lighting error."

Lillibridge filed this lawsuit in June 2008 to recover the costs it incurred in remedying these three problems. Prior to trial, Lillibridge estimated its damages from these three issues at roughly $300,000, with more than eighty percent of this amount attributed to the HVAC error. (JPS at 13).

In its Complaint (Doc. 1), Lillibridge alleged five counts: breach of contract against Hunton Brady (Count I); negligent design against Hunton Brady (Count II); breach of contract against Heery (Count III); negligent design against Heery (Count IV); and negligent misrepresentation against Heery (Count V[3]). Hunton Brady asserted crossclaims for indemnity and contribution against Heery. (Am.Cross-cl., Doc. 15). Both Defendants filed motions for summary judgment, but the Court denied both motions. (Order, Doc. 67). The case proceeded to a bench trial, during which Lillibridge voluntarily dismissed its negligence claim against Hunton Brady (Count II) and Hunton Brady dismissed its contribution crossclaim. It is undisputed that Lillibridge blames Heery for the engineering issues and does not allege that Hunton Brady was negligent in its architectural designs; Lillibridge sued Hunton Brady because the main Contract was made with Hunton Brady and not directly with Heery.

### II. Trial Evidence and Findings

Prior to trial, the parties stipulated to certain facts and to the applicability of certain codes. (*See* JPS). The Court adopts those stipulations as part of its factual findings and legal conclusions. The parties also stipulated to the admission of seventy-two joint exhibits, (*see* Ex. List, Doc. 85), and two additional exhibits were received from Plaintiff, (*see* Ex. List, Doc. 84). During the four-day trial, the Court heard testimony from five lay witnesses—Philip Taylor, senior vice-president for architecture and construction for Lillibridge; Charles W. "Chuck" Cole, Jr., Hunton Brady's principal in charge of healthcare architecture at the time of the events at issue[4]; Mark Stringer, managing principal of non-party Meinhardt Engineering; Richard "Dick" Snyder, a lighting designer who served as project manager for Heery; and Salvatore "Sam" Siciliano, one of two Heery mechanical engineers who worked on the project. Additionally, three other engineers—James Welter, Joseph DiGuglielmo, and

Kenneth Rigby—testified as expert witnesses. Based on the exhibits and testimony, the Court makes the following findings and conclusions regarding the three alleged errors for which Lillibridge seeks to recover damages. The issues are discussed here on an error-by-error basis as presented by the parties; later in this Order the counts of the Complaint will be addressed separately.

### A. The HVAC Error

#### 1. The Problem

**\*3** The main—and most costly—error alleged by Lillibridge is the HVAC error, a problem that came to light during tenant build-out of the ambulatory surgery center ("ASC") space on the fourth floor of the MOB. As earlier noted, the Contract and Subcontract required Hunton Brady and Heery to provide "design development and construction documents for the MOB shell, exclusive of tenant finish-out." (Contract at "Page 1 of 11"). Hunton Brady and Heery were the architects and engineers, respectively, for the MOB shell, but the ASC tenant—a joint venture between Florida Hospital and several physicians—retained a separate architectural firm, Gordon and Associates ("Gordon"), and engineering firm, Meinhardt Engineering ("Meinhardt"), for the build-out of the ASC. In early 2006, during that tenant build-out, either the Osceola County Building Department ("OCBD") or the Florida Agency for Health Care Administration ("AHCA") rejected the plans submitted by Gordon and Meinhardt, in part based on "code violations involving the HVAC connections to the ASC tenant space."[5] (JPS ¶ 9(s)).

The code violation identified by the reviewing authority was noncompliance with section 421.3.6 of the Florida Building Code ("FBC"), which pertains to HVAC systems in ASCs and provides in pertinent part that "[i]n buildings with multiple uses, tenants or occupancies, the licensed health care areas required by this code to maintain filter efficiencies and relative air pressure relationships shall be served by separate ducted mechanical air supply, return and exhaust systems." (FBC § 421.3.6, Joint Ex. 49). Heery's design of the HVAC system for the MOB provided for three rooftop air handler units ("RTUs" or "AHUs") to supply air conditioning to the MOB. One of these three AHUs—referred to by the parties as RTU 3—was to serve the entire fourth floor, with separate duct work for the ASC space and the non-ASC space on that floor. Heery believed that this separate ducting complied with section 421.3.6's requirement of "separate ducted mechanical air supply, return and exhaust systems." However, the reviewing authority interpreted the code as requiring not

only separate duct work but also separate AHUs for ASC and non-ASC space; thus, the ASC plans were rejected during tenant build-out because of the single AHU serving the whole fourth floor. Ultimately, in order to remedy the issue and obtain approval for the build-out of the ASC space, the ductwork running from RTU 3 to the non-ASC fourth floor space was capped, and another RTU was added to serve that non-ASC space.

### 2. The Design of the HVAC System

Heery completed its initial mechanical plans for the MOB shell—including the HVAC system plans—in 2004, and these plans were, along with Hunton Brady's architectural plans, approved by the OCBD in late 2004. Construction of the MOB began in December 2004, and some HVAC equipment was ordered at that time.

Initially, the ASC was slated to occupy the entire fourth floor of the MOB, but in March 2005 the ASC tenant, after considering for some time changing both the size and the location of the ASC, made a final decision to downsize the ASC to encompass only about half of the fourth floor instead of the whole floor; the balance of the floor was then to be used by other, non-ASC tenants. Once that decision was finalized, Hunton Brady and Heery were asked by Lillibridge to revise their drawings to take account of the reduced ASC footprint. Changes necessitated by the downsizing of the ASC included deletion of an elevator, addition of a corridor, and adjustments to the mechanical and electrical systems. "Additional Service" agreements (Joint Exs. 17 & 22) were executed, and Hunton Brady and Heery were paid additional monies to revise their plans. These revised plans were, like the original plans, submitted to and approved by OCBD.

**\*4** Dick Snyder, Heery's project manager, testified that when the ASC was downsized, Heery had to go back and recalculate the anticipated loads for the fourth floor both electrically and mechanically. In reassessing the mechanical requirements, Heery examined the building code and determined that although FBC section 421.3.6 specified a split system, that system could be a split duct system rather than a completely separate system with a separate AHU; thus, Heery redesigned the fourth floor HVAC system as a split-duct system with a single AHU. The AHU—RTU 3—was not downsized due to the smaller ASC, but the air flow—measured in cubic feet per minute (cfm)—was decreased.

Sam Siciliano, one of Heery's mechanical engineers on the project, testified that when Heery revised the fourth-floor HVAC plan, Heery designed it with split duct work

from the same AHU because the AHU had been sized to handle the whole fourth floor from the beginning of the project; after the ASC was downsized, Heery kept the same size AHU—knowing that it would be able to service the whole area—and cut down the air flow by about five percent because the ASC—a type of use that requires a higher amount of ventilation and air conditioning load than, for example, an office space type of use—would not require as much for the smaller area that it was going to occupy. It was Siciliano's interpretation of the building code that the AHU serving the ASC could serve the rest of the floor as well, even if that space was non-ASC tenant space.

Philip Taylor of Lillibridge testified that after the downsizing of the ASC, he noticed that Heery's revised drawings still indicated only one air handler for the entire fourth floor. Taylor questioned this because in other states where Lillibridge has done projects that included ASCs, such a single air handler arrangement had been disallowed. Taylor testified that either Snyder or Siciliano assured him during a meeting that a single air handler was allowed in Florida and that Heery did it that way all the time. According to Taylor, Lillibridge relied on Heery's expertise in that regard. This alleged statement forms the basis of the negligent misrepresentation count (Count V) of Lillibridge's Complaint.

Both Snyder and Siciliano deny making this statement, though they acknowledged that the way Heery designed the system was consistent with the sentiment that a single AHU for ASC and non-ASC space is permissible in Florida. Chuck Cole of Hunton Brady also denied hearing this statement at a meeting as alleged by Taylor. However, Mark Stringer of Meinhardt—the engineering firm that was retained by the ASC tenant for the ASC build-out—testified that in the fall of 2005 he questioned Philip Taylor about the propriety of the single-RTU setup, and Taylor responded that he had had the same question but had been assured by Heery that it was acceptable.

### 3. Arguments and Analysis

Heery maintains that it neither was negligent nor breached a contract with regard to the design of the HVAC system because its plans were submitted to and approved by OCBD. Heery acknowledges that the contract documents required that its designs comply with codes, but Heery avers that the only codes applicable to its work were the codes pertaining to the MOB shell—not those that applied to ASC space that was to be built out later by a tenant. Additionally, Heery argues that to the extent it was required to deliver a system that would later be approved by AHCA, it did all that it could toward that end by

Case 2:18-cv-11086-SFC-PTM   ECF No. 13-3, PageID.403   Filed 06/01/18   Page 99 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

making a reasonable interpretation of the FBC, asserting that it was neither required nor able to submit its plans to AHCA. Heery blames Meinhardt—the engineering firm for the tenant space—for the fact that the HVAC design was deemed noncompliant with code during build-out of the ASC.

**\*5** Lillibridge, on the other hand, argues that Heery is responsible for the HVAC system problem because Heery was obligated under the Contract and Subcontract to design a system that was appropriate for the intended use of the space, which was known from the outset by all parties to include an ASC on the fourth floor of the MOB. Lillibridge asserts that it contracted for a functional and code-compliant HVAC system for a MOB that included an ASC—a base system that would not require further upgrade or monetary expenditure during tenant build-out. The Court agrees with Lillibridge.

Heery's position that it was not obligated to deliver an HVAC design that complied with the Building Code's requirements for ASCs is belied by the terms of the contracts, the testimony of the trial witnesses, and common sense. As explained during trial testimony, including that of Philip Taylor, the tenant spaces have to tie in to systems that already exist in the shell building. The shell building would include some base mechanical and electrical items that would be used by the ASC in the future because it would be difficult to retrofit those items later. Lillibridge expected that the shell building was going to be designed to accommodate future tenants, including the ASC.

This expectation and understanding was known, and shared, by the other parties as well. Chuck Cole, Hunton Brady's principal in charge of health care architecture, acknowledged during his testimony that the scope of services in the Contract included the specific intended use for the MOB to house an ASC, and under both the Contract and the Subcontract it was always the intent from day one that the core and shell building was to be designed to accommodate that ASC. All of the obligations in the Contract were subject to the specified intent for the defined project, including the ASC that was going to be housed there in the future. Heery's obligations under the Subcontract included providing engineering services related to the core and shell mechanical, electrical, and plumbing components, including the HVAC and electrical systems that were going to supply the tenant spaces in the building—including the ASC. The fact that an ASC was going to be in the building had code implications with regard to the design of the core and shell, including implications as to HVAC and electrical system components.

Additionally, although the original intention was for the ASC to occupy the entire fourth floor, it was known from the outset that the ASC might be downsized and even moved to a different part of the building. Both Hunton Brady and Heery knew that sometime during the course of the project the ASC could be reduced in size and that this would result in multiple tenants occupying the fourth floor; this change would have code implications, including for the HVAC and electrical systems that were part of the core and shell. In that event, Heery would be required to accommodate its designs for those code implications.

**\*6** As Cole explained, after the decision was made to downsize the ASC, Hunton Brady and Heery had to evaluate what needed to be done in order to accommodate a reduced-size ASC within the core and shell. This necessarily included reviewing codes to see if the reduction in ASC size required different things with regard to the components of the core and shell that would tie in to the ASC Cole's expectation was that Heery would review the code implications of a reduced ASC space and multiple tenants occupying the fourth floor.

It is clear that Heery understood that the HVAC system needed to be able to serve the ASC, and even though Heery was not required to submit its plans to AHCA because the MOB shell was not a licensed healthcare space, Hunton Brady and Heery knew that when the ASC was later built out, AHCA would be reviewing components of the core and shell, including the HVAC system. Hunton Brady and Heery knew that if those core and shell components were not in compliance with the Florida Building Code as it pertained to AHCA-regulated space, the tenant fit-out plan would be rejected.

Heery's own witnesses acknowledged their awareness of the intended use of the space as an ASC. Snyder, Heery's project manager, testified that he knew from the terms of the Contract that there was going to be an ASC on the fourth floor of the MOB, and he acknowledged that when the ASC was reduced in size, Heery needed to do whatever was necessary to ensure that the engineering work incorporated how the code would be applied to it. Indeed, Heery attempted to deliver a system that met code in that regard. Both Snyder and Siciliano testified that Heery did review the code and came to the conclusion that section 421.3.6 allowed for the whole floor to be served by a single AHU so long as the spaces were separately ducted. However, the reviewing authority did not agree with that conclusion, and it disallowed the tenant build-out because of the way the core and shell HVAC system had been designed.

After Lillibridge learned of the problem with the ASC approval during tenant build-out, it looked to Hunton Brady and Heery to resolve it. Upon being informed of the issue, Siciliano and Snyder maintained that Heery's design was compliant with code. However, after they met with AHCA and explained Heery's position, they learned that AHCA required not only separate ductwork but separate AHUs; Siciliano explained the reason for this requirement in an email, stating: "[H]istorically, in multi-tenant office type buildings, after the ASCs were licensed, there was no control over adjacent tenant space configurations. These adjacent spaces would be built-out and configured in such a way as to overcome the remaining available capacity of the existing AHU. The ASC portion of the area suffered an HVAC capacity reduction and therefore reduced operational efficiencies." (Joint Ex. 26).

In sum, although Hunton Brady and Heery are correct that they were only responsible for architectural and engineering services for the MOB shell and core—not the tenant spaces in the building—it was plainly contemplated by all parties involved from the outset of the project that the MOB would eventually contain an ASC and that the shell building needed to be suitable for that purpose. It is not a reasonable reading of the contracts to find that Lillibridge or any third party was to be expected—after Hunton Brady and Heery's design work was complete—to have to spend more money to install additional HVAC equipment in order to render the shell HVAC system compliant with code for the known, intended use of tenant space.

**\*7** Heery's argument that its provision of engineering services did not fall below the relevant standard of care misses the mark. Heery is correct that several engineers testified that the Building Code provision at issue was "subject to interpretation." However, Heery's own mechanical engineering expert, Joseph DiGuglielmo, testified that he knew that AHCA's interpretation of section 421.3.6 was that separate AHUs were required for ASC space and non-ASC space; according to DiGuglielmo, an engineer in Florida who was familiar with this type of issue would know that that was how AHCA interpreted that provision. Heery was bound in this case to exercise "the standard of care used by similar professionals in the community" and also to comply with the requirements of the contracts. *Cf. CH2M Hill Southeast, Inc. v. Pinellas Cnty.,* 698 So.2d 1238, 1240 (Fla. 2d DCA 1997) ("Generally, the legal duty imposed upon professionals who contract to provide services is to perform such services in accordance with the standard of care used by similar professionals in the community.

Additionally, if the professional contracts to perform duties beyond those required by ordinary standards of care, the quality of that performance must comport with the contractual terms."). In short, Heery's design did not provide Lillibridge what it contracted for, and thus Lillibridge is entitled to recover damages.

### 4. Damages

As noted earlier, Lillibridge ultimately remedied the HVAC issue by having an additional RTU added to the roof of the MOB to serve the non-ASC portion of the fourth floor. Lillibridge established at trial that in doing so, it expended a total of $245,982.37: $450 to disconnect duct work; $66,709 ($62,750 unit price plus $3,959 in sales tax) for the fourth RTU that was added to the roof; $3,336.80 for services of Meinhardt; $3,015.57 for structural engineering services of another firm; and $172,471 for structural modifications to the building so that the fourth RTU could be added. (Joint Exs. 38, 41, 42, & 43; Pl.'s Ex. 2). Heery does not contest that Lillibridge spent this amount, but Heery contends that Lillibridge is not entitled to recover all of this amount because if the system had been designed correctly at the beginning, Lillibridge would still have had to expend some money for equipment.

Heery relies on *Lochrane Engineering, Inc. v. Willingham Real Growth Investment Fund, Ltd.,* 552 So.2d 228 (Fla. 5th DCA 1989), in which the court gave an example of the appropriate measure of damages for an engineering error. The *Lochrane* court explained that if an engineer who was retained to design a drain field designed a 1,000–square–foot drain field but a 1,200–square–foot drain field was later determined to be required, the engineer would not necessarily be liable to the owner for the full cost of installing the additional 200 feet of drain field because if the engineer had designed the field correctly the first time, the owner would have had to pay for that extra 200 feet anyway. *Id.* at 232–33. Citing this example, Heery contends that if the fourth RTU had been included in Heery's original design, Lillibridge would have had to pay for it at that point, and thus, argues Heery, Lillibridge should not be able to recoup the cost of the fourth RTU now.

**\*8** The problem with Heery's argument, however, is that it was not established at trial that the fourth RTU would have been necessary if the HVAC design for the MOB shell had been compliant in the first instance. The evidence was somewhat conflicting on this point.

Philip Taylor of Lillibridge testified that by March 2005 when the final decision was made to downsize the ASC,

Case 2:18-cv-11086-SFC-PTM ECF No. 13-3, PageID.405 Filed 06/01/18 Page 101 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

construction of the MOB shell had been underway for four months and the order for the original RTUs had already been placed. Based on Siciliano's revised calculations for the RTU requirements, Lillibridge stopped the order on the mechanical system and issued a new purchase order to Trane. The chiller was downsized, but the AHU was still intended to serve the top floor. Taylor thinks that if the AHCA requirement of a separate AHU for the rest of the fourth floor had been known in March 2005, Lillibridge could have changed the capacities of the other units to cover the non-ASC fourth floor space.

However, when the problem emerged in 2006 and solutions were sought, both Meinhardt and Heery told Taylor that another RTU would have to be added to serve the non-ASC space. Taylor looked for the least expensive way to resolve the issue. Lillibridge asked Trane if one of the existing RTUs could be upsized by, for example, changing fans, but Trane responded that the capacity could not be increased enough without replacing the unit, which was not practical because of tenants using the air conditioning at that time. They also looked into "stealing" air from the other RTUs, but the capacity was not there to be able to do that; the response from everyone was that adding another RTU was the only way to go at that point.

According to Dick Snyder of Heery, if RTU 3 had been identified originally as being for the ASC space only, the other two RTUs would have had sufficient capacity to service the balance of the building. This testimony from one of Heery's employees suggests that the fourth RTU would not have had to have been added if RTU 3 had been dedicated to only the ASC in the first place.

Siciliano testified that after the problem with AHCA emerged during tenant fit-out, Heery put together a design to add a separate AHU to service the non-ASC areas of the fourth floor. According to Siciliano, Heery did not evaluate whether the other RTUs could serve the balance of the fourth floor as well as the spaces they were intended to serve. Siciliano opined that those units probably would not have been able to do so, but he acknowledged that he did not know whether in fact the existing systems could have been increased to serve the balance of the fourth floor if Heery had interpreted the code in March 2005 the way that the reviewing authority did.

In sum, the evidence was not clear as to whether the fourth RTU would have been needed in the original design or whether the other RTUs could have been modified in some way to serve the non-ASC portion of the fourth floor. Lillibridge argued during closing that it is

the Defendants' burden—not Lillibridge's—to establish that the costs that Lillibridge incurred in resolving the issue were duplicative of costs it would have occurred originally. The Court agrees. Lillibridge established what it actually paid to remedy the HVAC issue, and if Defendants believed that only a lesser amount was recoverable, they should have established the extent to which Lillibridge's claimed damages were excessive. They did not do so. Thus, Lillibridge is entitled to a damages award of $245,982.37 on the HVAC issue.

### B. The GFI Error

#### 1. Overview of the Problem
**\*9** Like the HVAC error, the second issue—the GFI error—also derives from the presence of the ASC in the MOB. During the tenant fit-out of the ASC, AHCA required that a second level of ground-fault interruption ("GFI") protection be added to the circuit breakers in the main electrical distribution panel of the MOB because the electrical code required this second level of GFI in buildings with ASCs. In order for this second level of GFI protection to be added, eight circuit breakers in the main distribution panel had to be replaced at a cost of $47,729—$42,729 for replacement of the breakers and $5000 to add a panel section to accommodate the new, larger breakers. (Purchase Order, Joint Ex. 39). Lillibridge seeks to recover nearly all of this amount, asserting that Heery approved installation of a type of equipment that caused Lillibridge to expend significantly more than otherwise would have been necessary to add GFI protection.

#### 2. Trial Evidence
The Project Specifications for electrical equipment in the MOB provided in part: "Switchgears shall be Square D Power–Style." (Joint Ex. 52 at 16300–7). Dick Snyder of Heery explained during his trial testimony that Square D is the manufacturer's name and that this was a sole-source specification, meaning that Square D was the only acceptable vendor for this equipment. The specified Square D equipment had circuit breakers that could accommodate a later addition of GFI protection via a module that easily plugged into the back. In contrast, molded-case type breakers would not have that capability for later addition of GFI protection; instead, molded-case breakers might require replacement in order to add GFI protection.

Although Square D was the specified manufacturer, during construction the general contractor selected

Case 2:18-cv-11086-SFC-PTM   ECF No. 13-3, PageID.406   Filed 06/01/18   Page 102 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

switchboard equipment not from Square D but from another manufacturer—Siemens. The Siemens equipment that the contractor proposed included molded-case breakers rather than the type that facilitated GFI additions with a plug-in module. When the Siemens equipment was submitted for Heery's approval, Heery's electrical engineer, Jon Candor, initially rejected it because the specification was for Square D equipment, not Siemens equipment. Candor noted this rejection by indicating "not approved" on the submittal review stamp. (Attach. A to Joint Ex. 8).

After Heery refused to approve the Siemens switchboard that the contractor submitted, a Lillibridge representative, Keith Klingsporn, contacted Heery by telephone, stated that the Siemens board was already being fabricated, and asked whether there was any way that Heery could approve it. Candor then changed the lack of approval on the submittal to "approved as noted," with a note to a Hunton Brady employee that stated in part: "Regarding the submittal for switchboards and panelboards, please ensure the following: ... The branch circuit breaker feeding Panel N41 should be provided with ground fault protection. (verify that ground fault protection is available as an add on for all branch breakers if necessary). NOTE: The ground fault issue is of concern based on the fact that future tenant projects may be required to meet AHCA approval which states that there are two levels of ground fault protection." With this notation, Candor approved the submission and the Siemens equipment was installed in the building.

**\*10** Approximately a year later, during tenant fit-out, AHCA required additional GFI protection on all of the circuit breakers in the main distribution panel, "NDP1." Eight molded-case type circuit breakers in NDP1 had to be replaced at a cost of $47,729. If the Square D equipment—with its plug-in module capability—had been installed, the cost to add the GFI protection to the breakers would have been only $5,834. Lillibridge acknowledges that it would have had to pay $5,834 to add the GFI even if the specified Square D equipment had been installed, and it seeks to recover the $41,895 difference as damages for the GFI error.

### 3. Arguments and Analysis

Heery contends that it cannot be held responsible for the cost difference for adding the GFI protection because it accepted the Siemens product only after Lillibridge asked it to do so. Heery emphasizes that it initially rejected the contractor's submission of the Siemens board based on the sole-source specification for Square D equipment and only indicated its approval after being urged to do so by

Lillibridge—which retained substitution-approval authority in the Contract—and after Candor wrote a note regarding the future need for GFI protection. Lillibridge, however, asserts that Heery is responsible for the $41,895 cost difference because Heery did not explain the consequences of the substitution to Lillibridge when the contractor submitted the Siemens equipment and because Heery knew that additional GFI protection was going to be added later. Based on the evidence presented at trial, the Court is persuaded by Lillibridge's argument on this point.

Heery is correct in noting that the Contract did not allow substitutions of equipment without Lillibridge's approval; this was acknowledged by Phillip Taylor at trial. However, Taylor explained that Lillibridge retained substitution-approval power as a means of controlling costs and aesthetics on the project—not as a way to supplant the expertise of the hired consultants. Lillibridge did not review submittals for the purpose of determining whether they met the specification; Lillibridge relied on the architects and engineers to do that. It remained the responsibility of the design professionals hired for the project to determine whether product submittals were appropriate and should be approved.

Although Heery asserts that it approved the Siemens equipment only at the behest of Lillibridge, it was still Heery—not Lillibridge—that approved the substitution. Dick Snyder testified that a Lillibridge representative called and asked if there was any way that Heery could approve the substitution—not that the representative directed Heery to go ahead and approve it because Lillibridge said so. The question asked by the Lillibridge representative, as recounted by Snyder, still called for Heery to make a determination as to the propriety of the substitution. Heery then wrote a note regarding the future need for ground fault protection and approved the substitution of the Siemens product.

**\*11** There are several problems with Heery's attempted reliance on Candor's note, however. First, it was far from clear at trial that the note was received by Lillibridge at any meaningful time. The note was written to a Hunton Brady representative, and as explained by Snyder, the note would alert a successor engineer doing work in the building that he needed to be prepared to look at that particular item; according to Snyder, the engineer responsible for the tenant fit-out would have to verify that ground fault was available as an add on. Snyder felt that Heery's note indicated *to a future engineer on the project* that ground fault could be an issue. The note was directed to a future engineer, not to Lillibridge. There was no testimony that the note was seen by anyone at Lillibridge

Case 2:18-cv-11086-SFC-PTM    ECF No. 13-3, PageID.407    Filed 06/01/18    Page 103 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

at the time of the substitution. Philip Taylor did not recall seeing the note at the time, though he did testify that the note was in Lillibridge's project file when the issue came to a head a year later.

Even if Candor's note had been given to Lillibridge at the time, the note does not convey the significance of the equipment substitution. Taylor explained that a second level of GFI was not added at the time the MOB was constructed because Lillibridge was under the impression that it could be added later without significant additional cost—as would have been the case if the Square D switchboard had been installed. Candor's note "to a future engineer" did not apprise Lillibridge of the financial ramifications of using this type of switchboard instead of the item called for in the specifications; the note does not explain that the breakers would have to be replaced later in order for GFI protection to be added. As acknowledged by Snyder at trial, Heery never advised Lillibridge or even Hunton Brady what the cost would be to replace the Siemens equipment later when a second level of ground fault protection needed to be added. Taylor credibly testified that if Lillibridge had known that the breakers would have to be completely replaced later, the Siemens substitution would not have been allowed.

Heery clearly understood that the breakers in the Siemens panel did not have the same plug-in capability as the Square D product, but Lillibridge did not—until a year later, when it had to spend more than $40,000 to replace eight circuit breakers. In sum, Heery approved installation of a product that was not the equivalent of what was specified and which caused significant increased cost to Lillibridge. Lillibridge has established entitlement to damages of $41,895 with regard to this error.[6]

### C. The Porte Cochère Lighting Error
The third and final issue pertains to pendant light fixtures that were hung in the porte cochère area outside the MOB. These hanging fixtures with 36–inch stems were struck by delivery trucks shortly after the building opened. As a result, the fixtures were broken and had to be replaced. Lillibridge faults Defendants for the lighting specification and seeks to recover the $5480 that it paid to replace these fixtures. Defendants, on the other hand, contend that the clearance and hanging of the fixtures is a "means and methods issue" that was the responsibility of the general contractor on the site. The Court concludes that Lillibridge failed to establish at trial that either of the Defendants was responsible for the porte cochère fixture problem, and thus Lillibridge shall recover no damages in connection with this issue.

*12 The trial testimony established that Robert Stern, the initial architect for the MOB, had recommended some light fixtures for the exterior of the MOB that would match those of the adjacent hospital. Heery took Stern's specifications and put them on Heery's schedules so that the contractor knew what to purchase. However, the fixture that Stern specified was discontinued, and the contractor then submitted a Request for Information ("RFI") to Hunton Brady, which in turn submitted it to Heery, to find a substitute fixture that would keep the desired look. (Joint Ex. 19). A Heery engineer responded to that RFI by noting that substitutions were being reviewed by the architect, (*see* Joint Ex. 19), and there is no evidence that Heery was ever involved with these light fixtures again in any way.

Hunton Brady did specify substitute light fixtures in response to the RFI. (*See* Joint Ex. 44). However, Lillibridge did not establish that this act renders Hunton Brady at fault for the improper clearance. Lillibridge asserts that no clearance was specified for the fixtures and that thus Hunton Brady's error was an omission rather than an affirmative act. However, the most that the trial evidence established was that Hunton Brady specified an aesthetically similar fixture to substitute for the one that Stern had originally selected but which was discontinued. No evidence was presented as to whose responsibility it was to assure proper clearances, nor was evidence presented as to the dimensions of the original fixtures that had been specified by Stern. As far as the Court can tell, Hunton Brady merely selected an equivalent light fixture to what had previously been chosen. This does not render Hunton Brady responsible for the cost of replacing the damaged fixtures.

In sum, the issue may have been a "means and methods" issue for the contractor or an issue as to responsibility for specifying clearances in the porte cochère area. The Court cannot determine which, but it does determine that Lillibridge did not establish that either of these Defendants bears responsibility for the problem.

### III. Theories of Recovery

As earlier noted, Lillibridge alleged five counts in its Complaint, four of which remain: a breach of contract claim against Hunton Brady (Count I); a breach of contract claim against Heery (Count III); a negligent design claim against Heery (Count IV); and a negligent misrepresentation claim against Heery (Count V). While Count V pertains specifically to the alleged misrepresentation made by a Heery representative to

Case 2:18-cv-11086-SFC-PTM ECF No. 13-3, PageID.408 Filed 06/01/18 Page 104 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

Philip Taylor during a meeting, the other three counts relate more generally and collectively to the three errors discussed above. The viability of Lillibridge's theories of recovery must be analyzed on a count-by-count basis.

*A. Count I—Breach of Contract Against Hunton Brady*
In Count I of the Complaint, Lillibridge brings a claim of breach of contract against Hunton Brady. Lillibridge alleges that Hunton Brady breached the main Contract by, inter alia, "failing to provide Lillibridge with mechanical, electrical and lighting plans, specifications and designs that comply with all applicable codes and are otherwise proper for inclusion and construction in the Project." (Compl.¶ 48). Hunton Brady asserts that it cannot be held responsible for Heery's errors, but the Court disagrees.

**\*13** The Contract obligated Hunton Brady to provide Lillibridge with "structural, architectural, electrical, mechanical and plumbing plans," (Contract at "Page 1 of 11"), and required Hunton Brady and its consultants to "review all shop drawings and submittals for compliance with the information given and the design concept expressed in the Construction Drawings during the construction phase of the Project," (*id.* at "Page 3 of 11"). Although the Contract contemplated that Hunton Brady would retain consultants—including an engineering consultant—in order to comply with its obligations, Hunton Brady remained contractually obligated to provide these services nonetheless. As discussed earlier, because of the HVAC error—a problem with the mechanical plans—and the GFI error—a problem with conformity of the installed electrical equipment to the intended purpose of the building—Lillibridge did not receive a MOB suitable for its intended partial use as an ASC as it was promised in the Contract. Thus, the Contract was breached. *Cf. Owings v. Rose,* 262 Or. 247, 497 P.2d 1183, 1186 (Or.1972) (noting that architects agreed in their contract "to render all architectural and engineering services necessary in the design of the new plant and were thus obligated to furnish ... engineering service of reasonable quality"; thus, architects were liable even though they were not personally at fault where engineering services were defective). The fact that Hunton Brady is liable for breach of contract, however, does not leave Hunton Brady without recourse. Hunton Brady has brought a crossclaim against Heery for indemnity, which is discussed later.

*B. Count III—Breach of Contract Against Heery*
In Count III, Lillibridge brings a breach of contract claim against Heery. It is undisputed that Lillibridge and Heery

did not directly enter into a contract with one another. Consequently, Lillibridge's breach of contract claim against Heery is brought on the basis that Lillibridge is allegedly an intended, rather than incidental, beneficiary of the Subcontract between Hunton Brady and Heery.

" 'A third party is an intended beneficiary, and thus able to sue on a contract, only if the parties to the contract intended to primarily and directly benefit the third party.' " *Cigna Fire Underwriters Ins. Co. v. Leonard,* 645 So.2d 28, 29 (Fla. 4th DCA 1994) (quoting *Md. Cas. Co. v. State Dep't of Gen. Servs.,* 489 So.2d 57, 58 (Fla. 2d DCA 1986)). Thus, " '[t]he right of a third party beneficiary to sue under a contract is recognized in Florida, but that right is limited to those situations where the provisions of the contract clearly show an intention primarily and directly to benefit the individual bringing the suit or to a class of persons to which that individual belongs as a third party beneficiary.' " *Id.* (quoting *Sec. Mut. Cas. Co. v. Pacura,* 402 So.2d 1266, 1267 (Fla. 3d DCA 1981)).

The parties have not extensively addressed the issue of whether Lillibridge is an intended third party beneficiary of the Subcontract. In its motion for summary judgment, Heery argued that Lillibridge was not such a beneficiary only on the basis that the main Contract had been entered into between MMBC and Hunton Brady rather than Lillibridge and Hunton Brady. The Court rejected that argument, noting that Heery had not cited any authority for the proposition that a successor in interest would not acquire the same status as its predecessor. (*See* Order, Doc. 67, at 6–7).

**\*14** Generally, an owner or contractor is not regarded as an intended third-party beneficiary of a subcontract. *See, e.g., J.W. Hodges Drywall, Inc. v. Mizner Falls LLP,* 865 So.2d 681, 682 (Fla. 4th DCA 2004) ("Nor is a property owner generally considered a third party beneficiary of a contract between a general contractor and a subcontractor."); *accord Horizon Images, Inc. v. Delta Color Graphics, Inc.,* 639 So.2d 186, 187 (Fla. 4th DCA 1994) ("Our reversal should not be construed as a holding that one who purchases a product from a contractor, produced in part by subcontractors, can always sue the subcontractors as a third party beneficiary, because this is not the law.").

On similar facts, Florida's Second District Court of Appeal rejected an attempt by a municipality to assert third-party beneficiary status against an engineering firm that had subcontracted with an architectural firm with whom the municipality was in direct privity. In *City of Tampa v. Thornton–Tomasetti, P.C.,* 646 So.2d 279 (Fla.

