# EXHIBIT 3

596 Fed.Appx. 366
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Charles ANDREWS, Sr., Plaintiff–Appellant,
v.
TD AMERITRADE, INC., Defendant–Appellee.

No. 14–3466.
|
Dec. 30, 2014.

**Synopsis**
**Background:** Father of 401(k) trust account holder filed
state court suit against investment broker, claiming breach
of contract, breach of fiduciary duty, theft or conversion,
and breach of duty of loyalty by disregarding trading
authorization agreement between father and son and
power of attorney that gave father complete control over
son's account governed by client agreement with
arbitration clause. Following removal, broker moved to
dismiss or, alternatively, to compel arbitration and stay
proceedings. After denying father's request for
preliminary injunction and dissolving temporary
restraining order, the United States District Court for the
Northern District of Ohio, Patricia A. Gaughan, J., 2014
WL 1761562, granted motion and compelled arbitration
of all claims. Father appealed.

**Holdings:** The Court of Appeals, Merritt, Circuit Judge,
held that:

[1] arbitration clause in client agreement bound father;

[2] all claims fell within scope of arbitration clause;

[3] arbitration clause in trading authorization agreement
was not unconscionable; and

[4] removal was warranted based on diversity jurisdiction.

Affirmed.

**\*368** On Appeal from the United States District Court for
the Northern District of Ohio.

Before: MERRITT, GIBBONS, and DONALD, Circuit
Judges.

**Opinion**

MERRITT, Circuit Judge.

This appeal arises from a dispute between the plaintiff,
Charles Andrews, Sr., a lawyer, and defendant, TD
Ameritrade, Inc., over control of funds held in a 401(k)
trust account opened by plaintiff's adult son, Charles Jr.,
in 2010. Plaintiff claims that a power of attorney granted
to him by his son gives plaintiff complete control over his
son's financial affairs, including the Ameritrade account.
Ameritrade claims that the account holder, plaintiff's son,
revoked the power of attorney given to his father and that
the necessary forms to transfer control over the account
were never received by Ameritrade.

The primary question before us is whether the dispute
regarding plaintiff's control over the account is within the
scope of arbitration provisions included in Ameritrade's
agreements with its clients, as the district court held.
Plaintiff also appeals from two other orders issued by the
district court regarding the proceedings below. For the
reasons that follow, we affirm the judgment of the district
court.

## I. Facts and Procedural History

Charles Andrews, Jr., the son of plaintiff Charles
Andrews, Sr., opened a 401(k) trust account with
defendant TD Ameritrade in August 2010. The brokerage
account is governed by a Client Agreement. The Client
Agreement requires "any controversy" arising out of and
relating to the account to be submitted to arbitration:

> I agree that any controversy
> between you ... and me (including
> any of my officers, directors,
> employees or agents) arising out of
> or relating to this Agreement, our
> relationship, any services provided
> by you, or the use of the

Services, ... shall be arbitrated and conducted under the provisions of the Code of Arbitration....

Client Agreement at ¶ 12 (attached as Ex. A to Defendant's Brief in Opposition to Plaintiff's Request for a Preliminary Injunction). On October 15, 2012, Charles Jr. executed a power of attorney giving broad powers over his financial affairs to plaintiff, including the right to withdraw money from the Ameritrade trust account. Specifically, the power of attorney states that Charles Jr. agrees to "relinquish all my authority to access my Team American 410k account or to change it or to make any withdrawal or other direction to Td [sic] Ameritrade with respect to same." General Power of Attorney at 3 (attached as Exhibit A to Complaint). Soon thereafter, on January 3, 2013, plaintiff faxed a Trading Authorization Agreement and a copy of the power of attorney executed by his son to Ameritrade. The Trading Authorization Agreement "authorizes and appoints the Authorized Agent(s) below as the Account Owner's agents...." and allows the agent to make purchases and withdraw funds from the account without notice to the account owner. Trading Authorization Agreement at 1 (attached as Ex. C to Defendant's Brief in Opposition to Plaintiff's Request for a Preliminary Injunction). It also states that the Client Agreement "shall apply equally to the Authorized Agent(s)." *Id.* The Trading Authorization **\*369** Agreement was signed by plaintiff and included the handwritten notation "by authority of power of attorney attached." *Id.* at 2.

On January 14, 2013, shortly after receiving the power of attorney and the Trading Authorization Agreement from plaintiff, Ameritrade contacted plaintiff's son, the account holder, Charles Jr., via a secure email account and acknowledged receipt of "your Power of Attorney (POA) document," but advising Charles Jr. that the request could not be processed because

> [y]our state's [Ohio] statute prohibits the trustee of a trust from delegating their powers as trustee to an agent such as a Power of Attorney.
>
> Please consult your trust document to determine the provisions for removing or replacing a trustee. Please address any questions to your legal counsel. Please submit the attached Account Registration Conversion form along with a copy of your trust documents so we can make the necessary changes.

Email sent to Charles Andrews from TD Ameritrade, Jan. 14, 2013 (attached as Ex. D to Defendant's Brief in Opposition to Plaintiff's Request for a Preliminary Injunction). The record does not reflect whether plaintiff

knew about this email. Ameritrade represented that it never received any of the documentation requested in the email. Aff. of Jeff Plummer in Support of Defendant's Brief in Opposition to Plaintiff's Request for Preliminary Injunction at 2, ¶ 6. The record does not reflect, nor does either party claim, that there was any further contact between plaintiff and Ameritrade for over 10 months.

On November 26, 2013, plaintiff sent a letter to Ameritrade and requested that the account be liquidated and all proceeds sent to him. Charles Jr. notified Ameritrade by phone that day that he did not authorize his father to liquidate the account. Ameritrade responded to plaintiff that its regulatory department would review the matter and get back to him. On December 12, 2013, Ameritrade informed plaintiff that it could not comply with his request because the power of attorney had been revoked.

On December 16, 2013, plaintiff filed a complaint against Ameritrade in Ohio state court bringing a litany of claims: breach of contract, breach of fiduciary duty, theft or conversion, breach of the duty of loyalty, and a request for a temporary restraining order to prevent Ameritrade from disregarding the power of attorney and Trading Authorization Agreement, a request to prohibit anyone other than plaintiff from removing funds from the account and a request to force Ameritrade to liquidate the account and send the proceeds to plaintiff. The state court granted a temporary restraining order preventing Ameritrade from allowing anyone other than plaintiff to make changes to or withdraw money from the account, but it denied plaintiff's request to force Ameritrade to liquidate the account and give the proceeds to plaintiff. Ameritrade removed the complaint to federal court on the basis of diversity jurisdiction. Plaintiff moved for a preliminary injunction or to continue the temporary restraining order and Ameritrade countered by moving to dissolve the temporary restraining order and deny the request for a preliminary injunction.

The district court denied the motion for a preliminary injunction and dissolved the temporary restraining order, finding that plaintiff failed to establish a likelihood of success on the merits and did not demonstrate irreparable harm. Order dated Jan. 6, 2014. Plaintiff moved for reconsideration of the January 6, 2014, Order, attaching an affidavit that explained that his son was using the money in the account to **\*370** fund a drug addiction. The motion for reconsideration was denied by the district court on the ground that it was a "rehashing" of the original motion. Order dated Feb. 7, 2014. Ameritrade then filed a Motion to Dismiss or, in the Alternative, to Compel Arbitration and Stay Proceedings pursuant to

Federal Rule of Civil Procedure 12(b)(1). The district court granted the motion, compelled arbitration on all of plaintiff's claims and dismissed the complaint in its entirety. *Andrews v. TD Ameritrade, Inc.,* No. 1:13 CV 2811, 2014 WL 1761562 (N.D.Ohio May 1, 2014). Plaintiff filed a timely appeal of the January 6, 2014, Order denying the request for a preliminary injunction and dissolving the temporary restraining order, the February 7, 2014, Order denying reconsideration, and the May 1, 2014, Order dismissing the complaint in its entirety and compelling arbitration of all claims.

## II. Discussion

### A. *Decision to Compel Arbitration*

[1] There are two arbitration provisions at issue in this matter. One is contained in the Client Agreement that governs the brokerage account, as quoted above. Plaintiff did not sign this Agreement, but it is the agreement by which his son agreed to be bound in opening a brokerage account with Ameritrade. As plaintiff purports to be his son's agent for purposes of the trust account through the power of attorney, the plain language of the Client Agreement binds plaintiff as well as his son. The broad language of the arbitration provision ("*any* controversy between you [Ameritrade] and me [client or his agent] shall be arbitrated ...") covers the dispute between Ameritrade and anyone claiming control over one of its accounts.

The other relevant document is the Trading Authorization Agreement, which was signed by plaintiff and sent to Ameritrade on January 3, 2013. That document allows for authorized agents of the account owner to purchase and sell securities in the account owner's name. It states that "[t]he Client Agreement set forth in the Account Agreement (including arbitration of disputes) ... shall apply equally to the Authorized Agent(s)." Trading Authorization Agreement at 1. By executing the Trading Authorization Agreement and holding himself out as his son's agent, plaintiff became bound by the terms of the Client Agreement and the Trading Authorization Agreement, both of which contain arbitration requirements. Plaintiff relies on both the power of attorney and the Trading Authorization Agreement as the basis for his control over the account. *See* Complaint Counts I, IV. Plaintiff cannot seek the powers conveyed by the Trading Authorization Agreement and simply ignore its arbitration clause. *See Javitch v. First Union Secs., Inc.,* 315 F.3d 619, 625–26 (6th Cir.2003) (receiver's rights as a plaintiff are subject to the same

claims and defenses as the received entity he represents).

The Federal Arbitration Act codifies a national policy in favor of arbitrating claims when parties contract to settle disputes by arbitration. A district court should dismiss or stay a suit involving an arbitration clause as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, **\*371** providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The threshold question, then, is "whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *Landis v. Pinnacle Eye Care, LLC,* 537 F.3d 559, 561 (6th Cir.2008). Any doubts regarding arbitrability should be resolved in favor of arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

The Sixth Circuit analyzes the following four factors to determine whether to grant motions to dismiss and compel arbitration: (1) Whether the parties agreed to arbitrate; (2) the scope of the agreement to arbitrate; (3) if federal statutory claims are involved, whether Congress intended those claims to be arbitrable; and (4) if only some of the claims are subject to arbitration, whether the nonarbitrable claims should be stayed pending arbitration. *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 392 (6th Cir.2003).

[2] Plaintiff argues that the only question at issue is the adequacy of the power of attorney under Ohio law, which is a question of law that should be answered in the first instance by the courts, not an arbitrator. But that is not true in this case in the face of the broad arbitration provision included in the Client Agreement and the Trading Authorization Agreement. Even if the power of

attorney was adequate under Ohio law to appoint plaintiff his son's agent for purposes of controlling the account—a point Ameritrade disputes—it was within Ameritrade's rights to require further confirmation from its account holder to protect itself and to ensure that the account holder's wishes are followed. What those further requirements are, if any, is within the scope of the arbitration provision.

[3] [4] [5] In addition to challenging the scope of the arbitration provision in the Client Agreement, plaintiff makes several other claims of error regarding the district court's decision to compel arbitration. Plaintiff's contention that Ameritrade waived reliance on the arbitration provision by removing the complaint to federal court and failing to raise the issue in the Notice of Removal is without merit. Removal to federal court does not waive a party's otherwise enforceable right to arbitrate. *Dantz v. Am. Apple Grp.,* 123 Fed.Appx. 702, 707 (6th Cir.2005). No special notice is required. He also argues that the district court erred in considering evidence outside the pleadings submitted by Ameritrade with its motion to compel arbitration and dismiss the complaint. However, Ameritrade filed its motion pursuant to Fed. R. Civ. Pro. 12(b)(1), lack of subject-matter jurisdiction, not Rule 12(b)(6), dismissal for failure to state a claim. The district court must undertake a limited review of evidence to determine whether it has the authority to hear a case or compel arbitration. *Javitch,* 315 F.3d at 625. The Plummer affidavit and the Client Agreement were part of that limited review undertaken by the district court. Plaintiff also argues that the arbitration clause here is not valid because it uses "boilerplate" language that constitutes a contract of adhesion. However, the case on which he relies, *Sutton v. Laura Salkin Bridal & Fashions,* No. 72107, 1998 WL 45347 (Ohio Ct.App. Feb. 5, 1998), concerns an installment sales contract where the state court found that the seller and the customer had unequal bargaining power. That is not the case here. While the arbitration provision in the agreement is likely a standard form prepared by Ameritrade, this was not a case of unequal bargaining **\*372** power where a commercial enterprise took advantage of an off-the-street buyer. Plaintiff is a lawyer and he signed the Trading Authorization Agreement containing an arbitration provision, holding himself out as his son's agent in matters concerning all of his son's business dealings, including matters concerning the brokerage account. Plaintiff also attacks the arbitration clause as "unconscionable" because he had no "meaningful" choice and was forced to sign a contract with terms that are unreasonably favorable to the drafting party. Plaintiff was the one who affirmatively reached out and sought control over his son's account and he willingly signed the Trading Authorization Agreement and sent it to Ameritrade. He was not forced to sign the agreement, but agreed to be bound by its provisions when he signed it.

## B. *Removal of the Complaint*

[6] Ameritrade filed a Notice of Removal based on diversity jurisdiction, 28 U.S.C. § 1441(b)(1). Plaintiff contends that the district court erred in allowing the removal of the state case to federal court because (1) the underlying claims involved purely state-law issues and the application of state law, and (2) Ameritrade is registered to conduct business in Ohio, has an office in Ohio and is a citizen of Ohio, thereby destroying diversity with plaintiff, an Ohio resident. Plaintiff's arguments are untenable. There is complete diversity between the parties because plaintiff is a citizen of Ohio and Ameritrade is a citizen of New York, where it is incorporated, and Nebraska, where it maintains its headquarters and "principal place of business." The amount in controversy exceeds $75,000. The fact that Ameritrade maintains an office in Ohio does not destroy diversity jurisdiction unless plaintiff can show that the office there is the "principal place of business" or "the nerve center" of the company. *Hertz Corp. v. Friend,* 559 U.S. 77, 92–95, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010) (corporation has only one principal place of business). Plaintiff submitted no evidence to rebut Ameritrade's affidavit stating that its principal place of business is in Nebraska or any evidence to show that the Ohio office is Ameritrade's "nerve center" or otherwise functions as its "principal place of business."

Plaintiff also argues that the state law claims, which here encompass all of plaintiff's claims, should be severed and heard in state court. Because removal was based on diversity under § 1441(b)(1), not federal question jurisdiction under § 1441(a) or (c), the federal court has the authority to hear the state-law claims and, in fact, could not decline to hear the state-law claims. *Charvat v. NMP, LLC,* 656 F.3d 440, 446 (6th Cir.2011).

## C. *Other Claims*

Equally untenable is plaintiff's argument that the district court should have issued an injunction turning control of the account over to plaintiff. As we have held, this dispute is subject to the parties' agreement to arbitrate, a remedy inconsistent with issuing such an injunction. The claim fails on the merits.

[7] Finally, the plaintiff argues that the district court erred in dismissing his complaint instead of ordering a stay

Andrews v. TD Ameritrade, Inc., 596 Fed.Appx. 366 (2014)

until arbitration is complete. But the law is to the contrary: where there is "nothing for the district court to do but execute the judgment," dismissal is appropriate. *See Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). All of plaintiff's state-law claims (breach of contract, breach of fiduciary duty, theft or conversion, and breach of the duty of loyalty) fall within the scope of the arbitration provision because they concern Ameritrade's **\*373** decision not to recognize the power of attorney as sufficient under Ohio law and their own procedures to transfer sole authority over the account to plaintiff. Accordingly, the district court correctly determined that the case should be dismissed rather than stayed pending arbitration.

For the foregoing reasons, we affirm the judgment of the district court.

**All Citations**

596 Fed.Appx. 366

**End of Document**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

721 Fed.Appx. 414
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

AQUALUCID CONSULTANTS, INC. and David
Morrison, Sr., Plaintiffs-Appellants,
v.
ZETA CORPORATION and Carolyn Bartoe Pitts,
individually, and as wife as the personal
representative of the Estate of Michael Pitts,
jointly and severally, Defendants-Appellees.

No. 17-1217
|
Filed December 27, 2017

**Synopsis**
**Background:** Government contractor brought action
against scientific company, asserting various claims
arising out of parties' professional services contract
(PSA) for participation in research study for development
of a non-chemical water treatment. The United States
District Court for the Western District of Michigan,
granted judgment on the pleadings in favor of scientific
company. Contractor appealed.

**Holdings:** The Court of Appeals, Bernice Bouie Donald,
Circuit Judge, held that:

[1] scientific company did not waive its right to enforce
arbitration agreement contained in the PSA by failing to
raise it earlier in litigation;

[2] scientific company did not breach the arbitration
agreement; and

[3] scope of the arbitration agreement encompassed all of
contractor's claims.

Affirmed.

**\*415** ON APPEAL FROM THE UNITED STATES

DISTRICT COURT FOR THE WESTERN DISTRICT
OF MICHIGAN

**Attorneys and Law Firms**

Matthew S. DePerno, DePerno Law Office, Portage, MI,
for Plaintiffs-Appellants

Thomas V. Hubbard, Pennie S. Johnson, Drew, Cooper &
Anding, Grand Rapids, MI, for Defendants-Appellees

BEFORE: DAUGHTREY, McKEAGUE, and DONALD,
Circuit Judges

**Opinion**

BERNICE BOUIE DONALD, Circuit Judge.

Plaintiffs-Appellants filed a complaint in 2014, alleging
numerous claims against Defendants-Appellees arising
from a joint venture to secure a research study with the
United States Army Corps of Engineers to develop non-
chemical water treatments. After various delays in the
litigation, the district court granted judgment on the
pleadings in favor of Defendants and dismissed Plaintiffs'
claims, concluding that a binding arbitration agreement
governed the entire action. On appeal, Plaintiffs challenge
the posture of the motion, the enforceability of the
arbitration agreement, and the scope of the agreement.
Primarily, Plaintiffs contend that Defendants waived their
rights under the arbitration agreement by taking actions
that were inconsistent with a reliance on arbitration. For
the following reasons, we **AFFIRM**.

I.

Plaintiff David Morrison, Sr. and Plaintiff Aqualucid
Consultants, Inc. ("Aqualucid") engaged with Defendant
Zeta Corporation ("Zeta") and Defendant Michael Pitts,[1]
on a project to secure a study with the Construction
Engineering Research Laboratory ("CERL"), a
department of the United States Corps of Engineers, to
show the effectiveness of non-chemical water treatments
using Zeta's proprietary equipment and technology. The
proposal, developed from Morrison's marketing strategy,
involved creating a Demonstration/Validation
("DEM/VAL") of Zeta's technology for CERL. Morrison
approached Zeta with the marketing strategy, and in May
2006, Aqualucid was formed as a joint venture to
combine the use of the marketing strategy and Zeta's

equipment. Both Morrison and Pitts served as shareholders of Aqualucid.

Participation in the study involved three separate contractual agreements: (1) a Professional Services Agreement ("PSA") between Aqualucid and Zeta, dated December 2006; (2) a Sales Representative Agreement ("SRA"), making Aqualucid an authorized sales representative of Zeta, dated July 2006; and (3) a cooperative research and development agreement ("CRADA") between Zeta, Aqualucid, and the United States government, signed by all parties between February and March 2007. Most significant to this appeal is the PSA, which formalized the relationship between Aqualucid and Zeta, outlining the **\*416** work to be performed and the compensation schedule for the two parties to cooperate in developing the CRADA. The PSA also contained an arbitration clause binding "[a]ny claim, dispute or other matter in question arising out of or related to this Agreement" to mandatory arbitration. R. 56-1 at Page ID # 1381. The parties also agreed that "in all respects" the PSA would be governed by the laws of Michigan and that any dispute would be subject to the jurisdiction and venue of the State of Michigan. *Id.* at Page ID # 1382.

Ultimately, the relationship between Plaintiffs and Defendants deteriorated, resulting in Aqualucid withdrawing from the CRADA in 2008. Aqualucid first filed a complaint in Texas state court against Zeta and Mr. Pitts on April 29, 2008, based on the claims at issue in this case.[2] Neither party raised the arbitration agreement at any time during the pendency of the first case. The Texas case was dismissed without prejudice in November 2008. Six years later, Plaintiffs filed a complaint in the United States District Court for the Western District of Michigan, alleging numerous claims for breach of contract, tortious interference, intellectual property infringement, federal false designation of origin and unfair competition, claims under the Lanham Act, trade secret infringement, RICO violations, conspiracy to violate RICO, violations of the Michigan Consumer Protection Act, and breach of fiduciary duty and care, as well as various counts alleging fraud, unjust enrichment, conversion, and civil conspiracy. Defendants initially responded with a motion to dismiss for lack of personal jurisdiction, or, in the alternative, to transfer venue, based on Zeta and the Pitts' common residence of Arizona. In response to Defendants' motion to dismiss, Plaintiffs relied on the forum selection clause in the PSA, designating Michigan as the venue for claims related to the PSA. Over two years after the motion to dismiss was fully briefed, the district court issued an order and opinion granting in part and denying in part the motion. In denying the motion as to Plaintiffs'

claims against Zeta and Mr. Pitts, the court noted that the PSA—including the forum-selection clause—governed the action.

The district court then ordered Defendants to file an answer within 21 days. On November 9, 2016, Defendants filed an answer, a motion to dismiss under Rule 12(c), and a motion to stay discovery. Relevant to this appeal, none of these filings raised Defendants' arbitration rights under the PSA. In lieu of responding to the Rule 12(c) motion, Plaintiffs sought leave to amend their complaint, which the district court granted. The district court then amended the briefing schedule *sua sponte* and ordered that, due to the unusual posture of the case, Defendants must first answer Plaintiffs' amended complaint prior to filing a renewed Rule 12(c) motion because Defendants "may not raise the [failure to state a claim] argument on a successive pre-answer motion." R. 55 at Page ID # 1315-16. Accordingly, the district court ordered Defendants to answer Plaintiffs' amended complaint by December 21, 2016, and to file a renewed Rule 12(c) motion by December 28, 2016. Defendants filed their answer to the amended complaint on December 21, 2016, which did not raise an arbitration defense. In the renewed Rule 12(c) motion, also filed December 28, 2016, Defendants raised for the first time a defense that all Plaintiffs' claims were subject to the arbitration agreement in the PSA. At this stage, although the case had been pending for over two years, no discovery had been conducted **\*417** due to the amended complaint and the case remained in early stages of litigation.

The district court held a hearing on the Rule 12(c) motion on January 30, 2017. Following argument, the district court found in favor of Defendants in a bench ruling. The district court found that it had previously ruled that the PSA was the "operative document for purposes of this litigation." R. 72 at Page ID # 1912. Based on that finding, the court determined that Defendants had not breached the arbitration clause and did not waive its enforcement by the delay in raising the issue. In finding that Defendants did not waive the issue of arbitration, the court noted that the passage of time was "in large measure ... a result of the [c]ourt's inability to address the matter on a more timely basis." *Id.* at Page ID # 1915. The district court also noted in the alternative that the first motion to dismiss strategically waived only jurisdictional issues and that Plaintiffs had not shown actual prejudice from Defendants' delay. The district court further concluded that all claims were related to the PSA and thus subject to the binding arbitration agreement. Plaintiffs appealed.

04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

## II.

The Court reviews de novo the district court's grant of judgment on the pleadings under Rule 12(c). *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). We will uphold the grant of a Rule 12(c) motion "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* (quotation omitted).

## III.

Plaintiffs argue that judgment on the pleadings was improper because the district court should not have enforced the PSA's arbitration clause as a matter of law. Plaintiffs contend that the arbitration clause is invalid, that Defendants have waived their right to arbitrate, that Defendants breached the agreement by refusing to arbitrate, and, finally, that some of Plaintiffs' claims fall outside the scope of the PSA and are thus not subject to the arbitration agreement.

As an initial matter, Plaintiffs' challenge to the enforceability of the arbitration clause based on their broader fraud claims is misplaced. "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Plaintiffs challenge the enforceability of the PSA based on a "fraud in the inducement" claim. Thus, it is within the purview of an arbitrator, not federal courts, to determine whether the entire contract would be enforceable. *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 575 (6th Cir. 2003). Here, the fraud in the inducement claim is not specific to the arbitration clause, and, thus, it was proper for the district court to decline to consider the PSA's broader enforceability prior to considering whether arbitration was proper. *See id.* ("[I]f there was a fraud that 'goes to the "making" of the agreement to arbitrate,' then a federal court may adjudicate[.]" (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402-

### *418 A.

[1]The primary issue on appeal is whether Defendants waived their rights to enforce the arbitration agreement in the PSA by failing to raise it earlier in the litigation. A party waives its right to arbitrate by "engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) 'delaying its assertion to such an extent that the opposing party incurs actual prejudice.' " *Hurley v. Deutsche Bank Trust Co.*, 610 F.3d 334, 338 (6th Cir. 2010) (quoting *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 355 (6th Cir. 2003)). Both elements must be found to establish waiver. *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 828 (6th Cir. 2015). This Court assumes a position of deference to arbitration agreements, however: "Because of the presumption in favor of arbitration under the Federal Arbitration Act, we will not lightly infer a party's waiver of its right to arbitration." *Hurley*, 610 F.3d at 338 (citing *O.J. Distrib., Inc.*, 340 F.3d at 355).

It is on the second prong that Plaintiffs' waiver argument fails. There are many ways to establish prejudice, such as showing that a party waited until a statute of limitations expired to invoke arbitration, *see O.J. Distrib., Inc.*, 340 F.3d at 358, or showing harm to a party due to lengthy delays and costly discovery, *see Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 720-21 (6th Cir. 2012). Although there was significant delay in this litigation before Defendants asserted their arbitration defense, the lion's share of that delay was not caused by either party. At oral argument, Plaintiffs could not quantify any prejudice incurred or point to any time or resources exhausted that would not be transferrable to the arbitration process. *Cf. Johnson Assocs.*, 680 F.3d at 720 (finding prejudice where eight-month delay, numerous scheduling motions, and discovery were not transferrable to arbitration). Without discovery or any significant advancement in the litigation, Plaintiffs likely "wasted relatively few resources on unnecessary litigation" due to Defendants' delay. *Shy*, 781 F.3d at 830. Absent a showing of prejudice to Plaintiffs, there can be no waiver by Defendants.

### B.

[2]Plaintiffs contend in the alternative that Defendants breached the arbitration clause of the PSA by refusing to arbitrate, and, thus, cannot now rely on the PSA as a defense. In support, Plaintiffs rely on emails wherein Aqualucid states that it may "request dispute resolution under the terms of the CRADA." The district court properly rejected this argument. First, the referenced email is not directed at Zeta, but rather at the government. Second, the email references the CRADA, rather than the PSA. Therefore, any argument that Defendants breached the PSA by refusing to arbitrate in response to the email is disingenuous. Moreover, Pitts' email in response in which he stated that he would not participate in a conference call does not constitute a breach because there is "no waiver when a party refuse[s] to arbitrate, prior to the commencement of litigation, on the grounds that its opponent's claims were substantively weak." *Shy*, 781 F.3d at 829. Thus, Plaintiffs' allegation that Defendants breached the PSA fails.

### C.

[3]Finally, Plaintiffs challenge the scope of the arbitration agreement, contending that some of the claims here are not subject to arbitration because they fall outside the scope of the PSA. We consider whether "an action could be maintained without reference to the contract or relationship at issue," *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003), and here, Plaintiffs'

argument falls short. Plaintiffs' claims all reference the PSA, **419 claim breach under the agreement, or rely on the exchange of money and information that was governed by the PSA. Further, Plaintiffs previously argued that all the claims at issue in this litigation are governed by Michigan law, relying on the forum selection clause within the PSA. Plaintiffs' reliance on the PSA as the governing contract of the litigation supports a conclusion that the PSA controls all issues raised in the litigation. Thus, the district court correctly concluded that Plaintiffs' claims fall within the scope of the PSA and would be subject to its binding arbitration agreement, absent waiver.

### IV.

The district court properly dismissed Plaintiffs' claims, which fall under the scope of a binding arbitration agreement. Because Plaintiffs failed to establish prejudice, Defendants did not waive their rights to enforce the arbitration agreement. We **AFFIRM** the judgment of the district court.

### All Citations

721 Fed.Appx. 414

### Footnotes

1    Michael Pitts is now deceased and is represented in this litigation by his wife, Defendant Carolyn B. Pitts, the personal representative of his estate.

2    Aqualucid's first suit was joined by a second company not party to the present suit.

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 5894543
Only the Westlaw citation is currently available.
United States District Court,
E.D. Tennessee, Southern Division,
at Chattanooga.

David ASA, Plaintiff,
v.
VERIZON COMMUNICATIONS, INC., Defendant.

No.: 1:17-cv-256
|
Filed 11/29/2017

**Attorneys and Law Firms**

Grover C. Collins, Collins Law Firm, PLLC, Nashville, TN, Kevin Christopher, Christopher Intellectual Property Law, PLLC, Chattanooga, TN, for Plaintiff.

Michael James Dumitru, Robert F. Parsley, Miller & Martin, PLLC, Chattanooga, TN, Michael P. Kohler, Miller & Martin PLLC, Atlanta, GA, for Defendant.

**MEMORANDUM OPINION**

Thomas W. Phillips, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** This civil action was removed from the Circuit Court for Hamilton County, Tennessee, based on diversity jurisdiction [Doc. 1]. Plaintiff David Asa asserts claims of negligence, negligent infliction of emotional distress, gross negligence, and violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104, *et seq.* These claims arise from events in 2015–2017 in which plaintiff's cellular services account with Verizon Wireless was hacked by an unknown person.

Verizon Communications, Inc. is the named defendant. However, Verizon Communications Inc. has responded to the complaint by advising that Verizon Communications, Inc. is an inactive corporation that provided no services to the plaintiff [Doc. 12-1 at ¶ 2]. Verizon Communications Inc. is a holding company that indirectly wholly owns Cellco Partnership d/b/a Verizon Wireless [*Id.* at ¶ 3]. Cellco Partnership (hereinafter "Verizon Wireless") is the

business entity that provided wireless service to the plaintiff [*Id.* at ¶ 4].

Verizon Wireless has moved the Court to compel plaintiff to arbitrate all of his claims and to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) or 12(b)(6) [Doc. 12]. Verizon Wireless has filed supporting briefs and exhibits [Docs. 13, 22] and plaintiff has responded in opposition [Docs. 19, 21]. For the reasons set forth herein, the defendant's motion [Doc. 12] will be **GRANTED**.

**I. Relevant Facts**[1]
In October 2013, plaintiff entered into contract with Verizon Wireless for cellular services [Doc. 1-1 at ¶ 8]. On November 4, 2013, plaintiff assented to a receipt-form Customer Agreement with Verizon Wireless, which included a mandatory arbitration provision [Doc. 12-4].[2] On September 23, 2014, plaintiff executed a receipt-form Customer Agreement with Verizon Wireless, which also included a mandatory arbitration provision [Doc. 12-5]. In pertinent part, this Customer Agreement provided:

> I AGREE TO THE CURRENT VERIZON WIRELESS CUSTOMER AGREEMENT ... WHICH I HAVE HAD THE OPPORTUNITY TO REVIEW. I UNDERSTAND THAT I AM AGREEING TO ... SETTLEMENT OF DISPUTES BY ARBITRATION AND OTHER MEANS INSTEAD OF JURY TRIALS, AND OTHER IMPORTANT TERMS IN THE CUSTOMER AGREEMENT.

