# Exhibit A

Adler v. Dell Inc., Not Reported in F.Supp.2d (2009)

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Stewart v. GGNSC-Canonsburg, L.P., Pa.Super., November 4, 2010

2009 WL 4580739
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Michigan.

Barry ADLER, on behalf of himself and all others similarly situated, Plaintiff,
v.
DELL INC., a corporation, Banctec, Inc., a corporation, Qualxserv, LLC, an entity, Dell Catalog Sales, L.P., an entity, Dell Products, L.P., an entity, Dell Marketing L.P., an entity, Dell USA L.P., an entity, and Does 1 through 10, Defendants.

No. 08–cv–13170.
|
Dec. 3, 2009.

**Attorneys and Law Firms**

Richard E. Segal, Segal Goldman, West Bloomfield, MI, Brian R. Strange, Gretchen A. Carpenter, Strange and Carpenter, Los Angeles, CA, for Plaintiff.

Anthony A. Agosta, Clark Hill, Detroit, MI, Paul W. Schlaud, Reeves & Brightwell, LLP, Austin, TX, for Defendants.

*OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO LIFT STAY*

GEORGE CARAM STEEH, District Judge.

**\*1** Plaintiff Barry Adler moves this court to lift the stay in this case on the grounds that the arbitration agreement between the parties is no longer enforceable. For the reasons set forth below, plaintiff's motion to lift the stay is DENIED.

**I. Factual and Procedural Background**

The case arises out of plaintiff's 2004 purchase of a Dell XPS computer. Adler asserts that Dell failed to disclose a first-year opt out option for at—home service, thereby violating various consumer protection laws. At issue is whether this dispute is covered by an arbitration agreement contained in the contract between the parties.

The Contract provides, as follows:

> ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, COMMON LAW, INTENTIONAL TORT, AND EQUITABLE CLAIMS) AGAINST DELL, its agents, employees, successors, assigns, or affiliates (collectively for purposes of this paragraph ("Dell"), arising from or relating to this Agreement, its interpretation, or the breach, termination, or validity thereof, the relationships which result from this Agreement (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories to this Agreement), Dell's advertising, or any related purchase, SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM (NAF) under its Code of Procedure then in effect (available via the Internet at www.arb-forum.com or via telephone at 1–800–474–2371). The arbitration will be limited solely to the dispute or controversy between Customer and Dell. Any award of the arbitrator(s) shall be final and binding on each of the parties and may be entered as a judgment in any court of competent

jurisdiction. Information may be obtained and claims may be filed with the NAF or at P.O. Box 50191, Minneapolis, MN 55405.

On December 18, 2008, the court granted Dell's motion to compel arbitration according to the terms of the Arbitration Agreement and to stay further proceedings pending the results of arbitration. On March 10, 2009, the court denied Adler's motion for certification of an immediate appeal. Based upon recent developments, in this motion, Adler explains that arbitration has become impossible because the National Arbitration Forum (the "NAF") no longer conducts consumer arbitrations. According to Adler, because the designation of NAF as arbitrator is integral to the agreement, the arbitration provision fails altogether, and he should now be permitted to litigate his claim in court. He asks the court to lift the stay and revoke the agreement to arbitrate because of impossibility of performance.

Dell acknowledges that NAF recently stopped accepting new consumer arbitrations but asserts that plaintiff caused this impossibility by deliberately failing to comply with the court's order to arbitrate after plaintiff's request for certification for immediate appeal was denied. Dell continues to seek enforcement of the arbitration agreement with the court appointment of an alternate arbitrator, pursuant to Section 5 of the Federal Arbitration Act. Alternatively, Dell requests a dismissal of the case for failure to prosecute, based upon Adler's refusal to arbitrate the case as earlier ordered by the court.

## II. Analysis

**\*2** This matter rests on interpreting the Arbitration Clause's provision that disagreements between the parties "SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORM (NAF)." Adler suggests that the entire Arbitration Agreement is unenforceable because the requirement that the parties arbitrate before NAF is integral to the agreement and cannot be severed from it. This court disagrees.

Section 5 of the Federal Arbitration Act provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator ... such method shall be followed ... or if

for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein.

9 U.S.C. § 5. As a general rule, when the arbitrator named in the arbitration agreement cannot or will not arbitrate the dispute, the court does not void the arbitration agreement. Instead, it appoints a different arbitrator, as provided in the Federal Arbitration Act above. *See Brown v. ITT Consumer Fin. Corp.,* 211 F.3d 1217, 1222 (11th Cir.2000).[1]

The exception to this rule occurs when "it is *clear* that the failed term is not an ancillary logistical concern but rather is as important a consideration as the agreement to arbitrate itself." *Id.* (quoting *McGuire, Cornwell & Blakey v. Grider,* 771 F.Supp. 319, 320 (1991) (emphasis added)). In such situations, the Court will not sever the failed term from the rest of the agreement and the entire arbitration provision fails. *Id.* "Whether the agreement to arbitrate is entire or severable turns on the parties' intent at the time of the agreement was executed, as determined from the language of the contract and the surrounding circumstances." *Great Earth Cos. V. Simmons,* 288 F.3d 878, 890 (6th Cir.2002).

In this case, the language of the contract is ambiguous on the intent of the parties in designating NAF, to administer the arbitration. The clause, "SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM (NAF)" may either refer to the parties' intent to arbitrate all disputes or to the intent of the parties to bring arbitration solely before NAF, or both. At every pass through these words, it is impossible to discern whether the parties intended to embrace arbitration as their exclusive and final recourse for disputes while identifying NAF as a secondary matter to administer the process, or whether they intended NAF arbitration only to be their exclusive and final recourse for disputes. Both interpretations have merit, but there is nothing in the language to indicate which is the intended interpretation.

**\*3** Two aspects of the agreement offer some support for

the conclusion that the intent to arbitrate was paramount, and the designation of NAF secondary. First, the agreement requires NAF rules be used. This would appear to be mere surplusage, except in the case of a substitute arbitration forum, and Adler offered no reason to conclude that NAF rules cannot be applied by a substitute arbitrator. Second, the agreement specifically limits the arbitration process to the customer and Dell, which adds emphasis to the process agreed upon, as opposed to the designated forum.

Further, the agreement lacks any provision for a course of conduct in the event that NAF is unavailable or unwilling to arbitrate disputes between the parties. The lack of an alternative to NAF in the agreement may be taken as indicating a primary intent to arbitrate all disputes, or on the other hand, that the parties contemplated arbitration only if administered by NAF. This too can cut both ways and leaves the court guessing at the intent of the parties. In any event, the agreement falls far short of establishing the exception stated in *Brown* that arbitration will fail only if it is "clear" that the term in dispute, i.e. that the exclusive and final resolution of all disputes between the parties must be administered by NAF, is "as important a consideration as the agreement to arbitrate itself."

The surrounding circumstances are no more helpful than the language of the contract and the arbitration agreement in resolving this issue. Little can be gleaned from the surrounding circumstances as the details behind this agreement are few and far between. Although Dell drafted the agreement, apparently has employed other arbitrators in other disputes involving this contract language, and now continues to seek arbitration as the chosen process in this case, these facts fall short of settling the intent of the parties.

For his argument, Adler relies on the reasoning articulated in *Cairdeo v. Dell, Inc.,* 2009 WL 3485933 (W.D.Wash.). In that case, a Washington District Court addressed the same language at issue in this case. In contrast to this court's analysis, the *Cairdeo* court determined that the entire arbitration agreement was unenforceable because "the parties' selection of NAF as arbitrator is integral to the arbitration clause." *Id.* at *4. The court found that several factors supported its decision, including: (1) that the language "clearly and unequivocally selects NAF as arbitrator;" (2) that the agreement requires that NAF apply its own rules; and (3) the agreement does not provide an alternative arbitral forum. The *Cairdeo* court found that the language, "SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM (NAF)" meant

that the case would be arbitrated exclusively by the NAF. *Id.* at *4. The *Cairdeo* court also referred to an Illinois state case where an Illinois appellate court found in a similar contract that the "selection of NAF was integral to the arbitration clause at issue and thus held that § 5 could not be used to appoint a substitute arbitrator." *Id.* At *5 (citing *Carr v. Gateway, Inc.,* No. 5–07–0711 (Ill.App.Ct.2009).

**\*4** Dell distinguishes *Cairdeo* by pointing out that the enforceability of Dell's arbitration agreement in *Cairdeo* had not been resolved by the *Cairdeo* Court by the time that NAF stopped accepting new consumer claims, whereas the court in this case had determined that the arbitration agreement was enforceable months before the NAF stopped accepting new consumer claims. Dell also argues that the *Cairdeo* decision is factually and legally erroneous and states that it intends to appeal the decision. Dell argues that the *Cairdeo* decision improperly relies on *Carr v. Gateway,* which is distinguishable from *Cairdeo* and distinguishable from this case. Dell argues that the contract in *Cairdeo* provided for fees or penalties in the event a party brought a dispute in a forum other than NAF, which demonstrated that NAF was integral to the contract unlike in the case here. Finally, Dell responds by stating that the NAF is a red herring, because Dell has offered to arbitrate Adler's claim before the AAA or JAMS (or to litigate in small claims court).

This court disagrees with the reasoning of *Cairdeo* and its application of § 5 of the FAA. In reaching its decision, the *Cairdeo* court opined, "In general, the FAA provides that where the chosen arbitrator is unavailable, the court *may* appoint a substitute arbitrator." *Id.* at *3 (emphasis added). That finding overlooks the actual, mandatory language of the statute in § 5. "... or in filling a vacancy, then upon the application of either party to the controversy the court *shall* designate and appoint an arbitrator ...." *Id.* (emphasis added). Further, the FAA omits any mention of parsing through the parties' intent. Congress envisioned a situation such as the one presented to this court in which the named arbitrator is no longer available. Either party may request that the court appoint a replacement, one with the "same force and effect as if he or they had been specifically named therein." The tone of the FAA certainly implies that Congress intended that arbitration remain the prevailing method of resolving disputes if one of the parties requests arbitration. Dell has done so in its arguments and briefs.

In short, this court finds more persuasive the reasoning of the 11 th Circuit in *Brown* in refusing to void the arbitration clause because the specified forum (also the NAF in that case) was unavailable. *Brown,* 211 F.3d at

1222.

As set forth below, the decision in *Brown* is more consistent with both Sixth Circuit and Supreme Court authority than the analysis in *Cairdeo*.

In *Morrison v. Circuit City,* 317 F.3d 346 (6th Cir.2003), the Sixth Circuit stated that any doubts regarding arbitrability should be resolved in favor of arbitration. *Morrison,* 317 F.3d at 675 (citing *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). It is difficult to justify the abrogation of an entire arbitration agreement, especially when Congress has provided in the Federal Arbitration Act an easy remedy for an arbitrator's unavailability. *See McMullen v. Meijer, Inc.,* 166 Fed. Appx. 164, 169 (6th Cir.2006). In *McMullen,* the Sixth Circuit affirmed the trial court's decision to require arbitration even though arbitrator selection provisions were invalidated. The Sixth Circuit wrote that an additional consideration in whether to sever provisions from an arbitration agreement is the preference indicated by the courts to favor arbitration over litigation. Although *McMullen* ruled in an employment dispute, the same preference applies in situations such as these where the parties agree to take commercial disputes to arbitration. *See also Raddum v. KPMG LLP,* 457 F.3d 1054, 1060 (9th Cir.2006) (courts should be reluctant to dismiss arbitration agreements unless there is "evidence that the naming of the [arbitrator] was so central to the arbitration agreement that the unavailability of that arbitrator brought the agreement to an end."). Terminating the agreement to arbitrate could have been accomplished simply by so stating in the agreement. It was not. Consistent with this authority, the court finds that the language of the contract clearly indicates that the parties expected their disputes to be resolved by arbitration. The agreement does not allow for litigation in the event NAF is unavailable to act. The unavailability of NAF to hear the arbitration should not frustrate the overriding intent to arbitrate.

**\*5** WHEREFORE, IT IS HEREBY ORDERED that plaintiff's motion to lift the stay in this case is DENIED. The court instructs the parties to confer and agree on an alternate arbitrator who will apply the rules of NAF under its Code of Procedure, if possible. If the parties fail to come to an agreement within 30 days from the date of entry of this order, either defendants or plaintiff may submit an application to this court identifying proposed arbitrator(s) for appointment. In the event the parties fail to agree on an alternate arbitrator and no application is presented to this court for appointment by February 1, 2010, this matter shall be dismissed without prejudice.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 4580739

---

Footnotes

1   Michigan provides for a similar resolution. MCL § 600.5015 states "[i]f the arbitration agreement provides a method of appointment of arbitrators, this method shall be followed .... if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails or is unable to act and his successor has not been duly appointed, the court on application of a party shall appoint 1 or more arbitrators."

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite history available

2009 WL 3644801
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Walter Lee JONES–BEY, Plaintiff,
v.
Patricia CARUSO, Director of the Michigan
Department of Corrections, in her personal
capacity and in her official capacity, Defendant.

No. 1:07–cv–392.
|
Oct. 30, 2009.

Attorneys and Law Firms

Walter Lee Jones, Alger (Msp) Munising, MI, pro se.

Christine M. Campbell, Julia R. Bell, Mi Dept Attorney
General (Corrections), Lansing, MI, for Defendant.

*OPINION and ORDER*

PAUL L. MALONEY, Chief Judge.

**\*1 Striking the Plaintiff's "Objections" as Improper;
Adopting the Report and Recommendation without
Objection; Granting in Part and Denying in Part the
Plaintiff's Motion to Strike; Denying the Plaintiff's
FED. R. CIV. P. 56(f) Request to Defer Ruling on
Summary Judgment; Granting the Defendant's
Motion for Summary Judgment**

In July 2005, plaintiff Walter Lee Jones ("Jones")
initiated legal action against defendant Patricia Caruso
("Caruso") both in her personal capacity and in her
capacity as director of the Michigan Department of
Corrections ("MDOC"). In March 2006, MDOC
transferred Jones from Level II security to Level IV
security, citing his conviction of a major-misconduct
violation. In September 2006, a judge of this court entered
a preliminary injunction enjoining Caruso from enforcing

a policy which limited prisoners' access to Uniform
Commercial Code ("UCC") materials. In December 2006,
Caruso implemented Director's Office Memorandum
("DOM") 2006–14, prohibiting prisoners from entering
into Legal Assistance Agreements with other prisoners.

In April 2007, Jones filed this complaint, asserting claims
for First Amendment retaliation and violation of his and
other prisoners' right of access to the courts. In response
to Caruso's motion for summary judgment, Jones failed to
file an opposition brief addressing the merits of her
arguments. Nor did Jones seek an extension of time in
which to file an opposition brief. Instead, Jones merely
requested that the court defer ruling on summary
judgment, pursuant to Rule 56(f), to afford him more time
for discovery, and he moved to strike certain limited
portions of two affidavits which Caruso filed with her
motion. Jones made no arguments, cited no authority, and
proffered no reasoning in support of any of his claims or
against any of Caruso's grounds for summary judgment.

The Honorable Ellen S. Carmody, United States
Magistrate Judge, issued an R & R on September 22,
2009, recommending that Jones's motion to strike be
largely granted, but that Caruso's motion for summary
judgment then be granted (without considering the
material recommended to be stricken).

**Jones filed a document purporting to serve as
objections to the R & R on October 7, 2009, but the
document is not properly before the court. Our
Circuit holds that "[t]he Magistrate Judge Act, 28
U.S.C. § 631 et seq .... does not allow parties to raise at
the district court stage new arguments or issues."** *Murr
v. US,* 200 F.3d 895, 902 n. 1 (6th Cir.2000) (citing, *inter
alia, U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir.1998)
("issues raised for the first time in objections to [a] ...
report and recommendation are deemed waived")). The
Magistrates Act was not intended "to give litigants an
opportunity to run one version of their case past the
magistrate, then another past the district court ." *
Greenhow v. US,* 863 F.2d 633, 638–39 (9th Cir.1988),
*rev'd o.g. sub nom. US v. Hardesty,* 977 F.2d 1347 (9th
Cir.1992) (*en banc* ).

**\*2** Moreover, " '[i]f the Court were to consider these
untimely arguments, it would unduly undermine the
authority of the Magistrate Judge by allowing litigants the
option of waiting until a Recommended Ruling has issued
to advance additional arguments.' " *Kita v. SSA,* 2009 WL
1464252, \*2 (W.D.Mich. May 18, 2009) (Maloney, C.J.)
(quoting *Burden v. Astrue,* 588 F.Supp.2d 269, 279
(D.Conn.2008) ("Regarding Burden's new argument that

her headaches are debilitating because they would lead to an unacceptable number of absences for any employment for which she is qualified, this argument is waived because Burden never raised it prior to her Objection to the Recommended Ruling.")). *See also King v. Zamiara,* 2009 WL 1067317, *1 (W.D.Mich. Apr.21, 2009) (**Robert Holmes Bell, J.**) ("Because Defendants failed to raise this argument before the Magistrate Judge, they will be deemed to have waived it."); *Mitchell v. Washtenaw Cty.,* 2009 WL 909581, *4 (E.D.Mich. Mar.31, 2009) (**David Lawson, J.**) ("Because the Defendants did not raise the collateral estoppel argument in their motion before the magistrate judge, they have waived it."); *Sheets v. Astrue,* 2008 WL 3895515, *1 (S.D.Ohio Aug.22, 2008) (**Algenon Marbley, J.**) ("Sheets also argues that the [ALJ] failed to say what listings were applicable or why Sheets did not meet any listing either individually or in combination. [But] this argument was not raised ... before the Magistrate Judge and therefore is waived."); *Hennessy v. CIR,* 2007 WL 4357755, *2 (E.D.Mich. Dec.5, 2007) (**George Steeh, J.**) ("Petitioners object to the [R & R,] stating that the IRS failed to comply with the notice requirements of 26 C.F.R. § 1.6001–1(d) and that .... These objections have been waived as these issues were not raised before the Magistrate Judge.").

In accordance with our Circuit's precedent, and with the seemingly uniform practice of federal courts nationwide,[1] the court declines to consider Jones's improper "objections" document, which is nothing more than an egregiously untimely brief in opposition to the summary-judgment motion.[2]

Absent timely, specific objections which are properly before the court, there is neither obligation nor need to review the Magistrate's well-reasoned R & R. As the Supreme Court has said,

> It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo *or any other standard,* when neither party objects to those findings." * * * Because neither party filed timely objections to [the R & R] ... this Court need not conduct a review.

