# Exhibit H

 KeyCite history available

2017 WL 4654937
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

LANCASTER & YORK, LLC,
Plaintiff/Counter–Defendant–Appellant,
v.
OAKLAND COUNTY TREASURER,
Defendant/Counter–Plaintiff–Appellee.

No. 333064
|
October 17, 2017

Oakland Circuit Court, LC No. 2015–148563–CZ

Before: Gleicher, P.J., and Fort Hood and Swartzle, JJ.

**Opinion**

Per Curiam.

**\*1** In this breach of contract case involving repayment
plans for delinquent property taxes,
plaintiff/counter-defendant appeals as of right the trial
court's order granting summary disposition to
defendant/counter-plaintiff under MCR 2.116(C)(10). We
affirm.

Plaintiff, a Michigan limited liability company whose sole
member is Christopher Redding, owned two parcels of
commercial property located in Oakland County. Plaintiff
was delinquent in paying its property taxes in 2011 and
2012. Therefore, on April 3, 2014, defendant filed with
the Oakland County Registry of Deeds, certificates of
forfeiture for non-payment of taxes, which stated that the
two parcels were forfeited to defendant and would be
absolutely titled in defendant's name by foreclosure
proceeding if not redeemed by March 31, 2015, after
which date plaintiff would have no right of redemption.

On February 5, 2015, plaintiff assented to repayment

plans for the delinquent taxes and promised to make
substantial monthly installment payments to defendant for
both properties beginning on May 1, 2015. Defendant
made no express promise in the body of these agreements.
Plaintiff, however, had previously entered into
substantially similar repayment agreements with
defendant for delinquent taxes in 2012, 2013, and 2014. A
2012 letter sent from defendant to plaintiff indicates that
defendant promised to "withhold" the property from tax
sale for one year on the condition that plaintiff make the
payments required under the 2012 repayment plan.

Defendant sought and the trial court entered a judgment
of foreclosure for each parcel on February 18, 2015.
Although plaintiff asserts that he was unaware of the
foreclosure, he does not assert that the required notice was
insufficient.

The Oakland County Registry of Deeds recorded notice of
the judgment of foreclosure on August 4, 2015. Plaintiff
sued defendant on August 13, 2015, alleging that the
repayment plans were valid contracts and that defendant
had breached them by obtaining a judgment of foreclosure
vesting absolute title in defendant. Defendant filed a
counterclaim against plaintiff asserting that he owed
$123,267 in taxes and moved for summary disposition,
arguing that the repayment plans are not contracts because
they lacked consideration.

The trial court granted defendant's motion in full,
concluding that the repayment plans did not include an
enforceable agreement not to foreclose and that plaintiff
could not maintain an action for breach of contract.

On appeal, plaintiff argues that the trial court erred by
dismissing his complaint. We review de novo the trial
court's grant of summary disposition. *Maiden v.
Rozwood*, 461 Mich. 109, 118; 597 N.W.2d 817 (1999).
Summary disposition is appropriate under MCR
2.116(C)(10) when there is no genuine issue of material
fact and the moving party is entitled to judgment as a
matter of law. *Id.* at 119.

To be enforceable, a contract must be supported by legal
consideration. *Innovation Ventures v. Liquid Mfg.*, 499
Mich. 491, 508; 885 N.W.2d 861 (2016). Under the
pre-existing duty rule, a party's promise to provide
performance that he is already otherwise required to
provide—be it by statute, contract, or other enforceable
duty—is not valid consideration to render an agreement
an enforceable contract. *Gen. Aviation, Inc. v. Capital
Region Airport Auth.*, 224 Mich. App. 710, 715; 569
N.W.2d 883 (1997). Under the common law, the

pre-existing duty rule extends to promises to repay a pre-existing debt. Accordingly, to render enforceable a debtee's agreement to extend the time for the debtor's repayment of a pre-existing debt, the debtor must provide new consideration beyond his promise to repay the debt he is already obligated to pay. See *Andrews v. Pfent*, 280 Mich. 324, 326; 273 NW 585 (1937); *Briggs v. Norris*, 67 Mich. 325, 328; 34 NW 582 (1887).

**\*2** Plaintiff argues that this rule has been abrogated by statute in the case of an obligation to pay taxes on real property. Plaintiff points this Court to MCL 566.1, which reads:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration: Provided, That the agreement changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest shall not be valid or binding unless it shall be in writing and signed by the party against whom it is sought to enforce the change, modification, or discharge.

According to plaintiff, our Legislature's use of the term "obligation" in MCL 566.1 evidences a legislative intent to render a taxpayer's assent to a repayment plan sufficient to render the plan an enforceable contract without any need for additional consideration. We disagree.

"The primary goal of statutory interpretation is to discern and give effect to the Legislature's intent." *Petersen v. Magna Corp.*, 484 Mich. 300, 353; 773 N.W.2d 564 (2009). "When reviewing the statute, all words and phrases shall be construed and understood according to the common and approved usage of the language, and a word or phrase is given meaning by its context or setting." *Id.* (internal citations and quotation notation omitted).

Under traditional interpretive canons, a term appearing in a list should be construed consistently with the company it keeps. *GC Timmis & Co. v. Guardian Alarm Co.*, 468 Mich. 416, 420; 662 N.W.2d 710 (2003). MCL 566.1 sets forth five categories of property agreements which are modifiable without further consideration: contracts, obligations, leases, mortgages, and security interests. Plaintiff argues that the term "obligation" in MCL 566.1 should be read broadly to include required tax payments. A taxpayer's duty to pay property tax payments, however, originates in statute. See MCL 211.1 *et seq.* The remaining four categories listed in MCL 566.1 refer only to voluntarily assumed commitments. Therefore, when read in the context of MCL 566.1, the word "obligation" can reasonably be interpreted only to mean a voluntary obligation such as a promise or covenant.

Accordingly, MCL 566.1 does not apply to this situation. Therefore, to render the repayment plans binding contracts, plaintiff was required to provide new consideration beyond his agreement to pay the taxes he statutorily owed. Plaintiff has not provided this consideration and therefore cannot sustain a breach of contract claim.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2017 WL 4654937

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**H** KeyCite history available

2018 WL 2422582
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Grant MCKEE
v.
AUDIBLE, INC., et al.

Case No. CV 17-1941-GW(Ex)
|
Filed 04/06/2018

**Attorneys and Law Firms**

Jamin Samuel Soderstrom, Soderstrom Law PC, Irvine, CA, for Grant McKee.

Jedediah Wakefield, Armen Nercess Nercessian, Matthew B. Becker, Todd Richard Gregorian, Fenwick and West LLP, San Francisco, CA, Annasara G. Purcell, Fenwick and West LLP, Seattle, WA, for Audible, Inc., et al.

**PROCEEDINGS: IN CHAMBERS - RULING ON PLAINTIFFS' MOTION FOR CORRECTIVE ACTION [72]; and AUDIBLE'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS AS TO PLAINTIFFS ERIC WEBER AND MICHAEL ROGAWSKI [73]**

GEORGE H. WU, UNITED STATES DISTRICT JUDGE

**\*1** Attached hereto is the Court's Ruling on the above-entitled Motions. The Court would GRANT-in-part and DENY-in-part Plaintiffs' Motion for Corrective Action. The Court would GRANT Audible's Motion to Compel Arbitration as to Plaintiff Ragowski (subject to the evidentiary issues) but DENY Audible's MTC as to Plaintiff Weber.

The Court sets a status conference for April 19, 2018 at

8:30 a.m., with a joint report re proposed dates to be filed by April 16, 2018.

***McKee v. Audible, Inc. et al.***, Case No. CV-17-1941-GW (Ex)

Final Rulings on: (1) Plaintiffs' Motion for Corrective Action, and (2) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski

**I. Background**

Plaintiffs Grant McKee ("McKee"), Eric Weber ("Weber"), Michael Rogawski ("Rogawski" and together with McKee and Weber "the California Plaintiffs"); Taylor Fisse ("Fisse"); and Bryan Rees ("Rees") (collectively, "Plaintiffs") sue Defendant Audible, Inc. ("Audible") on behalf of a proposed nationwide class of consumers for: (1) violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (2) Common Law Fraud and Misrepresentation; (3) violation of Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD") and Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693*l*-1(a)(2)(B); (4) violation of the California Gift Certificate Law ("GCL"), Cal. Civ. Code §§ 1749.45 *et seq.*; (5) Violation of EFTA, 15 U.S.C. § 1693; (6) Common Law Conversion; (7) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* and Violation of California's Automatic Purchase Renewals Law, Cal. Bus. & Prof. Code § 17600 *et seq.*; (9) Violation of North Carolina's Unfair Competition Law; and (10) Restitution, Unjust Enrichment, and Money Had and Received.[1] *See generally* Second Amended Class Action Complaint ("SAC"), Docket No. 65.

**II. Procedural Background**

Plaintiff McKee originally sued both Audible and Amazon. *See* Docket No. 1. Both Defendants moved to compel him into arbitration. *See* Docket No. 18. The Court granted-in-part and denied-in-part the Defendants' motions to compel. *See* Final Ruling on Defendants' Motion to Compel Arbitration and Dismiss Claims ("Ruling I"), Docket No. 37. The Court granted Amazon's motion to compel because it found that McKee

had entered into a binding, click-wrap agreement to arbitrate his claims against Amazon. *See* Ruling I at 17-18 (concluding that Amazon's checkout page provided McKee with sufficient notice of Amazon's "conditions of use" ("COU") and the arbitration provision contained therein). The Court denied Audible's motion to compel because it found that McKee never agreed to arbitrate claims against Audible. *Id.* at 11-17. The Court found that Audible's mobile online sign up process and Audible's mobile Credit Redemption Flow did not afford McKee sufficient notice of Audible's COU and, for that reason, McKee never agreed to the Audible COU. *See id.* 11-14. The Court also found that McKee's agreement to *Amazon's* COU and his subsequent activation of his Amazon Echo did not bind him to *Audible's* COU. *Id.* at 15-17.

**\*2** Plaintiff filed a First Amended Complaint ("FAC") on August 11, 2017, adding Seth Beals as a second named Plaintiff. *See* Docket No. 40. Audible successfully moved to compel many of Beals' claims to arbitration because the process by which Beals signed up for Audible was different from McKee such that it provided Beals with notice of the Audible COU containing the arbitration provision. *See* Final Ruling on Audible's Motion to Compel Arbitration and Dismiss Claims as to Seth Beals, Docket No. 61 (adopting the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53, as its final decision). The Court also transferred the rest of Beals' claims to New York pursuant to a venue selection clause contained in Audible's Gift Membership Terms. *See* Docket No. 64.[2]

Audible also moved to dismiss McKee's claims as alleged in the FAC. *See* Docket No. 42. The Court granted in part and denied in part that motion. *See* Ruling II at 38. The Court granted the motion with respect to McKee's Lanham Act claim with prejudice. *Id.* The Court also granted the MTD with respect to McKee's claims for violation of California's Automatic Purchase Renewals Law ("CAPRL"), Conversion, and Restitution without prejudice. *Id.*[3] McKee was given leave to amend and filed the now operative SAC on December 15, 2017. Plaintiffs Rogawski, Weber, Fisse, and Rees joined the suit at that time.[4] Since the filing of the SAC, Audible has filed three motions: (1) Audible's Partial Motion to Dismiss the SAC as to Plaintiff McKee ("MTD SAC"), Docket No. 71; (2) Audible's Motion to Dismiss the SAC as to Fisse and Rees for Lack of Personal Jurisdiction ("MTD Fisse & Rees"), Docket No. 70; and (3) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski ("MTC"), Docket No. 73. Plaintiffs have filed a Motion For Corrective Action ("Pl. Mot.") under Fed. R. Civ. Proc. 23(d). *See* Docket No. 72.

On March 12, 2018, the Court issued a tentative ruling ("TR") on Audible's Motion to Dismiss the SAC and Motion to Dismiss as to Fisse & Rees. *See* Minutes of Hearing on Audible's MTD SAC, MTD Fisse & Rees, MTC, and Pl. Mot. ("Ruling III"), Docket No. 87. Consistent with the TR, the Court would grant Audible's MTD SAC with respect to Counts V and X but deny the MTD SAC with respect to Counts VII and VIII. *See* Ruling III at 31-32. The Court would also grant Audible's MTD Fisse & Rees for the reasons stated in the TR, with one modification. *See id.* at 20. The Court has the power to transfer Fisse's and Rees's claims to another district in which the claims could have been filed to cure a want of personal jurisdiction. *See* 28 U.S.C. § 1631. The parties have informed the Court that they stipulate to the transfer of Fisse's and Rees's claims to the Eastern District of North Carolina to avoid the inefficiency of dismissal and re-filing, subject to Defendant's reservation of the right to raise any jurisdictional or venue defenses that may exist. Accordingly, the Court would transfer Fisse's and Rees's claims to the Eastern District of North Carolina and instructs Audible's counsel to prepare an order effecting such transfer. All of Defendant's jurisdictional and venue defenses are preserved.