2d DCA 1994), the court noted that Florida "courts have been reluctant to expand the privity exception to an incidental third party beneficiary, such as the City" and that that "[i]t is not enough that the professional services ultimately rendered accrue to the owner." *Id.* at 282–83. Emphasizing that "[t]he intention of the contracting parties, gleaned from the contract itself, is determinative" and finding that "[i]t is evident from the agreements that the [engineering] consultants' contractual responsibilities were confined to the architects and did not extend to the city," the *Thornton–Tomasetti* court concluded that "[a]t best, the City was a remote or incidental beneficiary of the consultants' obligations to the architects." *Id.* at 282–83. The court affirmed dismissal of the City's breach-of-contract claim against the engineering firm.

The same result must obtain here. Lillibridge has not established that it enjoys intended third-party beneficiary status with regard to the Subcontract. Although Lillibridge was certainly an incidental beneficiary of the Subcontract, the intention of the parties to the Subcontract—Hunton Brady and Heery—as expressed in the document does not support third-party beneficiary status for Lillibridge. The Subcontract expressly states: "Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either [Hunton Brady] or [Heery]." (Subcontract at 13). Although the Subcontract does incorporate the main Contract, such incorporation serves to define the project and the scope of Heery's obligations to Hunton Brady—not to render Lillibridge an intended third-party beneficiary. In light of the express provision in the Subcontract disavowing creation of contract rights in favor of any third party, the Court concludes that Lillibridge may not recover from Heery directly for breach of contract on a third-party beneficiary theory.

### C. Counts IV and V—Negligent Design and Negligent Misrepresentation Against Heery

**\*15** In Count IV, Lillibridge alleges a claim of negligent design against Heery, and in Count V, Lillibridge makes a claim of negligent misrepresentation against Heery based on the statement allegedly made during a meeting by a Heery employee—either Snyder or Siciliano—regarding the propriety of one AHU serving both ASC space and non-ASC space. Both of these claims, however, are duplicative of the breach of contract claims already alleged by Lillibridge. The negligence that is alleged is the same conduct that is alleged to have amounted to a breach of contract, and the same economic losses are sought. For example, as noted by Heery, the negligent misrepresentation claim does not allege a misrepresentation independent of Heery's obligations

under the Subcontract and thus is not actionable as a negligence claim.[7] *Cf. Vesta Constr. & Design, L.L.C. v. Lotspeich & Assocs., Inc.,* 974 So.2d 1176, 1181 (Fla. 5th DCA 2008) (noting that "a distinction is drawn between misrepresentations that are directly related to the breaching party's performance of the contract and those which are independent of the contract"). And, Lillibridge may not overcome its lack of third-party beneficiary status by calling a breach of contract claim a negligence claim. *See Thornton–Tomasetti,* 646 So.2d at 282 (finding that City could not sue engineering firm for negligence and that "only the architects were answerable to the City for deficiencies in design or performance").

This case is clearly a contract-based case, and the negligence counts are duplicative of the breach of contract counts.[8] Here, there were two agreements—the main Contract between Lillibridge and Hunton Brady and the Subcontract between Hunton Brady and Heery—that cover the MOB project. The errors are derived from obligations imposed by the contracts and not from any other source. Under these circumstances, negligence counts will not lie. *See, e .g., Weimar v. Yacht Club Point Estates, Inc.,* 223 So.2d 100, 103 (Fla. 4th DCA 1969) ("[N]o cause of action in tort can arise from a breach of duty existing by virtue of contract."); *accord Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.,* 482 So.2d 518, 519 (Fla. 3d DCA 1986) ("It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence."). Thus, Lillibridge is not entitled to any relief on the negligence counts set forth in Count IV or V, and any recovery it obtains must be on its breach of contract claim against Hunton Brady in Count I.

### D. Hunton Brady's Crossclaim Against Heery

Hunton Brady has brought a crossclaim against Heery for common law indemnity, asserting that "[s]hould it be found that Hunton Brady is liable to Plaintiff, that liability is only vicarious, constructive, derivative or technical and arises because of the special relationship between Hunton Brady and Heery." (Am. Cross-cl., Doc. 15, at 3). "In order to prevail on a common law indemnity claim, the following two-pronged test must be satisfied: (1) the party seeking indemnity (the indemnitee) must be without fault and its liability must be solely vicarious for the wrongdoing of another, and (2) the party against whom indemnity is sought (the indemnitor) must be wholly at fault." *Heapy Eng'g, LLP v. Pure Lodging, Ltd.,* 849 So.2d 424, 425 (Fla. 1 st DCA 2003).

**\*16** The evidence at trial established that the errors that caused damage to Lillibridge—the HVAC error and the

Case 2:18-cv-11086-SFC-PTM  ECF No. 13-3, PageID.410  Filed 06/01/18  Page 106 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

GFI error—were the errors of Heery, not of Hunton Brady. There was no evidence that Hunton Brady was at fault with regard to the HVAC error or the GFI error, and Hunton Brady was entitled to rely on the expertise of Heery with regard to those issues. Thus, Hunton Brady's liability to Lillibridge is merely derivative, and Hunton Brady is entitled to be indemnified by Heery for the sums it owes to Lillibridge. *See, e.g., Owings,* 497 P.2d at 1186–87 (affirming award of indemnity to architect against structural engineer that it hired as a consultant, where architect had settled claim with owner regarding cracks in concrete floor).

### IV. Motions

#### A. Hunton Brady's Rule 52(c) Motion

On the third day of trial, after Lillibridge had rested its case, Hunton Brady moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).[9] This rule provides in pertinent part that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." The Court took Hunton Brady's motion—which raised four[10] distinct issues—under advisement, and the following ruling is now issued.

#### 1. Statute of Limitations

Hunton Brady first asserts entitlement to judgment in its favor based on the statute of limitations. Hunton Brady argues that the case is barred by the two-year statute of limitations set forth in paragraph 95.11(4)(a), Florida Statutes. Lillibridge, however, asserts that the four-year limitations period of paragraph 95.11(3)(c), Florida Statutes, is the appropriate limitations period and that thus the case was timely filed.

Paragraph 95.11(4) (a), upon which Hunton Brady relies, provides that "[a]n action for professional malpractice, other than medical malpractice, whether founded on contract or tort," must be brought within two years, "provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence." This two-year limitations period is limited, however, "to persons in privity with the professional." *Id.* The provision on which Lillibridge relies—paragraph 95.11(3)(c)—provides that

"[a]n action founded on the design, planning, or construction of an improvement to real property" must be brought within four years, "with the time running from the date of actual possession by the owner, the date of the issuance of a certificate of occupancy, the date of abandonment of construction if not completed, or the date of completion or termination of the contract between the professional engineer, registered architect, or licensed contractor and his or her employer, whichever date is latest; except that, when the action involves a latent defect, the time runs from the time the defect was discovered or should have been discovered with the exercise of reasonable diligence." § 95.11(3)(c), Fla. Stat.

**\*17** In arguing that paragraph (4)(a) governs this case, Hunton Brady relies on two cases. First, Hunton Brady cites *Sheils v. Jack Eckerd Corp.,* 560 So.2d 361, 363 (Fla. 2d DCA 1990), for the principle that "a specific statute of limitations addressing itself to a specific matter takes precedence over a more general statute of limitations even though the specific statute provides for a shorter period of limitations." Second, Hunton Brady cites *Baker County Medical Services, Inc. v. Summit Smith L.L.C.,* No. 3:05–cv–541–J–33HTS, 2008 WL 2245587, at *14 (M.D.Fla. May 29, 2008) (Covington, J.), a case involving the design, furnishing, and installation of an HVAC system in a hospital in which the court found that the two-year professional malpractice limitation in paragraph (4)(a) was a "more specific statute" than paragraph (3)(c) and applied that shorter period in finding some claims barred. Lillibridge responds that the *Baker* court erred in its analysis of this point and that Florida courts—to which this Court must defer on issues of state law[11]—have repeatedly applied paragraph (3)(c) rather than (4)(a) in suits against architects and engineers. This Court agrees with Lillibridge.[12]

In *School Board of Seminole County v. GAF Corp.,* 413 So.2d 1208 (Fla. 5th DCA 1982), the school board appealed the trial court's determination that its claims against an architect with whom it had contracted were barred by the four-year statute of limitations in paragraph (3)(c). The Fifth District Court of Appeal agreed with the lower court's determination that paragraph (3)(c)—rather than paragraph (4)(a)—applied, expressly stating that "[t]he language of the four-year statute is much more specifically applicable to these suits against [the architect] than the two-year statute, which generally references 'professional malpractice' suits." *Id.* at 1210. The court then reversed the trial court's grant of summary judgment against the School Board, finding that genuine issues of material fact remained with regard to the running of the statute. In the appeal of the Fifth District Court of Appeal's decision, the Supreme Court of Florida stated in

Case 2:18-cv-11086-SFC-PTM   ECF No. 13-3, PageID.411   Filed 06/01/18   Page 107 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

a footnote: "[The architect] argues that the 2–year statute of limitations in § 95.11(4)(a) ... should apply. Both the trial court and the fifth district found the 4–year statute applicable, and we agree with the district court that the language of (3)(c), rather than (4)(a), is more specifically applicable to this case." *Kelley v. Sch. Bd. of Seminole County,* 435 So.2d 804, 805 n. 2 (Fla.1983).

In response to Lillibridge's reliance on *Kelley,* Hunton Brady's counsel argued in court that the *Kelley* case is "almost thirty years old," that the court was not presented with a question of whether a two-year or four-year statute applied, and that the statement relied upon by Lillibridge was "only a footnote." However, regardless of how "old" the case is or whether this statement appeared in a footnote or the text of the opinion, the *Kelley* court expressly agreed with the Fifth District Court of Appeal's determination of which limitations period applied. Moreover, even assuming that the Supreme Court's statement in *Kelley* was not clear enough on this point,[13] the statement of the Fifth District certainly was, and its ruling would bind this Court in any event. *See McMahan v. Toto,* 311 F.3d 1077, 1080 (11th Cir.2002) ("[A]bsent a decision from the state supreme court on an issue of state law, [federal courts in Florida] are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently.").

**\*18** Thus, this Court concludes that the law of Florida is that the four-year statute of limitations in paragraph 95.11(3)(c), rather than the two-year statute of limitations in paragraph 95.11(4)(a), applies to actions such as the instant case and that Lillibridge's claims are not time-barred.

### 2. Independent Contractor

Hunton Brady also argued in its Rule 52(c) motion that it is not responsible for the acts of Heery, an independent contractor. Hunton Brady cites two cases in support of this contention, but neither is germane to this case. In the first, *Century Land Development, L.P. v. Weits,* No. 07–14377–CIV, 2009 WL 252091, at \*4–5 (S.D.Fla. Feb.2, 2009), the court noted that "[g]enerally, an employer is not liable for the torts of an independent contractor" and then found that a realty company was not vicariously liable for the negligence of a realtor with whom it had entered into an independent contractor agreement. However, the case at bar does not involve an employment setting, and *Weits* is of no assistance here. In the second, *Carrasquillo v. Holiday Carpet Service, Inc.,* 615 So.2d 862 (Fla. 3d DCA 1993), an employee of a hotel tripped and fell on some recently-installed carpet at the hotel and

sued the general contractor who had hired an independent contractor to install the carpet. The court found the general contractor not liable for the subcontractor's negligence, but this result does not aid Hunton Brady here. The *Carrasquillo* court noted that "the mere fact that there is a contract does not create a nondelegable duty vis-a-vis third persons," *id.* at 863, and that case obviously involved personal injury by a third party rather than a dispute regarding quality of services provided as between contracting parties.

The *Carrasquillo* court distinguished *Mills v. Krauss,* 114 So.2d 817 (Fla. 2d DCA 1959), a case which is more on point. In *Mills,* a general contractor who had been hired to perform repair work at a hotel was sued by the hotel when the roof leaked and caused damage. The general contractor settled with the hotel and then sued its roofing subcontractor. The *Mills* court reversed the trial court's ruling that the general contractor was not entitled to indemnification, holding that "the duty of a general contractor to use due care in repairing the premises of another, insofar as it is applicable to the owner of the premises, is a nondelegable duty which may not be committed to an independent contractor; and the latter will be deemed to be the employee of the general contractor, for whose failure to use due care in repairing said premises the general contractor will be held responsible." *Id.* at 820. Continuing, the court explained: "The general contractor, having undertaken to repair the premises of another, whether by his own employees or through an independent contractor or other agents, is under a duty to the owner of the premises by virtue of a relationship created by the general contract to see to it that due care is used in repairing the premises. This contractual responsibility of the general contractor to the owner cannot be delegated to a third person in such manner as to relieve the general contractor of liability for violation of his duty in that behalf." *Id.*

**\*19** Hunton Brady argues that it delegated—with Lillibridge's consent and, indeed, at Lillibridge's direction—the responsibility for engineering services under the main contract to Heery. Hunton Brady contends that the engineering duty was thus delegable rather than nondelegable, rendering *Carrasquillo* applicable. However, this case is much more like *Mills* than *Carrasquillo,* which involved a tort suit by a third party who suffered personal injury rather than a suit by one contracting party against another for economic damages based on services provided pursuant to the contract.

Clearly, it was understood by the parties that Hunton Brady—which is an architectural firm rather than an engineering firm—would be delegating the engineering

Case 2:18-cv-11086-SFC-PTM ECF No. 13-3, PageID.412 Filed 06/01/18 Page 108 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

work to Heery. However, this does not mean that such delegation absolved Hunton Brady of legal liability under the contract. As discussed earlier in this Order, Hunton Brady obligated itself contractually to provide architectural and engineering services, and its duties as to engineering arise from the contract. It was certainly permitted to engage professional engineers for the engineering portion of the project; however, much like a general contractor hired to perform construction services, one contracting party still may look to the other for a remedy if the services are deficient, and the party held liable as a matter of contract may then seek relief from the party at fault via indemnification, as Hunton Brady has done here. The cases cited by Hunton Brady in this second portion of its Rule 52(c) motion do not support its position that it may not be held accountable under the Contract.

### 3. Breach of Contract

In the third portion of its Rule 52(c) motion, Hunton Brady argues that Lillibridge failed to present evidence that Hunton Brady breached its contract with Lillibridge. However, as already discussed, the Court rejects this assertion. Hunton Brady's Rule 52(c) motion is also denied on this point.

### 4. Reliance on OCBD

Finally, Hunton Brady argues that it was entitled to rely on the approval of the shell and core design documents by OCBD. As discussed earlier, however, the contract contemplated and called for a specific use for the building—an ASC—and approval by OCBD does not absolve Hunton Brady of liability under the contract. This last argument of Hunton Brady's Rule 52(c) motion is therefore rejected.

### B. Heery's Rule 52(c) Motion

Heery also filed a Rule 52(c) motion on the third day of trial. (Doc. 80).[14] In the motion, Heery asserts that Lillibridge failed to establish the required elements of each of its causes of action against Heery—breach of contract, negligent design, and negligent misrepresentation. As discussed earlier, Lillibridge is not being awarded relief directly against Heery on any of these claims. However, the trial evidence did establish that Heery breached the Subcontract with Hunton Brady

by not providing engineering services that resulted in a building suited for its intended purpose. Heery's contention that Lillibridge failed to establish a breach of contract by Heery because Heery's plans were approved by OCBD is, as discussed earlier, rejected, and Heery's motion is denied.

### V. Conclusion

**\*20** In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Hunton Brady Architects, P.A.'s Motion for Judgment on Partial Findings (Doc. 79) is **DENIED in all respects.**

2. Defendant Heery Internationals, Inc.'s Motion for Involuntary Dismissal (Doc. 80) is **DENIED in all respects.**

3. As set forth herein, based on the trial evidence the Court concludes that Plaintiff Lillibridge Healthcare Services, Inc. prevails in part on its breach of contract claim (Count I) against Hunton Brady. Lillibridge prevails insofar as it seeks to recover for the HVAC error and the GFI error. Lillibridge does not prevail on its claim with regard to the porte cochère lighting error. Lillibridge established damages in the amount of $245,982.37 on the HVAC system error and in the amount of $41,895 on the GFI error, for total damages of $287,877.37.

4. The trial evidence establishes that Hunton Brady's crossclaim against Heery for indemnity is well-taken and that Hunton Brady is entitled to be indemnified by Heery for the amount that Hunton Brady is obligated to pay to Lillibridge as a result of Heery's errors.

5. **On or before Friday, October 1, 2010,** Lillibridge shall, after conferring with Defendants, submit a proposed judgment to the Court, noting the disagreements, if any, of Defendants with regard to the terms thereof.

**DONE** and **ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3788859

Footnotes

Case 2:18-cv-11086-SFC-PTM   ECF No. 13-3, PageID.413   Filed 06/01/18   Page 109 of 175

Lillibridge Health Care Services, Inc. v. Hunton Brady..., Not Reported in...

1      The Contract also stated that the MOB was to house a cancer center on the first floor; however, the plan for the cancer center was abandoned.

2      HLM Design is the named engineering firm in the Subcontract. Heery is HLM Design's successor in interest, and it later assumed HLM Design's obligations under the Subcontract.

3      This count is mislabeled as a second "Count IV" in the Complaint. (*See* Doc. 1 at 12).

4      At the time of trial, Cole was the president of Hunton Brady.

5      The parties stipulated prior to trial that AHCA rejected the plans, (JPS ¶ 9(s)), but the trial evidence suggested that it was OCBD, not AHCA, that first noted the issue with the HVAC design; in any event, one of these two reviewing authorities disapproved the plans.

6      There was also testimony at trial regarding a change to section 517.17 of the National Electric Code that affected the GFI protection requirements for the building. There was testimony that under the 2002 version of the NEC, the only breakers in the main panel that needed additional GFI protection were those feeding the ASC, but under the 2005 version, all breakers in the main panel needed the additional protection. Thus, Heery asserts that the code change in the interim between the MOB construction and the tenant build-out created this issue. However, the problem was created when Heery allowed the Siemens equipment to be installed, knowing that the future ASC would require more GFI protection. Although the code change may have increased the number of breakers that had to be replaced—the remedy for the problem—the code change did not affect the creation of the problem by Heery in the first instance. The Siemens board would have resulted in avoidable increased expense to Lillibridge under either version of the NEC; the new code merely increased the cost of the remedy, and the Court finds that Lillibridge may properly recover the full amount of the difference in the cost of upgrading the GFI protection.

7      The evidence was conflicting on whether this statement was made; Taylor testified that it was made, but neither Cole, Snyder, nor Siciliano recalled such a statement being made at a meeting. The Court need not resolve this conflicting evidence, however, because this claim is duplicative of the others; the negligence alleged is part and parcel of the alleged breach of contractual duties.

8      This reasoning would apply as well to the negligence count against Hunton Brady in Count II. However, Lillibridge has already voluntarily dismissed that count.

9      The motion was made and argued orally, and a written motion (Doc. 79) was also filed.

10      The written motion asserts a fifth argument—that there was no evidence that Hunton Brady breached the architectural standard of care—however, Lillibridge dismissed the professional negligence claim against Hunton Brady before the motion was argued in court, and that portion of the written motion was rendered moot.

11      In applying state law, this Court, as a federal court situated in Florida, "must follow the decisions of the Florida Supreme Court and Florida's intermediate appellate courts." *Prime Ins. Syndicate, Inc. v. Soil Tech Distribs., Inc.,* 270 F. App'x 962, 964 (11th Cir.2008).

12      The discussion in the text assumes for the sake of argument that this case can be characterized as a "professional malpractice" case against Hunton Brady at this point at all. The negligent design count against Hunton Brady has been dismissed, and Lillibridge does not allege the Hunton Brady breached the architectural standard of care—only that the Contract was breached due to problems with Heery's provision of engineering services.

13      Additionally, the Supreme Court of Florida suggested in a later case—again, in a footnote—that its view is that paragraph 95 .11(3)(c), rather than paragraph 95.11(4)(a), applies to claims against architects. In *Pierce v. AALL Insurance Inc.,* 531 So.2d 84 (Fla.1988), the court addressed the issue of whether an insurance agent was a "professional" for purposes of the "professional malpractice" statute of limitations in paragraph 95.11(4)(a). In the course of answering that question in the negative, the court defined "a profession as a vocation requiring as a minimum standard, a college degree in the specified field." *Id.* at 87. The court then listed examples of such professions—including architecture—but then stated that "[w]hile architecture is a profession under our definition, the statute of limitations for the design and construction of improvements to real property is four years, § 95.11(3)(c)." *Id.* n. 2. Seemingly, the Court was explaining that even though architecture fits within its definition of "profession" for purposes of paragraph (4)(a), claims against architects are governed by paragraph (3)(c) instead.

14     The motion is titled "Motion for Involuntary Dismissal," but Heery's counsel stated in court that the motion is incorrectly labeled and is actually, like Hunton Brady's motion, a motion for judgment on partial findings under Rule 52(c).

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3805673
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Eugene G. LIPOV, Plaintiff,
v.
LOUISIANA–PACIFIC CORP., Defendant.

No. 1:12–cv–439.
|
July 22, 2013.

**Attorneys and Law Firms**

Alyson L. Oliver, Oliver Law Group PC, Rochester, MI, for Plaintiff.

Kevin G. Dougherty, Elisabeth M. Von Eitzen, Warner Norcross & Judd LLP, Grand Rapids, MI, James Earnest Weatherholtz, Womble Carlyle Sandridge & Rice LLP, Charleston, SC, John Parker Sweeney, Tara Sky Woodward, Bradley Arant Boult Cummings LLP, Washington, DC, for Defendant.

*OPINION*

JANET T. NEFF, District Judge.

**\*1** Pending before the Court in this product liability action is Defendant's Partial Motion to Dismiss (Dkt 21), to which Plaintiff filed a Response (Dkt 23) and Defendant filed a Reply (Dkt 25). The motion is being decided without oral argument. *See* W.D. Mich. LCivR 7.2(d). After careful consideration of the parties' arguments and applicable law, the Court grants Defendant's motion.

**I. BACKGROUND**

Plaintiff Lipov, a resident and citizen of Illinois, owns a house in Grand Beach, Michigan (Dkt 14, Am. Compl. ¶ 8). The house was built in 2008 and contains ABTCO TrimBoard ("TrimBoard"), which was designed, manufactured, marketed, advertised and sold by

Defendant Louisiana–Pacific Corporation ("LP") (*id.* ¶ 1). TrimBoard is a manufactured wood exterior trim product for use as fascia, soffit, corner board, bandboards, window trim, door trim and general exterior use on homes and other structures (*id.* ¶ 2). The TrimBoard product came with a "10/5 Year Limited Warranty," the "LP Warranty" (Dkt 22–1, Ex. A to Def. Mot.).

According to Plaintiff, the TrimBoard contained design and manufacturing defects that resulted in deterioration (Dkt 14, Am. Compl. ¶ 4). On May 3, 2012, Plaintiff filed this purported class action against Defendant, alleging unfair and deceptive trade practices in violation of MICH. COMP. LAWS § 445.903 (Count I), breach of express warranty (Count II), breach of implied warranty of merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count IV), fraudulent misrepresentation (Count V), fraudulent concealment (Count VI), unjust enrichment (Count VII), and "declaratory relief" (Count VIII). Plaintiff subsequently filed a First Amended Complaint to clarify that the declaratory relief he seeks in this case does not constitute a separate count (Dkt 14).

Following a Pre–Motion Conference, the Court issued a briefing schedule, permitting the parties to brief Defendant's proposed Motion to Dismiss (Dkt 18).[1] Defendant filed its Partial Motion to Dismiss, arguing that this Court should dismiss all of Plaintiff's claims except for his express warranty claim under the LP Warranty (Dkt 21). Plaintiff filed a response, wholly failing to respond to some of Defendant's challenges (Dkt 23). Defendant filed a Reply to the Response (Dkt 25).

**II. ANALYSIS**

**A. Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). " 'A [Rule 12(b)(6) ] motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations.' " *Lambert v. Hartman,* 517 F.3d 433, 439 (6th Cir.2008) (quoting *Golden v. City of Columbus,* 404 F.3d 950, 958–59 (6th Cir.2005)). In deciding the motion, the court must treat all well-pleaded allegations in the complaint as true and draw all reasonable inferences from

those allegations in favor of the nonmoving party. *Id.* "When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,* 508 F.3d 327, 335–36 (6th Cir.2007).

**\*2** A plaintiff's complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (retiring the "no set of facts" formulation); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (clarifying that its decision in *Twombly* expounded the pleading standard for "all civil actions"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility ....' " *Id.* (quoting *Twombly,* 550 U.S. at 556–57). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## B. Discussion

***Count I.*** In Count I of his Amended Complaint (Violation of Michigan Comp. Laws § 445.903), Plaintiff alleges that Defendant's conduct in this case constitutes "unfair, unconscionable, or deceptive acts or practices" in violation of Michigan's Consumer Protection Act (MCPA). Specifically, Plaintiff alleges the following violations:

a. Defendant represented to Plaintiff and the Class that the Trimboard had characteristics, uses, and benefits that they [sic] did not have, specifically, that the Trimboard was a dependable, high-quality products [sic], free of defects; Defendant thus violated of [sic] MICH. COMP. LAWS § 445.903(1)(c);

b. Defendant represented to Plaintiff and the Class that the Trimboard were [sic] of very high standard and quality when they were [sic], in fact, of a much lesser standard or quality (and in fact were [sic] defective), in violation of MICH. COMP. LAWS §

445.903(1)(e);

c. Defendant failed to reveal to Plaintiff or the Class material facts that neither Plaintiff nor the Class could reasonable have known, causing Plaintiff and the Class to be misled and deceived, including that (i) Defendant's Trimboard was defective; and (ii) that Defendant's Trimboard would fail, leading to damage to the very structures they [sic] were purchased to protect, in violation of MICH. COMP. LAWS § 445.903(1)(s);

d. Defendant failed to provide the benefits of its Trimboard that Defendant promised to Plaintiff and the Class, including that the Trimboard was fit for the use for which it was intended and were [sic] free of defects, in violation of MICH. COMP. LAWS § 445.903(1)(y);

e. Defendant failed to provide the benefits set forth in its warranty for its Trimboard by failing to respond to customer complaints and/or failing to honor its warranties in violation of MICH. COMP. LAWS § 445.903(1)(y);

**\*3** f. Defendant made numerous representations of material fact such that Plaintiff and the Class reasonably believed the represented or suggested state of affairs to be other than it actually was, including that the Trimboard was fit for the purpose for which it was intended, that the Trimboard was free of manufacturing defects, and that the Defendant would honor its warranty for its Trimboard; Defendant's conduct thus violated MICH. COMP. LAWS § 445.903(1)(bb); and

g. Defendant failed to reveal material facts to Plaintiff and the Class in light of representations of fact that it made to Plaintiff and the Class; specifically, Defendant intentionally concealed from Plaintiff and the Class that its Trimboard were [sic] defective, while continually marketing the Trimboard as dependable, high-quality products [sic]. Defendant's conduct thus violated MICH. COMP. LAWS § 445.903(1)(cc).

(Dkt 14, Am. Compl. ¶ 54).

Michigan generally prohibits the use of unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce. MICH. COMP. LAWS § 445.903(1). Claims under the MPCA for fraud or mistake must state the circumstances with particularity. *HRL Land or Sea Yachts v. Travel Supreme, Inc.,* No. 1:07–cv–945, 2009 WL 427375, at \*8 (W.D.Mich.

Feb.20, 2009); *Michels v. Monaco Coach Corp.,* 298 F.Supp.2d 642, 650 (E.D.Mich.2003) (citing FED. R. CIV. P. 9(b)). When the MPCA claim is based on breach of express or implied warranties, the claim need not be pled with the same level of specificity. *Michels, supra.* However, a buyer may not assert a claim against a seller under the MCPA for alleged warranty related misrepresentations when the seller disclaimed all express and implied warranties. *Harnden v. Ford Motor Co.,* 408 F.Supp.2d 309, 314 (E.D.Mich.2005); *Ducharme v. A & S RV Center, Inc.,* 321 F.Supp.2d 843, 856 (E.D.Mich.2004).

The MCPA violations Plaintiff alleges in ¶ 54(d) and (e) under MICH. COMP. LAWS § 445.903(1)(y) merely restate his breach of warranty claims. As discussed at greater length, *infra,* Plaintiff abandoned his claim in Count II for breach of express warranties other than under the LP Warranty, and Defendant has properly disclaimed all implied warranties; therefore, Plaintiff's warranty-based MCPA claims fail. "[A] buyer may not assert a claim against a seller under the MCPA for alleged warranty related misrepresentations when the seller disclaimed all express and implied warranties." *HRL Land,* 2009 WL 427375, at *8.

Plaintiff's remaining MCPA allegations involve several fraud-based subsections of the MCPA. Like its challenges to Plaintiff's Count V (Fraudulent Misrepresentation) and Count VI (Fraudulent Concealment), counts that Plaintiff abandoned, Defendant asserts that Plaintiff's fraud-based MCPA claims in Count I similarly fail to state a claim because Plaintiff did not plead these claims with sufficient specificity (Dkt 22 at 16). Defendant points out that Plaintiff has failed to plead (a) what statements were made to him, (b) the time and place of each purported statement, (c) the manner in which the statements misled him, and (d) how he detrimentally relied on the statements, or that Defendant sold TrimBoard directly to Plaintiff (*id.*).

***4** In response, Plaintiff directs this Court's attention to two introductory paragraphs of his Amended Complaint (Dkt 24 at 14), but these two paragraphs merely identify the representations Defendant made in its product materials (Dkt 24 at 14, citing Am. Compl. ¶¶ 21 & 25). Plaintiff has not directed this Court to any place in his Amended Complaint particularly stating the circumstances constituting fraud. Indeed, as Defendant points out in Reply, Plaintiff has failed to allege that he even saw any of the offending materials that allegedly contained these representations (Dkt 25 at 11). In sum, treating all well-pleaded allegations in Plaintiff's Amended Complaint as true and drawing all reasonable

inferences from those allegations in favor of Plaintiff, Plaintiff's first count does not present enough facts to state a claim to relief under the MCPA that is plausible on its face. Defendant is therefore entitled to dismissal of Count I.

***Count II.** In Count II of his Amended Complaint (Breach of Express Warranty), Plaintiff alleges that "Defendants' affirmations, as well as the ten-year warranty accompanying Trimboard, became the basis of the bargain for Plaintiff and Class members purchasing Trimboard or homes, apartments, office buildings or other structures containing Trimboard" (Dkt 14, Am. Compl. ¶ 62). Defendant argues that Plaintiff's claim fails to the extent Plaintiff asserts a claim for a breach of any express warranty other than under the LP Warranty provided with the TrimBoard (Dkt 22 at 8–9). Plaintiff did not respond to Defendant's challenge to Count II, and this Court construes the omission as evidence of Plaintiff's intent to abandon this portion of his claim in Count II. Therefore, this Court dismisses Plaintiff's claim in Count II for breach of express warranties other than Plaintiff's claim under the LP Warranty.

***Counts III & IV.** In Count III of his Amended Complaint (Breach of Implied Warranty of Merchantability), Plaintiff alleges that Defendant "breached the implied warranty of merchantability by selling its Trimboard that was defective and not reasonably fit for its ordinary purpose" (Dkt 14, Am. Compl. ¶ 71). Similarly, in Count IV (Breach of Implied Warranty of Fitness for a Particular Purpose), Plaintiff alleges that Defendant "breached the implied warranty of fitness for a particular purpose by selling its Trimboard that was defective and not reasonably fit for its ordinary purpose" (*id.* ¶ 80).

A warranty of merchantability and warranty of fitness for a particular purpose is implied into every consumer contract unless expressly and conspicuously disclaimed. *See* MICH. COMP. LAWS §§ 440.2314–2315. MICH. COMP. LAWS § 440.2316(2) provides, in pertinent part, that "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Michigan law further instructs that

***5** "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include any of the following:

(*i* ) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to surrounding text of the same or lesser size.

(*ii* ) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

MICH. COMP. LAWS § 440.1201(2)(j).

Here, the LP Warranty provides, in pertinent part, the following:

> **NOTICE: THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANT ABILITY AND FITNESS FOR A PARTICULAR PURPOSE....**

(Dkt 22–1, Ex. A to Def. Mot. [bold and capitalization in original] ).

The above disclaimer mentions merchantability. Further, although Plaintiff attempts to require here the characteristics of disclaimers examined in other cases, the Court determines that the language of Defendant's disclaimer is "conspicuous" within the meaning of Michigan law where it is titled "10/5 YEAR LIMITED WARRANTY" and stated in capital letters and bold font. Defendant therefore properly disclaimed the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. Treating all well-pleaded allegations in Plaintiff's Amended Complaint as true and drawing all reasonable inferences from those allegations in favor of Plaintiff, Plaintiff's Counts III and IV fail to state implied warranty claims that are plausible on their face. Defendant is therefore entitled to dismissal of both counts.

**Counts v. & VI.** In Count V of his Amended Complaint (Fraudulent Misrepresentation), Plaintiff alleges, in pertinent part, that "LP falsely and fraudulently represented to Plaintiff, the Class members, and/or the consuming public in general that LP's Trimboard would be free from defects and fit for its customary and normal use" (Dkt 14, Am. Compl. ¶ 84). Similarly, in Count VI (Fraudulent Concealment), Plaintiff alleges that "LP fraudulently concealed from and/or intentionally failed to disclose to Plaintiff and the Class that Trimboard is defective" (*id.* ¶ 96). Defendant argues that the economic

loss doctrine bars these claims, which relate solely to the quality and characteristics of Defendant's TrimBoard (Dkt 22 at 10–13). Plaintiff did not respond to Defendant's challenge to Counts V and VI, and this Court construes the omission as evidence of Plaintiff's intent to abandon these counts. Defendant is therefore entitled to dismissal of Counts V and VI.