[*Id.* at pp. 2—3]. On March 15, 2017, plaintiff added a device and changed services to his account, once again executing an agreement that included an arbitration provision [Doc. 12-6].

**\*2** The full Verizon Wireless Customer Agreement, referenced in each of the receipt-form agreements signed by plaintiff, includes the following arbitration provision:

> YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT. YOU UNDERSTAND THAT BY THIS

AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY.... THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. EXCEPT FOR SMALL CLAIMS COURT CASES, ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US ... WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB").

[Doc. 12-3 at pp. 5—6].

In September 2015, an unidentified party attempted to gain unauthorized access to plaintiff's Verizon Wireless account [Doc. 1-1 at ¶ 9]. In March 2016, plaintiff received notice of an online user account password change [*Id.* at ¶ 10]. Plaintiff subsequently learned that an unidentified party attempted to activate an unauthorized cellular phone on his Verizon Wireless account by calling the customer service call center [*Id.*]. Following the March 2016 incident, Verizon Wireless assigned plaintiff a password and a password-protected verification process, by which plaintiff would be required to provide the assigned password to receive customer support from Verizon Wireless, including activating a new phone [*Id.* at ¶ 11].

On April 15, 2017, an unidentified party accessed plaintiff's Verizon Wireless account several times to activate an unauthorized cellular phone [*Id.* at ¶¶ 12—21]. Plaintiff took steps to thwart this unauthorized activity to his account by using Verizon's online support system and by speaking with Verizon's customer service representatives by phone and in person [*Id.*]. Verizon Wireless representatives repeatedly advised that plaintiff's account had been flagged and that additional security measures were added to protect his account [*Id.*]. Nevertheless, the next day, April 16, 2017, an unauthorized party again activated an unauthorized cellular phone on plaintiff's Verizon Wireless account [*Id.* at ¶ 22].

During the times when the unauthorized phone was activated on plaintiff's account, the hacker was able to use the unauthorized phone to obtain password resets to plaintiff's online commercial, personal, and media accounts [*Id.* at ¶ 23]. These password resets allowed the hacker access to plaintiff's Bitcoin account, from which 7.3 bitcoins were transferred at a present value of over $32,000 [*Id.*]. Plaintiff seeks compensatory, punitive, and treble damages, and attorney's fees and costs [*Id.* at p. 13].

## II. Meet and Confer

Plaintiff first complains that Verizon Wireless did not comply with this Court's Order Governing Motions to Dismiss, which requires parties to "meet and confer prior to the filing of a motion to dismiss" [Doc. 5]. Plaintiff notes that defendant filed the motion to dismiss and compel arbitration on October 12, 2017 [Doc. 12], but that defense counsel did not contact plaintiff's counsel until October 13, 2017 to discuss the motion [Doc. 15]. Plaintiff argues that the Court should deny the motion based on defendant's failure to meet and confer before filing the instant motion [Doc. 21 at pp. 1—2].

**\*3** Verizon Wireless responds that the "meet and confer" requirement does not apply here because it seeks to compel arbitration and dismissal is an alternative remedy [Doc. 22 at p. 12]. Verizon Wireless also argues that it "substantially complied" with the Court's order by filing its certification on October 16, 2016 [Doc. 15], the date that its response to the complaint was due.

The Court's Order provides that motions to dismiss pursuant to Fed. R. Civ. P. 12(b) are "discouraged if the defect is likely to be cured by filing an amended pleading" [Doc. 5]. Thus, "the parties must meet and confer prior to the filing of a motion to dismiss to determine whether it can be avoided [*Id.*]. Plaintiff is correct that Verizon Wireless has not complied with the strict letter of the Court's order by conferring with plaintiff *prior to* filing the pending motion. Verizon Wireless's argument that it is relieved of the obligation to meet and confer with plaintiff because dismissal is an alternate remedy is specious. Verizon Wireless's motion is styled as a "motion to compel arbitration *and to dismiss*" and seeks relief pursuant to Fed. R. Civ. P. 12(b)(1) or 12(b)(6). Nevertheless, the Court finds that Verizon Wireless's counsel did make a good faith attempt to confer with plaintiff's counsel regarding the motion. Further, if the Court were to adopt plaintiff's course of action and deny Verizon Wireless's motion solely on this basis, the Court reasonably anticipates that Verizon Wireless would merely re-file its motion. Such

gymnastics would not be a wise use of the parties' or the Court's resources. Accordingly, the Court declines plaintiff's invitation to deny the motion for failure to strictly comply with the meet and confer requirement.

## III. Analysis

The Federal Arbitration Act ("FAA") represents a strong public policy in favor of arbitration. *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). Arbitration agreements must satisfy two conditions for the FAA to apply: (1) it must be in writing; and (2) it must be part of a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The parties do not dispute that the arbitration provision in the Verizon Wireless Customer Agreement is in writing and it affects interstate commerce. *See United States v. Weathers*, 169 F.3d 336, 341 (6th Cir.), *cert. denied*, 528 U.S. 838 (1999) (cellular telephones are instrumentalities of interstate commerce). Further, the Customer Agreement plainly states that "THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT" [Doc. 12-3 at p. 5].

The FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a valid arbitration agreement governs a claim, courts must compel arbitration. *Id.* §§ 3–4. "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 812 (6th Cir. 2008) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). The Customer Agreement arbitration provision broadly covers "ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US ... INCLUDING ANY DISPUTES YOU HAVE WITH OUR EMPLOYEES OR AGENTS" [Doc. 12-3 at p. 5]. Plaintiff does not argue that his claims are excluded from the scope of the arbitration agreement. Based on the agreement's expansive language, the Court can easily conclude that plaintiff's claims against Verizon Wireless arise from the "equipment, products and services" he received. *See NCR Corp.*, 512 F.3d at 813 ("When faced with a broad arbitration clause, such as one covering *any* dispute arising out of an agreement, a court should follow the presumption of arbitration") (quoting *Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 482 n.10 (6th Cir. 2006)). Thus, the arbitration provision of the Customer Agreement covers plaintiff's claims.

**\*4** Plaintiff raises several arguments as to the enforceability of the arbitration agreement. If the validity of the agreement to arbitrate is "in issue," then the Court must first resolve that question. *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). The burden is on the party opposing arbitration to show that the agreement is not enforceable. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000). In order to meet this burden, the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, a showing that mirrors the summary judgment standard. *Great Earth*, 288 F.3d at 889. In other words, the plaintiff must present evidence "such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Id.* Further, the Court must consider claims concerning the validity of the arbitration clause itself, as opposed to challenges to the validity of the contract as a whole. *Id.* at 890.

### A. Whether the Contract is an Adhesion Contract or Unconscionable

In Tennessee, "[u]nconscionability may arise from a lack of a meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability)." *Trinity Industries, Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 170 (Tenn. Ct. App. 2001). Courts "have tended to lump the two together and speak of unconscionability resulting 'when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.' " *Id.* at 171 (quoting *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984)); *see Skaan v. Fed. Exp. Corp.*, No. W2011-01807-COA-R3-CV, 2012 WL 6212891, at \*9 (Tenn. Ct. App. Dec. 13, 2012). "In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case." *Haun*, 690 S.W.2d at 872 (quoting *Brenner v. Little Red Schoolhouse, Ltd.*, 274 S.E. 2d 206, 210 (N.C. 1981)); *Dortch v. Quality Rest. Concepts, LLC*, No. 1:12-CV-198, 2013 WL 1789603, at \*3 (E.D. Tenn. Apr. 26, 2013) (Collier, J.).

Plaintiff argues that the arbitration clause is unenforceable for lack of mutual assent, or procedurally unconscionable [Doc. 21 at pp. 4-5]. Plaintiff claims he did not assent to arbitration by merely "carrying forward service from childhood to adulthood and periodically signing terms of incorporation" [*Id.* at p. 4]. He further claims that he "is a

modern businessman who runs his enterprises primarily, and often time [*sic*] entirely through his mobile phone" [*Id.* at p. 4]. Thus, plaintiff claims he "had no choice but to be subject to an arbitration clause" and points to the service agreements of other cellular service providers [Docs. 19-1–19-5], which also contain arbitration provisions, as evidence that the arbitration clause at issue amounts to a contract of adhesion [*Id.* at pp. 4—5].

Under Tennessee law, an adhesion contract is "a standardized form offered on what amounts to a 'take it or leave it' basis, without affording the weaker party a realistic opportunity to bargain, and under conditions whereby the weaker party can only obtain the desired product or service by submitting to the form of the contract." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 975–76 (6th Cir. 2007) (quoting *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996)). However, a contract is not adhesive merely because it is a standardized form offered on a take-it-or-leave-it basis. Plaintiff must also present evidence of "the absence of a meaningful choice for the party occupying the weaker bargaining position." *Cooper*, 367 F.3d at 501—02 (6th Cir. 2004).

**\*5** Verizon Wireless correctly notes that the agreements from other cellular providers are unauthenticated and are therefore inadmissible [Doc. 22 at p. 4]. *See Winston v. Cargill, Inc.*, 699 F. Supp. 2d 1056, 1060 (W.D. Tenn. 2010). Further, plaintiff has presented no evidence that he attempted to obtain cellular services from these other providers, or that he could not obtain cellular services without also agreeing to an arbitration provision. *See Cooper*, 367 F.3d at 500. Additionally, plaintiff has presented no evidence that he "must obtain cellular services" in order to run his business enterprises. In short, plaintiff has presented no evidence to shore up his assertion that he "had no choice" but to consent to Verizon Wireless's arbitration agreement.

Even if the Customer Agreement was a contract of adhesion, it is enforceable unless plaintiff can also show it is substantively unconscionable. *Id.* at 503. Plaintiff argues that the Customer Agreement arbitration clause is unenforceable as an unconscionably one-sided provision [Doc. 21 at pp. 2-4]. Plaintiff contends that the agreement limits him to arbitration, but it allows Verizon Wireless certain unilateral remedies such as changing the terms of the agreement, terminating service, or collecting service charges [*Id.*].

Plaintiff's argument is misplaced. Plaintiff cites substantive provisions of the Customer Agreement that Verizon Wireless may unilaterally change, but that does not make the arbitration provision of the Agreement unilateral or one-sided. *See Great Earth Cos.*, 288 F.3d at 898 ("courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to challenges to the validity of the contract as a whole"). The arbitration provision in the Customer Agreement applies to both parties and to all claims, except for small claims. [Doc. 12-3 at p. 5 ("YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT.") ]. *See Berent v. CMH Homes, Inc.*, 466 S.W. 3d 740, 756 (Tenn. 2015). Plaintiff has presented no evidence that the terms of the arbitration agreement are one-sided, oppressive, or unfair.

### B. Jury Waiver

Finally, plaintiff argues that the arbitration agreement is unenforceable because he did not knowingly and voluntarily waive his right to a jury trial [Doc. 21 at p. 5]. Specifically, plaintiff claims that he "is not highly educated, there was no consideration for his waiver, there is a significant lack of clarity within the arbitration clause (e.g. ¶ 6), and the clause was administered through a click-wrap process" [*Id.*]. Plaintiff further argues that he used Verizon Wireless services "for years as a minor," but he was never consulted about the judicial waiver as an adult [*Id.*].

Although the Sixth Circuit has held that "the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate," *Cooper*, 367 F.3d at 506 (quoting *Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 492 (6th Cir. 2001), *cert. denied*, 535 U.S. 970 (2002)), the waiver of the right to a jury trial must be knowing and voluntary. *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 420 (6th Cir. 2011) (citing *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir. 1985)). In evaluating whether a plaintiff knowingly and voluntarily waived his right to pursue employment claims in court, the Court considers: (1) plaintiff's experience, background and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the plaintiff had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; and (5) the totality of the circumstances. *Id.* at 420–21 (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc)).

**\*6** With respect to the first factor, the complaint describes plaintiff as "an entrepreneur and leading social media influencer" with a significant online audience following "his communications, insights, and trend indications"

[Doc. 1-1 at ¶ 6]. Plaintiff further avers that he is "a high-profile businessman and influencer" [*Id.* at ¶ 7] and he feared the unauthorized access to his online accounts "could irreparably damage [his] standing as a broadly respected influencer" [*Id.* at ¶ 25]. The Court must accept these allegations as true for purposes of considering a motion to dismiss, rather than the factually unsupported assertion in plaintiff's response brief that he "is not highly educated" [Doc. 21 at p. 5]. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (a court must accept as true all of the factual allegations contained in a complaint); *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("[a]rguments in parties' briefs are not evidence"). Even if the Court were to accept the assertion that plaintiff is not highly educated, he has nevertheless presented himself as an experienced businessman and entrepreneur. Accordingly, his background and experience outweigh any purported educational deficiencies and the Court finds that this factor weighs in favor of a knowing and voluntary waiver.

As for the second factor, the record is silent on the amount of time the plaintiff had to consider whether to sign the waiver, including whether he had an opportunity to consult with a lawyer. Plaintiff asserts that he "used Verizon for years as a minor, and was never properly consulted about the judicial waiver when renewing his plan as an adult" [Doc. 21 at p. 5]. However, the record is undisputed that plaintiff used Verizon Wireless cellular services for several years and renewed his contractual agreement with Verizon at least twice. Thus, he had multiple occasions to consider the Customer Agreement, including the waiver. Plaintiff has presented no contrary evidence on this point. The Court finds that this factor weighs in favor of a knowing and voluntary waiver.

The third factor for consideration is the clarity of the waiver. Despite plaintiff's generic assertion that "there is a significant lack of clarity within the arbitration clause" [Doc. 21 at p. 5], the Court notes that the Customer Agreement plainly states that plaintiff is waiving his right to a jury trial. The September 2014 receipt-form agreement states: "I UNDERSTAND THAT I AM AGREEING TO ... SETTLEMENT OF DISPUTES BY ARBITRATION AND OTHER MEANS INSTEAD OF JURY TRIALS" [Doc. 12-5 at p. 2]. Similarly, the March 2017 receipt-form agreement states: "I agree to the Verizon Wireless Customer Agreement including ... settlement of disputes by arbitration instead of jury trial" [Doc. 12-6 at p. 3]. Further, the long form Customer Agreement provides: "YOU UNDERSTAND THAT BY THIS AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY.... YOU AND VERIZON

UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY WAY." [Doc. 12-3 at p. 6]. The Court finds that this factor weighs in favor of a knowing and voluntary waiver.

Regarding the fourth factor, plaintiff's responsive brief asserts, also without any evidentiary support, "there was no consideration for his waiver" [Doc. 21 at p. 5]. However, the complaint alleges that plaintiff contracted with Verizon Wireless for cellular services for several years, beginning in 2013 [Doc. 1-1 at ¶ 8], which the Court accepts as true for purposes of this motion. Further, Mr. Alexander Shekhter, employed by Verizon Corporate Resources Group, LLC, states that plaintiff "paid Verizon Wireless for wireless services received in relation to his account and Customer Agreement" [Doc. 12-1 at ¶ 10]. Plaintiff has presented no evidence to dispute Mr. Shekhter's affidavit. Moreover, as Verizon Wireless points out, a mutual promise is sufficient consideration to support an agreement to arbitrate under Tennessee law. *Sellers v. Macy's Retail Holdings, Inc.*, No. 2:12-CV-02496-SHL, 2014 WL 2826119, at *8 (W.D. Tenn. June 23, 2014) (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 974 (6th Cir. 2007)). The arbitration provision at issue is just such an agreement; plaintiff and Verizon Wireless "BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT" [Doc. 12-3 at p. 5]. The Court finds that this factor weighs in favor of a knowing and voluntary waiver.

**\*7** Finally, the totality of the circumstances convinces the Court that plaintiff knowingly and voluntarily waived his right to a jury trial. Plaintiff complains, "the clause was administered through a click-wrap process in which the Plaintiff signed a digital incorporation statement packaged in other clauses about return and restocking fees" [Doc. 21 at p. 5]. Thus, plaintiff seems to imply that the arbitration clause was hidden within other contractual provisions and he did not or could not review all of the terms. This argument fails. "[O]ne who signs a contract which he has had an opportunity to read and understand, is bound by its provisions" and thus plaintiff "cannot be excused from complying with the arbitration provision if [he] simply failed properly to read the contract." *See Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1016 (6th Cir. 2003) (internal citations and quotation marks omitted). Plaintiff has presented no evidence that he was prevented from reviewing the terms of any of the agreements with Verizon Wireless or that he was incapable of understanding their terms.

After considering all of the forgoing factors, the Court finds that all of the factors weigh in favor of a waiver. Thus, the Court concludes that plaintiff has knowingly and voluntarily waived his right to a jury trial. The Court finds that the parties have entered into a valid and enforceable agreement to arbitrate any disputes between them, including the claims raised in this case.

C. Remedy

In light of the Court's conclusion that the parties have entered into an enforceable arbitration agreement and the agreement covers the instant dispute, the Court next considers the appropriate remedy. Verizon Wireless argues that because all claims must be arbitrated, dismissal of this action is appropriate [Doc. 13 at pp. 10–11]. The Sixth Circuit has stated that " '[t]he weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration.' " *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)); *Hensel v. Cargill, Inc.*, No. 99–3199, 1999 WL 993775, at *4 (6th Cir. Oct. 19, 1999); *see also Choice Hotels Int'l,*

*Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001) (concluding that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable") (citation omitted); *Gassner v. Jay Wolfe Toyota*, No. 4:06–CV–1335 CAS, 2007 WL 1452240, at *4 (E.D. Mo. May 15, 2007) ("Where all issues in a case must be submitted to arbitration, it serves no purpose to retain jurisdiction and stay an action."). Because all of plaintiff's claims are arbitrable, the Court can find no reason to stay this matter pending arbitration.

**IV. Conclusion**

For all of the foregoing reasons, the Court finds that defendant's motion to compel arbitration [Doc. 12] should be **GRANTED** and plaintiff's claims should be dismissed. An appropriate order will be entered.

**All Citations**

Slip Copy, 2017 WL 5894543

Footnotes

1    For the purposes of a motion to dismiss, the Court takes the factual allegations in the complaint [Doc. 1-1] as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint").

2    Verizon Wireless, through the affidavit of Alexander V. Shekhter [Doc. 12-1], has submitted copies of the agreements between the parties. Because these documents are central to plaintiff's claims, the Court may consider them in reviewing a motion to dismiss without converting the motion to one for summary judgment. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court also notes that the plaintiff has not objected to the consideration of these exhibits.

**End of Document**                                           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4286193
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Anthony E. DIETZ, Plaintiff,
v.
ALLIED HOME MORTGAGE CAPITAL
CORPORATION, Defendant.

No. 10–12610.
|
Oct. 26, 2010.

**Attorneys and Law Firms**

Jeffrey J. Fleury, Ahern Fleury, Birmingham, MI, for Plaintiff.

Marc E. Thomas, Bendure & Thomas, Bingham Farms, MI, for Defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS*

GEORGE CARAM STEEH, District Judge.

**\*1** On June 10, 2010, plaintiff Anthony E. Dietz filed an action in Wayne County Circuit Court alleging claims against his former employer, defendant Allied Mortgage Capital Corporation ("Allied"). On July 1, 2010, Allied removed the case to this court and filed a motion to dismiss asserting the claims are subject to arbitration. A hearing on the motion was held on September 15, 2010. For the reasons set forth below, the court GRANTS defendant's motion to dismiss.

*BACKGROUND*

Allied is a national mortgage loan origination company headquartered in Houston, Texas. Plaintiff is a Michigan resident who on May 24, 2000 entered into an employment agreement with Allied to become a branch manager for three Allied locations. Plaintiff was employed by Allied as a branch manager until July 31, 2008. The employment agreement between plaintiff and Allied contains the following mandatory arbitration

agreement:

> Employer and Employee agree to submit to final and binding arbitration any and all disputes, claims (whether in tort, contract, statutory, or otherwise), and disagreements concerning the interpretation or application of this Agreement and Employee's employment by Employer and the termination of this Agreement ... including the arbitrability of any such controversy or claim ... Any such dispute, claim, and disagreement subject to arbitration pursuant to the terms of this Section 5.1 shall be resolved by arbitration in accordance with the Employment Dispute Resolution Rules ("Arbitration Rules") of the American Arbitration Association (the "AAA") in effect at the time of arbitration. Arbitration under this section must be initiated within sixty (60) days of the action, inaction, or occurrence about which the party initiating the arbitration is complaining.

Section 5.1, Exhibit A to Complaint.

Plaintiff filed an action in Wayne County Circuit Court alleging: (1) breach of the employment agreement; (2) fraud/fraudulent misrepresentation; (3) silent fraud; (4) innocent misrepresentation; (5) conversion; (6) unjust enrichment; and (7) an action for an accounting.

On July 1, 2010, Allied removed the case to this court and filed a motion to dismiss. In its motion, Allied argues all of plaintiff's claims relate to the employment relationship between the parties and are therefore subject to mandatory arbitration. Allied seeks dismissal of plaintiff's claims pursuant to the mandatory arbitration clause or, alternatively, a stay of the case pending arbitration.

In response, plaintiff admits his claims center around the employment relationship between the parties and therefore appears to admit the claims are within the scope of the arbitration clause. However, plaintiff argues: (1) Allied waived its right to compel arbitration by removing the case to federal court; (2) arbitration is barred by the provision in the arbitration clause mandating that claims

be filed within sixty days of accrual of the claim; and (3) the arbitration clause is invalid as it was induced by fraud.

### STANDARD OF REVIEW

**\*2** In deciding a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in favor of the plaintiff, accept the factual allegations as true, and determine whether the allegations present plausible claims. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). The pleading must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The court should first identify any conclusory allegations and bare assertions that are not entitled to an assumption of truth, then consider the factual allegations that are entitled to a presumption of truth and determine if they plausibly suggest entitlement to relief. *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009). The well-pleaded facts must permit an inference of more than a mere possibility of misconduct. *Id.* at 1950.

### ANALYSIS

Employment contracts, except those governing workers engaged in transportation, are governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 2. *DeOrnellas v. Aspen Square Mgt., Inc.,* 295 F.Supp.2d 753, 759 (E.D.Mich.2003) (citing *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002)). Under § 2 of the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." *Great Earth Companies, Inc. v. Simons,* 288 F.3d 878, 889 (6th Cir.2002) (quoting 9 U.S.C. § 2). "[I]n deciding whether a valid agreement to arbitrate exists, district courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to challenges to the validity of the contract as a whole." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)). Moreover, "courts are to examine the language of the contract in light of the strong federal policy in favor or arbitration. Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.* (quoting *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000)).

In this case, the employment agreement entered into by the parties (and attached to the plaintiff's complaint) contains a mandatory arbitration clause. The arbitration clause covers "any and all disputes, claims (whether in tort, contract, statutory, or otherwise), and disagreements" concerning the employment relationship between the parties. Plaintiff admits the claims "are based on his employment relationship with Allied." (Resp., p. 8.) Therefore, all seven of plaintiff's claims appear to fall within the scope of the arbitration clause. Plaintiff asserts three challenges to the mandatory arbitration clause: (1) waiver; (2) time bar; and (3) fraudulent inducement. As discussed below, none of these challenges invalidates the clause.

First, plaintiff asserts that Allied waived its right to compel arbitration by participating in this case. Plaintiff asserts Allied's removal of the case from state court to federal court constitutes a waiver. As the Sixth Circuit noted in *Dantz v. Am. Apple Group, LLC,* 123 Fed. Appx. 702, 707, 2005 U.S.App. LEXIS 3454, \*11–12, 2005 WL 465253 (6th Cir. March 1, 2005) (unpublished), "waiver can be implied by a defendant's actions in pursuing litigation." However, the Sixth Circuit found that "mere removal of a case to federal court, and nothing more, does not constitute waiver of a defendant's right to arbitration." *Id.,* citing *Williams v. Cigna Fin. Advisors,* 56 F.3d 656 (5th Cir.1995) (holding a defendant did not waive arbitration by removal to federal court, filing of compulsory counterclaim, and participation in discovery after stay was denied).

**\*3** Plaintiff cites two cases in support of its waiver argument. In *Joba Constr. Co. v. Monroe Cnty. Drain Comm'r,* 150 Mich.App. 173, 179, 388 N.W.2d 251 (1986), the plaintiff waived its right to arbitration when it filed an arbitration demand and then (1) filed a complaint in circuit court requesting the same relief; (2) answered a counterclaim; (3) submitted interrogatories; and (4) answered interrogatories. The court found that the pursuit of discovery not available in arbitration was inconsistent with the plaintiff's arbitration demand and therefore the plaintiff had waived its right to arbitrate. *Id.* In *Madison Dist. Pub. Sch. v. Myers,* 247 Mich.App. 583, 586, 637 N.W.2d 526 (2001), the plaintiff waived arbitration as it did not demand arbitration until after it (1) filed a lawsuit; (2) answered a counterclaim without mentioning the arbitration clause; (3) participated in mediation, facilitation, and eight witness depositions; (4) filed forty-five requests for admission and genuineness of documents (and then filed a motion and supporting brief to compel additional responses to the requests for admission); (5) exchanged exhibit and witness lists; and (6) otherwise actively pursued litigation for twenty months. The plaintiff's arbitration demand came after the court granted the defendant's motion for summary disposition, disposing of the plaintiff's claims. *Id.* at 586, 637 N.W.2d 526. Clearly, the facts in the cases cited by plaintiff are

substantially different from the facts in this case. In this case, Allied simultaneously removed the case and sought to enforce the arbitration agreement. Allied did not pursue discovery or otherwise actively litigate the claims.[1] Plaintiff does not cite any cases addressing mere removal as a waiver of arbitration. The court therefore finds the Sixth Circuit's analysis in *Dantz* compelling and applicable here. Plaintiff's first argument fails.

Second, plaintiff argues the case should not be dismissed pursuant to the mandatory arbitration clause because arbitration under the procedural posture of this case is barred by the portion of the arbitration clause mandating that claims be filed within sixty days of accrual of the claim. Plaintiff argues arbitration is time-barred and the time bar is unreasonable under Michigan law. Plaintiff cites three cases in support, but none of the cases involve a mandatory arbitration clause. Plaintiff fails to cite any authority for the proposition that this court should even consider its arguments—should even entertain an argument regarding the reasonableness of a time limitation on claims—*when a mandatory arbitration clause covers those claims.* Instead, the AAA is the appropriate forum for arguments concerning whether plaintiff's claims are time-barred. Such a result is particularly appropriate in this case because the mandatory arbitration clause also provides that the question of arbitrability is to be decided by the AAA arbitrators. *See* Ex. A to Compl., 5.1 ("Employer and Employee agree to submit to final and binding arbitration any and all disputes ... including the arbitrability of any such controversy or claim.") Thus, pursuant to the arbitration clause, the time bar issue raised by plaintiff is subject to mandatory arbitration.

**\*4** Third, plaintiff argues the arbitration clause is invalid as it was induced by fraud. In determining whether a valid arbitration agreement exists, state law concerning the validity of contracts applies, but the FAA preempts state laws addressing only arbitration provisions. *Great Earth,* 288 F.3d at 889. In addition, this court may only consider a claim of fraud in the inducement of the arbitration clause as distinguished from fraud in the inducement of the agreement as a whole. *See Great Earth,* 288 F.3d at 889 (citing *Prima Paint Corp.,* 388 U.S. at 403–04; *see also Rent–A–Center, West, Inc. v. Jackson,* ––– U.S. –––, ––––, 130 S.Ct. 2772, 2779, 177 L.Ed.2d 403 (2010) (finding challenges to the agreement as a whole, rather than the arbitration clause specifically, are matters for the arbitrator rather than the court to decide).

In the complaint, plaintiff does not allege fraud in the inducement of the mandatory arbitration clause or assert any other challenge to the validity of the arbitration

clause. These allegations were first asserted in response to the motion to dismiss. While plaintiff attempts to frame his new allegations as fraud in the inducement *of the arbitration clause,* it appears his allegations are directed at the contract as a whole. Tellingly, plaintiff states because the arbitration clause "was also agreed to based on fraudulent representations, that provision must fail *with the rest of the fraudulent contract.*" (Resp., p. 14 (emphasis added).) Plaintiff fails to create an issue of fact on his claim of fraud in the inducement of the arbitration clause. Plaintiff cites *Horn v. Cooke, M.D.,* 118 Mich.App. 740, 746, 325 N.W.2d 558 (1982) for the proposition "that in order to avoid an arbitration agreement, a plaintiff must establish that defendant made a misrepresentation that plaintiff relied upon when deciding to arbitrate and plaintiff was harmed thereby." (Resp., p. 15.) Plaintiff asserts that Allied had illegal practices and that he would not have entered into the arbitration clause had he known of these illegal practices. (Resp., p. 14.) However, plaintiff fails to identify any misrepresentations that induced him to enter into the arbitration clause. Plaintiff's complaint does not reference any allegedly fraudulent statements made prior to May 24, 2000 that would serve as a basis for such a claim. Indeed, the fraud/fraudulent misrepresentation claim asserted in the complaint relies upon representations made "[d]uring the course of the parties' employment relationship." (Compl., ¶ 57.) Dietz's Affidavit, filed with his response to the motion to dismiss, fails to cure this deficiency.

Plaintiff's challenges to the mandatory arbitration clause therefore fail.

Dismissal of a lawsuit is proper where the claims are all subject to mandatory arbitration. *Hensel v. Cargill, Inc.,* No. 99–3199, 1999 WL 993775, \*4 (6th Cir. Oct.19, 1999) (citing *Alford v. Dean Witter Reynolds Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992), and *Sparling v. Hoffman Const. Co., Inc.,* 864 F.2d 635, 638 (9th Cir.1988). Allied is entitled to dismissal of plaintiff's claims, without prejudice, because all of the claims are subject to arbitration.

*CONCLUSION*

**\*5** Defendant's motion to dismiss is hereby GRANTED. Plaintiff's claims are hereby DISMISSED, in deference to arbitration.

SO ORDERED.

Dietz v. Allied Home Mortg. Capital Corp., Not Reported in F.Supp.2d (2010)

**All Citations**                                          Not Reported in F.Supp.2d, 2010 WL 4286193

Footnotes

1       During the hearing on Allied's motion to dismiss, plaintiff argued Allied's removal was significant because the state court would
        have applied the AAA rules (as the arbitration clause provides the arbitration shall proceed in accordance with AAA rules).
        However, plaintiff failed to explain how the AAA rules would produce a different result. Indeed, the various versions of the AAA
        Employment Arbitration Rules and Mediation Procedures in place since 2006 have all included a statement that "[t]he arbitrator
        shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity
        of the arbitration agreement."

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   4

2013 WL 238540
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

FUEGO GRILL, L.L.C., and Samuel Alvarado,
Plaintiffs–Appellees,
v.
DOMESTIC UNIFORM RENTAL, Defendant–
Appellant.

Docket Nos. 302230, 303763.
|
Jan. 22, 2013.

Oakland Circuit Court; LC No.2010–113931–CK.

Before: MARKEY, P.J., and MURRAY and SHAPIRO,
JJ.

**Opinion**

PER CURIAM.

**\*1** In this consolidated case, defendant Domestic Uniform
Rental appeals by leave granted the trial court's orders
denying its motion to confirm an arbitration award and
denying its motion for summary disposition. We affirm
the trial court's orders in both appeals because the trial
court correctly held that it was for the court to determine
whether an agreement to arbitrate existed.