*Russell v. Caruso,* 2007 WL 3232126, *2 n. 3 (W.D.Mich.2007) (Maloney, J.) (quoting *Thomas,* 474 U.S. at 150). *Accord Tangwall v. Robb,* 2003 WL 23142190, *1 (E.D.Mich.2003) (David Lawson, J.) (after untimely objections, court stated, "the failure to object to

the magistrate judge's report releases the Court from its duty to independently review the motion."); *Coots v. Astrue,* 2009 WL 1326260 (E.D.Ky. May 12, 2009) (Gregory Van Tatenhove, J.) ("When no objections are made, this court is not required to review a magistrate judge's factual or legal conclusions, under a de novo or any other standard ....") (citation & quote marks omitted).[3]

### ORDER

**\*3** Plaintiff's purported objection **[document # 78]** is **STRICKEN** as improper.

The Report and Recommendation **[document # 75]** is **ADOPTED** without objection.

Plaintiff's motion to strike **[document # 69]** is **GRANTED in part** and **DENIED in part:**

> — As to the Melody Wallace affidavit [doc. # 31], paragraph four is *not* stricken.

> — As to the Melody Wallace affidavit [doc. # 31], the attached memorandum is stricken.

> — As to the Caruso affidavit [doc. # 52], the legal conclusions expressed in paragraphs seven and eight are stricken.

Defendant's renewed motion for summary judgment **[document # 51]** is **GRANTED.**

The second amended complaint **[document # 44]** is **DISMISSED.**

This is a final order, but it is *not* appealable. *See Roberts v. Apfel,* 222 F.3d 466, 470 (8th Cir.2000) ("Roberts argues that because he raised the claim in his objections to the magistrate judge's proposed findings, which are reviewed by the district court *de novo,* we should consider the issue to have been properly raised below. We disagree. * * * Roberts' situation is tantamount to those in which a claimant raises on appeal an argument not presented to the district court.").

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

ELLEN S. CARMODY, United States Magistrate Judge.

This matter is before the Court on *Defendant Caruso's Motion for Summary Judgment,* (dkt.# 51), and *Plaintiff's Motion to Strike,* (dkt.# 69). Pursuant to 28 U.S.C. § 636(b)(1)(B) granting authority for United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of motions for summary judgment, the undersigned recommends that Plaintiff's motion to strike be **granted in part and denied in part** and, furthermore, that Defendant's motion be **granted** and Plaintiff's action **dismissed.**

## BACKGROUND

In his second amended complaint, (dkt.# 44), Plaintiff asserts the following. On July 19, 2005, Plaintiff initiated legal action against Defendant Caruso, seeking an injunction against her implementation of a policy which limited prisoners' access to Uniform Commercial Code (UCC) material. On September 28, 2006, a preliminary injunction was entered preventing Defendant Caruso from enforcing the policy in question. On December 14, 2006, Defendant Caruso implemented Director's Office Memorandum (DOM) 2006–14, which prohibits prisoners from entering into Legal Assistance Agreements with other prisoners.

According to Plaintiff, Defendant Caruso enacted DOM 2006–14 "as a means of retaliating against Plaintiff for pursuing previous civil litigation against her regarding the UCC." Moreover, Caruso allegedly enacted DOM 2006–14 as a means of preventing Plaintiff from assisting other inmates pursue various legal claims. Plaintiff further asserts that he has been "excluded from" the MDOC Legal Writer program in retaliation for "filing of a prior lawsuit against [Defendant Caruso] and for plaintiff's active role in assisting other prisoners in litigating suits against Defendant Caruso."

**\*4** In March 2006 Plaintiff was transferred from Level II security to Level IV security. This transfer was accomplished "under the guise" that Plaintiff had been convicted of a major misconduct violation. This justification, however, was false because "at no time" was Plaintiff convicted of the alleged major misconduct violation. Plaintiff was instead transferred "to limit Plaintiff's law library research and access to other prisoners." This action was undertaken in retaliation for "Plaintiff's litigation efforts against defendants regarding their regulation ban on UCC-legal material and because of Plaintiff's efforts of assisting other prisoners with their

UCC claims against defendants."

Plaintiff initiated this action on April 19, 2007, against the Michigan Department of Corrections (MDOC) and Patricia Caruso. The MDOC was subsequently dismissed. Plaintiff asserts that Defendant Caruso has violated his First Amendment right to be free from unlawful retaliation. Plaintiff further alleges that Caruso's actions violate other prisoners' right of access to the courts. Defendant Caruso now moves for summary judgment. In response to Defendant's motion, Plaintiff asserts that he needs additional time to conduct discovery. As discussed below, the Court is unpersuaded by Plaintiff's request and, furthermore, finds that Defendant Caruso is entitled to summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints,* 398 F.3d 751, 761 (6th Cir.2005); *see also, Amini v. Oberlin College,* 440 F.3d 350, 357 (6th Cir.2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo,* 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini,* 440 F.3d at 357 (citing *Anderson,* 477 U.S. at 247–48; *Celotex Corp. v. Catrett,* 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini,* 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside,* 396 F.3d 730, 734–35

(6th Cir.2005) (quoting *Anderson,* 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.,* 434 F.3d 810, 813–14 (6th Cir.2006) (citations omitted).

**\*5** Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.,* 379 F.3d 348, 353 (6th Cir.2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353–54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Daniels,* 396 F.3d at 735.

### I. Plaintiff's Motion to Strike
In support of her motion for summary judgment, Defendant Caruso has executed an affidavit. (Dkt. # 52, Exhibit 5). Defendant also relies on an affidavit executed by Melody Wallace. (Dkt. # 31, Exhibit 3). Federal Rule of Civil Procedure 56(e) provides that affidavits used to oppose or support a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Plaintiff now moves to strike certain portions of these affidavits. Specifically, Plaintiff moves to strike paragraph four of Wallace's affidavit, as well as the attachments thereto. Plaintiff also moves to strike paragraphs seven and eight of Caruso's affidavit.

In paragraph four of her affidavit, Wallace asserts that December 12, 2006, she authored a memorandum titled "Proposed Discontinuation of Legal Assistance Agreements." The Court discerns no basis to strike this paragraph. With respect to the memorandum itself, which Wallace has included with her affidavit, the Court reaches a different conclusion. It is not clear whether the conclusions and assertions contained in the memorandum are based upon Wallace's first-hand knowledge or instead based upon hearsay. The undersigned, therefore, recommends that the memorandum included with Wallace's affidavit be stricken.

In paragraph seven of her affidavit, Defendant Caruso asserts that "MDOC prisoners are assured access to the courts as set forth in PD 05.03.116 "Prisoners' Access to the Courts." In paragraph eight of her affidavit, Caruso asserts that "[a]s set forth in Ms. Melody Wallace's December 12, 2006 Memorandum to Richard Stapleton, the Legal Writer Program and the mandatory law library collection assures prisoners' access to the courts." To the extent that these two paragraphs assert a legal conclusion (i.e., that Plaintiff did not suffer an infringement of his right of access to the courts), the undersigned recommends that such be stricken.

**\*6** In resolving Defendant Caruso's motion for summary judgment, the Court has not considered any of the material which it recommends be stricken.

### II. Denial of Access to the Courts
Plaintiff asserts that Defendant Caruso has violated other prisoners' First Amendment right of access to the courts.

The First Amendment protects every inmate's right of access to the courts, however, this protection extends only to "direct appeals, habeas corpus applications, and civil rights claims." *Thaddeus–X v. Blatter,* 175 F.3d 378, 391 (6th Cir.1999) (citing *Lewis v. Casey,* 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). To state a claim for denial of access to the courts, a prisoner must allege that he suffered "an actual litigation related injury or legal prejudice because of the actions of the defendants." *Erdman v. Martin,* 52 Fed. Appx. 801, 803 (6th Cir., Dec.12, 2002) (citing *Casey,* 518 U.S. at 349–51).

These particular claims fail for two reasons. First, Plaintiff lacks standing to assert the claim that another individual has suffered a violation of his right to access the courts. *See Shehee v. Grimes,* 39 Fed. Appx. 127, 129–30 (6th Cir., May 3, 2002) (court rejected plaintiff's claim "that the defendants interfered with the access to the courts of other inmates he was assisting" because "a plaintiff can only assert his own legal rights and interests, and he cannot rest a claim for relief on the legal rights and interests of third parties"). Second, even if Plaintiff could properly assert such claims, he has failed to submit evidence (or even allege) that the prisoners in question have suffered any actual litigation related injury or any form of legal prejudice. Accordingly, the Court recommends that Defendant is entitled to summary judgment as to Plaintiff's denial of access to the courts claims.

### III. Retaliation Claims

Plaintiff has asserted several claims of retaliation, each of which is addressed below. The elements of a First Amendment retaliation claim are well known: (1) Plaintiff was engaged in constitutionally protected conduct, (2) Plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action-in other words, the adverse action was motivated at least in part by Plaintiff's protected conduct. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999).

#### A. Plaintiff's Assistance to Other Inmates

Plaintiff asserts that Defendant Caruso implemented DOM 2006–14 in retaliation for Plaintiff having assisted other prisoners with various legal claims.

##### 1. Protected Conduct

Subject to legitimate penological restrictions, inmates generally possess the right to obtain legal assistance from other inmates (i.e ., jailhouse lawyers). *See McElhaney v. Elo,* 2000 WL 1477498 at *3 (6th Cir., Sep.25, 2000) (citing *Gibbs v. Hopkins,* 10 F.3d 373, 378 (6th Cir.1993)). However, to the extent that a jailhouse lawyer can be said to possess the "right" to assist another prisoner with his legal matters, such "is wholly derivative of the inmate/client's right of access to the courts." *McElhaney,* 2000 WL 1477498 at *3 (citing *Gibbs,* 10 F.3d at 378). Thus, any legal claim which may arise from the alleged interference in the relationship between a jailhouse lawyer and his "client" belongs to the client, not the jailhouse lawyer. *See McElhaney,* 2000 WL 1477498 at *3.

**\*7** In short, inmates generally possess no constitutional right to provide legal assistance to other prisoners. *See Shaw v. Murphy,* 532 U.S. 223, 225–32, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) ("beyond the protection normally accorded prisoners' speech," prisoners possess no right to provide legal assistance to other inmates); *Smith v. Campbell,* 250 F.3d 1032, 1037 n. 1 (6th Cir.2001) ("prisoners do not possess a special First Amendment right to provide legal assistance to fellow inmates"). There exists an exception to this general rule applicable in circumstances in which "the inmate[s] receiving the assistance would otherwise be unable to pursue legal redress." *VanDiver v. Martin,* 2002 WL 31166925 at *2 (6th Cir., Sep.27, 2002) (quoting *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000)).

As Defendant correctly observes, Plaintiff has failed to submit any evidence establishing that the inmates who Plaintiff had previously assisted would be unable to pursue their legal claims in the absence of his assistance. In response to Defendant's argument, Plaintiff, relying on Federal Rule of Civil Procedure 56(f), moves the Court to defer ruling on Defendant's motion for summary judgment so that he may conduct necessary discovery. (Dkt.# 61).

Rule 56(f) provides that "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable [discovery to be conducted]; or (3) issue any other just order." To obtain relief under this provision, the party opposing the motion for summary judgment cannot rely on "bare allegations or vague assertions of the need for discovery." *Everson v. Leis,* 556 F.3d 484, 493 (6th Cir.2009). The party must instead "describe with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment." *Id.* Furthermore, Rule 56(f) cannot be invoked by a party who has already had ample opportunity to conduct discovery. *See Mallory v. Noble Correctional Institute,* 45 Fed. Appx. 463, 469 (6th Cir., Sept.3, 2002) (citations omitted).

The Court finds Plaintiff's request for Rule 56(f) relief deficient in two respects. First, Plaintiff's affidavit in support thereof fails to describe with any particularity the evidence Plaintiff hopes to obtain in discovery or how such would advance his cause. Rather, Plaintiff merely asserts that he needs to obtain unspecified discovery from several prisoners. Furthermore, the Court finds that further delay is inappropriate considering that Plaintiff has not diligently pursued discovery in this matter. Plaintiff initiated this action more than twenty-eight (28) months ago. In the Court's estimation, this has afforded Plaintiff more than enough time to obtain from the prisoners he has allegedly assisted affidavits or other evidence on the subject of their ability to pursue their legal claims without Plaintiff's assistance. The Court, therefore, finds that Plaintiff was not engaged in protected conduct.

##### 2. Adverse Action Which Would Deter a Person of Ordinary Firmness

**\*8** Plaintiff asserts that Defendant Caruso implemented DOM 2006–14 in retaliation for Plaintiff assisting other prisoners with their legal matters. The question, therefore, is whether such constitutes adverse action sufficient to

maintain a First Amendment retaliation claim.

The Sixth Circuit has indicated that "in most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bell v. Johnson,* 308 F.3d 594, 603 (6th Cir.2002). As the *Bell* court further stated, "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out *only inconsequential actions." Id.* at 603 (quoting *Thaddeus–X,* 175 F.3d at 398). Accordingly, "unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Bell,* 308 F.3d at 603 (quoting *Thaddeus–X,* 175 F.3d at 398).

The Court is troubled by the notion that implementation of a Director's Office Memorandum, Policy Directive, or similar enactment applicable to the entire prison population could support a retaliation claim, as such could serve to trivialize the First Amendment by making every administrative decision grounds for a claim of retaliation. The Court recognizes, however, that at least one court has allegedly enjoined the Michigan Department of Corrections from enforcing DOM 2006–14 (or at least portions thereof). The aforementioned concerns notwithstanding, the Court finds that there exists a legitimate factual dispute as to whether the implementation of DOM 2006–14, the enforcement of which was later enjoined by a court, would deter a person of ordinary firmness from engaging in protected conduct.

### 3. Causal Connection

As courts recognize, retaliation is "easy to allege" and "can seldom be demonstrated by direct evidence." *Huff v. Rutter,* 2006 WL 2039983 at *7 (W.D.Mich., July 19, 2006) (quoting *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987)). Nonetheless, "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken. *Thaddeus–X,* 175 F.3d at 399 (citations omitted); *see also, Desmone v. Adams,* 1998 WL 702342 at *3 (6th Cir., Sep.23, 1998) ("[a] claim of retaliation must include a chronology of events from which retaliation may plausibly be inferred").

Aside from stating in conclusory fashion that he was retaliated against, Plaintiff has asserted no facts from which it is reasonable to conclude that his protected conduct was a motivating factor in Defendant Caruso's alleged conduct. With respect to the causation element

Plaintiff offers nothing more than "bare allegations of malice," which are insufficient to maintain a retaliation claim. *See, e.g., McMillan v. Fielding,* 136 Fed. Appx. 818, 820–21 (6th Cir., June 7, 2005) (holding that dismissal for failure to state a claim is appropriate where the plaintiff's allegations regarding causation "were purely conclusory") (citing *Crawford–El v. Britton,* 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)). The Court recommends, therefore, that Defendant Caruso is entitled to summary judgment as to Plaintiff's retaliation claims concerning the assistance he allegedly provided to other prisoners.

### B. Plaintiff's Prior Litigation Activities

**\*9** Plaintiff asserts that Defendant Caruso implemented DOM 2006–14 in retaliation for him having previously pursued litigation challenging MDOC policies regarding prisoners' ability to possess UCC materials. Even assuming Plaintiff could satisfy the first two prongs of the analysis, Plaintiff has failed to present any evidence from which a reasonable person could conclude that there exists any causal connection between Plaintiff's litigation activity and Defendant Caruso's decision to implement DOM 2006–14. The Court, therefore, recommends that Defendant Caruso is entitled to summary judgment as to this claim.

### C. Retaliatory Transfer Claim

Plaintiff asserts that in March 2006, he was transferred, and his security level increased, in retaliation for having previously pursued legal action challenging MDOC policies restricting the ability of prisoners to possess UCC materials. Again, even assuming Plaintiff can satisfy the first two prongs of the analysis, he cannot establish the requisite causal connection. Defendant Caruso has submitted an affidavit in which she asserts that she was not involved in this incident. Plaintiff has submitted no evidence suggesting otherwise. Accordingly, the Court recommends that Defendant Caruso is entitled to summary judgment as to this claim.

### D. Exclusion from the Legal Writer Program

Plaintiff also alleges that he was excluded from participating in the MDOC Legal Writer program in retaliation for "filing of a prior lawsuit against [Defendant Caruso] and for plaintiff's active role in assisting other prisoners in litigating suits against Defendant Caruso." Even if Plaintiff could satisfy the first two prongs of the analysis, he has failed to present any evidence from which

a reasonable person could conclude that there exists any causal connection between Plaintiff's litigation activities and Plaintiff's alleged exclusion from the Legal Writer program. The Court, therefore, recommends that Defendant Caruso is entitled to summary judgment as to this claim.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that *Plaintiff's Motion to Strike,* (dkt.# 69), be **granted in part and denied in part.** The undersigned further recommends that *Defendant Caruso's Motion for Summary Judgment,* (dkt.# 51), be **granted** and Plaintiff's

action **dismissed.**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

## All Citations

Not Reported in F.Supp.2d, 2009 WL 3644801

Footnotes

1    Accord **1st Circuit,** *Brown v. Apfel,* 71 F.Supp.2d 28, 35 and n. 1 (D.R.I.1999) ("This amendment [regarding alcohol or drug abuse as a factor contributing to disability] became effective ... thus prompting the ALJ to vacate his original decision ... which found plaintiff to be 'disabled,' so that this further determination ... could be made in light of the amendment. [T]o the extent Plaintiff had any due process argument regarding the application of the amendment to his case, he has waived it.") (citing *Santiago v. Canon USA, Inc.,* 138 F.3d 1, 4 (1st Cir.1998)), *aff'd,* No. 99−2355, 2000 WL 1451019, 230 F.3d 1347 (1st Cir. Sept.28, 2000);

    **2nd Circuit,** *Hubbard v. Kelley,* ––– F.Supp.2d ––––, 2009 WL 3078578, *1 (W.D.N.Y. Sept.24, 2009) (" 'In this ... circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.' ") (quoting *Illis v. Artus,* 2009 WL 2730870, *1 (E.D.N.Y. Aug.28, 2009) and citing *Pierce v. Mance,* 2009 WL 1754904, *1 (S.D.N.Y. June 22, 2009) ("Rule 72(b) does not provide that new claims may be raised in objections to a report and recommendation. Moreover, since new claims may not be raised properly at this late juncture, the petitioner's new claims, presented in the form of, or along with, 'objections', should be dismissed."));

    **3d Circuit,** *Paul v. Astrue,* 2008 WL 2053808, *3 (M.D.Pa. May 13, 2008) ("As for plaintiff's argument that substantial evidence does not support a finding that plaintiff does not meet listings 11.07 and 107.01 in the Childhood Listings of Impairments ... [he] did not raise this argument in his initial brief to the magistrate judge. * * * Thus, there exists a basis for concluding that plaintiff has waived this argument.");

    **5th Circuit,** *Martin v. Barnhart,* 2004 WL 1661207, *5 (E.D.La. July 23, 2004) ("Before the Magistrate Judge, Martin merely argued [for] remand ... based on 'new and material' evidence. Because Martin failed to raise these *legal* arguments before the magistrate judge, she has waived them absent compelling reasons for failing to do so ....") (citing, *inter alia, Freeman v. Bexar Cty.,* 142 F.3d 848, 851–52 (5th Cir.1998));

    **7th Circuit,** *Zendejas v. Reel Cleaning Servs., Inc.,* 2009 WL 2431299, *8 (N.D.Ill. Aug.6, 2009) ("Arguments not raised before a magistrate judge and raised for the first time in the objections filed before the district judge are waived.") (citing, *inter alia, U.S. v. Melgar,* 227 F.3d 1038, 1040 (7th Cir.2000));

    **8th Circuit,** *Roberts v. Apfel,* 222 F.3d 466, 470 (8th Cir.2000) (citing *Reciprocal Exchange v. Noland,* 542 F.3d 462, 464 (8th Cir.1976));

    **9th Circuit,** *US v. Howell,* 231 F.3d 615, 622 (9th Cir.2000) ("To require a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court.");

    **10th Circuit,** *Rothwell v. Barnhart,* 2006 WL 1789157, *1 (D.Kan. June 27, 2006) ("Plaintiff argues that the ALJ listed several reasons to support his credibility finding, but except for ... activities of daily living, the ALJ did not provide specific support for each reason. Because plaintiff did not raise this issue before the magistrate judge, he may not seek review of the ... [R & R] on this ground.") (citing, *i.a., U.S. v. Garfinkle,* 261 F.3d 1030, 1031 (**10th Cir.** 2001));

    **11th Circuit,** *Williams v. McNeil,* 557 F.3d 1287, 1290–92 (11th Cir.) (as a matter of first impression, panel affirmed district court's refusal to entertain arguments which were raised for the first time in objections to an R & R rather than in briefs before the Magistrate Judge), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 2747, 174 L.Ed.2d 249 (2009);

    *Cf.* **D.C. Circuit,** *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 835 with n. 10 (D.C.Cir.2001) (noting, with apparent approval, district court's refusal to entertain an argument in an objection to an R & R which was not raised before the Magistrate Judge).