**\*3** The Court deferred consideration of Audible's MTC to allow Plaintiff to file a Sur-Reply responding to new evidence Audible submitted in its Reply brief, and allow the parties to try to work out evidentiary disputes regarding the content of the Audible web site and mobile application on relevant dates.[5] Plaintiff filed his Sur-Reply on March 22, 2018. *See* Sur-Reply in Opposition to MTC ("Sur-Reply"), Docket No. 90. The Court also deferred consideration of Plaintiffs' Motion for Corrective Action because its merits might be informed by Weber and Rogawski's alleged interactions with Audible's web site. *See* Ruling III at 8 n.8, and at 32.

These two motions are now pending before the Court and have been fully briefed. *See* MTC; Pl.'s Mot.; *see also* Plaintiff's Opposition to Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski (Pl.'s Opp'n"), Docket No. 77; Memorandum in Opposition to Plaintiffs' Motion for Corrective Action ("Def.'s Opp'n"); Reply in Support of Motion to Compel Arbitration as to Weber and Rogawski ("Def.'s Reply"), Docket No. 82; Reply in Support of Motion for Corrective Action ("Pl.'s Reply"), Docket No. 80.

### III. **Plaintiff's Motion For Corrective Action**

**A. Background**

Plaintiffs seek corrective action under Fed. R. Civ. Proc. 23(d) on the basis that Audible has made changes to its Sign Up and Credit Redemption Flows following this Court's denial of Audible's Motion to Compel Arbitration as to Grant McKee. *See* Pl.'s Mot. at 1.

Audible changed the Sign Up Flow on its mobile webpage shortly after this Court ruled that the previous version failed to provide notice of the arbitration agreement contained in Audible's COU. Declaration of Jamin Soderstrom in Support of Motion for Corrective Action ("Soderstrom Decl.") Ex. 5 (Revised Sign Up Flow), Docket No. 72-7; Docket No. 21-4 (Original Mobile Sign Up Flow). The changes effectively fixed the issues that plagued the Original Sign Up Flow. *See* Pl.'s Mot. at 4 (side by side comparison of the two sign up flows). Audible also changed its Mobile Credit Redemption Flow and Standard Credit Redemption Webpage. *See* Docket No. 44-4 (Original Credit Redemption Flow); Soderstrom Decl. Ex. 7, Docket No. 72-9 (Revised Credit Redemption Flow); *see also* Pl.'s Mot. at 5 (side by side comparison). Audible also made changes to its mobile and standard credit redemption pages on Amazon.com. *See* Docket No. 21-16 (Original Amazon Mobile Flow); Soderstrom Decl. Ex. 8 (Revised Amazon Mobile Flow), Docket No. 72-10; Docket No. 44-3 (Original Amazon Standard Credit Flow); Soderstrom Decl. Ex. 9 (Revised Amazon Standard Credit Flow), Docket 72-11. Audible also made changes to its COU, its Gift Membership Terms, and its policies relating to "gifting" Credits. *See* Soderstrom Decl. ¶¶ 1-4.

Audible does not appear to have notified its current users of the pending litigation when it made these changes, or otherwise indicate that these changes would have the legal effect of requiring-for the first time-that each member agree to arbitrate their claims in exchange for continued use of Audible's service. Additionally, Audible does not appear to have allowed its current customers to opt out of the arbitration agreement, or to offer to refund amassed Credits or membership payments in the event a member did not want to enter into an arbitration agreement in exchange for continued use of Audible.

**\*4** Plaintiffs contend that such efforts constitute improper communications with putative class members that potentially interfere with putative members' ability to join the class. As such, Plaintiffs ask for certain corrective action, most notable the invalidation of any arbitration agreement procured through changes on Audible platforms following the initiation of this action.[6]

**B. Legal Standard**

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). "Rule 23(d) gives district courts the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation." *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010), *judgment vacated on other grounds*, 565 U.S. 801, 132 S.Ct. 74, 181 L.Ed.2d 1 (2011). "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." *O'Connor v. Uber Technologies, Inc. ("Uber II")*, No. C-13-3826 EMC, 2014 WL 1760314, at \*3 (N.D. Cal. May 1, 2014).

*Gulf Oil* mandates that "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at 101, 101 S.Ct. 2193. "[S]uch a weighing − identifying the potential abuses being addressed − should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102, 101 S.Ct. 2193. An order under *Gulf Oil* "does not require a finding of actual misconduct" − rather, "[t]he key is whether there is 'potential interference' with the rights of the parties in a class action." *O'Connor v. Uber Technologies, Inc. ("Uber I")*, No. C-13-3826 EMC, 2013 WL 6407583, at \*4-5 (N.D. Cal. Dec. 6, 2013) (quoting *Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193).

Rule 23(d) does not prohibit offers of settlement to putative class members, *see Gulf Oil*, 452 U.S. at 95, 101 S.Ct. 2193, but courts may limit communications that improperly encourage potential class members to not join the suit, especially if the defendant fails to provide adequate information about the pending class action. *See Uber II*, 2014 WL 1760314, at \*6-7. The best notice will "contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class

McKee v. Audible, Inc., Slip Copy (2018)

member." *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1104 (5th Cir. 1977).

**\*5** Courts in the Ninth Circuit have limited communications, as well as invalidated agreements that resulted from those communications, when they omitted critical information or were otherwise misleading or coercive. *See, e.g., County of Santa Clara v. Astra USA, Inc.*, No. 05-3740 WHA, 2010 WL 2724512 (N.D. Cal. July 8, 2010) (invalidating releases obtained by letter to putative class that did not attach plaintiffs' complaint, explain plaintiffs' claims or the status of the case, or include contact information for plaintiffs' counsel); *Camp v. Alexander*, 300 F.R.D. 617, 620, 624 (N.D. Cal. 2014) (invalidating opt-outs obtained by letter to employees of defendants stating the class action was "motivated by greed and other improper factors" and "could result in the closure" of the business, and failed to include any explanation of plaintiffs' claims, a copy of the complaint, or contact information for plaintiffs' counsel); *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-out forms when defendant employer presented the forms in mandatory one-on-one meetings during work hours, failed to provide forms in workers' primary language, and refused to give workers copies to take home); *Wright v. Adventures Rolling Cross Country, Inc.*, No. 12-0982 EMC, 2012 WL 2239797, at \*5 (N.D. Cal. June 15, 2012) (enjoining defendants from communicating with potential class members after they e-mailed members warning that if they participate in the suit, their "past transgressions will become very public" and they will be "left with tattered reputations and substantial legal bills").

Courts have also exercised their discretionary power under Fed. R. Civ. Proc. 23(d) to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights. *See, e.g., Uber I*, 2013 WL 6407583, at \*7 (invalidating arbitration agreement imposed before class certification where imposing agreement risked interference with putative class members' rights); *Balasanyan v. Nordstrom, Inc.*, No. 11-CV-2609-JM-WMC, 2012 WL 760566, \*1-2, 4 (S.D. Cal. Mar. 8, 2012) (declining to enforce individual arbitration agreement in class action where defendant's implementation of arbitration agreement was an improper class communication); *Williams v. Securitas Sec. Servs. USA, Inc.*, No. 10-7181, 2011 WL 2713818, \*1 (E.D. Pa. July 13, 2011) (refusing to enforce arbitration agreement imposed during pendency of putative class action); *In re Currency Conversion Fee Antitrust Litig.*, 361 F.Supp.2d 237, 252-54 (S.D.N.Y. 2005) (refusing to enforce arbitration agreement instituted after putative class action

was filed as it might mislead class members).

This authority under Rule 23(d) to enjoin or control communications exists even prior to class certification. *See, e.g., Urtubia v. B.A. Victory Corp.*, 857 F.Supp.2d 476, 484 (S.D.N.Y. 2012) ("A court possesses such supervisory authority even before a class is certified."); *accord Friedman v. Intervet Inc.*, 730 F.Supp.2d 758, 765 (N.D. Ohio 2010) (listing cases); *Sorrentino v. ASN Roosevelt Ctr. LLC*, 584 F.Supp.2d 529, 532 (E.D.N.Y. 2008).

### C. Application

The key question before the Court is whether Audible's changes to its various Sign Up and Credit Redemption Flows ("the Flows") constitute communications that interfered, or have the potential to interfere with putative class members' ability to participate in the lawsuit. *See Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193; *Wang*, 632 F.3d at 756. Plaintiff need not demonstrate "actual misconduct" − rather, "[t]he key is whether there is 'potential interference' with the rights of the parties in a class action." *Uber I*, 2013 WL 6407583, at \*4-5 (quoting *Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193).

The Court would find that Audible's changes to its online flows constitute misleading and/or coercive communications to putative class members that potentially interfere with the rights of putative class members and, as such warrant narrowly tailored corrective measures. *Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193. The Court bases its decision on the following findings and evidence.

First, the changes Audible made to the Flows took place during the pendency of this class action, and after the Court denied Audible's initial motion to compel arbitration. *See Jimenez v. Menzies Aviation Inc.,* No. 15-CV-02392-WHO, 2015 WL 4914727, at \*6, 2015 U.S. Dist. LEXIS 108223, \*15 (N.D. Cal. Aug. 17, 2015) ("Courts routinely exercise their discretion to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights"); *see also Uber I*, 2013 WL 6407583, at \*4-5. McKee filed a putative class action against Audible based on its member policies, including its credit redemption, credit rollover, automatic renewal, and cancellation policies on March 10, 2018. *See generally* Docket No. 1. After several rounds of briefing, the Court denied Audible's Motion to Compel Arbitration on July 17, 2018, because it found that Audible's Original

Mobile Sign Up Flow and Audible's Original Mobile Credit Redemption Flow did not require customers to agree to Audible's COU and the arbitration provision therein. *See* Ruling I at 13-15. This arbitration provision has contained a class action waiver since September 6, 2012. *See* Docket No. 18-5 at page 4 (Audible COU on June 26, 2016); *see also* Declaration of Jason Massello In Support of Audible's Opposition to Plaintiffs' Motion for Corrective Action ("Massello Decl."), Docket No. 78-1 at ¶ 2. Thereafter, Audible made changes to the Flows.[7] *See* Soderstrom Decl. ¶¶ 5-9. Two days following the Court's Ruling I, Audible also made changes to its arbitration agreement, removing one year statute of limitations requirement contained therein and including a more conspicuous hyperlink to Amazon.com's Conditions of Use. *See id.* ¶ 2.

**\*6** Second, Audible's actions, *i.e.* the changes made to the Flows, effectively asked putative class members to waive their ability to participate in this, or any class action, in exchange for continued use and enjoyment of their Audible Membership, and did so without providing notice of the present action or affording opt out rights. Several courts have found that a lack of notice of the present suit may render such communications misleading. *See, e.g., Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1197 (11th Cir. 1985) (defendant bank conducted telephone campaign "shrouded" in "secrecy and haste" with explicit purpose of soliciting opt-outs from bank customers); *Friedman*, 730 F.Supp.2d at 764 (defendant obtained settlement releases without informing class members they were giving up the right to participate in putative class action); *In re Currency Conversion Fee*, 361 F.Supp.2d at 251 (defendant did not inform class members of pending class action).

Audible's changes to the Flows had this effect because the changes "fixed" the deficiencies noted by the Court in Ruling I. For example, the new flows no longer have the linguistic imprecision that plagued the Original Sign Up and Credit Redemption Flows. *See* Pl.'s Mot. at 4-6 (displaying side by side comparisons). The new flows also placed the disclosures directly below the credit redemption buttons. *See id.* Taken together, the changes were plainly directed at, and were ultimately successful, in ensuring Audible provided then current and would-be members with sufficient notice of the arbitration provision contained in COU. *See* Ruling I at 13-15 (discussing deficiencies in Audible's original flows); *see also, id.* at 17-18 n.7 (holding that Amazon's checkout page afforded sufficient notice). Thus, in implementing changes to its web design, Audible actively sought a waiver of certain of its then members' class action rights as a term of Audible membership *for the first time*. In

other words, Audible asked putative class members to give up their ability to participate in the pending action (or any class action for that matter) in exchange for continued use of the Audible service. In seeking such an agreement, Audible afforded no notice of the pending action to its then current members, nor did it provide its members with the opportunity to opt out.

Finally, Audible's communications were coercive in a different way: because Audible requires members to agree to its then current COU in order to redeem a credit, then current members who did not want to agree to waive class action rights would be forced to forfeit whatever credits they had. This choice was inherently coercive because it forced Audible members to give up a paid-for benefit and end an ongoing business relationship in order to refuse to waive their class action rights. *See Kleiner*, 751 F.3d at 1202 ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." (internal quotations omitted); *see also Doe v. Swift Transp. Co.*, No. 2:10-cv-00899 JWS, 2017 U.S. Dist. LEXIS 26507, \*15 (D. Ariz. Feb. 24, 2017) ("The threat of owing money undoubtedly has a chilling effect on participation in the class action ...."); *In re Currency Conversion Fee*, 361 F.Supp.2d at 251 ("[T]he potential class consisted of cardholders who depend on defendants for their credit needs .... Thus, in light of the cardholders' dependence on defendants for their future credit needs and information, this Court finds that Chase's and Citibank's actions are potentially coercive and improper.").