**Count VII.** Last, in Count VII of his Amended Complaint (Unjust Enrichment), Plaintiff alleges that "LP has been unjustly enriched in retaining the revenues derived from Class members' purchases of the Trimboard, the retention of which under these circumstances is unjust and inequitable because LP Trimboard was defective in design, was not fit for its ordinary and intended use, and performed in accordance with neither the advertisements, marketing materials and warranties disseminated by LP nor the reasonable expectations of ordinary consumers and caused the Plaintiff and Class members to lose money as a result thereof" (Dkt 14, Am. Compl. ¶ 107).

**\*6** The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 473 N.W.2d 652, 663 (Mich.1991). In such instances, the law operates to imply a contract in order to prevent unjust enrichment. *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 509 N.W.2d 791, 796 (Mich.Ct.App.1993). However, a contract will be implied only if there is no express contract covering the same subject matter. *Id.*

Here, the LP Warranty provides a contractual remedy for Plaintiff. Therefore, as Defendant points out, Plaintiff may not assert an unjust enrichment claim against LP because there is an express contract covering the same matter (Dkt 22 at 15). Additionally, an unjust enrichment claim requires Plaintiff to have conferred a benefit to LP that it would be inequitable for LP to retain. Here, Plaintiff alleges that LP sold the TrimBoard through distributors and wholesalers to builders, subcontractors, and/or agents, who then installed the TrimBoard on Plaintiff's residence (Am.Compl.¶¶ 18–19). The Court agrees with Defendant that these indirect transactions do not state a claim that Plaintiff conferred a direct benefit on Defendant (Dkt 22 at 14–15, citing *W.C. Ducomb Co., Inc. v. Ann Arbor Mach. Co.,* No. 301988, 2012 WL 516089, at \*3 (Mich.Ct.App. Feb.16, 2012) (the plaintiff did not provide a benefit to the defendant because any benefit to the defendant came from a third-party)).

In favor of a contrary conclusion, Plaintiff relies on a passing reference in *Kammer Asphalt Paving Co. v. East*

Lipov v. Louisiana-Pacific Corp., Not Reported in F.Supp.2d (2013)

*China Twp. Schools,* 443 Mich. 176, 504 N.W.2d 635, 641 (Mich.Ct.App.1993), that "plaintiff indirectly provided defendant a benefit." However, as set forth in another case upon which Defendant relies, the facts of *Kammer* show that the defendant and the plaintiff were in contact with one another during the course of the plaintiff's paving activities at athletic facilities owned by the defendant and that the defendant directly benefitted from the plaintiff's work on those facilities (Dkt 22 at 15, citing *A & M Supply Co. v. Microsoft Corp.,* No. 274164, 2008 WL 540883, at *2 (Mich.Ct.App. Feb.28, 2008) (indirect purchasers of products did not have a viable unjust enrichment claim)).

Therefore, treating all well-pleaded allegations in Plaintiff's Amended Complaint as true and drawing all reasonable inferences from those allegations in favor of Plaintiff, Plaintiff has not presented enough facts to state a plausible unjust enrichment claim. Therefore, Defendant is entitled to dismissal of Plaintiff's Count VII.

### III. CONCLUSION

For the foregoing reasons, the Court determines that Defendant's Partial Motion to Dismiss (Dkt 21) is granted, and the remaining dispute between these parties is whether Defendant is liable to Plaintiff under the terms of the express LP Warranty. An Order will be entered consistent with this Opinion. Defendant shall file an Answer to the Amended Complaint within 14 days of entry of the Order. *See* FED. R. CIV. P. 12(a)(4)(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3805673

Footnotes

1    Resolving any dispositive motions in this case before examining the class certification allegations is, in this Court's opinion, in the interest of overall efficiency. *See* FED. R. CIV. P. 23(c)(1) (requiring only that courts decide motions for class certification "at an early practicable time").

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 520867
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

James Lossia, Jr. and Alexandra Plapcianu,
individually and on behalf of others similarly
situated, Plaintiffs,
v.
Flagstar Bancorp, Inc., a/k/a Flagstar Bank,
Defendant.

Case No. 15-12540
|
Signed 02/10/2016

**Attorneys and Law Firms**

Ronald G. Acho, Cummings, McClorey, Livonia, MI, for
Plaintiffs.

Caroline B. Giordano, Miller, Canfield, Paddock & Stone,
Seventh Floor, Colin M. Battersby, Miller, Canfield,
Detroit, MI, Sonal H. Mithani, Miller, Canfield, Ann
Arbor, MI, for Defendant.

ORDER GRANTING IN PART DEFENDANT'S
MOTION TO DISMISS STATE LAW CLAIMS [DOC.
11]

GEORGE CARAM STEEH, UNITED STATES
DISTRICT JUDGE

**\*1** Plaintiffs James Lossia Jr. and Alexandra Plapcianu
filed this proposed class action lawsuit against Flagstar
Bank alleging five state law claims and one federal claim.
The case previously came before the court on defendant's
motion to dismiss the federal claim brought under the Fair
Credit Reporting Act, 15 U.S.C. § 1681 et seq., which
alleges that Flagstar Bank furnished false information to
consumer reporting agencies as a result of insufficient
fund ("NSF") fees assessed by Flagstar. The court granted
defendant's motion to dismiss without prejudice, and gave
plaintiffs an opportunity to file an amended complaint.
Plaintiffs filed their amended complaint on November 19,
2015. Defendant then filed a motion to dismiss the five
state law claims, which is presently before the court. The
court does not believe that it would benefit from oral

argument, and so informed the parties that it would make
a determination on the briefs, pursuant to L.R. 7.1(f)(2).

FACTUAL BACKGROUND

Plaintiffs are Flagstar customers who maintain or
maintained a checking account with Flagstar pursuant to
Flagstar's Terms and Conditions and Disclosure Guide
(the "Deposit Agreement"). Plaintiff contend that "[i]n an
effort to maximize overdraft revenue, defendant
manipulates and reorders debit transactions from highest
to lowest during given periods of time." (Doc. 14, Pg ID
650). According to plaintiffs, while defendant's contract
with its account holders states that it processes checks in
the order in which they are received for the business day
on which they are processed, defendant's actual practice
is to always reorder debits from highest to lowest. The
five state law claims in plaintiffs' First Amended Class
Action Complaint ("FAC") – breach of contract and
breach of the covenant of good faith and fair dealing,
unconscionability, conversion, unjust enrichment and
violations of Michigan Consumer Protection Laws-focus
on the alleged manipulation and re-ordering of electronic
check transactions.

ANALYSIS

I. Dismissal Standard
Rule 12(b)(6) allows the Court to make an assessment as
to whether the plaintiff has stated a claim upon which
relief may be granted. Under the Supreme Court's
articulation of the Rule 12(b)(6) standard in *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the
Court must construe the complaint in favor of the
plaintiff, accept the allegations of the complaint as true,
and determine whether plaintiff's factual allegations
present plausible claims. " +'[N]aked assertion[s]' devoid
of 'further factual enhancement' +" are insufficient to
"state a claim to relief that is plausible on its face".
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting
*Twombly*, 550 U.S. at 557, 570). To survive a Rule
12(b)(6) motion to dismiss, plaintiff's pleading for relief
must provide "more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action
will not do." *D'Ambrosio v. Marino*, 747 F.3d 378, 383
(6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555) (other
citations omitted). Even though the complaint need not

contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1051 (6th Cir. 2011) (*citing Twombly,* 550 U.S. at 555).

## II. Breach of Contract

**\*2** Plaintiffs acknowledge that Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing, and elect to pursue only their claim for breach of contract. The elements of a breach of contract claim are "(1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *AFT Michigan v. Michigan,* 303 Mich. App. 651, 660 (2014) (citation omitted).

The "Common Factual Allegations" section of the complaint refers to the Deposit Agreement, and points to specific provisions including: "[w]e process checks and similar items second – in the order in which they are received for the business day on which they are processed" and "[t]here is a combined limit of five Non-Sufficient Funds Charges per business day." (FAC ¶¶ 33, 34). The complaint then explains that these are contrary to Flagstar's actual policies of assessing customers more than five NSF charges per day, and manipulating and reordering debit transactions in order to maximize overdraft revenue. (FAC ¶¶ 34, 35).

However, in the Claims section of the complaint, the only reference to a claim for breach of contract is in the caption for Count One – "Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing." (Doc. 10, Page ID 334). Count One first alleges that plaintiffs and defendant contracted for services, citing to "Flagstar Bank's Deposit Agreement and related documentation." (FAC ¶ 104). The remainder of the allegations address defendant's duty of good faith and fair dealing, and its breach of the same. Even the damages allegation states that plaintiffs "have sustained damages as a result of Flagstar Bank's breach of the covenant of good faith and fair dealing." (FAC ¶ 109). Other than the caption, there is nothing in the First Amended Complaint that puts defendant on notice that it must defend against a claim of breach of contract.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the...claim is and the

grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). It is not up to the defendant or the court to make plaintiffs' claim for them. In this case, Count One might be titled Breach of Contract, but it only alleges a claim for breach of the covenant of good faith and fair dealing.

The court holds that plaintiffs have failed to state a valid claim for breach of contract. However, given that defendant did not challenge the breach of contract claim in its first motion to dismiss, and that the factual allegations of the complaint allude to contract provisions that plaintiffs' breach of contract claim might be based upon, the court will give plaintiff an opportunity to amend its breach of contract count.

## III. Unconscionability

Count Two asserts that plaintiffs are entitled to damages because defendant's "overdraft policies and practices are substantively and procedurally unconscionable". (FAC ¶¶ 111, 114). Defendant moves to dismiss this count on the basis that unconscionability is a defense to contractual enforcement rather than an affirmative claim. Under Michigan law, a court may invalidate a contract that is determined to be unconscionable. Courts may even invalidate commercial contracts due to unconscionability. *See e.g., Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264 (E.D. Mich. 1976). However, unconscionability is not a separate cause of action. Rather, it is a defense to enforcement of a contract. *See Newman v. Roland Machinery Co.,* 2009 WL 3258319, \*10-11 (W.D. Mich. Oct. 8, 2009) (A plain reading of M.C.L. § 440.2302(1)-(2) indicates that it is to be used for protection against enforcement and not as an affirmative action for damages.) Thus, plaintiff cannot maintain a claim based on unconscionability. *Tamlin v. Citi Mortgage Servicing,* 2011 WL 2580656, at \*4 (E.D. Mich. June 29, 2011).

**\*3** Plaintiffs respond that they are pursuing a defense to the enforcement of the Deposit Agreement terms regarding overdraft fees. However, it is clear from the complaint that plaintiffs are seeking damages "as a result of Flagstar's unconscionable policies and practices." (FAC ¶ 114). While defendant might have imposed overdraft fees on plaintiffs pursuant to terms of the parties' contractual agreement, defendant has not brought an action to enforce its contractual agreement to which plaintiffs may assert an unconscionability defense. Defendant's motion to dismiss Count Two is granted.

## IV. Conversion

Under Michigan law, "an action cannot be maintained for conversion of money unless the money was obtained without the owner's consent to the creation of a debtor and creditor relationship." *Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc.*, 178 Mich. App. 570, 575 (1989). Plaintiffs admittedly consented to the creation of a debtor-creditor relationship with defendant by maintaining a checking account, entering into an account agreement and depositing money into their accounts. Plaintiffs' argument for stating a conversion claim is that the overdraft fees were drawn on a negative balance in their accounts, as opposed to being drawn from funds that had already been deposited in the accounts. (Doc. 14, Page ID 660-661). As a result, plaintiffs contend that they did not consent to a debtor-creditor relationship regarding the monies on which the fees were assessed. However, the proper focus of the consent is not the particular monies deposited, but the intent to form a debtor-creditor relationship by depositing money with the bank. *See Id.*

Plaintiffs contend that they have successfully pled a tort duty, separate and distinct from defendant's contractual obligations in this case. Specifically, plaintiffs point to a general common law duty to use due care to prevent the diminishment of plaintiffs' checking accounts through its own wrongful acts. (FAC § 116). However, "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 466 (2004). Plaintiffs' conversion claim alleges that defendant wrongfully collected overdraft fees, and exercised a right of ownership over plaintiffs' funds without proper authorization. (FAC §§ 117-118). This claim rests on duties that arise under the parties' contract rather than any independent duties arising outside the parties' contractual relationship.

Therefore, defendant's motion to dismiss Count Three is granted.

V. Unjust Enrichment

In order to allege an unjust enrichment claim, "a plaintiff must demonstrate (1) the defendant's receipt of a benefit from the plaintiff and (2) an inequity to plaintiff as a result." *AFT Mich. v. Michigan*, 303 Mich. App. 651, 660-61 (2014). "Courts, however, may not imply a contract if the parties have an express contract covering the same subject matter." *Id.* Plaintiffs cite to Fed. R. Civ. P. 8(d)(3), which provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency," to support its ability to plead inconsistent claims.

Where there is no contract governing the parties, a court may imply a contract to prevent unjust enrichment. *Fodale v. Waste Mgmt. of Michigan, Inc.*, 271 Mich. App. 11, 36 (2006). In this case, the subject matter of plaintiffs' claim is governed by an express agreement, that being the Deposit Agreement – an agreement acknowledged by both parties. Where the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for unjust enrichment. *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833-34 (E.D. Mich. 2014) (citations omitted).

**\*4** Defendant's motion to dismiss Count Four is granted.

VI. Michigan Consumer Protection Act

Plaintiffs assert that defendant violated the Michigan Consumer Protection Act ("MCPA") by "engag[ing] in unfair business practices relating to the imposition of overdraft fees on customers...." (FAC ¶ 137). The MCPA, however, expressly exempts any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." M.C.L. § 445.904(1)(a). The Michigan Supreme Court has determined that whether a claim falls under the broad exemption afforded by M.C.L. § 445.904(1)(a) is based on "whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 465 (1999); *see also Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 212-13 (2007).

The general transactions alleged in this case are defendant's provision of banking services to its customers, which are the type of conduct covered by the MCPA's exception. Even plaintiffs admit that "Flagstar is a federal savings association, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency." (FAC ¶ 15). Because Flagstar's general transactions are "specifically authorized by law," the MCPA exemption applies, and plaintiffs' MCPA claim must be dismissed.

CONCLUSION

For the reasons stated in this opinion and order, defendant's motion to dismiss state claims is GRANTED in part. Counts Two, Three, Four and Five of plaintiffs' complaint are dismissed with prejudice. Count Six, alleging violations of the Federal Fair Credit Reporting Act, remains pending before the court. Count One is

dismissed without prejudice. Plaintiffs may amend Count One to state a claim for breach of contract only, on or before March 1, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 520867

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

637 Fed.Appx. 192
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

MASCO CABINETRY MIDDLEFIELD, LLC, and
The Insurance Company of the State of
Pennsylvania, Plaintiffs–Appellants,
v.
CEFLA NORTH AMERICA, INC., and Cefla SC,
Defendants–Appellees.

No. 14–3422.
|
Dec. 11, 2015.

**Synopsis**
**Background:** Purchaser of custom woodworking production system brought products liability action against company that designed system and subsidiary that installed system in its cabinet manufacturing plant on theory that defect in component had resulted in fire at plant. The United States District Court for the Northern District of Ohio, Christopher A. Boyko, J., 2014 WL 1331038, granted defendants' motion for summary judgment on theory that purchaser's claims were barred by two-year time limit on such claims in purchase agreement, and denied motion for relief from judgment, 2015 WL 471432. Purchaser appealed on theory that neither company was party to agreement with right to enforce its provisions.

**Holdings:** The Court of Appeals, McKeague, Circuit Judge, held that:

[1] parent and subsidiary companies which, following purchaser's acceptance of offer by parent to design and manufacture custom woodworking system in its facilities in Italy, and of offer by subsidiary to install this system in purchaser's cabinet manufacturing plant in United States, had each performed in accordance with their offers, were both parties to written contract drafted by yet another entity memorializing this agreement, and

[2] district court did not abuse its discretion in denying motion for relief from judgment.

Affirmed.

Helene N. White, Circuit Judge, filed dissenting opinion.

**\*193** On Appeal from the United States District Court for the Northern District Of Ohio.

BEFORE: MERRITT, McKEAGUE and WHITE, Circuit Judges.

**OPINION**

McKEAGUE, Circuit Judge.

This is a products liability action against the manufacturer of industrial manufacturing equipment used in the manufacture of residential cabinetry. The action, brought by the purchaser of the equipment and its insurer as subrogee, seeks nearly $5 million in damages for loss sustained as a result of a fire in the purchaser's manufacturing plant. The district court, on cross-motions for summary judgment, enforced terms contained in the equipment sales agreement and dismissed the action as time-barred. On appeal, plaintiffs insist that the manufacturer of the defective equipment was not a party to the sales contract and has no right to assert the contractual limitations period in defense of their tort claims. The analysis in the district court's opinion is thin. Yet, on due consideration of the record, we conclude the result is correct and so affirm the judgment.

I

Plaintiff Masco Cabinetry Middlefield, LLC ("Masco"), an Ohio company located **\*194** in Middlefield, Ohio, is in the business of manufacturing residential cabinets. On January 27, 2004, Masco, through its Kraftmaid Cabinetry division, entered into an agreement to purchase certain woodworking equipment. The agreement is finalized by a three-page document entitled "Sales Agreement," prepared by Bob Langridge of Stiles Machinery, Inc. ("Stiles"), of Grand Rapids, Michigan. Stiles is the authorized sales agent of defendant Cefla North America,

Inc. ("Cefla NA"), which is a wholly owned subsidiary of, and exclusive distributor of products made by, Italian manufacturer, defendant Cefla SC.[1]

Pursuant to the Sales Agreement, Masco purchased a "Cefla Group Roll Coat System (UV3) ... as per Proposal # CE–3227C dated January 26, 2004." R. 37–5, Page ID 462. The Proposal, prepared for Masco by Cefla NA and signed by its Project Engineer Dennis Echelbarger, is twenty-one pages in length. It describes the various components of a woodworking production system to be custom designed and manufactured for Masco by Cefla SC in Italy and provides for installation and training in Middlefield by Cefla NA. The Proposal's total price, including importation from Italy and installation in Middlefield was $2,832,819. By its terms, the Proposal is "subject to our General Conditions of Sale" and its "offer is valid for thirty (30) days." Don Cox signed the Sales Agreement on behalf of Masco on January 27, 2004, thereby accepting Cefla NA's Proposal, subject to a special discount of $239,819.

The Sales Agreement includes two pages of "Standard Terms and Conditions of Sale," one applicable to Stiles and one applicable to Cefla NA. By virtue of the latter, the Sales Agreement thus explicitly includes the "General Conditions of Sale" referred to in the Proposal. The Sales Agreement also incorporates by reference terms and conditions of Masco's National Purchasing Agreement with Stiles.

The UV3 system was installed in Masco's Middlefield plant later in 2004. In October 2009, a fire occurred in the Middlefield plant where the UV3 production line was housed, causing substantial damage. Masco, together with its insurer, The Insurance Company of the State of Pennsylvania as subrogee (collectively, "Masco"), commenced this action in October 2011, asserting negligence and products liability claims against Cefla NA and Cefla SC, and claiming damages in the amount of $4,729,092. Defendants moved for summary judgment, contending that Masco's claims arose under the sales contract and should be dismissed as untimely because the contract bars action by Masco more than two years from the date of delivery of the equipment. The district court agreed and held that Masco's claims, filed more than two years after delivery of the equipment, are contractually time-barred.

## II

We review the summary judgment ruling de novo. *Smith*

*v. Perkins Bd. of Educ.,* 708 F.3d 821, 825 (6th Cir.2013). Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Smith*, 708 F.3d at 825. Not just any alleged factual dispute between **\*195** the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Id.* A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment. *Sierra Club v. ICG Hazard,* 781 F.3d 281, 284 (6th Cir.2015). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law—in this case, state law. *Crouch v. Honeywell Int'l, Inc.,* 720 F.3d 333, 338 (6th Cir.2013).

## III

[1] Here, the Cefla defendants' summary judgment motion was premised on the assertion that Masco's claims, albeit nominally tort claims, "arise out of the contract." Ordinarily, a federal court exercising diversity jurisdiction applies the choice-of-law rules of the forum state. *Standard Fire Ins. Co. v. Ford Motor Co.,* 723 F.3d 690, 692 (6th Cir.2013). Under Ohio law, different choice-of-law rules apply, depending on whether the cause of action sounds in contract or tort. *Ohayon v. Safeco Ins. Co. of Illinois,* 91 Ohio St.3d 474, 747 N.E.2d 206, 208 (2001). Hence, the court must first classify the cause of action. *Id.* If the action stems from a pre-existing contractual relationship, then the parties had the opportunity to negotiate the law to be applied to disputes arising thereunder and the law would seek to protect the justified expectations of the parties. *Id.* at 209. A tortfeasor, on the other hand, who acts without a conscious regard for the legal consequences of his or her conduct, has no justified expectations to protect and different factors are considered to determine the governing law. *Id.*

The Cefla defendants contend that Masco's claims—complaining of defectively and dangerously designed and manufactured equipment—though sounding in tort, do not arise in a vacuum; they necessarily stem from the Sales Agreement whereby Masco purchased the equipment that defendants offered to design, fabricate and install.

Defendants further contend that the parties' justified expectations are embodied in the Standard Terms and Conditions of Sale that are made part of the contract. These standard terms provide that the contract shall be deemed to have been made in Michigan and any action arising out of the contract shall be governed by Michigan law. They define the buyer's remedies upon discovery of a defect, as well as limitations of the seller's warranties. And they prescribe a two-year limitations period for claims arising out of the contract. Accordingly, defendants contend Masco's claims should be classified as claims sounding in contract and that the parties' contractual choice-of-law provision should be enforced. In support, they cite *Gen. Elec. Co. v. Siempelkamp GmbH & Co.*, 29 F.3d 1095 (6th Cir.1994) (breach of contract, tort, breach of warranty, and products liability claims arising out of purchase, installation and operation of industrial machinery held to be subject to contractual choice-of-law provision); *Baumgardner v. Bimbo Food Bakeries Distribution, Inc.*, 697 F.Supp.2d 801, 805–06 (N.D.Ohio 2010) (applying contractual choice-of-law provision to both tort and contract claims related to the contract); *Bohl v. Hauke*, 180 Ohio App.3d 526, 906 N.E.2d 450, 457 (2009) (recognizing that where a claim is sufficiently related to subject matter of the contract, the contractual forum-selection clause cannot be defeated simply by artfully pleading a claim not explicitly governed by the clause).

**\*196** Masco does not directly challenge the contention that its claims arise out of a contractual relationship reflected in the Sales Agreement, but contends the choice-of-law determination must be based on a proper understanding of the terms of the Sales Agreement. In connection with choice-of-law in particular, Masco argues that the preprinted standard terms choice-of-Michigan-law provision relied on by defendants was superseded by the terms and conditions of Masco's National Purchasing Agreement with Stiles, expressly made applicable by handwritten note on the face of the Sales Agreement. Citing *Love v. Beck Energy Corp.*, 2015 WL 1453338 at \*3 (Ohio Ct.App. 7 Dist.), Masco contends that handwritten terms prevail over typed or preprinted terms where there is a conflict between the two.

Yet, as the district court observed, there is no conflict between the two in regard to choice of law. The terms of the National Purchasing Agreement, incorporated by handwritten reference, originally included a choice-of-law clause providing that a "purchase order shall be construed and interpreted according to the laws of the state appearing in the Buyer's address on the face of [the] purchase order." R. 35–2 at 9, ¶ 24, Page ID 327. However, that provision had undisputedly been crossed out before the National Purchasing Agreement was finalized in 2001. *Id.* The district court therefore concluded that there was no conflict between the terms incorporated by handwritten reference in the Sales Agreement and the standard preprinted terms expressly made a part of the Sales Agreement. The court went on to hold that the parties' choice-of-law provision in the standard terms was unambiguous, uncontroverted and controlling.

In this conclusion, we find no error. Nothing in Masco's appellate arguments refutes the self-evident correctness of the ruling. Hence, although Masco's claims sound in tort, they clearly stem from the pre-existing contractual relationship that resulted in Masco's acquisition of the subject equipment. The claims are properly classified, under Ohio's choice-of-law rules, as arising out of the contract. It follows that the parties' justified expectations are best protected by enforcing their contractual choice-of-law provision. Michigan law governs.

### IV

[2] The district court then considered defendants' argument that under Michigan law, Masco's claims are time-barred pursuant to ¶ 11 of the standard terms in the Sales Agreement: "No suit may be brought by Buyer for any breach by Seller or any other claim arising out of this contract after two (2) years from the date of delivery of the goods covered." R. 37–5, Sales Agreement, Page ID 464. After summarizing the relevant standards under Michigan law, the district court held as follows:

The Stiles–CEFLA Terms and Conditions' contractual time limitation period provides that Buyer (Masco) had two years from the date of delivery of the goods to bring any cause of action regarding the goods governed by the contract. Similarly, the Stiles–Masco National Purchasing Agreement provides that Buyer (Masco) has one year from the date of delivery of the goods to bring any cause of action regarding the goods governed by the contract. Masco received the goods in 2004. Plaintiffs filed this suit on October 14, 2011, seven years after the delivery of the goods. This is well beyond either of the contractual periods.

Defendant CEFLA's Motion for Summary Judgment is granted on the basis that Plaintiff Masco's claims are time- **\*197** barred by the contractual limitations period.

R. 44, Opinion at 12, Page ID 765 (citations omitted).

Masco does not directly challenge this part of the district court's ruling, but rather insists the Cefla defendants have no right to assert the terms of the Sales Agreement because they are not parties to it.


**V**

The district court summarily held that the Cefla defendants were rendered parties to the agreement by virtue of the fact that the Cefla Standard Terms and Conditions of Sale are part of the agreement. Masco points out that the Sales Agreement was prepared by Stiles on a Stiles form and that it is signed only by Masco's Vice President of Manufacturing Operations, Don Cox. Since no representative of the Cefla defendants signed the Sales Agreement, Masco contends they have rights under the contract only if Stiles acted as their agent or if they can be deemed third party beneficiaries of the contract. As to the latter theory, Masco correctly contends that defendants have not even argued they are third party beneficiaries. As to the former, Masco insists the record is controverted and that there is a genuine dispute as to whether Stiles acted as the Cefla defendants' agent in finalizing the contract.

The contractual choice-of-law provision provides not only that enforcement of the contract shall be governed by Michigan law, but also that the contract shall be deemed to have been made in Michigan. Under Michigan law, a contract is formed upon offer and acceptance and a mutual assent or meeting of the minds on all essential terms. *Kloian v. Domino's Pizza L.L.C.,* 273 Mich.App. 449, 733 N.W.2d 766, 770 (2006). The "meeting of the minds" element is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind." *Id.* at 771 (quoting *Kamalnath v. Mercy Mem. Hosp. Corp.,* 194 Mich.App. 543, 487 N.W.2d 499, 503 (1992)).

The parties do not dispute that a contract was formed when Masco, by executing the Sales Agreement on January 27, 2004, accepted Cefla NA's offer, as set forth in its Proposal, prepared for Masco (through its Kraftmaid Cabinetry division) and dated January 26, 2004.[2] The essential elements the parties mutually assented to are set forth in great detail in the Proposal, including descriptions of more than thirty components, time of delivery and installation, price and terms of payment. Nor is there any hint of argument that any party did not perform its obligations under the contract—apart from Masco's claims that UV3 equipment defects caused the 2009 fire. The words in the Sales Agreement and Proposal make it

clear that Stiles, as Cefla NA's authorized sales agent, supervised the memorialization of Masco's acceptance of Cefla NA's offer, whereby a meeting of the minds was achieved: Cefla SC was obligated to fabricate the UV3 equipment components in Italy; Cefla NA was obligated to install them in Middlefield; and Masco was obligated to pay the purchase price on the agreed terms. The parties' subsequent "visible acts" in performance of their contractual obligations further demonstrate the meeting of the minds among the parties to the contract, namely: Masco, Cefla **\*198** NA and Cefla SC. Nothing in the Cefla NA Proposal, accepted by Masco in the Sales Agreement, expressly obligated Stiles to do anything.

But Masco argues that the document entitled "Sales Agreement," being a Stiles form, prepared by a Stiles employee, constitutes *the contract.* And under that contract, Masco argues, Stiles was the seller, not Cefla NA. Masco points out that no representative of Cefla NA or Cefla SC signed the Sales Agreement. Masco maintains that Stiles and Masco are the only two parties to the contract. In support of this understanding, Masco cites the affidavits of Cheryl Phillips, Masco's then Director of Corporate Purchasing; and Tom Anderson, Masco's then Director of Manufacturing Services. Both affiants attest to their understanding: (1) that the Sales Agreement was a contract between Masco and Stiles and that no Cefla entity was a party to the contract; (2) that the Sales Agreement was signed by Stiles' representative, Bob Langridge, not by any representative of the Cefla entities; (3) that the Sales Agreement was subject exclusively to the terms and conditions of the Masco–Stiles National Purchasing Agreement; (4) that the Cefla NA Standard Terms and Conditions made a part of the Sales Agreement were not actually intended to apply; and (5) that the Sales Agreement reference to the Cefla NA Proposal is significant only as a description of the machinery purchased from Stiles.

We are not persuaded. First, Phillips' and Anderson's subjective understandings are entitled to little weight. Under Michigan law, the elements of contract formation are "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind." *Kloian,* 733 N.W.2d at 771 (quoting *Kamalnath,* 487 N.W.2d at 503). As explained above, the words and actions of the parties, objectively viewed, evidence a meeting of the minds between Masco and Cefla NA.

Second, the Sales Agreement was not "signed" by Langridge on behalf of Stiles; rather, he is identified on the form as the one who prepared the form. Moreover, the presence of Langridge's name on the form is entirely

consistent with the Proposal's identification of him as a Stiles employee who served as Cefla NA's Sales Representative. It is also consistent with the Agency Agreement, which defines the principal-agent relationship between Cefla NA and Stiles and designates Stiles as "Authorized Agent of Cefla [NA] for the sale of Cefla Products in the United States." R. 38–2, Agency Agreement at 3, Page ID 598. Indeed, Cefla NA's position on the limited nature of Stiles' role in the transaction finds support in correspondence from Stiles' General Counsel, Michael Callahan, to the Cefla entities in December 2002:

> In the process of actively promoting Cefla products, Stiles has come across certain customers that are not as familiar with [Cefla NA] as they are with Stiles and these customers are not comfortable entering into any agreement with [Cefla NA]. Consequently, in order to keep the transaction alive, Stiles will present the customer with a Stiles Sales Agreement which the customer is willing to sign, and then Stiles submits the signed Sales Agreement to [Cefla NA] for fulfillment.

R. 37–4, Laghi Aff. at 5, Page ID 428. This correspondence at once explains why the Masco purchase order was communicated on a Stiles form; undercuts Masco's argument about the form's significance; and supports the conclusion that Stiles acted **\*199** as Cefla NA's agent in the transaction.[3]

Third, Masco's argument that the Cefla standard terms were not intended to be part of the contract is belied by the fact the Sales Agreement physically includes the Cefla NA standard terms *and* refers to the terms of the Masco–Stiles National Purchasing Agreement, side-by-side. The Sales Agreement includes no indication that the Cefla NA terms do not apply. That is, the Cefla NA terms were not crossed out or modified in any way, although other preprinted terms on the form (i.e., terms of payment) were crossed out.

Fourth, the notion that the Masco–Stiles National Purchasing Agreement controls (i.e., an agreement between Masco and Stiles, incorporated in the Sales Agreement only by handwritten reference) might have merit if Masco were proceeding against Stiles in connection with Stiles' role in the contract, but it's not.

Rather, Masco is proceeding against Cefla NA, a party whose role in the contract is expressly set forth in its Proposal and expressly governed by other standard terms and conditions that are not only referenced, but physically attached to the Sales Agreement.

Finally, in light of all the above, the assertion that the Sales Agreement's express reference to Cefla NA's Proposal does not evidence Masco's acceptance of the Proposal—prepared in great detail specifically for Masco—but represents simply a shorthand description of machinery to be purchased from Stiles—rendering Cefla NA a stranger to the contract—is simply not plausible. The notion that Cefla NA is not a party to the contract, despite the role played by Cefla NA's Proposal and despite the physical inclusion of Cefla's standard terms in the Sales Agreement, is further belied by the parties' subsequent conduct in performance of the contract. Stiles did not design, manufacture, own, sell and install the equipment; Cefla NA and Cefla SC did.

## VI

[3] Masco insists, however, that there is at least a question of fact regarding the district court's implicit conclusion that Stiles acted as Cefla NA's agent and that Stiles' principal was therefore bound by and entitled to enforce the contract. This question of fact, Masco contends, should have precluded summary judgment.

Under Michigan law, which also governs construction of the Agency Agreement between Cefla NA and Stiles, "a principal is bound by an agent's actions within the agent's actual or apparent authority." *James v. Alberts,* 464 Mich. 12, 626 N.W.2d 158, 160 (2001). "A duly authorized agent has the power to act and bind the principal to the same extent as if the principal acted." *In re Estate of Capuzzi,* 470 Mich. 399, 684 N.W.2d 677, 679 (2004). "An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Mais v. Allianz Life Ins. Co. of N. Am.,* 34 F.Supp.3d 754, 761–62 (W.D.Mich.2014) (quoting *Meretta v. Peach,* 195 Mich.App. 695, 491 N.W.2d 278, 280 (1992)). "The **\*200** test of whether an agency has been created is whether the principal has a right to control the actions of the agent." *Id.* (quoting *Meretta,* 491 N.W.2d at 280). The existence of an agency relationship generally presents a question of fact, unless the material facts are not disputed. *Vargo v. Sauer,* 457 Mich. 49, 576 N.W.2d 656, 666 (1998).

Masco points to language in the Cefla NA–Stiles Agency

Agreement itself as demonstrating that no agency relationship existed:

> This Agreement shall not constitute Agent the legal representative of Principal for any purpose whatsoever, nor shall Agent hold itself out as such. Agent has the status of an independent entrepreneur, and is granted no right or authority to assume or create any obligation or liability for or on behalf of Principal or to otherwise bind Principal or to use Principal's name other than as may be expressly authorized by Principal or permitted by Paragraph 4 above.