## I. FACTUAL PROCEEDINGS

Plaintiff Fuego Grill, L.L.C., is a restaurant owned by
plaintiff Samuel Alvarado. According to plaintiffs, on
March 30, 2010, while Alvarado was working at Fuego
Grill in preparation for its May 2010 grand opening,
defendant's district sales manager, Jim Carlisle, visited
the restaurant and attempted to discuss defendant's
products and services with Alvarado. However, Alvarado
told Carlisle that he had not come at a good time and
Alvarado continued to work. Nevertheless, Carlisle
proceeded to ask Alvarado several questions before he

filled out a form. Once Carlisle finished the form, he
presented it to Alvarado as a bid for defendant's services.
According to plaintiffs, Carlisle specifically told Alvarado
that the prepared form was not a contract and that any
future contract that defendant and plaintiffs may enter into
would be on a month-to-month basis. Carlisle then
presented Alvarado with two documents—the first
entitled "rental agreement domestic uniform rent" and the
second "guaranty of payment." Carlisle asked Alvarado to
sign both documents, stating that the documents were an
acknowledgement that Carlisle had discussed doing
business with plaintiffs. After Alvarado signed the
documents, Carlisle left the restaurant without providing a
copy of the documents to Alvarado. At this point,
Alvarado believed that defendant would prepare and send
him a written proposal for business. Thereafter, on April
30, 2010, defendant attempted to deliver an order to
plaintiffs but Alvarado refused delivery.

Because the purported agreement contained an arbitration
provision, defendant filed a demand for arbitration
following Alvarado's refusal of delivery. At the
arbitration, plaintiffs asserted that an enforceable contract
had not been formed, defendant's actions amounted to
fraud, and the contract was void or voidable. Conversely,
defendant asserted that a valid contract existed. After the
arbitration hearing closed, but before the arbitrator issued
a decision, plaintiffs filed a complaint in circuit court.
Among other things, plaintiff requested that the trial court
declare the rental agreement and guaranty unenforceable
as procured by fraud and in violation of Michigan law and
that the dispute was not subject to arbitration because the
agreement was induced by fraud.

Shortly thereafter, the arbitrator issued an award against
plaintiffs. Following the arbitrator's decision, defendant
filed a motion for confirmation of the arbitration award,
arguing that it was entitled to an order confirming the
arbitration award because the issues addressed by the
arbitrator arose out of or were related to the parties' rental
agreement and plaintiffs had voluntarily submitted all
claims and defenses to the arbitrator. Plaintiffs opposed
defendant's motion for confirmation of the arbitration
award, asserting that the arbitration clause was
unenforceable and that the rental agreement and guaranty
could not be enforced because defendant engaged in fraud
and there was no meeting of the minds.

**\*2** The trial court agreed with plaintiffs that the
determination regarding the existence of an agreement to
arbitrate was for the court. Additionally, it found that
plaintiffs' participation in arbitration did not waive
plaintiffs' challenge to the validity of the agreement.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.        1

Fuego Grill, L.L.C. v. Domestic Uniform Rental, Not Reported in N.W.2d (2013)

Consequently, the trial court concluded that it would consider plaintiffs' claims and it denied defendant's motion for confirmation of the arbitration award.

In the meantime, as a precautionary measure, defendant also filed a motion for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). Defendant argued that because the arbitrator's rulings had embodied plaintiffs' fraud issues, they were not actionable as a matter of law. Plaintiffs opposed defendant's motion for summary disposition and asserted that the arbitration provision was unenforceable because the rental agreement and guaranty were unenforceable through application of promissory estoppel. Plaintiffs also asserted fraud in the execution and fraud in the inducement and argued that no contract was entered into because there was no meeting of the minds.

After oral argument, the trial court denied defendant's motion for summary disposition and found, in the pertinent part:

> [P]ursuant to Michigan law a party can claim fraud, even if it was careless in failing to read a contract. Carelessness of a party defrauded is not a defense to intentional fraud.... One accused of a fraud may not raise as a defense the carelessness of the party defrauded.

> A party who induces someone to sign a contract by some stratagem, trick, or artifice cannot argue that the defrauded party is bound by its terms for negligently railing to read it....

\* \* \*

> The Defendant's argument that the arbitration clause contained in the agreement is controlling completely ignores the basis for this lawsuit, and that is that the arbitration clause ... is contained in a void or ... voidable contract, and therefore cannot control the relationship between the parties.

After the trial court entered an order denying defendant's motion for summary disposition, defendant filed applications for leave to appeal both the order denying its motion for confirmation of the arbitrator's award and the order denying its motion for summary disposition. Subsequently, this Court granted the applications for leave to appeal and consolidated the cases. *Fuego Grill LLC v. Domestic Uniform Rental,* unpublished order of the Court of Appeals, entered June 8, 2011 (Docket Nos.

302230 & 303763).

## II. ANALYSIS

The principal issue in this case is whether the trial court erred in concluding that there was not an agreement to arbitrate between the parties. The existence of an arbitration agreement is a judicial question that is subject to de novo review. *Watts v. Polaczyk,* 242 Mich.App 600, 603; 619 NW2d 714 (2000); see also *In re Nestorovski Estate,* 283 Mich.App 177, 184; 769 NW2d 720 (2009).

To begin, we reject defendant's waiver argument. It is well-settled that

> **\*3** [i]f a party to an arbitration agreement wants to object to the arbitrability of a specific issue, he should do so at the earliest opportunity. He should raise the objection before the issue is submitted for a hearing on its merits, because he may not voluntarily submit an issue to arbitration and then, if he suffers an adverse decision, move to set aside the adverse award on the ground that it was not an arbitrable issue. *[American Motorists Ins Co v. Llanes,* 396 Mich. 113, 114–115; 240 NW2d 203 (1976) (quotation marks and citation omitted).]

Thus, plaintiffs did not waive the issue of arbitrability through participation in the arbitration proceedings, as it argued during the arbitration that no contract existed because of fraudulent inducement and before the arbitration award was issued it filed a complaint in circuit court seeking to preclude arbitration because no contract to arbitrate existed.[1]

Turning now to the merits, which is governed by Michigan law, it is well-settled that the absence of a valid agreement to arbitrate constitutes a defense to plaintiffs' action to confirm the arbitration award. *Arrow Overall Supply Co v. Peloquin Enterprises,* 414 Mich. 95, 97; 323 NW2d 1 (1982). Indeed, the *Arrow Overall Supply Co* Court emphasized that "[t]he defense of 'no valid agreement to arbitrate' is a direct attack on the exercise of jurisdiction of both the arbitrator and the circuit court." *Id.* at 98. The reason a party can raise the existence of an arbitration agreement before the circuit court is that

"[a]bsent a binding contract, the parties cannot be required to arbitrate issues that arise between them." *36th Dist Court v. AFSCME Council 25, Local 917,* 295 Mich.App 502, 510; 815 NW2d 494 (2012) rev'd in part on other grounds —— Mich. ——; 821 NW2d 76 (2012), citing *City of Ferndale v. Florence Cement Co,* 269 Mich.App 452, 460; 712 NW2d 522 (2006) and *AFSCME Council 25 v. Wayne Co,* 290 Mich.App 348, 350; 810 NW2d 53 (2010). And, as our Supreme Court in *Arrow Overall Supply Co* recognized, "[t]he existence of a contract to arbitrate and the enforceability of its terms is a judicial question which cannot be decided by an arbitrator." *Arrow Overall Supply Co,* 414 Mich. at 99; see also *36th Dist Court,* 295 Mich.App at 510.

Here, as previously noted, plaintiffs did not waive the issue of arbitrability because they specifically challenged whether a valid agreement existed and the parties did not agree to submit the issue of arbitrability to the arbitrator. Hence, because plaintiffs challenge the *existence* of the contract to arbitrate—and not merely the arbitration terms within the contract—it was for the court to determine whether an agreement to arbitrate existed. See *Pub Serv Credit Union v. Ernest,* 988 F.2d 627, 629 (CA 6, 1993), citing *Horn v. Cooke,* 118 Mich.App 740, 744; 325 NW2d 558 (1982). Moreover, once the trial court determined that there was not an agreement to arbitrate, the arbitrator did not have jurisdiction to hear the case. Consequently, the trial court correctly denied defendant's motion to confirm the award and defendant's motion for summary disposition.

**\*4** As just detailed, Michigan law clearly and comprehensibly declares that it is for the court—and not the arbitrator—to determine whether a valid agreement to arbitrate exists. We disagree with the dissent's mention, let alone application of collateral estoppel (even by analogy) to this case, as the dissent correctly acknowledges that the doctrine is inapplicable. Moreover, although it is true that the purpose of arbitration is to avoid protracted litigation, it is equally true that parties cannot be forced to arbitrate a matter that they did not contractually agree to arbitrate. No matter the existence of a general public policy[2] favoring expeditious resolution by arbitration, the rule of law contained in Michigan case law is clear and consistent, and requires judicial resolution of this fundamental issue. *Arrow Overall Supply Co,* 414 Mich. at 95.

Affirmed.

MARKEY, P.J. (dissenting).

**\*4** I respectfully dissent. It is undisputed that plaintiff Samuel Alvarado, on behalf of plaintiff Fuego Grill, L.L.C., signed a rental agreement that plainly contained a broad arbitration clause. It is further undisputed that plaintiffs had a full and fair hearing before an arbitrator on plaintiffs' factual claims that the rental agreement was void or voidable for various reasons. I would hold that the trial court erred by not enforcing a "provision in a written contract to settle by arbitration"[1] both defendant's claims of breach of contract and plaintiffs' affirmative defenses to enforcement of the contract as a whole. I would therefore hold that the trial court erred by denying defendant's motion to confirm the arbitrator's award in Docket No. 302230 and that the trial court erred by denying defendant's motion for summary disposition as to plaintiffs' amended complaint for declaratory and other relief in Docket No. 303763.

I. FACTS AND PROCEEDINGS

On March 30, 2010, defendant's salesman, Jim Carlisle, visited plaintiff[3] as he was working at his soon to open restaurant, the Fuego Grill. Defendant provides items such as aprons, floor mats, and bathroom supplies, on a weekly rental basis. Carlisle prepared a one-page "RENTAL AGREEMENT" the first paragraph of which reads, "THIS AGREEMENT made at ...," states in bold capital letters: "THE PARTIES HEREBY AGREE UPON THE TERMS SET FORTH BELOW AND UPON THE REVERSE SIDE HEREOF." Below this were listed various items for a total weekly minimum charge of $78.20. At the bottom of the front page of the document and immediately above lines for defendant's salesman and the customer to sign is ¶ 4, which provides:

> The Customer warrants that he is not under contract with any other party for the furnishing of the items which are the subject matter hereof. The Customer also warrants that he has read the entire contract, front and back, and has received a copy of the Agreement. The signatory for the customer warrants that he is authorized on behalf of the customer to execute this Agreement.

**\*5** Plaintiffs do not dispute that Samuel Alvarado signed the rental agreement below this statement as the "owner" of Fuego Grill. Further, plaintiffs do not dispute that Alvarado also signed a separate one-page "GUARANTY OF PAYMENT." That document stated above Alvarado's signature: "The undersigned agrees to personally

guarantee payment of any amount due for services rendered or for contractual obligations incurred pursuant to any rental agreement between Domestic and the above named customer, or any extension or renewal thereof."

On the reverse side of the rental agreement, ¶ 14 contains a formula for the calculation of liquidated damages in the event of a breach of the agreement. Paragraph 15 contains the arbitration clause at issue, which provides in pertinent part:

> In the event of any controversy or claim in excess of $10,000.00 arising out of or relating to this agreement, including but not limited to questions regarding the authority of the persons who have executed this agreement, the question, controversy or dispute shall be submitted to and settled by arbitration to be held in the city closest to the city in which the branch office of the Company which serves the Customer is located. Said arbitration shall be held in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association.... Judgment upon and [sic] award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The filing party may use either court or arbitration where the claim is less than $10,000.00.... The judge or arbitrator shall include as part of the award all costs including reasonable attorney fees and arbitration fees of the non-breaching party where it is determined that one of the parties breached the agreement.

According to plaintiffs, Alvarado refused delivery of the items listed in the rental agreement in April 2010. In response, defendant filed a demand for arbitration with the American Arbitration Association (AAA), on July, 8, 2010. The AAA case manager assigned the matter to attorney Gene J. Esshaki to act as arbitrator. Esshaki conducted a prehearing conference on September 1, 2010, which defendant's attorney and plaintiff attended. The ground rules for hearing dates, filing witness lists, documents, and position papers were outlined at this conference. A hearing was held on September 30, 2010.

Defendant's counsel again appeared and plaintiffs were represented by Samuel Alvarado, Jr. and Samuel Alvarado, Sr.[3] After this hearing, the AAA case manager mailed written notice to the parties that the arbitration hearing was closed, and that the arbitrator would render a decision within 14 days.

After the arbitration hearing, plaintiffs retained counsel, who on September 30, 2010, faxed and mailed to the AAA case manager an appearance on behalf of plaintiffs. Counsel requested that the arbitration hearing be reopened, if closed, so that plaintiffs could present their case through counsel. In his letter, counsel did not dispute that an agreement existed between plaintiffs and defendant. But counsel noted that the "contract" contained "numerous questionable provisions," and a record should be made regarding the "enforceability of the 'contract.' " Counsel indicated it anticipated making a record regarding the following:

> **\*6** (a) That there was an actual agreement between the parties that preexisted the alleged "contract" containing terms substantially at variance to those the Claimant seeks to enforce;
>
> (b) Fraudulent representations were made and relied upon regarding the nature of the relationship;
>
> (c) That both the actual agreement and the alleged "contract" were procured through fraudulent inducement;
>
> (d) That the liquidated damage provisions are unenforceable penalties;
>
> (e) That Claimant's method of business and a substantial amount of its business income is based upon victimizing hapless small businesses in the manner in which these Respondents have been victimized; and
>
> (f) That at least one court and perhaps others have refused to enforce Claimant's questionable contract provisions.

On October 6, 2010, the arbitrator issued an order granting plaintiffs' motion to reopen the arbitration hearing. On the same day, plaintiffs filed their complaint in circuit court. They pleaded claims alleging that the rental agreement and the guarantee were unenforceable because the contract contained questionable terms and because Alvarado was fraudulently induced to sign them. Plaintiffs' alleged that Carlisle told Alvarado the documents were not a contract; that if plaintiffs entered into a contract it would be on a month-to-month basis; and that Carlisle stated he wanted Alvarado to sign the

documents to show his office that he had made the sales' call.

A new arbitration hearing was conducted on November 8, 2010. Plaintiffs submitted both a prehearing brief and a posthearing brief. Plaintiffs' arbitration briefs included not only the arguments and theories noted in counsel's September 30 letter and their circuit court complaint but also additional legal theories attacking the validity of the rental agreement and the guarantee. These additional theories included fraud in the execution; no contract was formed for lack of a meeting of the minds; and promissory estoppel, that is, the rental agreement should be reformed based on Carlisle's alleged statements so that it was terminable on one month's notice. Defendant in its posthearing arbitration brief argued that Michigan law requires that unambiguous contracts be enforced as written, and although disputed, plaintiffs' claims that Carlisle made oral misrepresentations were insufficient to grant relief where plaintiffs could have ascertained the truth by the simple act of reading the documents. Although defendant sought over $15,000 in damages, costs, and attorney fees, arbitrator Esshaki issued his decision awarding defendant $4,637.50 against plaintiffs jointly and severally.

On November 16, 2010, defendant filed a motion to confirm the arbitration award in plaintiffs' circuit court action. Defendant asserted it was entitled to an order confirming the arbitration award as the issues the arbitrator addressed arose out of or related to the parties' rental agreement, and plaintiffs had voluntarily submitted all their claims and defenses to the arbitrator. Two days later, on November 18, 2010, plaintiffs filed in circuit court their first amended complaint, adding the additional legal theories they had presented in the arbitration proceedings. Plaintiffs also submitted a brief in opposition to confirming the arbitration award. They argued that the arbitration clause in the rental agreement was unenforceable because the rental agreement itself was void or voidable based on the legal theories and facts alleged in their amended complaint.

**\*7** The trial court agreed with plaintiffs that the issue was controlled by *Arrow Overall Supply Co v. Peloquin Enterprises,* 414 Mich. 95, 99; 323 NW2d 1 (1982), and that the determination regarding the existence of an agreement to arbitrate is one for the court. My colleagues also agree. I respectfully disagree.

## II. ANALYSIS

The rental agreement at issue provides in ¶ 18 that it "shall be construed according to the law of the State of Michigan." Thus, Michigan law controls this case. *Madison Dist Pub Sch v. Myers,* 247 Mich.App 583, 588 n 1; 637 NW2d 526 (2001). Michigan has adopted the uniform arbitration act, MCL 600.5001 *et seq.,* which permits all persons, except infants and persons of unsound mind, to agree in writing to submit controversies between them to arbitration and to "agree that a judgment of any circuit court shall be rendered upon the award." MCL 600.5001(1); *Wold Architects & Engrs v. Strat,* 474 Mich. 223, 229; 713 NW2d 750 (2006). Thus, a written agreement providing for the judicial enforcement of controversies settled by arbitration is known as statutory arbitration. *Nordlund & Assoc, Inc v. Hesperia,* 288 Mich.App 222, 226; 792 NW2d 59 (2010). Such an agreement to arbitrate is "valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract ." MCL 600.5001(2); *Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC,* 276 Mich.App 146, 153; 742 NW2d 409 (2007). Michigan's public policy strongly favors arbitration to resolve disputes. *Rembert v. Ryan's Family Steak Houses, Inc,* 235 Mich.App 118, 127–128; 596 NW2d 208 (1999).

I agree that absent a binding contract, the parties cannot be required to arbitrate disagreements that arise out of the unenforceable contract. *Ferndale v. Florence Cement Co,* 269 Mich.App 452, 460; 712 NW2d 522 (2006). "[A]rbitrators derive their authority from the parties' contract and arbitration agreement," so "the parties' contract is the law of the case in this context." *Gordon Sel–Way, Inc v. Spence Bros,* 438 Mich. 488, 497–498; 475 NW2d 704 (1991). Furthermore, "[t]he existence of an arbitration agreement and the enforceability of its terms are judicial questions for the court, not the arbitrators." *Ferndale,* 269 Mich.App at 458. And, our Supreme Court has held that "the defense 'no valid agreement to arbitrate' may be raised in an action to confirm or enforce an arbitration award." *Arrow Overall Supply,* 414 Mich. at 97. But the issue remains whether plaintiffs, having submitted to an arbitrator their fact-based affirmative defenses to the written contract, which plaintiff undisputedly signed, and which plainly contains a broad arbitration clause, may relitigate their defenses to the contract as a whole in circuit court after an adverse decision by the arbitrator. I conclude on the basis of Michigan's strong policy favoring arbitration and because plaintiffs' fact-based claims are within the ambit of the unchallenged arbitration clause of the rental agreement that plaintiff signed, that plaintiffs may not relitigate their affirmative fact-based defenses in circuit court. My conclusion is reinforced by both federal precedent and by

principles underlying the judicial doctrine of collateral estoppel.[4]

**\*8** Whether an arbitration agreement exists and is enforceable are judicial questions. *Arrow Overall Supply,* 414 Mich. at 99; *Ferndale,* 269 Mich.App at 458. Appellate review of a trial court's determination whether a controversy is subject to arbitration is de novo. *Rooyakker* 276 Mich.App at 152; *Madison Dist Pub Sch,* 247 Mich.App at 594. To determine whether an issue is subject to arbitration, a court must consider (1) whether there is an arbitration provision in the parties' contract, (2) whether the disputed issue is arguably within the arbitration clause, and (3) whether the dispute is expressly exempt from arbitration under the terms of the contract. *City of Huntington Woods v. Ajax Paving Industries, Inc (After Remand),* 196 Mich.App 71, 74–75; 492 NW2d 463 (1992). Further, "a court should not interpret a contract's language beyond determining whether arbitration applies and should not allow the parties to divide their disputes between the court and an arbitrator." *Fromm v. MEEMIC Ins Co,* 264 Mich.App 302, 304; 690 NW2d 528 (2004). Also, courts should resolve any doubts in favor of arbitration. *Rembert,* 235 Mich.App at 129; *Huntington Woods,* 196 Mich.App at 75.

Here, it is undisputed that plaintiff signed a written agreement that contained an unambiguous provision for arbitration of disputes that may arise between parties to the agreement and for judicial enforcement of any arbitration award. On its face, the arbitration clause in the rental agreement complied with MCL 600.5001. *Wold Architects,* 474 Mich. 223, 229–230; *Rooyakker,* 276 Mich.App at 153–155. Plaintiff's signature on the rental agreement manifested plaintiffs' assent to the terms of the contract. *Ehresman v. Bultynck & Co, PC,* 203 Mich.App 350, 353–354; 511 NW2d 724 (1994). "Michigan law presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents." *Watts v. Polaczyk,* 242 Mich.App 600, 604; 619 NW2d 714 (2000). The purpose of this well-recognized rule is to preserve the integrity and stability of written instruments. *McKinstry v. Valley Obstetrics–Gynecology Clinic, PC,* 428 Mich. 167, 184; 405 NW2d 88 (1987).

Plaintiff seeks to avoid the plain terms of the contract he signed by alleging fraud. See *Christy v. Kelly,* 198 Mich.App 215; 497 NW2d 194 (1992). But "a person cannot avoid a written contract on the ground that he did not attend to its terms, did not read it, supposed it was different in its terms, or that he believed it to be a matter of mere form." *Rowady v. K Mart Corp,* 170 Mich.App 54, 60; 428 NW2d 22 (1988). Furthermore, "[t]here can be

no fraud where a person has the means to determine that a representation is not true." *Nieves v. Bell Industries, Inc,* 204 Mich.App 459, 464; 517 NW2d 235 (1994).

Plaintiffs also argue that no contract was formed because there was no meeting of the minds. Although it is a fundamental tenet of all contracts that there be mutual assent or a meeting of the minds on the essential terms of the contract, plaintiff's *subjective* belief does not control the terms of the parties' written agreement. *Burkhardt v. Bailey,* 260 Mich.App 636, 655–656; 680 NW2d 453 (2004). Rather, " '[a] meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts....' " *Kamalnath v. Mercy Memorial Hosp Corp,* 194 Mich.App 543, 548; 487 NW2d 499 (1992), quoting *Stanton v. Dachille,* 186 Mich.App 247, 256; 463 NW2d 479 (1990). The law presumes that the parties understand the content of a written contract and have thereby manifested their intent by its terms. *Burkhardt,* 260 Mich.App at 656. Thus, " 'an unambiguous contractual provision is reflective of the parties' intent as a matter of law.' " *AFSCME Council 25 v. Wayne Co,* 290 Mich.App 348, 350 n 3; 810 NW2d 53 (2010), quoting *Quality Products & Concepts Co v. Nagel Precision, Inc,* 469 Mich. 362, 375; 666 NW2d 251 (2003). Given these principles of contract law, the requirement that plaintiffs have the burden of proving the parties' dispute was not subject to arbitration, *McKinstry,* 428 Mich. at 184, and the strong public policy requiring that courts resolve any doubts in favor of arbitration, *Rembert,* 235 Mich.App at 127–129, I conclude that the trial court erred by failing to find from the plain terms of the arbitration clause in the rental agreement that plaintiffs' claims regarding the enforceability of the rental agreement as a whole were subject to arbitration.

**\*9** The arbitration clause in the rental agreement provides that "*any* controversy or claim in excess of $10,000.00 arising out of or relating to this agreement, including but not limited to questions regarding the authority of the persons who have executed this agreement, the question, controversy or dispute *shall* be submitted to and settled by arbitration.... The filing party may use either court or arbitration where the claim is less than $10,000 .00." The language of the "provision in [the] written contract to settle by arbitration ... controvers[ies] ... arising between the parties," MCL 600.5001(2), is clear and unambiguous: *any claims* arising out of or relating to the rental agreement, including the affirmative defense of fraud in the inducement and other affirmative defenses to the enforceability of the rental agreement as a whole are subject to arbitration.[5] Consequently, plaintiffs' claims were more than arguably within the ambit of the arbitration clause, and the parties' disputes were not

expressly exempted from arbitration by the terms of the contract. *Huntington Woods,* 196 Mich.App at 74–75. Moreover, when controversies arose between the parties to the rental agreement, plaintiffs voluntarily submitted their fact-based defenses to the enforceability of the contract to the arbitrator. After a full and fair hearing, the arbitrator resolved controversies between the parties in defendant's favor. The trial court erred in finding that it possessed the authority to resolve the parties' disputes anew when defendant brought its motion for enforcement of the arbitration award.

This Court reviews de novo a trial court's decision whether to enforce, vacate or modify an arbitration award. *Nordlund,* 288 Mich.App at 226. Judicial review of a statutory arbitration award is limited and governed by MCR 3.602. MCL 600.5021; MCR 3.602(A); *Brucker v. McKinlay Transport, Inc,* 454 Mich. 8, 17–18; 557 NW2d 536 (1997). Here, plaintiffs' basis for opposing defendant's motion for confirmation of the arbitration award was that the rental agreement was void or voidable. Thus, plaintiffs relied on MCR 3.602(J)(2)(c), which provides "the court shall vacate an award if ... the arbitrator exceeded his or her powers...." But an arbitrator only exceeds his power when he acts beyond the material terms of the contract from which his authority to arbitrate flows, or acts contrary to controlling principles of law. *Saveski v. Tiseo Architects, Inc,* 261 Mich.App 553, 554, 557; 682 NW2d 542 (2004). An arbitrator's alleged error of law must appear on the face of the award, and the error must be such that the award would have been substantially different. *Id.* at 555. Here, no error of law appears on the face of the award and the controversies between the parties that the arbitrator resolved were within the ambit of the arbitration clause. Finally, the arbitrator's findings of fact necessary to the award are simply not subject to judicial review. *Donegan v.*

*Michigan Mutual Ins Co,* 151 Mich.App 540, 549; 391 NW2d 403 (1986). Because plaintiffs presented no cognizable basis to vacate, modify, or correct the arbitration award, the trial court erred when it failed to render judgment in defendant's favor on the arbitration award. MCR 3.602(J)(5), (K)(3) & (L).

**\*10** I would also hold that the trial court erred by not granting defendant summary disposition on plaintiffs' attempt to assert a class action against defendant. Plaintiffs cite no authority, other than MCR 3.501, by which it may assert purported rights of others to rescind or revoke contracts the other persons might have entered with defendant. Even assuming other contracts exist with substantially similar or identical terms to those of the rental agreement at issue, plaintiffs offer no authority that the alleged questionable contract provisions might serve as a basis for commonality or are in any way actionable. Further, plaintiffs' claims for rescission or revocation arose not out of common contract terms but out of a salesman's alleged misrepresentations. Finally, because plaintiffs' contract claims against defendant have been resolved by arbitration, plaintiffs may not serve as representatives of the purported class. MCR 3.501(A)(1); *A & M Supply Co v. Microsoft Corp,* 252 Mich.App 580, 598; 654 NW2d 572 (2002).

For the foregoing reasons, I would reverse and remand for entry of an order enforcing the arbitration award and granting defendant summary disposition on all plaintiffs' claims. We do not retain jurisdiction.

### All Citations

Not Reported in N.W.2d, 2013 WL 238540

Footnotes

1    Additionally, the purported contract between the parties did not include an agreement to have the arbitrator determine arbitrability.

2    That the federal courts applying the Federal Arbitration Act may have ruled consistently with the dissent's result is of no moment, as no one has suggested that federal law governs this case. See *Pub Serv Credit Union,* 988 F.2d at 629 (recognizing cases applying federal law have no application to this issue which is governed by Michigan law).

1    MCL 600.5001.

2    The singular plaintiff refers to plaintiff Samuel Alvarado, who signed the written rental agreement at issue as the "owner" of plaintiff Fuego Grill, L.L.C.

3    The record is unclear which Samuel Alvarado is the owner of the Fuego Grill, L.L.C.

4     The doctrine of collateral estoppel serves "an important function in resolving disputes by imposing a state of finality to litigation where the same parties have previously had a full and fair opportunity to adjudicate their claims." *Minicuci v. Scientific Data Mgt, Inc,* 243 Mich.App 28, 33; 620 NW2d 657 (2000). "By putting an end to litigation, the preclusion doctrines eliminate costly repetition, conserve judicial resources, and ease fears of prolonged litigation. Whether the determination is made by an agency or court is inapposite; the interest in avoiding costly and repetitive litigation, as well as preserving judicial resources, still remains." *Id.* Similarly, arbitration is intended to avoid protracted litigation over disputes, *Nu Vision v. Dunscombe,* 163 Mich.App 674, 684; 415 NW2d 234 (1987), and an arbitrator's findings of fact are unreviewable, *Detroit Auto Inter–Insurance Exchange v. Gavin,* 416 Mich. 407, 429; 331 NW2d 418 (1982).

5     This conclusion is consistent with federal precedent under the federal arbitration act. 9 USC 1–16; See *Scanlon v. P & J Enterprises, Inc,* 182 Mich.App 347, 350; 451 NW2d 616 (1990), citing *Prima Paint Corp v. Flood & Conklin Mfg Co,* 388 U.S. 395; 87 S Ct 1801; 18 L.Ed.2d 1270 (1967) ("The arbitration clause in this case makes arbitrable any issue arising with respect to the contract, including a claim of fraud in the inducement of the entire contract."). Thus, as a matter of substantive federal arbitration law "attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved 'by the arbitrator in the first instance, not by a federal or state court.' " *Nitro–Lift Technologies, LLC v. Howard,* 568 U.S. ——; 133 S Ct 500, 503; 184 L.Ed.2d 328 (2012), quoting *Preston v. Ferrer,* 552 U.S. 346, 349; 128 S Ct 978; 169 L.Ed.2d 917 (2008).

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Hartman v. Hartman, Not Reported in N.W.2d (2012)

2012 WL 3194068
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Michael HARTMAN, Plaintiff–Appellant,
v.
Andrea HARTMAN, Defendant–Appellee.

Docket No. 304026.
|
Aug. 7, 2012.

Oakland Circuit Court; LC No.2009–764033–DM.

Before: DONOFRIO, P.J., and RONAYNE KRAUSE and
BOONSTRA, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff appeals as of right the trial court's refusal to
set aside a settlement agreement and judgment of divorce
on the basis of apparent impropriety committed by the
arbitrator/mediator and defense counsel. The trial court
properly declined to set aside the settlement agreement
and judgment of divorce. Therefore, we affirm.

FACTS AND PROCEDURAL HISTORY

This case arose out of a divorce action terminating a 23–
year marriage. The parties were ordered to mediation. The
parties agreed to a mediator and when mediation failed,
the parties agreed to binding arbitration using the
mediator as the arbitrator. In accordance with the signed
arbitration agreement the arbitrator issued some awards
covering minor issues. But before final arbitration on the
major issues, the parties agreed to again attempt to
mediate the divorce and reach a settlement agreement
utilizing the services of the arbitrator as a mediator.
Mediation failed.

The parties did reach a settlement agreement. However,

what took place during the course of this mediation is
disputed between the parties. Plaintiff asserts that the
mediator made statements regarding her feelings about
the case. Knowing her feelings and the fact that she would
also be the arbitrator, plaintiff proposed the settlement,
feeling that he had no real choice. Defendant asserts that
the mediator actually had an "informal" role throughout
the proceeding, and it was plaintiff and his representatives
who proposed the final agreement. Regardless, a
settlement agreement was drafted and signed.