2    *See, e.g., Wappler v. Huss,* 2009 WL 3055202, *1–2 (W.D.Mich. Sept.18, 2009) **(Neff, J.)**;
    *Benner v. Corr. Med. Servs., Inc.,* 2009 WL 2515823, *1 (W.D.Mich. Aug.14, 2009) **(Quist, J.)** ("Regarding exhaustion, Defendants first assert that the grievance was untimely at Step II. Defendants never raised this argument before the Magistrate Judge. Because Defendants raised it for the first time in their Objection, it is deemed waived.") (citing *Bramson v. Winn,* 136 F. App'x 380, 382 (1st Cir.2005) and *Hicks v. Woodruff,* No. 99–6303,216 F.3d 1087, 2000 WL 854269 (10th Cir. June 28, 2000) ("because we do not consider an issue raised for the first time in the objections to the magistrate judge's report and recommendation, we deem the issue waived"));
    *Kita v. SSA,* 2009 WL 1464252, *2 (W.D.Mich. May 18, 2009) **(Maloney, C.J.)** ("[A]t least some of the evidence Kita now raises regarding the severity of his physical impairments and limitations was not the subject of legal argument or discussion in Kita's brief before the Magistrate Judge and so cannot be considered by this court on review of the R & R.").

3    Accordingly, judges in our district consistently adopt R & Rs without additional analysis where the parties have not timely, specifically, properly objected. *See, e.g.,*

| | |
|---|---|
| *Stevenson v. Pramsteller,* 2009 WL 1883878 (W.D.Mich. June 30, 2009) | (Bell, J.) |
| *Banks v. Davis,* 2009 WL 1874093 (W.D.Mich. June 26, 2009) | (Quist, J.) |
| *Martin v. Smith,* 2008 WL 4151352 (W.D.Mich. Sept.3, 2008) | (Enslen, J.) |
| *US v. Bale,* 2008 WL 4534420 (W.D.Mich. Oct.2, 2008) | (Edgar, J .) |
| *Lee v. Caruso,* 2008 WL 2859212 (W.D.Mich. July 22, 2008) | (Miles, J.) |
| *Veltkamp v. SSA,* 528 F.Supp.2d 716, 718 n. 2 (W.D.Mich.2007) | (Maloney, J.) |
| *US v. Hart,* 2005 WL 1308199 (W.D.Mich. June 1, 2005) | (McKeague, J.) |
| *US v. Corradini,* 1994 WL 447174 (W.D.Mich. Jan.25, 1994) | (Gibson, C.J.) |
| *Gill v. HHS,* 1985 WL 71797 (W.D.Mich. Feb.27, 1985) | (Suhrheinrich). |

    Throughout our circuit, it is common to adopt R & Rs without discussion in the absence of timely, proper objection. *See, e.g.:*

| | |
|---|---|
| *Allen v. Hudson,* 2009 WL 1649312 (N.D.Ohio June 10, 2009) | (Lioi, J.) |
| *Schlatter v. Jeffries,* 2009 WL 73736 (N.D.Ohio Jan.8, 2009) | (Aldrich, J.) |
| *US v. Josic,* 2008 WL 5234386 (N.D.Ohio Dec.12, 2008) | (Boyko, J.) |
| *Hart v. Ridge Tool Co.,* 2007 WL 1983688, *2 (N.D.Ohio 2007) | (Nugent, J.) |
| *Montalvo v. GMC,* 2006 WL 1888704, *1 (N.D.Ohio 2006) | (Zouhary, J.) |
| *Wallace v. Jackson,* 2006 WL 467915, *1 (E.D.Mich.2006) | (Gadola, J.) |
| *Bradberry v. Astrue,* 2009 WL 2027111 (M.D.Tenn. July 8, 2009) | (Wiseman, J.) |
| *Winston v. Cargill, Inc.,* 2009 WL 1748728 (W.D.Tenn. June 19, 2009) | (Anderson, J.) |
| *Rose v. Mattrixx Init., Inc.,* 2009 WL 902311 (W.D.Tenn. Mar.31, 2009) | (McCalla, J.) |
| *Young v. Simpson,* 2009 WL 798787 (E.D.Ky. Mar.24, 2009) | (Coffman, J.). |

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite history available

2015 WL 6161791
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Michael MABIN, Plaintiff–Appellant,
v.
HSBC MORTGAGE SERVICES, INC.,
Defendant–Appellee.

Docket No. 323043.
|
Oct. 20, 2015.

Oakland Circuit Court; LC No.2014–140141–NZ.

Before: GLEICHER, P.J., and SAWYER and MURPHY,
JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff Michael Mabin commenced this lawsuit
against defendant HSBC Mortgage Services, Inc., in an
effort to stop HSBC's foreclosure by advertisement of a
mortgage on plaintiff's real property held by HSBC that
secured a promissory note executed by plaintiff. The
primary argument proffered by plaintiff was that HSBC
had violated a 2011 loan modification agreement, which
plaintiff sought to enforce. On HSBC's motion for
summary disposition, the trial court ruled that the 2011
agreement was temporary and that there was no guarantee
that its provisions would be extended beyond its limited
period of application. Moreover, the trial court ruled that
any loan modification agreement was superseded when
plaintiff entered into a subsequent modification of the
loan in 2013, resulting in a novation. For these reasons,
the trial court granted HSBC's motion for summary
disposition. Plaintiff appeals as of right, and we affirm.

On December 11, 2006, plaintiff executed a promissory
note in favor of HSBC, with plaintiff borrowing $334,000

and agreeing to pay HSBC $2,665 per month over 30
years at a fixed interest rate of 8.910%. On that same date,
plaintiff, as mortgagor, granted HSBC, as mortgagee, a
mortgage on plaintiff's home as security for the
underlying promissory note. The mortgage contained a
standard power-of-sale clause, allowing for foreclosure by
advertisement following default and acceleration of the
debt. See MCL 600.3201 ("Every mortgage of real estate,
which contains a power of sale, upon default being made
in any condition of such mortgage, may be foreclosed by
advertisement....").

According to HSBC, in October 2009, plaintiff was
approved for a short-term loan modification of six months
that lowered his monthly payments to $1,855, after which
plaintiff resumed making payments of $2,665 per month,
as called for by the original note. In May 2011, plaintiff
faxed a request to HSBC for a loan modification under its
Hardship Program. In an affidavit submitted below,
plaintiff averred that the request for a loan modification
was necessary due to a significant decline in plaintiff's
income. Pursuant to a letter from HSBC to plaintiff dated
October 21, 2011, HSBC indicated that it had approved
plaintiff's request for assistance under HSBC's Hardship
Program. The letter provided that HSBC would
temporarily adjust the interest rate of the loan to 5.25%
for six months and that plaintiff's monthly mortgage
payments would temporarily be reduced to $1,850. The
letter additionally stated:

> All payments must be made in accordance with the
> temporary Loan Modification Agreement. In modifying
> the terms of the original loan agreement, there may be a
> negative impact to your credit score. Your temporary
> modified payment amount will be accepted as of
> December 1, 2011.

> Upon completion of the temporary loan modification,
> your loan will revert to the interest rate and payment
> schedule set forth by your Note and Security
> Instrument.... Your temporary loan modification is set
> to expire on or after 05/01/12. *You may be eligible for*
> *an extension of payment relief at the end of the*
> *temporary modification period. To be eligible, you*
> *must make all contractual payments that are due*
> *during your temporary loan modification period, and*
> *demonstrate your continuing need for assistance once*
> *that loan modification has ended.*

> **\*2** ...

> HSBC ... has temporarily modified your loan wholly as
> a consideration. All obligations, rights and remedies set
> out in your Note and Security Instrument remain in full

force and effect. [Emphasis added.[1]]

In his affidavit, plaintiff averred that in October or November 2011, he had spoken by phone with an HSBC representative about the temporary modification and the representative informed plaintiff that he "could continue to make the modified payment amount provided [that plaintiff] made all [his] modified payments through the trial period and [the] hardship continued." Plaintiff further asserted, and there is no dispute, that he made all of the required loan payments during the temporary loan modification period. He averred that in April 2012, HSBC personnel advised plaintiff that he needed to provide financial documents in order to establish his continuing need for the loan modification. Plaintiff claimed in his affidavit that he faxed the requested financial documents to HSBC later in April 2012.

Plaintiff averred that HSBC refused to accept the modified monthly payment amount of $1,850 after May of 2012, at which time HSBC began demanding monthly payments of $2,519 under a two-month trial period plan (TPP). In a timeline prepared by HSBC,[2] it indicated that the temporary loan modification ($1,850 monthly rate) had expired under its own terms on May 1, 2012, and that the original contract rate of $2,665 was then reinstituted. HSBC's timeline further reflected that on April 30, 2012, plaintiff had faxed HSBC a request for yet another loan modification. According to HSBC, on May 25, 2012, it approved a two-month TPP, pursuant to which plaintiff was required to make payments of $2,519 on June 22 and July 22, 2012, in order to obtain a permanent loan modification. While the first payment was timely made, the second payment was not made in accordance with the TPP, and HSBC thus rejected modification of the loan. In plaintiff's affidavit, he acknowledged that the second payment under the TPP was late and that HSBC therefore refused to continue accepting the $2,519 amount and would not agree to a further loan modification.

In January 2013, ostensibly because plaintiff was struggling with or not making his loan payments, HSBC offered plaintiff a new two-month TPP, which, if satisfied, would lead to a new loan modification agreement. Under the 2013 TPP, plaintiff was required to make monthly payments of $3,031 on February 23 and March 25, 2013. Plaintiff timely made the two $3,031 payments, and by letter dated April 11, 2013, HSBC informed plaintiff that he had successfully completed the TPP and was thus approved for a loan modification. On April 23, 2013, plaintiff executed the new loan modification agreement. This agreement required plaintiff to make monthly payments of $3,055, commencing on May 1, 2013, with an interest rate of 8.410%. The loan

modification agreement also provided that it "shall supersede the terms of any modification, forbearance or [TPP] that [was] previously entered into with [HSBC]." In plaintiff's affidavit, he claimed that HSBC had demanded that he enter into the latest loan modification agreement under threat of foreclosure. Plaintiff further averred that he lacked legal representation "and believed HSBC's threats that if [he] didn't make the higher payments ..., [HSBC] would foreclose."

*3 As asserted in HSBC's timeline, in July 2013, plaintiff contacted HSBC and advised it that he was having difficulty making his monthly mortgage payments under the 2013 loan modification agreement. HSBC further indicated that in December 2013, it sent plaintiff a notice of right to cure default, and that in March 2014, HSBC delivered a notice of foreclosure sale to plaintiff, which sale was scheduled for April 22, 2014. On April 14, 2014, plaintiff filed the instant action against HSBC to quiet title and for other relief. The main theme of plaintiff's complaint was that the loan modification agreement (hereafter "LMA") entered into in 2011 (temporary $1,850 monthly payment), as opposed to the 2013 LMA ($3,055 monthly payment), governed the parties' rights and obligations in relationship to the note and mortgage. Plaintiff alleged that he had a contractual right to have the 2011 LMA continue indefinitely, given his full compliance with the payment requirements during the temporary period and so long as he could establish an ongoing financial hardship, which condition was satisfied. Plaintiff's complaint alleged causes of action for violation of the foreclosure-by-advertisement statutes, MCL 600.3201 et seq., breach of contract, fraud and misrepresentation, promissory estoppel, and violations of the Mortgage Brokers, Lenders, and Servicers Licensing Act (MBLSLA), MCL 445.1651 et seq. Plaintiff sought declaratory relief, damages, equitable relief, and attorney fees and costs. On April 17, 2014, the trial court entered a temporary restraining order, halting the scheduled sheriff's sale.

In lieu of filing an answer, on May 6, 2014, HSBC filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (10). HSBC first argued that the 2011 LMA[3] was temporary and expired on May 1, 2012, under its own terms. HSBC contended that the 2011 LMA merely indicated that plaintiff "*may be eligible* for an extension" (emphasis added), and thus there was no guarantee of an extension, nor any obligation to grant plaintiff an extension, even if the temporary monthly payments had been made and plaintiff's financial struggles continued. HSBC maintained that it ultimately never contractually agreed or promised to continue the 2011 LMA beyond its period of temporary application.

HSBC next argued that any claims related to averments in plaintiff's affidavit that HSBC personnel had orally promised him an extension of the 2011 LMA are barred by the statute of frauds under MCL 566.132(2).[4] HSBC further asserted that plaintiff's claims were subject to dismissal because he accepted the 2013 LMA, which superseded the 2011 LMA, making the 2011 LMA unenforceable under novation principles, assuming its enforceability in the first place with respect to an extension. Finally, HSBC argued that plaintiff failed to plead his fraud claim with particularity and that the fraud claim also failed because any reliance on purported HSBC oral representations would have been unreasonable given the clear language in the 2011 LMA indicating its temporary nature and the mere possibility of an extension.

**\*4** To avoid redundancy, we shall discuss plaintiff's position with respect to HSBC's summary disposition arguments in the analysis portion of this opinion, to the extent that an argument made by plaintiff below is renewed on appeal. The trial court conducted a hearing on HSBC's motion for summary disposition and took the matter under advisement. On July 21, 2014, the trial court issued a short written opinion and order granting summary disposition in favor of HSBC. The opinion and order provided, in pertinent part, as follows:

> The clear unambiguous language of the [2011 LMA] fails to support Plaintiff's assertion that the loan modification was permanent. By its express terms, the [2011 LMA] temporarily adjusted the loan interest rate for 6 months and provided that upon completion of the temporary loan modification, the loan would revert to the interest rate and payment schedule set forth in the Note and Security Instrument. While it did provide certain circumstances under which Plaintiff may have been eligible for an extension of payment relief, it did not guarantee that Plaintiff would receive an extension of the [2011 LMA]. In addition, once Plaintiff accepted the [2013 LMA], it superseded any prior modification agreement. The Court finds that Plaintiff has failed to state valid claims against [HSBC] and there is no genuine issue of material fact that the claims are barred by the doctrine of novation.

Plaintiff appeals as of right.

We review de novo a trial court's ruling on a motion for summary disposition. *Elba Twp v. Gratiot Co Drain Comm'r,* 493 Mich. 265, 277; 831 NW2d 204 (2013).[5] We similarly review de novo questions regarding the existence, construction, and application of a contract. *Rory v. Continental Ins Co,* 473 Mich. 457, 464; 703 NW2d 23 (2005); *Klapp v. United Ins Group Agency, Inc,* 468 Mich. 459, 463; 663 NW2d 447 (2003); *Kloian v. Domino's Pizza, LLC,* 273 Mich.App 449, 452; 733 NW2d 766 (2006).

Plaintiff first argues on appeal that HSBC and the trial court failed to specify how or why each one of plaintiff's particular causes of action alleged in the complaint was subject to summary dismissal under MCR 2.116(C)(8) for failure to state a claim. HSBC's motion for summary disposition was brought pursuant to MCR 2 .116(C)(8) and (10), and the trial court cited both of those provisions in granting the motion. In the context of reviewing a summary disposition ruling alluding to both MCR 2.116(C)(8) and (10), when a trial court clearly looked beyond the pleadings in resolving the motion, we review the court's ruling as having been decided under (C)(10) and not (C)(8). *Collins v. Detroit Free Press, Inc,* 245 Mich.App 27, 31; 627 NW2d 5 (2001). Here, the trial court, in deciding the motion for summary disposition, examined and relied on the language in the 2011 and 2013 LMAs, which were part of the documentary evidence submitted by the parties with respect to summary disposition. Plaintiff had also attached the 2011 LMA to his complaint, as required for a claim "based on a written instrument," effectively making it "a part of the pleading for all purposes." MCR 2.113(F)(1)(2). This would include consideration of the 2011 LMA for purposes of summary disposition under MCR 2.116(C)(8). See *AFP Specialties, Inc v. Vereyken,* 303 Mich.App 497, 512–513; 844 NW2d 470 (2014); *Karam v. Law Offices of Ralph J. Kliber,* 253 Mich.App 410, 418 n. 6; 655 NW2d 614 (2002). With respect to granting summary disposition on the basis of the 2013 LMA and the doctrine of novation, the trial court looked beyond the pleadings, thereby implicating MCR 2.116(C)(10) and not (C)(8). And, given that the 2011 LMA became part of the pleadings but was also submitted as documentary evidence in connection with the motion for summary disposition, the trial court's decision to grant summary disposition on the basis that the 2011 LMA did not contractually require an extension implicated both MCR 2.116(C)(8) and (10).