In sum, Audible's actions with regard to the Flows were: (1) unilateral, (2) directed at putative class members following the initiation of the lawsuit and subsequent denial of Audible's motion to compel, (3) did not include notice of the current action, and (4) forced putative class members to waive their rights or give up benefits. For these reasons, Audible's actions constitute coercive and misleading communications that have interfered (and could continue to interfere) with the present litigation. As such, Plaintiff is entitled to the narrow relief under Fed. R. Civ. Proc. 23(d) described below.

**\*7** Defendant's arguments otherwise are unpersuasive. As an initial matter, Defendant's opposition brief essentially concedes it changed the Flows following the Court's ruling on the first motion to compel in an effort to fix the deficiencies therein. *See* Opp'n at 13 (describing Audible's conduct as "clarifying the disclosures on its website"). Defendant also does not dispute that the updated disclosures require Audible members to agree to arbitration each time they redeem a credit. In fact, Defendant moved to compel Plaintiffs Weber and

McKee v. Audible, Inc., Slip Copy (2018)

Rogawski to arbitration, at least in part, based on their use of Audible after the modified disclosures. *See* Opp'n at 9 (conceding that the invalidation of post-litigation assent procured through altered Flows could determine whether Weber should be forced to arbitrate); *see generally* MTC. Audible also wholly fails to address the predicament a then-current Audible member faced when presented with the updated disclosures: agree or forfeit something of value.

Further, Defendant argues that Plaintiff's motion is premature because the class has yet to be certified and may never be. *See* Opp'n at 6:23-10:2. However, as the Court notes above, its Rule 23(d) powers may be exercised before class certification. *See supra* at 7 (citing cases); *see also, Friedman*, 730 F.Supp.2d at 765 ("[T]he effect of a defendant attempting to influence potential plaintiffs not to join an embryonic class action would be just as damaging to the purposes of Rule 23 as a defendant that influences members of an already-certified class."); *see also Menzies, Aviation Inc.*, 2015 U.S. Dist. LEXIS 108223, at *15-16 (listing cases). Indeed, Defendant admits Rule 23(d) provides the Court with this authority. *See* Opp'n at 8. Furthermore, as discussed in more detail below, the Court would severally limit the relief Plaintiff requested, and do so with an eye toward providing relief that will hasten, as oppose to hinder this litigation as it moves toward Plaintiffs' motion for class certification. Moreover, as Defendant concedes, the corrective action requested may be immediately relevant to Plaintiff Weber's ability to participate in this litigation. *See id.* at 9:12-26. As Defendant also points out in its briefing, Weber may be the only named Plaintiff with standing to assert certain of Plaintiffs' claims. *See id.*

Further, while the Court has expressed initial doubts about Plaintiffs' ability to successfully certify a nationwide consumer class, such doubts are commonplace in the modern class action landscape. More importantly, the pending motion is not the appropriate time to argue the merits of the class. Thus, Defendant's arguments concerning the viability of certification are not reasons to deny the pending motion.

Defendant also argues that the actions it took were not coercive and misleading. *See id.* at 14:1-17:20. Defendant attempts to distinguish this case from the inherently coercive employment relationship found in many of the illustrative cases. While the settings are certainly different, the online marketplace has its own inherent coercive qualities. The present case provides such an example, where a company can freeze a customer out of using its product – *an already paid for product* – unless the consumer accepts new terms and conditions. Also, *In*

*Re Currency Conversion*, although not an internet case, makes the same point in a similar one-sided business relationship between a bank and an individual client. *See* 361 F.Supp.2d at 251. *Uber I* and *Uber II* also discuss the coercive potential of post lawsuit agreements to arbitrate that can be easily accepted ("just swipe left to agree"), but are more onerous to reject. Here, current Audible members were given no realistic way to refuse the terms offered by the new disclosures without ending their business relationship with Audible and/or losing paid for benefits. There were no opt outs permitted at all, which makes the communications even more coercive than those in *Uber I*, *Uber II*, and *In Re Currency Conversion*.

**\*8** Defendant's attempts to limit the persuasive value of *In Re Currency Conversion* are not compelling. *See* Opp'n at 16:13-17:1. The Court does not agree that *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742, (2011), altered a court's power under Rule 23(d) irrespective of that case's "landmark" status. *See* Uber I, 2013 WL6407583 at *3 (rejecting similar argument that Rule 23(d) interferes with the FAA). Additionally, while *In Re Currency Conversion* did involve an already certified class, Defendant fails to explain why that would make a difference in terms of the coercive nature of the communications. Defendant also claims that Audible has always required arbitration. However, as explained above, prior to the changes, Audible did not require certain members, *i.e.* those for whom McKee's experience was representative, to agree to any such thing until they became potential members of the class McKee proposes. *See supra* at 8-9.

Third, Defendant argues that the revised disclosures are not misleading because they make Audible's terms more, not less clear. *See* Opp'n at 17:21-20:9. The problem with this argument is that it misconstrues the nature of Audible's communications. The revised websites offered a take it or leave it class arbitration waiver, for the first time, and did so without disclosing the presence of this pending class action, a case that admittedly prompted the revisions.

Finally, Defendant argues that because arbitration provisions may be retroactive, its actions cannot be considered coercive. This argument is unavailing for a few reasons. First of all, it ignores the fact that the agreement is being solicited during, and in apparent response to a pending class action. Second, the agreement being offered could not be refused without sacrificing something of value. Third, the Court's power to invalidate these agreements is based in Rule 23(d), not state unconscionability law. In other words, under Rule 23(d) a court may prohibit a party from doing what it could

McKee v. Audible, Inc., Slip Copy (2018)

otherwise do legally were no case pending, within reason. *See Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193.

Based on the above, the Court would find that Audible's changes to its Flows were coercive and misleading attempts to interfere with putative class members' ability to participate in the current litigation. The Court would therefore find any agreement to arbitrate entered into by a *then current* Audible member, on or after the Court denied the MTC through the present null and void only to the extent that it would limit a class member's participation or recovery in this action. Audible will be permitted, but not required, to obtain consent to its current arbitration provision from such members provided it does so in a manner that discloses information about this suit and affords an opt-out.[8]

The Court notes that this relief is limited in nature to what Plaintiff requests. *See Docket No. Docket No. 71-15 at 2.* The Court would take no action with respect to putative class members who were not Audible members prior to the Court's denial of the MTC[9]; (2) the Court would not require Audible to place any information on its public facing websites; and (3) if Audible provides new agreements, with proper notice of the current action and opt out opportunities, the Court would take no action with respect to such agreements.[10] In other words, Audible members in McKee's position could be subject to arbitration agreements if they give their informed consent and do not opt out. Court finds that these limitations reflect its careful weighing of the need for relief with the respective rights of the parties. *See Gulf Oil*, 452 U.S. at 101-102, 101 S.Ct. 2193. Audible and its customers may continue to agree to arbitrate disputes, *even this one*, provided the agreement is informed in a manner that will avoid interference with the present litigation. At the same time, the relief proposed remedies Audible's ability to use coercion and/or incomplete information to shrink the size of Plaintiff's potential class.

**\*9** The Court would ask the Plaintiff to prepare a more limited proposed order consistent with the Court's opinion. Additionally, the Court would direct Audible to meet and confer with Plaintiff's counsel regarding notice in the event Audible wishes to obtain class action waivers from putative class members in this action.

### D. Conclusion
The Court would GRANT-in-part and DENY-in-part Plaintiff's Motion for Corrective Action.

## IV. Defendants' Motion to Compel Arbitration

### A. Background
Defendant moves to compel Plaintiffs Weber and Rogawski to arbitrate their claims pursuant to the Audible COU. *See generally* MTC at 1. Defendant contends that Rogawski agreed to Audible's COU, and the arbitration provision therein on September 30, 2015, when he redeemed a credit through the Amazon.com website. *See* Declaration of Aniket Gune in Support of Audible's MTC ("Gune Decl."), Docket No. 73-1 at ¶¶ 11-12. Defendant argues that the Credit Redemption Flow that Weber and Rogawski viewed on these occasions afforded the type of notice that this Court already found sufficient when it compelled Plaintiff Beals to arbitrate his non-gift membership claims against Audible. *See* MTC at 2; Ruling II (finding that Beals' credit redemption constituted noticed assent to Audible's COU).

Plaintiffs oppose the motion with respect to Rogawski on evidentiary grounds and by reference to their Motion for Corrective Action. *See* Pl.'s Opp'n at 1:19-3:9. Plaintiffs initially opposed the motion with respect to Weber on the grounds that Audible presented evidence related to "the wrong Eric Weber." *See id.* at 1:6-18. However, in Plaintiffs' Sur-Reply they oppose the motion on the additional basis that, the evidence Audible subsequently presented regarding the correct Eric Weber only demonstrates, at most, that he agreed to arbitrate claims against Amazon, as opposed to Audible. *See* Sur-Reply at 1-5.

### B. Legal Standard
The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2010) (citation omitted). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*

McKee v. Audible, Inc., Slip Copy (2018)

*Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the Act is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) ). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.' " *Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F.Supp.2d 538, 540 (E.D. Pa. 2006) ).

**\*10** On a Motion to Compel Arbitration, the Court applies a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure. *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994) ). Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ) (internal quotation marks omitted).

Similarly, at the summary judgment stage the Court does not "focus on the admissibility of the evidence's form," but rather "focus[es] on the admissibility of its contents." *Fraser*, 342 F.3d at 1036. Objections on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate. *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 828 F.Supp.2d 1090, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they are capable of being reduced to admissible evidence at trial."); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if declaration violated best evidence rule, court was not precluded from considering declaration in awarding summary judgment).

### C. Analysis

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) ). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). As the party moving to compel arbitration, Defendant bears the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F.Supp.2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009) ).

Under Washington law, in order to form a valid contract the parties must manifest their mutual assent.[11] *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash.2d 171, 177-78, 94 P.3d 945 (2004); *see also Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007).[12] In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of a merchant's terms of service agreement. *See, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein."). Reasonable notice in this context requires that the consumer had either actual or constructive notice of the terms of service; constructive notice occurs when the consumer has inquiry notice of the terms of service, like a hyperlinked alert, and takes an affirmative action to demonstrate assent to them. *See id.* at 1176-79. This "inquiry turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177.

**\*11** Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of service. *See, e.g., Riensche v. Cingular Wireless, LLC*, C06-1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v.*

McKee v. Audible, Inc., Slip Copy (2018)

*Google*, Civil Action No. 06-2540, 513 F.Supp.2d 229, 2007 WL 966011, at *5-8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract). Courts have also found constructive notice where sites contain a disclosure statement that indicates that if a user signs up for a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See, e.g., Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign Up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them"). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[13]

Alternatively, some courts have refused to enforce sign-in-wrap, or click-wrap agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice. *See, e.g., Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Sprecht v. Netscape Communications Corp.* 306 F.3d 17, 22-23 (2d. Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign up process); *Meyer v. Kalanick*, 199 F.Supp.3d 752, 763 (S.D.N.Y. 2016) (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement").

While courts addressing constructive notice in internet commerce have avoided establishing hard and fast rules, review of the case law at the district level provides important guidance. *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).

> **\*12** Second "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage. *See, e.g., Ticketmaster Corp.*, 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the 'terms of use' 'could not be missed'); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).

> Third, 'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F.Supp.2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F.Supp.2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F.Supp.2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen − an action that was not required to effectuate her purchase").

97 F.Supp.3d at 401-02.

It was with this guidance in mind, and after a review of several, but admittedly not all of the sign-in-wrap agreements examined by courts throughout the country, the Court examined the particular design of the Sign Up Flow and Credit Flow to determine if Audible provided constructive notice of the Audible COU to Plaintiff Beals. *See* Ruling II. After doing so, it concluded that the Audible Credit Redemption Flow as accessed on

Amazon.com provided him sufficient notice. *See id.* at 13-15. The Court did the same with respect to McKee and determined that the Audible's flows it interacted with did not afford sufficient notice. *See* Ruling I at 19.

1. Rogawski's September 30, 2015 Credit Redemption on Amazon.com

Defendant contends that Rogawski agreed to Audible's COU, and the arbitration provision therein on September 30, 2015, when he redeemed a credit through the Amazon.com website. *See* MTC at 4-6; *see also,* Declaration of Aniket Gune in Support of Audible's MTC ("Gune Decl."), Docket No. 73-1 at ¶¶ 11-12. Defendant argues that the process by which Rogawski redeemed this credit required was identical to the one Plaintiff Beals completed and that the Court already held provides sufficient notice. *See* MTC at 2; Ruling II at 13-15 (finding that Beals' May 27, 2017 credit redemption on Amazon.com bound him to Audible's COU).

Plaintiffs initially argued that Audible's evidence was insufficient to establish that Rogawski viewed the same flow as Beals when he redeemed a credit on September 30, 2015. *See* Opp'n at 2-3. However, following a subsequent meet and confer, Plaintiffs appear to be willing to concede as much, provided Audible makes a further evidentiary showing. *See* Sur-Reply at 13:7-14:27. Specifically, Audible's motion to compel relies on testimony that, in turn, relies on yet to be produced business records. *See* Gune Decl. ¶¶ 11-12. At the last hearing, the Court told Defense counsel that it was to provide copies of those records to Plaintiffs. *See* Tr. at 19-21. At the time Plaintiffs filed their Sur-Reply, Audible had yet to provide that documentation. *See* Sur-Reply at 14.