R. 38–2, Agency Agreement at 5, ¶ 9, Page ID 600. Masco's reading is contrived. In a ten-page document appointing Stiles "Agent" of Cefla NA, "Principal," and defining the authority granted Stiles as Agent, this paragraph merely makes clear that Stiles was not Cefla NA's "legal representative" and had no right or authority other than those expressly granted. Stiles' actions in facilitating execution of the Sales Agreement were within the bounds of the authority expressly granted under paragraph 4 of the Agency Agreement. Paragraph 9 of the Agency Agreement does not undermine the conclusion that an agency relationship existed and that Stiles acted within its authority as Cefla NA's agent.

Masco also points to several items evidencing Stiles' involvement in pre-contract negotiations, and as well as its post-contract invoicing of amounts payable by Masco. These actions, too, are not inconsistent with authority undisputedly granted Stiles under the Agency Agreement. While Stiles' actions promoting, facilitating, and supporting the sale of the UV3 equipment may have contributed to subjective misunderstanding of Stiles' role in the transaction, they do not undermine the well-supported conclusion that Stiles was in fact acting within its authority as Cefla NA's agent. Masco's argument that a genuine fact issue is presented is supported by no more than a mere scintilla of evidence, which is insufficient to undermine the summary judgment ruling.

## VII

Finally, Masco contends the district court's ruling failed to properly distinguish between the two Cefla defendants.

Indeed, whereas much of the above analysis upholding the summary judgment ruling applies to Cefla NA, Cefla SC is a separate corporation. Cefla SC's role as manufacturer of the subject equipment was integral to performance of the contract, but its role was distinct.

This issue was first raised below only after the district court had granted the Cefla defendants' motion for summary judgment by way of a motion for relief from judgment under Fed.R.Civ.P. 60(b)(1). Masco argued that the district court made a mistake of law and fact by treating both Cefla entities as essentially one and the same. Whereas the materials relied on to justify Cefla NA's right to enforce the contractual time-bar—i.e., the Cefla Standard Terms and Conditions of Sale, the Proposal, and the Agency Agreement—all refer to Cefla NA, none of them refers to Cefla NA's parent corporation, Cefla SC. The district court denied relief, noting that Masco had not made the distinction in its summary judgment briefing, **\*201** but had itself "repeatedly referred to both entities interchangeably." R. 55, Opinion at 3, Page ID 823. The court also took note of allegations in Masco's amended complaint, recognizing that Cefla SC and Cefla NA were parent and wholly-owned subsidiary, who together visited Masco's Middlefield plant in negotiating the contract and who together designed and manufactured the UV3 system. Further, the court noted that the collaborative relationship between the Cefla entities in negotiating and performing the contract is made manifest in Sales Agreement and Proposal references to shipment of the equipment from Italy, where Cefla SC was located and where the actual manufacture of the equipment would be accomplished.

[4] We note first that Masco's challenge to the denial of relief from judgment is not properly before us. Masco filed its notice of appeal challenging the summary judgment ruling before the Rule 60(b)(1) ruling was made and never filed an amended notice of appeal specifically challenging the latter ruling. *See* Fed. R.App. P. 4(a)(4). But even if it were properly before us, we would find the claim to be without merit, for the reasons that follow.

[5] The court's denial of relief under Rule 60(b)(1) is reviewed for abuse of discretion. *Tyler v. Anderson,* 749 F.3d 499, 509 (6th Cir.2014). Rule 60(b) relief is not designed to "allow a defeated litigant a second chance to convince the court to rule in his or her favor by presenting new explanations, legal theories, or proof." *Id.* The district court's discretion in addressing such a motion is "especially broad" and our review is "limited and deferential." *Id.*

Michigan law generally presumes that parent and

subsidiary companies are distinct entities. *Seasword v. Hilti, Inc.,* 449 Mich. 542, 537 N.W.2d 221, 224 (1995). In determining whether separate corporate existence should be disregarded in relation to contractual responsibilities—because the subsidiary acted as "mere instrumentality or adjunct" of the parent—"each case is sui generis and must be decided in accordance with its own underlying facts." *Herman v. Mobile Homes Corp.,* 317 Mich. 233, 26 N.W.2d 757, 761 (1947).

Under these standards, Masco falls far short of showing an abuse of discretion. For all the reasons explained by the district court, it is apparent, under the unique circumstances of this case, that the Cefla entities operated in tandem with each other to negotiate and perform obligations under the contract. Both are properly deemed bound under the terms of the contract and we see no reason to disturb the conclusion that both Cefla defendants are equally entitled to summary judgment on Masco's claims against them.

## VIII

Accordingly, the judgment of the district court is **AFFIRMED.**

HELENE N. WHITE, Circuit Judge, dissenting.

I respectfully dissent from the majority's conclusion that Masco's tort claims against the Cefla companies (Cefla) are barred by printed terms attached to the Sales Agreement between Masco and Stiles.[1] The record clearly establishes that those printed terms are not part of Masco's contract with Stiles and that Masco had no contract with Cefla. Further, if the handwritten term adopting Masco's **\*202** terms and conditions is not recognized as superseding the printed terms and conditions on which Cefla relies, there is clearly at least a question of fact whether Masco agreed with either Stiles or Cefla that Cefla's printed terms would apply, thus precluding summary judgment. I would reverse and remand.

Masco's parent company, Masco Corporation, entered into a National Purchasing Agreement (NPA) with Stiles in 2001, setting forth standard terms and conditions for all orders submitted to Stiles by Masco Corporation and its subsidiaries, including Masco. Masco and Stiles renewed

the NPA for calendar year 2004, during which the sale at issue took place. On January 26, 2004, Cefla sent Masco a proposal for the sale of the UV3 roll-coat system. In the twenty-one page proposal, Cefla detailed the equipment's custom specifications and offered to sell the UV3 equipment to Masco for $2,832,819. Bob Langridge, a Stiles employee, is identified as the sale representative on the first page of the proposal. The last page of the proposal states that the equipment is "offered subject to [Cefla's] General Conditions of Sale". R. 37–5, Proposal, PID 485. The day after Cefla sent the proposal, Langridge prepared a separate document on Stiles letterhead for the sale of the equipment to Masco by Stiles. This Sales Agreement describes the equipment, offers a discounted price of $2,600,000, shipping terms, and, although Stiles's "Standard Terms and Conditions of Sale" are printed on the reverse side of the Sales Agreement and a second sheet containing Cefla's "Standard Terms and Conditions of Sale" is also attached, the front page of the agreement states in handwriting: "Masco terms and conditions apply according to current National Purchasing Agreement with Stiles Machinery." R. 37–5, Sales Agreement, PID 462. Masco's Vice President of Manufacturing Operations Don Cox signed the Sales Agreement on January 27, 2014. Three days later, Stiles sent Masco an invoice for $2,600,000. Consistent with the NPA, the invoice identifies the Sales Agreement as an order from Masco to Stiles.

The majority views Cefla's proposal as an offer and the Sales Agreement as an acceptance. Maj. Op. at 197–98. I find no basis for this construct.[2] First, Masco made no promise to Cefla. *See Williams v. Ormsby,* 131 Ohio St.3d 427, 966 N.E.2d 255, 258 (2012) (defining a contract as a promise or set of promises actionable upon breach).[3] Rather, Masco accepted the **\*203** Sales Agreement proffered by Stiles, which contained different terms, including a discounted price and the adoption of the terms and conditions of the NPA. Under this agreement, Masco promised to pay Stiles for the UV3 equipment, and Stiles promised to provide it at the agreed price according to the terms and conditions of the NPA and the specifications referenced in the proposal. Masco made no promises to Cefla and there was no "manifestation of mutual assent" to Cefla's printed language. *Lake Land Emp't Grp. of Akron, LLC v. Columber,* 101 Ohio St.3d 242, 804 N.E.2d 27, 31 (2004). Even if the Masco–Stiles Sales Agreement is reimagined as a legal act in relation to Cefla rather than Stiles, Masco's signing the Sales Agreement can only be viewed as a counteroffer proposing altered terms, including a discounted price and the handwritten provision that the NPA's terms apply. There is simply no basis to conclude that the Sales Agreement constitutes Masco's acceptance of Cefla's proposal with its standard

terms and conditions.

Without doubt, Cefla was intimately involved in the transaction through its design and manufacture of the UV3 line for Masco. But it does not follow that Cefla is a party to the Sales Agreement or that its printed terms are part of that contract. In 2002, Stiles sent a letter to Cefla explaining that Stiles had "come across certain customers that are not as familiar with [Cefla] as they are with Stiles and ... are not comfortable entering into any agreement with [Cefla]." R. 37–6, Callahan Letter, PID 492. In order to "keep the transaction alive," Stiles would "present the customer with a Stiles Sales Agreement which the customer is willing to sign and then Stiles [would] submit [ ] the signed Sales Agreement to [Cefla] for fulfillment." *Id.* The letter makes clear that Stiles proposed to contract directly with end customers and shoulder the responsibility for procuring fulfillment by the Cefla companies. In line with this understanding of Stiles's role, Masco and Stiles entered into a contract obligating Stiles to sell, and Masco to buy, a Cefla designed and manufactured UV3 line using the NPA negotiated between Stiles and Masco.

The majority is persuaded that Cefla is in privity with Masco in part because the Cefla equipment is described in the Stiles Sales Agreement by reference to Cefla's proposal. Maj. Op. at 199. Under the heading "Machinery Description," the Sales Agreement states, "Cefla Group Roll Coat System (UV3) (Reference Cefla Drawing No. CE04–0133–14) as per proposal # CE–3227C dated January 26th, 2004." R. 37–5, Sales Agreement, PID 462. Masco asserts, consistent with the NPA, that this language is only a reference to the equipment's technical specifications, not an acceptance of Cefla's proposal. The majority rejects this argument as "not plausible." Maj. Op. at 199. I disagree. Not only is the argument plausible, it is persuasively supported by the terms of the NPA expressly incorporated into the Sales Agreement. The NPA provides:

> This purchase order is Buyer's offer limited to the specific terms and conditions of this offer and does not constitute an acceptance by Buyer of any offer to sell or quotation of Seller. Any reference to Seller's offer to sell or quotation is solely for the purpose of incorporating the description and specifications of the goods and services covered hereby to the extent **\*204** that such description and specifications do not conflict with the description and specifications on the face of this purchase order.

R. 35–2, NPA, PID 321. Masco's position is consistent with the bargained-for terms that exclusively govern its long-term purchasing arrangement with Stiles.

Lastly, the majority concludes that Cefla is a party to the Sales Agreement because Stiles was acting as its agent. But concepts of agency and privity are simply red herrings; whoever the parties to the Sales Agreement may be, the contract terms control. Here, even accepting the fiction that Cefla is somehow a party to the Sales Agreement between Stiles and Masco, that contract does not include the printed terms on which Cefla relies because the NPA supersedes the printed form. The majority's conclusion that the Cefla terms attached to the Stiles Sales Agreement are part of the contract between Masco and Stiles and further evidence that Cefla is party to the contract is unfounded. *See* Maj. Op. at 196, 199. Basic contract law instructs that the NPA terms control. Taking the Sales Agreement as including the front page with the specifics of the agreement and handwritten entries, together with Stiles's printed terms and conditions on the reverse side and the attached printed sheet containing Cefla's terms and conditions, the Sales Agreement purports to incorporate three sets of terms and conditions. First, there is a handwritten note that provides, "Masco terms and conditions apply according to current national purchasing agreement with Stiles Machinery." R. 37–5, Sales Agreement, PID 462. Second, there is a printed statement that provides, "Your order is subject to the terms and conditions on the reverse side"—namely, the Stiles terms. *Id.* And third, there is Cefla's printed terms.[4] The two relevant sets of terms—the NPA terms and the Cefla terms[5]—conflict. Each set of terms purports to exclude the other terms in their entirety. The NPA provides, "Seller's standard terms and conditions of sale, whether communicated in writing, electronically, or by any other media, shall have no force or effect," and "[a]ny terms or conditions proposed in Seller's acceptance of this offer which add to, vary from or conflict with any of the terms or conditions of this purchase order are deemed to be material and are hereby objected to and rejected." R. 35–2, NPA, PID 319, 321. On the other hand, Cefla's standard terms and conditions provide that Masco's "acceptance of any part of the goods sold hereunder, any payment by Buyer for such goods, or any other form of acceptance by Buyer, shall constitute Buyer's acceptance of all terms and conditions herein," and Cefla "objects to any terms and conditions proposed by Buyer which vary the terms hereof." R. 37–5, Sales Agreement, PID 464. Thus, there is a conflict on the face of the Sales

Agreement between the handwritten provision that Masco's terms apply and the printed language that Cefla's terms apply.

Applying Ohio rules of contract construction, which reflect the most basic contract principles, the Masco terms prevail over the Cefla terms. "When there is a conflict between any of the preprinted provisions of a contract and those inserted in handwriting at the time the contract is executed, the handwritten terms will control." **205** 18 Ohio Jur.3d Contracts § 135; *see also Farmers' Nat'l Bank v. Del. Ins. Co.,* 83 Ohio St. 309, 94 N.E. 834, 834 (1911) ("Where there is a conflict between any of the printed provisions of a contract and those inserted in writing at the time the contract is executed, the latter will control."); *Love v. Beck Energy Corp.,* No. 14 NO 415, 2015 WL 1453338, at *3 (Ohio Ct.App. Mar. 31, 2015) ("In looking at the four corners of a contract there is a rule of construction that provides handwritten prevails over typed or preprinted terms when there is a conflict between the two."). Here, the terms and conditions of the Masco–Stiles NPA were expressly incorporated in handwriting, thus negating Cefla's conflicting preprinted terms.

Further, "[w]hen confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261 (2003); *see also Skinner v. Guar. Trust Life Ins. Co.,* 813 F.Supp.2d 865, 869 (S.D.Ohio 2011). "The court examines the contract as a whole and presumes that the intent of the parties is reflected in the language used in the agreement." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Utils. Comm'n,* 129 Ohio St.3d 485, 954 N.E.2d 104, 110 (2011). Here, the handwritten provision

and the entire course of dealing between Masco and Stiles make clear that the contracting parties intended to supersede the printed terms with the terms of the NPA, and the NPA makes clear that Masco's purchasing relationship with Stiles is premised on the bargained-for, exclusive terms of that agreement.[6]

The district court determined Masco's claims would be barred under either the Cefla terms or the NPA terms, R. 44, Opinion and Order, PID 763–64, and the majority accepts this analysis, Maj. Op. at 196–97. It is indeed true that the liability-limiting language of both documents would bar this tort action if either applies to Cefla. However, for the reasons discussed, regardless what the Cefla terms say, they are not part of the contract. And, the NPA does not assist Cefla because there is no provision in the NPA limiting Cefla's liability. The NPA's limitation-of-liability provision by its terms applies only to Stiles.[7] Cefla could have required that Stiles procure Masco's agreement to the Cefla terms it now seeks to enforce, but it did not. Or, Cefla could have insisted that the NPA's limitation of Stiles's liability also apply to Cefla, but it failed to do this as well. Thus, even if Cefla is deemed a party to the Sales Agreement, or if Stiles is seen as Cefla's **206** agent, the contract simply does not bar Masco's tort claims against Cefla.

I would reverse the grant of summary judgment to Cefla and remand for further proceedings.[8]

**All Citations**

637 Fed.Appx. 192

Footnotes

1       Cefla North America was known as Cefla Finishing America, Inc., at the time of the sale and is successor in interest for all purposes related to this litigation. Hence, all record references to Cefla Finishing America are treated herein as referring to Cefla NA.

2       Our dissenting colleague takes issue with this statement, but there simply is no dispute that Masco's execution of the Sales Agreement gave rise to a contract. What is in dispute in this litigation is *who* the parties to the contract are.

3       The dissent also views the Callahan letter as significant. Yet, whereas the letter describes Stiles' role—requiring Stiles to submit the signed Sales Agreement to Cefla for fulfillment—in a manner entirely consistent with the Proposal's identification of Stiles employee Robert Langridge as mere sales representative, the dissent inexplicably construes the same language as evidence that Stiles was actually the owner and seller of the equipment—i.e., equipment that had not even been fabricated yet. The dissent's proposed construction of the Callahan letter, like Masco's purported subjective understanding of the Sales Agreement, is contradicted by the actual facts, i.e., the visible acts surrounding formation of the contract and its subsequent performance.

1       The companies' current names are used for clarity. The parties do not dispute that Cefla and Masco are the respective successors of Cefla Finishing America, Inc. and KraftMaid Cabinetry, Inc., the relevant corporate entities in 2004.

2    Contrary to the majority's assertion, Masco does not concede "that a contract was formed when Masco, by executing the Sales Agreement on January 27, 2004, accepted Cefla NA's offer, as set forth in its Proposal," or that "the essential elements the parties mutually assented to are set forth in great detail in the proposal." Maj. Op. at 197. Masco argues that "[t]he only agreement for the purchase of the UV3 production line was the Masco–Stiles Sales Agreement, which was indisputably a contract solely between Masco and Stiles Machinery." Masco Br. at 11.

3    Federal courts sitting in diversity apply the law of the forum state to determine whether there is a valid choice-of-law provision. *See Performance Contracting Inc. v. DynaSteel Corp.,* 750 F.3d 608, 616 (6th Cir.2014) (upholding a choice-of-law provision under the law of the forum); *Langley v. Prudential Mortg. Capital Co., LLC,* 546 F.3d 365, 368 (6th Cir.2008) (holding that the law of the forum applies to the determination whether there is a valid contract with a forum-selection clause); *Wallace Hardware Co., Inc. v. Abrams,* 223 F.3d 382, 391 (6th Cir.2000) (applying the law of the forum to determine whether a choice-of-law provision governs). If there is no contract, there can be no contractual choice of law. The majority puts the cart before the horse by first deciding that Michigan law governs under a contractual choice-of-law provision, then applying Michigan law to determine whether there is a contract. *See* Maj. Op. at 196–97. Cefla does not contest that Ohio law governs this initial question of contract formation. *See* Cefla Br. at 11 ("Ohio law governs the interpretation of the Parties' contract because this case was filed in federal court in Ohio."). In any event, the choice of law is not determinative in this case.

4    Although "reverse side" implies only one page of terms, the parties appear to agree that the printed statement refers to both of the additional pages. *See, e.g.,* R. 37–5, Anderson Dep., PID 447 (describing the Sales Agreement as a three-page document including both the Stiles terms and the Cefla terms).

5    Tellingly, no one argues that Stiles's printed terms and conditions apply.

6    Applying Michigan law would yield the same result. *See, e.g.,* 5A Mich. Civ. Jur. Contracts § 149 ("The intention of the parties, as expressed in their contracts, is to govern in the construction of the contracts."); *id.* § 163 ("The written portion of a contract, if inconsistent with any part of the printed form, must govern and control.").

7    The NPA has an attached Warranty Statement that refers to Stiles's warranties, obligations, and liability. It limits Stiles's warranty to claims of which it receives notice no later than one year following delivery and further provides:
> IN NO EVENT SHALL **STILES** BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, WAHTSOEVER, [*sic* ] (INCLUDING, WITHOUT LIMITATION, PERSONAL INJURY, PROPERTY DAMAGE, LOST PROFITS OR OTHER ECONOMIC INJURY) EVEN IF STILES HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. **STILES** SHALL HAVE NO LIABILITY TO THE PRUCHASER [*sic* ] UNDER TORT THEORIES FOR ANY ALLEGED DESIGN DEFECT OR FOR ANY ALLEGED FAILURE TO WARN.
> R. 35–2, NPA, PID 331 (emphasis added).

8    To be clear, I would hold only that this tort action against Cefla is not barred by the Cefla printed terms and conditions or the NPA, and do not express an opinion regarding any other legal impediments to Masco's recovering in tort against Cefla.

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

McIntosh v. Royal Caribbean Cruises, Ltd., Slip Copy (2018)

2018 WL 1732177
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

Nikki MCINTOSH, on her own behalf and on
behalf of all other similarly situated passengers
scheduled to have been aboard the M/V Liberty of
the Seas, Plaintiffs,
v.
ROYAL CARIBBEAN CRUISES, LTD., Defendant.

CASE NO.: 17-cv-23575-KING-TORRES
|
Signed 04/09/2018
|
Entered 04/10/2018

### Attorneys and Law Firms

Plaintiff's Counsel, Marc E. Weiner, Lipcon, Margulies, Alsina, Winkleman, P.A., One Biscayne Tower, 2 South Biscayne Boulevard, Suite 1776, Miami, FL 33131, (305) 373-3016, Email: mweiner@lipcon.com, ATTORNEY TO BE NOTICED, Michael A. Winkleman, Lipcon Margulies Alsina & Winkleman, One Biscayne Tower, Suite 1776, Miami, FL 33131, 305-373-3016, Fax: 305-373-6204 Email: mwinkleman@lipcon.com, ATTORNEY TO BE NOTICED.

Defendant's Counsel, Scott Daniel Ponce, Holland & Knight, 701 Brickell Avenue, Suite 3000, Miami, FL 33131, 305-789-7575, Fax: 305-789-7799 Email: sponce@hklaw.com, ATTORNEY TO BE NOTICED.

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

JAMES LAWRENCE KING, UNITED STATES DISTRICT JUDGE

**\*1 THIS MATTER** comes before the Court upon Defendant ROYAL CARIBBEAN CRUISES, LTD.'s ("Royal Caribbean") Motion to Dismiss Plaintiff's Amended Complaint (DE 26) ("the Motion"). The Court has additionally considered Plaintiff's Response in Opposition to Defendant's Motion to Dismiss the Amended Complaint (DE 27), and Defendant's Reply in Support of Motion to Dismiss Plaintiff's Amended Complaint (DE 28). For the reasons outlined below, Royal Caribbean's Motion is **GRANTED**.

Plaintiff's Amended Complaint and Demand for Jury Trial (the "Amended Complaint") alleges injuries suffered as a result of allegedly being put in harm's way while Texas was in a state of emergency due to Hurricane Harvey. Specifically, Plaintiff alleges claims for negligence (Count I) and negligent infliction of emotional distress (count II). Plaintiff seeks to maintain this lawsuit as a class action on behalf all other similarly situated passengers scheduled to have been aboard the M/V Liberty of the Seas.

### I. LEGAL STANDARD

Rule 8 requires that a complaint include a "short and plain statement" demonstrating that the claimant is entitled to relief. FED. R. CIV. P. 8. To survive a Rule 12(b)(6) motion, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). As a corollary, allegations absent supporting facts are not entitled to this presumption of veracity. *Id.* at 681. The enforceability of a procedural device, like a class action waiver, should be resolved at this stage of the litigation by way of a motion to dismiss. *See, e.g., Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1206); *see also Assiff v. Carnival Corp.*, 930 So. 2d 776 (Fla. Dist. Ct. App. 2006). At the March 2, 2017, hearing, Plaintiff agreed that this Court should rule on the class action waiver at the motion to dismiss stage.

### II. DISCUSSION

Defendant argues that Plaintiff cannot maintain this lawsuit as a class action due to the parties' class action waiver provision. With respect to the enforceability of the class action waiver, Plaintiff responds that the class action waiver is void as against public policy pursuant to 46 U.S.C. § 30509. Plaintiff also argues more generally that the class action waiver provision is unenforceable as unconscionable.[1]

McIntosh v. Royal Caribbean Cruises, Ltd., Slip Copy (2018)

### A. The class action waiver was reasonably communicated to Plaintiff.

**\*2** The Plaintiff concedes that general maritime law applies to cases, such as this one, alleging torts committed on navigable waters. "[I]t is well settled that the general maritime law of the United States, and not state law, controls the issue of whether a passenger is bound to terms set forth in a cruise ship's ticket and contract of passage." *Veverka v. Royal Caribbean Cruises, Ltd.*, 2015 WL 1270139, *5 (D.N.J. Mar. 18, 2015). Under general maritime law, a term or condition of a cruise ticket contract is enforceable once it is reasonably communicated to the passenger. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991). The test involves a two-pronged analysis of: (1) the physical characteristics of the clause in question; and (2) whether the plaintiff had the ability to become meaningfully informed of the contract terms. *Estate of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1244 (11th Cir. 2012).

Ms. Topow's affidavit conclusively establishes that the ticket contract and class action waiver were reasonably communicated to Plaintiff prior to the cruise's cancellation. (DE 26–1). Plaintiff does not argue otherwise, and it is well-established that parties can agree to class action waivers. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011); *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205 (11th Cir. 2011). Given the uncontroverted evidence, the class action waiver was reasonably communicated to Plaintiff and is, therefore, enforceable.

### B. The class action waiver does not violate 46 U.S.C. 30509.

Plaintiff contends that the class action waiver is tantamount to a limitation on Royal Caribbean's liability and is void as against public policy. Pursuant to 46 U.S.C. § 30509:

> The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting ... (A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner

or the owner's employees or agents; or (B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.... (2) Voidness.—A provision described in paragraph (1) is void.

46 U.S.C. § 30509(a). Under the Act, a contract provision that (a) limits the liability of the shipowner for personal injury or (b) limits the right of the passenger to a trial by a competent court is void. *Id.* The class action waiver does neither.

"Congress's concern in enacting [section] 30509(a) was the unilateral imposition of bargaining power by a ship owner to limit its liability for its negligent acts," and it intended to stop ship owners from limiting liability "without any recourse to judicial process." *Estate of Myhra*, 695 F.3d at 1242, 1243 (alteration added). There is "no authority" for the proposition that the statute was intended to prevent cruise ticket contract terms that still "allow[ ] for judicial resolution of claims" but may cause the passenger an "unreasonable hardship in asserting their rights." *Lankford v. Carnival Corp.*, 12-cv-24408-CMA [ECF No. 280] (S.D. Fla. July 25, 2014).

*Shute*, the seminal case on the enforceability of cruise ticket contracts and forum selection clauses contained therein, is instructive on the issues raised by the class action waiver. In *Shute*, the Supreme Court held that a forum selection clause in a pre-printed cruise ticket not subject to negotiation was enforceable. The Court held that enforcement of the forum selection clause did not violate the predecessor statute to section 30509 because "by its plain language, the forum-selection clause before us does not take away respondents' right to a trial by a court or competent jurisdiction and thereby contravene the explicit proscription of" the statute. *Shute*, 499 U.S. at 596. "The fact the clause at issue in *Shute* was alleged to have 'caused[d] plaintiffs unreasonable hardship in asserting their rights' in part by requiring 'a plaintiff [to] travel to a distant forum in order to litigate' was not relevant given the plain language and legislative history of the statute." *Lankford v. Carnival Corp.*, 12-cv-24408-CMA [ECF No. 280, p. 8] (S.D. Fla. July 25, 2014) (quoting *Shute*, 499 U.S. at 596) (alterations in original) ).

### C. The class action waiver is not unconscionable.

**\*3** Plaintiff argues that the class action waiver is unenforceable as unconscionable. A court may refuse to

enforce a contract or term that is unconscionable at the time the contract is made. *Jerome v. Water Sports Adventure Rentals & Equipment, Inc.*, 2013 WL 692471, *8 (D.V.I. Feb. 26, 2013) (citing RESTATEMENT (SECOND) CONTRACTS § 208) ). "Unconscionability encompasses both procedural and substantive elements, and both must be proven to revoke a contract on that basis." *Id.* The party challenging the contract or contract term has the burden of establishing unconscionability. *Id.*

Here, the class action waiver is not procedurally or substantively unconscionable. Regarding the procedural unconscionability aspect of ticket contract formation, the Supreme Court has already rejected this argument. The *Shute* Court held that ticket contract provisions are enforceable so long as they are reasonably communicated to a passenger despite a passenger's claim that they lack equal bargaining power with the cruise line or that they did not negotiate the terms with the cruise line. *Shute*, 499 U.S. at 593 ("Common sense dictates that a ticket of this kind will be a form contract the terms of which are not subject to negotiation, and that an individual purchasing the ticket will not have bargaining parity with the cruise line."). Plaintiff's contention that the ticket contract is a "contract of adhesion" is not enough to find the ticket contract procedurally unconscionable. *Veverka*, 2015 WL 1270139 at *5. It is uncontroverted that Plaintiff had notice of the ticket contract terms, including the class action waiver as they were reasonably communicated to her.

The class action waiver is not substantively unconscionable. Class action waivers are enforceable outside the context of consumer arbitration. *Lankford*, 12-cv-24408-CMA; *Crusan v. Carnival Corp.*, 13-CV-20592-KMW; *see also Palmer v. Convergys Corp.*, 2012 WL 425256 (M.D. Ga. Feb. 9, 2012). The class action waiver does not affect Plaintiff's substantive right to bring a claim against Royal Caribbean and it does not limit Royal Caribbean's liability. *Id.*

The *Lankford* court also rejected the argument that class action waivers are only enforceable where they contain attorney's fees provisions. The court noted that there was "no authority upon which the Court would come to [the] conclusion" that "the class action waiver at issue is void for failure to include an attorney's fees provision." *Lankford*, 12-cv-24408-CMA [ECF No. 280, p. 11]. Cases, such as *Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007), invalidated class action waivers under state law (Georgia in that case), but this case is governed by general maritime law, which does not have any similar attorney's fees requirement.

In sum, the class action waiver is enforceable and is not unconscionable.

### III. CONCLUSION

Accordingly, it is **ORDERED, ADJUDGED,** and **DECREED** that Defendant ROYAL CARIBBEAN CRUISES LTD.'s Motion to Dismiss Plaintiff's Amended Complaint **(DE 26)** be, and the same is, hereby **GRANTED**. Should she elect to do so, Plaintiff may file a First Amended Complaint within **twenty (20) days** of the date of this Order. The First Amended Complaint shall set forth claims only in Plaintiff's individual capacity and shall not contain class action allegations.

**DONE AND ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 9th day of April, 2018.

### All Citations

Slip Copy, 2018 WL 1732177

Footnotes

1    The Plaintiff also contends that given that the Plaintiff(s) "never even boarded the ship ... the ticket contract, which includes the class action waiver, was never consummated and/or performed. Consequently, pursuant to the most basic principles of contractual interpretation, there is no valid contract between the parties." Pl.'s Resp. at 2. The Plaintiff does not support this position with any legal authority. Moreover, whether the Plaintiff boarded the ship or not is irrelevant to this determination. The class action waiver is not limited to claims occurring after a passenger boards the ship.

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

McIntosh v. Royal Caribbean Cruises, Ltd., Slip Copy (2018)

McKissic v. Country Coach, Inc., Not Reported in F.Supp.2d (2008)

66 UCC Rep.Serv.2d 388

2008 WL 2782678
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Allen and Evelyn McKISSIC, Plaintiffs,
v.
COUNTRY COACH, INC., and Lazy Days RV
Center, Inc., Defendants.

No. 8:07-cv-1488-T-17EAJ.
|
July 16, 2008.

**Attorneys and Law Firms**

Allen McKissic, pro se.

Evelyn McKissic, pro se.

Brian Dewitt Shank, Richard Alan Solomon, W. Scott
Powell, Powell & Pearson, LLP, Winter Park, FL, for
Defendants.

### *ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION*

ELIZABETH A. KOVACHEVICH, District Judge.

**\*1** This cause comes before the Court on Defendant, Lazy
Days' Motion for Reconsideration of this Court's March
3, 2008 Order (Dkt.47) and Plaintiffs' response thereto
(Dkt.51). For the reasons set forth below, Defendant's
Motion is GRANTED in part and DENIED in part and the
Court's previous Order (Dkt.47) is AMENDED.

### BACKGROUND

A factual account of this matter is detailed in this Court's
Order denying Defendants' Motion to Dismiss. Those
facts are re-adopted and accepted as true for the purpose
of resolving this pending motion. For the benefit of the
reader, pertinent facts are summarized as follows:

Plaintiffs contracted to purchase a used 2002 Country
Coach ("Manufacturer") recreational vehicle from Lazy
Days R.V. Center ("Dealer"). Plaintiffs' complaint
contains the following claims relevant to this Motion for
Reconsideration: Breach of Implied Warranties under the
UCC (Count I); Breach of Express Warranties under the
UCC (Count II); Breach of Express Warranties under
Magnuson-Moss (Count III); Breach of Implied
Warranties under Magnuson-Moss (Count IV);
Revocation of Acceptance (Count V); and Deceptive and
Unfair Trade Practices by Dealer (Count VI). Plaintiffs
allege that Lazy Days has breached both express and
implied warranties. Lazy Days claims that such warranties
were not provided to Plaintiffs and that same were
effectively disclaimed in the terms of the agreement.

The front page of the Buyer's Order contains three
clauses that make reference to additional terms found on
the back side of the agreement. Lazy Days alleges that
these terms, on the back side of the agreement, should be
considered part of the agreement and that they validly and
conspicuously waive liability for breach of both express
and implied warranties as well as revocation of
acceptance. These reference clauses are found in fine
print (1) below Buyer's contact information, (2) below the
price of the unit, and (3) above buyer's signature. The
clear intent of these clauses is to bind purchasers to the
additional terms on the back of the agreement.