By the date set for entry of the final judgment of divorce,
even though both parties had reached a settlement
agreement, a few issues were still outstanding. At the
hearing, plaintiff asked his counsel to state on the record
that he had concerns about the arbitrator acting as a
neutral third party. While he did not ask to have the
settlement agreement set aside, he wanted it on the record
that he had "had concerns about ... the mediation being
done by the arbitrator." The nature of those concerns was
not further articulated.

Because of the outstanding issues, the judge originally
wanted to continue the matter for two weeks, but defense
counsel stated that he was going to be out of town.
Therefore, the final judgment was continued for four
weeks. Plaintiff's counsel contacted the arbitrator to
inform her of the dates. The arbitrator informed plaintiff's
counsel that she was also going to be out of town in
Florida and staying at the home of defense counsel while
he would also be present. Plaintiff's counsel then
contacted defense counsel to request a new arbitrator to
handle the remaining issues. Defense counsel refused the
request. While the arbitrator and defense counsel were in
Florida, defense counsel contacted plaintiff's counsel via
fax threatening to ask the arbitrator to ask the court for
sanctions.

Thereafter, plaintiff's counsel filed a motion to remove
the arbitrator and have a new one assigned. Defendant
responded by stating that the arbitration awards were a
moot point because a settlement had been reached.
Plaintiff then filed an amended motion to remove the
arbitrator and obtain relief from the settlement agreement.
Defense counsel argued that he felt what occurred
between himself and the arbitrator was no more than
ordinary hospitality and that numerous attorneys,
including judges, have stayed at his Florida home. The
trial court ultimately denied plaintiff's motion, stating that
there was no appearance of impropriety because the
parties ultimately reached a settlement agreement and that
the trip to Florida occurred 30 days after the mediation.
The final issues were resolved by the trial court, and a

judgment of divorce was entered.


STANDARD OF REVIEW

**\*2** Plaintiff argues that the issue is whether the court erred in refusing to review an arbitrator's award. However, it is truly only about setting aside a settlement agreement. Therefore, plaintiff is incorrect in arguing that this Court must review the award de novo. Instead, the trial court's decision regarding the validity of a consent settlement agreement is reviewed for an abuse of discretion. *Lentz v. Lentz,* 271 Mich.App 465, 474–475; 721 NW2d 861 (2006). An abuse of discretion is found to have occurred "when the trial court's decision is outside the range of reasonable and principled outcomes." *Shawl v. Spence Bros, Inc,* 280 Mich.App 213, 222; 760 NW2d 674 (2008).


THE CONSENT SETTLEMENT AGREEMENT

Generally, parties are bound by their settlement agreement, unless there is a showing of "fraud, duress, [or] mutual mistake." *Keyser v. Keyser,* 182 Mich.App 268, 269–270; 451 NW2d 587 (1990) (internal citations omitted). Plaintiff argues that the contract between the parties should be set aside due to fraudulent misrepresentation, mutual mistake, violation of public policy, and unconscionability.

In order to set aside an agreement for fraudulent misrepresentation, plaintiff must prove that "(1) defendant made a material representation; (2) the representation was false; (3) defendant knew, or should have known, that the representation was false when making it; [and] (4) defendant made the representation with the intent that plaintiff rely on it ..." *Foreman v. Foreman,* 266 Mich.App 132, 141; 701 NW2d 167 (2005). Plaintiff argues that the false representation was that the arbitrator was neutral; however, plaintiff does not substantiate this argument with any evidence to prove that she actually acted with clear bias. As discussed below, there is no evidence of actual bias.

Next, plaintiff argues that a mistake of fact also mandates a reversal of the lower court's decision. This Court explained in *Casey v. Auto Owners Ins Co,* 273 Mich.App 388, 398; 729 NW2d 277 (2006) that in order to reform the contract, plaintiff must "prove a mutual mistake of fact, or mistake on one side and fraud on the other, by

clear and convincing evidence." This Court also explained that a unilateral mistake alone is not sufficient. *Id.* While plaintiff argues that the mistake involved is that the arbitrator was impartial and that there was no social relationship between the arbitrator and defense counsel, this alleged mistake is unilateral and, therefore, not enough to warrant a reversal. Again, plaintiff has not provided evidence to prove that what occurred between the arbitrator and defense counsel rises to the level of clear actual partiality.

Next, plaintiff correctly points out that if we were to find that the contract violated public policy, it would be unenforceable. This Court explained this principle in *Morris & Doherty, PC v. Lockwood,* 259 Mich.App 38, 58; 672 NW2d 884 (2003), stating "that contracts that violate our ethical rules violate our public policy and therefore are unenforceable" (internal citations omitted). However, we would have to find a clear violation of the Michigan Rules of Professional Conduct (MRPC). Plaintiff argues that MRPC 8.4 was violated. Under MRPC 8.4(b), a violation can occur when an attorney "engage [s] in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of criminal law." Plaintiff has failed to show that any of the enumerated circumstances happened. Plaintiff's counsel admitted at oral argument that he had referred neither defense counsel nor the arbitrator to the Attorney Grievance Commission. Therefore, because it is unclear that a violation of the ethical rules did occur, this argument lacks merit.

**\*3** Lastly, plaintiff's unconscionability argument only addresses half of the requirements for setting aside an argument on that basis. While plaintiff makes an argument for procedural unconscionability, he lacks any argument as to substantive unconscionability. Plaintiff has failed to argue or show this Court how he would have obtained a different result. He has also failed to show how the outcome was prejudiced or unfair. Both procedural and substantive unconscionability must be present in order for a contract to be set aside for it being unconscionable. *Clark v. DaimlerChrysler Corp,* 268 Mich.App 138, 143; 706 NW2d 741 (2005).

The procedural unconscionability is essentially the conduct of the arbitrator and defense counsel. MCR 3.216(k) governs the standard of conduct for mediation. It states that "[t]he State Court Administrator [ (SCAO) ] shall develop and approve standards of conduct for domestic relations mediators designed to promote honesty, integrity and impartiality in providing court-connected dispute resolution services." The SCAO's Standard of Conduct for Mediators emphasizes not only the importance of remaining impartial, but also the

importance of *appearing* impartial. Under Standard 4, "conflicts of interests," it states that a conflict can occur if it can "reasonably be seen as raising a question about impartiality." Standard 3, "Impartiality" states that, "if at any time the mediator is unable to conduct the process in an impartial manner, the mediator is obligated to withdraw."

There is no case law directly on point dealing with an appearance of partiality by an arbitrator or mediator under similar circumstances to those at bar. However, the Michigan Court Rules state that "the rule for disqualification of a mediator is the same as that provided in MCR 2.003 for the disqualification of a judge." MCR 3.216(E). MCR 2.003(C)(1) states that a judge should be disqualified if a judge "has failed to adhere to the appearance of impropriety standard set for in Canon 2 of the Michigan Code of Judicial Conduct." Canon 2 states that,

> "A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." [Code of Judicial Conduct, Canon 2]

This Court has held that actual bias or prejudice is not necessary where "experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Gates v. Gates,* 256 Mich.App 420, 441; 664 NW2d 231 (2003) (internal citations omitted). The Supreme Court in *Cain v. Michigan Dep't of Corrections,* 451 Mich. 470, 536 n. 22; 548 NW2d 210 (1996), clarified that while an actual showing of prejudice or bias is the general standard, "the appearance of impropriety may be sufficient to disqualify a judge after evaluation of the totality of the circumstances." *Id.*

**\*4** The totality of the circumstances in the case at bar rises to a level that would have required the arbitrator to be removed from arbitrating or mediating the remaining matters. However, the final matters that remained outstanding at the time of the arbitrator's and defense counsel's vacation together were settled by the judge. The arbitration awards issued before the settlement agreement became moot because the settlement agreement handled those matters. The only issue not moot is whether the settlement agreement can be set aside. We find that it cannot.

Plaintiff has failed to show that he would have received a different result if not for the social relationship between the arbitrator and defense counsel. This Court will not consider an argument that has not been sufficiently developed. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v. Payne,* 285 Mich.App 181, 195; 774 NW2d 714 (2009). Plaintiff simply fails to present a sufficiently developed or supported argument as to substantive unconscionability and, therefore, has waived this argument on appeal. *Phillips v. Jordan,* 241 Mich.App 17, 24 n. 2; 614 NW2d 183 (2000).

Because none of the requirements to set aside a settlement agreement have been met, the decision of the lower court to uphold the agreement is affirmed.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2012 WL 3194068

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 6161791
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Michael MABIN, Plaintiff–Appellant,
v.
HSBC MORTGAGE SERVICES, INC., Defendant–
Appellee.

Docket No. 323043.
|
Oct. 20, 2015.

Oakland Circuit Court; LC No.2014–140141–NZ.

Before: GLEICHER, P.J., and SAWYER and MURPHY,
JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff Michael Mabin commenced this lawsuit
against defendant HSBC Mortgage Services, Inc., in an
effort to stop HSBC's foreclosure by advertisement of a
mortgage on plaintiff's real property held by HSBC that
secured a promissory note executed by plaintiff. The
primary argument proffered by plaintiff was that HSBC
had violated a 2011 loan modification agreement, which
plaintiff sought to enforce. On HSBC's motion for
summary disposition, the trial court ruled that the 2011
agreement was temporary and there was no guarantee that
its provisions would be extended beyond its limited
period of application. Moreover, the trial court ruled that
any loan modification agreement was superseded when
plaintiff entered into a subsequent modification of the
loan in 2013, resulting in a novation. For these reasons,
the trial court granted HSBC's motion for summary
disposition. Plaintiff appeals as of right, and we affirm.

On December 11, 2006, plaintiff executed a promissory
note in favor of HSBC, with plaintiff borrowing $334,000
and agreeing to pay HSBC $2,665 per month over 30
years at a fixed interest rate of 8.910%. On that same date,
plaintiff, as mortgagor, granted HSBC, as mortgagee, a

mortgage on plaintiff's home as security for the
underlying promissory note. The mortgage contained a
standard power-of-sale clause, allowing for foreclosure by
advertisement following default and acceleration of the
debt. See MCL 600.3201 ("Every mortgage of real estate,
which contains a power of sale, upon default being made
in any condition of such mortgage, may be foreclosed by
advertisement....").

According to HSBC, in October 2009, plaintiff was
approved for a short-term loan modification of six months
that lowered his monthly payments to $1,855, after which
plaintiff resumed making payments of $2,665 per month,
as called for by the original note. In May 2011, plaintiff
faxed a request to HSBC for a loan modification under its
Hardship Program. In an affidavit submitted below,
plaintiff averred that the request for a loan modification
was necessary due to a significant decline in plaintiff's
income. Pursuant to a letter from HSBC to plaintiff dated
October 21, 2011, HSBC indicated that it had approved
plaintiff's request for assistance under its Hardship
Program. The letter provided that HSBC would
temporarily adjust the interest rate of the loan to 5.25%
for six months and that plaintiff's monthly mortgage
payments would temporarily be reduced to $1,850. The
letter additionally stated:

> All payments must be made in accordance with the
> temporary Loan Modification Agreement. In modifying
> the terms of the original loan agreement, there may be a
> negative impact to your credit score. Your temporary
> modified payment amount will be accepted as of
> December 1, 2011.

> Upon completion of the temporary loan modification,
> your loan will revert to the interest rate and payment
> schedule set forth by your Note and Security
> Instrument.... Your temporary loan modification is set
> to expire on or after 05/01/12. *You may be eligible for
> an extension of payment relief at the end of the
> temporary modification period. To be eligible, you
> must make all contractual payments that are due
> during your temporary loan modification period, and
> demonstrate your continuing need for assistance once
> that loan modification has ended.*

> **\*2** ...

> HSBC ... has temporarily modified your loan wholly as
> a consideration. All obligations, rights and remedies set
> out in your Note and Security Instrument remain in full
> force and effect. [Emphasis added.[1]]

In his affidavit, plaintiff averred that in October or

November 2011, he had spoken by phone with an HSBC representative about the temporary loan modification and the representative informed plaintiff that he "could continue to make the modified payment amount provided [that plaintiff] made all [his] modified payments through the trial period and [the] hardship continued." Plaintiff further asserted, and there is no dispute, that he made all of the required loan payments during the temporary loan modification period. He averred that in April 2012, HSBC personnel advised plaintiff that he needed to provide financial documents in order to establish his continuing need for the loan modification. Plaintiff claimed in his affidavit that he faxed the requested financial documents to HSBC later in April 2012.

Plaintiff averred that HSBC refused to accept the modified monthly payment amount of $1,850 after May of 2012, at which time HSBC began demanding monthly payments of $2,519 under a two-month trial period plan (TPP). In a timeline prepared by HSBC,[2] it indicated that the temporary loan modification ($1,850 monthly rate) had expired under its own terms on May 1, 2012, and that the original contract rate of $2,665 was then reinstituted. HSBC's timeline further reflected that on April 30, 2012, plaintiff had faxed HSBC a request for yet another loan modification. According to HSBC, on May 25, 2012, it approved a two-month TPP, pursuant to which plaintiff was required to make payments of $2,519 on June 22 and July 22, 2012, in order to obtain a permanent loan modification. While the first payment was timely made, the second payment was not made in accordance with the TPP, and HSBC thus rejected modification of the loan. In plaintiff's affidavit, he acknowledged that the second payment under the TPP was late and that HSBC therefore refused to continue accepting the $2,519 amount and would not agree to a further loan modification.

In January 2013, ostensibly because plaintiff was struggling with or not making his loan payments, HSBC offered plaintiff a new two-month TPP, which, if satisfied, would lead to a new loan modification agreement. Under the 2013 TPP, plaintiff was required to make monthly payments of $3,031 on February 23 and March 25, 2013. Plaintiff timely made the two $3,031 payments, and by letter dated April 11, 2013, HSBC informed plaintiff that he had successfully completed the TPP and was thus approved for a loan modification. On April 23, 2013, plaintiff executed the new loan modification agreement. This agreement required plaintiff to make monthly payments of $3,055, commencing on May 1, 2013, with an interest rate of 8.410%. The loan modification agreement also provided that it "shall supersede the terms of any modification, forbearance or [TPP] that [was] previously entered into with [HSBC]."

In plaintiff's affidavit, he claimed that HSBC had demanded that he enter into the latest loan modification agreement under threat of foreclosure. Plaintiff further averred that he lacked legal representation "and believed HSBC's threats that if [he] didn't make the higher payments ..., [HSBC] would foreclose."

**\*3** As asserted in HSBC's timeline, in July 2013, plaintiff contacted HSBC and advised it that he was having difficulty making his monthly mortgage payments under the 2013 loan modification agreement. HSBC further indicated that in December 2013, it sent plaintiff a notice of right to cure default, and that in March of 2014, HSBC delivered a notice of foreclosure sale to plaintiff, which sale was scheduled for April 22, 2014. On April 14, 2014, plaintiff filed the instant action against HSBC to quiet title and for other relief. The main theme of plaintiff's complaint was that the loan modification agreement (hereafter "LMA") entered into in 2011 (temporary $1,850 monthly payment), as opposed to the 2013 LMA ($3,055 monthly payment), governed the parties' rights and obligations in relationship to the note and mortgage. Plaintiff alleged that he had a contractual right to have the 2011 LMA continue indefinitely, given his full compliance with the payment requirements during the temporary period and so long as he could establish an ongoing financial hardship, which condition was satisfied. Plaintiff's complaint alleged causes of action for violation of the foreclosure-by-advertisement statutes, MCL 600.3201 *et seq.*, breach of contract, fraud and misrepresentation, promissory estoppel, and violations of the Mortgage Brokers, Lenders, and Servicers Licensing Act (MBLSLA), MCL 445.1651 *et seq.* Plaintiff sought declaratory relief, damages, equitable relief, and attorney fees and costs. On April 17, 2014, the trial court entered a temporary restraining order, halting the scheduled sheriff's sale.

In lieu of filing an answer, on May 6, 2014, HSBC filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (10). HSBC first argued that the 2011 LMA[3] was temporary and expired on May 1, 2012, under its own terms. HSBC contended that the 2011 LMA merely indicated that plaintiff "*may be eligible* for an extension" (emphasis added), and thus there was no guarantee of an extension, nor any obligation to grant plaintiff an extension, even if the temporary monthly payments had been made and plaintiff's financial struggles continued. HSBC maintained that it ultimately never contractually agreed or promised to continue the 2011 LMA beyond its period of temporary application. HSBC next argued that any claims related to averments in plaintiff's affidavit that HSBC personnel had orally promised him an extension of the 2011 LMA are barred

by the statute of frauds under MCL 566.132(2).[4] HSBC further asserted that plaintiff's claims were subject to dismissal because he accepted the 2013 LMA, which superseded the 2011 LMA, making the 2011 LMA unenforceable under novation principles, assuming its enforceability in the first place with respect to an extension. Finally, HSBC argued that plaintiff failed to plead his fraud claim with particularity and that the fraud claim also failed because any reliance on purported HSBC oral representations would have been unreasonable given the clear language in the 2011 LMA indicating its temporary nature and the mere possibility of an extension.

**\*4** To avoid redundancy, we shall discuss plaintiff's position with respect to HSBC's summary disposition arguments in the analysis portion of this opinion, to the extent that an argument made by plaintiff below is renewed on appeal. The trial court conducted a hearing on HSBC's motion for summary disposition and took the matter under advisement. On July 21, 2014, the trial court issued a short written opinion and order granting summary disposition in favor of HSBC. The opinion and order provided, in pertinent part, as follows:

> The clear unambiguous language of the [2011 LMA] fails to support Plaintiff's assertion that the loan modification was permanent. By its express terms, the [2011 LMA] temporarily adjusted the loan interest rate for 6 months and provided that upon completion of the temporary loan modification, the loan would revert to the interest rate and payment schedule set forth in the Note and Security Instrument. While it did provide certain circumstances under which Plaintiff may have been eligible for an extension of payment relief, it did not guarantee that Plaintiff would receive an extension of the [2011 LMA]. In addition, once Plaintiff accepted the [2013 LMA], it superseded any prior modification agreement. The Court finds that Plaintiff has failed to state valid claims against [HSBC] and there is no genuine issue of material fact that the claims are barred by the doctrine of novation.

Plaintiff appeals as of right.

We review de novo a trial court's ruling on a motion for summary disposition. *Elba Twp v. Gratiot Co Drain Comm'r,* 493 Mich. 265, 277; 831 NW2d 204 (2013).[5] We similarly review de novo questions regarding the existence, construction, and application of a contract. *Rory v. Continental Ins Co,* 473 Mich. 457, 464; 703 NW2d 23 (2005); *Klapp v. United Ins Group Agency, Inc,* 468 Mich. 459, 463; 663 NW2d 447 (2003); *Kloian v. Domino's Pizza, LLC,* 273 Mich.App 449, 452; 733 NW2d 766 (2006).

Plaintiff first argues on appeal that HSBC and the trial court failed to specify how or why each one of plaintiff's particular causes of action alleged in the complaint was subject to summary dismissal under MCR 2.116(C)(8) for failure to state a claim. HSBC's motion for summary disposition was brought pursuant to MCR 2 .116(C)(8) and (10), and the trial court cited both of those provisions in granting the motion. In the context of reviewing a summary disposition ruling alluding to both MCR 2.116(C)(8) and (10), when a trial court clearly looked beyond the pleadings in resolving the motion, we review the court's ruling as having been decided under (C)(10) and not (C)(8). *Collins v. Detroit Free Press, Inc,* 245 Mich.App 27, 31; 627 NW2d 5 (2001). Here, the trial court, in deciding the motion for summary disposition, examined and relied on the language in the 2011 and 2013 LMAs, which were part of the documentary evidence submitted by the parties with respect to summary disposition. Plaintiff had also attached the 2011 LMA to his complaint, as required for a claim "based on a written instrument," effectively making it "a part of the pleading for all purposes." MCR 2.113(F)(1)(2). This would include consideration of the 2011 LMA for purposes of summary disposition under MCR 2.116(C)(8). See *AFP Specialties, Inc v. Vereyken,* 303 Mich.App 497, 512–513; 844 NW2d 470 (2014); *Karam v. Law Offices of Ralph J. Kliber,* 253 Mich.App 410, 418 n. 6; 655 NW2d 614 (2002). With respect to granting summary disposition on the basis of the 2013 LMA and the doctrine of novation, the trial court looked beyond the pleadings, thereby implicating MCR 2.116(C)(10) and not (C)(8). And, given that the 2011 LMA became part of the pleadings but was also submitted as documentary evidence in connection to the motion for summary disposition, the trial court's decision to grant summary disposition on the basis that the 2011 LMA did not contractually require an extension implicated both MCR 2.116(C)(8) and (10).

**\*5** A review of the specific causes of action asserted by plaintiff in his complaint reveals that they were all ultimately predicated on the 2011 LMA and the claimed contractual right to an extension of that LMA under the circumstances, or the alleged oral representations made by

HSBC personnel to plaintiff that the 2011 LMA would be extended upon payment compliance and continuing financial hardship, or both the 2011 LMA and the oral representations. The trial court ruled that the 2011 LMA did not guarantee an extension even if plaintiff made the temporary payments and was still struggling financially and that, regardless, the 2011 LMA was superseded by the 2013 LMA under the doctrine of novation. These rulings could be viewed as not speaking directly to plaintiff's claims that were based on the alleged oral representations by HSBC personnel, e.g., promissory estoppel, fraud, and violation of the MBLSLA. However, the 2013 LMA provided that it "supersede[d] the terms of *any* modification, forbearance or [TPP] that [was] previously entered into with [HSBC]." (Emphasis added.) And the trial court ruled that the 2013 LMA "superseded *any* prior modification agreement." (Emphasis added.) The 2013 LMA and the trial court's ruling did not distinguish between prior *written* and prior *oral* agreements or promises for purposes of being superseded. Accordingly, our analysis and holding below regarding novation and the superseding capacity of the 2013 LMA apply equally to the written 2011 LMA and the alleged oral representations made in 2011.[6]

We now examine the 2011 LMA, which plaintiff argues gave him a contractual right to an extension beyond the temporary period if he satisfactorily complied with the decreased monthly payment requirements and could show ongoing financial hardship. Plaintiff contends that because he made the temporary monthly payments and submitted documents establishing a continuing financial hardship, HSBC was obligated to extend the 2011 LMA. We disagree.[7]

"In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja,* 187 Mich.App 418, 422; 468 NW2d 58 (1991). "A valid contract requires mutual assent on all essential terms[,]" and "[b]efore a contract can be completed, there must be an offer and acceptance." *Eerdmans v. Maki,* 226 Mich.App 360, 364; 573 NW2d 329 (1997). In *Burkhardt v. Bailey,* 260 Mich.App 636, 656–657; 680 NW2d 453 (2004), this Court recited the core principles of contract interpretation:

> [The] unilateral subjective intent of one party cannot control the terms of a contract. It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms. Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms.

**\*6** The main goal of contract interpretation generally is to enforce the parties' intent. But when the language of a document is clear and unambiguous, interpretation is limited to the actual words used, and parol evidence is inadmissible to prove a different intent. An unambiguous contract must be enforced according to its terms. The judiciary may not rewrite contracts on the basis of discerned "reasonable expectations" of the parties because to do so is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. [Citations and quotation marks omitted.]

Here, the parties do not dispute that the 2011 LMA was a valid contract, and there is no disagreement regarding the parties' rights and obligations *during or with respect to the temporary six-month period.* The dispute that arose concerned the construction of the 2011 LMA in regard to its possible extension beyond the temporary period. Plaintiff is essentially arguing that the 2011 LMA, aside from providing the contractual terms for the temporary period, created two conditions precedent (payments made during temporary period and continuing financial hardship), which, if satisfied, contractually obligated HSBC to extend the 2011 LMA beyond the temporary period and legally entitled plaintiff to such an extension. In *Harbor Park Market, Inc v. Gronda,* 277 Mich.App 126, 131; 743 NW2d 585 (2007), this Court discussed conditions precedent, observing:

> A condition precedent ... is a fact or event that the parties intend must take place before there is a right to performance. If the condition is not satisfied, there is no cause of action for a failure to perform the contract. However, ... promisors ... cannot avoid liability on [a] contract for the failure of a condition precedent where they caused the failure of the condition. [Citations and quotation marks omitted.]

A plain reading of the 2011 LMA indicates that it did not create conditions precedent giving rise to a right to performance—an extension of the LMA—if satisfied. Again, the 2011 LMA provided that plaintiff "may be eligible for an extension of payment relief[,]" and that "[t]o be eligible, [plaintiff] must make all contractual payments that are due during [the] temporary loan modification period[ ] and demonstrate [a] continuing

need for assistance once [the] loan modification has ended." At best, considering the lack of any dispute that plaintiff made the temporary monthly payments, and given that his financial hardship was apparently ongoing, the 2011 LMA merely made plaintiff "eligible" for an extension. The term "eligible" simply means that a person is "qualified to participate or [to] be chosen." *Merriam–Webster's Collegiate Dictionary* (11th ed). Had the 2011 LMA instead contained mandatory language, e.g., entitled, obligated, must, shall, or guarantee, in connection with an extension upon satisfaction of the conditions, only then would true conditions precedent have existed as to a right to an extension. The trial court correctly determined that the 2011 LMA did not guarantee plaintiff an extension. Accordingly, all of plaintiff's claims premised on contractual entitlement to an extension on the basis of the language in the 2011 LMA fail.

**\*7** Furthermore, the trial court correctly determined that the 2013 LMA superseded the 2011 LMA, resulting in a novation, even assuming that the 2011 LMA had created a contractual right to an extension under the circumstances. "A novation requires: (1) parties capable of contracting; (2) a valid obligation to be displaced; (3) consent of all parties to the substitution based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one." *In the Matter of the Dissolution of F. Yeager Bridge & Culvert Co,* 150 Mich.App 386, 410; 389 NW2d 99 (1986).

Plaintiff initially argues, in cursory and conclusory form, that there was no recognizable novation because the consideration was insufficient to support a novation. In *Keppen v. Rice,* 257 Mich. 299, 301; 241 NW 156 (1932), our Supreme Court stated that "[c]onsideration for [a] novation is essential, but that is furnished by the mutual agreement of the parties." The 2013 LMA reflected a mutual agreement reached by the parties. Moreover, "consideration" is something of value, which can include an act, a forbearance, a performance, a return promise, or the modification of a legal relationship. *Timko v. Oakwood Custom Coating, Inc,* 244 Mich.App 234, 244; 625 NW2d 101 (2001). Under the 2013 LMA, plaintiff promised to pay a new and higher monthly mortgage amount and HSBC effectively refrained from immediately enforcing the debt pursuant to the terms of the original note and mortgage, i.e., HSBC agreed to a forbearance that staved off foreclosure. We also note that the interest rate was slightly reduced in the 2013 LMA. "Courts will not ordinarily inquire into the adequacy of consideration[.]" *Moffit v. Sederlund,* 145 Mich.App 1, 11; 378 NW2d 491 (1985). In sum, the novation was supported by sufficient consideration.

Plaintiff finally contends that the novation was barred by coercion or economic duress. The basis for this argument is plaintiff's claim that he signed the 2013 LMA only because he was threatened with foreclosure. In *Allard v. Allard,* 308 Mich.App 536, 551–552; —— NW2d —— (2014), this Court addressed the contract defense of duress, observing:

> A contract may be deemed unenforceable if it was executed under duress. To succeed with respect to a claim of duress, defendants must establish that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes. Further, the fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully. Defendant claims on appeal that Michigan's definition of duress is unclear and that the "unlawful" aspect should be removed. We disagree. First, the definition is quite clear and needs no clarification. Second, defendant's argument tacitly acknowledges that the definition is indeed clear because she then argues that this Court should remove the definition's key component. Moreover, even if we were inclined to agree with defendant, we are bound by the doctrine of stare decisis and have no power to modify this Court's and our Supreme Court's prior definition of duress by removing the component addressing illegal acts by the person applying the coercion. [Citations, quotation marks, and alteration brackets omitted.]

**\*8** Here, assuming the truthfulness of plaintiff's affidavit, as we must do for purposes of MCR 2.116(C)(10), any threat by HSBC to foreclose on the mortgage was not unlawful, nor does plaintiff even specifically assert that the alleged foreclosure threat was unlawful. There appears to be no dispute that at the time of the 2013 LMA, plaintiff was in default of the note and mortgage and was

facing foreclosure. Indeed, plaintiff makes no argument that HSBC was not entitled to begin foreclosure proceedings when the 2013 LMA was executed. Considering that the mortgage contained a power-of-sale clause, HSBC had every legal right to commence a foreclosure by advertisement. And there was nothing illegal or unlawful about presenting plaintiff with the 2013 LMA, while at the same time reminding him that a foreclosure was looming should he choose not to agree to the 2013 LMA. Plaintiff was certainly aware that foreclosure was on the horizon even absent any express threat of foreclosure by HSBC. Accordingly, the trial court did not err in applying the doctrine of novation.

Affirmed. Having fully prevailed on appeal, HSBC is awarded taxable costs pursuant to MCR 7.219.

## All Citations

Not Reported in N.W.2d, 2015 WL 6161791

Footnotes

1   We note that the parties focus their arguments on construction of the language in this letter, particularly the emphasized language, with respect to whether HSBC was obligated to provide plaintiff with an extension of the temporary loan modification upon satisfaction of payment requirements during the temporary period and proof of continuing financial need. The letter references an associated temporary loan modification agreement; however, it is unclear whether such an agreement was ever executed. Regardless, assuming the existence of a signed agreement consistent with the letter or otherwise, it was never made part of the lower court record. The parties effectively treat the letter as the temporary loan modification agreement.

2   The trial court ordered both parties to prepare and file timelines, and they both complied.

3   Again, the parties treat the 2011 temporary modification acceptance letter sent by HSBC to plaintiff as an LMA, and considering that HSBC fully accepts that proposition and for ease of reference, we shall likewise treat and refer to the acceptance letter as the 2011 LMA.

4   MCL 566.132(2) provides in relevant part:
      An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
      ...
      (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

5   MCR 2.116(C)(8) provides for summary disposition when a complaining party fails "to state a claim on which relief can be granted." A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v. Henderson,* 465 Mich. 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint must be accepted as true. *Dolan v. Continental Airlines/Continental Express,* 454 Mich. 373, 380–381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie,* 465 Mich. at 130. With respect to the well-established principles governing the analysis of a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v. Dells,* 301 Mich.App 368, 377; 836 NW2d 257 (2013), stated:
      In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

6   Moreover, as argued by HSBC below and on appeal, and despite the trial court's failure to reach the issue in its opinion and order, the statute of frauds as set forth in MCL 566.132(2) quite clearly bars plaintiff's claims that were based on oral promises or communications regarding an extension of the 2011 LMA. See footnote 4 above; *Crown Technology Park v. D & N Bank, FSB,* 242 Mich.App 538, 548–553; 619 NW2d 66 (2000) (statutory provision bars all actions, even one based on promissory estoppel).

**Mabin v. HSBC Mortg. Services, Inc., Not Reported in N.W.2d (2015)**

7      We note that plaintiff never specifically argued nor submitted evidence showing that, had the 2011 LMA actually been extended, he would not have been in default and subject to foreclosure in light of payments that were made thereafter.

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

597 Fed.Appx. 301
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Shannon MARTIS, Plaintiff–Appellant,
v.
DISH NETWORK SERVICE, L.L.C., Defendant–
Appellee.