**\*5** A review of the specific causes of action asserted by plaintiff in his complaint reveals that they were all ultimately predicated on the 2011 LMA and the claimed

contractual right to an extension of that LMA under the circumstances, or the alleged oral representations made by HSBC personnel to plaintiff that the 2011 LMA would be extended upon payment compliance and continuing financial hardship, or both the 2011 LMA and the oral representations. The trial court ruled that the 2011 LMA did not guarantee an extension even if plaintiff made the temporary payments and was still struggling financially and that, regardless, the 2011 LMA was superseded by the 2013 LMA under the doctrine of novation. These rulings could be viewed as not speaking directly to plaintiff's claims that were based on the alleged oral representations by HSBC personnel, e.g., promissory estoppel, fraud, and violation of the MBLSLA. However, the 2013 LMA provided that it "supersede[d] the terms of *any* modification, forbearance or [TPP] that [was] previously entered into with [HSBC]." (Emphasis added.) And the trial court ruled that the 2013 LMA "superseded *any* prior modification agreement." (Emphasis added.) The 2013 LMA and the trial court's ruling did not distinguish between prior *written* and prior *oral* agreements or promises for purposes of being superseded. Accordingly, our analysis and holding below regarding novation and the superseding capacity of the 2013 LMA apply equally to the written 2011 LMA and the alleged oral representations made in 2011.[6]

We now examine the 2011 LMA, which plaintiff argues gave him a contractual right to an extension beyond the temporary period if he satisfactorily complied with the decreased monthly payment requirements and could show ongoing financial hardship. Plaintiff contends that because he made the temporary monthly payments and submitted documents establishing a continuing financial hardship, HSBC was obligated to extend the 2011 LMA. We disagree.[7]

"In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja,* 187 Mich.App 418, 422; 468 NW2d 58 (1991). "A valid contract requires mutual assent on all essential terms[,]" and "[b]efore a contract can be completed, there must be an offer and acceptance." *Eerdmans v. Maki,* 226 Mich.App 360, 364; 573 NW2d 329 (1997). In *Burkhardt v. Bailey,* 260 Mich.App 636, 656–657; 680 NW2d 453 (2004), this Court recited the core principles of contract interpretation:

> [The] unilateral subjective intent of one party cannot control the terms of a contract. It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms. Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms.

**\*6** The main goal of contract interpretation generally is to enforce the parties' intent. But when the language of a document is clear and unambiguous, interpretation is limited to the actual words used, and parol evidence is inadmissible to prove a different intent. An unambiguous contract must be enforced according to its terms. The judiciary may not rewrite contracts on the basis of discerned "reasonable expectations" of the parties because to do so is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. [Citations and quotation marks omitted.]

Here, the parties do not dispute that the 2011 LMA was a valid contract, and there is no disagreement regarding the parties' rights and obligations *during or with respect to the temporary six-month period.* The dispute that arose concerned the construction of the 2011 LMA in regard to its possible extension beyond the temporary period. Plaintiff is essentially arguing that the 2011 LMA, aside from providing the contractual terms for the temporary period, created two conditions precedent (payments made during temporary period and continuing financial hardship), which, if satisfied, contractually obligated HSBC to extend the 2011 LMA beyond the temporary period and legally entitled plaintiff to such an extension. In *Harbor Park Market, Inc v. Gronda,* 277 Mich.App 126, 131; 743 NW2d 585 (2007), this Court discussed conditions precedent, observing:

> A condition precedent ... is a fact or event that the parties intend must take place before there is a right to performance. If the condition is not satisfied, there is no cause of action for a failure to perform the contract. However, ... promisors ... cannot avoid liability on [a] contract for the failure of a condition precedent where they caused the failure of the condition. [Citations and quotation marks omitted.]

A plain reading of the 2011 LMA indicates that it did not create conditions precedent giving rise to a right to performance—an extension of the LMA—if satisfied. Again, the 2011 LMA provided that plaintiff "may be eligible for an extension of payment relief[,]" and that

"[t]o be eligible, [plaintiff] must make all contractual payments that are due during [the] temporary loan modification period[ ] and demonstrate [a] continuing need for assistance once [the] loan modification has ended." At best, considering the lack of any dispute that plaintiff made the temporary monthly payments, and given that his financial hardship was apparently ongoing, the 2011 LMA merely made plaintiff "eligible" for an extension. The term "eligible" simply means that a person is "qualified to participate or [to] be chosen." *Merriam–Webster's Collegiate Dictionary* (11th ed). Had the 2011 LMA instead contained mandatory language, e.g., entitled, obligated, must, shall, or guarantee, in connection with an extension upon satisfaction of the conditions, only then would true conditions precedent have existed as to a right to an extension. The trial court correctly determined that the 2011 LMA did not guarantee plaintiff an extension. Accordingly, all of plaintiff's claims premised on contractual entitlement to an extension on the basis of the language in the 2011 LMA fail.

**\*7** Furthermore, the trial court correctly determined that the 2013 LMA superseded the 2011 LMA, resulting in a novation, even assuming that the 2011 LMA had created a contractual right to an extension under the circumstances. "A novation requires: (1) parties capable of contracting; (2) a valid obligation to be displaced; (3) consent of all parties to the substitution based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one." *In the Matter of the Dissolution of F. Yeager Bridge & Culvert Co,* 150 Mich.App 386, 410; 389 NW2d 99 (1986).

Plaintiff initially argues, in cursory and conclusory form, that there was no recognizable novation because the consideration was insufficient to support a novation. In *Keppen v. Rice,* 257 Mich. 299, 301; 241 NW 156 (1932), our Supreme Court stated that "[c]onsideration for [a] novation is essential, but that is furnished by the mutual agreement of the parties." The 2013 LMA reflected a mutual agreement reached by the parties. Moreover, "consideration" is something of value, which can include an act, a forbearance, a performance, a return promise, or the modification of a legal relationship. *Timko v. Oakwood Custom Coating, Inc,* 244 Mich.App 234, 244; 625 NW2d 101 (2001). Under the 2013 LMA, plaintiff promised to pay a new and higher monthly mortgage amount and HSBC effectively refrained from immediately enforcing the debt pursuant to the terms of the original note and mortgage, i.e., HSBC agreed to a forbearance that staved off foreclosure. We also note that the interest rate was slightly reduced in the 2013 LMA. "Courts will not ordinarily inquire into the adequacy of

consideration[.]" *Moffit v. Sederlund,* 145 Mich.App 1, 11; 378 NW2d 491 (1985). In sum, the novation was supported by sufficient consideration.

Plaintiff finally contends that the novation was barred by coercion or economic duress. The basis for this argument is plaintiff's claim that he signed the 2013 LMA only because he was threatened with foreclosure. In *Allard v. Allard,* 308 Mich.App 536, 551–552; ––– NW2d ––– (2014), this Court addressed the contract defense of duress, observing:

> A contract may be deemed unenforceable if it was executed under duress. To succeed with respect to a claim of duress, defendants must establish that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes. Further, the fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully. Defendant claims on appeal that Michigan's definition of duress is unclear and that the "unlawful" aspect should be removed. We disagree. First, the definition is quite clear and needs no clarification. Second, defendant's argument tacitly acknowledges that the definition is indeed clear because she then argues that this Court should remove the definition's key component. Moreover, even if we were inclined to agree with defendant, we are bound by the doctrine of stare decisis and have no power to modify this Court's and our Supreme Court's prior definition of duress by removing the component addressing illegal acts by the person applying the coercion. [Citations, quotation marks, and alteration brackets omitted.]

**\*8** Here, assuming the truthfulness of plaintiff's affidavit, as we must do for purposes of MCR 2.116(C)(10), any threat by HSBC to foreclose on the mortgage was not unlawful, nor does plaintiff even specifically assert that

the alleged foreclosure threat was unlawful. There appears to be no dispute that at the time of the 2013 LMA, plaintiff was in default of the note and mortgage and was facing foreclosure. Indeed, plaintiff makes no argument that HSBC was not entitled to begin foreclosure proceedings when the 2013 LMA was executed. Considering that the mortgage contained a power-of-sale clause, HSBC had every legal right to commence a foreclosure by advertisement. And there was nothing illegal or unlawful about presenting plaintiff with the 2013 LMA, while at the same time reminding him that a foreclosure was looming should he choose not to agree to the 2013 LMA. Plaintiff was certainly aware that foreclosure was on the horizon even absent any express threat of foreclosure by HSBC. Accordingly, the trial court did not err in applying the doctrine of novation.

Affirmed. Having fully prevailed on appeal, HSBC is awarded taxable costs pursuant to MCR 7.219.

**All Citations**

Not Reported in N.W.2d, 2015 WL 6161791

Footnotes

1    We note that the parties focus their arguments on construction of the language in this letter, particularly the emphasized language, with respect to whether HSBC was obligated to provide plaintiff with an extension of the temporary loan modification upon satisfaction of payment requirements during the temporary period and proof of continuing financial need. The letter references an associated temporary loan modification agreement; however, it is unclear whether such an agreement was ever executed. Regardless, assuming the existence of a signed agreement consistent with the letter or otherwise, it was never made part of the lower court record. The parties effectively treat the letter as the temporary loan modification agreement.

2    The trial court ordered both parties to prepare and file timelines, and they both complied.

3    Again, the parties treat the 2011 temporary modification acceptance letter sent by HSBC to plaintiff as an LMA, and considering that HSBC fully accepts that proposition and for ease of reference, we shall likewise treat and refer to the acceptance letter as the 2011 LMA.

4    MCL 566.132(2) provides in relevant part:
        An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
        ...
        (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

5    MCR 2.116(C)(8) provides for summary disposition when a complaining party fails "to state a claim on which relief can be granted." A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v. Henderson,* 465 Mich. 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint must be accepted as true. *Dolan v. Continental Airlines/Continental Express,* 454 Mich. 373, 380–381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie,* 465 Mich. at 130. With respect to the well-established principles governing the analysis of a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v. Dells,* 301 Mich.App 368, 377; 836 NW2d 257 (2013), stated:
        In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

6    Moreover, as argued by HSBC below and on appeal, and despite the trial court's failure to reach the issue in its opinion and order, the statute of frauds as set forth in MCL 566.132(2) quite clearly bars plaintiff's claims that were based on oral promises or

communications regarding an extension of the 2011 LMA. See footnote 4 above; *Crown Technology Park v. D & N Bank, FSB,* 242 Mich.App 538, 548–553; 619 NW2d 66 (2000) (statutory provision bars all actions, even one based on promissory estoppel).

7     We note that plaintiff never specifically argued nor submitted evidence showing that, had the 2011 LMA actually been extended, he would not have been in default and subject to foreclosure in light of payments that were made thereafter.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

C KeyCite citing references available

2012 WL 5939931
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Edwin and Carla McINTYRE, and Kelly M. Hagan,
Trustee, Plaintiffs,
v.
FIRST FINANCIAL GROUP (a/k/a 1st Financial
Group and/or M4 Financial), a Florida Business,
and Global Client Solutions, LLC, an Oklahoma
Company, Defendants.

No. 1:12–CV–00740.
|
Nov. 27, 2012.

**Attorneys and Law Firms**

John A.M. Ferguson, Jr., John Ferguson, Elk Rapids, MI,
for Plaintiff.

Marilyn S. Tyree, Charles F. Behler Smith Haughey Rice
& Roegge PC, Grand Rapids, MI, for Defendant.

*OPINION*

GORDON J. QUIST, District Judge.

**\*1** On April 24, 2012, Plaintiffs Edwin and Carla
McIntyre and Kelly M. Hagan, Trustee, filed a claim
against Defendants First Financial Group (FFG) and
Global Client Solutions (Global) in Antrim County
Circuit Court, Michigan, claiming violation of the Credit
Services Protection Act, Mich. Comp. Laws § 445.1821 *et
seq.*[1] On July 18, 2012, Global filed a Notice of Removal
to this Court. The matter currently before the Court is
Global's Motion to Compel Arbitration. (Docket no. 8,
Page ID 65.) The Motion has been fully briefed and the
Court believes oral argument to be unnecessary. W.D
.Mich. LCivR 7.2(d). For the reasons set forth below, the
Court will grant Global's motion.

**I. Background**

FFG is a Florida business that represents debtors to
creditors to negotiate repayment of debts.[2] (Compl., Ex.
A, Docket no. 1–1, Page ID 14.) Global is a "third party
sender" that processes payments for banks and provides
account customer services for account holders. (Jade
Decl., Docket no. 10, Page ID 92.) Plaintiffs Edwin and
Carla McIntyre are Michigan residents who entered into a
Client Partnership Agreement with FFG on December 4,
2008, for debt negotiation services. (Ex. A, Docket no.
1–1, Page ID 13, 17–18.) Global had previously
processed account transactions for Rocky Mountain Bank
and Trust, where Plaintiffs had an account pursuant to the
Client Partnership Agreement. (Ex. A, Docket no. 1–1,
Page ID 17.) The Client Partnership Agreement explicitly
named Global as the account servicer. (*Id.*) Plaintiffs used
the account until December 1, 2010, when they withdrew
the remaining funds. (Ex. D, Docket no. 10–4, Page ID
112.)

On December 9, 2008, Global mailed Plaintiffs a
welcome letter marked "return service requested." (Ex. A,
Docket no. 1–1, Page ID 19.) The letter contained a
Special Purpose Account Agreement outlining the terms
of Global's services. (*Id.* at 20.) Plaintiffs never signed the
agreement but did use Global's account services. (*See
id.*) On September 20, 2010, Global mailed Plaintiffs a
notice marked "return service requested," stating that
Plaintiffs' Rocky Mountain account administered by
Global had been transferred to another FDIC-insured
bank. (Ex. C, Docket no. 10–3, Page ID 106.) The notice
also included a new Special Purpose Account Agreement
(hereinafter replacement Agreement). (*Id.* at 108.) The
notice stated that the replacement Agreement "shall
govern your account going forward. Please read it
carefully." (*Id.* at 106.) Plaintiffs never signed the
Replacement Agreement but continued to use Global's
services. (*See id.*) All three agreements—the Client
Partnership Agreement with FFG and the two Agreements
with Global—contained arbitration provisions. In
pertinent part, the arbitration provision in the replacement
Agreement with Global states,

> In the event of any controversy,
> claim or dispute between the
> parties arising out of or relating to
> this Agreement or the breach,
> termination, enforcement,
> interpretation or validity thereof,
> including the termination of the
> scope or applicability of this

Agreement to arbitrate, shall be determined by arbitration in Tulsa County, State of Oklahoma in accordance with the laws of Oklahoma, or in the county in which the consumer resides, in accordance with the Laws of the that [sic] state.

**\*2** (Ex. C, Docket no. 10–3, Page ID 109.) The arbitration provision is identical to the arbitration provision in the original Special Purpose Account Agreement. (Ex. A, Docket no. 1–1, Page ID 20.)

According to Plaintiffs' Complaint, unspecified "Defendant" violated the Credit Services Protection Act (CSPA), Mich. Comp. Laws § 455.1821 secs. 3(b), (d) and (f), by (1) charging Plaintiffs a fee prior to completing the services, (2) making false or misleading statements by promising to resolve Plaintiffs' debts but failing to do so, and (3) failing to perform services within 90 days of the agreement. (Ex. A, Docket no. 1–1, Page ID 14–15.)

On August 6, 2012, Defendant Global filed a motion to compel arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* (Docket no. 8, Page ID 65–66.) Plaintiffs oppose the motion, arguing that the replacement Agreement does not give rise to the dispute, and, therefore, its arbitration provision is inapplicable. (Pls.' Resp., Docket no. 11, Page ID 117.) Plaintiffs further contend that claims arising under the CSPA are not subject to arbitration because the statute renders the replacement Agreement "moot, as opposed to void, unconscionable, or any other question that has come up." (*Id.* at 119.) Plaintiffs support this position by arguing that the action could be maintained without reference to the replacement Agreement. (*Id.* at 120.) Additionally, Plaintiffs assert that because the CSPA provides for the Michigan Attorney General to pursue criminal sanctions, claims arising under the Act are not arbitrable. (*Id.* at 121.)

## II. Discussion

According to the FAA, "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. One purpose of the FAA is to override judicial reluctance to enforce arbitration agreements. *See AT & T Mobility LLC v. Concepcion,* ––– U.S. ––––, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742

(2011). The FAA reflects "both a liberal federal policy favoring arbitration" and "the fundamental principle that arbitration is a matter of contract." *Id.* (internal quotations omitted). In line with these principles, courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms. *Id.* at 1745–46.

When faced with a motion to compel arbitration under the FAA, a district court has four tasks:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

**\*3** *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000); *see also Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 392 (6th Cir.2003). In making these determinations, "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The court need not hold an evidentiary hearing before compelling arbitration as long as the parties have been provided the opportunity to fully brief the issue and there has been no showing of disputed factual questions going to the legal issue of arbitrability. *See Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.,* 706 F.2d 155, 159 (6th Cir.1983).

## A. Scope of the Arbitration Provision

In this case, the parties do not dispute whether they agreed to arbitrate.[3] Rather, Plaintiffs oppose arbitration because they contend that the claim arises "without reference to the contract or relationship at issue." (Docket no. 12, Page ID 120.) The parties, therefore, disagree about the scope of the agreement. It also appears, based on Plaintiffs' Response, (docket no. 11), that the parties disagree about whether Congress intended Plaintiffs'

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

McIntyre v. First Financial Group, Not Reported in F.Supp.2d (2012)

claim to be arbitrable.

First, the Court must determine whether Plaintiffs' claim falls within the scope of the arbitration provision. The Court has the authority to decide whether Plaintiffs' claim falls within the provision's scope. *AT & T Techs., Inc. v. Commc'n Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). Regarding the scope of the arbitration provision, the "proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue. If it could, then it is likely outside the scope of the arbitration agreement." *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 395 (6th Cir.2003). When a contract contains an arbitration clause, there is a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration, "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. at 1419. Where the arbitration clause is broad, only an express provision excluding a specific dispute, or "the most forceful evidence of a purpose to exclude the claim from arbitration" will remove the dispute from consideration by the arbitrators. *Id.* at 650, 106 S.Ct. at 1419. An arbitration clause requiring arbitration of any dispute arising out of an agreement is "extremely broad." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan,* 350 F.3d 568, 578 (6th Cir.2003).

**\*4** Here, the arbitration provision in the replacement Agreement encompasses "any controversy, claim or dispute between the parties arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the termination of the scope or applicability of this Agreement to arbitrate." Plaintiffs argue that their claim under the CSPA can be maintained without reference to the replacement Agreement. The Court disagrees. The facts underlying Plaintiffs' claim arise from Plaintiffs' relationship with Global, as set out in the replacement Agreement. Nonetheless, even if Plaintiffs' contention were true, the authority cited by Plaintiffs only indicates that Plaintiffs' claim "may" fall outside the scope of the arbitration agreement. *See id.* at 576. In light of the broad language of the present arbitration provision, the Court finds that Plaintiffs' claim is subject to arbitration even if it could be maintained without reference to the contract or relationship at issue. The Court therefore finds that the scope of the arbitration provision encompasses Plaintiffs'

claim.