**\*13** The Court would find that Rogawski agreed to Audible's COU on September 30, 2015, subject to the parties' ability to resolve the aforementioned issue. Should the issue remain unresolved due to Audible's failure to provide documentation, the Court would consider whether an evidentiary hearing, or limited arbitration related discovery would be required.

On September 30, 2015, Rogawski (at least according to Audible's declaration testimony) redeemed a membership credit on the Amazon desktop website. Gune Decl. ¶ 12, Ex. 2. In order to do so, Rogawski selected an audiobook, and then encountered the then in use flow ("Amazon

Redemption Flow"). *See* Gune Decl. ¶ 12; *see also, id.* Gune Decl. Ex. 2 (Amazon Redemption Flow). This was the same flow that Plaintiff Beals encountered, and that this Court has already found provided sufficient notice under the relevant case law. *See* Gune Decl. ¶¶ 14-15; *see also,* Ruling II at 13-15.

Thus, the Court would find that the Amazon Credit Flow, as it is reflected in exhibit 2, afforded constructive notice that redeeming a credit for an audiobook constituted assent to the Audible COU and the arbitration provision contained therein. However, as stated above, if Audible fails to provide the documentation relied on by Gune, this ruling might be deferred pending discovery.

The Court would also find, as it has previously, that the arbitration provision was not unconscionable or otherwise unenforceable. *See* Ruling I at 18-21, Ruling II at 15; *see also, Ekin,* 84 F.Supp.3d at 78; *Fagerstrom,* 141 F.Supp.3d at 1064-76; *Peters,* 2 F.Supp.3d at 1170. As a result, the Court would GRANT Audible's motion to compel Rogawski's claims to arbitration, subject to resolution of the evidentiary issues subject to the meet and confer.[14]

2. Weber's Use of Amazon

In Defendant's initial moving papers, it identified three instances in which Weber redeemed a credit on Audible's mobile web platform ("Audible Mobile Credit Flow"). *See* MTC at 10:20-11:1. However, the evidence attached concerned another Eric Weber, who is not the named Plaintiff in this action. *See* Ruling III at 33.

In its Reply, Audible submits zero evidence that the "real Eric Weber" agreed to Audible's COU. *See generally* Declaration of Karen Ressmeyer in Support of Reply Brief on Audible's Motion to Compel, ("Ressmeyer Decl."), Docket No. 82-4. Instead, Audible provides evidence that Weber agreed to Amazon's COU by signing up for Amazon, Amazon Prime, and making several purchases on Amazon.com and/or Amazon Prime. *See* Ressmeyer Decl. at ¶¶ 6-9. Audible argues that in agreeing to Amazon's COU, Weber agreed to arbitrate claims *against Audible. See* Def.'s Reply at 12:5-15:16. The Court already rejected this argument and does so again. *See* Ruling I at 17.[15] Amazon's COU do not reference Audible, or state that Audible is a party to Amazon's COU. *See* Ressmeyer Decl. Ex. 6. As such, the Amazon COU's do not bind Weber to arbitrate claims

McKee v. Audible, Inc., Slip Copy (2018)

*against Audible. See* Ruling I at 13. The Court already rejected an estoppel based argument raised previously whereby Audible, as a non-party, could seek to enforce the Amazon COU. *Id.*

**\*14** Audible's only attempt to distinguish the case of Weber, from the case of McKee, whom the Court held did not agree to arbitration with Audible simply by agreeing to arbitrate with Amazon, is to argue that the nature of Weber's claims are different because they rely on an alleged misuse of a credit card Weber provided in connection with his Amazon account. Audible contends that because Weber's claims would fall within the scope his agreement to arbitrate with Amazon, he must also arbitrate claims against Audible. Audible again misses the point. Weber's present claim is against Audible. Audible has not produced evidence that Weber ever agreed *with Audible* to arbitrate disputes between Weber *and Audible*. It may be the case that Weber has agreed to arbitrate claims like the ones asserted here were he to assert them against Amazon. However, that determination would only allow Amazon to force Weber into arbitration; it would not allow Audible to do the same. *See* Ruing I at 17.

In sum, Audible has failed to demonstrate that is has evidence that would show that Weber agreed to arbitrate his present claims.

### E. Conclusion

The Court would GRANT Audible's motion to compel Rogawski to arbitration, if the evidentiary issues (*see, supra*, at 19-20) are resolved; but DENY Audible's motion to compel Weber to arbitration.[16]

### IV. Conclusion

The Court would GRANT-in-part and DENY-in-part Plaintiffs' Motion for Corrective Action. The Court would GRANT Audible's Motion to Compel Arbitration as to Plaintiff Ragowski (subject to the evidentiary issues) but DENY Audible's MTC as to Plaintiff Weber.

### All Citations

Slip Copy, 2018 WL 2422582

Footnotes

1   Plaintiff Seth Beals' claims were dismissed and/or transferred to New York per the Court's granting of Defendant's Motion to Compel Arbitration as to him. *See* Docket No. 61 (finalizing the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53).

2   The Court transferred Beals' claims after granting Audible's Motion to Change Venue. *See* Docket No. 62.

3   The Court found that McKee lacked standing to assert his CAPRL claim based on Audible's alleged charging of non-designated credit cards because Audible never charged a non-designated credit card of McKee. *See id.* at 28. The Court also found that, even if McKee had standing to assert such a claim, the FAC's allegations were insufficient for the purposes of Rule 12(b)(6) because Plaintiff did not allege the specific disclosures Audible made at the point of sale in connection with its policy of automatic charges. *Id.* at 36-37. The Court also dismissed Plaintiff's CLRA claim (based on unconscionable terms), his UCL claim (also based on unconscionable contract terms), and his claim for Restitution, Unjust Enrichment, and Money Had and Received. *Id.* at 37-38.

4   Weber has also sued Amazon in a related case also before this Court.

5   Audible's moving papers had erroneously relied on evidence about the "wrong" Eric Weber. *See* Ruling III at 32; *see also* Transcript for Proceedings Held on 3/12/18 ("Tr.") at pages 19 through 21. The Court also directed the parties to meet and confer with respect to the appearance of the Audible's mobile and web pages on certain relevant dates hopes that the parties could stipulate to the content of the relevant sites on the dates that Audible contends that Weber and Rogawski interfaced with the site. *See id.*; *see also* Tr. at 19-21.

6   Plaintiffs ask the Court to order that:
    any arbitration agreements that Defendant secures based using webpages, disclosures, and/or terms that Defendant revised after this action was filed are invalid and unenforceable insofar as they are or could be used to limit consumers' potential participation in this action or ability to file or participate in another action. This order has no effect on any arbitration agreements that Defendant may have secured using webpages, disclosures, and/or terms that existed when this action was filed.

McKee v. Audible, Inc., Slip Copy (2018)

---

   Proposed Order Granting Plaintiffs' Motion for Corrective Action, Docket No. 72-15.

7   Audible does not deny that the Flows changed following the Court's order. *See generally* Massello Decl. ¶ 5. Audible claims that, as "part of its regular business [it] frequently revise[s] and seek[s] to improve various visual aspects of the webpages on which assent occurs." *Id.* Audible is silent on whether it made these changes in order to ensure that it provides sufficient notice. Audible also claims that it first implements such changes via "test groups." *Id.* The result, according to Audible, is that even on the same day, two users using the same devise might view different versions of a given flow. *Id.* ¶ 6.

8   Audible's problem herein is its unilateral and unauthorized attempt at self-helping its litigation position at the expense of actual and potential class members. The Court would caution it (as the Court would advise any party in a litigation) to seek the Court's approval before engaging in a such conduct which would have a direct and immediate impact on the litigation, especially when the conduct is opposed by the opposing party.

9   This is because such members were not required to sacrifice anything of value in order to refuse the terms and conditions offered. Furthermore, such members were not potential members of the class at sign up, which is when their agreement was obtained. To do otherwise would essentially require every business to disclose its litigation activities at its first interaction with a customer in order to obtain consent to a class action waiver. The Supreme Court cautions against such overly broad relief. *See Gulf Oil*, 452 U.S. at 101, 101 S.Ct. 2193.

10   Such notice and opt out rights must also disclose and seek to remedy the potential forfeiture required for customers wishing to opt out. The Court will leave it to the parties to work out the specifics of that arrangement.

11   This Court previously: (1) noted "that the Amazon COU incorporated by reference in the Audible COU contains a choice of law provision that provides for the application of the laws of the state of Washington;" and (2) conducted a choice of law analysis and concluded that it "would, in keeping with California choice of law principles, honor the parties' choice of law provision and apply Washington law." *See* Docket No. 35 at pages 7-8 of 24.

12   The relevant California law is functionally identical. *See Bowman v. Victor*, 83 Cal.App.2d 693, 189 P.2d 876 (1948); *Roth v. Malson*, 67 Cal.App.4th 552, 557, 79 Cal.Rptr.2d 226 (1998).

13   *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:
   Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.
   97 F.Supp.3d at 394-95.

14   Consistent with the Court's attached ruling on Plaintiff's Motion for Correction Action, the Court would not have found assent solely based on Rogawski's October 18, 2017 credit redemption on Audible.com. *See supra* at 13. However, because Rogawski assented to the Audible COU back in 2015, the relief afforded by the Court would have no effect on Rogawski, or any other Audible member that had already agreed to the Audible COU before the commencement of this litigation. *See id.*

15   In relevant part, the Court held as follows:
   Defendants' final attempt to bind Plaintiff to the arbitration clause contained in Audible's COU is to argue that he pre-agreed to arbitrate claims against Audible each and every time he purchased a product from Amazon. This is because, Defendants contend, Amazon's COU cover all of Amazon's affiliates and their products. *See* Defs.' Supp. Br. at 10:11-23. It appears to be undisputed Plaintiff has made multiple purchases on Amazon and that, each time he assented to Amazon's COU. *See* Massello Supp. Decl. at ¶¶ 36-37, Exs. 18-19. Defendants argue that because Amazon's COU define "Amazon" to include its affiliates, Plaintiff, in making purchases on Amazon.com enters into arbitration agreements with every single Amazon affiliate. This line of argument is unpersuasive. First, it is a relatively basic proposition that a party can only assent to a contract with notice of its essential terms, including, the actual parties to the contract. *See Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) ("Washington law requires that the 'essential elements' of the contract be set forth in writing. An essential element is identification of the parties to the contract."). Audible is not listed as a party to the Amazon COU.
   Further, Defendants contention that the Amazon sign in page provided Plaintiff with notice that he was making an agreement *with Audible* has other problems. For one, unless the Amazon agreement directs Plaintiff to Audible's COU in some way, or notifies Plaintiff of the existence of Audible as an Amazon affiliate it does not afford notice. The Court is unwilling to hold that a reasonable consumer signing into Amazon would believe he or she is also waiving the right to sue several additional corporations. While Amazon may be able to compel Plaintiff to arbitrate his claims based on purchases he made on Amazon, Audible may not.
   Ruling I at 17.

---

**McKee v. Audible, Inc., Slip Copy (2018)**

16     As discussed above, the parties are continuing to meet and confer on certain evidentiary issues. Plaintiff's counsel has indicated that he will stipulate to the fact that Rogawski viewed the same credit redemption flows as Beels, provided Audible produces the documents that Gune relies on. *See* Declaration of Jamin S. Soderstrom in Support of Plaintiffs' Sur-Reply ("Soderstrom Supp. Decl."), Docket No. 90-3 at ¶ 8. However, Plaintiffs have also reserved the right to argue otherwise if Defendant fails to produce said evidence, or produces evidence that casts doubt on the accuracy of the declaration testimony. *Id.* The Court may defer finalizing its decision to grant Audible's motion with respect to Rogawski until this issue is resolved.

**End of Document**     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**C** KeyCite citing references available

2017 WL 4447016
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

PTN–NRS, LLC, Plaintiff–Appellant,
v.
COUNTY OF WAYNE, Defendant–Appellee.

No. 332135
|
October 5, 2017

Wayne Circuit Court, LC No. 13–012537–CK

Before: Saad, P.J., and Servitto and Gadola, JJ.

**Opinion**

Per Curiam.

**\*1** Plaintiff appeals as of right the trial court order partially granting defendant's motion for summary disposition on plaintiff's complaint pursuant to MCR 2.116(C)(8) and the trial court order granting summary disposition in defendant's favor on plaintiff's first amended complaint asserting breach of contract pursuant to MCR 2.116(C)(10) and dismissing plaintiff's complaint.[1] We reverse and remand for proceedings consistent with this opinion.