The back page of Buyer's Order contains three paragraphs
that are relevant to the issue before the Court. The first,
paragraph 9, states and appears as:

> *EXCLUSIONS OF WARRANTIES. I UNDERSTAND
> THAT THE IMPLIED WARRANTIES OF
> MERCHANTABILITY AND FITNESS FOR A
> PARTICULAR PURPOSE AND ALL OTHER
> WARRANTIES. EXPRESS OR IMPLIED, ARE
> EXCLUDED BY YOU FROM THIS TRANSACTION
> AND SHALL NOT APPLY TO THE GOODS SOLD. I
> UNDERSTAND THAT THERE ARE NO WARRANTIES
> WHICH EXTEND BEYOND THE DESCRIPTION ON
> THE FACE HEREOF REGARDING THE UNIT OR
> ANY APPLIANCE OR COMPONENT WHICH IS A
> PART OF THE UNIT OR THIS SALE.*

Paragraph 11 states and appears as:

> *MANUFACTURERS WARRANTIES, MECHANICAL
> PROBLEMS MAY ARISE WITH ANY VEHICLE, I
> UNDERSTAND THAT THERE MAY BE WRITTEN
> WARRANTIES COVERING THE UNIT PURCHASED,
> OR ANY APPLIANCE(S) OR THE COMPONENT(S),
> SUCH AS THOSE WHICH HAVE BEEN PROVIDED
> BY THE MANUFACTURERS OF THE UNIT, THE
> APPLIANCE(S) OR THE COMPONENTS. I*

*UNDERSTAND THAT THE WARRANTY OR WARRANTIES I RECEIVED AT THE TIME OF SALE ARE MY EXCLUSIVE AND SOLE REMEDY FOR ANY PROBLEMS THAT I MIGHT HAVE WITH THE UNIT OR ANY APPLIANCES OR COMPONENTS. I AGREE THAT NO OTHER REMEDIES ARE AVAILABLE TO ME. INCLUDING BUT NOT LIMITED TO, REVOCATION OF ACCEPTANCE AND RESCISSION.*

**\*2** Paragraph 14 states and appears as:

> NO SPECIAL DAMAGES. I understand that you will not be liable for incidental, consequential or special damages, including loss of use, resulting from or arising in any way out of this transaction or the purchase, use, servicing, operation or ownership of the goods conveyed by this agreement.

Lazy Days further alleges that the claim for Deceptive and Unfair Trade Practices should be dismissed, because it is time-barred by the applicable statute of limitations.

On August 21, 2007, Plaintiffs filed their complaint. (Dkt.2). Defendant, Lazy Days, filed its Motion to Dismiss on October 8, 2007, (Dkt.12), and Plaintiffs filed their Memorandum in Opposition of Defendant's Motion to Dismiss on October 17, 2007, (Dkt.14). This Court issued its Order on Defendant, Lazy Days', Motion to Dismiss on March 3, 3008. (Dkt.47). The Court Denied Defendant's Motion To Dismiss as to Counts I, II, III, IV, V, and IV. The Defendant, Lazy Days, now urges this Court to reconsider their respective motion. (Dkt.48). In response to Defendant's Motion for Reconsideration, Plaintiffs filed a response on March 13, 2008, maintaining that this Court uphold its previous Order and making a request for attorneys' fees. (Dkt.51).

## STANDARD OF REVIEW

There are three identifiable bases for reconsidering an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. This case would come under the third-prong. *See Lamar Adver. Of Mobile, Inc. v. City of Lankeland,* 189 F.R.D. 480, 489 (M.D.Fla.1999)). The proper standard of review is explained in *Prudential Securities, Inc. v. Emerson,* 919 F.Supp. 415, 417 (M.D.Fla.1996). This Court will not

amend a prior decision without a showing of "clear and obvious error where the 'interests of justice' demand correction." *Id.* at 417 (quoting *American Home Assurance Co. v. Glenn Estess & Assoc.,* 763 F.2d 1237, 1239 (11th Cir.1985)). Only in extraordinary circumstances that justify expending the scant resources of the Court will a motion for reconsideration be granted. *See Pennsylvania Ins. Guar. Ass'n v. Trabosh,* 812 F.Supp. 522, 524 (E.D.Pa.1992). The reconsideration of a previous order is an "extraordinary remedy" and "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Ludwig v. Liberty Mutual Fire Ins. Co.,* 2005 WL 1053691 (citing *Lamar,* 189 F.R.D. at 489 (M.D.Fla.1999)).

## DISCUSSION

Defendant asks this Court to reconsider and reverse its March 3, 2008 Order, which found that the warranty and remedy exclusions were invalid because they were printed on the reverse side of its contractual "Buyer's Order" with Plaintiffs. In its previous Order, this Court relied on the inapposite Indiana case of *Miley v. Fleetwood,* 381 F.Supp.2d 839 (S.D.Ind.2005) as guidance in reaching its decision. The *Miley* court held that the defendants violated the Magnuson-Moss Warranty Act when they wrongfully disclaimed incidental and consequential damages by having a warranty disclaimer that started on the first page but continued to the second page of the warranty. *Id.* at 840. Applying the *Miley* reasoning, this Court focused on whether the Defendant, Lazy Days, placed the waiver on the face of the warranty. Because the language in question was found on the back of the Buyer's Order, not the face of the document, it was held that a dismissal of the claims would be improper. The Court followed this principle in its analysis of Counts I, II, III, and IV.

**\*3** However, the Court now recognizes that in order to reach a proper decision, these claims are subject to more than a *Miley* analysis. The claims under the UCC (Counts I and II) must be analyzed separately from the claims under the Magnuson-Moss Act (Counts III and IV).

### Count I

First, the Court will reconsider its ruling on Count I, Breach of Implied Warranties under the UCC. Lazy Days argues that *Miley* has no application to the validity of the dealer's warranty and remedy exclusions in this case and that, instead, they are controlled by Florida's Uniform

Commercial Code, Florida Statute Section 672.316(2) and (4), which state:

> (2) ... to exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in case of a writing must be conspicuous ...

> (4) Remedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (ss. 672.718 and 672.719).

Plaintiffs make lengthy argument using the Magnuson-Moss Act and the *Miley* case. However, Plaintiffs do not present to this Court any argument as to their applicability to Counts I and II, which are made under the UCC, not the Magnuson-Moss Act. To the contrary, Plaintiffs recognize that in the case of *Ames v. Winnebago Indus. Inc.,* 2005 WL 2614614 (M.D.Fla.2005), where there was no Magnuson-Moss Warranty Act Claim, the seller was not subject to the federal statutory, regulatory, and case-law requirements of disclaimer presentation. In addition, Plaintiffs further accept that those standards, 15 U.S.C. § 2304 and the *Miley* case, were not applicable in *Ames*.

The Court agrees with Lazy Days in that the UCC and relevant state law controls these claims. The correct rule to apply is Florida Statute § 672.316. It was error of this Court to conduct the analysis for Counts I and II, in its previous order, under 15 U.S.C. § 2304, the Magnuson-Moss Warranty Act, and the *Miley* case. These provisions would apply to Counts III and IV, which are claims made under Magnuson-Moss. The Court must reconsider its previous Order as to Counts I and II by conducting its analysis using Florida Statute 672.316 and applicable sections of the UCC.

Florida Statute 672.316(2) specifically focuses on excluding or modifying the *implied* warranty of merchantability. Therefore, it is applicable to Count I of Plaintiff s complaint, Breach of Implied Warranties under the UCC. The issue turns on whether Defendant, Lazy Days, excluded or modified the implied warranty of merchantability in accordance with regulatory standards. The relevant portion of the statute (quoted above) requires that the language must be "conspicuous". "Conspicuous" is defined by Florida Statute 671.201(10):

> (10) "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against whom it is to operate ought to have noticed it. Whether a term is "conspicuous" is a decision for the court. Conspicuous terms include the

following:

**\*4** (a) A heading in capitals in a size equal to or larger than that of the surrounding text or in a type, font, or color in contrast to the surrounding text of the same or lesser size.

> (b) Language in the body of a record or display in type larger than that of the surrounding text; in a type, font, or color in contrast to the surrounding text of the same size; or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

It is Defendant's position that the location of the warranty disclaimers on the reverse page of Buyer's Order are conspicuous, as required by Florida Statute 672.316(2). To support its position, Defendant cites to several cases. This district, in more than one case, has previously held the same type of warranty provisions, such as those presented in the case at issue, to be "conspicuous". *Chmura v. Monaco Coach Corp.,* 2006 WL 709325 (M.D.Fla.2006), *Progressive Northern Ins. Co. v. Therm Technology Corp.,* 2007 WL 4557206 (M.D.Fla.2007), citing *Rudy's Glass Construction Co. v. E.F. Johnson Co.,* 404 So.2d 1087 (Fla. 3d DCA1981).

The facts of this case become extremely relevant here. As previously mentioned, the only references to the reverse page of the warranty were placed in fine print (1) below Buyer's contact information in the upper half of the order, (2) below the price of the unit, and (3) above buyer's signature. These three statements refer the purchaser to the reverse page, one of which is written in small capitalized letters. There appears to be no signature or initials on the reverse page of the warranty. On the reverse side of the agreement, the relevant warranty provisions are presented in all capital letters and underlined.

A disclaimer on the reverse page of a document, accompanied by a similar reference on the front page, is considered "conspicuous". *Progressive,* 2007 WL 4557206 at *6. Additionally, the fact that the disclaimers are on the back of the Buyer's Order does not make them inconspicuous, since the statement above the purchaser's signature is in all capital letters, alerting the purchaser that there are additional terms on the reverse side of the document. *Chmura,* 2006 WL 709325 at *3.

Here, one of the references to the reverse side of Buyer's Order was in all capital letters above Plaintiffs' signature. As they were in *Chmura,* the disclaimers here are conspicuous. Lazy Days has demonstrated that it has disclaimed all warranties, express and implied. As such,

McKissic v. Country Coach, Inc., Not Reported in F.Supp.2d (2008)

66 UCC Rep.Serv.2d 388

Lazy Days has shown that there is no basis for Plaintiffs to claim they are entitled to such warranties. Since the implied warranty of merchantability was properly excluded by Lazy Days, Plaintiff has not and cannot show a breach of a contractual obligation by Lazy Days. Accordingly, this Court rejects Plaintiffs' arguments on this issue and finds that Lazy Days has shown that Count I of Plaintiffs' complaint does not state a cause of action upon which relief may be granted.

### Count II

**\*5** Section (1) of Florida Statute 672.316 is applicable to Count II, Breach of Express Warranties under the UCC. It states as follows:

> (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever possible as consistent with each other; but, subject to the provisions of this chapter on parol or extrinsic evidence (s.672.202), negation or limitation is inoperative to the extent that such construction is unreasonable.

For the above stated reasons under Count I and because this Court finds that the construction of the clauses modifying and excluding the warranties (found on the back of Buyer's Order) are not unreasonable, Count II fails to state a cause of action upon which relief may be granted.

### Counts III and IV

Counts III and IV are both claims for breach of warranties under the Magnuson-Moss Warranty Act. 15 U.S.C.A. § 2304(a)(3) states:

> (3) such warranter may not exclude or limit consequential damages for breach of any written or implied warranty on such product, unless such exclusion or limitation conspicuously appears on the face of the warranty

16 C.F.R. § 701.1(1) defines "on the face of the warranty" as:

(I) On the face of the warranty means:

> (1) Where the warranty is a single sheet with printing on both sides of the sheet or where the warranty is comprised of more than one sheet, the page on which the warranty text begins;

> (2) Where the warranty is included as part of a larger document, such as a use and care manual, the page in such document on which the warranty text begins.

This Court, in its previous order, focused on whether the waiver of warranties was found on the "face" of the warranty. The page on which the warranty text begins is the face of the warranty, and since the alleged waivers do not appear on the front page, this Court found a dismissal of the claims to be improper, since Lazy Days did not effectively waive warranties.

In its Motion for Reconsideration, Lazy Days states that the Court incorrectly relied on *Miley,* 381 F.Supp.2d 839, in reaching its decision. It is Lazy Days' position that *Miley* is wholly inapposite here for numerous reasons. First, Lazy Days claims that *Miley* was a warranty lawsuit against the *manufacturer,* not a *dealer.* However, Lazy Days reaches this conclusion without citation to any authority. Lazy Days incorrectly assumes that because the *Miley* case involved a manufacturer that the Magnuson-Moss Act does not apply to sellers. The failure to include does not automatically warrant exclusion. The Court agrees with Plaintiffs' contentions that *Miley* applies to all warranties, whether manufacturers or sellers. Additionally, by implication, 16 C.F.R. § 701(1) and 15 U.S.C. § 2304(a)(3) of the Magnuson-Moss Warranty Act apply to both manufacturers and sellers. The Magnuson-Moss Warranty Act is applicable to all warranters, not just manufacturers. "The term 'warranter' means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty." 15 U.S.C. § 2301(5). Accordingly, Lazy Days fits the definition of "warranter".

**\*6** Moreover, Defendant contends that *Miley* only dealt with the validity of a remote manufacturer's *incidental and consequential damage* disclaimers in its warranty, not the validity of a selling dealer's *implied warranty and remedy exclusions* in a retail purchase contract. The Court finds this argument one without merit. The fact that *Miley* was discussing warranty "disclaimers", can be implied and understood to mean that the *Miley* court was speaking on the subject of implied warranties.

McKissic v. Country Coach, Inc., Not Reported in F.Supp.2d (2008)
66 UCC Rep.Serv.2d 388

This Court, in its previous Order, as well as the *Miley* case, did not make the distinction between "incidental" and "consequential" damages. This, however, is a critical point that must be analyzed further. 15 U.S.C. § 2304(3), in its plain language, refers to "consequential damages" in that they may not be excluded or limited unless such is on the face of the warranty. This section of the Code does not make mention of "incidental" damages. Therefore, only limitations as to "consequential" damages must appear on the face of the warranty to satisfy Magnuson-Moss. Uniform Commercial Code § 2-715 defines these different types of damages:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

> (2) Consequential damages resulting from the seller's breach include

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

> (b) injury to person or property proximately resulting from any breach of warranty.

The "consequential" damages provision on the reverse side of Buyer's Order are contained in paragraph 14, which begins with "NO SPECIAL DAMAGES". This is the clause that needed to appear on the face of Buyer's Order, Since 15 U.S.C. § 2304(a)(3) only mentions that "consequential" damages need be on the face, the additional provisions found in paragraphs 9 and 11, limiting incidental damages, are valid and enforceable, even though they are found on the reverse side of the Buyer's Order.

It then seems that Plaintiffs might be able to recover "consequential" or "special" damages since this exclusion was not on the face of the warranty as it should have been if they win this case. Even so, remedies under Magnuson-Moss, 15 U.S.C. § 2304, are applicable only to "full" warranties. *Lambert v. Monaco,* 2005 WL 1227485 (M.D.Fla.2005). The issue now turns on whether Lazy Days provided a "full" or "limited" warranty to Plaintiffs.

Section 2303, 15 U.S.C. § 2303(a), states that written

warranties shall be conspicuously designated as "full warranty" or "limited warranty". Nevertheless, Lazy Days did not make such a designation at the top of the reverse side of Buyer's Order. Therefore, the Court must consider the content to determine whether Lazy Days intended to provide a "full" or "limited" warranty to Plaintiffs. Since the incidental damage provisions found on the reverse side of Buyer's Order are deemed valid and enforceable, it can be concluded that such warranty was a "limited" warranty given to Plaintiffs. A "limited" warranty is not subject to § 2304 or the Magnuson-Moss Act's substantive remedies. *Id.* at \*4, citing *Schimmer v. Jaguar Cars, Inc.,* 384 F.3d 402, 405 (7th Cir.2004), *Milicevic v. Fletcher Jones Imports, Ltd.,* 402 F.3d 912, 919 n. 4 (9th Cir.2004).

\*7 Therefore, recovery to Plaintiffs is not available under the Magnuson-Moss Act (§ 2304) since Lazy Days provided only a "limited" warranty to Plaintiffs. Therefore, Counts III and IV fail to state a cause of action upon which relief can be granted.

*Count V*
This Court held in its previous Order that Plaintiffs alleged facts that could entitle them to some relief and dismissal was improper since a disclaimer must be found on the face of the warranty, but the relevant text in this case appears on the reverse side of Buyer's Order. However, for those reasons stated above, only provisions modifying or excluding "consequential" damages must appear on the face. Therefore, under § 2304, the exclusion of revocation as a remedy would be valid, even though it is found on the reverse side of Buyer's Order. However, Plaintiffs do not make their claim in Count V under Magnuson-Moss. Therefore, this Court must examine this claim under Florida law, Florida Statute § 672.608, which provides the following provisions regarding revocation of acceptance:

> (1) The buyer may revoke her or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to her or him if she or he has accepted it:

> (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

> (b) Without discovery of such nonconformity if her or his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.

When the *Ames* court applied Florida Statute § 672.608, it found that the "Exclusion of Warranties" section was conspicuous because it was the only language on the back of the Buyer's Order, other than the "Manufacturers Warranties" section. *Ames v. Winnebago Industries, Inc.,* 2005 WL 2614614 (M.D.Fla.2005). But, *Ames* is distinguishable from the facts present here. The warranty disclaimer present in *Ames* differs from the placement and content of the disclaimers in this case. Paragraph 9 of the reverse side of Buyer's Order begins with "EXCLUSIONS OF WARRANTIES ." Paragraph 11 begins with "MANUFACTURERS WARRANTIES." It is under paragraph 11 where the statement "I AGREE THAT NO OTHER REMEDIES ARE AVAILABLE TO ME, INCLUDING BUT NOT LIMITED TO, REVOCATION OF ACCEPTANCE AND RESCISSION." Because this exclusion of revocation is found under the title "Manufacturers Warranties.", this Court finds that it is not an exclusion applicable to the *Dealer's* (Lazy Days), agreement with Plaintiffs. Through its designation of "manufacturer", this exclusion refers to Country Coach, the *manufacturer* of the recreational vehicle. For the foregoing reasons, Lazy Days did not properly modify or exclude revocation of acceptance, and it survives as an available remedy to Plaintiffs, so long as they can establish that their revocation meets the terms set forth in § 672.608.

**\*8** This Court stated in the previous Order that an action founded under Florida statute to establish liability is governed by a four year statute of limitations. Fla. Stat. § 95.11(3)(f). By claiming that Dealer has violated the

Florida Deceptive and Unfair Trade Practices Act (hereafter FDUTPA), Plaintiff is attempting to establish liability under Florida Statute. Thus, a claim under FDUTPA is governed by a four year statute of limitations.

Absent application of the delayed discovery rules, the cause of action was created at the time the recreational vehicle was purchased. *Yusaf Mohamad Excavation, Inc. v. Ringhaver Equipment, Co.,* 793 So.2d 1127, 1128-1129 (Fla. 5th DCA 2001). *See also, South Motor Co. Of Dade County v. Doktorczyk,* 957 So.2d 1215, 1217 (Fla. 3rd DCA 2007). *Ringhaver,* citing the Florida Supreme Court, states that the applicable Florida statute does not mention the delayed discovery rule and as such, the delayed discovery rule does not apply. *Id.* at 1128. Because the delayed discovery rule does not apply to the FDUPTA, Plaintiffs were required to make their claim within four years of the purchase date. The RV in question was purchased on or about March 17, 2002, which would require this action to have been filed by March 17, 2006. Because this action was not filed until July 21, 2007, it is time-barred by the applicable statute of limitations.

There was a scrivener's error in the Order when the Court denied Lazy Days' Motion to Dismiss at the end of the Court's Order. Consistent with the above analysis, Defendant, Lazy Days', Motion to Dismiss Count VI is hereby **GRANTED.** Accordingly, it is

**ORDERED** that the Order at Dkt. 47 is **AMENDED** in that Defendant, Lazy Days', Motion to Dismiss be **GRANTED,** leaving only Count V as to Defendant, Lazy Days. In addition, the Plaintiff's request for attorney's fees is **DENIED.**

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2782678, 66 UCC Rep.Serv.2d 388

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 589442
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

MOTOR CITY POWER SPORTS, LLC, a Michigan
limited liability company, Plaintiff,
v.
ARCTIC CAT SALES, INC., a Minnesota
corporation, Defendant.

No. 10–13213.
|
Feb. 9, 2011.

**Attorneys and Law Firms**

Daniel J. Schouman, Ryan and Schouman, Walled Lake, MI, for Plaintiff.

Jeffrey G. Muth, Barnes & Thornburg, Grand Rapids, MI, for Defendant.

## I. INTRODUCTION

### OPINION AND ORDER

LAWRENCE P. ZATKOFF, District Judge.

**\*1** This matter is before the Court on Defendant's motion to dismiss pursuant to 12(b)(6) or transfer venue pursuant to 28 U.S.C. § 1404(a) [dkt 5]. Plaintiff responded to the motion. Defendant, however, did not file a reply brief, and the time to do so has elapsed. E.D. Mich. L.R. 7.1(e)(1). The Court, therefore, finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Defendant's motion to dismiss or to transfer venue [dkt 5] is GRANTED.

## II. BACKGROUND

This case arises from a dispute between a snowmobile and all-terrain vehicle ("ATV") dealer and a snowmobile and ATV manufacturer. Plaintiff, a snowmobile and ATV dealer, is a Michigan limited liability company that operates a retail store in Oakland County, Michigan, which sells snowmobiles, ATVs, clothing, and accessories (e.g., parts). Defendant is a Minnesota corporation that manufactures snowmobiles, ATVs, clothing, and accessories under the brand names Arctic Cat and Arcticwear. Plaintiff and Defendant are parties to two written agreements (collectively, the "Dealer Agreements")—one governs ATVs and one governs snowmobiles—which were entered into in Thief Rivers Falls, Minnesota. From at least 2006, Plaintiff and Defendant have entered into the Dealer Agreements so that Plaintiff may sell Defendant's products. Both Dealer Agreements contain a forum-selection clause and a choice-of-law clause. The forum-selection clause states the following:

> Any claim, action or other dispute between the parties as to the terms of the Agreement, or as to the performance or nonperformance of either party under the Agreement, or as to any other matter arising out of the parties' relationship, shall be resolved by the State or Federal Courts of the State of Minnesota.

With respect to the choice-of-law clause, it provides that "[t]his Agreement shall be governed, interpreted, and construed under the laws of the State of Minnesota, excluding that body of law known as choice of laws."

In December 2009, Plaintiff alleges that Defendant terminated the Dealer Agreements. Plaintiff purportedly accepted that termination. Defendant, however, denies that it terminated Plaintiff as a dealer. In January of 2010, Plaintiff purportedly demanded that Defendant repurchase Plaintiff's inventory pursuant to Michigan's Motor Vehicle Dealers Act ("MVDA"), Mich. Comp. Laws § 445.1561, *et seq.*[1] Defendant refused to repurchase the inventory pursuant to the MVDA, and instead notified Plaintiff that it would repurchase Plaintiff's inventory at an amount discounted up to twenty-five percent off Plaintiff's net acquisition cost.

Based on Defendant's refusal to repurchase the inventory

pursuant to the MVDA, Plaintiff filed this action on August 13, 2010, based on diversity of citizenship. Before filing an answer, Defendant filed the instant motion to dismiss Plaintiff's complaint, or in the alternative, to transfer venue. Defendant primarily argues that the forum-selection clause agreed to in the Dealer Agreements requires the Court to dismiss this case. Plaintiff disagrees. For the foregoing reaons, the Court grants Defendant's request to transfer venue pursuant to 28 U.S.C. § 1404(a), and thus declines to reach the merits of Defendant's request to dismiss Plaintiff's claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

### III. LEGAL STANDARD

**\*2** Pursuant to 28 U.S.C. § 1404(a), which provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "[A] district court 'has broad discretion to grant or deny [a] motion to transfer a case.' " *Phelps v. McClellan,* 30 F.3d 658, 663 (6th Cir.1994) (quoting *Cote v. Wadel,* 796 F.2d 981, 985 (7th Cir.1986)). The Court must give deference to the plaintiff's choice of forum, which is not disturbed "unless the balance is strongly in favor of the defendant." *Stewart v. Dow Chem. Co.,* 865 F.2d 103, 106 (6th Cir.1989) (citing *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). The moving party bears the burden of showing, by a preponderance of the evidence that a change of venue is warranted. *Amphion, Inc. v. Buckeye Elec. Co.,* 285 F.Supp.2d 943, 946 (E.D.Mich.2003).

Defendant requests that this Court transfer the action to the United States District Court for the District of Minnesota. The parties do not dispute that venue is proper there. *See* 28 U.S.C. § 1391(b) (stating that venue is proper in a particular district "where any defendant resides" or "in which a substantial part of the events or omissions giving rise to the claim occurred").

Therefore, to determine whether a motion to transfer venue pursuant to § 1404(a) should be granted, this Court must weigh the following factors: (1) the convenience of the parties; (2) the convenience of the witnesses; (3) accessibility to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the costs of obtaining willing witnesses; (6) the practical problems of trying the case most expeditiously and inexpensively; and (7) the interests of justice. *Kepler v. ITT Sheraton Corp.,* 860 F.Supp. 393, 398

(E.D.Mich.1994); *see Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1137(6th Cir.1991) (considering the "private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns" when ruling on a motion to transfer under § 1404(a)). The presence of a forum-selection clause is significant when weighing the balance of the parties' interests. *Moses,* 929 F.2d at 1136–37.

### IV. ANALYSIS

Defendant argues that the forum-selection clause weighs heavily in favor of transferring the action. Plaintiff responds that the MVDA prohibits Defendant from transferring the action to Minnesota. Applying the factors enunciated in *Kepler,* the factors weigh equally in favor of Plaintiff and Defendant. Plaintiff is a Michigan limited-liability company that operates its dealership in Michigan, as opposed to Defendant being a Minnesota corporation that operates its manufacturing facility in Minnesota. The parties have not stated if any inconvenience will result with respect to evidence, costs, or witnesses if the action is transferred to the United States District Court for the District of Minnesota. Because of the weight given to forum-selection clauses, if the forumselection clause in this action is valid, then Defendant's interests outweigh Plaintiff's preferred forum, and the action will be transferred to Minnesota. Plaintiff's argument that the MVDA makes enforcement of the forum-selection clause invalid depends, in the first instance, on whether Michigan or Minnesota's laws apply.

### MICHIGAN CHOICE–OF–LAW RULES
**\*3** In a diversity case, a federal district court "is obligated to apply the choice of law rules of the state in which it sits." *Security Ins. Co. v. Kevin Tucker & Assoc.,* 64 F.3d 1001, 1005 (6th Cir.1995); *Mahne v. Ford Motor Co.,* 900 F.2d 83, 86 (6th Cir.1990), *cert den.,* 498 U.S. 941, 111 S.Ct. 349, 112 L.Ed.2d 313 (1990). Thus, the Court must look to Michigan choice-of-law rules. For contractual disputes, Michigan adopted § 187 of the Restatement (Second) of Conflict of Laws. *Chrysler Corp. v. Skyline Indus. Servs., Inc.,* 448 Mich. 113, 528 N.W.2d 698, 702 (Mich.1995). Section 187(2) provides that the parties will be bound by a contractual forum-selection clause unless:

> a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2); *see also Kipin Indus., Inc. v. Van Deilen Int'l, Inc.,* 182 F.3d 490, 493 (6th Cir.1999). According to § 188, to determine which state's laws control, if a choice-of-law provision is absent, the district court analyzes: (1) where the contract was formed; (2) where performance of the contract is expected; and (3) the domicile and place of business of the parties with respect to the particular claims before the Court.[2] Restatement (Second) of Conflict of Laws § 188(2).

Plaintiff is essentially asserting its argument under § 187(2)(b). Therefore, the Court must determine if: (1) applying the forum-selection clause would violate a fundamental policy of Michigan; and (2) Michigan has a materially greater interest than Minnesota in the determination of the issue.

**(a). Violation of a Fundamental Policy**
Forum-selection clauses are generally enforceable in Michigan. *Turcheck v. Amerifund Fin., Inc.,* 272 Mich.App. 341, 725 N.W.2d 684, 688 (Mich.Ct.App.2006) (explaining that Michigan's public policy favors the enforcement of forum-selection clauses); *Offerdahl v. Silverstein,* 224 Mich.App. 417, 569 N.W.2d 834, 835–36 (Mich.Ct.App.1997) (recognizing the enforceability of forum-selection and choice-of-law clauses). But, in the specific context of motor vehicle dealers and manufacturers, the MVDA was enacted to regulate the dealings between a motor vehicle manufacturer and its motor vehicle dealers in Michigan. Mich. Comp. Laws prec. § 445.1561. According to the MVDA, a manufacturer may not require a motor vehicle dealer in Michigan to "require any controversy between a new motor vehicle dealer and a manufacturer ... to be referred to a person other than the duly constituted courts of [Michigan] or of the United States located in [Michigan].... *Such a provision in a dealer agreement is void and unenforceable.*" Mich. Comp. Laws § 445.1573(h) (emphasis added).[3]

**\*4** Plaintiff argues that the MVDA also applies to agreements between ATV and snowmobile dealers and manufacturers when the ATV and snowmobile dealer's business is in Michigan. In response, Defendant contends that the MVDA is not applicable to ATV and snowmobile

dealers and manufacturers. Without interpreting the MVDA to determine if it meant to encompass ATV and snowmobile dealers and manufacturers, Michigan also must have a "materially greater" interest than Minnesota—the state where the parties agreed to dispute their legal issues.

**(b). Materially Greater Interest**
The Court does not find that Michigan has a "materially greater" interest in determination of this case than Minnesota. Plaintiff is a Michigan corporation, and Defendant is a Minnesota corporation. Minnesota has an interest in protecting Defendant's lawfully entered into contract, which requires that Minnesota law governs and that all legal issues will be disputed in Minnesota. Michigan has an interest in protecting Plaintiff from being subject to a contract provision that Michigan law may find unenforceable—i.e., the MVDA would invalidate such a forum-selection clause in a motor vehicle dealer agreement. However, the parties do not cite any authority, nor has the Court located any, where the mere fact that Minnesota law and Michigan law conflict makes Michigan's interest "materially greater" than Minnesota's interest. Moreover, not only did the parties contract for Minnesota law, but Plaintiff also agreed to waive any objections to jurisdiction in the Minnesota courts. Therefore, even assuming that the MVDA is applicable, the Court determines that Michigan and Minnesota have an equal interest in their respective laws governing the relationship between these parties. As such, the Court finds that such interests are insufficient to determine that Michigan has a "materially greater" interest than Minnesota. *See Chrysler,* 528 N.W.2d at 707 (declining to void the parties' express written provision that created a preference for Michigan law without evidence that Illinois had a materially greater interest than Michigan).

**(c). Conclusion**
Because Minnesota law governs, and under Minnesota law, forum-selection clauses are valid, the forum-selection clause in the ATV and snowmobile dealer agreement is valid and enforceable. *See Hauenstein & Bermeister, Inc. v. Met–Fab Indus. Inc.,* 320 N.W.2d 886, 889 (Minn.1982) (noting that "persuasive public policy reasons exist for enforcing a forum selection clause in a contract freely entered into by parties who have negotiated at arm's length"); *C.H. Robinson Worldwide, Inc. v. FLS Transp.,* 772 N.W.2d 528, 534 (Minn.Ct.App.2009) (explaining that a forum-selection clause is typically enforced unless the clause is "so unreasonable that its enforcement would be clearly

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   3

erroneous and against both logic and the facts on record") (citation omitted). Therefore, Defendant's interests outweigh Plaintiff's interest in deciding if the action may be transferred to the United States District Court for the District of Minnesota. *See Moses,* 929 F.2d Accordingly, Defendant's motion to transfer venue pursuant to § 1404(a) is GRANTED.

### V. CONCLUSION

**\*5** Accordingly, for the above reasons, IT IS HEREBY

ORDERED that Defendant's motion to dismiss, or to transfer venue [dkt 5] is GRANTED. This matter is HEREBY TRANSFERRED to the United States District Court for the District of Minnesota.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 589442

Footnotes

1    Plaintiff indicates in its response brief that its demand is located in Exhibit B of its brief, but the Court does not find an exhibit purporting to be a demand attached to Plaintiff's brief. The Court also does not find an exhibit purporting to be a demand attached to Plaintiff's complaint.

2    In this case, Michigan law would have been the controlling law in the absence of the choice-of-law clause in the Dealer Agreements, which specifies Minnesota law. The contract was formed in Thief River Falls, Minnesota. The place of performance is in Michigan where Plaintiff was authorized to maintain and operate a dealership that sold Defendant's ATVs and snowmobiles. The parties's domicile and place of business are split between Minnesota and Michigan equally, but with respect to Plaintiff's claims filed in this forum, following the rubric in § 188, Michigan law would control in the absence of the choice-of-law clause.

3    A "manufacturer" is "any person who manufactures or assembles new motor vehicles." Mich. Comp. Laws § 445.1564(2). A "new motor vehicle dealer" is a "person, including a distributor, who holds a dealer agreement granted by a manufacturer ... who is engaged in the business of purchasing, selling, exchanging, or dealing in new motor vehicles and who has an established place of business in [Michigan]." Mich. Comp. Laws § 445.1565(2). Both terms—manufacturer and new motor vehicle dealer—are defined using the term "motor vehicle." The MVDA explicitly excludes buses, tractors, and farm equipment from the definition of a "motor vehicle," and directs the Court to Michigan's motor vehicle code ("MVC") for further refinement of the term "motor vehicle." Mich. Comp. Laws § 445.1564(3). The MVC provides that a "motor vehicle" is "every vehicle that is self-propelled, but ... does not include industrial equipment such as a forklift, front-end loader, [other] construction equipment" an electric patrol vehicle, and an electric personal assistive mobility device. Mich. Comp. Laws § 257.33.

---

**End of Document**                                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

492 Fed.Appx. 518
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

NORTHAMPTON RESTAURANT GROUP, INC.,
and Hamburger Station, Inc., Plaintiffs–
Appellants,
v.
FIRSTMERIT BANK, N.A., Defendant–Appellee.

No. 10–4056.
|
July 5, 2012.

**Synopsis**
**Background:** Restaurant operator brought putative class
action against bank, alleging that bank breached its
contracts with its customers, wrongfully converted their
property, and violated implementing regulations for
Electronic Funds Availability Act (EFAA). The United
States District Court for the Northern District of Ohio,
2010 WL 3069494, granted bank's motion to dismiss.
Operator appealed.

**Holdings:** The Court of Appeals, Russell, Senior District
Judge, held that:

[1] operator failed to adequately allege claim for breach of
contract, and

[2] Ohio statute allows banks to reorder deposit account
transactions in any manner they see fit.

Affirmed.