No. 14–1753.
|
Jan. 7, 2015.

**Synopsis**
**Background:** Former employee brought action against
his former employer, seeking to vacate arbitration award.
The United States District Court for the Western District
of Michigan, Bell, J., 2014 WL 2571553, confirmed the
award, and employee appealed.

**Holding:** The Court of Appeals, Helene N. White, Circuit
Judge, held that Federal Arbitration Act (FAA), rather
than Michigan Arbitration Act, governed review of the
arbitration award.

Affirmed.

**\*301** On Appeal from the United States District Court for
the Western District of Michigan.

**\*302** BEFORE: SILER, GRIFFIN, and WHITE, Circuit
Judges.

**Opinion**

HELENE N. WHITE, Circuit Judge.

Shannon Martis appeals the dismissal of his state-law
claims of disability discrimination and retaliation and the
confirmation of an arbitration award in favor of his
former employer, Defendant Dish Network Service,
L.L.C. (DISH). The principal issue is whether federal law
or Michigan law governs the district court's review of the
arbitration award. We agree with the district court that
federal law governs and AFFIRM.

**I.**

DISH hired Martis in December 2006 as a Quality
Assurance Specialist, which entailed driving to and
evaluating job installations by DISH employees and
employees of DISH contractors. In late 2009, DISH
replaced the work van Martis had driven for several years
with a smaller pick-up truck. PID 499. In early May 2010,
Martis emailed his supervisor, Jimmy Turbeville,[1] asking
to drive the larger van because he was experiencing knee,
hip, and lower back pain resulting from the awkward
position he had to assume (given his height and size, 6'5″
and 250 lbs.) to drive the smaller pick-up truck. On May
12 and June 18, 2010, the company doctor recommended
that Martis drive the larger van, diagnosing Martis with
knee strain and hip tension strain.

In the meantime, on March 2, 2010, Martis had written a
letter of recommendation for Robert Knott, an employee
of DISH subcontractor Galaxy 1, stating that Knott would
be a valuable addition to any company's work force. PID
438, 458. In early June 2010, Robert Byrd, the CEO of
Galaxy 1, complained to DISH General Manager Glen
Capra that Martis had written a letter of recommendation
for Knott and had told Galaxy 1 employees that Vision
Quest was a better place to work than Galaxy 1, and that
Byrd believed Martis was working as a spy for Vision
Quest. Byrd gave a copy of Martis's letter to Capra,
which Capra turned over to DISH Human Resources
Representative LeTonya Merriweather.

When Merriweather and Martis's supervisor Turbeville
met with Martis on June 8, 2010 regarding Byrd's
complaints, Martis admitted telling the Galaxy 1
technician that Vision Quest was a better subcontractor to
work for and writing the letter of recommendation, and
acknowledged that he should have sought Merriweather
or Turbeville's approval before writing the letter.

DISH suspended Martis on June 8, 2010, pending a more
thorough investigation. PID 441. Merriweather then spoke
with Galaxy 1 and Vision Quest representatives and
summarized her findings for Turbeville and several
superiors (Jared Coleman and Senior HR Resource
Managers Jeannette Alonzo and Jennifer Falbo). PID 442.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    1

These five DISH representatives held a telephone conference on June 28, 2010, and concluded that Martis should be discharged for violating DISH's reference and conflict of interest policies. Turbeville authored a letter stating that Martis was being discharged for violating company policy: "[Martis] wrote a reference letter for Galaxy 1 employee and represented Dish Network in the letter." Attached to Turbeville's letter were DISH's policies on "Reference and Employment **\*303** Verification" and "Conflict of Interest."

## II.

Martis filed a complaint and demand for arbitration with the American Arbitration Association in June 2012, asserting state claims of height, weight, and disability discrimination, discrimination in violation of Michigan's Worker's Disability Compensation Act, and retaliation. PID 142–50.[2] Thomas Barnes, a labor-and-employment-law specialist, was appointed as arbitrator. PID 152–54.

Following discovery, DISH moved for summary judgment. PID 92–118. The Arbitrator dismissed all of Martis's claims except the discrimination and retaliation claims brought under Michigan's Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 *et seq.* PID 157–73. After a four-day hearing and post-hearing briefing by the parties, the Arbitrator dismissed the remaining claims, concluding as to the disability discrimination claim that Martis presented insufficient evidence that his disability was one of the reasons that made a difference in DISH's determination to discharge him, and as to the retaliation claim that Martis failed to establish a causal connection between his discharge and any protected activity. PID 186, 190; 175–191.

Martis filed this action to vacate the arbitration award in Ingham County Circuit Court. PID 1–5. DISH removed the action to federal court on grounds of diversity, counterclaimed, and later moved for summary judgment, confirmation of the arbitration award, and dismissal of Martis's complaint to vacate the award. PID 70–74. Martis filed a cross-motion to vacate and modify the arbitration award, PID 251–76, to which DISH responded that Martis could not establish that the Arbitrator committed a clear error of law or otherwise exceeded his powers, as is required for a court to vacate or modify an arbitration award. PID 388–97.

## III.

The Arbitration Agreement Martis signed as part of his employment with DISH states:

> [A]ny claim, controversy and/or dispute between [Martis and DISH], arising out of and/or in any way related to [Martis's] ... employment and/or termination of employment, whenever and wherever brought, shall be resolved by arbitration. [Martis] agrees that this Agreement **is governed by the Federal Arbitration Act,** 9 U.S.C. §§ 1 et seq., and is fully enforceable.
>
> ....
>
> The arbitration **shall be governed by and construed in accordance** with the substantive law of the State ... **in which the Employee last performed services for [DISH, i.e., Michigan]**.... The arbitrator's decision shall be final and binding, and judgment upon the arbitrator's decision and/or award may be entered in any court of competent jurisdiction....

PID 27 (emphasis added). Thus the Agreement provides that it is governed by both the Federal Arbitration Act (FAA) and Michigan substantive law. As this court has observed:

> Although the FAA generally preempts inconsistent state laws and governs all aspects of arbitrations concerning "transaction[s] involving commerce, **\*304** parties may agree to abide by state rules of arbitration, and "enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." The central inquiry in this choice-of-law determination is whether the parties unambiguously intended to displace the FAA with state rules of arbitration.

*Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.,* 748 F.3d 708, 715–16 (6th Cir.2014) (quoting *Muskegon Cent. Dispatch 911 v. Tiburon, Inc.,* 462 Fed.Appx. 517, 522–23 (6th Cir.2012)). In the instant case, the Arbitration Agreement does not unambiguously express an intent to displace the federal standard with Michigan law because it states that it is governed by both the FAA and Michigan's substantive law. Ambiguities are resolved in favor of the federal standard, thus federal law applied to the district court's review of the arbitration award, although Michigan law governed the Arbitrator's substantive decision. *See, e.g., Uhl v. Komatsu Forklift Co., Ltd.,* 512 F.3d 294, 303 (6th Cir.2008) (concluding that, where the parties' choice of law provision referenced both the FAA and Michigan law, the FAA governed); *Savers Prop. & Cas. Ins. Co.,* 748 F.3d at 716

(concluding that where the agreement provided that it was subject to the laws of the State of Michigan and did not refer to the FAA or otherwise suggest that the parties sought to invoke its provisions, the parties intended to displace federal law with Michigan law); *Tiburon,* 462 Fed.Appx. at 523 (concluding that the arbitration agreement evidenced the parties' unambiguous intent to apply Michigan law in any subsequent appeal of the arbitration award where the agreement "explicitly refers to the Michigan Arbitration Act in stating that disputes 'shall be submitted to final and binding arbitration [...] pursuant to the provisions of MCL 600.5001–600.5035.' ")

Thus, the district court properly determined that the FAA governed its review of the arbitration award.

Applying federal law, the district court concluded that because the Arbitrator's analysis and decision were legally plausible,[3] the Arbitrator neither exceeded his authority nor manifestly disregarded the law. PID 511. Martis concedes that under federal law interpreting the

FAA, the district court properly affirmed the arbitration award. *See* Appellant's Br. at 6 ("The court below in confirming the award deferred to the Arbitrator as he was required to do under the federal standard applicable in cases under the Federal Arbitration Act."). Thus, we need go no further.

### *305 IV.

We AFFIRM the district court's grant of summary judgment to DISH, its confirmation of the arbitration award in DISH's favor, and its denial of Martis's motion to vacate or modify the award.

### All Citations

597 Fed.Appx. 301

### Footnotes

[1]  Martis copied General Manager Capra and Supervisor Gary Hull in his email to Turbeville.

[2]  Martis's complaint filed with the American Arbitration Association named as respondents Echostar [Communications Corporation], L.L.C., and DISH, which is an affiliate of Echostar. The Arbitration Agreement is on Echostar letterhead. *See* PID 420.

[3]  The district court agreed with Martis that the Arbitrator found that Martis established a prima facie case of disability discrimination and retaliation but disagreed that the Arbitrator found that Martis had established pretext. PID 509. Contrary to Martis's argument, even if the Arbitrator found pretext, that would not *require* a finding of unlawful discrimination or retaliation, but rather, a permissive inference of discrimination and retaliation would arise. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("The factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff."); *Smith v. Mosaica Ed., Inc.,* No. 269764, 2007 WL 677755, at *5 (Mich.Ct.App., Mar. 6, 2007) (applying *Reeves* ). Martis still bore the burden of establishing that unlawful discrimination or retaliation *actually motivated* DISH to discharge him. *See Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515, 522 n. 8 (2001) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") The district court did not err in determining that the Arbitrator properly followed Michigan law by requiring Martis to establish the latter. PID 510.

---

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 11010071
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

Kevin McGEE, Plaintiff,
v.
Thomas ARMSTRONG, et al., Defendants.

No. 5:11–cv–2751.
|
Signed Nov. 14, 2012.

**Attorneys and Law Firms**

Matthew G. Vansuch, Michael J. McGee, Harrington, Hoppe & Mitchell, Warren, OH, for Plaintiff.

David S. Kessler, S. Scott Haynes, Stephen P. Postalakis, Blaugrund, Herbert & Martin, Worthington, OH, for Defendants.

REPORT & RECOMMENDATION

KATHLEEN B. BURKE, United States Magistrate Judge.

**\*1** This case is before the undersigned Magistrate Judge on Defendants' Motion to Stay Proceedings and/or Compel Arbitration for Certain Claims of Plaintiff (the "Motion") filed on June 18, 2012. Doc. 83. Defendants seek to compel arbitration of Plaintiff's common law and statutory claims "related to any allegations of removal, suspension, or demotion," including claims brought under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. Doc. 83, p. 9. Plaintiff opposes the Motion. Briefing was completed on November 5, 2012.[1] Docs. 83, 102, 104, 131, 132, 135, 136. For the reasons set forth below, the undersigned recommends that the Motion be **GRANTED**.

**I. Background**[2]

Plaintiff Kevin McGee ("Plaintiff" or "McGee") is a terminated former management employee of Defendant County of Summit Developmental Disabilities Board

("Board"). Before the Board terminated him in April 2012, McGee served as the Board's Director of Marketing, Public Relations and Specialty Businesses. Doc. 57, ¶¶ 1, 15. McGee is also a Second Lieutenant in the Ohio Army National Guard (the "National Guard") and has been a member of the National Guard for over three years. Doc. 57, ¶ 1. He was engaged in active military duty service at various times during each of the years 2008 through 2012. Doc. 57, ¶ 25.

Defendant Thomas Armstrong ("Armstrong") is the Board's Superintendent, a manager in the chain of command within the Board, and McGee's immediate supervisor. Doc. 57, ¶¶ 5, 6, 17. Defendant Lisa Kamlowsky ("Kamlowsky") is the Board's Assistant Superintendant and Chief Legal Counsel and a manager in the chain of command within the Board. Doc. 57, ¶¶ 7, 18. Plaintiff alleges in his Complaint that Armstrong and Kamlowsky are "employers." Doc. 57, ¶¶ 5 and 7.

In his Second Amended Complaint (Doc. 57), McGee alleges that Defendants terminated his employment and discriminated against and retaliated against him in other employmentrelated actions because of his military status and service. As described more fully below, he alleges violations of federal and state statutes and common law causes of action.[3] Doc. 57, Doc. 102.

McGee was employed under a renewable one-year limited contract (the "Employment Contract").[4] Doc. 57–1. The Employment Contract contains a section addressing termination and employee discipline, which includes the arbitration provisions at issue. Specifically, the "Contract Termination–Employee Discipline" section provides:

> During the term of the Contract, the Employee may be removed, suspended or demoted for cause pursuant to ORC 5126.23....
>
> In consideration for the compensation and other benefits set forth herein, and after specifically considering this WAIVER OF RIGHTS, the Employee agrees that the parties shall not use the statutory procedures set forth in ORC 5126.23 for the resolution of any matter regarding the removal, suspension or demotion of the Employee. Any dispute, claim or cause of action arising out of such removal, suspension or demotion shall be submitted to binding arbitration under the then existing rules of the American Arbitration Association.

**\*2** Within fourteen (14) calendar days following notification to the Employee of the Superintendent's

decision to remove, suspend or demote the Employee, the Employee shall provide written notification to the Superintendent of the Employee's intention to proceed to arbitration....

* * *

The question of arbitrability must be raised by either party before the arbitrator hears the merits of the dispute. If a question of arbitrability is raised, the arbitrator may either rule on this issue or reserve ruling and hear the merits of the dispute before issuing a ruling on this question.

The decision of the arbitrator shall be final and binding upon the Board and the Employee. The parties expressly waive the procedures for appeal set forth in Ohio Revised Code Chapter 5126 in order to engage in this expedited, binding arbitration procedure.

* * *

Doc. 57–1, Section VIII.

In their briefing on the Motion, the parties have provided information regarding the steps they have taken relative to arbitration. Docs. 104–3, 131, 132. In summary, very little has been done due to the parties' disagreement as to whether Plaintiff's claims are arbitrable.

On April 25, 2012, after he received notice that his employment was being terminated, McGee sent a letter to the Board demanding a hearing before the Board pursuant to O.R.C. § 5126.23 or arbitration if the Board was unwilling, unable or refused to schedule a hearing pursuant to O.R.C. § 5126.23. Doc. 104–3. Plaintiff asserts that the Defendants refused his demand for a hearing before the Board but did agree to arbitration. Doc. 132, p. 1. Counsel for the parties apparently had some conversations regarding arbitration and counsel for Defendants sent McGee's counsel a form to be submitted to the American Arbitration Association ("AAA") to request a potential panel of arbitrators. Doc. 131. Defendants assert, and Plaintiff does not deny, that McGee's counsel failed to sign or return the AAA form or to pay his share of the arbitration fee. Docs. 131 and 132. Plaintiff explains this failure by stating that all of his available funds are being used to finance this litigation and that he "maintains that the proper forum for litigation of these matters is Federal District Court rather than

arbitration." Doc. 132, pp. 1–2

## II. Plaintiff's Claims

McGee filed his original Complaint in this action (Doc. 1) on December 20, 2011, immediately prior to a three-month deployment by the National Guard.[5] On February 21, 2012, with leave of court, McGee filed his First Amended Complaint. Doc. 24. On May 17, 2012, following his termination by Defendants,[6] McGee, with leave of court, filed his Second Amended Complaint. Doc. 57. As summarized below, McGee asserts fourteen (14) causes of action against Defendants, the primary thrust of which is that Defendants took various employment-related actions against him based on his status as an active member of the Ohio Army National Guard. Doc. 57, ¶¶ 47–138.[7]

**\*3** 1. *First Cause of Action*—Civil Rights Violations (42 U.S.C. § 1983). Doc. 57, ¶¶ 47–53—alleging a deprivation of equal protection of the laws; deprivation of a property interest in his permanent public position of public employment without due process of law, violation of his First Amendment rights to free speech and freedom of association. Doc. 57, ¶¶ 50–51.

2. *Second Cause of Action*—Discipline, Suspension and Failure to Promote and Retaliation in Violation of O.R.C. § 4112.01, et seq.—Military Discrimination. Doc. 57, ¶¶ 54–61—alleging loss based on a refusal to promote or renew contract for two years and suspension and discipline. Doc. 57, ¶¶ 55–56.

3. *Third Cause of Action*—Discipline, Suspension and Failure to Promote and Retaliation in Violation of Public Policy. Doc. 57, ¶¶ 62–72—alleging loss based on refusal to promote/renew and subsequent suspension and discipline. Doc. 57, ¶ 67.

4. *Fourth Cause of Action*—Retaliation in Violation of Ohio Revised Code § 4112.01, et seq.—Military Status Discrimination and Retaliation in violation of the The Civil Rights Act (42 U.S.C. § 1983) and Retaliation in Violation of Public Policy and USERRA (38 U .S.C. § 4301 et seq.). Doc. 57, ¶¶ 73–80—alleging loss based on suspension and discipline and failure to promote/renew contract. Doc. 57, ¶ 75.

5. *Fifth Cause of Action*–USERRA Employment and Reemployment Rights of Members of the Uniformed

Services (38 U.S.C. § 4301 et seq.). Doc. 57, ¶¶ 81–86–alleging a denial of employment, reemployment, retention in employment, promotion, or any benefit of employment. Doc. 57, ¶ 83.

6. *Sixth Cause of Action*–Breach of Contract. Doc. 57, ¶¶ 87–91—alleging a failure to pay required salary and required military leave pay. Doc. 57, ¶ 88(a)-(b).

7. *Seventh Cause of Action*—Civil Right Violations (42 U.S.C. § 1983). Doc. 57, ¶¶ 92–98–alleging that Defendants' discharge of Plaintiff deprived him of equal protection of the laws and violated his right to free speech by denying him a governmental benefit, his job, and depriving him of a property interest in his permanent position of public employment without due process of law and in violation of his rights to free speech. Doc. 57, ¶ 95–96.

8. *Eighth Cause of Action*—Termination and Retaliation in Violation of Ohio Revised Code § 4112.01 et seq.—Military Status Discrimination. Doc. 57, ¶¶ 99–106–alleging a loss based on Defendants' discharge of Plaintiff. Doc. 57, ¶¶ 100–101.

9. *Ninth Cause of Action*—Discharge and Retaliation in Violation of the Family Medical Leave Act of 1993 (29 U.S.C. §§ 2611 et seq.). Doc. 57, ¶¶ 107–111—alleging wrongful discharge and loss as a result of Defendants' failure to restore Plaintiff to the position he held before his military leave or an equivalent position. Doc. 57, ¶ 108–111.

10. *Tenth Cause of Action*–Retaliation in Violation of Ohio Revised Code § 4112.01, et seq.—Military Status Discrimination and Retaliation in violation of the the Civil Rights Act (42 U.S.C. § 1983) and Retaliation in Violation of Public Policy and USERRA (38 U .S.C. § 4301 et seq.). Doc. 57, ¶¶ 112–119—alleging loss based on discharge. Doc. 57, ¶ 114.

**\*4** 11. *Eleventh Cause of Action*—USERRA Employment and Reemployment Rights of Members of the Uniformed Services (38 U.S.C. § 4301 et seq.). Doc. 57, ¶¶ 120–125—alleging a discharge on the basis of military service. Doc. 57, ¶ 122.

12. *Twelfth Cause of Action*–Breach of Contract. Doc. 57, ¶¶ 126–129—alleging a failure to pay required salary and required military leave pay and discharge for illegal reasons and not for cause.

Doc. 57, ¶ 127(a)-(c).

13. *Thirteenth Cause of Action*—Ohio Wage and Hour Violations (ORC Section 4113.15). Doc. 57, ¶¶ 130–133—alleging a failure to pay wages and benefits since Defendants' termination of Plaintiff on April 21, 2012, and a failure to pay semimonthly wages and benefits. Doc. 57, ¶¶ 131–132.

14. *Fourteenth Cause of Action*—Defamation. Doc. 57, ¶¶ 134–13 8—alleging that defendant Armstrong falsely stated on April 20, 2012, and April 26, 2012, that Plaintiff had engaged in unethical conduct. Doc. 57, ¶ 135.

### III. Law and Analysis

With limited exceptions not applicable here, the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., applies to employment contracts containing arbitration provisions. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (finding that the provision in § 1 of the FAA exempting "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign commerce" is confined to contracts of transportation workers). The FAA allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to seek an order compelling arbitration, 9 U.S.C. § 4, and provides for a stay of proceedings where an issue is referable to arbitration. 9 U.S.C. § 3. The Sixth Circuit has set forth a four-part test for a court to apply when considering a motion to stay proceedings and compel arbitration under the FAA. *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (2000).

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement, third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Id.*

The first *Stout* factor is satisfied here because Plaintiff admits the existence of the Employment Contract and the arbitration provision and does not contend that the arbitration provision is unconscionable. Rather, Plaintiff opposes the Motion based on his contention that the arbitration provision is narrow and specific and the claims asserted in this litigation are not within its scope. Doc. 102, pp. 2–3; Doc. 136, p. 3. Plaintiff's argument thus asks the Court to consider the second *Stout* factor, the scope of the arbitration provision. However, before the Court can reach that issue, it needs to address a related, but different, question: Who is to decide which disputes fall within the scope of the arbitration provision, i.e., did the parties agree to arbitrate arbitrability? If so, the arbitrator must decide which disputes are arbitrable; if not, the Court must decide. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute ..., so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (internal citations omitted); *Warren Steel Holdings, LLC v. Williams,* 2007 WL 2688240, *3 (N.D.Ohio 2007). "In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties." *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). "[P]arties to an agreement are free to provide that the question of arbitrability is to be decided by an arbitrator." *Wuliger v. Gilbert,* 261 F.Supp.2d 946, 949 (N.D.Ohio 2003).

**\*5** The standard to be applied in determining whether the parties agreed to arbitrate arbitrability differs from the standard applied to determine which disputes fall within the scope of an arbitration agreement. With respect to the latter, doubts are to be resolved in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.,* 350 F.3d 568, 576–577 (6th Cir.2003) (internal citations omitted). With respect to the former question, however, "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options,* 514 U .S. at 944.

In this case, as in *Warren Steel Holdings,* the parties did clearly and unmistakably agree to arbitrate arbitrability. There are two provisions in the Employment Contract that establish the parties' intent to arbitrate arbitrability. The first is the provision that states:

> Any dispute, claim or cause of action arising out of such removal, suspension or demotion shall be submitted to binding arbitration *under the then existing rules of the American Arbitration Association.*

Doc. 57–1, Section VII, p. 4 (emphasis supplied).

The *Employment Arbitration Rules and Mediation Procedures* of the American Arbitration Association pursuant to which the parties agreed to arbitrate expressly provide that the question of arbitrability is for the arbitrator:

> 6. Jurisdiction

>> a. The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

>> b. The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that a contract is null and void shall not for that reason alone render invalid the arbitration clause.

>> c. A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as a part of the final award.

> AAA *Employment Arbitration Rules and Mediation Procedures* ("AAA Rules"), Section 6, amended and effective November 1, 2009.[8]

The parties' agreement to be bound by the AAA Rules clearly demonstrates that "the parties agreed to arbitrate arbitrability by the terms of the arbitration provision." *Warren Steel Holdings,* 2007 WL 2688240 at *3; *see also Turi v. Main Street Adoption Services, LLP,* 633 F.3d 496 506–507 (2011), *citing Contec Corp. v. Remote Solution, Co., Ltd.,* 398 F.3d 205, 208 (2nd Cir.2005) (Sixth Circuit acknowledges that the Second Circuit has held that "incorporation of the AAA rules 'serves as clear and unmistakable evidence of the parties' intent to delegate

issues of arbitrability to an arbitrator' "); *see also Bishop v. Gosiger, Inc.,* 692 F.Supp.2d 692, 769 (E.D.Mich.2010) (recognizing that several district courts within the Sixth Circuit have concluded that incorporation of AAA rules into an arbitration provision can constitute clear and unmistakable evidence that the parties intended to submit the issue of arbitrability to an arbitrator).

**\*6** The second provision of the Employment Contract that establishes that the parties clearly and unmistakably agreed to arbitrate arbitrability is the provision that states:

> The question of arbitrability must be raised by either party before the arbitrator hears the merits of the dispute. If a question of arbitrability is raised, the arbitrator may either rule on this issue or reserve ruling and hear the merits of the dispute before issuing a ruling on this question.

Doc. 57–1, Section VIII, pp. 4–5.

Plaintiff does not dispute the existence of the provisions of the Employment Contract in which the parties agreed to arbitrate arbitrability. Instead he asserts that the parties did not designate the arbitrator as the sole person to decide the question of arbitrability. Doc. 136, pp. 102. Thus, Plaintiff appears to be arguing, in part, that the District Court is required to decide questions of arbitrability notwithstanding the parties' agreement to have an arbitrator decide those questions because the parties did not expressly provide that the District Court may not decide such questions. Doc. 136, pp. 1–2. Plaintiff cites no law to support this proposition and the case law is to the contrary. *See First Options,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985, *Warren Steel Holdings,* 2007 WL 2688240. Accordingly, for the reasons set forth herein, the undersigned concludes that the parties did agree to arbitrate arbitrability and that agreement should be enforced.

However, before reaching a final conclusion as to whether the arbitrator or the court should decide the arbitrability of Plaintiff's claims, the Court must take one additional step. Under the Sixth Circuit's decision in *Turi v. Main Street Adoption Services, LLP,* 633 F.3d 496, 511 (2011), the Court must determine whether the claims are "at least arguably" within the scope of the arbitration provision. *Turi* instructs that an arbitrator would not have the authority to decide the arbitrability of claims that "are clearly outside the scope of the arbitration clause." 633 F.3d at 507. "A dispute that plainly has nothing to do with

the subject matter of an arbitration agreement, for example, would not give the arbitrator the authority to decide the arbitrability of this wholly unrelated claim." 633 F.3d at 507.

The arbitration clause in *Turi* was a very narrow one. Here, the arbitration clause is not narrow. It is very broad with respect to claims relating to any removal, suspension, or demotion. Specifically, the parties agreed:

> *Any* dispute, claim or cause of action *arising out of* such removal, suspension or demotion shall be submitted to binding arbitration....

Doc. 57–1, Section VIII, p. 4 (emphasis supplied).

With very limited exceptions, all of Plaintiff's Causes of Action include allegations relating to a suspension, a failure to promote, a discharge and/or a denial of a right to public employment and therefore they all are at least arguably subject to arbitration under the terms of the Employment Contract.[9] The possible exceptions are his Sixth and a portion of his Twelfth Causes of Action, which allege that Defendants breached the Employment Contract by failing to pay him the required salary and pay differential during his military leave, and his Fourteenth Cause of Action, which alleges defamation. The Sixth and the noted portion of the Twelfth Cause of Action do not arise out of a "removal, suspension or demotion;" accordingly, they do not arguably fall within the scope of the arbitration provision of the Employment Contract. By contrast, the Fourteenth Cause of Action does at least arguably fall within the scope of the arbitration provision because it is based on statements allegedly made by Armstrong on or after the date of Plaintiff's discharge, which, according to Plaintiff's filings with the Court, appear to have related to Plaintiff's discharge. Doc. 57, ¶¶ 134–138, Doc. 55, pp. 2–3, Doc. 65–1, p. 4.[10] Accordingly, it is the arbitrator who should determine whether Plaintiff's Causes of Action, with the exception of the Sixth and the portion of the Twelfth described above,[11] are in fact within the scope of the parties' arbitration agreement.[12] *In re Goe Lima, LLC v. Ohio Farmers Insurance Co.,* 2012 WL 4634885, * 10 (Bankr.N.D.Ohio 2012) (referring case to arbitration, in part, because claims at least arguably fell within the contemplated scope of the agreement). Plaintiff's argument that his claims against Defendants Kamlowsky and Armstrong cannot be covered by the arbitration clause because they were not parties to the Employment Contract (Docs. 102, p. 2; 136, p. 3), is undercut by his Second Amended Complaint, in which he alleges that Kamlowsky and Armstrong are "employers" (Doc. 57, ¶¶ 5 and 7). Moreover, Plaintiff cites no authority for his argument. Thus, the undersigned's recommendation

relates to Plaintiff's claims against all Defendants.

**\*7** Plaintiff also argues that this Court should not compel arbitration because, while the arbitration provision authorizes the arbitrator "to affirm, disaffirm, or modify any decision to remove, suspend, or demote the Employee," it does not give the arbitrator authority to provide relief available under his statutory claims, such as back pay, front pay, general damages, punitive damages and injunctive relief. Doc. 136, p. 3. However, the AAA Rules, under which the parties agreed to be bound, do provide such authority. Specifically, the AAA Rules state:

> The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law.

*See* AAA *Employment Arbitration Rules and Mediation Procedures,* Section 39(d), amended and effective November 1, 2009.

Further, the liberal policy under the FAA favoring arbitration agreements applies "even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.' "[13] *CompuCredit Corp. v. Greenwood,* ––– U.S. ––––, ––––, 132 S.Ct. 665, 669, 181 L.Ed.2d 586 (2012) (internal citations omitted). Plaintiff acknowledges that USERRA claims and FMLA claims have been held to be arbitrable. Doc. 102, p. 4; *see e.g. Landis v. Pinnacle Eye Care, LLC,* 537 F.3d 559, 563 (6th Cir.2008) (agreeing with other district courts that USERRA claims are arbitrable because there is no ambiguity in the text of USERRA regarding preemption of arbitration agreements); *O'Neil v. Hilton Head Hosp.,* 115 F.3d 272, 273–274 (4th Cir.1997) (indicating that "[n]othing in the Family Medical Leave Act suggests that Congress wished to exempt disputes arising under it from the coverage of the FAA."). Further, Plaintiff has failed to point to language in any of the other statutes under which he seeks relief that manifests Congress' intent to preclude the enforcement of agreements to arbitrate such claims.

Thus, the fact that Plaintiff has asserted statutory claims does not foreclose an arbitrator from deciding issues of arbitrability.

As his final argument against arbitration, Plaintiff asserts that this case is almost one year old; the parties have expended significant resources and time litigating all of the claims; and the case is on the verge of dispositive motions being filed. Doc. 136, p. 3. Plaintiff's argument that this Court should not compel arbitration because this case is almost one year old is unpersuasive. Plaintiff cites no supporting authority, nor do the facts help him. While Plaintiff is correct that he filed this case almost one year ago, the facts and claims have changed since that time. Plaintiff was employed by the Board on the date of filing, was about to be deployed, and was seeking injunctive relief in connection with that deployment. Approximately four months later, Defendants terminated Plaintiff. It was not until May 17, 2012, that Plaintiff filed his Second Amended Complaint, which contained additional Causes of Action. Doc. 57. Although the parties have expended resources and time in litigating the claims in this case, those efforts largely have been devoted to discovery and they will not be wasted by virtue of this recommendation. Discovery would have been necessary even if this case had started with arbitration and neither party has asserted that discovery taken in this case will not be available to them in an arbitration proceeding.

**\*8** Because the parties have "clearly and unmistakably" agreed to arbitrate issues relating to arbitrability, the undersigned recommends that Defendants' Motion to Compel arbitration (Doc. 83) be **GRANTED** with respect to all of Plaintiff's Causes of Action except for the Sixth Cause of Action and the portion of the Twelfth Cause of Action that alleges a breach of contract with respect to Plaintiff's military leave salary and pay differential. The undersigned further recommends that this case be stayed pending the outcome of arbitration.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 11010071

Footnotes

1      After Defendants filed their Reply Brief on August 1, 2012, (Doc. 104), the Court issued orders (Docs. 130 and 134) requiring the parties to submit supplemental briefs regarding two matters: (1) the current status of the arbitration proceeding referred to in Defendants' Reply Brief; and (2) the question whether the parties agreed to arbitrate issues pertaining to the arbitrability of Plaintiff's claims.