### B. Arbitrability of Plaintiffs' Claim

Next, because Plaintiffs raise a statutory claim, the Court must determine whether Congress intended to exclude Plaintiffs' claim from arbitration. "Although all statutory claims may not be appropriate for arbitration, '[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)). The burden is on the party resisting arbitration to show that Congress intended to preclude the claims at issue from arbitration. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941.

Here, Plaintiffs' claim is a state statutory claim before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). The United States Supreme Court has previously held that the FAA is applicable to state as well as federal claims. *See Buckeye Check Cashing, Inc. v. Cardengna,* 546 U.S. 440, 445, 126 S.Ct. 1204, 1208–09, 163 L.Ed.2d 1038 (2006) (citing *Southland Corp. v. Keating,* 465 U.S. 1, 12, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984)). Therefore, the correct analysis is whether Congress intended to exclude Plaintiffs' claim. In support of their argument that claims under the CSPA are nonarbitrable, Plaintiffs argue that the Act provides for criminal sanctions. That argument is unpersuasive. That the Michigan Attorney General or a county prosecutor may bring criminal charges for violations of the Act is not relevant to the issue of whether Plaintiffs, in arbitration with Defendant Global, have an adequate remedy for their claim. One judge in this district has already held that claims arising under the CSPA are arbitrable. *See CSA–Credit Solutions of Am., Inc. V. Schafer,* 408 F.Supp.2d 503, 512 (W.D.Mich.2006) (citing *Burden v. Check Into Cash of Ky., LLC,* 267 F.3d 483, 489–90 (6th Cir.2001)) (finding in a CSPA case that the Sixth Circuit previously rejected a similar argument in the context of its discussion of void versus voidable contracts). The Court therefore finds that Plaintiffs have failed to meet their burden of demonstrating that Congress intended Plaintiffs' claim to be nonarbitrable. The claim is, in fact, arbitrable.

McIntyre v. First Financial Group, Not Reported in F.Supp.2d (2012)

**\*5** Since Plaintiffs have raised only one claim, and the Court finds it to be arbitrable, the Court need not address the fourth issue—"if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration ." *Stout,* 228 F.3d at 714. Where, as here, it has been determined that arbitration is compelled as to all claims, it is not necessary to stay the proceedings; instead, dismissal for lack of jurisdiction is appropriate. *See* 9 U.S.C. § 3 (only requiring a stay of proceedings upon application of one of the parties to the action). Yet, because this dismissal is not on the merits, it will be without prejudice. *See Costello v. United States,* 365 U.S. 265, 285–86, 81 S.Ct. 534, 545, 5 L.Ed.2d 551 (1961); *see also Bauer v. RBX Indus., Inc.,* 368 F.3d 569, 580–81 (6th Cir.2004), *overruled on other grounds by Winnett v. Caterpillar, Inc.,* 553 F.3d 1000, 1005, 1012 (6th Cir.2009) (analyzing when a claim should be dismissed without prejudice).

### III. Conclusion
For the reasons set forth above, Global's Motion to Compel Arbitration will be granted. This case will be dismissed without prejudice.

A separate Order will issue.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 5939931

Footnotes

1       Case no. 12–8732–CK.

2       Although served with a Summons and Complaint, Defendant FFG has not responded in this case. (*See* Exhibit 2, Docket no. 1–2, Page ID 14–17.)

3       Specifically, Plaintiffs do not challenge the validity of the replacement Agreement's arbitration provision. They only challenge its applicability to Plaintiffs' claim.

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite history available

2014 WL 7157419
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Ann L. SILVERMAN, Plaintiff/Counter,
Defendant–Appellee/Cross–Appellant,
v.
Alexander R. SPITZER, Defendant/Counter,
Plaintiff–Appellant/Cross–Appellee.

Docket No. 317682.
|
Dec. 16, 2014.

Chippewa Circuit Court; LC No. 12–012390–DM.

Before: M.J. KELLY, P.J., and CAVANAGH and
METER, JJ.

**Opinion**

PER CURIAM.

**\*1** In this suit for divorce, defendant Alexander R. Spitzer
appeals by right the trial court's order denying his motion
to set aside the settlement agreement and the court's
decision to enter the consent judgment of divorce. On
cross-appeal, Silverman argues the trial court erred when
it denied her motion for sanctions against Spitzer for
filing a frivolous motion to set aside the parties'
settlement agreement. Because we conclude there were no
errors warranting relief, we affirm.

## I. BASIC FACTS

Silverman married Spitzer in January 1980. Silverman
and Spitzer are medical doctors and earn substantial
incomes as part of their practices; Silverman is a
gastroenterologist and Spitzer is a neurologist. Over the
course of their marriage, Silverman and Spitzer had four

children. They lived in West Bloomfield, but later moved
to Sault St. Marie. They owned real property in West
Bloomfield, Ann Arbor, Sault St. Marie, and on Mackinac
Island.

In September 2012, Silverman sued Spitzer for a divorce.
At the time of the divorce, Silverman and Spitzer had
only one child who was still a minor, and she was nearly
17 years of age. As such, the primary issues in the divorce
were the division of the marital estate and whether the
court should order spousal support.

Spitzer counter-sued for divorce in October 2012. In his
counter complaint, Spitzer asked the trial court to order
Silverman to pay spousal support. Spitzer retained Jay
Abramson, who he later stated was his longtime
counsellor, to assist him with his divorce. However,
Abramson worked out of West Bloomfield, Michigan, so
Spitzer also retained a lawyer who worked in Sault St.
Marie, Michael Winnick.

Spitzer moved for temporary spousal support in that same
month. In his motion, he alleged that Silverman earned
approximately $650,000 per year and that he earned only
$250,000 per year. He asked the trial court to order
Silverman to pay him $3,875 per week in order to
equalize their incomes.

Spitzer is, by his own account, an avid pilot and he and
his wife owned a small airplane through a limited liability
company. In October 2012, Spitzer incurred what he
described as a "propeller strike" while landing the plane
at Sault St. Marie. After the incident, Silverman's lawyer,
Leanne Deuman, aggressively pursued discovery about
the incident—including details about the damage to the
plane and the costs to repair it.

In December 2012, Spitzer moved to limit the scope of
discovery concerning the airplane. In the motion, which
was signed by Winnick, Spitzer maintained that
Silverman was attempting to obtain information about the
incident for an improper purpose. Specifically, he argued
that Silverman intended to use the information to pressure
him to drop his request for alimony or risk a report to the
Federal Aviation Administration (FAA) or National
Transportation Safety Board that might result in the loss
of his pilot's license. Accordingly, Spitzer asked the court
to limit the scope of discovery to information relevant to
valuing the airplane and the extent of any expenditure of
marital assets to repair it.

**\*2** In January 2013, Spitzer filed a motion that was signed
by Abramson in which he asked the trial court to declare

Silverman to be in default on the basis of allegedly criminal conduct. Spitzer stated that Silverman's lawyer, Deuman, sent his lawyer, Winnick, two letters in which she threatened to report the incident with the airplane to the FAA unless Spitzer immediately provided her with certain information and turned over some marital property with substantial value. Spitzer maintained that the threats amounted to felonies, including racketeering. On the basis of this "criminal misconduct", Spitzer asked the trial court to exercise its equitable powers to dismiss Silverman's complaint for divorce and hold her in default on Spitzer's counter complaint. Spitzer—again acting through Abramson—also asked for leave to amend his complaint to include allegations that Silverman engaged in extortion and racketeering. Evidence would later show that Winnick refused to participate in the drafting or filing of these motions.

In Silverman's response, Deuman stated that her client might have a duty as an owner of the plane to report the accident to the FAA and, because Spitzer refused to disclose the details of the accident, she could not determine whether she had to do so. It was for that reason that she threatened to file a report unless Spitzer turned over the relevant information. She further claimed that Spitzer's lawyer, Winnick, misrepresented the severity of the incident, which appeared to involve $140,000 in repairs. Because the motion to dismiss was not well-grounded in fact or law, Deuman asked the trial court to deny the motion and determine that it was frivolous. She asked the trial court to sanction both Spitzer and Abramson for filing the motion.

In January 2013, the trial court denied Spitzer's motion for leave to amend with prejudice. In separate orders, it also denied Spitzer's motion to limit discovery and to dismiss Silverman's complaint and enter a default. Winnick continued to represent Spitzer along with Abramson.

In February 2013, Silverman moved to have Abramson recuse himself from the case. She argued that he must recuse himself because he had represented both Silverman and Spitzer in the past and had a conflict of interest. In response, Abramson asked the trial court to deny the motion. He characterized Silverman's motion as an effort to interfere with Spitzer's right to be represented by counsel of his choice. He attached a copy of his response to a request for investigation, which he intended to file with the Attorney Grievance Commission after he returned from a trip overseas. A hearing was scheduled for the motion later that same month.

Silverman moved to adjourn the hearing on Spitzer's motion for interim spousal support. In her motion, Silverman alleged that Spitzer recently negotiated a check for $250,000 to repair the airplane and stated that she needed time to conduct further discovery before she could adequately respond to Spitzer's claimed need for spousal support.

**\*3** On the day of the hearing to consider—along with other matters—whether Abramson should be compelled to recuse himself, Spitzer entered into a settlement agreement with Silverman. Winnick represented Spitzer at the time because Abramson was overseas.

In the settlement, Spitzer and Silverman agreed that Silverman would get her jewelry and retirement benefits, one home in Sault St. Marie and the condominium in Ann Arbor. The parties agreed that Spitzer would get one of the homes in Sault St. Marie, the properties on Mackinac Island, and the home in West Bloomfield. He also received all the membership interests in the limited liability company that owned the parties' airplane. They would each also retain any retirement or pension benefits that either held in his or her own name, as well as their personal property and vehicles. Finally, they agreed that neither party would be awarded spousal support and provided that spousal support would "be forever barred." The parties signed the agreement and dated it February 21, 2013.

Before accepting the settlement, the trial court heard testimony from Silverman and Spitzer concerning the consent judgment. Both Silverman and Spitzer testified that they entered into the agreement after consulting with their lawyers and both agreed that it was in their best interest to settle. Spitzer also agreed that he voluntarily, intelligently, and knowingly entered into the agreement on the basis of his understanding of the options open to him.

In March 2013, Silverman moved for entry of a judgment of divorce incorporating the settlement agreement.

In that same month, Lea Ann Sterling and Steven Paciorka substituted for Winnick as Spitzer's lawyers along with Abramson. Spitzer then moved—through his new lawyers—to have the settlement agreement set aside. Spitzer argued that the settlement was invalid because he was coerced or operating under duress when he entered into the settlement. He also maintained that the agreement must be set aside because it was unconscionable. Specifically, Spitzer relied on his allegation that Silverman makes substantially more than him and received approximately $2.4 million of the marital estate, while he received only around $1.6 million in assets.

Spitzer attached copies of his email and written correspondence with Winnick in support of his motion to set aside the settlement. The correspondence revealed that Winnick frequently addressed Spitzer with strong—even unprofessional—language and tones. In particular, Winnick warned Spitzer that it was his belief that Spitzer might have engaged in misconduct when he used a power of attorney from his father to transfer funds from his father's accounts and used his father's trust to pay for repairs to the airplane. Winnick wrote that the transfers might expose Spitzer to civil or criminal liability and opined that his conduct compromised the viability of his claims in the divorce. Winnick stated that he would continue to treat Spitzer as "at risk for criminal indictment" until he reduced the transactions to writing and ensured that they were transparent and proper. Winnick also vigorously urged Spitzer to settle the divorce in order to avoid what he characterized as the risk of criminal investigation that might leave Spitzer without a license to practice medicine.

**\*4** In response to the motion to set aside, Silverman argued that the record showed that Spitzer was not coerced or operating under duress when he agreed to the settlement. Silverman stated that her lawyer's letters concerning the airplane incident were sent months prior to the settlement and could not have operated to coerce Spitzer into settling. Because she and her lawyer did not otherwise participate in any acts to coerce Spitzer, the settlement must be enforced. Silverman also argued that duress did not apply because there was no evidence that Spitzer did not have the mental capacity to understand and enter into the settlement agreement. She further maintained that there is no basis for setting the agreement aside as unconscionable; even though the agreement did not provide for an equal distribution of the marital assets, the division was not so inequitable as to shock the conscience. Finally, Silverman asked the court to sanction Spitzer and his lawyer for filing a frivolous motion to set aside the settlement agreement.

In April 2013, Silverman formally requested sanctions under MCR 2 .114. She asked the trial court to award her costs and attorney fees for defending against a frivolous motion to set aside the settlement agreement.

The trial court heard arguments and took testimony concerning the events surrounding Spitzer's decision to enter into the settlement agreement in March, April, and June 2013. On August 6, 2013, the trial court heard closing arguments and announced its decision.

The court stated that Spitzer did not contend "that he was

prevented from understanding ... the nature and effect of the agreement because of fraud, mutual mistake or severe distress." Rather, he claimed the settlement was the result of "duress or coercion." The trial court found that Spitzer was not coerced into entering into the agreement by Deuman's previous threats to report the landing incident to the FAA because Spitzer knew that the landing incident did not need to be reported and would not result in any sanctions. The court stated that the "landing mishap" was not "even a consideration" when Spitzer negotiated the settlement.

The court similarly rejected the contention that Winnick coerced Spitzer into settling by stating that Spitzer's handling of his father's money was suspect. If there is a dispute over the handling of those funds, that dispute would be between Spitzer and the trust and had nothing to do with the decision to settle.

Finally, the trial court rejected Spitzer's contention that the settlement agreement was unconscionable. The court recognized that Spitzer may have received less than half the marital estate, but it determined that the division was not itself unconscionable. The trial court denied the motion to set aside the settlement and indicated that it would sign the judgment of divorce.

On August 6, 2013, the trial court entered a judgment of divorce, which incorporated the parties' settlement agreement. On the same day, the trial court entered an order denying Spitzer's motion to set aside the settlement.

**\*5** These appeals followed.

## II. MOTION TO SET ASIDE

### A. STANDARDS OF REVIEW

Spitzer argues on appeal that the trial court erred when it denied his motion to set aside the settlement agreement. He maintains that the trial court misunderstood the law applicable to a claim that a party's consent was induced by coercion and improperly excluded relevant evidence. Considering the totality of the evidence, Spitzer states, the trial court should have found that he was coerced into settling. This Court reviews a trial court's decision to set aside a settlement agreement for an abuse of discretion. See *Groulx v. Carlson,* 176 Mich.App 484, 493; 440 NW2d 644 (1989); *Tinkle v. Tinkle,* 106 Mich.App 423, 426; 308 NW2d 241 (1981) (declining to disturb the trial

court's finding that the petitioner knowingly and voluntarily entered into the settlement agreement and, accordingly, concluding that the trial court did not abuse its discretion when it denied the petition to set aside the agreement). "The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact." *Lafayette Dramatic Productions, Inc. v. Ferentz,* 305 Mich. 193, 216; 9 NW.2d 57 (1943). This Court reviews the factual findings underlying a trial court's decision for clear error. *Vittiglio v. Vittiglio,* 297 Mich.App 391, 398; 824 NW2d 591 (2012). Finally, this Court reviews a trial court's evidentiary decisions for an abuse of discretion. *Barnett v. Hidalgo,* 478 Mich. 151, 158159; 732 NW2d 472 (2007).

## B. ANALYSIS

Generally, trial courts must uphold the validity of settlement agreements reached through negotiations and agreement by the parties to a divorce action. *Kline v. Kline,* 92 Mich.App 62, 71; 284 NW2d 488 (1979). However, as with any contractual agreement, the parties must validly consent to the settlement before it will bind them. *Vittiglio,* 297 Mich.App at 400. Accordingly, a trial court may set aside a settlement agreement that was the result of fraud, duress, or mutual mistake, or where one of the parties lacked the mental capacity to enter into the agreement as a result of severe distress. *Van Wagoner v. Van Wagoner,* 131 Mich.App 204, 209214; 346 NW2d 77 (1983).

As the trial court aptly noted, Spitzer did not argue that the settlement agreement had to be set aside because he lacked the mental capacity to understand it or because it was the result of fraud or mistake. Instead, Spitzer argued that the settlement agreement had to be set aside because Silverman's lawyer, along with Winnick, forced him to enter into it. Specifically, he maintained that he was so overwhelmed by Winnick's threats of civil and criminal liability and Deuman's threats to report him to the FAA that his decision to enter into the settlement agreement cannot be said to be voluntary—he only acted out of fear that he would lose his pilot's license and perhaps his medical license.

Our Supreme Court has recognized that duress or coercion may warrant setting aside an agreement. *Lafeyette Dramatic Prod.,* 305 Mich. at 216. Duress involves a compulsion or constraint by which a person is illegally forced to do or forebear some act by a threat that would cause a person of ordinary firmness to fear serious injury to person or reputation. *Id.* In order to establish

duress, the party seeking to set aside the agreement must show that the party applying the duress acted unlawfully. See *Apfelblat v. Nat'l. Bank Wyandotte–Taylor,* 158 Mich.App 258, 263; 404 NW2d 725 (1987); see also *Hackley v. Headley,* 45 Mich. 569, 576; 8 NW 511 (1881) (stating that it is not duress for a party to threaten to do what he or she has a lawful right to do). Coercion similarly involves the application of physical or moral force to cause another to do something that the person would not otherwise have done. *Lafayette Dramatic Prod.,* 305 Mich. at 216. Coercion, like duress, must involve wrongful conduct: "The coercion, however, must be illegal in nature, manifestly unjust, or purposely oppressive." *Stott Realty Co. v. Detroit Savings Bank,* 274 Mich. 80, 84; 264 NW 297 (1936). A claim of duress or coercion "will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Payne v. Cavanaugh,* 292 Mich. 305, 308; 290 NW 807 (1940). Rather, the evidence must show that the person affected by the duress or coercion "ceased to be a free moral agent and was thereby incapacitated to consent to the agreement...." *Meier v. Schulte,* 327 Mich. 206, 212; 41 NW2d 351 (1950).

## 1. THE AIRPLANE INCIDENT

**\*6** With regard to Silverman's threats, Spitzer relied heavily on the letters sent by Deuman in which she threatened to file a report with the FAA.

In a letter dated October 24, 2012, Deuman brought several issues to Winnick's attention. She addressed Silverman's Morgan Stanley account, an appraisal for the Mackinac Island property, and a stipulation concerning custody of the parties' remaining minor child. She also asked about some personal property:

> I would like to suggest that your client allow my client to access the home to remove all of her furs, her jewelry, and two paintings; one of a girl and one of a boy that she had custom commissioned. These are personal effects to her and there is no reason why she should not obtain them. If I do not have a positive response on this by November 2[,] I will proceed with placing this matter for decision in front of [the judge].