In 2009, plaintiff and defendant entered into a contract whereby plaintiff would have the exclusive right and obligation to identify, solicit and pursue opportunities for defendant to earn revenue through sponsorships, naming rights, and similar advertising and promotions. For its services, plaintiff was to receive 25% of all revenues for revenue contracts it procured for defendant. According to plaintiff, it procured numerous opportunities for new revenue sources for defendant, yet defendant failed to abide by its obligations under the contract. Specifically, plaintiff alleged that defendant failed to effectuate the terms of a certain revenue agreement negotiated by

plaintiff, and that defendant failed to provide information for and to implement numerous other (unidentified) proposed revenue contracts thereby breaching the parties' contract and causing damage to plaintiff. As a result, plaintiff brought a one count complaint for breach of contract against defendant.

Defendant moved for summary disposition pursuant to MCR 2.116(C)(8), contending that the parties' contractual language did not *require* it to accept any proposed revenue opportunities procured or submitted by plaintiff, but instead merely provides that defendant "may" approve and sign contracts with the proposed revenue opportunities. That being the case, any decision to approve or deny plaintiff's proposed revenue opportunities was within defendant's discretion and defendant's failure or refusal to approve any specific opportunity, specifically the only one identified by plaintiff as the Coca–Cola pouring rights agreement[2], could not be the basis of a breach of contract action. Defendant further argued that plaintiff's failure to identify or attach to the complaint the specific other numerous revenue contracts it purportedly failed to provide information for or implement required a grant of summary disposition in defendant's favor, as did the speculative nature of plaintiff's proposed damages. The trial court agreed with defendant and granted its motion, but gave plaintiff 14 days to amend its complaint *solely* with respect to the allegation that defendant failed or refused to provide information to plaintiff for numerous revenue opportunities "which do not include the Coca Cola Pouring Right Agreement, to plead very specifically, breach of contract, fraud and misrepresentation."

**\*2** Plaintiff thereafter filed a first amended complaint adding allegations that it provided defendant with revenue and savings opportunities, including the I–94 beautification project, the LED lighting project, the LED network project, and the 511 Woodward LED project. Plaintiff alleged that defendant refused and/or failed to abide by the parties' agreement and that these actions were in bad faith and amounted to a breach of the contract. Plaintiff's first amended complaint presented counts for breach of contract, promissory estoppel, and fraudulent misrepresentation.

Defendant moved for summary disposition on plaintiff's first amended complaint pursuant to MCR 2.116(C)(7) and (10). Defendant argued that plaintiff materially breached the parties' contract first by not meeting the contract's revenue benchmarks, and could not demonstrate that defendant breached any revenue opportunity contract such that summary disposition was

appropriate as to plaintiff's breach of contract claim. Defendant additionally asserted that plaintiff's promissory estoppel claim must fail because there was a written agreement between the parties, and that plaintiff's fraudulent misrepresentation claim is barred by governmental immunity. In a March 1, 2016 order, the trial court granted defendant's motion and dismissed plaintiff's case. This appeal followed.

Appellate review of a motion for summary disposition is de novo. *Spiek v. Michigan Dept. of Transp.*, 456 Mich. 331, 337; 572 N.W.2d 201 (1998). Summary disposition may be granted pursuant to MCR 2.116(C)(7) when, among other things, a claim is barred by governmental immunity. When considering a motion brought under subrule (C)(7), a court must consider any affidavits, depositions, admissions, or other documentary evidence submitted by the parties to determine whether there is a genuine issue of material fact precluding summary disposition. *Dybata v. Wayne Co.*, 287 Mich. App. 635, 637–38; 791 N.W.2d 499 (2010). If no facts are in dispute, then the question whether the claim is barred by governmental immunity is an issue of law. *Id.* If, on the other hand, a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate under subrule (C)(7). *Id.*

MCR 2.116(C)(8) tests the legal sufficiency of a claim, on the pleadings alone, to determine whether the plaintiff has stated a claim on which relief may be granted. *Spiek*, 456 Mich. at 337. A motion brought under (C)(8) must be granted if no factual development could justify the plaintiff's claim for relief. *Id.*

A motion under MCR 2.116(C)(10) tests the factual support for a claim. *1300 LaFayette E. Coop., Inc. v. Savoy*, 284 Mich. App. 522 (2009). When reviewing a motion under MCR 2.116(C)(10), the court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. *Id.* If there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law, summary disposition is properly granted under MCR 2.116(C)(10). *Id.*

Plaintiff first asserts that the trial court erred in granting defendant's first motion relating to the Coca–Cola contract when plaintiff's complaint stated a valid claim for breach of contract, sufficient to survive under MCR 2.116(C)(8). We agree.

A complaint must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating

the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend ...." *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 305; 788 N.W.2d 679 (2010), quoting MCR 2.111(B)(1). If a party fails to plead facts with sufficient detail, the court should permit the party to file an amended complaint setting forth its claims in more specific detail. *Dalley*, 287 Mich. App. at 306. To state a claim for breach of contract, plaintiff must allege a contract, a breach of that contract, and damages. M Civ JI 142.01, citing *McInerney v. Detroit Trust Co.*, 279 Mich. 42, 46; 271 N.W. 545 (1937).

**\*3** In its original complaint, plaintiff generally alleged that it entered into a contract with defendant giving plaintiff the exclusive right and obligation to pursue and identify revenue opportunities for defendant. Plaintiff would receive 25% of the revenue contracts received by defendant for its services. The contract, which was attached to the complaint, was effective from November 5, 2009, through September 30, 2013, with an automatic 3 year renewal if the "target" revenue goal was met. Plaintiff alleged that it successfully negotiated a pouring rights agreement for defendant with Coca–Cola, but that despite acknowledging the existence of the agreement and plaintiff and defendant's agreement, defendant refused to put the terms of the parties' agreement into effect. In its breach of contract claim, plaintiff alleged that defendant breached its contract with plaintiff when it failed to provide plaintiff "with the information and support needed for the Coca–Cola Pouring Rights Agreement and hindered [plaintiff's] efforts to perform under the contract." Plaintiff further alleged that defendant breached the parties contract when it "refused to put the terms of the Coca–Cola Pouring Rights contract into effect" and by "failing and/or refusing to implement the opportunities identified by Plaintiff and by refusing to provide information and assistance as required by the Primary Agreement." Plaintiff asserted that these failures/refusals caused defendant to lose hundreds of thousands of dollars in revenue and resulted in corresponding damages to plaintiff. The contract itself, a part of the complaint, provides at least one obligation on the part of defendant consistent with the allegations in plaintiff's complaint. For example, at section 5.01 the contract provides: "Upon the request of [plaintiff], without charge, [defendant] must furnish copies of all information, data, reports, records, etc. that [defendant] and [plaintiff] believe are necessary for [plaintiff] to provide the Work contemplated by this Agreement."

As set forth above, plaintiff alleged the existence of a valid contract, a breach of that contract by defendant, and

damages as a proximate result of the breach by defendant. The trial court thus erred in finding that plaintiff failed to state a cause of action for breach of contract. It is true, as the trial court pointed out, that the contract places no obligation on defendant to implement or approve any revenue opportunity obtained by plaintiff. However, the contract does require defendant to furnish information necessary for plaintiff to perform its required work under the contract and plaintiff has alleged that defendant failed to do so. Whether this was a failure to provide necessary information in order to get the Coca–Cola pouring revenue contract to the Wayne County Commission or otherwise would bear out in discovery, and the trial court's reliance on defense counsel's factual statements at oral argument provided no basis for granting summary disposition based upon the pleadings alone, under MCR 2.116(C)(8).

Moreover, an implied covenant of good faith and fair dealing generally exists in all contracts, except employment contracts, which is an implied promise that neither party will do anything "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151–152; 483 N.W.2d 652 (1992). This implied covenant applies to the performance and enforcement of contracts even where a contractual term leaves the manner of its performance to one party's discretion. *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243; 357 N.W.2d 669 (1984). Where a party to a contract makes the manner of performance a matter of its own discretion, it must exercise that discretion honestly and in good faith. *Id.* at 243. Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself. *Belle Isle Grill Group v. City of Detroit*, 256 Mich. App. 463; 666 N.W.2d 271 (2003). However, because the focus of the obligation of good faith is on the manner in which the agreement or other duty is performed or enforced, a breach of contract may be found where bad faith or unfair dealing exists in the performance of a contractual term when the manner of performance was discretionary. See *Ferrell*, 137 Mich. App. at 243–244; *Gorman v. Am. Honda Motor Co., Inc.*, 302 Mich. App. 113, 132–136; 839 N.W.2d 223 (2013).

In sum, plaintiff has sufficiently alleged a breach of contract claim. Not only did it allege that specific provisions in the parties' contract were breached, but it also sufficiently alleged a breach of contract based upon bad faith or unfair dealing. The trial court erred in granting partial summary disposition of plaintiff's first complaint based upon MCR 2.116(C)(8).

Plaintiff next contends that the trial court erred in dismissing its case and granting summary disposition in defendant's favor on plaintiff's amended breach of contract claim based upon MCR 2.116(C)(10) where issues of fact existed concerning whether defendant's breaches of the parties' contract made plaintiff's performance impossible. We agree.

**\*4** The trial court granted defendant's motion on plaintiff's breach of contract claim based on its observation that it had not seen any evidence that defendant obstructed or precluded plaintiff from performing its part of the contract, but that the documentary evidence submitted did show that plaintiff failed to meet the contractually required benchmark revenue target by September 30, 2010. While defendant reads the trial court's oral statement as a pronouncement that plaintiff's failure to meet the benchmark constituted the first material breach of the parties' contract, and thus precluded plaintiff from bringing its breach of contract claims, it is not entirely clear that this was the basis for the trial court's summary disposition ruling. The trial court did state that plaintiff breached the parties' contract by failing to meet the September 2010 revenue benchmark. Plaintiff does not dispute that it failed to meet the benchmark. The focus of the oral argument, however, and thus the more readily apparent basis for the trial court's ruling, was on the evidence, or lack thereof, creating a material question of fact concerning plaintiff's allegations in its first amended complaint that defendant breached the parties contract by: (1) refusing and/or failing to provide plaintiff with information and support for various revenue opportunities; (2) failing to act in good faith when it failed to assist plaintiff as required by the contract; (3) failing to act in good faith when it failed to assist plaintiff's efforts to perform under the contract, and; (4) when, in bad faith, it failed and/or refused to implement the opportunities identified by plaintiff and by refusing to provide information and assistance as required by the parties' contract. Plaintiff's argument was essentially that defendant breached the parties' contract by interfering with plaintiff's performance under the contract which, in turn, caused plaintiff to breach. The trial court found that there was no evidence that defendant breached the parties contract in such a manner. Only if plaintiff had provided evidence of some breach of contract by defendant would defendant's argument that plaintiff breached the contract first come into play.

Again, to establish a breach of contract claim, a party must establish that (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting the breach suffered damages as a result of

the breach of contract. *Dunn v. Bennett*, 303 Mich. App. 767, 774; 846 N.W.2d 75 (2013). Determining whether the trial court erred by concluding that defendant did not breach the contract requires us to interpret the underlying contractual language. We review de novo the proper construction and interpretation of a contract as a question of law. *Perry v. Sied*, 461 Mich. 680, 681, n. 1; 611 N.W.2d 516 (2000). "A trial court may determine the meaning of the contract only when the terms are not ambiguous," and terms are ambiguous if they are "susceptible to two or more reasonable interpretations." *D'Avanzo v. Wise & Marsac PC*, 223 Mich. App. 314, 319; 565 N.W.2d 915 (1997).

Plaintiff contends that the defendant's failure to provide information and assistance regarding the Coca-Cola pouring contract made it impossible to get that contract signed faster and that the Coca-Cola contract would have contributed toward the benchmark revenue. As we found above, the trial court erred in granting summary disposition in defendant's favor on plaintiff's original breach of contract claim as it pertained to the Coca-Cola pouring agreement. Plaintiff was precluded from alleging or arguing any facts with respect to the Coca-Cola pouring agreement in its first amended complaint or at the oral argument on defendant's second motion for summary disposition. As a result, the trial court did not and would not have ruled with respect to a claim that defendant failed to provide information with respect to the Coca-Cola pouring agreement or a claim that defendant acted in bad faith when it failed to assist plaintiff's efforts to perform under the contract. Remand is therefore necessary for the trial court to determine whether material questions of fact exist concerning plaintiff's breach of contract claim pertaining to the Coca-Cola pouring agreement.

With respect to whether questions of fact existed as to the breaches of contract as they were set forth in plaintiff's first amended complaint, plaintiff directs us to the documents submitted in support of its response to defendant's motion for summary disposition. Of relevance to the matters at hand,[3] plaintiff attached the affidavit of Timothy Nasso, the Chief Operating Officer for Wayne County from January 3, 2012, until December 2014. Nasso swore that he had significant marketing experience (including having been the director of global marketing for The Dow Chemical Company and Dow Automotive and that based upon his experience and background) and how defendant handled the Coca-Cola pouring contract was incomprehensible. Nasso further swore that overall, during the time he worked for defendant, information that was given to plaintiff was not timely and some of the requested information was never

provided.