**\*518** On Appeal from the United States District Court for
the Northern District of Ohio.
Before: BOGGS and GIBBONS, Circuit Judges;
RUSSELL, Senior District **\*519** Judge.[*]

**Opinion**

RUSSELL, Senior District Judge.

**\*\*1** Northampton Restaurant Group, Inc., and Hamburger
Station, Inc., (collectively "Northampton" or the
"restaurant") brought suit against FirstMerit Bank, N.A.
("FirstMerit" or the "bank") on behalf of themselves and
several putative classes, alleging that the bank breached
its contracts with its customers, wrongfully converted
their property, and violated the implementing regulations
of Electronic Funds Availability Act ("EFAA" or the
"Act"), 12 U.S.C. § 4001 *et seq.* The district court
dismissed all of Northampton's causes of action pursuant
to a motion to dismiss by FirstMerit under Federal Rule of
Civil Procedure 12(b)(6). Northampton now appeals
dismissal of all of the claims.

I. FACTUAL BACKGROUND

Northampton's primary business is the operation of
restaurants in Ohio. To facilitate that business,
Northampton maintains a commercial banking
relationship with FirstMerit. Pursuant to contract,
Northampton opened a deposit account (*i.e.,* a checking
account) with FirstMerit more than twenty years ago.
Approximately ten years ago, Northampton also opened a
credit line (*i.e.,* a credit card) with the bank. Northampton
opened the credit line, in part, to provide overdraft
protection on its deposit account. If the assets of the
deposit account were ever insufficient to cover the
account's liabilities, the credit line would be used to cover
any overdraft.

Northampton alleged that discrepancies in the deposit
account and credit line began occurring in January of
2007. According to Northampton, the bank used the credit
line to cover overdrafts in the deposit account even
though that account held sufficient funds to pay some or
all of the items presented for payment. Each time the
credit line was used to cover an overdraft (regardless of
whether sufficient funds were available to cover the item),
FirstMerit charged Northampton two separate fees. First,
the bank charged Northampton an overdraft fee on the
deposit account. Second, FirstMerit charged a finance fee
on the credit line when it was used to cover an item
presented for payment on the deposit account. According
to Northampton, the bank wrongfully charged overdraft

and finance fees even though the restaurant had sufficient funds to pay some or all of the items presented for payment, and these wrongfully imposed fees constituted a breach of contract by FirstMerit.

Northampton's breach-of-contract claim centers on a banking practice known as "resequencing." When a deposit account is resequenced, items presented for payment on the account during a twenty-four-hour period are not paid in the order in which they were received. Instead, the items are resequenced and paid in order of amount, largest to smallest. Thus, even if the largest item presented for payment on any particular day is the last item received, resequencing causes it to be paid first.

Banks justify resequencing as a means of protecting their customers' interests. Because the largest items presented for payment on a deposit account are often those with the greatest consequences if left unpaid—a payment to a business's main supplier—banks resequence accounts to ensure that these "big ticket" items are **520** paid first. Resequencing has at least two interrelated drawbacks, however. First, when the largest items are paid first, the account's balance is consumed more quickly and this can result in overdraft fees being charged on numerous, smaller payments that the account would otherwise have had funds to cover. For example, if the largest item presented for payment consumes the account's entire balance, all other items will overdraft, and the customer will be charged a fee for each overdraft. Second, if there are insufficient funds in the account to pay the largest item, then no items get paid, even though the funds would cover some or all of the lesser items. Additionally, if a credit line has been established for overdraft protection, as in the present case, and the funds in a resequenced account are insufficient to pay some or all of the items presented for payment, the credit line will be used to cover the shortfall. Thus, in addition to overdraft fees on the deposit account, finance fees will be charged for each extension of credit used to cover a shortfall in the deposit account.

**\*\*2** In the present case, Northampton alleged that its contracts with FirstMerit prohibited the bank from resequencing transactions in its deposit account. FirstMerit allegedly disregarded this prohibition and wrongfully charged overdraft and finance fees. Northampton also alleged that FirstMerit's practices were not restricted to its account but also extended to many of the bank's other commercial customers, who comprised the putative classes.

In addition to the breach-of-contract claim, Northampton asserted that FirstMerit wrongfully converted the

restaurant's property. The conversion claim is closely related to the breach-of-contract claim. By wrongfully resequencing the accounts, Northampton claimed that FirstMerit converted its property in two ways. First, the bank used funds in Northampton's deposit account that were not used to pay items presented on the account to make investments for the bank's own benefit. Second, FirstMerit converted Northampton's funds when it charged finance fees on the credit line at a time that Northampton's deposit account contained sufficient funds to pay some or all of the items presented.

Finally, Northampton alleged that FirstMerit violated the EFAA, 12 U.S.C. § 4001 *et seq.,* and its implementing regulations in two ways. First, the bank failed to make funds in Northampton's deposit account available as required by FirstMerit's own policies and by the EFAA's implementing regulations. Second, FirstMerit failed to disclose its policies on availability of funds or changes in those policies to its customers within the statutorily prescribed time periods.

## II. STANDARD OF REVIEW

This court reviews *de novo* a district court's dismissal of a case pursuant to Federal Rule of Civil Procedure 12(b)(6), and, in reviewing the dismissal, the court employs the same standard as the district court. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008) (citing *First Am. Title Co. v. Devaugh,* 480 F.3d 438, 443 (6th Cir.2007); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,* 419 F.3d 462, 468 (6th Cir.2005)).

The Federal Rules of Civil Procedure require that pleadings, including complaints, contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). A complaint may be attacked for failure "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When **\*521** considering a Rule 12(b)(6) motion to dismiss, the court will presume all of the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the non-moving party. *Total Benefits,* 552 F.3d at 434 (citing *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir.1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). Instead, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). A complaint should contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 1950 (citing Fed.R.Civ.P. 8(a)(2)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

### III. ANALYSIS

**\*\*3** The district court dismissed all of Northampton's causes of action under Federal Rule of Civil Procedure 12(b)(6). Having reviewed the district court's opinion and analysis of Northampton's claims, we find no error in the lower court's opinion. Upon our own *de novo* review, we find that Northampton has failed to state a claim upon which relief can be granted.

[1] As detailed above, Northampton alleged that FirstMerit's practice of resequencing the restaurant's deposit account was a breach of the parties' contracts. Despite making this claim, Northampton did not attach any contracts to its complaint and did not include the language of any specific contractual provisions that had been breached by the bank. In its briefs on appeal, the restaurant admitted that it could not provide the contracts to the court because it no longer possessed copies of them. Instead, Northampton argued that dismissal was inappropriate because it should be allowed to conduct discovery in order to obtain the contracts that would show FirstMerit's actions violated their agreement. In a recent anti-trust case, a panel of this court affirmed a Rule 12(b)(6) dismissal in the absence of discovery because:

[T]he language of *Iqbal* specifically

directs that *no* discovery may be conducted in cases such as this, even when the information needed to establish a claim of discriminatory pricing is solely within the purview of the defendant.... [The] plaintiff must allege specific facts of price discrimination even if those facts are only within the head or hands of the defendants. The plaintiff may not use the discovery process to obtain these facts after filing suit.

**\*522** *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1051 (6th Cir.2011). In this case, "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Harris v. Am. Postal Workers Union,* 198 F.3d 245, ——— – ———, 1999 WL 993882, at \*4–5, 1999 U.S.App. LEXIS 26601, at \*14 (6th Cir. Oct. 19, 1999) (per curiam) (table) (citing *Platsis v. E.F. Hutton & Co., Inc.,* 829 F.2d 13 (6th Cir.1987); *Western Indus., Inc. v. Newcor Canada, Ltd.,* 739 F.2d 1198, 1206 (7th Cir.1984)). Accordingly, just as it would have been inappropriate to allow the *Louisville Tractor* plaintiff to conduct discovery on the issue of price discrimination in order to avoid dismissal, it would be equally inappropriate to allow Northampton to use the discovery process to find the contracts in dispute *after* filing suit. The restaurant was required to allege facts sufficient to make its breach-of-contract claim plausible on its face, and without the contracts or reference to specific language, Northampton has failed to put forth a plausible claim for relief.

[2] In any event, attached to its motion to dismiss, FirstMerit included copies of the parties' contracts, which expressly show that Northampton agreed that the bank could resequence the deposit account in the manner of its choosing.[1] Furthermore, even in the absence of an agreement, the Ohio commercial code explicitly allows banks to reorder account transactions in any manner they see fit. *See* Ohio Rev.Code Ann. § 1304.29(B) (LexisNexis 1994) ("[I]tems may be accepted, paid, certified, or charged to the indicated account of [a bank's] customer in any order.");[2] *Daniels v. PNC Bank, N.A.,* 137 Ohio App.3d 247, 738 N.E.2d 447, 449 (2000) (finding that a resequencing program did not violate an account agreement and was expressly authorized by § 1304.29(B)). Given these facts, Northampton failed to state a claim for breach of contract upon which relief could be granted, and dismissal of that claim was appropriate.

**4 Northampton also alleged a cause of action for conversion and for FirstMerit's *523 violation of the EFAA, 12 U.S.C. § 4001 *et seq.* In a well-reasoned opinion the district court dismissed those claims because Northampton could not recover as a matter of law. Upon review, the we affirm dismissal of those claims for the reasons articulated by the district court.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

492 Fed.Appx. 518, 2012 WL 2608807, 78 UCC Rep.Serv.2d 1

Footnotes

* The Honorable Thomas B. Russell, United States Senior District Judge for the Western District of Kentucky, sitting by designation.

1   Including the contracts with FirstMerit's motion to dismiss did not convert that motion into a motion for summary judgment under Federal Rule of Civil Procedure 12(d) because Northampton expressly referenced those contracts in its complaint. *See Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto ... and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.") (citing *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir.2001)).

2   Comment 7 to § 1304.29 of the Ohio Revised Code is particularly instructive in this case:
    As between one item and another no priority rule is stated. This is justified because of the impossibility of stating a rule that would be fair in all cases, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables. Further, the drawer has drawn all the checks, the drawer should have funds available to meet all of them and has no basis for urging one should be paid before another; and the holders have no direct right against the payor or bank in any event, unless of course, the bank has accepted, certified, or finally paid a particular item, or has become liable for it under section 4–302. Under subsection (b) the bank has the right to pay items for which it is itself liable ahead of those for which it is not.
    Ohio Rev.Code Ann. § 1304.29 cmt. 7 (LexisNexis 1994). This comment makes it exceedingly clear that banks may resequence deposit account transactions in whatsoever order they choose.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 2853591
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Eastern Division.

Praxis Capital & Investment Management Ltd,
Plaintiff,
v.
Gemini Holdings I, LLC, et al., Defendants.

Case No. 2:15-CV-2912
|
Signed 05/16/2016

## OPINION & ORDER

ALGENON L. MARBLEY, UNITED STATES
DISTRICT JUDGE

**\*1** This matter is before the Court on the motion of
Defendants Gemini Holdings I, LLC and Gemini PNC,
LLC (collectively, "Gemini") to compel mediation and
arbitration. (Doc. 13.) After Defendants filed their motion
to compel, Plaintiff Praxis Capital & Investment
Management LTD ("Praxis") filed an application for
entry of default because Defendants did not file an answer
to the complaint. (Doc. 16.) For the reasons that follow,
the Court **DENIES** the motion to compel and **DENIES**
the application for entry of default. Defendant is
**ORDERED** to file *instanter* an answer or other
responsive pleading within fourteen (14) days of the date
of this order.

## I. BACKGROUND

On October 14, 2015, Praxis filed a complaint against
Gemini. (Doc. 1.) The dispute arose from an agreement
(the "Engagement Agreement") between Praxis and
Gemini for Praxis to perform consulting services for
Gemini in connection with the construction and operation
of a large-scale recycling center next to the Franklin
County Landfill in Grove City, Ohio. (*Id.* at ¶¶ 8-9, 11-
12.) Plaintiff brought claims against Defendants for
breach of contract, promissory estoppel, and quantum
meruit. (*Id.* at ¶¶ 24-40.)

Defendants filed a motion to compel mediation and
arbitration and stay proceedings (Doc. 13) but did not file
an answer or other responsive pleading. Plaintiff filed a
response opposing the motion to compel (Doc. 15) and
also filed an application for entry of default under Federal
Rule of Civil Procedure 55(a). (Doc. 16.) Defendants
opposed the application. (Doc. 19.)

## II. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") was enacted "to
provide for enforcement of privately entered agreements
to arbitrate." *Ferro Corp. v. Garrison Indus., Inc.*, 142
F.3d 926, 932 (6th Cir. 1998). Under the FAA:

> A written provision in any
> maritime transaction of contract
> evidencing a transaction involving
> commerce to settle by arbitration a
> controversy thereafter..., or an
> agreement in writing to submit to
> arbitration an existing controversy
> arising out of such a contract
> transaction, or refusal, shall be
> valid, irrevocable, and enforceable,
> save upon such grounds as exist at
> law or in equity for the revocation
> of any contract.

9 U.S.C. § 2. A party aggrieved by the refusal of another
party to arbitrate under an agreement for arbitration may
petition the court for an order directing that such
arbitration proceed according to the terms of the
agreement. 9 U.S.C. § 4. The Court's task is to
"determine whether the parties agreed to arbitrate the
dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714
(6th Cir. 2000). Whether the parties' contract evinces an
agreement to arbitrate is governed by principles of state
contract law. *First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938, 944 (1995). The Court must "examine the
language of the contract in light of the strong federal
policy in favor of arbitration." *Stout*, 228 F.3d at 714. Put
differently, "any doubts concerning the scope of arbitrable
issues should be resolved in favor of arbitration, whether
the problem at hand is the construction of the contract
language itself, or an allegation of waiver, delay, or a like
defense to arbitrability." *Moses H. Cone Mem'l Hosp. v.
Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Praxis Capital & Investment Management Ltd v. Gemini..., Not Reported in...

## III. ANALYSIS

### A. Motion to Compel

**\*2** Defendants submit that the Engagement Agreement between Praxis and Gemini, which was attached to the complaint, reflects an agreement, albeit a poorly drafted one, among the parties to first mediate and then arbitrate any "dispute, controversy or claim arising out of" the Agreement. (Doc. 13 at 2.) Plaintiffs counter that: (1) the language of the Agreement does not require mediation but, rather, renders certain remedies unavailable if a party elects litigation over mediation; and (2) instead of mandating arbitration, the Agreement merely sets forth the procedures that would govern an arbitration if the parties choose to enter one. (Doc. 15 at 1-2.)

The relevant section of the Engagement Agreement, which was drafted by Praxis and signed by representatives from both Praxis and Gemini, states:

Governing Law; Forum; Attorneys' Fees:...[Praxis] and [Gemini] agree to mediate in Columbus, Ohio any controversy, claim, or dispute arising between the parties before resorting to legal action as set forth below. Mediation fees, if any, shall be divided equally between the parties. The parties agree that if any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorneys' fees, even if said fees would otherwise be available to that party in any such action. In the event that the parties cannot settle the dispute in mediation, each party hereto irrevocably consents to the exclusive jurisdiction of the federal and state courts sitting in Franklin County, Ohio for any legal action, suit, or proceeding arising out of or in connection with this Agreement, any agreement contemplated hereby or thereby, and agrees that any such action, suit, or proceeding may be brought only in such court, provided that this section shall not prevent a party from seeking to enforce any judgment of such court in any other court....

Jurisdiction. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of Ohio, without giving effect to the principles of conflicts of law thereof. Any dispute, controversy or claim arising out of or related to this Agreement to be submitted to arbitration shall be submitted to and settled by binding

arbitration in the City of Columbus, Ohio, pursuant to the Commercial Arbitration Rules of the American Arbitration Association then in effect (or at any other place or under any other form of arbitration mutually acceptable to the parties). Notwithstanding the foregoing, the parties hereto agree that any such arbitration shall be governed by the following requirements...

(Doc. 1-1 at 5-6.)

As to mediation, the Court agrees with Plaintiff that the language of the agreement indicates that the mediation should not be compelled because the parties specifically provided for a contingency if a party refused to mediate—specifically, that the party would be prohibited from collecting attorney fees. Therefore, the Court declines to compel the parties to mediate this dispute.

As to the arbitration provision in the Agreement, Defendants maintain that the following phrase was a product of sloppy drafting and should be construed in their favor: "Any dispute, controversy or claim arising out of or related to this Agreement *to be submitted to arbitration* shall be submitted to and settled by binding arbitration in the City of Columbus, Ohio..." (*Id.* at 6 (emphasis added).) Defendants concede that the phrase "to be submitted to arbitration" does not exactly support their position but they posit that it was most likely a typographical error. (Doc. 19 at 3.) They argue that any doubt about the meaning of the Agreement should be resolved in favor of arbitration due to the strong federal policy in favor of enforcing agreements to arbitrate, *see Moses H. Mem'l Hosp.*, 460 U.S. at 24-25, and the fact that Plaintiff drafted the contract and, pursuant to Ohio law, ambiguous language should be interpreted against the drafting party, *see McKay Machine Co. v. Rodman*, 228 N.E.2d 304, 307 (Ohio 1967).

**\*3** Under Ohio contract law, "construction of the contract should attempt to harmonize all the provisions rather than produce conflict in them." *Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987). Accordingly, "no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation which gives effect to both." *Id.* (citing *Expanded Metal Fire-Proofing Co. v. Noel Constr. Co.*, 101 N.E. 348, 350 (Ohio 1913)).

Although Defendants are correct that ambiguities in the Engagement Agreement must be resolved in their favor due to the federal policy favoring arbitration, the Court finds that here the Agreement is not ambiguous. First, the sentence that Defendants declare to be ambiguous is not. It merely lays out the rules for the arbitration proceeding that would apply *if* a dispute is submitted to arbitration.

Second, the Agreement is internally inconsistent if interpreted as Defendants urge. In light of the preceding section on mediation, which provides that a party may proceed directly to litigation if it is willing to forego the possibility of collecting attorney fees, and that also provides that the parties will submit to the exclusive jurisdiction of the state and federal courts in Columbus, Ohio if mediation fails, they cannot also be required to arbitrate before litigation. Therefore, the Court finds that the arbitration provision in the Engagement Agreement is not mandatory and **DENIES** Defendants' Motion to Compel.

### B. Application for Entry of Default

Defendants ask the Court, if it denies the motion to stay, to grant them fourteen days to file a responsive pleading, and Plaintiff states that it does not object to this request. It is an unsettled issue whether a party that files a motion to compel arbitration must also file a timely responsive pleading, although at least one court of appeals has said that the party may file the motion to compel in lieu of the answer. *See Lamkin v. Morinda Props., Weight Parcel, LLC*, 440 Fed.Appx. 604, 607-08 (10th Cir. 2011). And the Supreme Court has assumed, although not squarely decided, as much. *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 83 (2000) ("In lieu of an answer,

petitioners filed a motion to compel arbitration, denied the motion to stay, and dismissed [respondent's] claims with prejudice."). In any event, Plaintiff does not object to a grant of leave to file an answer *instanter*. (Doc. 20 at 5.) Therefore, the Court **DENIES** Plaintiff's application for entry of default but **GRANTS** Defendant leave to file *instanter* an answer or other responsive pleading within fourteen (14) days of the date of this order.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to compel mediation and arbitration is **DENIED**. (Doc. 13.) Plaintiff's application for entry of default is also **DENIED**. (Doc. 16.) The Court **GRANTS** Defendant leave to file *instanter* an answer or other responsive pleading within fourteen (14) days of the date of this order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 2853591

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6675327
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Gale SANTILLI, Plaintiff,
v.
JPMORGAN CHASE BANK, N.A., Defendant.

No. 14–12359.
|
Signed Nov. 25, 2014.

**Attorneys and Law Firms**

Renette Jackson, AJ at Law, PLLC, Detroit, MI, for
Plaintiff.

Laura Baucus, Dykema Gossett, Bloomfield Hills, MI,
Nasseem S. Ramin, Dykema Gossett, Detroit, MI, for
Defendant.

### ORDER ACCEPTING AND ADOPTING REPORT & RECOMMENDATION

SEAN F. COX, District Judge.

**\*1** This is a case regarding foreclosure of real property.
On or about April 8, 2014, Plaintiff Gale Santilli filed a
complaint in the Oakland County Circuit Court
commencing action against Defendant JPMorgan Chase
Bank, N.A., challenging foreclosure proceedings related
to her properly located in Berkley, Michigan.

On June 16, 2014, Defendant removed the case to this
Court. (Doc. # 1). On August 22, 2014, Defendant filed a
Motion to Dismiss the Complaint. (Doc. # 5). Plaintiff
failed to file a response to Defendant's motion. The
motion was referred to Magistrate Judge Mona K.
Majzoub for issuance of a Report and Recommendation
pursuant to 28 U.S.C. section 636(b)(1)(B). (Doc. # 6).

On October 30, 2014, Magistrate Judge Majzoub issued a
Report and Recommendation ("R & R") wherein she
recommended that this Court GRANT Defendant's
Motion to Dismiss, and DISMISS this matter in its
entirety. (Doc. # 8).

Pursuant to FED. R. CIV. P. 72(b), a party objecting to
the recommended disposition of a matter by a Magistrate
Judge must file objections to the R & R within fourteen
(14) days after being served with a copy of the R & R.
FED. R. CIV. P. 72(b)(2). "The district judge must
determine *de novo* any part of the magistrate judge's
disposition that has been properly objected to." FED. R.
CIV. P. 72(b)(3).

The time for filing objections to the R & R has expired
and the docket reflects that neither party has filed
objections to the R & R. Furthermore, the Court agrees
with the Magistrate Judge's recommendation. Therefore,
the Court hereby ADOPTS the October 30, 2014 R & R.
IT IS ORDERED that Defendant's Motion to Dismiss is
GRANTED, and Plaintiff's Complaint is DISMISSED in
its entirety.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

MONA K. MAJZOUB, United States Magistrate Judge.

Plaintiff Gale Santilli commenced this action in the
Oakland County Circuit Court against Defendant
JPMorgan Chase Bank, N.A. on April 8, 2014. (Docket
no. 1 at ¶ 1.) In her Complaint, Plaintiff challenges
foreclosure proceedings related to real property located at
1354 Harvard Rd. in Berkley, Michigan. (*See* docket no.
1–2.) On June 16, 2014, Defendant removed the case to
this Court. (Docket no. 1.) Before the Court is
Defendant's Motion to Dismiss. (Docket no. 5.) Plaintiff
has not filed a response to Defendant's Motion, but a
response was due within 21 days of service, and that time
has now passed. E.D. Mich. LR 7.1(e)(1)(B). All pretrial
matters have been referred to the undersigned for
consideration. (Docket no. 6.) The undersigned has
reviewed the pleadings, dispenses with a hearing pursuant
to E.D. Mich. L.R. 7.1(f)(2), and issues this Report and
Recommendation.

### I. RECOMMENDATION
For the reasons that follow, the undersigned recommends
that Defendant's Motion to Dismiss (docket no. 5) be
**GRANTED** and that this matter be dismissed in its
entirety.

## II. REPORT

### A. Facts and Procedural History

**\*2** Plaintiff borrowed the sum of $202,000 from GreenPoint Mortgage Funding, Inc. on May 5, 2005. (Docket no. 1–3.) As security for the loan, Plaintiff granted Mortgage Electronic Registration Systems, Inc. (MERS), as the sole nominee for the lender, a mortgage interest in real property located at 1354 Harvard Rd. in Berkley, Michigan. (*Id.*) On October 12, 2011, MERS assigned the mortgage to Wells Fargo Bank, with JPMorgan Chase acting as the servicer for the loan. (Docket no. 5–3.) Plaintiff then defaulted on her loan obligations, and foreclosure proceedings were initiated. (Docket no. 1–2 at ¶ 10.) A sheriff's sale was held on October 8, 2013. (Docket no. 5–4.) Wells Fargo purchased the property at this sheriff's sale and received a sheriff's deed. (*Id.*) Plaintiff failed to redeem the property within the six-month redemption period. Plaintiff brought this lawsuit on April 8, 2014, the day that the redemption period expired, alleging: (1) fraudulent misrepresentation; (2) breach of contract; (3) violation of the Federal Real Estate Settlement Procedures Act (RESPA) and the Truth in Lending Act (TILA) ( 15 USC 1601 *et seq.*); (4) violation of 15USC 1639; (5) quiet title; (6) violation of MCL 600.3204 *et seq.;* (7) slander of title; (8) defamation; (9) intentional infliction of emotional distress; and (10) injunctive relief. (Docket no. 1 at ¶ 1.) Defendant filed a Motion to Dismiss Plaintiff's complaint on June 16, 2014. (Docket no. 5.) This matter is currently pending before the Court.

### B. Governing Law

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. The court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir.2002). To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007).

This acceptance of factual allegations as true, however, is inapplicable to legal conclusions: "Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotations and citations omitted). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

"Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* To make this determination, a court may apply the following two-part test: (1) "identify pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth; and (2) "assume the veracity [of the remaining allegations] and determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

### C. Analysis

**\*3** Plaintiff filed her complaint in Oakland County Circuit Court on April 8, 2014. (Docket no. 1 at ¶ 1; Docket no. 1–2.) After removal, Defendant filed the instant Motion to Dismiss claiming that Plaintiff's Complaint should be dismissed for the following reasons: (1) Plaintiff's claims are unsupported by factual details; (2) Plaintiff lacks statutory standing to challenge the foreclosure sale; (3) Plaintiff does not allege fraud, irregularity, or facts establishing prejudice in the procedure of the foreclosure sale; (4) Plaintiff failed to plead fraud (Count I) with requisite particularity; (5) Plaintiff failed to state a claim for breach of contract (Count II), slander of title (Count VII), and defamation (Count VIII); (6) Plaintiff's claims that Defendant violated the Real Estate Settlement Procedures Act (RESPA) and Truth in Lending Act (TILA) (Counts III and IV) are time barred; (7) Plaintiff has not stated a *prima facie* case for title (Count V); (8) Defendant complied with MCL 600.3204 *et seq* (Count VI); (9) extreme or outrageous conduct is lacking for a valid claim of emotional distress (Count IX); and (10) Plaintiff's claim for injunctive relief (Count X) is moot and legally insufficient. (Docket no. 6.)

### 1. Failure to State a claim

After conducting a thorough review of Plaintiff's Complaint, the undersigned concludes that each count of the Complaint is based entirely on conclusory statements, which fail to provide any factual support for the

underlying allegations. Because the claims are based solely on vague allegations, they do not meet the standards established by the United States Supreme Court in *Twombly* and *Iqbal,* and as a result, they are not sufficient to raise Plaintiff's right to relief above a speculative level. Therefore, the claims cannot survive a motion under Federal Rule of Civil Procedure 12(b)(6), and the undersigned recommends that Defendant's Motion to Dismiss Plaintiff's Complaint be GRANTED.

### 2. Setting Aside the Foreclosure

The foreclosure should not be set aside because Plaintiff did not redeem the property within the statutory redemption period. Defendant initiated foreclosure proceedings by publishing a Notice of Foreclosure in accordance with Mich. Comp. Laws § 600.3208, which ultimately resulted in a sheriff's sale on October 8, 2013. (*See* docekt 5–4.) Under Michigan law, Plaintiff had until April 8, 2014, to redeem the property. MCL § 600.3240(8). Once the April 8 deadline passed, all of Plaintiff's rights in the property were effectively extinguished, and all rights, title, and interest in the property vested with Defendant. MCL § 600.3236. Thus, Plaintiff lacks standing after April 8, 2014, to challenge the sheriff's sale or to raise any claims related to the property; therefore, the undersigned recommends that Defendant's Motion to Dismiss Plaintiff's Complaint be GRANTED.

### 3. Fraudulent Misrepresentation (Count I)

In Count I of her Complaint, Plaintiff claims that Defendant committed fraud in failing to provide required notices and disclosures. (Docket no. 1–2 at ¶ 19.) To support this claim, Plaintiff alleges that Defendant knew its representations were false and intended that Plaintiff would rely on those representations. (*Id.* at ¶¶ 20–21.) Plaintiff also alleges that Defendant's actions resulted in a substantial economic loss. (*Id.* at ¶ 23 .)

**\*4** Under Michigan law, a claim for fraudulent misrepresentation requires Plaintiff to show: (1) that the defendant made a material misrepresentation; (2) that was false; (3) that when he made it he knew that it was false, or he made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff was injured as a result. *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (Mich.1976) (citation omitted) .[T]he absence of any one of [these elements] is fatal to a recovery. *Id.* Additionally,

Federal Rule of Civil Procedure 9(b) imposes an obligation on any plaintiff alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." To meet the particularity requirement of Rule 9(b), the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Frank v. Dana Corp.,* 547 F.3d 564, 569–70 (6th Cir.2008) (citation and internal quotation marks omitted). "At a minimum, the plaintiff must allege the time, place and contents of the misrepresentations upon which [she] relied." *Id.* "The plaintiff also must allege facts from which it could be concluded that [her] reliance was reasonable." *Issa v. Provident Funding Grp., Inc.,* No. 09–12595, 2010 WL 538298, \*5 (E.D.Mich. Feb.10, 2010) (citing *Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App. 675, 599 N.W.2d 546, 553–54 (Mich.Ct.App.1999)). "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation, allowing the defendant[ ] to answer, addressing in an informed way the [plaintiff's] claim of fraud." *Kashat v. Paramount Bancorp, Inc.,* No. 09–10863, 2010 WL 538295, at \*4 (E.D.Mich. Feb.10, 2010) (citation omitted; alterations in original) (dismissing the plaintiffs' complaint because it did "not contain allegations concerning the time and place of the alleged misrepresentations.").

In this case, Plaintiff's Complaint fails to identify who made the misrepresentation, when the fraudulent statement was made, how the statements were made, and why the statement was inaccurate. Therefore, Plaintiff's allegations fail to state a claim for fraud under Michigan law and fail to meet the particularity requirements of Rule 9(b). As a result, the undersigned recommends that Defendant's Motion to Dismiss the Count I of Plaintiff's Complaint be GRANTED.

### 4. Breach of Contract (Count II)

Count II of the Complaint alleges that Defendant breached the loan agreement by failing to disclose material facts, by making false and misleading statements, and by engaging in deficient mortgage servicing and foreclosure processes. (Docket no. 1–2 at ¶ 27.)

Under Michigan law, a plaintiff must show the following to bring a valid breach-of-contract claim: (1) the existence of a valid contract; (2) the terms of the contract; (3) performance of things by the plaintiff; (4) conduct constituting breach by the defendant; and (5) damages. *Keywell and Rosenfeld v. Bithell,* 254 Mich.App. 300, 657 N.W.2d 759 (Mich.Ct.App.2002).

**\*5** Defendant claims that Plaintiff's allegations do not sufficiently identify the contract at issue, the terms that were breached, or the actions causing the breach. (Docket no. 5 at 29.) Defendant also claims that because these key facts have not been identified, they have not been put on sufficient notice of the claim against them. (*Id.*) As a result of these deficiencies, Defendant argues that Plaintiff's breach-of-contract claim cannot survive this Motion. (*Id.*)

The Court agrees with Defendant. Plaintiff has done nothing more than make conclusory statements listing the elements required to establish a valid breach of contract claim without providing any factual support. The contract at issue was not identified, there was no indication of the terms that were breached, and nothing in the complaint describes Defendant's wrongful actions. Therefore, Plaintiff has failed to state a plausible claim for relief, and as a result, the undersigned recommends that Defendant's Motion to Dismiss Count II of Plaintiff's Complaint be GRANTED.

### 5. Violation of the Federal Real Estate Settlement Procedures Act (RESPA) and the Truth in Lending Act (TILA) (15 USC 1601 *et seq* ) (Count III) and Violation of 15 USC 1639 (Count IV)

Count III of Plaintiff's Complaint alleges that Defendant failed to provide the notices and disclosures required under the Federal Real Estate Settlement Procedures Act and/or the Truth in Lending Act. (Docket no. 1–2 at ¶ 30.) Plaintiff claims that these actions caused an increase to the home's principal, resulting in a loss of Plaintiff's property rights. (*Id* at ¶ 31.) Count IV alleges that Defendant wrongly extended credit to Plaintiff without properly considering her ability to repay the debt. (*Id* at ¶ 36.)

Both claims are subject to statutes of limitation, and both statutes began running on the day the violation occurred. 12 USC 2614; 15 USC 1640(e). In this case, Plaintiff signed the loan agreement in question on May 5, 2005. Therefore, if the alleged violations did occur, they would have occurred on that date. Plaintiff's claims was filed on April 8, 2014, nearly nine years after the alleged violations would have occurred. This is well beyond the time period to bring a claim. Consequentially, the Plaintiff's claims are time-barred, and the undersigned recommends that Defendant's Motion to Dismiss Count III and Count IV of Plaintiff's Complaint be GRANTED.

### 6. Quiet Title (Count V)

In Count V of the Complaint, Plaintiff claims that Defendant's actions induced Plaintiff to obtain the loan, and as a result, Defendant does not have a valid interest in the home. (Docket no. 1–2 at ¶¶ 40–41.) Plaintiff then argues that because Defendant did not have a valid interest in the home, Defendant is in violation of MCL § 600.3204, and consequentially, its interest in the home should be extinguished under MCL § 600.2932. (*Id* at ¶¶ 40–41.)

Under Michigan law, "in an action to quiet title, the plaintiffs have the burden of proof and must make out a *prima facie* case of title." *Beulah Hoagland Appleton Qualified Pers. Residence Trust v. Emmet Co. Road Comm'n,* 236 Mich.App. 546, 600 N.W.2d 698, 700 (Mich.Ct.App.1999).

**\*6** Here, Plaintiff has failed to establish that her interest in the property is superior to Defendant's interest. Further, by the time Plaintiff brought the claim to quiet title to the property, she had already lost any interest that she may have previously held in the property for the reasons discussed, *supra.* Therefore, Plaintiff has failed to make out a *prima facie* case of title, and the undersigned recommends that Defendant's Motion to Dismiss Count V of Plaintiff's Complaint be GRANTED.