2      The background facts are taken from Plaintiff's Second Amended Complaint. Doc. 57.

3    Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq., Family Medical Leave Act ("FMLA"), 42 U.S.C. § 1983 (due process, equal protection, First Amendment, freedom of speech, freedom of association, freedom to petition for redress of grievances), Ohio Civil Rights Act, O.R.C. § 4112.01 et seq., wage and hour violations for failure to pay final paycheck and accrued vacation after termination, breach of contract, and defamation. Doc. 57, Doc. 102, p. 1.

4    The Employment Contract states that it is a " 'limited' contract within the meaning of Ohio Revised Code (ORC) 5126.20." Doc. 57–1, Section I. A "limited contract" is defined as "a contract of limited duration which is renewable at the discretion of the superintendent." *See* O.R.C. § 5126.20(D). The initial term of the Employment Contract was October 3, 2010, through October 2, 2011, with a provision for automatic renewal for successive oneyear periods unless the Superintendent notifies the employee in writing no later than 90 days prior to the expiration of the contract. Doc. 57–1, Section IX.

5    The Complaint was accompanied by Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7), which sought to enjoin Defendants from failing to pay Plaintiff the salary and pay differential allegedly owed under the Employment Contract during Plaintiff's military leave. On December 23, 2011, the Court denied Plaintiff's TRO Motion. Doc. 10.

6    McGee alleges that Defendants terminated him on April 21, 2012. Doc. 57, ¶ 33.

7    There is considerable overlap between a number of Plaintiff's Causes of Action, i.e., the First and Seventh, the Second and Eighth, the Fourth and Tenth, the Fifth and Eleventh, and the Sixth and Twelfth Causes of Action.

8    The AAA Rules provide, in part, that "[t]he parties shall be deemed to have made these rules part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ... or under its *Employment Arbitration Rules and Mediation Procedures* for arbitration by the AAA of an employment dispute without specifying the particular rules." *See* AAA *Employment Arbitration Rules and Mediation Procedures,* Section 6, amended and effective November 1, 2009, Section 1. While the AAA Rules are not attached to Plaintiff's Second Amended Complaint, the Employment Contract, which incorporates those rules, is attached (Doc. 57–1). Further the AAA, through its public disclosure of its rules, has made them capable of accurate and ready determination. http://www.adr.org/aaa/faces  /rules/searchrules/rulesdetail?doc=ADRSTG_  004366  & _afrLoop=605161061427986  &  —afrWindowMode=0  &  —  afrWindowId=qxj2ubpr1—134#  ?—afrWindowId=qxj2ubpr1—1  34%  26_  afrLoop=605161061427986%  26doc=ADRSTG  _004366%  26_afrWindow Thus, in accordance with Evid R. 201, the undersigned takes judicial notice of the AAA Rules. *See e.g., Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 362 (Tenn.2001) (finding that a trial court properly took judicial notice of AAA Rules).

9    The fact that Plaintiff uses the term "discharge" in his Second Amended Complaint rather than the term "removal," which is used in the arbitration provision of the Employment Contract, does not alter the analysis or conclusions herein.

10   In concluding that the Fourteenth Cause of Action is at least arguably within the scope of the arbitration provision, the undersigned has taken into account the standard that doubts are to be resolved in favor of arbitrability "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.,* 350 F.3d 568, 576–577 (6th Cir.2003) (internal citations omitted).

11   The portion of the Twelfth Cause of Action that alleges that Defendants breached the Employment Contract when discharging Plaintiff is certainly at least arguably within the scope of the arbitration provision. Doc. 57–1, ¶ 127(c).

12   The undersigned's conclusion that Plaintiff's claims, with very limited exceptions, are at least arguably within the scope of the parties' agreement to arbitrate is not intended as an advisory opinion or direction to the arbitrator to determine that those claims are in fact with the scope of the arbitration provision of the Employment Contract.

13   In *CompuCredit,* the Court held that the Credit Repair Organization Act, which requires credit repair organizations to provide consumers with a notice concerning their right to sue, did not prohibit enforcement of the parties' agreement to arbitrate. *CompuCredit,* ——U.S. ——, 132 S.Ct. 665, 181 L.Ed.2d 586. The Court concluded that "[b]ecause the CROA is silent on whether claims under the Act can proceed in an arbitrable forum, the FAA requires the arbitration agreement to be enforced according to its terms." *Id.* at 673.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

McGee v. Armstrong, Not Reported in F.Supp.2d (2012)

McGee v. Armstrong, Not Reported in F.Supp.3d (2014)

2014 WL 3012879
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

Kevin V. McGEE, Plaintiff,
v.
Thomas L. ARMSTRONG, et al., Defendants.

No. 5:11CV2751.
|
Signed July 3, 2014.

**Attorneys and Law Firms**

Matthew G. Vansuch, Michael J. McGee, Harrington, Hoppe & Mitchell, Warren, OH, for Plaintiff.

David S. Kessler, S. Scott Haynes, Stephen P. Postalakis, Blaugrund, Herbert & Martin, Worthington, OH, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SARA LIOI, District Judge.

**\*1** Before the Court is the Report and Recommendation ("R & R") (Doc. No. 140) of Magistrate Judge Kathleen Burke, recommending that this Court substantially grant defendants' motion to compel arbitration and, further, grant the accompanying motion to stay proceedings pending arbitration.[1] Plaintiff filed objections (Doc. No. 143), and defendants filed their opposition to the objections (Doc. No. 144). Pursuant to Fed.R.Civ.P. 72(b)(3), the Court has conducted its de novo review of the matters properly raised in the objections.[2] For the reasons discussed herein, plaintiff's objections are overruled and the R & R is accepted. Defendants' motion to compel arbitration is **GRANTED,** and the case is stayed until that arbitration is completed.

**STANDARD OF REVIEW**

Matters that are dispositive of a case may be referred to a magistrate judge for "proposed findings and recommendations[.]" 28 U.S.C. § 636(b)(1)(B). "Within fourteen days after being served a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C. § 636(b)(1). Thereafter, under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Powell v. United States,* 37 F.3d 1499 (Table), 1994 WL 532926, at * 1 (6th Cir. Sept.30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to de novo review by the district court in light of specific objections filed by any party.").

"An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock,* 327 F.Supp.2d 743, 747 (E.D.Mich.2004); *see also* Fed.R.Civ.P. 72(b)(3) ("[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to"); LR 72.3(b) (any objecting party shall file "written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections").

After review, the district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b)(3).

**THE REPORT AND RECOMMENDATION**

The R & R sets forth the background facts and identifies the fourteen causes of action, all based on plaintiff's second amended complaint. (*See* R & R at 1894–96; 1896–98.) Plaintiff has not specifically objected to anything in Sections I or II of the R & R. Therefore, pursuant to Fed.R.Civ.P. 72(b)(3), the Court accepts both the factual and procedural background[3] summarized in Section I of the R & R, and the listing of the fourteen causes of action set forth in Section II of the R & R. For ease of review, the Court incorporates those sections herein.

**I. Background**

McGee v. Armstrong, Not Reported in F.Supp.3d (2014)

**\*2** Plaintiff Kevin McGee ("Plaintiff" or "McGee") is a terminated former management employee of Defendant County of Summit Developmental Disabilities Board ("Board"). Before the Board terminated him in April 2012, McGee served as the Board's Director of Marketing, Public Relations and Specialty Businesses. Doc. 57, ¶¶ 1, 15. McGee is also a Second Lieutenant in the Ohio Army National Guard (the "National Guard") and has been a member of the National Guard for over three years. Doc. 57, ¶ 1. He was engaged in active military duty service at various times during each of the years 2008 through 2012. Doc. 57, ¶ 25.

Defendant Thomas Armstrong ("Armstrong") is the Board's Superintendent, a manager in the chain of command within the Board, and McGee's immediate supervisor. Doc. 57, ¶¶ 5, 6, 17. Defendant Lisa Kamlowsky ("Kamlowsky") is the Board's Assistant Superintendant [sic] and Chief Legal Counsel and a manager in the chain of command within the Board. Doc. 57, ¶¶ 7, 18. Plaintiff alleges in his Complaint that Armstrong and Kamlowsky are "employers." Doc. 57, ¶¶ 5 and 7.

In his Second Amended Complaint (Doc. 57), McGee alleges that Defendants terminated his employment and discriminated against and retaliated against him in other employment-related actions because of his military status and service. As described more fully below, he alleges violations of federal and state statutes and common law causes of action.[3] Doc. 57, Doc. 102.

McGee was employed under a renewable one-year limited contract (the "Employment Contract"). [footnote omitted.] Doc. 57–1. The Employment Contract contains a section addressing termination and employee discipline, which includes the arbitration provisions at issue. Specifically, the "Contract Termination–Employee Discipline" section provides:

During the term of the Contract, the Employee may be removed, suspended or demoted for cause pursuant to ORC 5126.23....

In consideration for the compensation and other benefits set forth herein, and after specifically considering this WAIVER OF RIGHTS, the Employee agrees that the parties shall *not* use the statutory procedures set forth in ORC 5126.23 for the resolution of any matter regarding the removal, suspension or demotion of the Employee. Any dispute, claim or cause of action arising out of such removal, suspension or demotion shall be submitted to binding arbitration under the then

existing rules of the American Arbitration Association.

**\*3** Within fourteen (14) calendar days following notification to the Employee of the Superintendent's decision to remove, suspend or demote the Employee, the Employee shall provide written notification to the Superintendent of the Employee's intention to proceed to arbitration....

* * *

The question of arbitrability must be raised by either party before the arbitrator hears the merits of the dispute. If a question of arbitrability is raised, the arbitrator may either rule on this issue or reserve ruling and hear the merits of the dispute before issuing a ruling on this question.

The decision of the arbitrator shall be final and binding upon the Board and the Employee. The parties expressly waive the procedures for appeal set forth in Ohio Revised Code Chapter 5126 in order to engage in this expedited, binding arbitration procedure.

* * *

Doc. 57–1, Section VIII.

In their briefing on the Motion, the parties have provided information regarding the steps they have taken relative to arbitration. Docs. 104–3, 131, 132. In summary, very little has been done due to the parties' disagreement as to whether Plaintiff's claims are arbitrable.

On April 25, 2012, after he received notice that his employment was being terminated, McGee sent a letter to the Board demanding a hearing before the Board pursuant to O.R.C. § 5126.23 or arbitration if the Board was unwilling, unable or refused to schedule a hearing pursuant to O.R.C. § 5126.23. Doc. 104–3. Plaintiff asserts that the Defendants refused his demand for a hearing before the Board but did agree to arbitration. Doc. 132, p. 1. Counsel for the parties apparently had some conversations regarding arbitration and counsel for Defendants sent McGee's counsel a form to be submitted to the American Arbitration Association ("AAA") to request a potential panel of arbitrators. Doc. 131. Defendants assert, and Plaintiff does not deny, that McGee's counsel failed to sign or return the AAA form or to pay his share of the arbitration fee. Docs. 131 and 132. Plaintiff explains this failure by stating that all of his available funds are being used to finance this litigation and that he "maintains that the

proper forum for litigation of these matters is Federal District Court rather than arbitration." Doc. 132, pp. 1–2[.]

(R & R at 1894–96, footnote 3 in original; footnote 4 omitted.)

In Section II, the R & R lists the following fourteen causes of action in plaintiff's second amended complaint:

1. *First Cause of Action*—Civil Rights Violations (42 U.S.C. § 1983). Doc. 57, ¶¶ 47–53—alleging a deprivation of equal protection of the laws; deprivation of a property interest in his permanent public position of public employment without due process of law, violation of his First Amendment rights to free speech and freedom of association. Doc. 57, ¶¶ 50–51.

2. *Second Cause of Action*—Discipline, Suspension and Failure to Promote and Retaliation in Violation of O.R.C. § 4112.01, et seq.—Military Discrimination. Doc. 57, ¶¶ 54–61—alleging loss based on a refusal to promote or renew contract for two years and suspension and discipline. Doc. 57, ¶¶ 55–56.

**\*4** 3. *Third Cause of Action*—Discipline, Suspension and Failure to Promote and Retaliation in Violation of Public Policy. Doc. 57, ¶¶ 62–72—alleging loss based on refusal to promote/renew and subsequent suspension and discipline. Doc. 57, ¶ 67.

4. *Fourth Cause of Action–Retaliation in Violation of Ohio Revised Code § 4112.01, et seq.*—Military Status Discrimination and Retaliation in violation of the The [sic] Civil Rights Act (42 U .S.C. § 1983) and Retaliation in Violation of Public Policy and USERRA (38 U.S.C. § 4301 et seq.). Doc. 57, ¶ ¶ 73–80—alleging loss based on suspension and discipline and failure to promote/renew contract. Doc. 57, ¶ 75.

5. *Fifth Cause of Action*—USERRA Employment and Reemployment Rights of Members of the Uniformed Services (38 U.S.C. § 4301 et seq.). Doc. 57, ¶¶ 81–86—alleging a denial of employment, reemployment, retention in employment, promotion, or any benefit of employment. Doc. 57, ¶ 83.

6. *Sixth Cause of Action*—Breach of Contract. Doc. 57, ¶¶ 87–91—alleging a failure to pay required salary and required military leave pay. Doc. 57, ¶ 88(a)-(b).

7. *Seventh Cause of Action*—Civil Right Violations (42 U.S.C. § 1983). Doc. 57, ¶¶ 92–98—alleging that Defendants' discharge of Plaintiff deprived him of equal protection of the laws and violated his right to free speech by denying him a governmental benefit, his job, and depriving him of a property interest in his permanent position of public employment without due process of law and in violation of his rights to free speech. Doc. 57, ¶ 95–96.

8. *Eighth Cause of Action*—Termination and Retaliation in Violation of Ohio Revised Code § 4112.01 et seq.—Military Status Discrimination. Doc. 57, ¶¶ 99–106—alleging a loss based on Defendants' discharge of Plaintiff. Doc. 57, ¶¶ 100–101.

9. *Ninth Cause of Action*—Discharge and Retaliation in Violation of the Family [and] Medical Leave Act of 1993 (29 U.S.C. §§ 2611 et seq.). Doc. 57, ¶¶ 107–111—alleging wrongful discharge and loss as a result of Defendants' failure to restore Plaintiff to the position he held before his military leave or an equivalent position. Doc. 57, ¶ 108–111.

10. *Tenth Cause of Action*—Retaliation in Violation of Ohio Revised Code § 4112.01, et seq.—Military Status Discrimination and Retaliation in violation of the the [sic] Civil Rights Act (42 U.S.C. § 1983) and Retaliation in Violation of Public Policy and USERRA (38 U.S.C. § 4301 et seq.). Doc. 57, ¶ ¶ 112–119—alleging loss based on discharge. Doc. 57, ¶ 114.

11. *Eleventh Cause of Action*—USERRA Employment and Reemployment Rights of Members of the Uniformed Services (38 U.S.C. § 4301 et seq.). Doc. 57, ¶¶ 120–125—alleging a discharge on the basis of military service. Doc. 57, ¶ 122.

12. *Twelfth Cause of Action*—Breach of Contract. Doc. 57, ¶¶ 126–129—alleging a failure to pay required salary and required military leave pay and discharge for illegal reasons and not for cause. Doc. 57, ¶ 127(a)-(c).

**\*5** 13. Thirteenth Cause of Action—Ohio Wage and Hour Violations (ORC Section 4113.15). Doc. 57, ¶¶ 130–133—alleging a failure to pay wages and benefits since Defendants' termination of Plaintiff on April 21, 2012, and a failure to pay semi-monthly wages and benefits. Doc. 57, ¶¶ 131–132.

14. *Fourteenth Cause of Action*—Defamation. Doc. 57, ¶¶ 134–138—alleging that defendant Armstrong falsely stated on April 20, 2012, and April 26, 2012, that Plaintiff had engaged in unethical conduct. Doc. 57, ¶ 135.

(R & R at 1897–98.)

In Section III, the R & R reviews the controlling law with

respect to arbitration. Plaintiff has not challenged the R & R's actual recitation of the law; rather, he challenges only the application of that law to the facts of the current case. Finding the R & R's presentation of the legal standard to be correct, the Court need not fully reiterate that standard herein and repeats it only to the extent necessary to give clarity to the discussion below.

As properly noted by the R & R, a court has four tasks when considering a motion to stay proceedings and compel arbitration:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement[;] third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

(R & R at 1899 [quoting *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000) ].)

As to the first and second tasks, the R & R notes:

> ... Plaintiff admits the existence of the Employment Contract and the arbitration provision and does not contend that the arbitration provision is unconscionable. Rather, Plaintiff opposes the Motion based on his contention that the arbitration provision is narrow and specific and the claims asserted in this litigation are not within its scope.

(*Id.* [citing Doc. Nos. 102 & 136].) The R & R explains that, before reaching the question of the scope of the arbitration provision in plaintiff's employment contract with the Board, "it needs to address a related, but different, question: Who is to decide which disputes fall within the scope of the arbitration provision, i.e., did the parties agree to arbitrate arbitrability?" (*Id.*) As to that related question, the R & R concludes: "In this case, ... the parties did clearly and unmistakably agree to arbitrate arbitrability." (*Id.* at 1900.)

Considering the scope of the arbitration provision, particularly in light of the fact that plaintiff has sued two individuals who were not party to the employment contract (Thomas Armstrong and Lisa Kamlowsky), the R & R concludes that, for the most part, all of plaintiff's claims against all three defendants are "at least arguably" within the "very broad" scope of the arbitration clause. (R & R at 1902–03.) The R & R carves out the sixth cause of action and a portion of the twelfth cause of action as exceptions,[4] and determines that, otherwise, "it is the arbitrator who should determine whether Plaintiff's Causes of Action ... are in fact within the scope of the parties' arbitration agreement." (*Id.* at 1903–04.)

**\*6** Turning to the third task, the R & R concludes that, under both the AAA Rules and controlling case law, there is no indication that it was Congress's intent to make federal statutory claims non-arbitrable. (*Id.* at 1905.)

Finally, the R & R rejects any suggestion that it should not recommend arbitration simply because of the age of the case and the status of plaintiff as a member of the armed forces. (*Id.* at 1906.)

## PLAINTIFF'S OBJECTIONS

As noted above, under the Federal Rules and controlling case law, the Court need only provide de novo review of matters that are properly objected to. To the extent plaintiff has merely repeated verbatim the arguments made in his opposition to defendants' motion to compel arbitration and stay proceedings, those "objections" need not, and will not, be addressed.

### A. Arbitrability of Claims Against Non–Parties to the Employment Contract

First, Plaintiff objects to the R & R's conclusion that, because defendants Armstrong and Kamlowsky are alleged in the second amended complaint to be "employers," they are subject to the arbitration clause in the employment contract even though neither is a party to that contract. Plaintiff argues that whether these two defendants can enjoy the benefit of the contract's arbitration clause requires analyzing whether they were intended third-party beneficiaries of the contract. (Objections at 1961.) This is a new argument, never raised before the magistrate judge.[5]

... Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.,* permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate. *See United States v. Waters,* 158 F.3d 933, 936 (6th Cir.1998) (citing *Marshall v. Chater,* 75 F.3d 1421, 1426–27 (10th Cir.1996) ("issues raised for the first time in objections to magistrate judge's report and recommendation are deemed waived")); *see also Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994); *Paterson–Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988); *Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co., Inc.,* 747 F.Supp. 1299, 1302–03 (S.D.Ill.1990).
*Murr v. United States,* 200 F.3d 895, 902 n. 1 (6th Cir.2000); *see also Broad v. N. Pointe Ins. Co.,* No. 5:11CV2422, 2014 WL 1097925, at *9 n. 7 (N.D.Ohio Mar.19, 2014) (citing *Murr* and other cases).
Because this is a new argument made to the Court by way of objection to the R & R, it cannot be the basis for asserting error in the R & R. This argument need not be considered by the Court upon de novo review. That said, the third-party beneficiary doctrine has no applicability here.

Whether or not plaintiff's claims are subject to arbitration as to *all* of the defendants, even those who are not parties to the employment contract, is governed by the arbitration provision itself. This was made clear in *Landis v. Pinnacle Eye Care, LLC,* 537 F.3d 559 (6th Cir.2008). There, an optometrist, who was a member of the National Guard, had an employment contract with Louisville Optometric Centers III ("LOC") under which the optometrist agreed to "resolve any controversy, dispute or disagreement arising out of or relating to [the] Agreement" through negotiation or, if that proved unsuccessful, through arbitration. *Id.* at 560 (alteration in original). The optometrist brought suit against LOC, alleging employment discrimination based on his military service and age. He also named as defendants LOC's primary optometrist, its manager, and its management company, none of whom were parties to the employment contract. On defendants' motion, the district court stayed all proceedings and ordered arbitration. Noting that the employment contract contained an integration clause, the court of appeals affirmed, concluding that anything pertaining to the employment relationship was subject to arbitration. It also concluded that "[t]he district court correctly held that the claims against [the non-parties to the employment contract] were subject to the arbitration clause of the employment agreement ... [because] [t]hese parties were employers within the meaning of USERRA,

38 U.S.C. § 4303(4)(A), and the claims against them arose in their capacities as managers of LOC offices." *Id.* at 561.

**\*7** The same reasoning applies here. Any objection based on a third-party beneficiary argument is overruled.

## B. Scope of Arbitration

Plaintiff's next objection[6] relates to the R & R's conclusion that the parties agreed to arbitrate arbitrability *and* that all but claim six and part of claim twelve at least arguably fall within the intended scope of the arbitration clause.

Plaintiff's employment contract provided that, during its term, he "may be removed, suspended or demoted for cause pursuant to ORC 5126.23." (Doc. No. 57–1 at 430.) It further provides:

> ... Any dispute, claim or cause of action arising out of such removal, suspension or demotion shall be submitted to binding arbitration under the then existing rules of the American Arbitration Association.
>
> * * *
>
> The question of arbitrability must be raised by either party before the arbitrator hears the merits of the dispute. If a question of arbitrability is raised, the arbitrator may either rule on the issue or reserve ruling and hear the merits of the dispute before issuing a ruling on this question.

(*Id.* at 431–32.)

Plaintiff asserts that the arbitration provision is "not a broadly worded provision that provides 'for any controversy or claim arising out of or related to this Agreement or the breach thereof' to be arbitrated." (Objections at 1963 [repeating the argument in Doc. No. 102 at 1229].) He asserts that the provision is "narrowly crafted ... to replace only the statutorily dictated administrative procedures for a ... management employee[,] ... not to replace the courts as venues for USERRA, FMLA, § 1983 claims, constitutional claims, breach of contract claims, or other types of claims." (*Id.* at 1964 [repeating the argument in Doc. No. 102 at 1229–30].) He argues that "such claims do not *arise out of* any removal or suspension[,] [but rather] *arise out of* the violation of the plaintiff's constitutional rights." (*Id.* at 1964, underlining in original.) Nor, he argues, were "the retaliation claims brought under USERRA, the FMLA, and Section 1983" contemplated by the parties to be

McGee v. Armstrong, Not Reported in F.Supp.3d (2014)

"encompassed within the narrow scope of the arbitration clause at issue and do not arise out of the removal." (*Id.* at 1964–65.)[7]

Plaintiff is simply wrong in this regard. The contract provision broadly requires arbitration for *"[a]ny* dispute, claim or cause of action *arising out of* such removal, suspension or demotion[.]"* (Doc. No. 57–1 at 431, emphases added.) Here, all but the two claims excluded by the R & R, even the statutory claims and the constitutional claims raised thereunder, at least arguably *arise out of* the defendants' "removal" of plaintiff. Plaintiff mischaracterizes the source of his claims—his claims arose because he was removed, and that removal *might* have violated statutory or constitutional rights. "Where the arbitration clause is broad, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators." *Highlands Wellmont Health Network Inc. v. John Deere Health Plan Inc.,* 350 F.3d 568, 577 (6th Cir.2003) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ( "[T]here is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.") (citations and quotes omitted)).

**\*8** Plaintiff argues that "[t]he question is not whether [his] federal and state claims generally concern the subject of the employment agreement, but whether those claims are wrongs independent of the breach of the employment agreement." (Objections at 1965.)[8] Plaintiff's statement of the law is correct, as the Sixth Circuit has stated: "A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue." *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 395 (6th Cir.2003), cited favorably by *Panepucci v. Honigman Miller Schwartz & Cohn LLP,* 281 F. App'x 482, 487–88 (6th Cir.2008) ("[t]he key issue in [plaintiff's] suit is whether she was paid less and denied work because of illegal discrimination[,]" a determination that "will require reference to the Partnership Agreement[ ]" that contained the arbitration provision).

The gravamen of most of plaintiff's causes of action (with the exception of the sixth and part of the twelfth) is that defendants wrongfully terminated him, but claimed to have had cause for doing so—cause that plaintiff alleges

was a mere pretext for discrimination and for violation of rights secured to him by the Constitution and various federal and state statutes. Thus, as in *Panepucci,* "[t]he key issue ... is whether [he] was [terminated] because of illegal discrimination[ ]" and/or other unconstitutional practices. 281 F. App'x at 487.

This Court's role in the face of a motion to compel arbitration is to determine whether the claims arguably fall within the arbitration provision in the employment contract. If they do, since the parties also agreed to arbitrate arbitrability, under the policy favoring arbitration, it is the arbitrator who should decide which of the claims are actually arbitrable under the contract. Here, if the Court were to attempt to resolve plaintiff's statutory claims independent of arbitration, it would be confronted with the question of whether defendants properly and legitimately terminated plaintiff's employment, a matter that "aris[es] out of ... removal, suspension or demotion[.]" (Doc. No. 57–1 at 431.) Plaintiff's claims, therefore, fall within that provision of the employment contract.

## CONCLUSION

For the reasons set forth above, the Court concludes that plaintiff's statutory and constitutional challenges to his termination are arguably subject to arbitration because they must be resolved with reference to the employment relationship set forth in the employment contract. In so concluding, the Court, as did the R & R, emphasizes that this ruling is not intended as a suggestion to the arbitrator as to what the scope or outcome of the arbitration should be.

Defendants' motion to compel arbitration and to stay all proceedings in this Court until that arbitration is concluded is **GRANTED.** The Clerk is directed to mark the docket as "stayed." Counsel for the parties are directed to keep the Court apprised of the status of the arbitration.

**\*9 IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3012879

Footnotes

McGee v. Armstrong, Not Reported in F.Supp.3d (2014)

1    Defendants' motion is Doc. No. 83. Plaintiff filed his opposition (Doc. No. 102), and defendants filed a reply (Doc. No. 104). At the Magistrate Judge's request (Doc. No. 130), each side also filed a supplemental brief relating to the merits of the motion. (Defendants' brief, Doc. No. 135; plaintiff's brief, Doc. No. 136.)

2    The Court's review of the R & R was delayed by a stay of proceedings from January 31, 2013 through April 17, 2014, necessitated by plaintiff's having been called to active military duty. The Court undertook the review upon being notified that plaintiff had returned from active duty.

3    The factual background is accepted solely for purposes of ruling on the current motion and objections to the R & R. This should not be construed as fact-finding since any and all facts will be put to the appropriate burden of proof if and when the case proceeds before this Court.

        FN) Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq., Family [and] Medical Leave Act ("FMLA"), 42 U.S.C. § 1983 (due process, equal protection, First Amendment, freedom of speech, freedom of association, freedom to petition for redress of grievances), Ohio Civil Rights Act, O.R.C. § 4112.01 et seq., wage and hour violations for failure to pay final paycheck and accrued vacation after termination, breach of contract, and defamation. Doc. 57, Doc. 102, p. 1.

4    These exceptions involve plaintiff's claims that defendants breached his employment contract by failing to pay him the required salary and pay differential during his military leave, claims that do not "arise out of [his] 'removal, suspension or demotion[.]' " (R & R at 1903.) The R & R briefly considers whether the fourteenth cause of action (defamation) might also be an exception, but decides it is not. (*Id.* at 1903–04.)

5    In response to defendants' motion, plaintiff argued, *inter alia,* that he had raised claims against two defendants who were not parties to the employment contract and, therefore, were not "covered by" the arbitration clause. (Response to Motion, Doc. No. 102 at 1229.) Plaintiff offered no further explanation as to why he believed two defendants identified as "employers" in the second amended complaint would not be covered by the clause. Even in his supplemental brief, he failed to change or expand upon this argument, simply holding fast to his position that his claims against Armstrong and Kamlowsky are not "subject to" arbitration. (Supp. Brief, Doc. No. 136 at 1882.)

6    The bulk of plaintiff's argument is repeated verbatim from his opposition to the underlying motion and, therefore, need not be addressed by this Court as a proper "objection."

7    Plaintiff also asserts that, if the employer contemplated that "[r]etaliation for protected free speech and petition for redress of grievances" would be encompassed by the arbitration clause, then the clause "should be held unconscionable." (Objections at 1965.) This argument need not be addressed because it was never raised before the magistrate judge.

8    In making this argument, plaintiff relies upon *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292 (9th Cir.1994). Aside from the fact that Ninth Circuit law is not controlling in the Sixth Circuit, the case is inapplicable and clearly distinguishable. In *Tracer Research,* the two parties had entered into a licensing agreement under which defendant NESCO was licensed to use a chemical tracer process developed and marketed by Tracer Research. The licensing agreement contained a provision that "[i]n the event any controversy or claim arising out of this Agreement cannot be settled by the parties [ ], such controversy or claim shall be settled by arbitration." 42 F.3d at 1295 (alterations in original). NESCO also signed a confidentiality and nondisclosure agreement. After a couple years, the parties terminated the licensing agreement, but NESCO allegedly continued to use the process. Tracer Research sued, seeking damages and injunctive relief, *inter alia,* for trademark infringement and misappropriation of trade secrets. The district court issued a preliminary injunction and, over Tracer Research's objections, referred the entire matter to arbitration. Subsequently, based on the outcome of the arbitration, the district court dissolved the injunction. The court of appeals, finding it had jurisdiction, reversed and remanded. It concluded that the trade secrets claims were not arbitrable under the clause in the licensing agreement for arbitration of claims "arising out of" the agreement, since a misappropriation claim was a tort claim that was independent of any breach of the licensing and nondisclosure agreements. In so ruling, the court noted that NESCO was not arguing that the licensing agreement gave it the right to continue using Tracer's trade secrets, but, rather, that Tracer had no protectable trade secrets.
        By contrast, in the instant case, all claims but the two already identified do more than just "generally concern the subject of the employment agreement[ ]" (Objections at 1965); rather, the claims, at least *arguably,* "aris[e] out of [plaintiff's] removal[.]" (Doc. No. 57–1 at 431.) The parties contractually agreed that "the resolution of any [such] matter regarding ... removal[ ]" would be resolved through arbitration, and, at the very least, the arbitrator must be the one to decide whether these matters are arbitrable. (*Id.* at 431.)

**McGee v. Armstrong, Not Reported in F.Supp.3d (2014)**

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

354 Fed.Appx. 972
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Joseph T. OZORMOOR, Plaintiff–Appellant,
v.
T–MOBILE USA, INC., Defendant–Appellee.

No. 08–2596.
|
Dec. 3, 2009.