After asking Winnick to have his client turn over the personal property, Deuman proceeded to ask Winnick to provide her with documentation concerning Spitzer's recent incident with the plane:

> I would like you to provide me all documentation regarding Dr. Spitzer's recent crash of his airplane. I presume that there is an insurance claim being filed, and I demand to see a copy of that as soon as possible. If this is not forthcoming, a report will be made appropriately to the FAA.

In a second letter to Winnick, which was dated November 1, 2012, Deuman expressed her frustration with Spitzer's refusal to cooperate. Deuman threatened to file a report with the FAA about the plane crash unless Spitzer delivered several things to Silverman: the insurance policy on the plane, the report of the accident, Silverman's jewelry, Silverman's furs, and the requested paintings. Although Deuman demanded the jewelry, furs, and paintings, it was evident that her frustration primarily involved Spitzer's refusal to provide information about his recent crash, which—she noted—involved a valuable marital asset. Deuman suggested that Winnick had deliberately mischaracterized or "downplayed" the nature of the accident: "You can call it anything you want but it was not a safe and damage free landing." She wrote that she had learned some preliminary information about the incident and understood that Spitzer had to replace the engines and had not insured the plane. She suggested that he should not be flying it under the circumstances. She also stated her belief that Spitzer was "not acting rationally around" Silverman at the hospital where the parties both worked. Deuman was convinced that the trial court would rule in her client's favor on these issues and wrote that Winnick should make arrangements promptly.

The parties' airplane was a valuable marital asset, which was apparently under Spitzer's sole control. Because it was a marital asset, Silverman had the right to know whether and to what extent it might have been damaged, whether the marital estate had been exposed to any liability, and whether the estate had a viable insurance claim. She also had the right to know if Spitzer was using marital assets to repair the airplane. Accordingly, Deuman cannot be said to have overstepped the bounds of propriety when she asked for information and records about the crash in her letter of October 2012. She also did not directly connect her request to turn over Silverman's jewels, furs, and paintings to the issue with the crash, but

instead indicated that she would ask the trial court to decide the issue, which was entirely appropriate. Therefore, this letter did not involve any illegal, manifestly unjust, or purposely oppressive conduct. *Stott Realty Co.,* 274 Mich. at 84.

**\*7** In her letter of November 2012, Deuman did threaten to report Spitzer's accident to the FAA unless he turned over the requested documents and personal property,[1] but she presented her demand in the same context—namely, that the airplane was a significant marital asset and her client had the right to any documentation bearing on the condition of that asset and the potential for liability. Her letter was in some respects unprofessional and poorly drafted, but it is apparent that Deuman wrote out of frustration with Winnick's—or Spitzer's—failure to fully disclose the severity of the crash and Spitzer's handling of the marital estate: "This game of 'keep away' cannot and, undoubtedly, will not continue particularly when [the court] gets a good look at what is going on; especially with the flight problems Dr. Spitzer has and that the problem is an ongoing one."

When read in context, this letter too was not particularly threatening and did not amount to illegal, manifestly unjust or purposefully oppressive conduct. See *id.* Indeed, the trial court determined that the parties' various motions concerning the plane crash and the letters did not warrant any sanctions or even extraordinary relief. It is, however, plain that the lawyers involved on both sides had resorted to inappropriate and unprofessional tactics; it was unprofessional for Abramson to accuse Deuman of criminal conduct and it was unprofessional for Deuman to use Spitzer's love of flying as leverage in the divorce. In the end, however, the trial court reasonably handled the disputes: it allowed discovery concerning the crash subject to a protective order, denied Abramson's request for sanctions arising out of Deuman's threatening letters, and allowed Spitzer to continue to use and control the plane, albeit with the requirement that he insure it. Given that the letters were sent months before the parties entered into the settlement agreement and that the trial court resolved all the issues relating to the letters weeks before the settlement, it is difficult to see how these letters exercised such a powerful effect on Spitzer's will that he "ceased to be a free moral agent" and lost the capacity to contract on the day of the settlement. *Meier,* 327 Mich. at 212.

The record also supports the trial court's finding that Spitzer understood that his license was not really in danger as a result of Silverman's threat to file an accident report.[2] Prior to the settlement, Spitzer filed documents with the court in which he stated his position that Deuman

was using the accident to gain leverage in the divorce and argued that the details concerning the accident were irrelevant to the divorce proceedings. At the hearing on the motion to set aside the agreement, Winnick testified that he vigorously opposed every effort by Deuman to make the accident an issue in the divorce and he opined that the accident issue was going "nowhere" because it was irrelevant. He also explained to the court that Spitzer told him that he did not do anything "wrong" with regard to the incident with the airplane and, for that reason, was not concerned about the threats to file a report—he just wanted to avoid the "annoyance of the investigation."[3] Winnick admitted that he continued to discuss the incident with Spitzer because he was concerned that his client was not being forthcoming and appeared to overreact to any hint of an investigation; specifically, Winnick was concerned that Spitzer had health issues that might have come out in an investigation and which might put his pilot's license at risk, but Winnick's continued preoccupation with the incident cannot be attributed to Deuman.

**\*8** The parties' record filings and Deuman's letters do not establish that Deuman—acting on Silverman's behalf—engaged in any illegal, manifestly unjust, or purposely oppressive conduct that forced Spitzer to settle against his will. *Stott Realty Co.,* 274 Mich. at 84. Although Spitzer testified that he felt that he was under "duress" for months as a result of people telling him he was going to lose his pilot's license and other things, he testified that it was Winnick and his statements concerning the potential problems that might occur if the case proceeded to trial that led him to settle. That is, by Spitzer's own admission, the coercion he felt was primarily caused by his own lawyer, Winnick. To be sure, Deuman's vigorous advocacy helped raise the stress of the litigation, but Spitzer did not allege or argue that he was under such stress that he lost the mental capacity to contract. Rather, he argued that his will was overcome by the threats to his profession and his love of flying and the evidence showed that Deuman did not coerce Spitzer into settling with such threats. Consequently, on this record, we cannot conclude that the trial court clearly erred when it found that Deuman's threats to file a crash report did not influence Spitzer's decision to settle. *Vittiglio,* 297 Mich.App at 398. It also did not clearly err when it found that Deuman's actions surrounding the airplane incident played no role in Spitzer's decision to settle. *Id.*

## 2. THE SETTLEMENT

It is well established that duress or coercion cannot be

used to set aside an agreement unless the duress or coercion was caused by the opposing party. See *Musial v. Yatzik,* 329 Mich. 379, 383; 45 NW2d 329 (1951). Consequently, a party cannot set aside an agreement on the ground that his or her lawyer coerced the settlement; there must be evidence that the opposing party actively participated in the coercion.[4] *Howard v. Howard,* 134 Mich.App 391, 397; 352 NW2d 280 (1984).

In his motion to set aside the settlement agreement, Spitzer presented strong evidence that Winnick engaged in unprofessional conduct. Winnick's communications with Spitzer show that Winnick did not treat Spitzer with dignity and respect—he used profane language and accused his client of reprehensible conduct. It is also evident that Winnick believed that Spitzer had severely undermined his ability to obtain spousal support from Silverman and, for that reason, placed substantial pressure on Spitzer to settle. Furthermore, as Spitzer aptly describes on appeal, the circumstances surrounding the events on the day of the settlement permit an inference that Winnick took advantage of events to persuade Spitzer that he had to quickly settle the case, even though it might not have been in his best interest to do so at that time. But even assuming that Winnick engaged in wrongful and oppressive conduct that overcame Spitzer's will and forced him to settle, see *Meier,* 327 Mich. at 212, there is no evidence that Deuman colluded with Winnick to coerce Spitzer to settle on that basis or otherwise directly participated in Winnick's coercion.

**\*9** We cannot agree with Spitzer's contention on appeal that Deuman participated in Winnick's coercion by creating an environment that made Winnick's coercion more effective.[5] In order to warrant setting aside a settlement on the grounds of duress or coercion, the opposing party must himself or herself engage in wrongful conduct to coerce settlement. *Musial,* 329 Mich. at 383. Spitzer admitted on cross-examination that he did not speak with Deuman or Silverman on the day of the settlement before agreeing to the settlement on the record. Instead, Deuman communicated with her client in a separate room and then conveyed her client's wishes to Winnick, who then spoke with Spitzer in a different room. The only evidence that Deuman took any action to coerce the settlement involved Deuman's letters concerning the airplane incident, which were sent months earlier, and her efforts to conduct discovery with regard to the incident; and we have already determined that the trial court did not clearly err when it found that those letters and Deuman's other actions concerning the airplane incident did not directly affect Spitzer's decision to settle.

Deuman did file a motion with the trial court that

suggested she had become aware that Spitzer had access to funds other than marital funds because he used such funds to pay for the repairs to the airplane, but there is no evidence that she knew about the specific acts that Spitzer took to obtain the funds or thought that the transfers were improper. There is also no evidence that Deuman tried to use Spitzer's handling of the funds to coerce a settlement. Although Deuman likely contributed to Spitzer's strain by zealously advocating for her client and manipulating every advantage that she could discern, Deuman's acts did not rise to the level of illegal, manifestly unjust, or purposely oppressive conduct done to coerce Spitzer into settling. *Stott Realty Co.,* 274 Mich. at 84. Because there is no evidence that Silverman—through Deuman—participated in Winnick's coercive conduct, even if Winnick wrongfully coerced Spitzer to settle, that coercion would not warrant setting aside the settlement agreement. *Howard,* 134 Mich.App at 397. Therefore, we need not determine whether the trial court clearly erred when it found that Winnick's threats and actions did not coerce Spitzer into settling. Even if the trial court had clearly erred in that regard, that error would not warrant relief because neither Deuman nor Silverman participated in Winnick's coercion. See MCR 2.613(A). The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement. *Tinkle,* 106 Mich.App at 426.

### 3. ERRORS OF LAW AND EVIDENCE

We also do not agree with Spitzer's contention on appeal that the trial court's findings and conclusions of law demonstrated that it "did not understand the law of coercion." Spitzer maintains that the trial court apparently did not understand that he was compelled to answer in the affirmative when Winnick examined him on the day of the settlement. But we do not read the trial court's statements concerning Spitzer's testimony at the settlement as an indication that it did not understand that Winnick might have coerced Spitzer's answers. The trial court presided over the settlement and had the opportunity to assess Spitzer's demeanor and, on the whole record, the trial court could reasonably find that Spitzer's testimony on that day was knowingly and voluntarily made. MCR 2.613(C). Thus, the trial court's reliance on that testimony does not demonstrate that the trial court was laboring under a misunderstanding of the applicable law. The fact that the trial court held an evidentiary hearing that spanned several days and took testimony from various witnesses—including Spitzer and Winnick—concerning the events leading to the settlement demonstrates that the trial court was not laboring under the mistaken belief that

it had to accept Spitzer's testimony from the day of the settlement.

**\*10** Similarly, the trial court did not abuse its discretion when it limited the testimony and evidence to the events surrounding Spitzer's decision to settle on the day at issue. In her letters, Deuman did not threaten to file a report with the FAA unless Spitzer settled the division of the marital estate and gave up his claim for spousal support; Deuman threatened to file a report with the FAA if Spitzer did not turn over documentation on the incident and failed to return certain personal property. That is, to the extent that Deuman's letters could be said to involve improper coercion, they were directed at coercing discovery and the transfer of personal property. Thus, any testimony and evidence concerning the events involving those letters was not particularly relevant to the coercion operating on Spitzer on the day of the settlement. MRE 401; MRE 402. Moreover, as the trial court repeatedly emphasized at the evidentiary hearing, the parties had litigated the issues surrounding Deuman's letters and the incident with the airplane "ad nauseam." The court was well aware of the role that the plane incident and letters played to that point. Accordingly, the trial court's decision to limit the testimony and evidence—even if otherwise minimally relevant—to the facts concerning Spitzer's state of mind on the day of the settlement did not fall outside the range of reasonable outcomes. See MRE 403; *Barnett,* 478 Mich. at 158–159.

### C. CONCLUSION

The trial court did not clearly err when it found that Deuman's letters and actions concerning the incident with the airplane did not coerce Spitzer into settling the division of the marital estate in February 2013. And, even if the trial court clearly erred when it found that Winnick's actions on the day of the settlement did not overcome Spitzer's will and compel him to settle, an issue that we decline to address, that error would not warrant relief. Other than Deuman's letters and attempts to discover evidence concerning the airplane accident, which the trial court found did not play a role in Spitzer's decision, there was no evidence that Silverman—through her lawyer—participated in Winnick's coercion. Therefore, Spitzer failed to establish grounds for setting the settlement aside.

The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement on the grounds that the settlement was coerced.

### III. UNCONSCIONABLE SETTLEMENT

#### A. STANDARDS OF REVIEW

On appeal, Spitzer argues the trial court also erred when it did not set aside the agreement as unconscionable. Specifically, he maintains that the evidence that he acted under duress or coercion also demonstrates that he entered into the agreement under conditions of procedural unconscionability. He further argues that, had the trial court not improperly prevented him from conducting discovery, he could have established that the settlement was substantively unconscionable. This Court reviews a trial court's decision on a motion to set aside a settlement agreement for an abuse of discretion. *Tinkle,* 106 Mich.App. at 426. This Court reviews a trial court's decision to limit evidence for an abuse of discretion. *Barnett,* 478 Mich. at 158–159.

#### B. ANALSYIS

**\*11** In order to set aside a settlement agreement as unconscionable, the moving party must establish both procedural and substantive unconscionability. *Vittiglio,* 297 Mich.App at 403.

> Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. *Allen v. Michigan Bell Tel. Co.,* 18 Mich.App 632, 637; 171 NW2d 689 (1969). If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. *Id.* Substantive unconscionability exists where the challenged term is not substantively reasonable. *Id.* at 637–638. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. *Gillam v. Michigan Mortgage–Investment Corp.,* 224 Mich. 405, 409; 194 N.W. 981 (1923). Instead, a term is

> substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. *Id* . [*Clark v. DaimlerChrysler Corp.,* 268 Mich.App 138, 144; 706 NW2d 471 (2005).]

As the trial court correctly noted at the hearing to set aside the settlement agreement, whether an agreement is substantively unconscionable must be determined from the facts as they existed at the time of the agreement. See *Northwest Acceptance Corp. v. Almont Gravel, Inc.,* 162 Mich.App 294, 300; 412 NW2d 719 (1987). Because Spitzer and Silverman proceeded to divide the marital estate on the basis of their understandings of the values after incomplete discovery on the day of the settlement, the trial court determined that Spitzer could not testify concerning his current understanding of the values because that evidence was not relevant to whether the agreement was unconscionable at the time of the agreement. The court explained that it would be unfair to allow Spitzer to claim unconscionability on the basis of valuations that neither party had available at the time of the settlement: "I can't go back and fix that. I mean I can't go back and manufacture discovery now. They knew that it wasn't completed. Everybody knew here. Now to affix numbers to those things now. I mean then why—that's the problem with this case." Under these circumstances, the trial court did not abuse its discretion when it prevented Spitzer from presenting evidence that the values were different than understood by the parties at the time of the settlement. *Barnett,* 478 Mich. at 158–159.

Although the parties had not completed discovery, the record evidence up to the time of the settlement demonstrated that the parties had a basic understanding of the marital assets at issue and their debts. At the hearing on the settlement agreement, Spitzer stated he wanted to obtain the home and lot on Mackinac Island, the home in which he resided in Sault St. Marie, and the home in West Bloomfield. In the settlement, he received each of these properties. He also wanted to receive all the membership interests in the company that owned the parties' airplane, which he also received. Despite receiving each of the assets that he specifically wanted, Spitzer still argued that the division of the estate was so inequitable as to shock the conscience. He alleged that the total value of the assets he received—after adjusting for secured debts—amounted to just $1.645 million, whereas Silverman received approximately $2.4 million of the marital estate.[6]

**\*12** On this record, we cannot conclude that the trial court erred when it determined that the division of the martial

estate was not unconscionable. In order to obtain specific assets with sentimental or personal value, a reasonable person might be willing to settle for a smaller overall percentage of the estate. See *Northwest Acceptance Corp.,* 162 Mich.App at 302 (noting that an unconscionable bargain is often characterized as one that no man in his senses and not under a delusion would make). And, although there appeared to be a substantial difference in the value of the assets awarded to each party, even assuming that Spitzer's valuations were accurate, the difference is not so extreme that it shocks the conscience. *Clark,* 268 Mich.App at 144.

The fact that the parties waived the right to spousal support in their agreement also does not shock the conscience. The parties to a divorce may waive their statutory right to receive spousal support. *Staple v. Staple,* 241 Mich.App 562, 568–569; 616 NW2d 219 (2000). Spitzer had earlier asserted his right to spousal support; he moved for entry of an order compelling his wife to pay him spousal support on the grounds that she earned substantially more income (he alleged that she earned $650,000 per year and that he only earned $250,000 per year). But Silverman contested Spitzer's claim. In her response, Silverman denied that she earned $650,000 per year and took the position that Spitzer had been keeping his income artificially low by "refus [ing] to seriously work at his practice." Consequently, at the time of the settlement, the parties understood that there was a significant dispute concerning their actual incomes, their earning potential, and the propriety of an order for spousal support.

At the hearing on the motion to set aside the settlement, Spitzer asserted that the settlement was unsatisfactory because, without an order for spousal support to equalize their incomes, it left him in an untenable position. Specifically, he complained that his income was insufficient to allow him to keep the home on Mackinac Island and to continue to enjoy his airplane: "And so I had to service two mortgages on a substantially lower portion of the income—of the total family income. And so the other main component, to not go bankrupt, was to allow me to continue to fly the airplane and not lose the house on Mackinac Island." Spitzer's lawyer similarly asserted at the hearing that the settlement made no sense considering the parties' cash flow. However, the fact that Spitzer regrets waiving his spousal support does not render the agreement unconscionable. Although Spitzer always maintained the position that Silverman made substantially more than he did and that he would require spousal support in order to continue to maintain the lifestyle to which he had become accustomed, it is not clear that he could have established the factual basis for

his position had he proceeded to trial rather than settle. A trial might have revealed that Silverman made substantially less and that Spitzer made or could have made substantially more. Accordingly, Spitzer might not have been able to establish grounds for spousal support or might have received substantially less support than he initially requested. Under these circumstances, a reasonable person in Spitzer's position might conclude that it was better to waive spousal support in order to settle the dispute and obtain the martial estate's most desirable assets without the hassle and uncertainty of further litigation. See *Northwest Acceptance Corp.,* 162 Mich.App at 302.