**\*5** Ronald Makino's (president of plaintiff) deposition was also part of the lower court record. Makin testified that Steven Collins, his default contact for defendant, was very difficult to coordinate with and receive answers from. According to Makino, he and Collins would set up a meeting and Collins would "blow it off," would not answer phone calls for weeks at a time, and would not address issues for weeks at a time. Makino further testified that Clarence McNeal, the County's director of purchasing, told him shortly after the parties' contract went into effect that he had a wealth of information to assist plaintiff. According to Makino, McNeal sent him to a couple of useless places, and then stopped returning his phone calls and emails before telling Makino several months later that he couldn't help him and he was going to have to just start from scratch. Makino further testified that he had asked about banking information to see about a bank sponsorship and did not receive any information regarding that. Further, Makino researched the jail commissary contract with its concessionaire and it had expired. Makino testified that Maddasser Tawakul, defendant's director of purchasing, lobbied the commissary board on three occasions to extend the concessionaire's contract and did so without speaking to plaintiff.

Plaintiff also relies heavily upon a letter addressed to defendant county department directors and deputy directors from Elder. In the September 14, 2011 letter, Elder introduces plaintiff and indicates that defendant has contracted with it for the "sole purpose of developing opportunities for Wayne County in the naming Rights and Sponsorship areas." Elder asks, "Please make contact with [plaintiff] before implementing any new product, service, or lease contract for potential opportunities." In answers to interrogatories, defendant provided information concerning leases and contracts for revenue opportunities it had entered into from 2010 through 2013 without having contacted plaintiff. For example, defendant approved the extension of an agreement with Warren Valley and Inkster Valley Golf Courses on or about July 15, 2010. While the Elder letter is not a part of the parties' contract and serves as more of an introduction of plaintiff, it does indicate that at least defendant's deputy county executive believed that information should be provided to plaintiff prior to the implementation of any new service, lease, or product so that plaintiff could identify potential revenue opportunities. Defendant's failure to provide information to plaintiff concerning its contracts and leases that could present opportunities for potential additional revenue could be deemed a breach of defendant's contractual obligations.

As pointed out by defendant, plaintiff did obtain some information about defendant on its own. Vetra Stephens, regional director of corporate accounts for plaintiff, provided an affidavit wherein she swore that in early 2010 she and defendant's maintenance supervisor visited each county owned and/or operated site and that she created a list of revenue opportunity sites from those visits. Stephens swore that among those on the list were what the parties referred to as the 511 Woodward Project, the I–94 beautification project, and the LED lighting project. However, the parties' agreement provided plaintiff with the exclusive right and obligation to identify, solicit, pursue, and develop "opportunities for the County to earn additional revenues through corporate or other commercial sponsorship, naming rights, and/or similar advertising and promotional transactions." While Stephens could identify site locations for potential revenue opportunities, without information concerning any existing contracts, leases, or other relevant revenue information regarding the sites, plaintiff could not adequately perform its job functions.

Because there is evidence creating a question of material fact as to whether defendant breached the parties' contract, defendant's argument that plaintiff was the first to breach is relevant. It has long been held that "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650; 522 N.W.2d 703 (1994), quoting *Flamm v. Scherer*, 40 Mich. App. 1, 8–9; 198 N.W.2d 702 (1972).

**\*6** As previously indicated, the parties' contract contained a target revenue schedule that plaintiff was to meet. Appendix B to the parties' contract provides that plaintiff and defendant have agreed that "during the Term [plaintiff] shall provide Revenue Contracts to [defendant]. [Defendant] shall have the ability to terminate this Contract pursuant to the provisions of Section 16.01 if [plaintiff] does not provide the following revenues to [defendant] during the time periods indicated." Appendix B thereafter sets forth the relevant time periods and target revenues for the following time periods (1) beginning with the commencement of the contract to September 30, 2010; (2) October 1, 2010 through September 30, 2011; (3) October 1, 2011 through September 30, 2012, and; (4) October 1, 2012 through September 30, 2013. The following sentence then appears in Appendix B: "[Plaintiff] shall be bound to provide the cumulative revenues to [defendant] prior to the end of the [defendant]'s fiscal year of September 31, 2011. If [plaintiff] is unable to meet the cumulative revenues

indicated [defendant] shall have the ability to terminate the contract under provision 16.01.

Notably, the above contractual language is less than clear as to exactly when plaintiff could be deemed to have breached the parties' contract with regard to providing revenues to defendant. The beginning of Appendix B suggests that plaintiff is required to provide the stated revenues on a yearly basis, with the first revenue due date being September 30, 2010. However, the later sentence in Appendix B specifically states that plaintiff is bound to provide the revenues prior to September 31, 2011. This ambiguous contractual language provides a question of fact as to when plaintiff could be deemed to have first breached the parties' contract. See *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467, 469; 663 N.W.2d 447 (2003)(A contract is ambiguous when two provisions are capable of conflicting interpretations or irreconcilably conflict with each other and when contractual language is ambiguous, its meaning become a question of fact).

Moreover, the rule that a party who first breaches a contract cannot sue the other party for breach of contract applies only when the initial breach is substantial. *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650; 522 N.W.2d 703 (1994). As our Supreme Court has stated, such a breach:

> can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party. [*McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 574; 127 N.W.2d 340 (1964) (citations omitted).]

The more oft used and comparative "material" breach of contract standard requires a court to consider whether the nonbreaching party obtained the benefit it reasonably expected to receive as well as:

> the extent to which the injured

party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the wilfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract. [*Omnicom of Michigan v. Giannetti Inv. Co.*, 221 Mich. App. 341, 348; 561 N.W.2d 138 (1997) (internal citation omitted) ].

Defendant points out that section 16 of the parties' contract defines plaintiff's failure to meet the target revenue as a material breach of contract. Indeed, Section 16, entitled "Termination" states at section 16.01, in pertinent part:

> If [plaintiff] materially breaches the Agreement, [defendant] may terminate the agreement after giving [plaintiff] written notice ... of its intention to terminate for default, together with a reasonable identification of the reasons giving rise to the notice .... If [plaintiff] fully cures the identified default within the specified notice period, and [defendant] shall revoke the notice in writing ... it will not take effect.

**\*7** Section 16.01 then lists actions taken by plaintiff that "will be deemed to constitute 'material breach' of the Agreement" including "failing to obtain Revenue Contracts that provide [defendant] with compensation schedule listed in Exhibit (sic) B."

Given that plaintiff's failure to meet revenues is defined as a material breach in the context of defendant's right to terminate the agreement and defendant did not terminate the agreement, it is questionable whether plaintiff's failure was deemed to be a material breach *outside* of the context of termination and whether defendant did, in fact, consider this failure a material or substantial breach.

In any event, plaintiff does not dispute that it failed to generate any revenues in 2010 or, in fact, any revenues as a result of the parties' contract. Assuming, without deciding, that plaintiff was in breach of the parties' contract as of September 30, 2010 (the first revenue target date), plaintiff nevertheless presented evidence that defendant failed to provide it information concerning at least one contract defendant renewed in July 2010 that could have potential revenue opportunities. It also presented evidence that defendant did not provide information requested to assist it in developing its work on potential revenue producing opportunities. Because plaintiff presented evidence creating a material question of fact as to whether defendant breached the parties' contract, and did so first, the trial court erred in granting summary disposition in defendant's favor on plaintiff's breach of contract claim.

Reversed and remanded for proceedings consisted with this opinion. We do not retain jurisdiction.

Gadola, J. (dissenting ).

Plaintiff appeals as of right the final order of the trial court granting defendant summary disposition pursuant to MCR 2.116(C)(7) and (10), and dismissing plaintiff's amended complaint. Plaintiff also challenges the earlier order of the trial court granting defendant summary disposition pursuant to MCR 2.116(C)(8) of the claim raised in plaintiff's original complaint. The majority opinion concludes that the trial court erroneously granted defendant summary disposition pursuant to MCR 2.116(C)(8) and (10). I disagree, and would hold that the trial court correctly granted summary disposition of plaintiff's claims. I therefore respectfully dissent.

I. FACTS

This case involves an agreement executed by the parties in November 2009. As stated in the agreement, the purpose of the agreement was for plaintiff to take action "to increase [defendant's] revenues through advertising, sponsorship opportunities and/or granting naming right[s] to interested parties ...." The agreement provides in

paragraph 3.01, in relevant part:

> [Defendant] hereby grants to [plaintiff] and [plaintiff] hereby accepts the exclusive right and obligation to perform the following work ... on behalf of [defendant]: (1) identifying, soliciting, pursuing, and developing opportunities for [defendant] to earn additional revenues through, corporate or other commercial sponsorship, naming rights, and/or similar advertising and promotional transactions ("Revenue Opportunities"), (2) presenting to [defendant] for its consideration and review, proposed Revenue Opportunities, and proposed contract terms under which the Revenue Opportunities may be obtained, and (3) for such Revenue Opportunity contracts as [defendant] may approve and sign ("Revenue Contracts,"), overseeing all necessary implementation of [defendant's] obligations under such contracts.... [Plaintiff] agrees and understands that each Revenue Contract will be submitted to the Wayne County Commission from the Wayne County Executive for approval, prior to execution by the Wayne County Executive....

**\*8** In addition, paragraph 5.01 of the agreement provides, in relevant part:

> Upon the request of [plaintiff] ... [defendant] must furnish copies of all information, data, reports, records, etc., that [defendant] and [plaintiff] believe are necessary for [plaintiff] to provide the Work contemplated by this Agreement.

Pursuant to the agreement, plaintiff was entitled to receive 25% of the revenues generated from each approved revenue contract as compensation for its work. That is, plaintiff would only receive payment under the agreement if defendant accepted a proposed revenue contract submitted by plaintiff and the implemented revenue contract thereafter generated revenue. The agreement explicitly states in paragraph 8.01 that the 25% of the revenue generated by approved revenue contracts is the "full compensation" to which plaintiff is entitled and, in paragraph 8.02, that "[Plaintiff] is not entitled to any costs incurred in carrying out the Work."

No provision of the agreement obligates defendant to accept any proposed revenue contract submitted by plaintiff; under the agreement, defendant had sole discretion to reject any and all revenue contracts proposed by plaintiff. The parties' agreement also specifies in paragraphs 16.01 and 16.02 that the remedy available to each party, if the other party should breach the agreement, is termination of the agreement.

In its original complaint before the trial court, plaintiff alleged that defendant had breached the parties' agreement by failing to accept the revenue opportunities plaintiff had presented. Plaintiff alleged that it had provided defendant "with numerous opportunities for new revenue sources" in accordance with the parties' agreement but that defendant "refused and/or failed to complete its obligations and abide by" the agreement. The original complaint specifically identified one proposal plaintiff had submitted to defendant involving a "pouring rights agreement" with Coca–Cola, and alleged that defendant had "refused to put the terms of the Primary Agreement into effect." Plaintiff alleged that this refusal to execute the pouring rights agreement with Coca–Cola caused plaintiff to lose the percentage of the revenue that defendant would have received had defendant accepted the Coca–Cola proposal (and, presumably, had that accepted proposal thereafter produced revenue). Plaintiff also alleged that defendant breached the initial agreement by failing to provide plaintiff with information and support needed to implement the Coca–Cola proposal, thereby hindering plaintiff's ability to put the Coca–Cola proposal into effect.

Defendant moved for summary disposition of plaintiff's complaint pursuant to MCR 2.116(C)(8), contending that plaintiff had failed to state a claim because the agreement between the parties did not require defendant to accept any proposed revenue opportunity presented to it by plaintiff. Defendant argued that the agreement provided plaintiff only with the exclusive right to present proposed revenue opportunities, that plaintiff's right to compensation was conditioned upon defendant's approval of a revenue contract and the generation of profit from the

execution of such a revenue contract, and that defendant had sole discretion to accept or deny any such proposal.

**\*9** In response to the motion, plaintiff argued that while the initial agreement did not require defendant to accept any revenue opportunity presented by plaintiff, defendant had a duty of honesty and good faith with respect to its discretion in the performance of the contract. Plaintiff argued that defendant's officials and employees had acted to further their own personal interests and/or with personal animosity toward plaintiff when considering and reviewing the proposed revenue opportunities, resulting in defendant breaching the primary agreement by failing to act in good faith, and the revenue opportunities being lost.

At the hearing on the motion before the trial court, defendant argued that plaintiff's complaint included no allegations of bad faith and unfair dealing, and that plaintiff had failed to state a claim for breach of the primary agreement. Plaintiff asserted that through discovery it could obtain evidence that defendant acted in bad faith in blocking the progress of the proposed revenue opportunities, and sought to amend the complaint to add specific allegations of bad faith. The trial court granted defendant's motion with regard to the allegations of the original complaint, specifically those allegations arising out of the Coca–Cola proposal, but permitted plaintiff to file an amended complaint to allege breach of contract, fraud, and misrepresentation arising out of any proposed revenue opportunity other than the Coca–Cola proposal.