### 7. Violation of MCL 600.3204 *et seq* (Count VI)

Count VI of the Complaint alleges that Defendant failed to provide Plaintiff with required notice before initiating foreclosure proceedings, which denied her the opportunity to refinance the home within the redemption period. (Docket no. 1–2 at ¶¶ 45, 49.) Defendant counters Plaintiff's arguments by pointing out that the required notice was provided. (*See* docekt 5–4.) Further, Defendant cannot be held liable for any alleged violations of MCL § 600.3205 because that statute has been repealed, making any possible claims moot. Mich. Comp. Laws § 600.3205, *repealed by* P.A.2014, No. 125, § 1, Eff. June 19, 2014. Additionally, even if Plaintiff had qualified for modification, Defendant was not legally required to modify the loan. *Buchanan v. Household Fin. Corp. III,* No. 311689, 2014 WL 575762, \*1 (Mich.App. Feb.14, 2014.) Defendant also points out that Plaintiff's conclusory allegations that Defendant made "misrepresentations" do not survive Rule 9(b) and are insufficient for stating a claim. Consequentially, Plaintiff's claim that Defendant violated MCL § 600.3204 *et seq* fails, and the undersigned recommends that Defendant's Motion to Dismiss Count VI of Plaintiff's Complaint be GRANTED.

Santilli v. JPMorgan Chase Bank, N.A., Not Reported in F.Supp.3d (2014)

**8. Slander of Title (Count VII)**

In Count VII of the Complaint, Plaintiff claims that Defendant did not have a valid security interest in the home, while proceeding to cause a sheriff's sale of the home. (Docket no. 1–2 at ¶¶ 5253.) Under Michigan law, to make such a claim, "a plaintiff must show falsity, malice, and special damages, *i.e.,* that the defendant maliciously published false statements that disparaged a plaintiff's right in property, causing special damages." *B & B Inv. Group v. Gitler,* 304 Minn. 545, 229 N.W.2d 17 (Mich.Ct.App.1998). Plaintiff's claim fails to allege any specific conduct by Defendant, any malice, or specify how Defendant's conduct caused any special damages. The claim only vaguely refers to "illegal conduct," which was the "proximate cause of damages." These are merely conclusory statements, and as a result, Plaintiff has failed to state a claim. Therefore, the undersigned recommends that Defendant's Motion to Dismiss Count VII of Plaintiff's Complaint be GRANTED.

**9. Defamation (Count VIII)**

Count VIII of Plaintiff's Complaint alleges that Defendant made false statements regarding Plaintiff's character and personal information while knowing the statements were false or while recklessly disregarding the truth. (Docket no. 1–2 at ¶¶ 57–58.) Plaintiff further argues that Defendant also published this non-privileged information to third parties, damaging Plaintiff's reputation and causing economic loss. (*Id* at ¶¶ 59–60.)

**\*7** Under Michigan law, a plaintiff must allege the following to bring a valid defamation claim: (1) the making of a false and defamatory statement concerning the plaintiff; (2) that an unprivileged communication was made to a third party; (3) that there was fault amounting at least to negligence on the part of the publisher; and (4) either (a) actionability of the statement irrespective of special harm (defamation per se), or (b) the existence of special harm caused by the publication. *Mitan v. Campbell,* 474 Mich. 21, 24, 706 N.W.2d 420 (2005).

Plaintiff has failed to identify any specific defamatory statements or any damages related to such statements. Therefore, Plaintiff's claims are only a recitation of the elements needed to establish a valid defamation claim and fail to sufficiently state a claim. Consequently, the undersigned recommends that Defendant's Motion to Dismiss Count VIII of Plaintiff's Complaint be GRANTED.

**10. Intentional Infliction of Emotional Distress (Count IX)**

In Count IX of the Complaint, Plaintiff claims that Defendant caused her severe emotional distress by engaging in intentional conduct that was extreme, outrageous, and could not be tolerated by a civilized society. (Docket no. 1–2 at ¶¶ 62–65.) Again, Plaintiff has only made a threadbare recital of the elements without providing any factual support for her claims. In failing to identify any extreme or outrageous conduct, Plaintiff has not raised a valid intentional infliction of emotional distress claim; therefore, the undersigned recommends that Defendant's Motion to Dismiss Count IX of Plaintiff's Complaint be GRANTED.

**11. Injunctive Relief (Count X)**

Count X alleges that Defendant is not entitled to the home, and unless the Court grants Plaintiff the requested relief, she will suffer irreparable harm. (Docket no. 1–2 at ¶¶ 69–70.) Before a permanent injunction will be granted, the party seeking the injunction must establish the following factors: (1) the plaintiff has suffered irreparable injury; (2) the plaintiff has no adequate remedy at law, such as an award of money damages; (3) a permanent injunction is warranted by the balance of the hardships between the plaintiff and defendant; and (4) it is in the public interest to issue a permanent injunction. *See Audi AG v. D'Amato,* 469 F.3d 534, 500 (6th Cir.2006).

Plaintiff has failed to sufficiently establish any of the required factors, only claiming that "Defendant is not entitled to the home." (Docket no. 1–2 at ¶¶ 69.) Therefore, Plaintiff has failed to meet his legal burden. Additionally, the foreclosure sale has already occurred, and the redemption period has passed, making Plaintiff's claim for injunctive relief moot. Accordingly, the undersigned recommends that Defendant's Motion to Dismiss Count X of Plaintiff's Complaint be GRANTED.

**D. Conclusion**

For the reasons that follow, the undersigned recommends that Defendant's Motion to Dismiss (docket no. 5) be **GRANTED** and that this matter be dismissed in its entirety.

***REVIEW OF REPORT AND RECOMMENDATION***

**\*8** Either party to this action may object to and seek

review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *See Willis v. Sec'y of Health and Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Rule 72.1(d)(2) of the Local Rules of the United States District Court for the Eastern District of Michigan, a copy of any

objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: October 30, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6675327

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 10565034
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

SUN LIFE ASSURANCE COMPANY OF CANADA,
Plaintiff(s),
v.
IMPERIAL HOLDINGS INC., et al., Defendant(s).

Case No. 13–80385–Civ–Brannon
|
Signed 09/22/2016

**Attorneys and Law Firms**

Pedro L. Reyes Ramos, Miami Beach, FL, pro se.

Brett A. Feinstein, Miami, FL, for Defendants.

### ORDER GRANTING SUN LIFE'S MOTION FOR SUMMARY JUDGMENT

DAVE LEE BRANNON, U.S. MAGISTRATE JUDGE

**\*1** This MATTER is before the Court on Sun Life Assurance Company of Canada's ("Sun Life") Motion for Summary Judgment [DE 452], Imperial Premium Finance, LLC's ("Imperial") Response [DE 471], and Sun Life's Reply [DE 493]. Being fully advised, the Court GRANTS Sun Life's Motion and enters summary judgment in its favor accordingly.

### FACTUAL BACKGROUND

This consent case involves life insurance policies. Sun Life is a life insurance company that issued 33 policies insuring the lives of various individuals. (DE 472 ¶ 16). As mandated by statute, these policies provide, with slight variations, that "[a]fter this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, [Sun Life] cannot contest it except for non-payment of Premiums." (DE 472 ¶ 18; DE 472–1 at 14).

Unbeknownst to Sun Life, at the time that it issued the

policies, the contracting individuals had a financing agreement in place with Imperial secured by the policies themselves. After the two year incontestability period expired on the policies, all 33 policies were assigned to Imperial pursuant to the terms of this separate agreement. (DE 499 at 16). Thereafter, and in accordance with the policies, Sun Life was provided with change of ownership and beneficiary forms to reflect Imperial's ownership of the policies. (DE 499 at 16). Sun Life honored some of the change of ownership and beneficiary forms, but refused others on the basis that the policies were void because they lacked an insurable interest at inception in violation of applicable law. See Fla. Stat. § 627.404.

Thereafter, Sun Life sued Imperial seeking damages and to invalidate the policies arguing that Imperial masterminded a scheme to procure illegal and invalid life insurance policies that lack an insurable interest. [DE 1]. In response, Imperial filed its own suit against Sun Life based primarily on Sun Life having "breached" the incontestability clauses in the policies, causing Imperial damages. [DE 1 in Case 13–80730]. After consolidating the two cases, the Court dismissed Sun Life's suit holding that it was barred by the applicable two year incontestability provisions in the policies. [DE 291]. Imperial's suit, which asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud, remains pending and is the subject of Sun Life's current motion for summary judgment, which is now ripe for resolution. [DE 452].

### LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Sun Life, as the moving party, bears the initial burden of showing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This may be accomplished by showing that Imperial, the nonmoving party, will be unable to "establish the existence of an element essential to [Imperial's] case, and on which [Imperial] will bear the burden of proof at trial." Id. at 322.

**\*2** Once Sun Life has met its burden, the burden shifts to Imperial to "designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks omitted). There is a genuine issue for trial if the evidence, viewed in the light most favorable to Imperial, would allow a reasonable jury to find in Imperial's favor.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In short, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided" that Sun Life must prevail as a matter of law. *Id.* at 251–52.


### ANALYSIS

### I. Imperial's Claims Based on Sun Life "Contesting" the Policies are not Actionable.

The bulk of Imperial's case seeks damages allegedly suffered as a result of Sun Life "contesting" the policies in violation of the incontestability clauses. Sun Life argues that it is entitled to summary judgment because incontestability clauses "provide a ***defense*** against" an insurer's attempts to void a policy, "***not*** an actionable claim for damages." (DE 493 at 7) (emphasis in original). The Court agrees and will enter summary judgment in Sun Life's favor on all claims based on Sun Life having improperly "contested" the policies.

In Florida,[1] all life insurance contracts must provide "that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue," with exceptions not applicable here. Fla. Stat. § 627.455. The Florida Supreme Court has determined that these so-called "incontestability clauses" are "in the nature of, and serve a similar purpose as, a statute of limitations." *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1115 (11th Cir. 2005) (quoting *Prudential Ins. Co. of Am. v. Prescott*, 176 So. 875, 878 (Fla. 1937)). Accordingly, courts applying Florida law have interpreted incontestability clauses to bar an insured's efforts to rescind a policy outside of the two year period. *Miller*, 424 F.3d at 1115 (collecting cases). To that end, policy holders typically raise incontestability clauses *as a means to defeat an insurer's attempts to invalidate a policy* after the contestability period has expired, not as a basis for an independent case for damages resulting from the provision being "breached." *See e.g.*, *Allstate Life Ins. Co. v. Fox*, 700 So. 2d 49, 49–50 (Fla. 5th DCA 1997) (explaining that statutorily required incontestability clauses prevent insurers from "*raising as a defense to payment of a claim*," any misrepresentations a decedent made in the policy application when that decedent survives at least two years from the date the policy is issued") (emphasis added); *see also Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327 (11th Cir. 2015) (policy holders raised incontestability clauses to bar insurers from invalidating policy; not as a means for independent damages); *accord Miller*, 424 F.3d at 1113;

*Bankers Sec. Life Ins. Soc. v. Kane*, 885 F.2d 820 (11th Cir. 1989); *Great S. Life Ins. Co. v. Porcaro*, 869 So. 2d 585 (Fla. 4th DCA 2004).[2]

**\*3** Here, Imperial has already successfully raised the incontestability clauses as a shield against Sun Life's lawsuit attempting to invalidate the policies. Now, however, Imperial seeks affirmative damages in contract and tort based on Sun Life having "breached" the incontestability clauses. Imperial cites no authority holding that an incontestability clause mandated by Section 627.455 may give rise to an affirmative claim for damages, and the Court has not found any despite an extensive search. At most, despite the thoroughness of the briefs filed in this case by very competent counsel, Imperial has identified a complaint pending in New York where the plaintiff, like Imperial, seeks affirmative damages on the theory that an insurer "breached" an incontestability clause. [DE 518]. But simply because another litigant is pursuing a similar claim (under different laws) does not persuade the Court. If anything, the fact that Imperial cannot find settled authority to support its position further confirms the Court's conclusion: incontestability clauses as mandated by Section 627.455 are to be raised as a shield, not a sword. That is consistent with the Florida Supreme Court's holding that incontestability clauses are akin to statutes of limitations. Just as a litigant may not recover damages based on a statute of limitations having run, he or she may not recover damages based on the time period in an incontestability clause having run.

Unable to find cases on point, Imperial analogizes incontestability clauses to covenants not to sue, which do give rise to an affirmative case for damages when breached. (DE 471 at 11). Again, Imperial cites no authority likening incontestability clauses under Section 627.455 to covenants not to sue, and the Court is not persuaded by Imperial's analogy. To start, the Florida Supreme Court has said that incontestability clauses are like statutes of limitations, not covenants not to sue. *Prescott*, 176 So. at 878. Moreover, incontestability clauses and covenants not to sue are different in significant ways. While parties may freely bargain for a covenant not to sue, incontestability clause must be included in all insurance contracts by statute. Fla. Stat. 627.455. This matters in light of the right to access to courts guaranteed by Article I, Section 21 of the Florida Constitution. Covenants not to sue do not violate that right because the restrictions placed on the party's access to courts are of the party's "own agreement and [are] not the result of legislative or judicial action." *Shay v. First Fed. of Miami, Inc.*, 429 So. 2d 64, 67 (Fla. 3d DCA 1983). The same cannot be said about incontestability

clauses, which ***are*** the result of legislative action, namely Section 627.455. When faced with two plausible interpretations, the Court will choose the one that does not call into question Section 627.455's constitutionality. *See Frazier ex rel. Frazier v. Winn,* 535 F.3d 1279, 1282 (11th Cir. 2008) (citing *Clark v. Martinez,* 543 U.S. 371 (2005)). That interpretation, which is consistent with the Florida Supreme Court's view on the issue, is that incontestability clauses are like statutes of limitations, not covenants not to sue, and they therefore do not give rise to an independent action for damages.

Because the incontestability clauses at issue here do not give rise to an affirmative claim for damages, the Court will enter summary judgment in Sun Life's favor on all claims to the extent that they rely on Sun Life having improperly "contested" the policies. With that in mind, the Court will now address Imperial's individual counts.

## II. Sun Life is Entitled to Summary Judgment on Imperial's Breach of Contract Claim.

The Court will now address Imperial's breach of contract claim. Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller,* 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). In its motion for summary judgment, Sun Life attacks the second and third elements of the claim: breach and damages.

With regard to the breach element, two provisions are at issue:

> (1) ***the "Incontestability Clause"*** providing in relevant part that "[a]fter this Policy has been in force ... for a period of two years from its Issue Date, [Sun Life] cannot contest it except for non-payment of premiums"; and
>
> **\*4** (2) ***the "Rights and Privileges Clause"*** providing that the policy owner has "the sole and absolute power to exercise all rights and privileges under [the] Policy without the consent of any other person[.]"

(DE 471 at 4; DE 472 ¶¶ 18, 25). The Court has already held that Sun Life is entitled to summary judgment on Imperial's breach of contract claim based on the Incontestability Clause. That wipes out Imperial's claims for damages for (a) legal fees incurred as a result of litigating Sun Life's lawsuit; and (b) the reduced valuation of the policies. (DE 471 at 11–12) (conceding that these damages were suffered "as a result of Sun

Life's breach of the incontestability provision.").

That leaves the Rights and Privileges Clause. With regard to that clause, Sun Life attacks the third element of Imperial's breach of contract claim—damages. Under Florida law, the purpose of breach of contract damages is to restore an injured party to the same position that he or she would have been in had the contract not been breached. *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.,* 25 So. 3d 593, 596 (Fla. 1st DCA 2009). Restoring the injured party to the "same position," however, does not allow for putting the party in a position better than that which he would have occupied had the breach not occurred. *Lindon v. Dalton Hotel Corp.,* 49 So. 3d 299, 305–06 (Fla. 5th DCA 2010). Rather, the only damages that are recoverable are those that flow naturally from the breach and can "reasonably be said to have been contemplated by the parties at the time that the contract was made." *Id.* (citations omitted).

Here, Imperial argues that Sun Life breached the Rights and Privileges Clause by:

> (a) Refusing to process the ownership change requests for the policies insuring the lives of June Fuhrman, James Deberry, and Elizabeth Geller, which violates (i) the owner's right to "change the Owner and Beneficiary by written notice," and (ii) interferes with the owner's right to assign its interests under the policy (DE 471 at 4 "Row 2, Column B"; DE 472 ¶ 29(a)–(c); DE 472–15 ¶ 3(a); DE 499 ¶¶ 64–65, 74); and
>
> (b) Failing to mail the requisite Grace Period notices for the policies insuring the lives of June Fuhrman, Elizabeth Geller, and Ernest Caparelli, which violates the owner's right to receive grace notices prior to a policy lapsing for insufficient value (DE 471 at 4 "Row 2, Column B"; DE 472 ¶ 30; DE 472–15 ¶ 3(b); DE 499 ¶¶ 66, 105(c)).[3]

As a result of these alleged breaches, Imperial argues that it "has been unable to use the Policies" as collateral for its credit facility, which has caused it over $10 million in premium payments and $5 million in interest-related expenses. (DE 471 at 15). Imperial has not provided any evidence showing that these damages of over $15 million were incurred as a result of Sun Life breaching the Rights and Privileges Clauses in the Fuhrman, Deberry, Geller, and Caparelli policies.[4] Imperial's lack of evidence showing that it suffered damages as a result of Sun Life breaching the applicable Rights and Privileges Clauses entitles Sun Life to summary judgment on the breach of contract claim. *See ProfiTel Grp., LLC v. PolyOne Corp.,* 238 Fed.Appx. 444, 451 (11th Cir. 2007) (affirming summary judgment on breach of contract claim where the

"evidence at the summary judgment stage was simply too flimsy" to establish that defendant's conduct caused the damages sought); *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1273 (S.D. Fla. 2015) (granting summary judgment on contractual claims "[b]ecause Plaintiffs have failed to produce evidence that would support their claim for damages"); *Chipman v. Chonin*, 597 So. 2d 363, 364 (Fla. 3d DCA 1992) (affirming summary judgment on breach of contract claim where "the record is devoid of any evidence" establishing damages as a result of the alleged breach).

**\*5** Additionally, the Court agrees with Sun Life's position that these damages are not recoverable as a matter of law. (DE 452 at 8–9). Again, an injured party may only recover damages that "can reasonably be said to have been contemplated by the parties at the time that the contract was made." *Lindon*, 49 So. 3d at 306. Here, it cannot be said that when Sun Life entered into the Fuhrman, Deberry, Geller, and Caparelli policies with the original contracting individuals that it could have reasonably anticipated that it would have been liable for over $15 million in damages to a non-party to the contract simply because it failed to honor ownership change requests and failed to send grace notices on these four policies. While foreseeability issues are typically factual inquiries, the claimed damages here are so speculative, unforeseeable, and attenuated that no reasonable jury could hold otherwise, and summary judgment is proper for this independent reason. *See In re New River Shipyard, Inc.*, 355 B.R. 894, 906 (Bankr. S.D. Fla. 2006) (granting summary judgment on breach of contract claim in part because "[n]o reasonable person could have foreseen" the damages sought at the time the contract was entered into); *see also Chipman*, 597 So. 2d at 364 (affirming summary judgment on breach of contract claim and explaining that "where reasonable minds cannot differ, proximate cause becomes a question of law").

In sum, Imperial's breach of contract claim based on the Incontestability Clauses fails because incontestability clauses do not give rise to an independent claim for damages. Imperial's breach of contract claim based on the Rights and Privileges Clauses fails because Imperial has no evidence of recoverable damages, a necessary element of the claim. Accordingly, Sun Life is entitled to summary judgment on the entirety of Imperial's breach of contract claim.

### III. Sun Life is Entitled to Summary Judgment on Imperial's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Next, the Court must determine whether Sun Life is entitled to summary judgment on the breach of good faith and fair dealing claim. As an initial matter, it is well-settled that a claim for a breach of the implied covenant of good faith and fair dealing cannot survive when the allegations underlying the claim are duplicative of the allegations underlying a breach of contract claim. *Bradman v. Mental Health Network, Inc.*, 2008 WL 5110525, at \*2 (S.D. Fla. Dec. 2, 2008); *Trief v. Am. Gen. Life Ins. Co.*, 444 F. Supp. 2d 1268, 1270 (S.D. Fla. 2006); *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000). Here, Imperial alleges that Sun Life breached the implied covenant of good-faith and fair dealing by refusing to acknowledge ownership change request forms, and by improperly challenging the validity of the policies. (DE 199 ¶¶ 108–109). These are the same allegations underlying Imperial's failed breach of contract claim. As such, the breach of the implied covenant claim is duplicative of the breach of contract claim, and Sun Life is entitled to summary judgment.

Additionally, a plaintiff asserting a claim for breach of good faith and fair dealing must show that "a specific contractual provision has been breached, causing it damages." *APR Energy, LLC v. Pakistan Power Res., LLC*, 653 F. Supp. 2d 1227, 1235 (M.D. Fla. 2009). Because the Court has already held that Imperial's breach of contract claim fails as a matter of law, so too does its claim for breach of the implied covenant of good faith and fair dealing. *See Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (affirming summary judgment where breach of contract claim failed because "[a] breach of the implied covenant of good faith and fair dealing is not an independent cause of action"); *Bowe*, 106 F. Supp. 3d at 1273 (granting summary judgment on breach of good faith and fair dealing claim because of lack of evidence of contractual damages). Accordingly, the Court will enter summary judgment in Sun Life's favor on the breach of implied covenant of good faith and fair dealing claim.

### IV. Sun Life is Entitled to Summary Judgment on Imperial's Fraud Claim.

Finally, the Court must determine whether Sun Life is entitled to summary judgment on Imperial's fraud claim. It is well-settled that a plaintiff may not "recast causes of action that are otherwise breach-of-contract claims as tort claims." *Kaye v. Ingenio, Filiale De Loto–Quebec, Inc.*, No. 13–61687–CIV, 2014 WL 2215770, at \*4 (S.D. Fla. May 29, 2014) (Rosenbaum, J.). Instead, a party asserting a tort claim must establish conduct "beyond and independent of breach of contract that amounts to an independent tort." *Id.* (citations omitted). With regard to a fraud claim, "the critical inquiry focuses on whether the

alleged fraud is separate from the performance of the contract." *Id.* (citations omitted). An alleged fraud is ***not*** separate from the performance of the contract where the misrepresentations forming the basis for the fraud also form the basis for the breach of contract claim. *See Lookout Mountain Wild Animal Park, Inc. v. Stearns Zoological Rescue & Rehab Ctr., Inc.*, 553 Fed.Appx. 864, 866 (11th Cir. 2014) (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407–410 (Fla. 2013) (affirming entry of judgment as a matter of law on tort claims where the court was "not persuaded that plaintiff has identified any tortious acts that are sufficiently independent of the alleged breach of contract to render the tort claims viable."); *Kaye*, 2014 WL 2215770, at *4 (rejecting fraud claim where "[a]lthough Kaye attempts to characterize his claim as sounding in fraud, the factual allegations reveal nothing more than a purported breach of contract."); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1318 (S.D. Fla. 2014) (holding that fraud claim failed as a matter of law where "Plaintiffs have not pleaded any breach or injury separate and apart from their breach of contract claims").

**\*6** Here, while Imperial asserts a fraud claim, it is nothing more than a claim for breach of contract. Imperial's fraud claim hinges on Sun Life challenging the validity of the policies in violation of the incontestability clauses. (DE 471 at 20 (claiming that Sun Life committed fraud because it "never intended to comply with its contractual obligation not to contest the Policies after expiration of the two-year contestability period[.]")). These purported misrepresentations are no different than what underlies Imperial's contractual claims. As such, Imperial has not identified any tortious acts that are sufficiently independent from the contractual claims to render its fraud claim viable, and Sun Life is entitled to summary judgment on the fraud claim for this reason alone.

In addition to being duplicative of the contractual claims, Imperial has failed to identify anything in the record to support the elements of a fraud claim. Under Florida law, a fraud claim requires: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1281 (S.D. Fla. 2003) (quoting *Lopez–Infante v. Union Cent. Life Ins. Co.,* 809 So.2d 13 (Fla. 3d DCA 2002)).

Here, Imperial claims that Sun Life committed fraud by (1) entering into the policies containing incontestability clauses while intending to breach those clauses; and (2)

issuing routine correspondence on some of the policies indicating that Sun Life considered the policies valid, despite its intention to later seek to invalidate them. (DE 471 at 16). As an initial matter, Imperial's fraud claim again improperly seeks affirmative damages for Sun Life having violated the incontestability clauses, which the Court has already held is improper. Additionally, with respect to the account correspondence, Imperial has failed to identify anything false contained in these communications. The statements made in the correspondence relate to the status of the policies at the time of the correspondence, not to Sun Life's beliefs or future intentions. And there was nothing false at the time of the correspondence because the policies were indeed valid, issued, and in force, as represented. Sun Life is entitled to summary judgment on Imperial's fraud claim for this reason too. *Compania de Elaborados de Café*, 401 F. Supp. 2d at 1281 (granting summary judgment on fraud claim where plaintiffs "casually reference correspondence ... that they maintain misrepresents [Defendant's] position," but "no evidence has been presented that the statements were false."); *see also U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. CIV. 12–877 JRT/TNL, 2013 WL 2936099, at *9 (D. Minn. June 14, 2013) (dismissing similar fraud claim under Minnesota law because the statements in the account correspondence related to the status of the policy at the time, not the insurer's beliefs or intentions).

## CONCLUSION

Based on the foregoing, the Court holds that Sun Life is entitled to summary judgment on the entirety of Imperial's case. Accordingly, it is ORDERED and ADJUDGED that:

> 1. Sun Life's Motion for Summary Judgment [DE 452] is GRANTED;

> 2. All pending motions, including Imperial's Motion for Equitable Application of the October 31, 2014 Scheduling Order [DE 435], are denied as moot; and

> 3. The Court will enter a Final Judgment by separate order under Fed. R. Civ. P. 58(a).

DONE and ORDERED in Chambers at West Palm Beach in the Southern District of Florida, this 22nd day of September, 2016.

**All Citations**

Slip Copy, 2016 WL 10565034

Footnotes

| | |
|---|---|
| 1 | The parties agree that Florida law applies to this action, and the Court will not *sua sponte* hold otherwise at this stage. *Cf. Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 n.15 (11th Cir. 1995) (appellant waived choice-of–law issue when it had acquiesced in the trial court's choice-of–law decisions throughout the trial court proceedings). |
| 2 | When policy holders have sought affirmative relief, it has typically been in the form of death benefits on the insurance policy, not independent damages flowing from the incontestability clause being "breached." *See e.g., Sciaretta v. Lincoln Nat. Life Ins. Co.*, 899 F. Supp. 2d 1318, 1320 (S.D. Fla. 2012) (policy holder brought suit "to recover death benefits on an insurance policy," and raised incontestability clause as a means to bar insurer's attempts to invalidate policy). |
| 3 | Imperial also claims that Sun Life breached the Rights and Privileges Clause by "contesting" the validity of the policies—conduct which the Court has already held is not actionable. |
| 4 | The Court notes that each policy in this case is an independent contract, and the Court will treat it as such. |

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1582226
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Gloria TASSY, individually and on behalf of all
similarly situated, Plaintiff–Appellee,
v.
LINDSAY ENTERTAINMENT ENTERPRISES,
INC., Defendant–Appellant.

Nos. 17–5338
|
17–5375
|
FILED February 22, 2018

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
KENTUCKY

**Attorneys and Law Firms**

Bernard R. Mazaheri, Christina Thomas Mazaheri,
Morgan & Morgan, Lexington, KY, for Plaintiff–
Appellee.

Garry Richard Adams, Jr., David N. Ward, Clay, Daniel,
Walton & Adams, Louisville, KY, for Defendant–
Appellant.

Before: McKEAGUE, KETHLEDGE, and THAPAR,
Circuit Judges.

**Opinion**

**\*1** When "the making of [an] arbitration agreement" is
"in issue," the Federal Arbitration Act requires district
courts to "proceed summarily to [a] trial" to decide the
matter. 9 U.S.C. § 4. In this case, the district court did not
"summarily" determine whether the parties had agreed to
arbitrate. As such, we reverse.

Two years ago, Gloria Tassy sued Lindsay Entertainment
under the Fair Labor Standards Act. When Lindsay
moved to compel arbitration, Tassy balked. She claimed
she had not signed an arbitration agreement. In response,
Lindsay could not produce a signed agreement but only
two witnesses who swore she had signed one. The district
court noted that the parties had raised a genuine factual
dispute and resolved to hold an evidentiary hearing, but it

never did. To date, in fact, the district court has not
decided the formation question. Instead, after about a
year, it (1) conditionally certified Tassy's FLSA class and
(2) denied Lindsay's motion to compel arbitration with
leave to refile following an evidentiary hearing.[1] The
district court's failure to "summarily" determine whether
the parties formed an agreement to arbitrate was error.

When arbitration is in dispute, the Federal Arbitration Act
requires that "courts process the venue question quickly
so the parties can get on with the merits of their dispute in
the right forum." *Howard v. Ferrellgas Partners, L.P.*,
748 F.3d 975, 978 (10th Cir. 2014). Taking over a year to
resolve Lindsay's motion to compel was not "quick." *Id.*
at 977–78 (reversing where district court took a year and a
half to rule on arbitrability dispute, and noting that "[t]he
object is always to decide quickly—summarily—the
proper venue for the case ... so the parties can get on with
the merits of their dispute"); *see also Silfee v. Automatic
Data Processing, Inc.*, 696 Fed.Appx. 576, 577–79 (3d
Cir. 2017) (holding that district court erred by deciding
motion to dismiss before motion to compel arbitration);
*Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 376–78
(5th Cir. 2016) (holding that "upon being presented with
[a] motion to compel arbitration, the district court was
required to address the arbitrability of [the plaintiff's]
claim at the outset of the proceedings, prior to considering
conditional certification"). On remand, the district court
should promptly determine whether the parties agreed to
arbitrate. *See Dean Witter Reynolds, Inc. v. Byrd*, 470
U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no
place for the exercise of discretion by a district court, but
instead mandates that district courts *shall* direct the
parties to proceed to arbitration on issues as to which an
arbitration agreement has been signed."); *Moses H. Cohn
Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22
(1983) (FAA requires "an expeditious and summary
hearing, with only restricted inquiry into factual issues").

**\*2** Accordingly, we **VACATE** the district court's order
denying Lindsay's motion to stay proceedings and compel
arbitration and **REMAND** for further proceedings
consistent with this decision. In addition, we **DISMISS**
Lindsay's appeal from the district court's grant of
conditional certification for lack of jurisdiction.

**All Citations**

Not Reported in Fed. Rptr., 2018 WL 1582226

**Tassy v. Lindsay Entertainment Enterprises, Inc., Not Reported in Fed. Rptr. (2018)**

Footnotes

1    We do not have jurisdiction to consider the district court's grant of conditional certification under the FLSA, *see Taylor v. Pilot Corp.,* 697 Fed.Appx. 854, 858–60 (6th Cir. 2017), but only its provisional denial of Lindsay's motion to stay the proceedings and compel arbitration, 9 U.S.C. § 16. And, contrary to Tassy's suggestion, Lindsay's appeal from that order is timely. The district court did not deny Lindsay's motion to compel arbitration until March 31, 2017, and Lindsay filed its amended notice of appeal on April 2, 2017. *See* Fed. R. App. P. 4(a)(1)(A).

---

**End of Document**                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   2

2012 WL 5611055
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.

David A. VARNES, Plaintiff,
v.
HOME DEPOT USA, INC., et al., Defendant.

No. 3:12–cv–622–J–99TJC–JBT.
|
Nov. 15, 2012.

**Attorneys and Law Firms**

John Allen Yanchunis, Sr., Rachel Soffin, Morgan & Morgan, PA, St. Petersburg, FL, for Plaintiff.

Andrew J. Knight, II, Moseley, Prichard, Parrish, Knight & Jones, Jacksonville, FL, S. Stewart Haskins, Skyler A. McDonald, Zachary A. McEntyre, King & Spalding, LLP, Atlanta, GA, for Defendant.

***ORDER***

TIMOTHY J. CORRIGAN, District Judge.

**\*1** This case is before the Court on Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 6). Plaintiff filed his Response to the Motion to Dismiss (Doc. 20). Defendant filed a Reply (Doc. 25) and Plaintiff filed a Surreply (Doc. 27). On October 16, 2012, the Court heard oral arguments from the parties. Those discussions are incorporated by reference. After considering the oral arguments and the papers, the Court concludes that Plaintiff's Complaint should be dismissed, with leave to amend.

The Court had issues with all the claims in the Complaint, for a variety of reasons delineated below. First, Paragraph 21, while possibly not rising to the level of an admission, certainly confuses the issues. This statement affects not only the breach of contract claim, but the breach of warranty claim as well. Further for the breach of warranty claim, it is unclear in what manner Defendant presented Plaintiff with the "Lifetime Craftsmanship Warranty" (Doc. 3–2). The Complaint makes no mention of where this document was obtained or whether it was a pamphlet

that came with the product or simply an advertisement. If Plaintiff refiles the Complaint, he should make clear the origin of the Craftsmanship Warranty and remove Paragraph 21 of the Complaint or change it in a way to alleviate confusion.

Plaintiff's Florida Deceptive and Unfair Trade Practices Act (FDUTPA) claim merely restates the allegations of his breach of contract and breach of warranty claims, without noting which facts show deceptive or unfair practices. Paragraphs 48 and 49 of the Complaint contain conclusory statements that track the language of FDUTPA. Plaintiff correctly states that a FDUTPA claim can coexist with a breach of contract claim. *See PNR, Inc. v. Beacon Mgmt., Inc.,* 842 So.2d 773, 777 n. 2 (Fla.2003). However, "without significant allegations of unfair or deceptive conduct," there can be no claim under FDUTPA. *Hache v. Damon Corp.,* 2008 WL 912434 at \*2 (M.D.Fla.2008). Formulaic recitation of the elements under FDUTPA using conclusory statements is not enough to state a cause of action. *Infinity Global, LLC v. Resort at Singer Island, Inc.,* 2008 WL 1711535 (S.D.Fla.2008). If the Plaintiff wishes to bring a FDUTPA claim in his Amended Complaint, he must allege facts that show unfair or deceptive conduct and note which of his factual allegations support a FDUTPA claim.