**Synopsis**
**Background:** Former customer sued wireless telephone
services provider in state court, alleging breach of
contract, violations of Michigan Consumer Protection
Act, intentional infliction of emotional distress, and
defamation. After provider removed action, the United
States District Court for the Eastern District of Michigan,
2008 WL 2518549, granted provider's motion to compel
arbitration and stay proceedings, and then, 2008 WL
5188775, denied reconsideration and, 2008 WL 5188772,
vacated stay and dismissed proceedings. Former customer
appealed.

**Holdings:** The Court of Appeals, Kethledge, Circuit
Judge, held that:

[1] legal certainty required to dismiss action for failure to
satisfy $75,000 amount-in-controversy requirement of
diversity jurisdiction did not exist;

[2] arbitration clause in former customer's contract with
provider was not procedurally unreasonable, as required
for clause to be unconscionable under Michigan law;

[3] arbitration clause was not unenforceable due to lack of
mutuality; and

[4] after ordering arbitration, district court could dismiss,
rather than stay, action.

Affirmed.

**\*973** On Appeal from the United States District Court for
the Eastern District of Michigan.
Before: GRIFFIN and KETHLEDGE, Circuit Judges;
CARR, Chief District Judge.*

**Opinion**

KETHLEDGE, Circuit Judge.

**\*\*1** Plaintiff Joseph Ozormoor appeals the district court's
orders compelling arbitration and dismissing his
complaint. He contends that the arbitration clauses in his
contracts with defendant, T–Mobile USA, Inc., are
unenforceable, and that his suit should have been stayed
pending arbitration. We reject his arguments, and affirm.

I.

In 2003, Ozormoor entered into a one-year contract with
T–Mobile for cell phone service. That contract expired,
and in 2005 Ozormoor agreed to another one-year
contract with T–Mobile. Both the 2003 and 2005
contracts included provisions requiring mandatory
arbitration of all claims against T–Mobile.

Throughout late 2005, Ozormoor complained to T–
Mobile about poor cell phone service, unpaid rebates, and
international voice mail charges. Ozormoor was unhappy
with the resolution of these complaints, so in December
2005 he terminated his contract. T–Mobile assessed
Ozormoor cancellation fees for his early termination,
which Ozormoor refused to pay. T–Mobile thereafter
referred his account to a debt-collection agency.

In response to the debt-collection efforts, Ozormoor filed
a lawsuit against T–Mobile in Michigan state court
seeking over $600,000 in damages. T–Mobile removed
the case to federal court and filed a motion to compel
arbitration, which the district court granted. T–Mobile
then filed a motion to dismiss, which the court likewise
granted. This appeal followed.

II.

[1] Although neither party raises the issue, we have "an independent obligation to ensure that subject matter jurisdiction exists." *Olden v. LaFarge Corp.,* 383 F.3d 495, 498 (6th Cir.2004). The only basis for jurisdiction here is diversity jurisdiction, which requires that "the matter in controversy exceed[ ] the sum or value of $75,000[.]" 28 U.S.C. § 1332(a).

In determining whether a claim's value exceeds $75,000, we use the plaintiff's alleged amount unless "it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed[.]" *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). We generally find such certainty only when state law categorically bars the plaintiff from recovering the necessary amount. *See Kovacs v. Chesley,* 406 F.3d 393, 395–97 (6th Cir.2005). When it is inconceivable, however, that the plaintiff will recover $75,000 in damages, we deny jurisdiction because we "find to a legal certainty that these claims are really for less than the jurisdictional amount." *Gill* **\*974** *v. Allstate Ins. Co.,* 458 F.2d 577, 579 (6th Cir.1972); *see also St. Paul Mercury Indem. Co.,* 303 U.S. at 292, 58 S.Ct. 586 (jurisdiction absent "if, upon the face of the complaint, it is obvious that the suit cannot involve the necessary amount"). The latter rule is infrequently invoked; courts have found jurisdiction in cases, like this one, where the damages claim appears inflated. *See, e.g., Martinez v. Reserve Life Ins. Co.,* 879 F.2d 865, at *3 (9th Cir.1989) (table) (upholding jurisdiction on an emotional-distress claim when plaintiff's recovery of the necessary amount is "unlikely" but "not inconceivable"); *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982) (stating that "dismissal is not warranted" even when the "allegations leave grave doubt about the likelihood of a recovery of the requisite amount").

**\*\*2** The jurisdictional question here is a close one. Ozormoor's claimed amount of $600,000 is surely overstated. The same could almost certainly be said about a claim for $75,000; but we need legal certainty to dismiss for lack of jurisdiction. Ozormoor has stated claims for breach of contract, violations of the Michigan Consumer Protection Act, intentional infliction of emotional distress, and defamation. His theory appears to be that T–Mobile singled him out for especially bad treatment. He seeks both compensatory and exemplary damages for his claims, and Michigan law places no limit on his recovery. Under these circumstances, the caselaw supports finding jurisdiction here—but only just barely.

III.

[2] Ozormoor challenges the district court's order compelling him to arbitrate his claims. He contends that the arbitration provisions in his contracts are unconscionable. Whether a contract term is unconscionable is a question of law that we review *de novo. Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 323 (6th Cir.1998).

Under Michigan law, a contract term is unconscionable only if it is procedurally and substantively unreasonable. *Allen v. Mich. Bell Tel. Co.,* 18 Mich.App. 632, 171 N.W.2d 689, 692 (1969). The party asserting the defense of unconscionability bears the burden of proving it. *Morris v. Metriyakool,* 418 Mich. 423, 344 N.W.2d 736, 742 (1984).

To be procedurally unreasonable, a party must show "an absence of meaningful choice on the part of one of the parties[.]" *Allen,* 171 N.W.2d at 692. Thus, when a party has "an alternative source with which it could contract," the contract cannot be procedurally unreasonable. *Horton Farms,* 166 F.3d at 324.

Ozormoor has not shown procedural unreasonableness here. The district court found that "there are several wireless service providers for him to choose from," a fact that Ozormoor's own complaint confirms; he signed a contract with Verizon less than a week after canceling his T–Mobile contract. And contrary to Ozormoor's assertions, he is not entitled to a wireless provider that offers a "camera cell phone with [a] long-lasting Lithium-ion battery providing 290 talk-time minutes and 320 hours standby battery life." Ozormoor's Br. at 28. The unconscionability doctrine only requires that reasonable alternatives be available, not identical ones. *See All Makes S–V, Inc. v. Ameritech Publ'g, Inc.,* Case No. 221188, 2001 WL 951381 at *2 (Mich.Ct.App. Aug.21, 2001) (the existence of "comparable" alternatives precludes finding procedural unreasonableness). Ozormoor has "failed to present evidence that [he] searched for other alternatives and that there were none." *Horton Farms,* 166 F.3d at 324. His contention of procedural unreasonableness therefore fails; and that defeats his unconscionability claim.

**\*975** [3] Ozormoor also argues that the arbitration provision is unenforceable because it did not impose mutual obligations. He asserts that he is required to submit his claims to arbitration, but T–Mobile is not required to do the same; therefore the arbitration provision lacks mutuality.

**\*\*3** This argument is meritless. Arbitration provisions need not require both parties to arbitrate their claims, so

48 Communications Reg. (P&F) 1455

long as the contract as a whole imposes mutual obligations on both parties. *See Glazer v. Lehman Brothers, Inc.,* 394 F.3d 444, 452–54 (6th Cir.2005); *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.,* 878 F.2d 167, 169 (6th Cir.1989). Here, the contracts required Ozormoor to make payments in return for T–Mobile's provision of cell phone service. Thus, the contracts imposed mutual obligations, and the arbitration provisions are enforceable. The district court properly ordered arbitration.

## IV.

[4] Ozormoor challenges the dismissal of his suit, asserting that 9 U.S.C. § 3 requires district courts to stay suits pending arbitration rather than dismiss them. We have

already rejected that argument. *See Arnold v. Arnold Corp.,* 920 F.2d 1269, 1275 (6th Cir.1990) (stating that it was not "error for the district court to dismiss the complaint" after ordering arbitration); *see also Hensel v. Cargill, Inc.,* 198 F.3d 245, at *4 (6th Cir.1999) (table) (upholding dismissal of "litigation in which all claims are referred to arbitration"). Thus, the district court did not err in dismissing Ozormoor's suit.

The district court's orders compelling arbitration and dismissing the complaint are affirmed.

## All Citations

354 Fed.Appx. 972, 2009 WL 4408187, 48 Communications Reg. (P&F) 1455

Footnotes

*      The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 7157419
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Ann L. SILVERMAN, Plaintiff/Counter,
Defendant–Appellee/Cross–Appellant,
v.
Alexander R. SPITZER, Defendant/Counter,
Plaintiff–Appellant/Cross–Appellee.

Docket No. 317682.
|
Dec. 16, 2014.

Chippewa Circuit Court; LC No. 12–012390–DM.

Before: M.J. KELLY, P.J., and CAVANAGH and
METER, JJ.

**Opinion**

PER CURIAM.

**\*1** In this suit for divorce, defendant Alexander R. Spitzer
appeals by right the trial court's order denying his motion
to set aside the settlement agreement and the court's
decision to enter the consent judgment of divorce. On
cross-appeal, Silverman argues the trial court erred when
it denied her motion for sanctions against Spitzer for
filing a frivolous motion to set aside the parties'
settlement agreement. Because we conclude there were no
errors warranting relief, we affirm.

I. BASIC FACTS

Silverman married Spitzer in January 1980. Silverman
and Spitzer are medical doctors and earn substantial
incomes as part of their practices; Silverman is a
gastroenterologist and Spitzer is a neurologist. Over the
course of their marriage, Silverman and Spitzer had four
children. They lived in West Bloomfield, but later moved
to Sault St. Marie. They owned real property in West
Bloomfield, Ann Arbor, Sault St. Marie, and on Mackinac
Island.

In September 2012, Silverman sued Spitzer for a divorce.
At the time of the divorce, Silverman and Spitzer had
only one child who was still a minor, and she was nearly
17 years of age. As such, the primary issues in the divorce
were the division of the marital estate and whether the
court should order spousal support.

Spitzer counter-sued for divorce in October 2012. In his
counter complaint, Spitzer asked the trial court to order
Silverman to pay spousal support. Spitzer retained Jay
Abramson, who he later stated was his longtime
counsellor, to assist him with his divorce. However,
Abramson worked out of West Bloomfield, Michigan, so
Spitzer also retained a lawyer who worked in Sault St.
Marie, Michael Winnick.

Spitzer moved for temporary spousal support in that same
month. In his motion, he alleged that Silverman earned
approximately $650,000 per year and that he earned only
$250,000 per year. He asked the trial court to order
Silverman to pay him $3,875 per week in order to
equalize their incomes.

Spitzer is, by his own account, an avid pilot and he and
his wife owned a small airplane through a limited liability
company. In October 2012, Spitzer incurred what he
described as a "propeller strike" while landing the plane
at Sault St. Marie. After the incident, Silverman's lawyer,
Leanne Deuman, aggressively pursued discovery about the
incident—including details about the damage to the
plane and the costs to repair it.

In December 2012, Spitzer moved to limit the scope of
discovery concerning the airplane. In the motion, which
was signed by Winnick, Spitzer maintained that
Silverman was attempting to obtain information about the
incident for an improper purpose. Specifically, he argued
that Silverman intended to use the information to pressure
him to drop his request for alimony or risk a report to the
Federal Aviation Administration (FAA) or National
Transportation Safety Board that might result in the loss
of his pilot's license. Accordingly, Spitzer asked the court
to limit the scope of discovery to information relevant to
valuing the airplane and the extent of any expenditure of
marital assets to repair it.

**\*2** In January 2013, Spitzer filed a motion that was signed
by Abramson in which he asked the trial court to declare
Silverman to be in default on the basis of allegedly
criminal conduct. Spitzer stated that Silverman's lawyer,
Deuman, sent his lawyer, Winnick, two letters in which

she threatened to report the incident with the airplane to the FAA unless Spitzer immediately provided her with certain information and turned over some marital property with substantial value. Spitzer maintained that the threats amounted to felonies, including racketeering. On the basis of this "criminal misconduct", Spitzer asked the trial court to exercise its equitable powers to dismiss Silverman's complaint for divorce and hold her in default on Spitzer's counter complaint. Spitzer—again acting through Abramson—also asked for leave to amend his complaint to include allegations that Silverman engaged in extortion and racketeering. Evidence would later show that Winnick refused to participate in the drafting or filing of these motions.

In Silverman's response, Deuman stated that her client might have a duty as an owner of the plane to report the accident to the FAA and, because Spitzer refused to disclose the details of the accident, she could not determine whether she had to do so. It was for that reason that she threatened to file a report unless Spitzer turned over the relevant information. She further claimed that Spitzer's lawyer, Winnick, misrepresented the severity of the incident, which appeared to involve $140,000 in repairs. Because the motion to dismiss was not well-grounded in fact or law, Deuman asked the trial court to deny the motion and determine that it was frivolous. She asked the trial court to sanction both Spitzer and Abramson for filing the motion.

In January 2013, the trial court denied Spitzer's motion for leave to amend with prejudice. In separate orders, it also denied Spitzer's motion to limit discovery and to dismiss Silverman's complaint and enter a default. Winnick continued to represent Spitzer along with Abramson.

In February 2013, Silverman moved to have Abramson recuse himself from the case. She argued that he must recuse himself because he had represented both Silverman and Spitzer in the past and had a conflict of interest. In response, Abramson asked the trial court to deny the motion. He characterized Silverman's motion as an effort to interfere with Spitzer's right to be represented by counsel of his choice. He attached a copy of his response to a request for investigation, which he intended to file with the Attorney Grievance Commission after he returned from a trip overseas. A hearing was scheduled for the motion later that same month.

Silverman moved to adjourn the hearing on Spitzer's motion for interim spousal support. In her motion, Silverman alleged that Spitzer recently negotiated a check for $250,000 to repair the airplane and stated that she

needed time to conduct further discovery before she could adequately respond to Spitzer's claimed need for spousal support.

**\*3** On the day of the hearing to consider—along with other matters—whether Abramson should be compelled to recuse himself, Spitzer entered into a settlement agreement with Silverman. Winnick represented Spitzer at the time because Abramson was overseas.

In the settlement, Spitzer and Silverman agreed that Silverman would get her jewelry and retirement benefits, one home in Sault St. Marie and the condominium in Ann Arbor. The parties agreed that Spitzer would get one of the homes in Sault St. Marie, the properties on Mackinac Island, and the home in West Bloomfield. He also received all the membership interests in the limited liability company that owned the parties' airplane. They would each also retain any retirement or pension benefits that either held in his or her own name, as well as their personal property and vehicles. Finally, they agreed that neither party would be awarded spousal support and provided that spousal support would "be forever barred." The parties signed the agreement and dated it February 21, 2013.

Before accepting the settlement, the trial court heard testimony from Silverman and Spitzer concerning the consent judgment. Both Silverman and Spitzer testified that they entered into the agreement after consulting with their lawyers and both agreed that it was in their best interest to settle. Spitzer also agreed that he voluntarily, intelligently, and knowingly entered into the agreement on the basis of his understanding of the options open to him.

In March 2013, Silverman moved for entry of a judgment of divorce incorporating the settlement agreement.

In that same month, Lea Ann Sterling and Steven Paciorka substituted for Winnick as Spitzer's lawyers along with Abramson. Spitzer then moved—through his new lawyers—to have the settlement agreement set aside. Spitzer argued that the settlement was invalid because he was coerced or operating under duress when he entered into the settlement. He also maintained that the agreement must be set aside because it was unconscionable. Specifically, Spitzer relied on his allegation that Silverman makes substantially more than him and received approximately $2.4 million of the marital estate, while he received only around $1.6 million in assets.

Spitzer attached copies of his email and written correspondence with Winnick in support of his motion to

set aside the settlement. The correspondence revealed that Winnick frequently addressed Spitzer with strong—even unprofessional—language and tones. In particular, Winnick warned Spitzer that it was his belief that Spitzer might have engaged in misconduct when he used a power of attorney from his father to transfer funds from his father's accounts and used his father's trust to pay for repairs to the airplane. Winnick wrote that the transfers might expose Spitzer to civil or criminal liability and opined that his conduct compromised the viability of his claims in the divorce. Winnick stated that he would continue to treat Spitzer as "at risk for criminal indictment" until he reduced the transactions to writing and ensured that they were transparent and proper. Winnick also vigorously urged Spitzer to settle the divorce in order to avoid what he characterized as the risk of criminal investigation that might leave Spitzer without a license to practice medicine.

**\*4** In response to the motion to set aside, Silverman argued that the record showed that Spitzer was not coerced or operating under duress when he agreed to the settlement. Silverman stated that her lawyer's letters concerning the airplane incident were sent months prior to the settlement and could not have operated to coerce Spitzer into settling. Because she and her lawyer did not otherwise participate in any acts to coerce Spitzer, the settlement must be enforced. Silverman also argued that duress did not apply because there was no evidence that Spitzer did not have the mental capacity to understand and enter into the settlement agreement. She further maintained that there is no basis for setting the agreement aside as unconscionable; even though the agreement did not provide for an equal distribution of the marital assets, the division was not so inequitable as to shock the conscience. Finally, Silverman asked the court to sanction Spitzer and his lawyer for filing a frivolous motion to set aside the settlement agreement.

In April 2013, Silverman formally requested sanctions under MCR 2 .114. She asked the trial court to award her costs and attorney fees for defending against a frivolous motion to set aside the settlement agreement.

The trial court heard arguments and took testimony concerning the events surrounding Spitzer's decision to enter into the settlement agreement in March, April, and June 2013. On August 6, 2013, the trial court heard closing arguments and announced its decision.

The court stated that Spitzer did not contend "that he was prevented from understanding ... the nature and effect of the agreement because of fraud, mutual mistake or severe distress." Rather, he claimed the settlement was the result

of "duress or coercion." The trial court found that Spitzer was not coerced into entering into the agreement by Deuman's previous threats to report the landing incident to the FAA because Spitzer knew that the landing incident did not need to be reported and would not result in any sanctions. The court stated that the "landing mishap" was not "even a consideration" when Spitzer negotiated the settlement.

The court similarly rejected the contention that Winnick coerced Spitzer into settling by stating that Spitzer's handling of his father's money was suspect. If there is a dispute over the handling of those funds, that dispute would be between Spitzer and the trust and had nothing to do with the decision to settle.

Finally, the trial court rejected Spitzer's contention that the settlement agreement was unconscionable. The court recognized that Spitzer may have received less than half the marital estate, but it determined that the division was not itself unconscionable. The trial court denied the motion to set aside the settlement and indicated that it would sign the judgment of divorce.

On August 6, 2013, the trial court entered a judgment of divorce, which incorporated the parties' settlement agreement. On the same day, the trial court entered an order denying Spitzer's motion to set aside the settlement.

**\*5** These appeals followed.


## II. MOTION TO SET ASIDE


### A. STANDARDS OF REVIEW

Spitzer argues on appeal that the trial court erred when it denied his motion to set aside the settlement agreement. He maintains that the trial court misunderstood the law applicable to a claim that a party's consent was induced by coercion and improperly excluded relevant evidence. Considering the totality of the evidence, Spitzer states, the trial court should have found that he was coerced into settling. This Court reviews a trial court's decision to set aside a settlement agreement for an abuse of discretion. See *Groulx v. Carlson,* 176 Mich.App 484, 493; 440 NW2d 644 (1989); *Tinkle v. Tinkle,* 106 Mich.App 423, 426; 308 NW2d 241 (1981) (declining to disturb the trial court's finding that the petitioner knowingly and voluntarily entered into the settlement agreement and, accordingly, concluding that the trial court did not abuse

its discretion when it denied the petition to set aside the agreement). "The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact." *Lafayette Dramatic Productions, Inc. v. Ferentz,* 305 Mich. 193, 216; 9 NW2d 57 (1943). This Court reviews the factual findings underlying a trial court's decision for clear error. *Vittiglio v. Vittiglio,* 297 Mich.App 391, 398; 824 NW2d 591 (2012). Finally, this Court reviews a trial court's evidentiary decisions for an abuse of discretion. *Barnett v. Hidalgo,* 478 Mich. 151, 158159; 732 NW2d 472 (2007).

## B. ANALYSIS

Generally, trial courts must uphold the validity of settlement agreements reached through negotiations and agreement by the parties to a divorce action. *Kline v. Kline,* 92 Mich.App 62, 71; 284 NW2d 488 (1979). However, as with any contractual agreement, the parties must validly consent to the settlement before it will bind them. *Vittiglio,* 297 Mich.App at 400. Accordingly, a trial court may set aside a settlement agreement that was the result of fraud, duress, or mutual mistake, or where one of the parties lacked the mental capacity to enter into the agreement as a result of severe distress. *Van Wagoner v. Van Wagoner,* 131 Mich.App 204, 209214; 346 NW2d 77 (1983).

As the trial court aptly noted, Spitzer did not argue that the settlement agreement had to be set aside because he lacked the mental capacity to understand it or because it was the result of fraud or mistake. Instead, Spitzer argued that the settlement agreement had to be set aside because Silverman's lawyer, along with Winnick, forced him to enter into it. Specifically, he maintained that he was so overwhelmed by Winnick's threats of civil and criminal liability and Deuman's threats to report him to the FAA that his decision to enter into the settlement agreement cannot be said to be voluntary—he only acted out of fear that he would lose his pilot's license and perhaps his medical license.

Our Supreme Court has recognized that duress or coercion may warrant setting aside an agreement. *Lafayette Dramatic Prod.,* 305 Mich. at 216. Duress involves a compulsion or constraint by which a person is illegally forced to do or forebear some act by a threat that would cause a person of ordinary firmness to fear serious injury to person or reputation. *Id.* In order to establish duress, the party seeking to set aside the agreement must show that the party applying the duress acted unlawfully. See *Apfelblat v. Nat'l. Bank Wyandotte–Taylor,* 158

Mich.App 258, 263; 404 NW2d 725 (1987); see also *Hackley v. Headley,* 45 Mich. 569, 576; 8 NW 511 (1881) (stating that it is not duress for a party to threaten to do what he or she has a lawful right to do). Coercion similarly involves the application of physical or moral force to cause another to do something that the person would not otherwise have done. *Lafayette Dramatic Prod.,* 305 Mich. at 216. Coercion, like duress, must involve wrongful conduct: "The coercion, however, must be illegal in nature, manifestly unjust, or purposely oppressive." *Stott Realty Co. v. Detroit Savings Bank,* 274 Mich. 80, 84; 264 NW 297 (1936). A claim of duress or coercion "will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Payne v. Cavanaugh,* 292 Mich. 305, 308; 290 NW 807 (1940). Rather, the evidence must show that the person affected by the duress or coercion "ceased to be a free moral agent and was thereby incapacitated to consent to the agreement...." *Meier v. Schulte,* 327 Mich. 206, 212; 41 NW2d 351 (1950).

### 1. THE AIRPLANE INCIDENT

**\*6** With regard to Silverman's threats, Spitzer relied heavily on the letters sent by Deuman in which she threatened to file a report with the FAA.

In a letter dated October 24, 2012, Deuman brought several issues to Winnick's attention. She addressed Silverman's Morgan Stanley account, an appraisal for the Mackinac Island property, and a stipulation concerning custody of the parties' remaining minor child. She also asked about some personal property:

> I would like to suggest that your client allow my client to access the home to remove all of her furs, her jewelry, and two paintings; one of a girl and one of a boy that she had custom commissioned. These are personal effects to her and there is no reason why she should not obtain them. If I do not have a positive response on this by November 2[,] I will proceed with placing this matter for decision in front of [the judge].

After asking Winnick to have his client turn over the personal property, Deuman proceeded to ask Winnick to

provide her with documentation concerning Spitzer's recent incident with the plane:

> I would like you to provide me all documentation regarding Dr. Spitzer's recent crash of his airplane. I presume that there is an insurance claim being filed, and I demand to see a copy of that as soon as possible. If this is not forthcoming, a report will be made appropriately to the FAA.

In a second letter to Winnick, which was dated November 1, 2012, Deuman expressed her frustration with Spitzer's refusal to cooperate. Deuman threatened to file a report with the FAA about the plane crash unless Spitzer delivered several things to Silverman: the insurance policy on the plane, the report of the accident, Silverman's jewelry, Silverman's furs, and the requested paintings. Although Deuman demanded the jewelry, furs, and paintings, it was evident that her frustration primarily involved Spitzer's refusal to provide information about his recent crash, which—she noted—involved a valuable marital asset. Deuman suggested that Winnick had deliberately mischaracterized or "downplayed" the nature of the accident: "You can call it anything you want but it was not a safe and damage free landing." She wrote that she had learned some preliminary information about the incident and understood that Spitzer had to replace the engines and had not insured the plane. She suggested that he should not be flying it under the circumstances. She also stated her belief that Spitzer was "not acting rationally around" Silverman at the hospital where the parties both worked. Deuman was convinced that the trial court would rule in her client's favor on these issues and wrote that Winnick should make arrangements promptly.

The parties' airplane was a valuable marital asset, which was apparently under Spitzer's sole control. Because it was a marital asset, Silverman had the right to know whether and to what extent it might have been damaged, whether the marital estate had been exposed to any liability, and whether the estate had a viable insurance claim. She also had the right to know if Spitzer was using marital assets to repair the airplane. Accordingly, Deuman cannot be said to have overstepped the bounds of propriety when she asked for information and records about the crash in her letter of October 2012. She also did not directly connect her request to turn over Silverman's jewels, furs, and paintings to the issue with the crash, but instead indicated that she would ask the trial court to decide the issue, which was entirely appropriate. Therefore, this letter did not involve any illegal,

manifestly unjust, or purposely oppressive conduct. *Stott Realty Co.,* 274 Mich. at 84.

**\*7** In her letter of November 2012, Deuman did threaten to report Spitzer's accident to the FAA unless he turned over the requested documents and personal property,[1] but she presented her demand in the same context—namely, that the airplane was a significant marital asset and her client had the right to any documentation bearing on the condition of that asset and the potential for liability. Her letter was in some respects unprofessional and poorly drafted, but it is apparent that Deuman wrote out of frustration with Winnick's—or Spitzer's—failure to fully disclose the severity of the crash and Spitzer's handling of the marital estate: "This game of 'keep away' cannot and, undoubtedly, will not continue particularly when [the court] gets a good look at what is going on; especially with the flight problems Dr. Spitzer has and that the problem is an ongoing one."

When read in context, this letter too was not particularly threatening and did not amount to illegal, manifestly unjust or purposefully oppressive conduct. See *id.* Indeed, the trial court determined that the parties' various motions concerning the plane crash and the letters did not warrant any sanctions or even extraordinary relief. It is, however, plain that the lawyers involved on both sides had resorted to inappropriate and unprofessional tactics; it was unprofessional for Abramson to accuse Deuman of criminal conduct and it was unprofessional for Deuman to use Spitzer's love of flying as leverage in the divorce. In the end, however, the trial court reasonably handled the disputes: it allowed discovery concerning the crash subject to a protective order, denied Abramson's request for sanctions arising out of Deuman's threatening letters, and allowed Spitzer to continue to use and control the plane, albeit with the requirement that he insure it. Given that the letters were sent months before the parties entered into the settlement agreement and that the trial court resolved all the issues relating to the letters weeks before the settlement, it is difficult to see how these letters exercised such a powerful effect on Spitzer's will that he "ceased to be a free moral agent" and lost the capacity to contract on the day of the settlement. *Meier,* 327 Mich. at 212.

The record also supports the trial court's finding that Spitzer understood that his license was not really in danger as a result of Silverman's threat to file an accident report.[2] Prior to the settlement, Spitzer filed documents with the court in which he stated his position that Deuman was using the accident to gain leverage in the divorce and argued that the details concerning the accident were irrelevant to the divorce proceedings. At the hearing on

the motion to set aside the agreement, Winnick testified that he vigorously opposed every effort by Deuman to make the accident an issue in the divorce and he opined that the accident issue was going "nowhere" because it was irrelevant. He also explained to the court that Spitzer told him that he did not do anything "wrong" with regard to the incident with the airplane and, for that reason, was not concerned about the threats to file a report—he just wanted to avoid the "annoyance of the investigation."[3] Winnick admitted that he continued to discuss the incident with Spitzer because he was concerned that his client was not being forthcoming and appeared to overreact to any hint of an investigation; specifically, Winnick was concerned that Spitzer had health issues that might have come out in an investigation and which might put his pilot's license at risk, but Winnick's continued preoccupation with the incident cannot be attributed to Deuman.

**\*8** The parties' record filings and Deuman's letters do not establish that Deuman—acting on Silverman's behalf—engaged in any illegal, manifestly unjust, or purposely oppressive conduct that forced Spitzer to settle against his will. *Stott Realty Co.,* 274 Mich. at 84. Although Spitzer testified that he felt that he was under "duress" for months as a result of people telling him he was going to lose his pilot's license and other things, he testified that it was Winnick and his statements concerning the potential problems that might occur if the case proceeded to trial that led him to settle. That is, by Spitzer's own admission, the coercion he felt was primarily caused by his own lawyer, Winnick. To be sure, Deuman's vigorous advocacy helped raise the stress of the litigation, but Spitzer did not allege or argue that he was under such stress that he lost the mental capacity to contract. Rather, he argued that his will was overcome by the threats to his profession and his love of flying and the evidence showed that Deuman did not coerce Spitzer into settling with such threats. Consequently, on this record, we cannot conclude that the trial court clearly erred when it found that Deuman's threats to file a crash report did not influence Spitzer's decision to settle. *Vittiglio,* 297 Mich.App at 398. It also did not clearly err when it found that Deuman's actions surrounding the airplane incident played no role in Spitzer's decision to settle. *Id.*

## 2. THE SETTLEMENT

It is well established that duress or coercion cannot be used to set aside an agreement unless the duress or coercion was caused by the opposing party. See *Musial v. Yatzik,* 329 Mich. 379, 383; 45 NW2d 329 (1951).

Consequently, a party cannot set aside an agreement on the ground that his or her lawyer coerced the settlement; there must be evidence that the opposing party actively participated in the coercion.[4] *Howard v. Howard,* 134 Mich.App 391, 397; 352 NW2d 280 (1984).

In his motion to set aside the settlement agreement, Spitzer presented strong evidence that Winnick engaged in unprofessional conduct. Winnick's communications with Spitzer show that Winnick did not treat Spitzer with dignity and respect—he used profane language and accused his client of reprehensible conduct. It is also evident that Winnick believed that Spitzer had severely undermined his ability to obtain spousal support from Silverman and, for that reason, placed substantial pressure on Spitzer to settle. Furthermore, as Spitzer aptly describes on appeal, the circumstances surrounding the events on the day of the settlement permit an inference that Winnick took advantage of events to persuade Spitzer that he had to quickly settle the case, even though it might not have been in his best interest to do so at that time. But even assuming that Winnick engaged in wrongful and oppressive conduct that overcame Spitzer's will and forced him to settle, see *Meier,* 327 Mich. at 212, there is no evidence that Deuman colluded with Winnick to coerce Spitzer to settle on that basis or otherwise directly participated in Winnick's coercion.

**\*9** We cannot agree with Spitzer's contention on appeal that Deuman participated in Winnick's coercion by creating an environment that made Winnick's coercion more effective.[5] In order to warrant setting aside a settlement on the grounds of duress or coercion, the opposing party must himself or herself engage in wrongful conduct to coerce settlement. *Musial,* 329 Mich. at 383. Spitzer admitted on cross-examination that he did not speak with Deuman or Silverman on the day of the settlement before agreeing to the settlement on the record. Instead, Deuman communicated with her client in a separate room and then conveyed her client's wishes to Winnick, who then spoke with Spitzer in a different room. The only evidence that Deuman took any action to coerce the settlement involved Deuman's letters concerning the airplane incident, which were sent months earlier, and her efforts to conduct discovery with regard to the incident; and we have already determined that the trial court did not clearly err when it found that those letters and Deuman's other actions concerning the airplane incident did not directly affect Spitzer's decision to settle.