**\*13** The trial court did not err when it determined that the settlement was not on its face substantially unconscionable. Consequently, it did not err when it denied Spitzer's motion to set aside the settlement agreement on that basis.[7]

## IV. SANCTIONS

### A. STANDARD OF REVIEW

On cross-appeal, Silverman argues that the trial court erred when it refused to order Spitzer and his lawyers to pay sanctions for filing a frivolous motion to set aside the settlement agreement. This Court reviews a trial court's finding that a motion was not frivolous for clear error. *Kitchen v. Kitchen,* 465 Mich. 654, 661, 641 NW2d 245 (2002).

### B. ANALYSIS

A trial court must order a party or lawyer who files a motion in violation of MCR 2.114(D) to pay an appropriate sanction. MCR 2.114(E); see also MCL 600.2591. A party violates that rule if he or she signs the motion, in relevant part, without ensuring through a reasonable inquiry that the motion is well grounded in fact and is warranted by existing law. MCR 2.114(D).

Spitzer moved to set aside the settlement on the basis of duress or coercion and on the ground that the agreement was unconscionable. In support of his motion, Spitzer cited Deuman's threatening letters and his communications with Winnick preceding the settlement. In the communications, Winnick treated Spitzer in an

undignified manner and suggested that Spitzer should settle to avoid litigation that might jeopardize Spitzer's medical license. The documentary evidence was minimally sufficient to establish a factual basis for a hearing on the claim under existing law. Moreover, although the settlement agreement was not on its face unconscionable, given the parties' respective positions in the litigation prior to the settlement, Spitzer's claim that the agreement might be unconscionable considering the circumstances surrounding the settlement was reasonably grounded on fact and law.

The trial court did not err when refused to order sanctions under MCR 2.114(E).

### V. GENERAL CONCLUSION

There were no errors warranting relief.

Affirmed. Neither party having prevailed in full, we order that neither may tax costs. MCR 7.219(A).

### All Citations

Not Reported in N.W.2d, 2014 WL 7157419

### Footnotes

1    In his motion to enter a default, which Abramson signed, Spitzer inaccurately stated that Deuman threatened to accuse him of committing a crime—namely, to report him for violating FAA regulations. In her letters, Deuman did not threaten to accuse Spitzer of committing a crime; she threatened to file crash report with the FAA, which it was her position, she might have an obligation to do.

2    Spitzer continues to assert on appeal that the incident was not one that had to be reported.

3    Winnick testified that he asked Spitzer whether he was worried about any criminal or administrative liability with regard to his incident with the airplane and Spitzer told him, "No."

4    In such cases, the client has an adequate remedy; the client can sue his or her lawyer for malpractice: if the jury finds for the client, the judgment will compensate the client for the difference between the value of the coerced settlement and a fair division of the marital estate.

5    On appeal, Spitzer argues that Winnick "picked up on Attorney Deuman's theme of wrongdoing" and Winnick's threats "were informed by [Deuman's] treatment of the FAA reporting issue."

6    As alleged in his motion, the disparity primarily arose from the difference in the values between the parties' pensions.

7    Because Spitzer failed to establish that the settlement was substantively unconscionable, we need not address whether the settlement involved procedural unconscionablility. *Clark,* 268 Mich.App at 144.

**End of Document**                                           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**H** KeyCite history available

2016 WL 6476458
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Andre D. West, Plaintiff,
v.
Legacy Motors, Inc., et. al., Defendants.

Case No. 16-12101
|
Signed 11/02/2016

**Attorneys and Law Firms**

Andre D. West, Redford, MI, pro se.

Amer S. Hakim, Hakim and Toma, P.C., Warren, MI, Stephen W. King, King & Murray PLLC, Birmingham, MI, for Defendants.

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DISMISS**

ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE

**\*1** This matter arises from the circumstances surrounding the sale of a vehicle by Defendant Legacy Motors Inc. to pro se Plaintiff Andre West, with financing provided by Defendant Credit Acceptance Corp. (Dkt. # 1.) Plaintiff alleges violations of the Truth in Lending Act, 15 U.S.C. § 1638(b), the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, and common-law fraud. (*Id.*) Each Defendant has filed a Motion to Compel Arbitration and Dismiss under the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., citing the written arbitration agreement signed by Plaintiff. (Dkt. ## 11, 12.) Plaintiff argues that the arbitration clause is unconscionable. (Dkt. ## 1, 14.) After reviewing the motions and Plaintiff's Response, filed October 20, 2016 (Dkt. # 14), the court concludes that further briefing and a hearing are unnecessary. *See* E.D. LR 7.1(f)(2). For the reasons that follow, the court will

grant Defendants' motions.

**I. BACKGROUND**

The following facts are undisputed unless otherwise noted. Plaintiff entered into a "retail installment contract" with Legacy Motors to purchase a 2006 Cadillac in June of 2015. (Dkt. # 12-1, Pg. ID 113.) Legacy immediately assigned its interests in the contract to Credit Acceptance. (*Id.* at Pg. ID 116.) The written contract contained a page-long arbitration clause. (*Id.* at Pg. ID 117.) On the first page, two provisions refer to the arbitration clause, reading:

> **Arbitration Notice:** PLEASE SEE PAGE 4 OF THIS CONTRACT FOR INFORMAITON REGARDING THE **AGREEMENT TO ARBITRATE** CONTAINED IN THIS CONTRACT.

> **ADDITIONAL TERMS AND CONDITIONS:** THE CONDITIONAL TERMS AND CONDITIONS, INCLUDING THE AGREEMENT TO ARBITRATE SET FORTH ON THE ADDITIONAL PAGES OF THIS CONTRACT ARE A PART OF THIS CONTRACT AND ARE INCORPORATED HEREIN BY REFERENCE.

(*Id.* at Pg. ID 113 (emphasis in original).) The arbitration clause, on the fourth page of the contract, provides:

> A "Dispute" is any controversy or claim between You and Us arising out of or in any way related to this Contract, including, but not limited to, any default under this Contract, the collection of amounts due under the contract, the purchase, sale, delivery, set-up, quality of the Vehicle, advertising for the Vehicle or its financing, or any product or service included in this Contract. "Dispute" shall have the broadest meaning possible, and includes contract claims, and claims based on [sic] tort, violations of laws, statutes, ordinances or regulations or any other legal or equitable theories.

> Either You or We may require any Dispute to be arbitrated and may do so before or after a lawsuit has been started over the Dispute or with respect to other Disputes or counterclaims brought later in the lawsuit. If You or We elect to arbitrate a Dispute, this Arbitration Clause applies....

> If You or We elect to arbitrate a Dispute, neither You

nor We will have the right to pursue that Dispute in court or have a jury resolve that dispute....

It is expressly agreed that this Contract evidences a transaction in interstate commerce. This Arbitration Clause is governed by the FAA and not by any state arbitration law.

**\*2** (*Id.* at Pg. ID 117.) Plaintiff also had the right to reject the arbitration clause without affecting the balance of the agreement, which he did not do. (*Id.*)

## II. DISCUSSION

The FAA states that every written provision in a contract "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract...shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The act requires federal courts to stay an action when the issue in the proceeding is referable to arbitration and to compel arbitration when one party fails or refuses to comply with the provisions of an enforceable agreement. *See* 9 U.S.C. §§ 3, 4; *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 573 (6th Cir. 2003).

The Supreme Court has described the FAA as manifesting "a liberal federal policy favoring arbitration agreements" which "requires [the courts] to rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985) (citations omitted). In the Sixth Circuit:

> when considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005).

First, the court concludes that the parties agreed to arbitrate. *Id.* Plaintiff and Legacy Motors signed the retail installment contract containing the full-page arbitration clause. (Dkt. # 12-1, Pg. ID 117.) Plaintiff did not exercise his right to reject under the contract, which would not have affected the balance of the agreement. (*Id.*)

While Plaintiff argues that the arbitration clause is unconscionable, other courts have upheld highly similar clauses. *See, e.g., Credit Acceptance Corp. v. Davisson*, 644 F. Supp.2d 948, 958-59 (N.D. Ohio 2009); *Anderson v. Credit Acceptance Corp.*, 2015 U.S. Dist. LEXIS 70149 (W.D. Mich. June 1, 2015). Plaintiff's argument that the arbitration clause is substantively unconscionable is, effectively, that Plaintiff got a bad deal. (Dkt. # 14, Pg. ID 127-28.) But a contract is not unconscionable "simply because it is foolish for one party and advantageous to the other." *Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp.3d 1000, 1005-06 (E.D. Mich. 2015) (Ludington, J.) ("Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience.") (citation omitted). Here, there is no apparent inequity of any kind, far from any so "extreme as to shock the conscience." The contract, in plain and prominent language, simply called for what amounted to an option to arbitrate, which would be held in the Purchaser's own home jurisdiction. (Dkt. # 12-1, Pg. ID 117.) The power to arbitrate or sue is held entirely in the hands of the purchaser. The court finds nothing unfair or inequitable about such a clause, and concludes that the instant arbitration clause is enforceable.

**\*3** Second, the scope of the agreement is broad. The arbitration clause provides for arbitration of "any Dispute," and provides that " 'Dispute' shall have the broadest meaning possible, and includes contract claims, and claims based on [sic] tort, violations of laws, statutes, ordinances or regulations or any other legal or equitable theories." (*Id.*) The contractual language clearly calls for a broad scope.

Third, nothing suggests that Congress intended to exempt Plaintiff's claims from arbitration. "The burden is on the party opposing arbitration...to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987). Plaintiff does not address the issue, and the court necessarily concludes that Congress has not precluded arbitration of Plaintiff's claims. *Id.*

Finally, because all of Plaintiff's claims are subject to arbitration, there is no reason to stay this proceeding rather than dismiss without prejudice. *Glazer*, 394 F.3d at 451.

### III. CONCLUSION

Accordingly, IT IS ORDERED that Defendants' Motions to Compel Arbitration and Dismiss (Dkt. ## 11, 12) are GRANTED. This case is DISMISSED WITHOUT

PREJUDICE to the parties' right to move to re-open this case for entry of an arbitration award or for any other relief to which the parties may be entitled.

IT IS FURTHER ORDERED that the parties are directed to proceed with arbitration of Plaintiff's claims pursuant to the terms of the agreement to arbitrate.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6476458

---

**End of Document**                                           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:18-cv-11086-SFC-PTM   ECF No. 25-1, PageID.1207   Filed 11/19/18   Page 39 of 46

Williams Intern. Co., LLC v. New West Mach. Tool Corp., Not Reported in F.Supp.2d...

 KeyCite history available

2010 WL 331714
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

WILLIAMS INTERNATIONAL CO., LLC, Plaintiff,
v.
NEW WEST MACHINE TOOL CORP., Defendant.

No. 09-12516.
|
Jan. 22, 2010.

**Attorneys and Law Firms**

Douglas C. Salzenstein, Norman C. Ankers, Honigman, Miller, Detroit, MI, for Plaintiff.

James S. Lowrie, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, for Defendant.

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL ARBITRATION [3]**

NANCY G. EDMUNDS, District Judge.

**\*1** This matter comes before the Court on Plaintiff Williams International Co., LLC ("Williams")'s motion to compel arbitration. For the reasons stated more

**I. Facts**

**A. The Parties**
Plaintiff Williams is a Michigan limited liability company that manufactures engines and propulsion units for the aviation and aerospace industries.

Defendant New West is a Utah corporation that is in the business of ordering the manufacture, sale, delivery, and service of precision milling and mill/turn machines for use in the aerospace industry.

**B. Utah Lawsuit**
On May 8, 2009, Defendant New West initiated a lawsuit against Plaintiff Williams in the United States District Court for the District of Utah, Case No. 2:09cv00425, assigned to Judge Dale A. Kimball ("the Utah Litigation"). Defendant New West filed an Amended Complaint on May 14, 2009, alleging that Plaintiff Williams breached two separate purchase orders: the "2007 Purchase Order" and the "2008 Revised Purchase Order." Specifically, as to the 2007 Purchase Order, New West alleges that Williams's failure to commission scheduled maintenance on three machines purchased under the 2007 Purchase Order constitutes a substantial and material breach of that contract thus voiding New West's special warranty as to the three identified machines. (Utah Am. Compl. ¶¶ 49-51, Prayer for Relief ¶ 1.) As to the 2008 Revised Purchase Order, New West alleges that Williams's cancellation and termination of this Order constitutes a substantial and material breach of contract that caused it to suffer over $3 million in damages and also constitutes tortious interference with its business relationship with Mori Seike USA, its manufacturer supplier. (*Id.* at ¶¶ 52-67; K. Roestenburg Decl. ¶ 7.)

**C. The Parties' Contractual Relationship**
Williams and New West have had a business relationship for about a decade. ionship for about a decade.Williams has, from time-to-time, purchased milling machines from New West, using a purchase order executed by both parties. (J. Shephard Decl. ¶¶ 5-6.) Each purchase order attached and incorporated by reference a set of Williams's standard commercial terms and conditions, including a clause requiring that any dispute related to the purchase order be arbitrated in Oakland County, Michigan, where Williams is headquartered and operates. (*Id.* at ¶¶ 3, 7-10.)

**D. Contracts At Issue-2007 Purchase Order and 2008 Revised Purchase Order**

**1. 2007 Purchase Order**
On the first line of its first page, the 2007 Purchase Order incorporates by reference Williams's POP3206 terms and conditions: "This order is subject to the terms and conditions per attachment herein: POP3206 ...." (Pl.'s Ex. D, 2007 Purchase Order No. 374391 at 1 of 11.) This

information is repeated on page seven, under the title "Additional Provisions," and provides in relevant part that:

> The equipment ordered herein is subject to the terms and conditions set forth in this order. If/Where a conflict of terms takes place, the following order of precedence shall apply:

**\*2** A. The Purchase Order.

\* \* \*

C. Purchase Order Provisions (POP) 3206 attached hereto and made a part hereof.
(*Id.* at 7 of 11.)
Attachment POP3206 begins with the all capital heading: "THIS ORDER IS SUBJECT TO THE FOLLOWING PROVISIONS." (Pl.'s Ex. E, POP3206 at 1.) Paragraph 30 contains the arbitration clause that is at issue in this lawsuit and the Utah Litigation:

> > (3)DISPUTES: Any claim, controversy or dispute arising out of or relating to the performance of this purchase order which is not disposed of by agreement shall be settled by arbitration. The procedure for which will follow the rules of the American Arbitration Association. The award rendered by the arbitrator(s) shall be final and binding and the judgment may be entered thereon in any court having jurisdiction thereof. Pending final decision of a dispute, controversy, or claim hereunder, the seller shall proceed with the performance of this order. The arbitration provided for herein shall be held in Oakland County, Michigan.

(*Id.* at 2 ¶ 30.) Paragraph 33 provides that "Michigan law shall apply to this order and its construction, except for Michigan's conflict of laws provision which shall not apply." (*Id.* at ¶ 33.)

New West does not deny that it received these terms and conditions nor does it dispute that they contain the above-quoted provisions. Rather, New West claims that it

did not read the terms and conditions (at least paragraph 30) and that "no Williams' representative brought to the attention of any New West representative the existence of any provision of the document dealing with arbitration in Oakland County, Michigan." (Def.'s Combined Br. at 2; K. Roestenburg Decl. ¶¶ 17-19.)

#### 2. 2008 Revised Purchase Order
In September 2008, representatives of Williams and New West executed the 2008 Revised Purchase Order, No. 376432B, where New West agreed to sell and Williams agreed to purchase five highly specialized milling machines. (Pl.'s Ex. B.) New West's President and COO, Kelly Roestenburg, personally reviewed and signed the 2008 Revised Purchase Order. (*Id.* at 16; Roestenburg Decl. ¶ 22.)

The 2008 Revised Purchase Order, similar to the 2007 Purchase Order, attached and incorporated by reference "Williams International Purchase Order Terms and Conditions," Form CT100-Williams's standard commercial terms and conditions. (Pl.'s Ex. C.) On the first two lines of its first page, the 2008 Revised Purchase Order provides that:

> > This order is subject to the terms and conditions per attachment herein: Attachment 1: CT100

(Pl.'s Ex. B, 2008 Revised Pur. Order at 1 of 16.) This information is repeated on page eleven, under the title "Additional Provisions," and provides in relevant part that:

> The equipment ordered herein is subject to the terms and conditions set forth in this order. If/Where a conflict of terms takes place, the following order of precedence shall apply:

A. The Purchase Order.

\* \* \*

**\*3** D. Standard Commercial Terms (CT) 100 attached hereto and made a part hereof.
(*Id.* at 11 of 16.)
Immediately following this provision, the 2008 Revised Purchase Order sets forth an integration clause that expressly notifies New West, as Seller, that it "shall

notify the buyer [Williams] immediately and specifically of anything herein which the seller does not assent to as a term and condition governing transaction covered herein." (*Id.*) New West did, in fact, rely on this language to suggest several modifications to the purchase order during negotiations.[1] (Pl.'s Stay Resp. Br. Ex. H, 8/4/08 email.) New West did not, however, object to the incorporation of the CT100 terms and conditions and did not inform Williams that they were not included with the purchase order documents under consideration or ask for a copy.

Williams's standard commercial terms contained on Form CT100 and incorporated by reference in the 2008 Revised Purchase Order include an arbitration clause similar to that in the 2007 Purchase Order:

> 23. DISPUTES: Buyer and Seller shall strive to settle amicably and in good faith any dispute arising in connection with this Purchase Order. If they are unable to do so, the dispute shall be resolved by binding arbitration conducted under the rules of the American Arbitration Association, as presently in force, by three arbitrators appointed in accordance with said rules. The place of arbitration shall be Oakland County, Michigan. Pending resolution of any dispute hereunder, Seller shall proceed diligently with the performance of work, including the delivery of goods in accordance with Buyer's direction. Upon resolution of the dispute, this Order shall be equitably adjusted, if necessary, to reflect such resolution.

(Pl.'s Ex. C, Form CT100 at 5 ¶ 23.) Paragraph 18 provides that "This Order shall be deemed to be a contract entered into in the State of Michigan, U.S.A., and shall be construed and governed in all respects, and the legal relationships between the parties shall be determined in accordance with applicable commercial law of the State of Michigan, U.S.A., including but not limited to, the Uniform Commercial Code, as the same may be enacted and in force from time to time in that jurisdiction." (*Id.* at ¶ 18.)

In its Utah Amended Complaint, New West alleges that the 2008 Revised Purchase Order "was also subject to the 'Williams International Purchase Order Terms and Conditions' (a standardized form apparently applicable to Williams' purchase orders generally)." (Utah Am.Compl.¶ 27.) In his Declaration, Kelly Roestenburg, New West's President and COO, proclaims that he "read the allegations in the Amended Complaint ..., and state the same to be true to the best of my knowledge, information and belief." (Roestenburg Decl. ¶ 4.)