Plaintiff thereafter filed its amended complaint, alleging breach of contract, promissory estoppel, and fraudulent misrepresentation. Specifically, plaintiff alleged in the amended complaint that pursuant to the agreement plaintiff had provided defendant with "numerous opportunities for new revenue sources" including, but not limited to: "the I–94 beautification project, the LED lighting project, the LED network project, the 511 Woodward LED project," as well as the Coca–Cola proposal that the trial court had earlier ruled upon. Plaintiff alleged that defendant had breached the initial agreement when it failed to provide plaintiff with "the information and support needed for various revenue opportunities" and that this failure was a bad faith refusal and/or failure by defendant to abide by the agreement causing defendant "huge revenues and savings cost opportunities" and "causing Plaintiff to incur unreimbursed time and unreimbursed expenses."

Defendant moved for summary disposition of plaintiff's allegations of fraudulent misrepresentation pursuant to MCR 2.116(C)(7) arguing that the claim was barred by governmental immunity, and moved for summary

disposition of plaintiff's breach of contract claim pursuant to MCR 2.116 (C)(10), arguing that there was no dispute of material fact and that defendant was entitled to judgment as a matter of law. The trial court granted defendant's motion regarding the claim of fraudulent misrepresentation pursuant to MCR 2.116(C)(7) and of the breach of contract and promissory estoppel claims pursuant to MCR 2.116(C)(10).

On appeal to this Court, plaintiff challenges the trial court's orders granting summary disposition pursuant to MCR 2.116(C)(8) and (10).[1] Plaintiff contends that the trial court erred when it granted summary disposition of the original complaint pursuant to MCR 2.116(C)(8) of the claim of breach of contract related to the Coca–Cola proposal, and further erred in granting summary disposition pursuant to MCR 2.116(C)(10) of plaintiff's breach of contract claim in the amended complaint.

## II. THE ORIGINAL COMPLAINT

**\*10** The majority opinion first concludes that the trial court erred in granting defendant summary disposition of plaintiff's original complaint which alleged that defendant breached the contract by not accepting the Coca–Cola revenue proposal and by failing to provide plaintiff with information and support regarding the Coca–Cola revenue proposal. The majority opinion concludes that the original complaint set forth allegations of breach of contract sufficient to survive a motion for summary disposition pursuant to MCR 2.116(C)(8). I disagree.

This Court reviews de novo the grant or denial of summary disposition. *Graham v. Foster*, 500 Mich. 23, 28; 893 N.W.2d 319 (2017). We also review de novo the interpretation of a contractual agreement. *Rory v. Continental Ins. Co.*, 473 Mich. 457, 464; 703 N.W.2d 23 (2005). A motion for summary disposition pursuant to MCR 2.116(C)(8) tests the legal sufficiency of the complaint, and is considered on the pleadings alone.[2] *Bryan v. JPMorgan Chase Bank*, 304 Mich. App. 708, 713; 848 N.W.2d 482 (2014). If no facts can be developed to sustain the claim, the motion must be granted. *Id.*

To adequately allege a breach of contract, the party asserting the breach must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach. *Miller–Davis Co.*

*v. Ahrens Construction, Inc.*, 495 Mich. 161, 178; 848 N.W.2d 95 (2014). The alleged breach by the defendant must be the proximate cause of the plaintiff's harm. *Chelsea Investment Group LLC v. City of Chelsea*, 288 Mich. App. 239, 254; 792 N.W.2d 781 (2010).

In this case, plaintiff's original complaint did not adequately allege either breach or damages. The parties' agreement grants plaintiff the exclusive right (1) to identify, solicit, pursue and develop revenue opportunities; (2) to present proposed revenue opportunities to defendant for its consideration and review; and (3) of oversight of all necessary implementation of defendant's obligations under an executed revenue contract. The agreement requires defendant, upon plaintiff's request, to provide plaintiff with "all information, data, reports, records, etc.," that the parties believe is necessary for plaintiff to provide the work covered by the preliminary agreement. The agreement imposes no other duty upon defendant. The agreement makes clear that each proposed revenue opportunity must be submitted to defendant for approval, and gives defendant complete discretion to approve or reject any revenue opportunity presented to it by plaintiff. The agreement further provides that the remedy available to either party, upon breach of the agreement by the other party, is termination of the agreement.

We interpret a contractual agreement according to its plain and ordinary meaning. *Wells Fargo Bank, NA v. Cherryland Mall Ltd. Partnership (On Remand)*, 300 Mich. App. 361, 386; 835 N.W.2d 593 (2013). Because an unambiguous contract reflects the parties' intent as a matter of law, courts must interpret and enforce a contract as written. *In re Egbert R. Smith Trust*, 480 Mich. 19, 24; 745 N.W.2d 754 (2008). An agreement is unambiguous when it "fairly allows but one interpretation." See *Morley v. Auto. Club of Mich.*, 458 Mich. 459, 465; 581 N.W.2d 237 (1998).

In this case, plaintiff's original complaint alleged that defendant breached the agreement "when it refused to put the terms of the Coca–Cola Pouring Rights contract into effect" and failed or refused "to implement the opportunities identified by plaintiff ...." That action, however, was permitted under the parties' agreement. A plain reading of the parties' agreement reveals that defendant had no obligation to accept any of the revenue opportunities presented to it by plaintiff, and whether to accept or reject any revenue opportunity was within the discretion of defendant alone. Alleging that defendant failed or refused to accept the Coca–Cola proposal or any other proposed revenue opportunity, therefore, does not articulate a claim for breach of the parties' agreement.

**\*11** Plaintiff further alleged in the original complaint that defendant breached the agreement because it "failed to provide [plaintiff] with the information and support needed for the Coca–Cola Pouring Rights Agreement and hindered [plaintiff's] efforts to perform under the contract." Plaintiff's original complaint did not allege any facts to support this allegation, however. The express language of the parties' agreement provides in paragraph 5.01 that "[defendant] must furnish copies of all information, data, reports, records, etc., **that [defendant] and [plaintiff] believe are necessary**..." (emphasis added). The plain language of the agreement thus provides that defendant is only obligated to provide the information that both parties agree is necessary. Further, plaintiff was able to negotiate and present the fully-negotiated Coca–Cola proposal to defendant for approval, demonstrating that it had the requisite information and support to do so. Because plaintiff did not allege any facts in its original complaint to establish that defendant breached any provision of the contract or that plaintiff had suffered any resultant damages, plaintiff's original complaint failed to state a claim for breach of contract, and the trial court properly granted defendant summary disposition of the original complaint pursuant to MCR 2.116(C)(8).

On appeal, however, plaintiff urges us to find that the original complaint should not have been dismissed because defendant breached the contract by breaching the implied covenant of good faith and fair dealing. The majority opinion agrees, and concludes that plaintiff's original complaint sets forth a claim for breach of contract both because it alleges that specific provisions of the parties' contract were breached and also because it sufficiently alleges a breach of contract based upon bad faith or unfair dealing. Again, I disagree.

Plaintiff's original complaint did not allege a breach of an implied covenant of good faith and fair dealing. A complaint must contain "[a] statement of facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend." MCR 2.111(B)(1). A mere statement of the pleader's conclusions, unsupported by allegations of fact, does not sufficiently state a cause of action. *Golec v. Metal Exch. Corp.*, 208 Mich. App. 380, 382; 528 N.W.2d 756 (1995).

Moreover, Michigan does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing. *In re Leix Estate*, 289 Mich. App. 574, 591; 797 N.W.2d 673 (2010); see also *Belle Isle Grill Corp. v.*

*Detroit*, 256 Mich. App. 463, 476; 666 N.W.2d 271 (2003) (explaining that because Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing, the trial court properly dismissed the claim). It is true that this Court has often noted that there exists in every contract an implied covenant of good faith and fair dealing, which is a promise "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 152; 483 N.W.2d 652 (1992). This Court has stated that "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v. City Nat'l Bank*, 57 Mich. App. 649, 652; 226 N.W.2d 678 (1975).

But under Michigan law, the implied covenant of good faith neither overrides nor replaces express contractual terms. *Bank of America, NA v. Fidelity National Title Ins. Co.*, 316 Mich. App. 480, 501; 892 N.W.2d 467 (2016), citing *Van Arnem Co. v. Mfr. Hanover Leasing Corp.*, 776 F. Supp. 1220, 1223 (E.D. Mich, 1991). See also *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 877 (CA 5, 1989) (Michigan law does not imply a covenant of good faith where the parties have "unmistakably expressed" their respective rights).[3] Nor will the implied covenant of good faith be used to fill alleged gaps in a contract where the contract is clear and specific regarding the parties' rights and obligations. See *Bank of America,* 316 Mich. App. at 501. So while an implied covenant of good faith has been recognized by this Court, the obligation of good faith cannot be used when interpreting a contract to override the express terms of the contract. *Cook v. Little Caesar Enterprises, Inc.*, 210 F.3d 653, 657 (CA 6, 2000). That is, an implied covenant of good faith does not require a party to "ignore, forego, or waive its express contract rights." *VanArnem Co.,* 776 F. Supp. at 1223. See also *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 827 (CA 6, 2008) (holding that there is no implied duty of good faith where the parties have "unmistakably expressed their respective rights," because the implied duty cannot override express contract terms). Rather, where an action is permitted by a contract, there is no contract violation even if the action undertaken thwarts the reasonable expectations of the contracting party. *In re Leix Estate*, 289 Mich. App. at 591.

**\*12** In this case, the parties' agreement unmistakably expressed the respective rights and duties of the parties. Accordingly, plaintiff cannot successfully argue that an implied duty of good faith overrides these plain terms.

*Stephenson*, 328 F.3d at 827; see also *Hubbard*, 873 F.2d at 877–878 (holding that there was no implied duty of good faith and fair dealing when the parties' agreement gave one party the authority to approve or disapprove a term for its own reasons, thus setting limits on what the contract required of the parties). In sum, not only did the original complaint fail to allege breach of an implied duty of good faith and fair dealing, such an allegation would have been fruitless. I therefore must disagree with the conclusion of the majority opinion and would hold that trial court properly granted defendant summary disposition of the original complaint pursuant to MCR 2.116(C)(8).

### III. THE AMENDED COMPLAINT

In this case, the trial court permitted plaintiff to amend its complaint to allege with specificity its contention that defendant had breached the parties' agreement with regard to proposed revenue opportunities other than the Coca–Cola proposal. Plaintiff consequently filed its amended complaint, alleging breach of contract, promissory estoppel, and fraudulent misrepresentation. Specifically, plaintiff alleged in the amended complaint that pursuant to the agreement plaintiff had provided defendant with "numerous opportunities for new revenue sources" including, but not limited to, "the I–94 beautification project, the LED lighting project, the LED network project, the 511 Woodward LED project," as well as the Coca–Cola proposal that the trial court had earlier ruled upon. Plaintiff alleged that defendant had breached the initial agreement when it failed to provide plaintiff with "the information and support needed for various revenue opportunities" and that this failure was a bad faith refusal and/or failure by defendant to abide by the agreement causing defendant "huge revenues and savings cost opportunities" and "causing Plaintiff to incur unreimbursed time and unreimbursed expenses." The trial court granted defendant's motion regarding the claim of fraudulent misrepresentation pursuant to MCR 2.116(C)(7) and of the claims of breach of contract and promissory estoppel pursuant to MCR 2.116(C)(10).

On appeal, plaintiff contends that the trial court erred by granting defendant's motion for summary disposition of plaintiff's amended complaint pursuant to MCR 2.116(C)(10) with respect to plaintiff's claim of breach of contract. Plaintiff argues that based on the allegations of the amended complaint and supporting documentation

there existed a genuine issue of material fact regarding whether defendant breached the parties' agreement by hindering plaintiff's ability to perform the contract. Specifically, plaintiff argues that defendant failed to provide needed information and assistance for proposed revenue opportunities and that certain of defendant's employees attempted to thwart plaintiff in its performance of the agreement. Plaintiff argues that these actions constituted breach of the parties' agreement and that it was damaged in the amount that it spent working on proposed revenue projects and in the amounts to which plaintiff would have been entitled had defendant approved the proposals.

The majority opinion agrees that there was a genuine issue of material fact and cites documentary evidence plaintiff presented to the trial court ostensibly demonstrating that defendant was uncooperative in assisting plaintiff in its efforts to perform the contract. The amended complaint and supporting documentation, however, fail to articulate the elements of proximate cause or damages necessary to sustain a cause of action for breach of contract. I therefore disagree with the conclusion of the majority opinion.

A motion for summary disposition pursuant to MCR 2.116(C)(10) is to be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Dawoud v. State Farm Mut. Auto. Ins. Co.*, 317 Mich. App. 517, 520; 895 N.W.2d 188 (2016). When reviewing an order granting summary disposition pursuant to MCR 2.116(C)(10) we consider all documentary evidence submitted by the parties in the light most favorable to the nonmoving party. *Id.*

**\*13** Again, the interpretation of a contract presents a question of law for this Court to determine de novo. *Bank of America*, 316 Mich. App. at 488. In interpreting a contract, this Court must give the words of the contract their ordinary and plain meanings. If the language of a contract is unambiguous, we must interpret and enforce the contract as written because an unambiguous contractual provision reflects the parties' intent as a matter of law. *Id.* at 489.