Plaintiff's claim of negligence is barred by the economic loss rule, unless an exception applies. Plaintiff cites the "other loss" exception, which normally applies to product liability cases. *Indemnity Ins. Co. Of North America v. American Aviation, Inc.,* 891 So.2d 532, 536 (Fla.2004). Plaintiff should carefully evaluate his negligence claim to see if it can survive an economic loss rule challenge.

For the breach of the implied covenant of good faith and fair dealing claim, Plaintiff has not alleged any violation different from the breach of contract and breach of warranty claims. "[A] breach of the implied duty may be dismissed as redundant where the conduct allegedly violating the implied covenant is duplicative of the companion cause of action alleging breach of contract." *Shibata v. Lim,* 133 F.Supp.2d 1311, 1319 (M.D.Fla.2000). For Plaintiff to survive a motion to dismiss on this cause of action, the claim must be distinct and not duplicative of the breach of contract or breach of warranty claims.

**\*2** Finally, Plaintiff's claim for violation of the Florida Building Code is dismissed for failure to give 60 days notice and an opportunity for Defendant to inspect the property pursuant to Florida Statute § 558.004(1).[1]

Varnes v. Home Depot USA, Inc., Not Reported in F.Supp.2d (2012)

For the foregoing reasons, it is hereby

**ORDERED:**

Defendant's Motion to Dismiss (Doc. 6) is **GRANTED.** No later than **December 7, 2012** Plaintiff may file an Amended Complaint. No later than **January 4, 2013,** Defendant shall file a response. The parties shall confer and no later than **January 4, 2013,** the parties shall inform the Court if the schedule proposed by their Case Management Report (Doc. 26), can be maintained. If the schedule cannot be maintained, no later than **January 4, 2013,** the parties shall file a new Case Management Report.

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5611055

Footnotes

1   The Court is giving Plaintiff until December 7, 2012 to file an Amended Complaint, assuming that Plaintiff will not renew the claim for violation of the Florida Building Code. If Plaintiff intends to allege this claim in the Amended Complaint, Plaintiff should give notice to Defendant forthwith and allow Defendant to inspect the property in accordance with § 558.004(1). Plaintiff may then move for an extension of time to file an Amended Complaint so Plainitff can comply with the statutory notice requirement.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Williams v. General Motors Acceptance Corp., Not Reported in N.W.2d (2011)

75 UCC Rep.Serv.2d 863

2011 WL 5071365

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Fred James WILLIAMS, Plaintiff/Counter
Defendant–Appellant,
v.
GENERAL MOTORS ACCEPTANCE
CORPORATION (GMAC), Defendant/Counter
Plaintiff–Third Party Plaintiff,
and
Williams Chevrolet, Inc., Defendant/Third Party
Defendant–Appellee.

Docket No. 299345.
|
Oct. 25, 2011.

Grand Traverse Circuit Court; LC No. 09–027524–NZ.

Before: STEPHENS, P.J., and SAWYER and K.F.
KELLY, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff appeals as of right challenging the trial court's
orders dismissing his various claims against defendant
pursuant to MCR 2.116(C)(10), and sanctioning
plaintiff's attorneys approximately $16,500 for signing a
frivolous complaint in contradiction to MCR 2.114. We
affirm in part, reverse in part and remand for further
proceedings consistent with this opinion.

On April 8, 2008, plaintiff purchased a 1997 Cadillac
DeVille from defendant Williams Chevrolet, Inc. (the
dealership). The purchase price was $4,995 and the
vehicle had approximately 135,000 miles. Plaintiff signed
a retail installment sales contract with the dealership to
complete the purchase. The dealership assigned this
contract to co-defendant General Motors Acceptance
Corporation (GMAC).[1]

As part of the transaction, plaintiff signed a document
entitled "Vehicle Order." This document stated that the
vehicle was "sold as is" with "no warranty." It also

included an integration clause: "The front and back hereof
comprise the entire agreement pertaining to this purchase
and no other agreement of any kind, verbal understanding
or promise have been made."

According to plaintiff, he asked the salesperson for a
"safe and reliable used vehicle," the salesperson showed
him the Cadillac at issue, and told him that the Cadillac
"had been inspected by the dealership and had been found
to have no mechanical problems or deficiencies." Plaintiff
claimed that he relied on the salesperson when he decided
to purchase the vehicle. Defendant acknowledged that the
vehicle "had a safety inspection and an oil change," but
has otherwise denied plaintiff's allegations. Plaintiff also
claimed that there was no "buyer's guide" in the vehicle's
window and that he did not otherwise receive one.

According to plaintiff, when he drove the vehicle
approximately 80 miles back to his residence, the service
engine light came on and the vehicle began lurching.
Plaintiff took the vehicle to a nearby GM dealership,
where a mechanic performed a throttle body cleaning and
replaced the fuel filter. Shortly thereafter, the vehicle
"suffered ... another mechanical failure" and was towed to
Maxx Garage, where $436.76 worth of repairs were
completed. The mechanics at Maxx Garage also
discovered that the vehicle needed additional repairs.
Plaintiff claimed that the mechanics at Maxx Garage told
him that had the dealership performed a proper
inspection, it would have recognized that the vehicle
required these additional repairs.

Subsequently, the dealership reimbursed plaintiff $436.76
for the Maxx Garage repairs and performed some
additional repairs for free, but refused to repair all the
problems discovered by Maxx Garage. After attempts to
resolve the problems directly with the dealership failed,
plaintiff stopped making payments[2] on the vehicle and
filed a complaint alleging ten causes of action against the
dealership. Plaintiff claimed (I) Fraud and/or
misrepresentation; (II) Breach of express warranty; (III)
Breach of implied warranty; (IV) Breach of implied
warranty of fitness for particular purpose; (V) Revocation
of acceptance; (VI) Violation of the Magnuson–Moss
Warranty Act ("MMWA"), 15 USC 2301 *et seq.;* (VII)
Violation of the Michigan Motor Vehicle Code, MCL
257.1 *et seq.;* (VIII) Violation of the Michigan Consumer
Protection Act ("MCPA"), MCL 445.901 *et seq.;* (IX)
Breach of contract/rescission; and (X) Violation of the
Motor Vehicle Service and Repair Act, MCL 257.1301 *et
seq.*

**\*2** On December 1, 2009, defendant moved for summary

disposition pursuant to MCR 2.116(C)(10). Plaintiff responded, and the trial court held a hearing on December 21, 2009. The trial court granted the motion in part, dismissing with prejudice counts I, II, III, IV, V, VII, IX, and X. The trial court requested additional briefing regarding counts VI and VIII.

On February 16, 2010, defendant moved for summary disposition as to counts VI and VIII. Defendant also requested costs and attorney fees pursuant to MCR 2.114. Plaintiff responded, and a hearing was held on March 15, 2010. The trial court granted the motion and, additionally, awarded costs in the amount of $285.74 and attorney fees in the amount of $16,120.

Plaintiff first argues that the trial court erred in granting defendant summary disposition on the warranty, fraud, MCPA, and MMWA claims. We agree that the trial court erred in granting summary disposition on the fraud and MCPA claims, but conclude that the trial court did not err in granting summary disposition on the warranty and MMWA claims.

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Feyz v. Mercy Mem Hosp,* 475 Mich. 663, 672; 719 NW2d 1 (2006). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Corley v. Detroit Bd of Ed,* 470 Mich. 274, 278; 681 NW2d 342 (2004). The moving party must specifically identify the matters that have no disputed factual issues, MCR 2.116(G)(4), and must support his position with affidavits, depositions, admissions, or other documentary evidence, *Maiden v. Rozwood,* 461 Mich. 109, 120; 597 NW2d 817 (1999). The opposing party must then show, by submission of admissible evidence, that a genuine issue of material fact exists. *Mich Mut Ins Co v. Dowell,* 204 Mich.App 81, 85; 514 NW2d 185 (1994). A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue on which reasonable minds could differ. *West v. Gen Motors Corp,* 469 Mich. 177, 183; 665 NW2d 468 (2003).

The trial court ruled from the bench in dismissing the fraud and warranty claims, as follows:

> Count I is fraud and misrepresentation, that's based on the claim that they—Paragraph 3 of the affidavit of Fred Williams, which is attached to the defendant's response, in making my decision to purchase the Cadillac I relied on defendant, dealer/salesperson, who told me Cadillac had been inspected by the dealership and found no mechanical problems or deficiencies, that would appear to be the explicit warranty that he's claiming was violated. I will grant the motion to

dismiss for two reasons. One, there is no evidence that the dealership did not inspect, and there is no evidence there were actual mechanical problems or deficiencies at the time the thing was picked up. We're talking an 11–year old car with 135,000 miles on it. To the extent you construe something as shrimpy as this, warranting the car[']s going to be new, that would be ridiculous. In addition ... the purchaser, signed [the vehicle order] and above that there is six lines of gray matter and immediately above that is terms of purchase and three vacant lines. And, written on those lines are in handwriting, larger than the type of the printed form by a lot, a lot larger, it says, customer agrees to above terms, vehicle sold as is, no warranty, and Mr. Williams signed it, that's a disclaimer of any expressed warranty. And consequently, so, A, they can't claim this is an expressed warranty and, B, there is no evidence to indicate the warranty was in fact invalid. Remember the warranty as recited in Paragraph 3, Williams affidavit is not that the vehicle will be without mechanical problems or deficiencies for an extended period of time, it's just warranting at the time that they inspected it and found, that's the word it says here, "found" no mechanical problems or deficiencies. There is no evidence whatsoever they did not inspect the Cadillac, and there is no evidence whatsoever they inspected it and did find mechanical problems or deficiencies. But, beyond that, you still have a waiver of any expressed warranty. So, I'm going to dismiss fraud, misrepresentation, Count II[sic].

**\*3** Breach or [sic] express warranty, Count III[sic], is warranty for an implied purpose. Again, this "as is, no warranty" language handwritten right above the guy[']s signature is a disclaimer of that also. So, implied warranty is dismissed, Count III.

## I. WARRANTY CLAIM

Article 2 of the Uniform Commercial Code (UCC) applies to transactions in goods, MCL 440.2102, and the existence of a warranty arising out of such a transaction is evaluated under the terms of the UCC. *Heritage Resources, Inc v. Caterpillar Fin Services Corp,* 284 Mich.App 617, 633; 774 NW2d 332 (2009). Here, the 1997 Cadillac at issue in the immediate case was indisputably a good within the meaning of the UCC. MCL 440.2105(1); See also *Whitcraft v. Wolfe,* 148 Mich.App 40, 50; 384 NW2d 400 (1985) (recognizing that automobiles are goods).

75 UCC Rep.Serv.2d 863

#### Express Warranty

Plaintiff asserts that the salesperson told him the automobile had been inspected by the dealership and had been found to have no mechanical problems or deficiencies, and argues that such an express warranty may not be disclaimed. However, when parties reduce their sales agreement to writing and the writing expresses the parties' intention that it represents "a final expression of their agreement," then evidence of prior or contemporaneous oral agreements may not contradict the writing. MCL 440.2202. Here, plaintiff attempted to introduce parol evidence of a warranty despite a conspicuous warranty disclaimer and integration clause in the written vehicle order. Because no evidence of defendant's warranty exists inside the written sales contract, and the integration clause forecloses parol evidence of the oral warranty, MCL 440.2202; MCL 440.2316, the trial court properly granted defendant summary disposition on plaintiff's breach of express warranty claim.

#### Implied Warranty

Plaintiff's count III alleged breach of implied warranty of merchantability, and count IV alleged breach of implied warranty of fitness for particular purpose. Although the implied warranties of merchantability and fitness for a particular purpose arise by operation of law under the UCC, MCL 440.2314; MCL 440.2315, both of these implied warranties may be excluded or disclaimed by the seller pursuant to MCL 440.2316. *McGhee v. GMC Truck & Coach Div, Gen Motors Corp,* 98 Mich.App 495, 500; 296 NW2d 286 (1980).

Here, the vehicle order stated that the vehicle was "sold as is" with "no warranty." This document met the statutory requirements of MCL 440.2316(3)(a) and therefore operated to preclude liability for breach of any implied warranties. Plaintiff's freedom to inspect the vehicle at the time of purchase also precluded his recovery under his implied warranty claims, MCL 440.2316(3)(b). Indeed, plaintiff himself claimed that an inspection would have revealed the defects. As such, the trial court properly granted defendant summary disposition on plaintiff's breach of implied warranty claims.[3]

#### II. FRAUD CLAIM

**\*4** Plaintiff argues that he raised a viable claim of fraud or misrepresentation regarding a statement defendant's employee allegedly made in connection with purchasing the automobile. Plaintiff claimed that defendant induced him into purchasing the automobile by fraudulently informing him that the automobile had been inspected by the dealership and had been found to have no mechanical problems or deficiencies.

The elements of a fraud or misrepresentation claim are: "(1) the defendant made a material representation, (2) the representation was false, (3) when making the representation, the defendant knew or should have known it was false, (4) the defendant made the representation with the intention that the plaintiff would act upon it, and (5) the plaintiff acted upon it and suffered damages as a result." *Novak v. Nationwide Mut Ins Co,* 235 Mich.App 675; 599 NW2d 546 (1999). Additionally, the plaintiff's reliance upon the representation must have been reasonable. *Id.* at 690.

The trial court engaged in impermissible fact finding in granting defendant summary disposition on this issue. Although the burden of proving fraud by clear and convincing evidence is on the party alleging it, *Groth v. Singerman,* 328 Mich. 615, 619; 44 NW2d 155 (1950), reasonable minds could find that the dealership fraudulently informed plaintiff that the automobile had been inspected by the dealership and had been found to have no mechanical problems or deficiencies.

Defendant argued below and on appeal that plaintiff's fraud claim should fail because any reliance was unreasonable in light of the "as is, no warranty" clause. See *Novak,* 235 Mich.App at 689 (plaintiff acted unreasonably in relying on oral statements that were contradicted by written contract). However, in the immediate case, it was not unreasonable for plaintiff to rely on the alleged oral statements because they were not contradicted by the written contract. An allegedly false assertion that a car has been inspected and found free of mechanical problems is not inconsistent with an "as is, no warranty" provision, because a vehicle can be sold "as is, no warranty" after an inspection is performed and reveals no problems.[4]

It was undisputed that the car had mechanical problems after plaintiff drove it approximately 80 miles. The vehicle was repaired several times, including by defendant, but apparently remained inoperable at the time of the lower court proceedings due to mechanical problems that defendant refused to fix. Based on the vehicle breaking down so quickly and the need to repair it, a reasonable jury could find that the dealership

fraudulently informed plaintiff that the automobile had been inspected by the dealership and had been found to have no mechanical problems or deficiencies. Summary disposition was inappropriate because there are many genuine issues of material fact, primarily concerning whether defendant made false or misleading statements, which must be decided in order to resolve the fraud claim.

### III. MCPA CLAIM[5]

**\*5** The trial court's reasoning for granting defendant summary disposition on this issue is somewhat unclear. Although it did not explain how, it appears that the trial court determined that the "as is, no warranty" clause defeated plaintiff's claims under the MCPA. Again, however, an allegedly false assertion that a car has been inspected and found free of mechanical problems is not inconsistent with an "as is, no warranty" provision. A vehicle can be sold "as is, no warranty" after an inspection is performed and reveals no problems.

The MCPA prohibits deceptive, unfair, and unconscionable trade practices that cause loss to consumers. MCL 445.903. An individual who suffers a loss from any of the acts enumerated in MCL 445.903 can bring suit under the MCPA. MCL 445.911. Under the statute, a loss includes unfulfilled or frustrated expectations. *Mayhall v. A H Pond Co, Inc,* 129 Mich.App 178, 185–186; 341 NW2d 268 (1983) (frustration of the plaintiff's expectation constitutes an injury under the MCPA, whereby a plaintiff may recover the difference between the actual value of the property and the value it would have possessed if the representation had been true).

Plaintiff alleged that defendant made false or misleading statements concerning whether the vehicle had undergone a safety inspection and had no mechanical problems or deficiencies. Plaintiff argues that he established valid claims based on MCL 445.903(c), (e), (n), (t), and (y), as follows:

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

* * *

(e) Representing that goods or services are of a

particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

* * *

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

* * *

(t) Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it.

* * *

(y) Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

Viewing the evidence in the light most favorable to plaintiff, plaintiff presented sufficient evidence to establish valid claims under most of the sections quoted above. He alleged that defendant represented that the car had characteristics or a quality that it did not have. MCL 445.903(c), (e), or that defendant did not provide a mechanically sound car as promised, MCL 445.903(y). A reasonable factfinder could find that defendant's alleged representation caused plaintiff confusion as to his legal rights. MCL 445.903(n). However, a reasonable fact-finder could not find a violation of subsection (t), because plaintiff did not argue that the waiver was unclear. And again, summary disposition was inappropriate because there are many genuine issues of material fact, primarily concerning whether defendant made false or misleading statements, which must be decided in order to resolve defendant's MCPA claims. Given the existence of these genuine issues of material fact, the trial court erred in granting defendant summary disposition on this cause of action.

Williams v. General Motors Acceptance Corp., Not Reported in N.W.2d (2011)

75 UCC Rep.Serv.2d 863

## IV. MMWA CLAIM

**\*6** The MMWA is designed to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 USC 2302(a). The statute permits "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract" to bring a cause of action against the warrantor for damages. 15 USC 2310(d)(1).

The Federal Trade Commission, pursuant to 15 USC 2309(b) of the MMWA, has enacted regulations and rules dealing with warranties and warranty practices in connection with the sale of used motor vehicles. The Used Motor Vehicle Trade Regulation Rule ("Used Car Rule") is found at 16 CFR 455.1, *et seq.* 16 CFR 455.1(c) states that "It is a violation of this Rule for any used vehicle dealer to fail to comply with the requirements set forth in §§ 455.2 through 455.5 of this part." 16 CFR 455.2(a) requires that before a used vehicle is offered for sale, a seller must prepare, fill in as applicable, and display on the vehicle a "buyer's guide." If the seller offers the used vehicle without a warranty, the "as is" box should be marked on the buyer's guide. 16 CFR 455.2(b)(i). A cause of action for violation of the Used Car Rule is authorized under § 2310(d)(1) of the MMWA, which allows a consumer to recover when he "is damaged by the failure of a supplier, warrantor, or service contract to comply with any obligation under this title." 15 USC 2310(d)(1).

In the instant case, plaintiff alleged that defendant failed to comply with the Used Car Rule when it failed to display the buyer's guide at the time the Cadillac was offered for sale. Defendant did not directly rebut plaintiff's claim; however, it did assert that the buyer's guide was affixed to the vehicle on March 19, 2008, approximately 20 days before plaintiff purchased the automobile. Plaintiff also claimed that had he received the buyer's guide, he would have had a better opportunity to avoid the transaction.

Defendant was entitled to summary disposition on this claim because plaintiff failed to show that he was damaged as a result of the dealership's alleged failure to provide the buyer's guide. It is unclear how the lack of the buyer's guide, which primarily concerns disclosure of the fact that the car was being sold "as is," could have damaged defendant, when he signed a vehicle order that clearly disclaimed all warranties. As a matter of law, plaintiff cannot establish that he was damaged due to defendant's failure to properly disclaim warranties in the buyer's guide. Thus, the trial court properly granted

defendant summary disposition on this claim.

In sum, the trial court properly granted summary disposition on plaintiff's warranty and MMWA claims. However, the trial court erred in granting summary disposition on plaintiff's fraud and MCPA claim, because a genuine issue of material fact existed whether the dealership fraudulently informed plaintiff.

## V. SANCTIONS FOR FRIVOLOUS COMPLAINT

**\*7** Plaintiff next argues that the trial court erred in sanctioning plaintiff's attorneys for filing a frivolous claim. We agree.

"We review for clear error the trial court's determination whether to impose sanctions under MCR 2.114." *Guerrero v. Smith,* 280 Mich.App 647, 677; 761 NW2d 723 (2008). A decision is clearly erroneous when, although there may be evidence to support it, this Court is left with a definite and firm conviction that a mistake was made. *Id.*

On appeal, plaintiff provides only general assertions that his counsel cited legal authority for her positions. He does not cite this authority or provide any specific argument how the ten causes of action he alleged in the complaint were not frivolous. This Court cannot analyze what plaintiff has not presented. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v. Detroit,* 355 Mich. 182, 203; 94 NW2d 388 (1959).

However, given our conclusion that the trial court erred in granting summary disposition for plaintiff's fraud and MCPA claim, these two claims were clearly well grounded in fact and warranted by existing law. MCR 2.114(D)(2). As such, on remand, the trial court shall vacate the portion of the sanction award related to the fraud and MCPA claim.

## VI. NEW JUDGE ON REMAND

Finally, plaintiff argues that the case should be reassigned to a different judge on remand. We disagree.

This Court "may remand to a different judge if the original judge would have difficulty in putting aside previously expressed views or findings, if reassignment is advisable to preserve the appearance of justice, and if reassignment will not entail excessive waste or duplication." *Bayati v. Bayati,* 264 Mich.App 595, 602–603; 691 NW2d 812 (2004). A party claiming judicial bias must overcome a heavy presumption of judicial impartiality. *Armstrong v.. Ypsilanti Charter Twp,* 248 Mich.App 573, 597; 640 NW2d 321 (2001).

We find nothing in the record to indicate that the trial court would have substantial difficulty in setting aside previously expressed views or findings determined to be erroneous. Therefore, resentencing before a different judge is not warranted.

We affirm in part, reverse in part and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs, neither party having prevailed in full.

**All Citations**

Not Reported in N.W.2d, 2011 WL 5071365, 75 UCC Rep.Serv.2d 863

Footnotes

1    GMAC settled with plaintiff and has no stake in this appeal. Because the dealership is the only party that has an interest at stake on appeal, we will use the singular "defendant" to refer to it.

2    Again, plaintiff settled his dispute over payment of the sales contract with GMAC, agreeing to pay GMAC $2,500 and consent to an order dismissing all of plaintiff's claims with prejudice.

3    Plaintiff also argues that a question of fact existed whether defendant waived the "as is, no warranty" provision when it performed repairs on the vehicle, therefore reinstating the implied warranties. However, even assuming that this factual question was decided in plaintiff's favor, i.e., that defendant did waive the "as is, no warranty" provision, plaintiff's freedom to inspect the vehicle at the time of purchase would still preclude his implied warranty claim. MCL 440.2316(3)(b).

4    However, as discussed above, an "as is, no warranty" provision is inconsistent with a claim that defendant provided an oral *warranty* that the vehicle is free of mechanical problems, because a vehicle with a warranty cannot be sold as is.

5    As defendant noted, plaintiff has abandoned some of his MCPA violations. See *Yee v. Shiawassee Co Bd of Comm'rs,* 251 Mich.App 379, 406; 651 NW2d 756 (2002) (stating that a party abandons an allegation of error by failing to brief its merits on appeal). Plaintiff originally alleged 17 violations of the MCPA; however, in his brief on appeal, he cited and addressed only five subsections of the MCPA, each corresponding to one of the 17 alleged violations. The 12 unaddressed violations have been abandoned.

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Young v. International Union, United Automobile, Aerospace..., Not Reported in...

2016 L.R.R.M. (BNA) 41,986

2016 WL 589891
United States District Court,
E.D. Michigan, Southern Division.

Earline Young, et al., Plaintiffs,
v.
International Union, United Automobile,
Aerospace & Agricultural Implement Workers of
America (UAW), Local 651, et al., Defendants.

Case No. 15-11151
|
Signed 02/15/2016

**Attorneys and Law Firms**

Stuart G. Friedman, Southfield, MI, Kenneth D. Myers, Law Offices of Kenneth D. Myers, Cleveland, OH, for Plaintiffs.

Kim F. Ebert, Matthew J. Kelley, Ogletree Deakins, Indianapolis, IN, Sharon R. Gross, Ogletree, Deakins, Bloomfield Hills, MI, for Defendants.

**OPINION AND ORDER DENYING PLAINTIFFS'
MOTION FOR RECONSIDERATION [27],
DENYING PLAINTIFFS' MOTION FOR LEAVE
TO FILE AMENDED COMPLAINT INSTANTER
[28], DENYING PLAINTIFFS' MOTION FOR
LEAVE TO FILE AMENDED COMPLAINT AS TO
GENERAL MOTORS [31]**

Nancy G. Edmunds, United States District Judge

**\*1** Before the Court is Plaintiffs' motion for reconsideration of the Court's December 1, 2015 opinion and order granting UAW Defendants' motion to dismiss and denying Plaintiffs' requests to amend complaint. (Dkt. no. 23.) On the same date that they filed the motion for reconsideration, Plaintiffs also filed a motion for leave to amend complaint instanter. (Dkt. no. 27.) On January 5, 2016, Plaintiffs filed a motion for leave to file amended complaint as to [Defendant] General Motors. (Dkt. no. 31.) For the reasons set forth below, the Court finds that there is no palpable defect in the order, that Plaintiffs have not persuaded the Court that it should rule differently, and that amendment would be futile, therefore the Court DENIES Plaintiffs' motion for reconsideration

and motions for leave to file amended complaint.

Pursuant to Rule 7.1(h) of the Local Rules for the Eastern District of Michigan, a party may file a motion for reconsideration within fourteen days after a court issues an order to which the party objects. Although a court has the discretion to grant such a motion, it generally will not grant a motion for reconsideration that 'merely present[s] the same issues ruled upon by the court, either expressly or by reasonable implication.' E.D. Mich. LR 7.1(h)(3). To persuade a court to grant the motion, the movant 'must not only demonstrate a palpable defect by which the court and the parties...have been misled but also show that correcting the defect will result in a different disposition of the case. *Id.*

Plaintiffs first ask the Court to reconsider its prior decision denying Plaintiffs leave to amend the Complaint. In addition to addressing UAW Defendants' motion to dismiss, the Court's December 1, 2015 opinion and order addressed Plaintiffs' general 'requests' to amend the Complaint. After referring to amendment in their responsive pleadings and at the hearing, Plaintiffs were given the opportunity at the hearing to specifically address what amendments they sought to make to the Complaint. As set forth in the opinion and order, at footnote 5, Plaintiffs were unable to identify specific contractual provisions they allege were violated. The Court also noted that the factual matter which Plaintiffs sought to add at that time was already under consideration by the Court and did not change the Court's analysis. The Court denied those requests to amend as futile. Although not a basis for the Court's denial, it is worth noting that Plaintiffs had not complied with the Local Rule 15.1 in seeking to amend their pleading, and had not provided a proposed amended complaint.[1] With respect to the Court's decision to deny Plaintiffs' prior requests to amend, Plaintiff has not shown a palpable defect in the decision to deny the prior requests to amend.

**\*2** Plaintiff also asks the Court to reconsider its decision that the only Plaintiffs for whom the statute of limitations was tolled were the two Plaintiffs who had signed the internal appeal of the prior grievance, in compliance with the appeal process set forth in the UAW Constitution, which specifically requires that the appeal 'must include an original physical signature, signed by the member(s).' (Constitution of the International Union (UAW), Adopted June 2010, Def.'s Mot. Dismiss dkt. no. 16, Ex. 9; Compl. ¶¶ 28-32.) The Court considered the allegations in the Complaint and the appeal documents central to that allegation to conclude that the appeal was signed by only two Plaintiffs: Shante Marshall and Jakeiya Anderson.

The Court relied on case law holding that the parties to such an appeal were those who signed it, as required by the UAW Constitution. *See VanRiper v. Local 14, UAW*, 2015 WL 45533 (N.D. Ohio Jan. 2, 2015); *DeMott v. UAW Int'l Union*, 2011 WL 824488 (E.D. Mich. Mar. 3, 2011) (Edmunds, J.). The Court found that 'the Complaint and documents show that the only two Plaintiffs who brought the appeal pursuant to the UAW Constitution requirements were those who signed it.' (Op. And Order 15, dkt. no. 23.) Plaintiff has not submitted evidence that shows that the appeal was signed by anyone other than these two Plaintiffs. (Def.'s Mot. Dismiss Ex. 7, dkt. 16-8; Compl. ¶¶ 28, 29.) Plaintiffs' proposed amended complaint does not change this analysis, despite adding the allegation that Plaintiffs Marshall and Anderson were 'intending it to be on behalf of all the other members of the original group grievance, which includes all plaintiffs ' and alleging that other plaintiffs had made inquiry on the status of the appeal. (Proposed Amended Compl. ¶¶ 40, 43, dkt. no. 28-1.) Plaintiffs have alleged no new information that would warrant reconsidering its earlier decision to dismiss all Plaintiffs except Marshall and Anderson, those whose original signatures appear on the appeal.

Finally, Plaintiffs ask the Court to reconsider its decision related to Plaintiffs' claims of breach of the collective bargaining agreements. That decision was based largely on Plaintiffs' failure to identify specific contractual provisions to support their inferences and legal conclusions that the Plaintiffs are entitled to higher pay rates and levels of seniority. In arguing the issue, Plaintiffs rely on their 'proposed amended complaint,' which was not before the Court at that time and was not a basis for the Court's December 1, 2015 decision. The Court herein considers the proposed amended allegations in concert with Plaintiff's motion for reconsideration and motions for leave to amend.

As set forth above, Plaintiffs failed to show a reason to reconsider the Court's December 1, 2015 dismissal of all Plaintiffs except Marshall and Anderson. Plaintiffs' proposed amended complaint does not include allegations that state a plausible claim for relief as to Plaintiffs Marshall and Anderson. The proposed amended complaint confirms that Plaintiffs Marshall and Anderson were hired in 2006. (Proposed Amended Compl. ¶ 10, Ex. H, dkt. nos. 28-1, 28-12.) They were, therefore, not subject to Plaintiffs' allegations regarding contractual provisions relating to 'employees hired prior to October 18, 1999. ' (E.g., *id.* at ¶ 10, 23.) Other allegations relating to Marshall and Anderson were addressed in the prior opinion and order and Plaintiffs do not show a palpable defect in that order, even in consideration of the more specific allegations now presented in the proposed amended complaint.

The Court has presumed the factual allegations in the complaint (and now the proposed amended complaint) to be true and has drawn reasonable inferences in favor of Plaintiff, the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). Yet it remains 'a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached.' *Northhampton Restaurant Group, Inc. v. FirstMerit Bank, N.A.*, 492 Fed. Appx. 518, 522 (6th Cir. 2012) (citation omitted). When the Court considers Plaintiffs' conclusory allegations next to the plain language of the cited provisions they purport to represent, the Court is unable to draw the reasonable inferences necessary to support Plaintiff's claims.[2] Plaintiffs have not show a palpable defect in the Court's opinion.

**\*3** Federal Rule of Civil Procedure 15(a)(2) provides that 'a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires. ' The Sixth Circuit has held that 'where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.' *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) (citation omitted). 'Denial may be appropriate, however, where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.' ' *Id.* (citation omitted). 'A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.' *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citation omitted).

As the Court noted in its December 1, 2015 opinion and order, Plaintiffs failed to identify specific contractual language that supported their vague and conclusory allegations that Defendant General Motors violated the collective bargaining agreement and other agreements by improperly determining Plaintiffs' pay rates and seniority. At that time, they not only failed to identify the specific contractual provisions that were violated, but failed to provide the relevant documents. Yet with the motion to dismiss, the Court considered those documents that were both referred to in Plaintiffs' complaint and integral to Plaintiffs' claims. *Commercial Money Ctr., Inc. v. Ill.*

2016 L.R.R.M. (BNA) 41,986

Union Ins. Co., 508 F.3d 327, 335-36 (6th Cir. 2007); Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 514 (6th Cir.1999); Weiner v. Klais and Co., 108 F.3d 86, 89 (6th Cir. 1997). Plaintiffs' proposed amended complaint now includes the documents, most of which were considered in the motion to dismiss when referenced in Plaintiffs' claims and provided by UAW Defendants, and contains specific excerpts from those documents. As set forth above with respect to Plaintiffs' motion for reconsideration, the proposed amended complaint does not allege facts that provide a basis for finding that Plaintiffs other than Marshall and Anderson submitted the internal appeal and thus tolled the statute of limitations, and it does not provide allegations that would defeat a motion to dismiss as to these two Plaintiffs. Such amendment would be futile.

For the reasons set forth above, the Court DENIES Plaintiffs' motion for reconsideration [27], DENIES Plaintiff's Motion For Leave To File Amended Complaint Instanter [28] and DENIES Plaintiff's Motion For Leave To File Amended Complaint As To General Motors [31].

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 589891, 2016 L.R.R.M. (BNA) 41,986

Footnotes

1   Although the Court opted to consider Plaintiffs' prior and very general requests to amend the complaint, the Sixth Circuit has noted that '[a] request for leave to amend 'almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is...not a motion to amend.' ' C & L Ward Bros., Co. v. Outsource Solutions, Inc., 547 Fed. Appx. 741 (6th Cir. 2013) (citing La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010)).

2   For example, 'In February, 2009, GM and the UAW signed a Memorandum of Understanding (MOU) giving all Delphi Flint East employees who transferred to GM in January, 2009 a retroactive March 17, 2008 GM Corporate Seniority date (Exhibit E). This fictitious seniority date was created by defendants to avoid the requirements of listing these plaintiffs as having 2006 (or earlier) seniority dates, which would have retroactively made them Tier I employees pursuant to the 2007 GM-UAW CBA.' (Proposed Amended Compl. ¶ 26, dkt. nos. 28-1 (emphasis added, proposed amendment underlined)). What remains lacking are contract terms which have been breached. It is not enough to argue that something else 'should' have happened. (For example, Id. ¶ 22.) The Court addressed this provision in the opinion and order and Plaintiff has not shown an error in the opinion, even when considered with the proposed amended allegations.

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.