Deuman did file a motion with the trial court that suggested she had become aware that Spitzer had access to funds other than marital funds because he used such funds to pay for the repairs to the airplane, but there is no

evidence that she knew about the specific acts that Spitzer took to obtain the funds or thought that the transfers were improper. There is also no evidence that Deuman tried to use Spitzer's handling of the funds to coerce a settlement. Although Deuman likely contributed to Spitzer's strain by zealously advocating for her client and manipulating every advantage that she could discern, Deuman's acts did not rise to the level of illegal, manifestly unjust, or purposely oppressive conduct done to coerce Spitzer into settling. *Stott Realty Co.,* 274 Mich. at 84. Because there is no evidence that Silverman—through Deuman—participated in Winnick's coercive conduct, even if Winnick wrongfully coerced Spitzer to settle, that coercion would not warrant setting aside the settlement agreement. *Howard,* 134 Mich.App at 397. Therefore, we need not determine whether the trial court clearly erred when it found that Winnick's threats and actions did not coerce Spitzer into settling. Even if the trial court had clearly erred in that regard, that error would not warrant relief because neither Deuman nor Silverman participated in Winnick's coercion. See MCR 2.613(A). The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement. *Tinkle,* 106 Mich.App at 426.

### 3. ERRORS OF LAW AND EVIDENCE

We also do not agree with Spitzer's contention on appeal that the trial court's findings and conclusions of law demonstrated that it "did not understand the law of coercion." Spitzer maintains that the trial court apparently did not understand that he was compelled to answer in the affirmative when Winnick examined him on the day of the settlement. But we do not read the trial court's statements concerning Spitzer's testimony at the settlement as an indication that it did not understand that Winnick might have coerced Spitzer's answers. The trial court presided over the settlement and had the opportunity to assess Spitzer's demeanor and, on the whole record, the trial court could reasonably find that Spitzer's testimony on that day was knowingly and voluntarily made. MCR 2.613(C). Thus, the trial court's reliance on that testimony does not demonstrate that the trial court was laboring under a misunderstanding of the applicable law. The fact that the trial court held an evidentiary hearing that spanned several days and took testimony from various witnesses—including Spitzer and Winnick—concerning the events leading to the settlement demonstrates that the trial court was not laboring under the mistaken belief that it had to accept Spitzer's testimony from the day of the settlement.

**\*10** Similarly, the trial court did not abuse its discretion when it limited the testimony and evidence to the events surrounding Spitzer's decision to settle on the day at issue. In her letters, Deuman did not threaten to file a report with the FAA unless Spitzer settled the division of the marital estate and gave up his claim for spousal support; Deuman threatened to file a report with the FAA if Spitzer did not turn over documentation on the incident and failed to return certain personal property. That is, to the extent that Deuman's letters could be said to involve improper coercion, they were directed at coercing discovery and the transfer of personal property. Thus, any testimony and evidence concerning the events involving those letters was not particularly relevant to the coercion operating on Spitzer on the day of the settlement. MRE 401; MRE 402. Moreover, as the trial court repeatedly emphasized at the evidentiary hearing, the parties had litigated the issues surrounding Deuman's letters and the incident with the airplane "ad nauseam." The court was well aware of the role that the plane incident and letters played to that point. Accordingly, the trial court's decision to limit the testimony and evidence—even if otherwise minimally relevant—to the facts concerning Spitzer's state of mind on the day of the settlement did not fall outside the range of reasonable outcomes. See MRE 403; *Barnett,* 478 Mich. at 158–159.

### C. CONCLUSION

The trial court did not clearly err when it found that Deuman's letters and actions concerning the incident with the airplane did not coerce Spitzer into settling the division of the marital estate in February 2013. And, even if the trial court clearly erred when it found that Winnick's actions on the day of the settlement did not overcome Spitzer's will and compel him to settle, an issue that we decline to address, that error would not warrant relief. Other than Deuman's letters and attempts to discover evidence concerning the airplane accident, which the trial court found did not play a role in Spitzer's decision, there was no evidence that Silverman—through her lawyer—participated in Winnick's coercion. Therefore, Spitzer failed to establish grounds for setting the settlement aside.

The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement on the grounds that the settlement was coerced.

### III. UNCONSCIONABLE SETTLEMENT

#### A. STANDARDS OF REVIEW

On appeal, Spitzer argues the trial court also erred when it did not set aside the agreement as unconscionable. Specifically, he maintains that the evidence that he acted under duress or coercion also demonstrates that he entered into the agreement under conditions of procedural unconscionability. He further argues that, had the trial court not improperly prevented him from conducting discovery, he could have established that the settlement was substantively unconscionable. This Court reviews a trial court's decision on a motion to set aside a settlement agreement for an abuse of discretion. *Tinkle,* 106 Mich.App at 426. This Court reviews a trial court's decision to limit evidence for an abuse of discretion. *Barnett,* 478 Mich. at 158–159.

#### B. ANALSYIS

**\*11** In order to set aside a settlement agreement as unconscionable, the moving party must establish both procedural and substantive unconscionability. *Vittiglio,* 297 Mich.App at 403.

> Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. *Allen v. Michigan Bell Tel. Co.,* 18 Mich.App 632, 637; 171 NW2d 689 (1969). If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. *Id.* Substantive unconscionability exists where the challenged term is not substantively reasonable. *Id.* at 637–638. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. *Gillam v. Michigan Mortgage–Investment Corp.,* 224 Mich. 405, 409; 194 N.W. 981 (1923). Instead, a term is substantively unreasonable where the inequity of the term is so

> extreme as to shock the conscience. *Id* . [*Clark v. DaimlerChrysler Corp.,* 268 Mich.App 138, 144; 706 NW2d 471 (2005).]

As the trial court correctly noted at the hearing to set aside the settlement agreement, whether an agreement is substantively unconscionable must be determined from the facts as they existed at the time of the agreement. See *Northwest Acceptance Corp. v. Almont Gravel, Inc.,* 162 Mich.App 294, 300; 412 NW2d 719 (1987). Because Spitzer and Silverman proceeded to divide the marital estate on the basis of their understandings of the values after incomplete discovery on the day of the settlement, the trial court determined that Spitzer could not testify concerning his current understanding of the values because that evidence was not relevant to whether the agreement was unconscionable at the time of the agreement. The court explained that it would be unfair to allow Spitzer to claim unconscionability on the basis of valuations that neither party had available at the time of the settlement: "I can't go back and fix that. I mean I can't go back and manufacture discovery now. They knew that it wasn't completed. Everybody knew here. Now to affix numbers to those things now. I mean then why—that's the problem with this case." Under these circumstances, the trial court did not abuse its discretion when it prevented Spitzer from presenting evidence that the values were different than understood by the parties at the time of the settlement. *Barnett,* 478 Mich. at 158–159.

Although the parties had not completed discovery, the record evidence up to the time of the settlement demonstrated that the parties had a basic understanding of the marital assets at issue and their debts. At the hearing on the settlement agreement, Spitzer stated he wanted to obtain the home and lot on Mackinac Island, the home in which he resided in Sault St. Marie, and the home in West Bloomfield. In the settlement, he received each of these properties. He also wanted to receive all the membership interests in the company that owned the parties' airplane, which he also received. Despite receiving each of the assets that he specifically wanted, Spitzer still argued that the division of the estate was so inequitable as to shock the conscience. He alleged that the total value of the assets he received—after adjusting for secured debts— amounted to just $1.645 million, whereas Silverman received approximately $2.4 million of the marital estate.[6]

**\*12** On this record, we cannot conclude that the trial court erred when it determined that the division of the martial estate was not unconscionable. In order to obtain specific assets with sentimental or personal value, a reasonable person might be willing to settle for a smaller overall

percentage of the estate. See *Northwest Acceptance Corp.,* 162 Mich.App at 302 (noting that an unconscionable bargain is often characterized as one that no man in his senses and not under a delusion would make). And, although there appeared to be a substantial difference in the value of the assets awarded to each party, even assuming that Spitzer's valuations were accurate, the difference is not so extreme that it shocks the conscience. *Clark,* 268 Mich.App at 144.

The fact that the parties waived the right to spousal support in their agreement also does not shock the conscience. The parties to a divorce may waive their statutory right to receive spousal support. *Staple v. Staple,* 241 Mich.App 562, 568–569; 616 NW2d 219 (2000). Spitzer had earlier asserted his right to spousal support; he moved for entry of an order compelling his wife to pay him spousal support on the grounds that she earned substantially more income (he alleged that she earned $650,000 per year and that he only earned $250,000 per year). But Silverman contested Spitzer's claim. In her response, Silverman denied that she earned $650,000 per year and took the position that Spitzer had been keeping his income artificially low by "refus[ing] to seriously work at his practice." Consequently, at the time of the settlement, the parties understood that there was a significant dispute concerning their actual incomes, their earning potential, and the propriety of an order for spousal support.

At the hearing on the motion to set aside the settlement, Spitzer asserted that the settlement was unsatisfactory because, without an order for spousal support to equalize their incomes, it left him in an untenable position. Specifically, he complained that his income was insufficient to allow him to keep the home on Mackinac Island and to continue to enjoy his airplane: "And so I had to service two mortgages on a substantially lower portion of the income—of the total family income. And so the other main component, to not go bankrupt, was to allow me to continue to fly the airplane and not lose the house on Mackinac Island." Spitzer's lawyer similarly asserted at the hearing that the settlement made no sense considering the parties' cash flow. However, the fact that Spitzer regrets waiving his spousal support does not render the agreement unconscionable. Although Spitzer always maintained the position that Silverman made substantially more than he did and that he would require spousal support in order to continue to maintain the lifestyle to which he had become accustomed, it is not clear that he could have established the factual basis for his position had he proceeded to trial rather than settle. A trial might have revealed that Silverman made substantially less and that Spitzer made or could have

made substantially more. Accordingly, Spitzer might not have been able to establish grounds for spousal support or might have received substantially less support than he initially requested. Under these circumstances, a reasonable person in Spitzer's position might conclude that it was better to waive spousal support in order to settle the dispute and obtain the martial estate's most desirable assets without the hassle and uncertainty of further litigation. See *Northwest Acceptance Corp.,* 162 Mich.App at 302.

**\*13** The trial court did not err when it determined that the settlement was not on its face substantially unconscionable. Consequently, it did not err when it denied Spitzer's motion to set aside the settlement agreement on that basis.[7]

IV. SANCTIONS

A. STANDARD OF REVIEW

On cross-appeal, Silverman argues that the trial court erred when it refused to order Spitzer and his lawyers to pay sanctions for filing a frivolous motion to set aside the settlement agreement. This Court reviews a trial court's finding that a motion was not frivolous for clear error. *Kitchen v. Kitchen,* 465 Mich. 654, 661, 641 NW2d 245 (2002).

B. ANALYSIS

A trial court must order a party or lawyer who files a motion in violation of MCR 2.114(D) to pay an appropriate sanction. MCR 2.114(E); see also MCL 600.2591. A party violates that rule if he or she signs the motion, in relevant part, without ensuring through a reasonable inquiry that the motion is well grounded in fact and is warranted by existing law. MCR 2.114(D).

Spitzer moved to set aside the settlement on the basis of duress or coercion and on the ground that the agreement was unconscionable. In support of his motion, Spitzer cited Deuman's threatening letters and his communications with Winnick preceding the settlement. In the communications, Winnick treated Spitzer in an undignified manner and suggested that Spitzer should settle to avoid litigation that might jeopardize Spitzer's medical license. The documentary evidence was

minimally sufficient to establish a factual basis for a hearing on the claim under existing law. Moreover, although the settlement agreement was not on its face unconscionable, given the parties' respective positions in the litigation prior to the settlement, Spitzer's claim that the agreement might be unconscionable considering the circumstances surrounding the settlement was reasonably grounded on fact and law.

The trial court did not err when refused to order sanctions under MCR 2.114(E).

V. GENERAL CONCLUSION

There were no errors warranting relief.

Affirmed. Neither party having prevailed in full, we order that neither may tax costs. MCR 7.219(A).

**All Citations**

Not Reported in N.W.2d, 2014 WL 7157419

Footnotes

1    In his motion to enter a default, which Abramson signed, Spitzer inaccurately stated that Deuman threatened to accuse him of committing a crime—namely, to report him for violating FAA regulations. In her letters, Deuman did not threaten to accuse Spitzer of committing a crime; she threatened to file crash report with the FAA, which it was her position, she might have an obligation to do.

2    Spitzer continues to assert on appeal that the incident was not one that had to be reported.

3    Winnick testified that he asked Spitzer whether he was worried about any criminal or administrative liability with regard to his incident with the airplane and Spitzer told him, "No."

4    In such cases, the client has an adequate remedy; the client can sue his or her lawyer for malpractice: if the jury finds for the client, the judgment will compensate the client for the difference between the value of the coerced settlement and a fair division of the marital estate.

5    On appeal, Spitzer argues that Winnick "picked up on Attorney Deuman's theme of wrongdoing" and Winnick's threats "were informed by [Deuman's] treatment of the FAA reporting issue."

6    As alleged in his motion, the disparity primarily arose from the difference in the values between the parties' pensions.

7    Because Spitzer failed to establish that the settlement was substantively unconscionable, we need not address whether the settlement involved procedural unconscionablility. *Clark,* 268 Mich.App at 144.

**End of Document**                                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

McIntyre v. First Financial Group, Not Reported in F.Supp.2d (2012)

2012 WL 5939931

2012 WL 5939931
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Edwin and Carla McINTYRE, and
Kelly M. Hagan, Trustee, Plaintiffs,
v.

FIRST FINANCIAL GROUP (a/k/a 1st
Financial Group and/or M4 Financial), a
Florida Business, and Global Client Solutions,
LLC, an Oklahoma Company, Defendants.

No. 1:12–CV–00740.
|
Nov. 27, 2012.

**Attorneys and Law Firms**

John A.M. Ferguson, Jr., John Ferguson, Elk Rapids, MI,
for Plaintiff.

Marilyn S. Tyree, Charles F. Behler Smith Haughey Rice
& Roegge PC, Grand Rapids, MI, for Defendant.

### OPINION

GORDON J. QUIST, District Judge.

**\*1** On April 24, 2012, Plaintiffs Edwin and Carla
McIntyre and Kelly M. Hagan, Trustee, filed a claim
against Defendants First Financial Group (FFG) and
Global Client Solutions (Global) in Antrim County
Circuit Court, Michigan, claiming violation of the Credit
Services Protection Act, Mich. Comp. Laws § 445.1821
et seq.[1] On July 18, 2012, Global filed a Notice of
Removal to this Court. The matter currently before the
Court is Global's Motion to Compel Arbitration. (Docket
no. 8, Page ID 65.) The Motion has been fully briefed
and the Court believes oral argument to be unnecessary.
W.D .Mich. LCivR 7.2(d). For the reasons set forth
below, the Court will grant Global's motion.

[1]    Case no. 12–8732–CK.

### I. Background

FFG is a Florida business that represents debtors to
creditors to negotiate repayment of debts.[2] (Compl., Ex.
A, Docket no. 1–1, Page ID 14.) Global is a "third party
sender" that processes payments for banks and provides
account customer services for account holders. (Jade
Decl., Docket no. 10, Page ID 92.) Plaintiffs Edwin and
Carla McIntyre are Michigan residents who entered into
a Client Partnership Agreement with FFG on December
4, 2008, for debt negotiation services. (Ex. A, Docket no.
1–1, Page ID 13, 17–18.) Global had previously processed
account transactions for Rocky Mountain Bank and
Trust, where Plaintiffs had an account pursuant to the
Client Partnership Agreement. (Ex. A, Docket no. 1–1,
Page ID 17.) The Client Partnership Agreement explicitly
named Global as the account servicer. (Id.) Plaintiffs used
the account until December 1, 2010, when they withdrew
the remaining funds. (Ex. D, Docket no. 10–4, Page ID
112.)

[2]    Although served with a Summons and Complaint,
       Defendant FFG has not responded in this case. (See
       Exhibit 2, Docket no. 1–2, Page ID 14–17.)

On December 9, 2008, Global mailed Plaintiffs a welcome
letter marked "return service requested." (Ex. A, Docket
no. 1–1, Page ID 19.) The letter contained a Special
Purpose Account Agreement outlining the terms of
Global's services. (Id. at 20.) Plaintiffs never signed the
agreement but did use Global's account services. (See id.)
On September 20, 2010, Global mailed Plaintiffs a notice
marked "return service requested," stating that Plaintiffs'
Rocky Mountain account administered by Global had
been transferred to another FDIC-insured bank. (Ex. C,
Docket no. 10–3, Page ID 106.) The notice also included
a new Special Purpose Account Agreement (hereinafter
replacement Agreement). (Id. at 108.) The notice stated
that the replacement Agreement "shall govern your
account going forward. Please read it carefully." (Id. at
106.) Plaintiffs never signed the Replacement Agreement
but continued to use Global's services. (See id.) All
three agreements—the Client Partnership Agreement with
FFG and the two Agreements with Global—contained
arbitration provisions. In pertinent part, the arbitration
provision in the replacement Agreement with Global
states,

> In the event of any controversy,
> claim or dispute between the
> parties arising out of or relating
> to this Agreement or the

breach, termination, enforcement, interpretation or validity thereof, including the termination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Tulsa County, State of Oklahoma in accordance with the laws of Oklahoma, or in the county in which the consumer resides, in accordance with the Laws of the that [sic] state.

**\*2** (Ex. C, Docket no. 10–3, Page ID 109.) The arbitration provision is identical to the arbitration provision in the original Special Purpose Account Agreement. (Ex. A, Docket no. 1–1, Page ID 20.)

According to Plaintiffs' Complaint, unspecified "Defendant" violated the Credit Services Protection Act (CSPA), Mich. Comp. Laws § 455.1821 secs. 3(b), (d) and (f), by (1) charging Plaintiffs a fee prior to completing the services, (2) making false or misleading statements by promising to resolve Plaintiffs' debts but failing to do so, and (3) failing to perform services within 90 days of the agreement. (Ex. A, Docket no. 1–1, Page ID 14–15.)

On August 6, 2012, Defendant Global filed a motion to compel arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* (Docket no. 8, Page ID 65–66.) Plaintiffs oppose the motion, arguing that the replacement Agreement does not give rise to the dispute, and, therefore, its arbitration provision is inapplicable. (Pls.' Resp., Docket no. 11, Page ID 117.) Plaintiffs further contend that claims arising under the CSPA are not subject to arbitration because the statute renders the replacement Agreement "moot, as opposed to void, unconscionable, or any other question that has come up." (*Id.* at 119.) Plaintiffs support this position by arguing that the action could be maintained without reference to the replacement Agreement. (*Id.* at 120.) Additionally, Plaintiffs assert that because the CSPA provides for the Michigan Attorney General to pursue criminal sanctions, claims arising under the Act are not arbitrable. (*Id.* at 121.)

## II. Discussion

According to the FAA, "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. One purpose of the FAA is to override judicial reluctance to enforce arbitration agreements. *See AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011). The FAA reflects "both a liberal federal policy favoring arbitration" and "the fundamental principle that arbitration is a matter of contract." *Id.* (internal quotations omitted). In line with these principles, courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms. *Id.* at 1745–46.

When faced with a motion to compel arbitration under the FAA, a district court has four tasks:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

**\*3** *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000); *see also Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 392 (6th Cir.2003). In making these determinations, "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The court need not hold an evidentiary hearing before compelling arbitration as long as the parties have been provided the opportunity to fully brief the issue and there has been no showing of disputed factual questions going to the legal issue of arbitrability. *See Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.,* 706 F.2d 155, 159 (6th Cir.1983).

## A. Scope of the Arbitration Provision

2012 WL 5939931

In this case, the parties do not dispute whether they agreed to arbitrate.[3] Rather, Plaintiffs oppose arbitration because they contend that the claim arises "without reference to the contract or relationship at issue." (Docket no. 12, Page ID 120.) The parties, therefore, disagree about the scope of the agreement. It also appears, based on Plaintiffs' Response, (docket no. 11), that the parties disagree about whether Congress intended Plaintiffs' claim to be arbitrable.

[3]     Specifically, Plaintiffs do not challenge the validity of the replacement Agreement's arbitration provision. They only challenge its applicability to Plaintiffs' claim.

First, the Court must determine whether Plaintiffs' claim falls within the scope of the arbitration provision. The Court has the authority to decide whether Plaintiffs' claim falls within the provision's scope. *AT & T Techs., Inc. v. Commc'n Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). Regarding the scope of the arbitration provision, the "proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue. If it could, then it is likely outside the scope of the arbitration agreement." *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 395 (6th Cir.2003). When a contract contains an arbitration clause, there is a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration, "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. at 1419. Where the arbitration clause is broad, only an express provision excluding a specific dispute, or "the most forceful evidence of a purpose to exclude the claim from arbitration" will remove the dispute from consideration by the arbitrators. *Id.* at 650, 106 S.Ct. at 1419. An arbitration clause requiring arbitration of any dispute arising out of an agreement is "extremely broad." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan,* 350 F.3d 568, 578 (6th Cir.2003).

**\*4** Here, the arbitration provision in the replacement Agreement encompasses "any controversy, claim or dispute between the parties arising out of or

relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the termination of the scope or applicability of this Agreement to arbitrate." Plaintiffs argue that their claim under the CSPA can be maintained without reference to the replacement Agreement. The Court disagrees. The facts underlying Plaintiffs' claim arise from Plaintiffs' relationship with Global, as set out in the replacement Agreement. Nonetheless, even if Plaintiffs' contention were true, the authority cited by Plaintiffs only indicates that Plaintiffs' claim "may" fall outside the scope of the arbitration agreement. *See id.* at 576. In light of the broad language of the present arbitration provision, the Court finds that Plaintiffs' claim is subject to arbitration even if it could be maintained without reference to the contract or relationship at issue. The Court therefore finds that the scope of the arbitration provision encompasses Plaintiffs' claim.

### B. Arbitrability of Plaintiffs' Claim

Next, because Plaintiffs raise a statutory claim, the Court must determine whether Congress intended to exclude Plaintiffs' claim from arbitration. "Although all statutory claims may not be appropriate for arbitration, '[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)). The burden is on the party resisting arbitration to show that Congress intended to preclude the claims at issue from arbitration. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941.

Here, Plaintiffs' claim is a state statutory claim before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). The United States Supreme Court has previously held that the FAA is applicable to state as well as federal claims. *See Buckeye Check Cashing, Inc. v. Cardenga,* 546 U.S. 440, 445, 126 S.Ct. 1204, 1208–09, 163 L.Ed.2d 1038 (2006) (citing *Southland Corp. v. Keating,* 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984)). Therefore, the correct analysis is whether Congress intended to exclude

2012 WL 5939931

Plaintiffs' claim. In support of their argument that claims under the CSPA are nonarbitrable, Plaintiffs argue that the Act provides for criminal sanctions. That argument is unpersuasive. That the Michigan Attorney General or a county prosecutor may bring criminal charges for violations of the Act is not relevant to the issue of whether Plaintiffs, in arbitration with Defendant Global, have an adequate remedy for their claim. One judge in this district has already held that claims arising under the CSPA are arbitrable. *See CSA–Credit Solutions of Am., Inc. v. Schafer,* 408 F.Supp.2d 503, 512 (W.D.Mich.2006) (citing *Burden v. Check Into Cash of Ky., LLC,* 267 F.3d 483, 489–90 (6th Cir.2001)) (finding in a CSPA case that the Sixth Circuit previously rejected a similar argument in the context of its discussion of void versus voidable contracts). The Court therefore finds that Plaintiffs have failed to meet their burden of demonstrating that Congress intended Plaintiffs' claim to be nonarbitrable. The claim is, in fact, arbitrable.

**\*5** Since Plaintiffs have raised only one claim, and the Court finds it to be arbitrable, the Court need not address the fourth issue—"if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration ." *Stout,*

228 F.3d at 714. Where, as here, it has been determined that arbitration is compelled as to all claims, it is not necessary to stay the proceedings; instead, dismissal for lack of jurisdiction is appropriate. *See* 9 U.S.C. § 3 (only requiring a stay of proceedings upon application of one of the parties to the action). Yet, because this dismissal is not on the merits, it will be without prejudice. *See Costello v. United States,* 365 U.S. 265, 285–86, 81 S.Ct. 534, 545, 5 L.Ed.2d 551 (1961); *see also Bauer v. RBX Indus., Inc.,* 368 F.3d 569, 580–81 (6th Cir.2004), *overruled on other grounds by Winnett v. Caterpillar, Inc.,* 553 F.3d 1000, 1005, 1012 (6th Cir.2009) (analyzing when a claim should be dismissed without prejudice).

### III. Conclusion

For the reasons set forth above, Global's Motion to Compel Arbitration will be granted. This case will be dismissed without prejudice.

A separate Order will issue.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 5939931

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 12161864
Only the Westlaw citation is currently available.
United States District Court,
N.D. Florida,
**Tallahassee Division**.

CENTENNIAL BANK, Plaintiff,
v.
ADAMS STREET LOFTS, LLC; Steven M.
Leoni; Jonathan D. Leoni, Defendants.

Case No. 4:13–CV–00027–RH/CAS
|
Signed 07/30/2013

**Attorneys and Law Firms**

Megan Fortson Fry, Pensacola, FL, for Plaintiff.

Russell Bradbury Buchanan, Joseph Peter Jones, Broad &
Cassel, Tallahassee, FL, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

Robert L. Hinkle, United States District Judge

**\*1** This is an action on a promissory note. The plaintiff
Centennial Bank is the payee. The defendant Adams
Street Lofts, LLC, is the maker. The defendants Steven M.
Leoni and Jonathan D. Leoni are guarantors.

Centennial has moved for summary judgment. The record
establishes without dispute that the note is due and
unpaid. The defendants do not assert the contrary.
Instead, they rely on ten purported affirmative defenses
that can be grouped in four categories.

I

The first category relates to Centennial's election to
proceed on the note without foreclosing the real-estate
mortgage that Centennial holds as security. This is the
basis for affirmative defenses 1, 3, 8, and 10.

Florida law is settled that a mortgagee may pursue
an action on a note without foreclosing the mortgage,
and vice versa. *See Junction Bit & Tool Co. v. Village
Apartments, Inc.*, 262 So. 2d 659 (Fla. 1972). Here the note

itself also expressly allows the holder to sue on the note
without foreclosing the mortgage. ECF No. 16–2 at ¶ 11.

Centennial is entitled to a judgment on the note without
a reduction for the fair-market value of the mortgaged
property. *See, e.g., Thunderbird, Ltd. v. Great Am. Ins.
Co.*, 566 So. 2d 1296, 1298 (Fla. 1st DCA 1990). If
Centennial collects the judgment, Centennial will be
obligated to satisfy the mortgage, thus allowing Adams
Street Lofts to keep the property.

II

The second category of purported affirmative defenses
relates to ongoing litigation over alleged construction
defects in the mortgaged property. Affirmative defenses 3,
8, and 9 are in this category.

The defendants here are plaintiffs in the construction
litigation. They seek a judgment against third parties.
They have pledged any recovery as further collateral for
the Centennial note.

Just as the holder of a mortgage note need not foreclose
the mortgage prior to suing on the note, *see* section I
above, so also a holder of collateral of this kind need
not pursue the collateral before proceeding on the note.
The record includes no evidence that Centennial agreed
to forebear suing on the note until after resolution of the
construction litigation. Centennial is entitled to proceed
now.

III

The third category of purported affirmative defenses
relates to Centennial's loss-share agreement with the
Federal Deposit Insurance Corporation. Affirmative
defenses 2, 4, and 7 are in this category.

Centennial acquired from the FDIC assets previously held
by the Wakulla Bank. One such asset was the original
note from Adams Street Lofts. The loss- share agreement
addresses the relationship between Centennial and the
FDIC—how they will share proceeds of or losses from
this note and others. That has nothing to do with the
defendants' obligation to pay the note. Nothing in the
loss- share agreement deprives Centennial of the right

to enforce the note. Nothing in the loss-share agreement relieves the defendants from the obligation to pay the note.

Indeed, the loss-share agreement expressly provides that it is not intended to benefit any third party. The defendants have no rights under the loss-share agreement. *See Branch Banking and Trust Co. v. Maxwell*, No. 12–12551, 2013 WL 1136578, *2 (11th Cir. March 19, 2013) (holding that a guarantor of a loan is not an intended third-party beneficiary of a purchase and assumption agreement containing a loss-share provision and therefore "lacks standing to enforce its interpretation of that Agreement") (quoting *Interface Kanner, LLC v. JPMorgan Chase Bank*, 704 F.3d 927, 934 (11th Cir. 2013)).

IV

**\*2** The final category of affirmative defenses relates to duress. This category includes affirmative defenses 5 and 6.

The note at issue is a renewal note. It was executed on April 6, 2012. The defendants say the mortgaged property suffered construction defects and that it was impossible to "simultaneously perform under the terms of the Note and protect the collateral as required under the Mortgage." ECF No. 9 at 4. The defendants say this subjected them to a "Morton's Fork"—a "choice between two equally unpleasant alternatives." *Kohorst v. Van Wert Cnty. Hosp.*, 2010 WL 4883784, *5 n.2 (N.D. Ohio 2010). In order to avoid action by Centennial to enforce the note or mortgage at that time, Adams Street Lofts, LLC, signed the renewal note, and the Leonis affirmed their guaranties.

Under Florida law, having to choose between unpleasant alternatives is not, without more, duress. Having to sign a renewal note to avoid enforcement of an existing note is not, without more, duress. *See, e.g.*, *Kohen v. H.S. Crocker Co.*, 260 F.2d 790, 792 (5th Cir. 1958) ("[T]he law is settled that business compulsion is not established merely by proof that consent was secured by the pressure of financial

circumstances ...") (applying Florida law). The defendants have not shown that they executed any of the relevant documents under duress.

V

In sum, Centennial is entitled to summary judgment. The record, ECF No. 16–1 at 6, establishes that the proper amount of the judgment is $3,208,872.04 as principal; $164,779.38 as interest through April 6, 2012; $73,486.26 as interest from April 7, 2012, through April 30, 2013; $32,445.14 as interest from May 1, 2013, through July 30, 2013, calculated at $356.54 per day for 91 days; $2,300.00 as late fees; and $456.76 as appraisal fees. The total is $3,482,339.58.

This order directs the entry of judgment in this amount. Centennial may file a timely bill of costs and motion to determine its entitlement to an award of attorney's fees.

IT IS ORDERED:

1. Centennial's summary-judgment motion, ECF No. 16, is GRANTED.

2. The clerk must enter a judgment stating: "It is ordered that the plaintiff Centennial Bank recover from the defendants Adams Street Lofts, LLC, Steven Leoni, and Jonathan Leoni, jointly and severally, the amount of Three Million, Four Hundred Eighty–Two Thousand, Three Hundred Thirty–Nine and 58/100 Dollars ($3,482,339.58), with interest from July 31, 2013, forward as provided by law."

3. The clerk must close the file.

SO ORDERED on July 30, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 12161864

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.