Despite the above, Mr. Roestenburg also declares that, although the 2008 Revised Purchase Order makes reference to the CT100 Terms and Conditions, it was not included with the 2008 Revised Purchase Order "at the time" he reviewed, accepted and signed that purchase order, it is not currently included with the 2008 Revised Purchase Order that is in New West's possession, and he does not "recall" seeing it "in connection with" his "review and execution" of the 2008 Revised Purchase Order. (*Id.* at ¶¶ 23-25.) Nonetheless, his conduct reveals not only knowledge but reliance on the CT100 Terms and Conditions. (Pl.'s Stay Resp. Br. Ex. I, 11 /13/08 letter at 5; Ex. J, 11 /28/08 letter at 2.) The specific language Mr. Roestenburg quoted in his November 13, 2008 letter and relied upon in his November 28, 2008 letter comes from Paragraph 23 of CT100. Paragraph 23 also contains the arbitration clause that is at issue in this lawsuit. Thus, in the Utah Litigation, New West relies on the CT100 Terms and Conditions to establish its claims against Williams with regard to the 2008 Revised Purchase Order. In contrast, in this action, New West argues that it was unaware of these same terms and conditions at the time it entered into the 2008 Revised Purchase Order and further argues that it would not have accepted the Purchase Order if it had been aware of Paragraph 23 and the arbitration clause.

### E. This Lawsuit

**\*4** Plaintiff Williams filed this action on September 25, 2009, based on diversity jurisdiction, seeking a judgment declaring that Defendant New West must arbitrate the claims it raised against Williams in the Utah Litigation. An Amended Complaint was subsequently filed on August 5, 2009, also seeking a judgment declaring that New West must arbitrate the claims asserted in the Utah Litigation.

In the Utah Litigation, Williams filed a motion to dismiss or, in the alternative, to stay that litigation pending resolution of this action. On September 29, 2009, the Utah District Court issued an order staying the Utah Litigation pending this Court's decision on Williams's motion to compel arbitration, relying on a Tenth Circuit decision observing that "[a] district court lacks authority to compel arbitration in other districts, or in its own district, if

another has been specified for arbitration." *New West Machine Tool Corp. v. Williams Int'l Co., LLC,* Case No. 2:09CV00425DAK, Mem. Decision & Order [14] at 2 (C.D.Utah Sept. 29, 2009) (quoting *Ansari v. Qwest Comm. Corp.,* 414 F.3d 1214, 1219-20 (10th Cir.2005)).

This matter is now before the Court on Williams's motion to compel arbitration of the claims asserted against it in the Utah Litigation.

## II. Compel Arbitration Standard
In seeking dismissal of Plaintiffs' claims, Defendant relies on the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* which provides that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party aggrieved by the alleged ... refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "Upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*

"The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation." *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000). "Courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration. Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.* But a party "cannot be required to submit to arbitration any dispute that the party has not agreed to so submit." *Bratt Enterprises, Inc. v. Noble Int'l Ltd.,* 338 F.3d 609, 612 (6th Cir.2003); *see also Albert M. Higley Co. v. N/S Corp.,* 445 F.3d 861, 863 (6th Cir.2006) (internal citations omitted) (noting that "arbitration under the Federal Arbitration Act is a matter of consent, not coercion").

**\*5** "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir.2003). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the

construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

When determining "whether the arbitration clause itself was validly obtained," state contract law is applied, "provided the contract law applied is general and not specific to arbitration clauses." *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386, 393 (6th Cir.2003). State law inconsistent with the FAA's "broad principle of enforceability" of arbitration agreements, however, is pre-empted by federal arbitration law. *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 661, 688 (1996); *Stout,* 228 F.3d at 716.

If a court determines that the cause of action is covered by an arbitration clause, Section 3 of the FAA provides that "it must stay the proceedings until the arbitration process is complete." *Fazio,* 340 F.3d at 392 (citing 9 U.S.C. § 3). Courts have held, however, that when the court determines that all the claims in a cause of action are to be submitted to arbitration, it may dismiss, rather than stay the action because "staying the action will serve no purpose." *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992). *See Hensel v. Cargill, Inc.,* No. 99-3199, 1999 WL 993775, \*4 (6th Cir. Oct.19, 1999) (rejecting an argument that dismissal was improper, citing *Alford* with approval, and holding that dismissal is proper when all claims in a suit are submitted to arbitration).

## III. Analysis
New West argues that (1) Michigan's arbitration law governs rather than the FAA and the arbitration clauses at issue here do not satisfy Michigan law; (2) the CT100 Terms and Conditions were not attached to the executed 2008 Revised Purchase Order and thus were not properly incorporated by reference; and (3) the parties' arbitration agreements are procedurally and substantively unconscionable because they are in fine print, were not subject to negotiation, and unreasonably force New West to arbitrate in a remote location. Williams argues the opposite. The Court begins its analysis by determining whether the FAA or Michigan's arbitration laws govern here.

### A. The FAA, Not Michigan's Arbitration Laws, Apply Here
New West does not dispute that the purchase orders at

issue here involve interstate commerce. The FAA applies to commercial transactions governed by written agreements that provide for arbitration of disputes arising out of that transaction. *Southland Corp. v. Keating,* 465 U.S. 1, 10-11, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Accordingly, the arbitration clauses fall within the scope of the FAA. *See Mechanical Power Conversion, L.L.C. v. Cobasys, L.L.C.,* 500 F.Supp.2d 716, 719 (E.D.Mich.2007) (observing that, despite diversity jurisdiction, "the FAA created substantive law regarding arbitration clauses that must be enforced both in state and federal courts."). Nonetheless, New West argues that Michigan's arbitration laws should apply here. This Court disagrees.

**\*6** Relying on the Supreme Court's decision in *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), New West argues that, because Williams's incorporated terms and conditions include choice-of-law provisions stating that Michigan law governs interpretation of the purc hase orders, Michigan's arbitrability rules rather than those of the FAA must also govern the standards applied to the parties' arbitration agreements. This argument has been firmly rejected by the federal courts.

A decision New West relies upon for support refutes rather than supports its argument. In *Volk v. X-Rite, Inc.,* 599 F.Supp.2d 1118 (S.D.Iowa 2009), the court was similarly presented with the threshold issue "whether federal or Michigan law applies" when the contract at issue contains a choice-of-law provision but the arbitration clause does not. *Id.* at 1123. After examining relevant Supreme Court and Eighth Circuit Court of Appeal decisions, the district court in *Volk* concluded that "the FAA will govern federal courts' interpretation of arbitration clauses unless the parties make 'abundantly clear' their preference for state arbitration law," and "[a] generic choice-of-law clause that is silent on whether state arbitration rules will govern the agreement, as a matter of law, does not make the parties' intent to have federal courts apply state arbitration law 'abundantly clear.' " *Id.* at 1124-25 (citations omitted). The Sixth Circuit is in agreement.

In *Ferro Corporation v. Garrison Industries, Inc.,* 142 F.3d 926 (6th Cir.1998), the Sixth Circuit recognized that the Supreme Court's holding in *Volk* had been substantially limited by its subsequent decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). In *Ferro,* the Sixth Circuit applied *Mastrobuono* and concluded that the choice-of-law provision in the parties' contract was "no

indication that the parties intended to incorporate Ohio law, or to invoke the power of courts" into their arbitration agreement and thus displace application of the FAA. *Id.* at 937. Similarly, in a 2005 decision, the Sixth Circuit concluded that a choice-of-law provision providing that "this agreement shall be governed by the laws of the State of Michigan" did not displace the rules of the FAA. *See Jacada (Europe), Ltd. v. International Marketing Strategies, Inc.,* 401 F.3d 701, 710-12 (6th Cir.2005), *abrogated on other grounds, Hall Street Assocs., LLC v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). The *Jacada* court observed that, "[j]ust as in *Mastrobuono,* the choice-of-law clause [in *Jacada*] could be read as only specifying what state contract law the parties wished to use;" the parties had "entered into an agreement in which, without the choice-oflaw provision, the FAA rule would apply;" and "the clause does not unequivocally suggest an intent to displace the default federal standard." *Jacada,* 401 F.3d at 711. Thus, "[c]onsidering the federal policy in favor of arbitration" and relevant Supreme Court and Circuit Court of Appeal decisions, the Sixth Circuit determined that the FAA would not be displaced "when the only evidence of such intent is a generic choice-of-law provision." *Id.* at 712. Following these decisions, the United States District Court for the Eastern District of Michigan recently rejected the argument New West makes here. *See Mechanical Power,* 500 F.Supp.2d at 720-21 (rejecting an argument that Michigan law applies to the parties' arbitration agreement because there was "no clear indication in the agreement that the arbitration procedures are governed by Michigan law" and thus "the strong presumption in the federal courts toward compelling arbitration applies.").

**\*7** Like the decisions discussed above, although there is a choice-of-law provision providing that the parties' 2007 Purchase Order and 2008 Revised Purchase Order are to be interpreted by applying Michigan law, there is no clear indication that Michigan law should displace federal law on arbitration.[2] Accordingly, the FAA rules govern whether the claims asserted against Williams in the Utah Litigation should be compelled to arbitration.

## B. The Arbitration Agreement Was Properly Incorporated By Reference in the 2008 Revised Purchase Agreement

This Court acknowledges that before it "can send a case to arbitration, it must first determine that a valid agreement to arbitrate exists." *Fazio,* 340 F.3d at 393 (citing 9 U.S.C. § 2; *Stout,* 228 F.3d at 714). This "gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of

arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (internal quotation marks and citations omitted).

New West does not dispute that the arbitration agreement in POP3206 Terms and Conditions was properly incorporated by reference in the 2007 Purchase Order but argues that it should not be bound by that agreement because Williams did not highlight its presence. New West also disputes that the CT100 Terms and Conditions were properly incorporated by reference in the 2008 Revised Purchase Order because the terms were not attached to that Purchase Order when it was executed. The relevant case law does not support New West's arguments. Michigan law allows parties to incorporate terms and conditions by reference, and the courts have consistently rejected arguments similar to those of New West.

"It is well settled that the failure of a party to obtain an explanation of a contract is ordinary negligence. Accordingly, this estops the party from avoiding a contract on the ground that the party was ignorant of the contract provisions." *Scholz v. Montgomery Ward & Co.,* 437 Mich. 83, 468 N.W.2d 845, 848 (Mich.1991). Applying Michigan law, the Sixth Circuit recently addressed arguments similar to those New West presents here:

> ASC argues that the "Terms & Conditions Of Sale" Bosch cites were never sent to it, and therefore, because ASC had no notice of them they never became a part of the contract. However, Bosch sent seven quotations, each stating that "Bosch standard terms and conditions apply unless otherwise specified." Michigan law permits a party to incorporate terms or documents from other writings. A party may not plead ignorance as an excuse if the contract is clear on its face that such terms were intended to be incorporated. To the extent ASC contends that the term was not capitalized or otherwise point to a specific document, the argument fails. In *Forge [v. Smith,* 458 Mich. 198, 580 N.W.2d 876, 882 (1998) ], the Michigan Supreme Court held that a contract provision incorporating "architectural specifications" was sufficiently specific to conclude that it clearly refers for some of its terms to an extraneous document. Notably, those terms were not capitalized either, nor did they cite the title of the outside document. Thus, *we find that the language clearly and unambiguously evinced an intent to incorporate Bosch's standard terms and conditions.* ASC's proffered alternate construction is both unreasonable and irrelevant because *the issue is notice,* and ASC fails to explain why no one bothered to pick

up the phone to seek clarification.

**\*8** *Robert Bosch Corp. v. ASC, Inc.,* 195 F. App'x 503, 505 (6th Cir.2006) (internal quotation marks and citations omitted) (emphasis added). *Accord, Constr. Fasteners, Inc. v. Digital Equip. Co.,* No. 185679, 1996 WL 33348735, \*2 (Mich.Ct.App. Oct.22, 1996) (rejecting the same "no attachment" argument raised here, observing that "[w]here additional documents or terms are made part of a written contract by reference, the parties are bound by those additional terms even if they have never seen them, and concluding that "[a]lthough the standard terms and conditions were not attached to the letter of authorization, plaintiff was put on notice that they were incorporated by reference" and "will not be heard to claim that those terms were not applicable.").

New West's reliance on *Manasher v. NECC Telecom,* No. 06-10749, 2007 WL 2713845 (E.D.Mich. Sept.18, 2007), is misplaced. In *Manasher,* the issue was whether a statement on the plaintiffs' invoice for phone services was sufficient to incorporate a document that included an arbitration agreement found only on the defendant's website. *Id.* at ----3-6 The court found that the language on the invoice did "not betray a clear intent" that the referenced document was to "be considered part of the contract between the parties." *Id.* at \*6. The facts in *Manasher* are vastly different than those presented here. Williams's CT100 Purchase Order Terms and Conditions are expressly and unambiguously incorporated by reference on both the first and eleventh pages of the 2008 Revised Purchase Order.

### C. The Arbitration Agreements Are Not Unconscionable

The Court now considers New West's argument that the arbitration agreements are unconscionable and thus unenforceable. New West argues that the parties' arbitration agreements are procedurally and substantively unconscionable because (a) they are buried in fine print in referenced terms and conditions and were not subject to negotiation, and (b) they force New West to arbitrate in a remote location.

Under the FAA, courts look to state contract law to determine whether a contract is unconscionable. *Andersons, Inc. v. Horton Farms,* 166 F.3d 308, 322 (6th Cir.1998). Whether an arbitration agreement is unconscionable presents a matter of law for the court to decide. *Id.* at 323. "Michigan applies a two-prong test of 'procedural' and 'substantive' unconscionability." *Id.* at 322. It involves two types of inquiries: "(1) What is the relative bargaining power of the parties, their relative

economic strength, the alternative sources of supply, in a word, what are their options?;" and "(2) Is the challenged term substantively reasonable." *Id.* (internal quotation marks and citations omitted). The first inquiry addresses procedural unconscionability whereas the second addresses substantive unconscionability. Both must be found to exist for an agreement to be considered unconscionable. *Id.*

### 1. Procedural Unconscionability

**\*9** New West argues that the arbitration agreements are procedurally unconscionable because they are buried in fine print in referenced terms and conditions that were not subject to negotiation. This Court rejects New West's arguments of procedural unconscionability.

"Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the contested term." *Clark v. DaimlerChrysler Corp.,* 268 Mich.App. 138, 706 N.W.2d 471, 474 (Mich.Ct.App.2005). Applying Michigan law, the Sixth Circuit has observed that "the most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable." *Andersons, Inc.,* 166 F.3d at 324.

New West cannot establish procedural unconscionability. Both New West and Williams are sophisticated parties with equal bargaining power. In fact, in the business transactions at issue here, New West was the Seller; this is not a scenario where a buyer is complaining that it had no alternative source and was thus forced to accept a challenged term. As the Seller, New West was in a position to reject Williams's offer to buy. Moreover, as to the 2008 Revised Purchase Order, Williams presents evidence showing New West was able to negotiate. Finally, that Purchase Order expressly provides that "[t]he seller shall notify the buyer immediately and specifically of anything herein which the seller does not assent to as a term and condition governing transaction covered herein." (2008 Revised Purchase Order at 11 of 16.) New West failed to take advantage of this clause and thus cannot now be heard that it had no opportunity to negotiate the arbitration clause.

### 2. Substantive Unconscionability

New West likewise cannot establish substantive unconscionability. A term is not substantively unconscionable "simply because it is foolish for one party

and very advantageous to the other." *Clark,* 706 N.W.2d at 475. "Instead, a term is substantially unreasonable where the inequity of the term is so extreme as to shock the conscience." *Id.* There is nothing here about the challenged arbitration agreements that shocks the conscience. Both parties agreed to arbitrate any disputes arising in connection with the 2007 Purchase Order and the 2008 Revised Purchase Order. That New West must travel to Oakland County, Michigan does not shock the conscience. Unlike the plaintiff in *Vegter v. Forecast Financial Corporation,* No. 1:07-CV-279, 2007 WL 4178947, \*4 (W.D.Mich. Nov.20, 2007), New West is not a financially destitute consumer forced to travel to a remote location to arbitrate claims brought against a far more lucrative and sophisticated party. Unlike *Vegter,* requiring New West to arbitrate its claims against Williams in Oakland County, Michigan, where Williams is headquartered, would not effectively deter New West or other similarly situated sellers from pursuing arbitration. *Id.*

### D. The Parties Agreed to Arbitrate The Claims Asserted in the Utah Litigation

**\*10** Here, there can be no doubt that the parties agreed to arbitrate the claims asserted by New West against Williams in the Utah Litigation. New West's Amended Complaint is based on the alleged breach of express and/or implied terms of the 2007 Purchase Order and 2008 Revised Purchase Order. Moreover, the arbitration agreements at issue here broadly require New West and Williams to arbitrate "any dispute arising in connection with" the 2008 Revised Purchase Order and "any claim, controversy, or dispute arising out of or relating to the performance of" the 2007 Purchase Order. (CT100 Terms & Conditions at ¶ 23; POP3206 Terms & Conditions at ¶ 30.) The federal courts have routinely found that similar broad language requires arbitration of virtually any claim arising between the contracting parties. *See, e.g., Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.,* 706 F.2d 155, 160 (6th Cir.1983) (observing that "[w]here a commercial contract contains a broad arbitration provision covering all controversies arising under the agreement, arbitration is ordered unless the party seeking to avoid it can show that the particular dispute is expressly excluded"); *First Union Real Estate Equity and Mortg. Inv. v. Crown Am.,* No. 93-3459, 1994 WL 151338, \*3 (6th Cir. Apr.26, 1994) (observing that "[a]n arbitration clause requiring arbitration of any dispute arising out of an agreement is 'extremely broad.' A claim, regardless of the legal label assigned to it, falls within the scope of [an] extremely broad arbitration clause if the allegations underlying the claim or its defenses involve matters covered by the agreement."). Because the claims

asserted by New West against Williams in the Utah Litigation involve a dispute within the broad scope of the parties' arbitration agreements, they must be arbitrated consistent with the well-established federal policy favoring the enforcement of arbitration agreements.

compel arbitration is GRANTED. It is FURTHER ORDERED that this matter is STAYED pending arbitration.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 331714

## IV. Conclusion

For the above-stated reasons, Defendant's motion to

Footnotes

1    The 2008 Revised Purchase Order followed months of negotiations between Williams and New West. (Utah Am. Compl. ¶¶ 33-37; Shephard Decl. ¶¶ 11-13.)

2    Moreover, as discussed at oral argument and in Plaintiff's briefs, even if Michigan arbitration laws did apply, the arbitration clauses at issue here provide that disputes are to be resolved by binding arbitration and that the rules of the American Arbitration Association apply thus making them statutory rather than common law arbitration agreements.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.