In this case, the amended complaint continues to fail to state a claim for breach of contract and, as the trial court held, also fails to present a disputed issue of fact that would avoid summary disposition pursuant to MCR 2.116(C)(10). Viewing all the documentary evidence in the light most favorable to plaintiff, the only allegation of the amended complaint that conceivably could constitute breach of the parties' agreement is the allegation that defendant failed to provide information to plaintiff as required by paragraph 5.01 of the agreement. But even if we accept this allegation as true, plaintiff has failed to show how this alleged action by defendant was the proximate cause of the damages plaintiff now seeks.

Under the terms of the agreement, breach by either party entitles the non-breaching party to terminate the agreement; breach does not entitle the non-breaching party to the amounts that party might have earned had a proposed revenue opportunity been accepted, and thereafter produced revenue. Again, we are constrained to give contract language its plain and ordinary meaning. The contract language states unequivocally that the only payment to which plaintiff can ever be entitled under the agreement is 25% of revenue realized by defendant, if defendant accepts a revenue proposal presented by plaintiff and if that accepted proposal generates revenue. The agreement explicitly states in paragraph 8.01 that the 25% of revenue for such an accepted contract is the "full compensation" to which plaintiff is entitled and, in paragraph 8.02, that "... [Plaintiff] is not entitled to any costs incurred in carrying out the Work." Thus, even if we accept for purposes of the motion that there is a question of fact regarding whether defendant failed to provide plaintiff information as required by the agreement, plaintiff has nonetheless failed to establish that this alleged breach resulted in plaintiff's alleged damages.[4] The trial court therefore also appropriately granted summary disposition of plaintiff's amended complaint. I would therefore affirm.

## All Citations

Not Reported in N.W.2d, 2017 WL 4447016

Footnotes

1    Plaintiff's amended complaint also asserted claims for promissory estoppel and fraudulent misrepresentation which were dismissed pursuant to MCR 2.116(C)(10) and (C)(7), respectively. Plaintiff does not challenge the dismissal of these claims on appeal.

2    A pouring rights agreement has been described as one granting a beverage maker or distributer the exclusive right to have its products sold at a venue or venues and which, in return, provides stream(s) of revenue to the other contracting party.

3    Because this Court is remanding to the trial court for consideration of issues concerning the Coca–Cola pouring rights agreement, we will not address any specific evidence concerning that agreement.

1    Plaintiff does not pursue on appeal its arguments regarding promissory estoppel or fraudulent misrepresentation.

2    Plaintiff attached the initial agreement to the complaint, thereby incorporating the agreement into the pleadings. See *Laurel Woods Apts. v. Roumayah*, 274 Mich. App. 631, 635; 734 N.W.2d 217 (2007).

3    The decisions of lower federal courts, though not binding upon state courts, may be persuasive. *Abela v. Gen. Motors Corp.*, 469 Mich. 603, 607; 677 N.W.2d 325 (2004).

4    There is an additional reason it cannot be said that any failure on the part of defendant to cooperate with plaintiff in the development of revenue opportunities was the proximate cause of any damages plaintiff may have suffered. Under the terms of the contract, any revenue opportunities plaintiff might have presented to defendant would have to be approved both by the County Executive and County Commission before taking effect. It is pure speculation to conclude, for example, that the Coca–Cola pouring rights agreement, or any other revenue opportunity, would have received the necessary approvals from these political actors. For this reason, any lack of cooperation plaintiff may have demonstrated in developing revenue opportunities was far too attenuated from its alleged damages to support the element of proximate cause. The same logic applies to the element of damages, as plaintiff could have had no meaningful expectation that it would profit under the terms of this contract given its dependence upon the approval of two separate branches of county government for any revenue opportunities to take effect. Plaintiff's damages are wholly speculative under these facts.

---

**End of Document**                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

C KeyCite citing references available

2007 WL 2807938
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

ULTICARE, INC., Plaintiff-Appellee,
v.
COUNTY OF WAYNE and Urban Hospital Care
Plus, Defendants-Appellants.
Ulticare, Inc., Plaintiff-Appellee,
v.
County of Wayne, Defendant-Appellant,
and
Urban Hospital Care Plus, Defendant.

Docket Nos. 272229, 272282.
|
Sept. 27, 2007.

Wayne Circuit Court; LC No. 05-536287-CK.

Before: WHITBECK, C.J., and WILDER and
BORRELLO, JJ.

**Opinion**

PER CURIAM.

**\*1** In these consolidated appeals, defendants Wayne
County and Urban Hospital Care Plus (UHCP) appeal by
leave granted in Docket No. 272229, and defendant
Wayne County appeals as of right in Docket No. 272282,
from the trial court's opinion and order denying their
motions for summary disposition of plaintiff's breach of
contract and promissory estoppel claims. We reverse.

Plaintiff is a "coordinated provider entity" pursuant to a
Health Services Agreement with HealthChoice of
Michigan (HC), a statutory corporation formed pursuant
to the Municipal Health Facilities Corporation Act, MCL
331.1101 *et seq.* In this role, plaintiff was responsible for
paying health benefits covered by the Health Choice Plan
out of funding it received from defendants. Plaintiff filed
this lawsuit alleging that defendants breached an

agreement to provide additional funding for the Health
Choice Plan, seeking damages under theories of piercing
the corporate veil (count 1), breach of contract (count II),
promissory estoppel (count III), and unjust enrichment
(count IV). Defendants moved for summary disposition,
seeking dismissal of all claims. The trial court dismissed
counts I and IV, but denied defendants' motions with
respect to the breach of contract and promissory estoppel
claims.

I. Standards of Review

Defendants' motions sought summary disposition under
MCR 2.116(C)(7), (8), and (10). "When reviewing a
motion for summary disposition under MCR 2.116(C)(7),
an appellate court accepts all well-pleaded allegations as
true, and construes them most favorably to the plaintiff,
unless specifically contradicted by contrary evidence." *Xu
v. Gay,* 257 Mich.App 263, 266; 668 NW2d 166 (2003).
"The court must consider all affidavits, pleadings,
depositions, admissions, and documentary evidence filed
or submitted by the parties, and the motion should be
granted only if no factual development could provide a
basis for recovery." *Id.* at 266-267.

As this Court explained in *Smith v. Stolberg,* 231
Mich.App 256, 258; 586 NW2d 103 (1998):

> A motion for summary disposition
> under MCR 2.116(C)(8) tests the
> legal sufficiency of a claim by the
> pleadings alone. This Court reviews
> de novo a trial court's decision
> regarding a motion under MCR
> 2.116(C)(8) to determine whether the
> claim is so clearly unenforceable as a
> matter of law that no factual
> development could establish the claim
> and justify recovery. All factual
> allegations supporting the claim, and
> any reasonable inference or
> conclusions that can be drawn from
> the facts, are accepted as true.

A motion under MCR 2.116(C)(10) tests the factual

support for a claim. *Lewis v. LeGrow,* 258 Mich.App 175, 192; 670 NW2d 675 (2003). In reviewing a motion under MCR 2.116(C)(10), this Court " 'must consider the available pleadings, affidavits, depositions, and other documentary evidence in a light most favorable to the nonmoving party and determine whether the moving party was entitled to judgment as a matter of law.' " *Michigan Ed. Employees Mut. Ins. Co. v. Turow,* 242 Mich.App 112, 114-115; 617 NW2d 725 (2000), quoting *Unisys Corp. v. Comm'r of Ins.,* 236 Mich.App 686, 689; 601 NW2d 155 (1999).

## II. Breach of Contract

**\*2** Defendants argue that plaintiff failed to state a claim for breach of contract because they were not a party to the Health Services Agreement. Rather, only plaintiff and HC were parties to that agreement.

A plaintiff in a breach of contract action must establish that a contractual relationship existed. *McInerney v. Detroit Trust Co.,* 279 Mich. 42, 46; 271 NW 545 (1937). Although neither defendant is a party to the Health Services Agreement, we agree with the trial court that plaintiff's complaint does not allege a breach of that agreement. Instead, plaintiff's breach of contract claim is based on an allegedly independent agreement by defendants to increase plaintiff's funding in order to offset plaintiff's increased costs and obligations under the Health Services Agreement. Thus, dismissal was not warranted because of lack of privity.

Further, because the Health Services Agreement is not the basis for the breach of contract claim, its provisions requiring arbitration of disputes and that modifications be in writing do not defeat the breach of contract claim, nor does the fact that plaintiff did not prevail in its arbitration with HC.

We agree with defendants, however, that the breach of contract claim cannot survive because there is no evidence of consideration for defendants' alleged promises to increase plaintiff's funding. Under the written agreement (the Health Services Agreement), there was no coverage for preexisting conditions. After the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), certain preexisting conditions were required to be covered. According to plaintiff, the alleged oral agreement or representation was by Mr. Mike Duggan, and was to the effect that "if you don't cancel,

we'll pay you extra if you cover preexisting conditions." However, plaintiff failed to present any evidence below that Mr. Duggan made any such promise. In order to raise a genuine issue of material fact, the claimant must come forward with documentary evidence showing specific facts indicating a genuine factual issue for trial. *McManamon v. Redford Charter Twp.,* 273 Mich.App 131, 134; 730 NW2d 757 (2006).

In addition, there was a preexisting duty to cover preexisting conditions. It is undisputed that under HIPAA, certain preexisting conditions were required to be covered. Although defendants did not raise this argument below, "this Court may overlook preservation requirements if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented[.]" *Smith v. Foerster-Bolser Construction, Inc.,* 269 Mich.App 424, 427; 711 NW2d 421 (2006). Here, consideration is a question of law, the facts necessary for its determination are presented, and review of the consideration issue is necessary for a proper determination of the case.

**\*3** Consideration is required for a valid contract. *The Meyer & Anna Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute,* 266 Mich.App 39, 58; 698 NW2d 900 (2005). Consideration is a bargained for exchange involving a benefit on one side or a detriment suffered, or service done, on the other. *Id.* In other words, the consideration necessary to support a contract is a benefit to the promisor or a detriment to the promisee. *Levitz v. Capitol S & L Co.,* 267 Mich. 92, 96; 255 NW 166 (1934). Consideration has also been described as

"[t]he inducement to a contract. The cause, motive, price, or impelling influence which induces a contracting party to enter into a contract. The reason or material cause of a contract. Some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." *[Sands Appliance Services, Inc. v. Wilson,* 463 Mich. 231, 241-242; 615 NW2d 241 (2000), quoting Black's Law Dictionary (6th ed), p 306.]

Here, plaintiff's complaint alleges consideration: "WCHC, UHCP and Wayne County represented to Ulticare that it would increase the funding to Ulticare to pay for the new responsibilities of the Health Choice Plan related to HIPPA [sic; HIPAA]."[1] But at the time of defendants' alleged promises, plaintiff was already obligated to perform under the Health Services

Agreement with HC. Under the "preexisting duty" rule, doing what one is legally bound to do is not consideration for a new promise. *46th Circuit Trial Court v. Crawford Co.,* 476 Mich. 131, 158; 719 NW2d 553 (2006). Plaintiff's contract with HC included the following provision:

4.3 *CPE Acceptance of and Responsibilities for Payment.*
CPE shall accept monthly capitation payments as payment in full for the provision of all Basic Covered Services and Supplemental Covered Services by CPE and CPE's Participating Providers to Subscribers. In exchange for the applicable monthly capitation payment as set forth in Appendix B, CPE agrees to pay all claims of Participating Providers and, in relation to CPE approved referral services, Out-of-CPE Providers, for providing Basic Covered Services and Supplemental Covered Services to Subscribers.

Under this provision, plaintiff was required to accept the monthly capitation payments as payment in full for the performance of its obligations, even if the cost of performing its obligations increased, which is what plaintiff alleges occurred in this case. Plaintiff does not allege that it suffered any additional detriment or assumed any additional obligations that it was not already required to perform under the Health Services Agreement. Therefore, consideration for defendants' alleged promises is lacking. Without valid consideration, there can be no claim enforceable in contract.

Accordingly, on these bases, defendants are entitled to summary disposition on the breach of contract claim.

III. Promissory Estoppel

**\*4** "The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App 675, 686-687; 599 NW2d 546 (1999). The reliance must be reasonable and the promise must be definite and clear. *Ypsilanti Twp. v. Gen. Motors Corp.,* 201 Mich.App 128, 134, 139; 506 NW2d 556 (1993). Courts should cautiously evaluate an estoppel claim and apply the doctrine only if "the facts are unquestionable and the wrong to be prevented undoubted." *Novak, supra* at 687.

In this case, even assuming the existence of clear and definite promises to increase plaintiff's funding, plaintiff has not alleged any circumstances showing that an injustice would result if the alleged promises were not enforced. As previously explained, plaintiff was already obligated to perform under the Health Services Agreement. Plaintiff does not allege, nor did it factually show, that it did anything or changed its position in a way that was not required, because of defendants' alleged promises. Therefore, summary disposition of the promissory estoppel claim is also warranted.

In light of our decision, it is unnecessary to address Wayne County's immunity arguments in Docket No. 272282.

Reversed and remanded for entry of summary disposition in favor of defendants. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2007 WL 2807938

Footnotes

1        HIPAA is the Heath Insurance Portability and Accountability Act, a federal statute passed in 1996.

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    3