IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

TEMUJIN KENSU,                          )
                                        )
     Plaintiff,                         )
                                        ) Case No. 18-11086
     vs.                                )
                                        ) Bay City, Michigan
JPAY, INC. ,                            )
                                        ) June  26, 2019
     Defendant.                         )
_____ ) 9:54 a.m.

TRANSCRIPT OF MOTION
BEFORE THE HONORABLE PATRICIA T. MORRIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:   Keith L. Altman
                     Excolo Law PLLC
                     26700 Lahser Road
                     Suite 401
                     Southfield, MI 48033

For the Defendant:   Elizabeth B. Herrington
                     Morgan Lewis & Bockius, LLP
                     77 West Wacker Drive
                     Chicago, IL 60606

**For the Defendant:   Benjamin W. Jeffers**
                     Hickey Hauck Bishoff & Jeffers PLLC
                     1 Woodward Ave
                     Detroit, MI 48226

Recorded by:         Kristen Castaneda

Transcribed by:      Carol M. Harrison, RMR, FCRR
                     1000 Washington Avenue
                     Bay City, MI  48708

TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING
TRANSCRIBER NOT PRESENT AT LIVE PROCEEDINGS

1              P R O C E E D I N G S

2              (At 9:54 a.m., proceedings commenced.)

3              (Defendant present.)

4              THE COURT:  Good morning.  The Court calls the case

5  of Kensu versus JPay.  It's Case No. 18-11086.  Could I have

6  the attorney appearances, please.

7              MR. ALTMAN:  Keith Altman on behalf of plaintiffs.

8  With me is Albert O'Shayga (ph), my colleague.

9              THE COURT:  Thank you very much.

10             MR. ALTMAN:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MS. HERRINGTON:  Good morning, Your Honor.  Beth

13 Herrington on behalf of defendant JPay.

14             THE COURT:  Thank you.

15             MR. JEFFERS:  And Ben Jeffers on behalf of defendant

16 JPay.

17             THE COURT:  Okay.  Great.  Yes, thank you.  My case

18 manager is well organized, so I've got everybody's names.

19 Thanks very much.

20             So we're here today on the motion to lift the stay,

21 and that is plaintiff's motion and so if you wouldn't mind

22 going first.  Thank you, sir.

23             MR. ALTMAN:  Good morning, Your Honor.  I don't want

24 to waste too much time going over the history.  Your Honor is

25 well aware, but essentially we had filed this case, defendants

1   filed a motion to compel arbitration.  Your Honor reviewed that

2   motion and oppositions.  You made a decision that arbitration

3   should be compelled.  We objected.  The DJ reviewed our

4   objection, overruled our objections.

5          When we went to go file arbitration of the case with

6   the required arbitration firm JAMS, JAMS says, sorry, we're not

7   going to arbitrate these cases anymore, so we have a

8   fundamental problem here is that the arbitration forum that was

9   selected by the defendant is not available to arbitrate this

10  case.  So one of the things the Court had done, they had

11  dismissed -- they had not dismissed the case but had stayed the

12  proceedings of the case --

13          THE COURT:  Right.

14          MR. ALTMAN:  -- pending arbitration, so from a

15  procedural perspective, given the fact that there was no place

16  to arbitrate, plaintiffs brought a motion to lift the stay

17  because, obviously, since there's no place to arbitrate, we

18  need to come back to Your Honor and Judge Cox to see what to do

19  next.

20          Now, it's plaintiff's position that, No. 1, you know,

21  there was some wrangling over the arbitration, whether the

22  arbitration is appropriate.  It was plaintiff's position that

23  the arbitration agreement is unconscionable, an unconscionable

24  adhesion contract.

25          THE COURT:  Yes, and we left that decision for --

1          MR. ALTMAN:  The arbitrator.

2          THE COURT:  -- the arbitrator, yes.

3          MR. ALTMAN:  But we have a fundamental problem

4   because there is no arbitrator, so one of the things we raised

5   though is that if you read the language -- and I'm the first to

6   admit I missed this the first time around.  It appears to be

7   clear from the contract that this Court does, in fact, by the

8   terms, have the -- the ability to decide the validity of the

9   arbitration or to the degree that which the defendants maintain

10   is a separate agreement.  They've taken the position that we

11   have our terms of use, but contained within that is a

12   completely separate agreement, which is the arbitration

13   agreement which can be addressed separately.

14          The second thing is is it's our position that given

15   that, the arbitration -- you know, we think the arbitration

16   agreement -- now the Court does have to decide whether the

17   arbitration agreement itself is enforceable.

18          THE COURT:  Didn't we basically say in the R and R,

19   which was adopted, that we were looking at the agreement as a

20   whole, and then there was some talk about, you know, we looked

21   at the agreement as a whole and said that decision on the

22   unconscionability or other questions of validity of the

23   agreement would be left in the arbitrator, and then I believe,

24   kind of as an aside, said even if the Court were to look at

25   just the arbitration clause portions of it, that the result

1   would be the same.

2            So it wasn't a real strong ruling on whether the

3   arbitration portion of it is unconscionable or not.  It was one

4   of those kind of, you know, even if we looked at it, we'd still

5   be upholding the notion of arbitration, so -- and I realize

6   your argument today is we'd like to separate that out and just

7   talk about whether the arbitration portion of the agreement is

8   unconscionable.

9            MR. ALTMAN:  And that's based on -- and that's based

10  on the defendant's own words where they claim that the

11  arbitration clauses are a completely separate agreement.  They

12  made that rep -- they made that representation in their papers

13  that the arbitration's a completely separate agreement.

14           THE COURT:  Of course, that representation wouldn't

15  bind the Court, I mean, that's --

16           MR. ALTMAN:  I'm not saying -- I'm not saying it's

17  binding the Court, but the defendants themselves concede that

18  the arbitration is a separate agreement.  But even putting that

19  aside, then we come back to -- even if this Court were to

20  decide that, okay, you're going to go to arbitration or should

21  go to arbitration, we then have a fundamental problem is that

22  JAMS won't arbitrate the case.

23           THE COURT:  Right.

24           MR. ALTMAN:  JAMS was -- just wasn't mentioned in

25  passing.  It's not just JAMS.  It's JAMS is the arbitrator.

1          THE COURT:  So your position is following those

2  circuits that talk about whether the particular arbitrator is

3  central or integral to the agreement, and your argument is JAMS

4  is --

5          MR. ALTMAN:  JAMS is --

6          THE COURT:  -- central or integral to the agreement.

7          MR. ALTMAN:  And not just because they said JAMS.

8  It's because they said certain specific JAMS rules --

9          THE COURT:  Uh-huh.

10          MR. ALTMAN:  -- and said certain specific

11  requirements so there is no -- you know, first of all, we think

12  JAMS would never have arbitrated the case.  It appears that

13  JAMS is not arbitrating on admin -- will not arbitrate if it's

14  administrative difficulties.

15          THE COURT:  Right.

16          MR. ALTMAN:  But we think even if that were not the

17  case, JAMS would not arbitrate the agreement because it does

18  not meet their consumer protection standards that are required,

19  and JAMS very clearly says, we will only arbitrate agreement if

20  the following provisions are in place.

21          I think any reasonable inference is is that if those

22  terms are not met, JAMS will not arbitrate the agreement.

23  So -- but we have the JAMS rules that are supposed to be there,

24  so now if JAMS won't arbitrate the agreement, and the defendant

25  was very particular about the terms of the arbitration, the way

1    they want it to happen and whose rules would apply, et cetera,

2    and things like that, we don't think that they can just simply

3    substitute another arbitration -- you know, another arbitrator

4    like they have done now.

5              THE COURT:  So -- and I understood that in your

6    arguments, what you're reiterating today, that you had implied

7    that JAMS did not want to arbitrate this particular agreement

8    because somehow that showed that the agreement is

9    unconscionable because JAMS didn't want to -- when JAMS

10   discussed their reasonings for why they would not arbitrate

11   these types of cases anymore, they said things like the

12   difficulties in communicating with prisoners, and the high

13   volume of calls, which I thought was kind of funny because

14   they're sort of at odds with one another, but I get it.

15   They're getting too much probably collect or other calls

16   from -- you know, from the prisons or having a hard time

17   finding the prisoners, and when they do communicating with them

18   so they -- they did not state that there was a failure to meet

19   the consumer protection requirements in their rationale for

20   explaining why.  Would you agree with that anyway?

21             MR. ALTMAN:  That -- I do agree -- I do agree with

22   that.  There is two bases here.  You know, there's the

23   individual -- there is globally JAMS says we're not going to

24   arbitrate JPay claims anymore, but we think that, you know,

25   based upon its statement we will only arbitrate claims if the

1  following conditions are in place; we have dem -- we have shown

2  how the terms of the arbitration agreement do not meet the

3  terms that JAMS says must be in place in order for them to

4  arbitrate.

5          We believe -- and we have no way to test that now, we

6  believe that even if JAMS were in principle willing to

7  arbitrate JPay cases, that when presented with these failures

8  in the terms to comply with the consumer protection standards,

9  JPay would come back and say we will not arbitrate this

10  particular case because you have not met the consumer

11  protection statute, the standards --

12          THE COURT:  Okay.

13          MR. ALTMAN:  -- but we have no way to test that

14  anymore --

15          THE COURT:  Right, right --

16          MR. ALTMAN:  -- because --

17          THE COURT:  -- because they won't arbitrate it, so

18  they won't even look at it.

19          MR. ALTMAN:  Correct.  And if -- now, we had raised

20  that very issue the first time --

21          THE COURT:  Understood, uh-huh.

22          MR. ALTMAN:  -- even before they had come out and

23  said we won't arbitrate.  At the time they said -- and so, just

24  to be clear, in our original motion --

25          THE COURT:  Sure.

1          MR. ALTMAN:  -- we said JAMS will not arbitrate

2   because it doesn't meet their standards.

3          THE COURT:  Uh-huh.

4          MR. ALTMAN:  When we tried to arbitrate it, and we

5   found out that they wouldn't arbitrate, we were not aware of

6   the basis of why JAMS --

7          THE COURT:  Right, okay.

8          MR. ALTMAN:  -- would not arbitrate so we continued

9   following along with what we still believe would be the case.

10  And then as part of their reply, defendants had the benefit of

11  having a more detailed --

12         THE COURT:  Yes, right --

13         MR. ALTMAN:  -- letter from JAMS explaining why.

14         THE COURT:  -- right, yes, yes.

15         MR. ALTMAN:  But I don't think that's an im -- I

16  don't think the Court can take that to mean that it's only for

17  administrative purposes because they did not -- never evaluated

18  our --

19         THE COURT:  Particular contract?

20         MR. ALTMAN:  This particular contract and our issues

21  with this particular --

22         THE COURT:  Right --

23         MR. ALTMAN:  -- contract.

24         THE COURT:  -- understood.

25         MR. ALTMAN:  So I just want to be clear.  I wasn't --

```
 1  we weren't --
 2          THE COURT:  No, I appreciate that.
 3          MR. ALTMAN:  -- trying to pull a fast one on the
 4  Court and, you know, kind of try to --
 5          THE COURT:  Right --
 6          MR. ALTMAN:  -- mislead.
 7          THE COURT:  -- not at all.
 8          MR. ALTMAN:  We still believe that -- we still
 9  believe that that's the case.
10          THE COURT:  Okay.
11          MR. ALTMAN:  So it's our position here that, No. 1,
12  this Court can -- should do a more detailed analysis -- you
13  know, No. 1, the Court has the jurisdiction under the contract
14  to evaluate the arbitration agreement.  No. 2, that it should
15  do a more detailed analysis.  Your Honor, you know,
16  acknowledged that it was a kind of even if --
17          THE COURT:  Yes, yes --
18          MR. ALTMAN:  -- kind of thing, but I don't --
19          THE COURT:  -- absolutely.
20          MR. ALTMAN:  -- think the Court really looked at it
21  in serious detail.
22          THE COURT:  No, it was a small paragraph.
23          MR. ALTMAN:  It was a small -- that the Court should,
24  if the Court believes it has jurisdiction, it should do a more
25  detailed evaluation because, frankly, Your Honor, this is, you
```

```
1   know, kind of an unusual contract.  You know, to some degree
2   JPay is in a position to take advantage of prisoners in anyway
3   that they want.  They can insert any terms that they want.  The
4   prisoners have absolutely no negotiating power.  They have no
5   alternative typically.  In a typical situation, that if a
6   person doesn't like the terms of this particular vendor,
7   they're allowed to seek another vendor.  They have a choice.
8           THE COURT:  Right, and we talked about that.
9           MR. ALTMAN:  They have a choice.
10          THE COURT:  That it was a -- it's a take it or leave
11  it kind of situation.
12          MR. ALTMAN:  They have no choice.  If they don't
13  accept JPay's terms, they do without.
14          THE COURT:  Right.
15          MR. ALTMAN:  And one of the fundamental problems
16  overlying all of this, this is not one of these circumstances,
17  Your Honor, where it's just that, you know, one guy's just
18  ticked off that he lost three songs on his player.  There is an
19  endemic problem within the Michigan Department of Corrections
20  and the JPay system that the players continuously fail; that my
21  client has probably been through six or eight players from
22  JPay; that the kiosks often don't work; that they lose their
23  emails; that they lose their -- this is a huge problem here.
24  This is not just an isolated incident that --
25          THE COURT:  And I understand, that was part of your
```

1   argument before so, yes.

2          MR. ALTMAN:  This is a big deal.  And the other thing

3   is is that in terms of -- there was a little bit about the

4   agreement itself and whether he agreed to the terms.  One of

5   the things JPay doesn't show is that how is the agreement

6   actually presented to a prisoner for acceptance?  They simply

7   say that in order for Kensu to have used the system, he must

8   have agreed to the terms.

9          Well, did they present them to Kensu in a way that he

10  actually had an opportunity to read them?  Were they in a font

11  size that he could have -- that he could have read them?  We

12  have -- they presented no evidence whatsoever that the

13  agreement that they allegedly agreed to was presented to them

14  in any kind of meaningfully consumer -- a reasonable manner.

15  It could have been at one point type at the bottom that they

16  never would have had an opportunity to read, like you sometimes

17  see on TV.

18         And I think that's an important element here.  If

19  they want to argue that the prisoners agreed to this, and

20  nothing in their affidavit that they put in from their person

21  shows whether they had met any kind of reasonable consumer

22  standards, and I think that's an element here if they want to

23  argue that Mr. Kensu and others had agreed to these terms, and

24  that's just not there.  They just simply say, these are what

25  the terms are, and if they use the system, they had to have

1  agreed to these terms.

2          But they make no showing whatsoever that they were --

3  how they were presented, and not only that, they don't even

4  show that the prisoner has a meaningful opportunity to review

5  the terms of the agreement after they've allegedly agreed to

6  them.  Did they have an opportunity on the kiosk to click on a

7  button and see what the terms are so that they might have some

8  understanding?  I think these are fundamental problems.

9          THE COURT:  And I know they are and you've, you know,

10  done a good job of rearticulating those same arguments that we

11  did here before.  Just for today's purposes, I'd like to ask

12  you how you feel about -- we have a situation that hasn't been

13  discussed very well in our own pres -- Sixth Circuit precedent

14  as to what to do when the named arbitrator is no longer

15  available.  I assume, from the case law that you cited, that

16  you're going with those circuits that say, well, the Court

17  shouldn't just immediately substitute someone.  Instead, we

18  should look to whether the particular chosen arbitrator is

19  central or integral to the agreement, and so I'd like you to

20  focus on what you think about this case.

21          First of all, do you think that's what the Sixth

22  Circuit law should be, to follow those circuits; and, secondly,

23  how you think -- if we were to apply that rule, that we look to

24  whether the particular named arbitrator is central or integral

25  to the agreement, what should the outcome be of this case and

```
 1   why.  So go ahead, Mr. Altman.
 2          MR. ALTMAN:  First of all, Your Honor, it's -- Sixth
 3   Circuit law does not apply.  Formation of the contract would be
 4   Michigan law, but if there is a contract, if there is an
 5   agreement, there's a very specific clause within the agreement
 6   that says Florida law, law Florida is what applies to this
 7   case.  So it would be the Eleventh Circuit.
 8          THE COURT:  For things like formation of a contract
 9   and --
10          MR. ALTMAN:  No, no, if there is a contract.
11          THE COURT:  Right.
12          MR. ALTMAN:  Anything going on with the contract --
13          THE COURT:  Yes.
14          MR. ALTMAN:  -- in terms of -- so in terms of whether
15   an arbitrator could be substituted, et cetera, what to go with,
16   it would be Eleventh Circuit.
17          THE COURT:  Your agreement also refers to the FAA.
18          MR. ALTMAN:  Correct, but that would -- but the
19   Eleventh Circuit law would be an interpretation of the FAA.
20   All I'm saying is if the FAA -- I don't mean Florida state --
21   I'm not saying Florida state law.  Florida Eleventh Circuit law
22   interpreting the FAA is what should be controlling here because
23   the defendants have decided that Florida -- you know, Florida
24   law, Florida venue, Florida is what applies to this case.
25          THE COURT:  We do this all the time where, you know,
```

1    we would still be -- the federal court is bound by the Sixth

2    Circuit law, the -- if it's a diversity case when it comes to,

3    you know, some of the underlying law, like the contract

4    validity and so forth, we use the law of the state in which

5    we're located, or if there's a choice of law provision, we can

6    follow that, but I don't think, when it comes to us using our

7    own federal law, I'm not aware of anything that says we,

8    federal court here in the Sixth Circuit, should be looking to

9    Eleventh Circuit law because the agreement refers to if we're

10   going to look at state law, the state should be Florida.

11              MR. ALTMAN:  Well, I think it's --

12              THE COURT:  (inaudible) Government I'm giving you

13   that.

14              MR. ALTMAN:  I think it's -- you know what, Your

15   Honor, I think it's a little bit -- you know, there's gray area

16   there.  It is not clear as to what's the implication of them

17   selecting a Florida venue, having a Florida venue clause

18   potentially, and Florida law apply.  You know, I don't know

19   that they get to pick and choose which -- you know, which law

20   they like.  If they want to pick that Florida is where the

21   venue should be --

22              THE COURT:  But that's state law.

23              MR. ALTMAN:  Well -- no, but they say venue to -- it

24   would be venue to federal court.  It -- Your Honor, there's

25   reasonable --

```
 1              THE COURT:  Okay.  Well, let's --
 2              MR. ALTMAN:  There's reasonable room for
 3   interpretation.
 4              THE COURT:  We'll move on from that.  So you're going
 5   to -- you're going to look to the Eleventh Circuit law.
 6              MR. ALTMAN:  Well, I think Sixth Circuit law, you
 7   know, is it -- there's not a lot of law in this particular
 8   area.  It is somewhat difficult --
 9              THE COURT:  Right, right, I agree.
10              MR. ALTMAN:  -- as to what to do, so at the end of
11   the day, as a practical matter, I think all the law would be
12   useful to Your Honor in making an opinion here because --
13              THE COURT:  Not all the laws.
14              MR. ALTMAN:  But just whether it's Eleventh
15   Circuit --
16              THE COURT:  I'm just teasing you.  Go ahead.
17              MR. ALTMAN:  But whether it's Eleventh Circuit or
18   Sixth Circuit, you know, I think Your Honor has got to -- this
19   is not such a clearcut case that you can go to one case says
20   that answers it all.  I think Your Honor's going to have to --
21              THE COURT:  Right, I agree we're --
22              MR. ALTMAN:  -- put together -- put together pieces.
23              THE COURT:  Yes, I agree with you there.  Are you
24   aware of the *Robinson* case in the Sixth Circuit?
25              MR. ALTMAN:  I am not.
```

1          THE COURT:  I don't think either party cited it.

2    It's not a great statement, but it's 841 F.3d 781, and it's a

3    2016 case.

4          MR. ALTMAN:  You said 781, Your Honor?  F.3d?

5          THE COURT:  Yes, I'm sorry, 841.

6          MR. ALTMAN:  841.

7          THE COURT:  841 F.3d 781.  It's --

8          MR. ALTMAN:  781.

9          THE COURT:  -- a 2016 case, and it doesn't do a great

10   job because it just kind of briefly mentions, you know, whether

11   there should be an exception, as they word it, to Section 5 of

12   the FAA --

13         MR. ALTMAN:  Your Honor, my thoughts --

14         THE COURT:  -- when the choice of the arbitrator is

15   integral to the arbitration agreement, and then they basically

16   say we need not decide whether to adopt such an exception

17   because it wouldn't apply here anyway.

18         But the implication, which other courts have cited,

19   and I'm looking at -- it's a Colorado case that's going to be

20   published, it's a 2019 case at 2019 Westlaw 1382791, and it

21   divides up the circuits, and it puts the Sixth Circuit in with

22   the circuits that don't look to whether a particular named

23   arbitrator is integral or not.

24         MR. ALTMAN:  Your Honor, here's the fundamental

25   problem.  This is a consumer contract, and I'm just giving you

1  my thoughts a little bit here, but this is a clearcut example

2  of a merchant company taking as much advantage of a consumer as

3  it possibly can, and there are certain elements of that that

4  are very odd.

5          For example, these claims typically would be a few

6  hundred dollars in their nature, few hundred, maybe a thousand,

7  maybe at most two or 3,000.  The defendants put in there that

8  this is going to be a three arbitrator panel.  Now that's a

9  little bit absurd when one thinks about we need three

10  arbitrators to rule upon a dispute that's over a couple

11  thousand dollars?

12          They put in here that says that the costs will be

13  borne by the losing party but yet both AAA and JAMS say,

14  huh-uh, the complaining party in a consumer contract pays about

15  $200, and the merchanted is responsible for the rest, including

16  the arbitration costs and everything like that, but that's not

17  what's put in this contract.  They put in there that the fee --

18  the costs will be split, never mind attorneys fees which would

19  be, you know, just a separate issue and stuff like that.

20          They put in here the arbitration will take place in

21  Miami, but both JAMS and AAA would say, no, the arbitration has

22  to take place in the county where the consumer is.  So what

23  happened here is that the defendants stacked the deck as much

24  as possible in their favor in a consumer arbitration, which in

25  its -- on its face is supposed to have certain protection to

1  the consumers so that they have a meaningful opportunity to

2  litigate -- to litigate their case, and we called them out on

3  it is what it boils down to.

4         We've said, what you've done here is not right and

5  not fair, and so they want to get the benefit of saying, well,

6  we put in all these rules in here, we said how the landscape

7  should be played, and you caught us, and we should get the

8  benefit of changing the landscape so that we can have our

9  arbitration, and that's really what it boils down to.

10        When you take the arbitration clause together, plus

11  all the things they put into it, all the rules they put into

12  it, that really does make it a picture that is -- that they

13  have set forth.  They had the opportunity.  They could have

14  said things like, we would -- a national arbitration

15  organization such as JAMS.  They could have said that.  That

16  would have meant if it wasn't -- JAMS wasn't available, it

17  could have been AAA.

18        THE COURT:  Right, so good.  Now you're getting to

19  the -- what I was looking for.

20        MR. ALTMAN:  Now, they could have --

21        THE COURT:  Why is JAMS central or integral to the

22  disagreement?

23        MR. ALTMAN:  But they didn't say that.

24        THE COURT:  They didn't have a substitute name.

25        MR. ALTMAN:  They didn't have a substitute name.

1   They didn't say using the national organization's consumer

2   arbitration rules.  They didn't do that.  They set the rules.

3   They set the JAMS expedited rules.  They specifically specified

4   what rules they wanted to operate under, which would be --

5   which would be -- those rules would be dependent.

6          So, you know, while we don't think this is a valid

7   contract, if it is, the plaintiffs are certainly entitled to

8   know the rules of engagement.  They've set forth the rules of

9   engagement.  They had no ability to negotiate that.  Here's a

10  company saying we're going to do JAMS, we're going to do JAMS'

11  rules, we're gonna do this, we're gonna do this, we're gonna do

12  this.  It would be fundamentally unfair for it to come down

13  that what you've said there, all of that together, doesn't

14  work, but we're going to let you change the landscape so that

15  you can get your arbitration anyway.  That's really what

16  they're asking for here.

17         It should be -- since you went through all this

18  trouble to specify the exact rules, the exact arbitrator, the

19  exact other terms, you live or die by that.  If that's not

20  available to you, you should not get the benefit.

21         THE COURT:  Then you litigate in court?

22         MR. ALTMAN:  Then you litigate -- then you litigate

23  in court, or you shouldn't put rules because, you know, one of

24  the things that's interesting -- it would be interesting to see

25  it now that they've selected AAA.  AAA requires a -- the

1    business, in a consumer dispute, requires the business to

2    submit their arbitration clause to AAA for an assessment of

3    whether it meets their consumer due process standards, and they

4    have to actually pay for that.

5            THE COURT:  So you like AAA's rules better?

6            MR. ALTMAN:  It's -- well, I mean, AAA's rules are

7    whatever they are.

8            THE COURT:  Right.

9            MR. ALTMAN:  Okay.

10           THE COURT:  So if you were -- if you were to not be

11   successful in the motion, and if the Court were to substitute

12   someone, what do you think of AAA?

13           MR. ALTMAN:  You know, I think if you operate under

14   the consumer standards of AAA or JAMS, it is certainly far

15   superior to the terms the defendants put in their arbitration

16   clause.  There is -- I do believe that there is a significant

17   attempt on both AAA and JAMS to see that consumers have a fair

18   day in court, that they are not so deterred from standing up

19   for their rights that they won't do anything, they'll just

20   accept whatever it is -- whatever -- accept whatever it is that

21   they get, and I know that AAA and JAMS have done that.

22           JAMS would have done -- you know, if the JAMS

23   consumer rules would have been far superior to what the

24   defendants put in there as well, but JAMS isn't here.  But it

25   just seems to me that it's fundamentally unfair that a company

```
 1   selects arbitration, stacks the deck as they see fit, probably
 2   deters a lot of people because the clause in there that says,
 3   if you lose, you're going pay all our costs and attorneys fees,
 4   on a couple of hundred dollar claim -- now, to put something in
 5   perspective here, for them to litigate this claim under AAA
 6   rules means the defendants would have to spend approximately
 7   $9,500 in order -- just in fees to AAA just to arbitrate this
 8   case.  $9,500, because they insisted on three arbitrators.  So
 9   be it.  You want three people?  I mean, the consumer rules, you
10   know, of arbitration allow for one person or three people.
11   They've demanded that it be three people, well, it's going to
12   be three people.
13            THE COURT:  How does that help or hurt your argument
14   that JAMS --
15            MR. ALTMAN:  It doesn't help -- it doesn't help or
16   hurt my.
17            THE COURT:  Okay, just an interesting aside.
18            MR. ALTMAN:  Your Honor asked me what I thought of
19   AAA rules and things like that.
20            THE COURT:  Okay.  Okay.
21            MR. ALTMAN:  So what I'm saying is is that if this
22   Court were to -- you know, were to decide that arbitration
23   should take place, those rules are certainly better than what's
24   there, and they have to --
25            THE COURT:  Okay.
```

```
 1          MR. ALTMAN:  But I still question the fact, should
 2  they be allowed to alter the agreement, to change the rules so
 3  that they can comply with the rules when they didn't do it in
 4  the first place.  It seems a bit unfair to allow them to do
 5  that.  They chose these rules.  They chose these terms.  If
 6  those terms will not work, they shouldn't get the benefit of
 7  just changing the terms.  You know, and it's not a question of
 8  like Your Honor can excise a term out of the agreement and
 9  stuff like that.  This is a fundamental change like -- you
10  know, like for example --
11          THE COURT:  And in some ways favorable.
12          MR. ALTMAN:  In some ways -- well, but if that term
13  actually -- that can actually happen.
14          THE COURT:  Okay.
15          MR. ALTMAN:  See you have this fundamental contract,
16  let, you know --
17          THE COURT:  You'd rather go to court, right, got it.
18          MR. ALTMAN:  I mean, we'd rather go to court but if
19  Your Honor decides that it should be arbitration, they've now
20  got an agreement with AAA that it should be under the AAA
21  consumer protection rules, with three arbitrators, that's what
22  they picked.  That's the consumer rules.
23          THE COURT:  I think it would have to be because, you
24  know, you can't shove JAMS' rules down AAA's throat.
25          MR. ALTMAN:  But that's not a -- that's not a JAMS'
```

1  rule.  They decided -- both JAMS --

2          THE COURT:  It'll be the AAA rules.

3          MR. ALTMAN:  Both JAMS and AAA allow for three

4  arbitrators in a -- even in a consumer dispute.  They selected

5  three arbitrators.  I don't have any basis for saying that

6  three arbitrators violates the consumer protection standards,

7  because it doesn't.  The consumer either --

8          THE COURT:  Okay.  Right --

9          MR. ALTMAN:  They -- so --

10         THE COURT:  -- no problem.

11         MR. ALTMAN:  It needs to be three arbitrators.

12         THE COURT:  Yep.

13         MR. ALTMAN:  That's what -- that's what it's going to

14  be, it's going to be three arbitrators.  So if Your Honor

15  decides it should be AAA, it should be under the AAA rules.

16  The arbitration should have to take place in, excuse me, the

17  county where the prisoners are, which is what AAA requires,

18  okay; not down in Florida.

19         Florida law will apply in terms of -- you know,

20  Florida law will apply in terms of any -- the consumer

21  protection statute, which is raised in these complaints.  It

22  would be Florida law because they've selected Florida state

23  law.  That's not a -- you know, and both our sets of

24  arbitration require that any remedy available to an

25  individual -- any remedy available to an individual in state

1    court must be available to them through arbitration.  So, for

2    example, if the Florida Consumer Protection Act allows for fees

3    to be awarded to the consumer should they prevail, then that

4    has to be available to them in the arbitration.  That's the

5    arbitration rules.

6            But if the arbitration rules don't -- you know, if

7    the state law does not allow for fee shifting the other way,

8    like, for example, the Florida Consumer Protection Act says a

9    prevailing consumer can get his attorney -- his or her

10   attorneys fees.  The business can only get their attorneys'

11   fees if the claim was frivolous.  That's the only basis for it,

12   even if they are the prevailing party.  They have to

13   demonstrate that it's frivolous.

14           So the clause in the contract that says the losing

15   party pays all the costs and fees of the winning party, that

16   has to be gone because it violates -- not only does it violate

17   state law in Florida, it violates the arbitration rules.  So,

18   you know, in principle, if this Court decides arbitration takes

19   place and there's a way to do it, but it's got to be, you know,

20   got to be all the way so that it complies with AAA.

21           THE COURT:  All right.  Thank you very much, Mr.

22   Altman.

23           MR. ALTMAN:  Thank you, Your Honor.

24           THE COURT:  Go ahead, Ms. Harrington.

25           MS. HERRINGTON:  Thank you very much.  I'll just pick

1    up on where counsel left off, and Your Honor knows the timing

2    of this on April -- on March 11th, 2019, the Court

3    recommendation was adopted by Judge Cox.  The unconscionability

4    arguments that have been raised in the papers that were just

5    filed were addressed by Judge Cox in that order, so I think

6    today really we are addressing what to do about the arbitrator.

7         And Judge Cox recognized that Section 5 of the FAA

8    contemplated the situation where if an arbitrator was -- that

9    was originally appointed was not available, unfortunately for

10   purposes of this case, JAMS decided -- I guess that after the

11   report and recommendation was adopted on April 2nd, it was

12   three weeks later that JAMS tells us we're not going to service

13   you anymore and that's disappointing.

14        But to be fair, counsel made a great point, the AAA

15   rules are actually much more detailed for consumer claims, and

16   I think that most consumers would argue much more favorable,

17   and Mr. Kensu has an available route here for an arbitrator,

18   the AAA is now in our terms of use.  We think that under

19   Section 5 of the FAA that it would be appropriate for the Court

20   to appoint AAA as the arbitrator in light of the fact that JAMS

21   is no longer servicing our arbitrations.

22        THE COURT:  Can I ask you, Ms. Herrington, as I did

23   Mr. Altman, on the flip side, he gave a couple of reasons why

24   he thinks if we were to go into the inquiry about whether JAMS

25   is central to the agreement, he had a couple of reasons why he

1  think JAMS is central to the agreement.  What would your

2  arguments be as to why JAMS is not an integral part of the

3  agreement?

4        MS. HERRINGTON:  Well, I think that one of the

5  arguments made in the papers was that there were certain

6  policies that the JAMS had that talked about arbitrations, what

7  policies had to be complied with under JAMS for consumer

8  arbitrations.  Those were -- those are policies.  I would say

9  that the -- AAA actually has rules that govern how the consumer

10 arbitrations need to move forward.

11       If you look at the cases that were cited by the

12 parties --

13       THE COURT:  And you did cite *Adler* --

14       MS. HERRINGTON:  We did.

15       THE COURT:  -- which is the Eastern District case.

16       MS. HERRINGTON:  We did cite -- yes, we did.  We

17 cited Adler.

18       THE COURT:  (Inaudible).

19       MS. HERRINGTON:  Yes, exactly, and we believe that

20 this case is analogous there.  In that case, the clause said

21 that the arbitration shall be resolved exclusively and finally

22 in binding arbitration administered by the National Arbitration

23 Forum.

24       Very clear, much like here where it said that JAMS

25 would apply.  There they said, well, the fact of the matter is

1    is that NAF was not available, and the Court said that because

2    it was an arbitration that could be decided by a similar type

3    of arbitration system, that the Court then should -- well, the

4    Court then ordered the parties to meet and confer on an

5    alternative arbitrator that would apply the rules of NAF under

6    its code of procedure.

7          Here we actually have a substitute that we believe is

8    even more favorable for Mr. Kensu's claims.  His claims, as

9    you've seen in the papers, are worth many thousands of dollars,

10   and AAA handles these everyday all day.  JAMS was arbitrating

11   these matters for us for years and years, and unfortunately

12   they decided to take a step back.

13         But when you look at the two provisions, you look at

14   JAMS and you look at AAA, they are both companies that provide

15   arbitration services for consumer claims and are very, very

16   similar.  The cases cited by opposing counsel from the Eleventh

17   Circuit, the *Parm* case, and then I'm going to say it wrong,

18   *Inetianbor*.

19         THE COURT:  Oh, I know.  I didn't know how to say it

20   either.

21         MS. HERRINGTON:  I practiced a few times, but

22   *Inetianbor versus CashCall*, both of those cases involved the

23   Cheyenne River Sioux Tribe, and the defendants there being from

24   the Cheyenne tribe is my understanding were -- said, hey, the

25   whole point of this is that I was going to go before a forum,

1   an arbitration forum, that was very specific.

2           In other words, the Cheyenne River Sioux Tribe is not

3   interchangeable with AAA, or just an arbitrator that could be

4   randomly appointed by the Court.  More it's integral to why I

5   entered into this contract, because I believed if I did have a

6   problem, there would be somebody from the tribe that I

7   associate with that would be responsible for stepping in or for

8   being the arbitrator in the event of a dispute.

9           Here, we do not have the same situation.  It's

10  actually -- it's much different, it's much more close to the

11  *Adler* set of facts.  We have a consumer who has a -- you know,

12  has claims, wants them heard, and we have AAA standing at the

13  ready to arbitrate those claims.

14          In many ways, as I've said before, AAA is the much

15  better alternative for purely consumer claims as -- that are

16  raised here.  As far as what law applies or what claims they

17  hear, that will be up to the arbitrator.  If the AAA is

18  appointed and we move forward, AAA will decide all of those

19  issues along with the unconscionability argument that was

20  raised again today.

21          THE COURT:  All right.  Very well.  Thank you.

22          MS. HERRINGTON:  Thank you.

23          THE COURT:  Mr. Altman, do you have any rebuttal?

24          MR. ALTMAN:  Yes.

25          THE COURT:  And, again, focusing on the arbitration

1   issue, thank you.

2          MR. ALTMAN:  Your Honor, can I ask for a five minute

3   recess?  I'd like to discuss something with opposing counsel

4   and maybe respond to you, and I have some ideas that may --

5          THE COURT:  Sure.  If you two want to talk, we have

6   no problem with that at all.

7          MR. ALTMAN:  Can we -- so if I can just have like a

8   five minute recess.

9          THE COURT:  All right.  Absolutely.  If you want to

10  just come -- have someone come to chambers and let us know when

11  you're ready.

12         MR. ALTMAN:  Okay.  That's fine.

13         MS. HERRINGTON:  Very good.

14         (At 10:28 a.m., break taken.)

15         (At 10:55 a.m., break concluded.)

16         THE COURT:  All right.  Thank you.  How are things

17  going, Mr. Altman?

18         MR. ALTMAN:  Reasonably well, Your Honor.  I

19  appreciate you giving us a little bit of time for us to discuss

20  the matter.

21         THE COURT:  Sure.  Always.

22         MR. ALTMAN:  The parties are trying to reach an

23  agreement where plaintiffs would waive -- you know, would agree

24  to arbitration and drop our position on that.  We're not quite

25  there yet.  It's a little easier on my end because I can make

```
 1   agreements, and they have to consult with their -- they have to
 2   consult with their corporate --
 3            THE COURT:  Oh, right.
 4            MR. ALTMAN:  So the parties request, if we could have
 5   a 7-day continuance to give the parties time for them to confer
 6   with counsel and to see if we could come up with an agreement
 7   before, Your Honor rules on -- rules on the motions.
 8            It's plaintiff's position -- I just want to lay out
 9   plaintiff's position, if we cannot reach an agreement, and I
10   think there's a good chance we will, so we're -- we're in the
11   ballpark.  We're not like it's never going to happen.
12            THE COURT:  I must admit, I have mixed feelings about
13   that because it was kind of an interesting legal issue that
14   hasn't been well developed and so --
15            MR. ALTMAN:  It is an interesting legal issue.
16            THE COURT:  -- either way we'll be happy.  Whether --
17   you know, we don't need more work; but, on the other hand, it's
18   kind of an interesting issue, so --
19            MR. ALTMAN:  Here's a couple -- here's a couple of
20   the sticking points, and I just want to lay out just
21   plaintiff's position if the Court is required to rule, what we
22   think should happen.
23            If the Court decides that arbitration -- we don't
24   think arbitration should take place --
25            THE COURT:  Right --
```

1        MR. ALTMAN:  -- but if the Court decides --

2        THE COURT:  -- you're not undermining your position,

3  I understand.

4        MR. ALTMAN:  If the Court decides that arbitration

5  should take place, we believe that the -- this should be the

6  terms of it, because, frankly, the arbitration agreement is

7  being rewritten anyway to put AAA in there.  So it's

8  plaintiff's position that it should take -- you know, AAA,

9  we're fine with that if that's going to be an arbitrator.  It

10  should be with the consumer rules.

11        The three arbitrators that they've -- that they put

12  in the contract, we're fine with the three arbitrators.  It'll

13  be three arbitrators.  They've asked for it.  We're not going

14  to dispute that.  There are a couple of terms that are

15  currently.

16        THE COURT:  And when you say "consumer rules", is

17  that the AAA rules?

18        MR. ALTMAN:  The AAA consumer rules allow for either

19  one arbitrator or three arbitrators, so we have no basis for

20  saying three arbitrators is inconsistent with the -- so, we

21  agree --

22        THE COURT:  Okay.

23        MR. ALTMAN:  -- the three -- three arbitrators is

24  what they have said, we're fine with that.

25        There are two terms in there that we believe are

Kensu vs. JPay, Inc. - Motion - June 26, 2019

1    inconsistent with the consumer rules; one is the fee shifting

2    provision that's in there that says that the losing party pays

3    costs and attorneys fees.  That's inconsistent with the AAA

4    rules.  We think that that should be excised.

5            The term that says that the arbitration should take

6    place in Florida, AAA requires that arbitration take place in

7    the county of where the consumer resides, which would be

8    wherever the prison is.  So we think those two things are

9    inconsistent, those should be manageable.

10           And the only -- one sticking point that we have to

11   work out is what's the effect of this on the putative class,

12   that if the Court -- you know, if the Court makes the decision,

13   and this is something -- one of the things we have to work

14   through, it's not only Mr. Kensu, but there's all the putative

15   class members that they should have the benefit of the very

16   same agreement in that, you know, anybody who was a putative

17   class member at the time this complaint was filed should have

18   the benefit of this arbitration agreement.  It shouldn't be

19   that we have to come forward with each and every person that

20   say you say JAMS and, no, it should be this, and have to have a

21   negotiation over what terms apply.

22           THE COURT:  You don't yet have a class action.

23           MR. ALTMAN:  I understand that, but from an American

24   Pipe perspective, you know, all the putative members though,

25   their claims are tolled, were tolled when we filed the case,

```
 1   even though we don't have a class.  My point is we shouldn't
 2   have to sit and resolve this issue for the next person, even if
 3   there's no class.  So we get another prisoner who wants an
 4   arbitration, are we going to be back before Your Honor, you
 5   know, saying, hey, wait a second, this guy, you know, has a
 6   contract that says JAMS, or should this be resolved for all
 7   putative class members, and I'm hoping we can agree to that.
 8   That would be the simplest -- the --
 9            THE COURT:  Okay.  That might be your biggest
10   sticking point right there.
11            MR. ALTMAN:  -- simplest solution.  Yeah, it is.
12   We're trying --
13            THE COURT:  That's my guess.
14            MR. ALTMAN:  We're trying to work through it, but it
15   seems to make sense --
16            THE COURT:  Okay.
17            MR. ALTMAN:  -- I mean, why would they -- you know,
18   why would they want to have different terms with respect to
19   arbitration for different people so that we're back -- you
20   know, back in court fighting over how that says JAMS, JAMS
21   won't do it.  You know, it just, as a practical matter,
22   wouldn't make any sense.
23            THE COURT:  Okay.
24            MR. ALTMAN:  But I'm hopeful.  We had a good
25   productive -- good productive chat.  I'm hopeful that we will
```

```
 1   come up with some terms that will make sense to everybody if,
 2   you know -- and if we come up with those terms, we will waive
 3   our there should be no arbitration arguments.  Now --
 4            THE COURT:  Okay.
 5            MR. ALTMAN:  -- if we can't come up with an
 6   agreement, then, you know, Your Honor will have to decide
 7   that --
 8            THE COURT:  Right.
 9            MR. ALTMAN:  -- and if you do decide there should be
10   arbitration, the Court will decide what terms the --
11            THE COURT:  So we will do that.  We'll give you the
12   continuance for seven days.  We'll wait and see if you do
13   resolve things and you'll withdraw your motion --
14            MR. ALTMAN:  Yes.
15            THE COURT:  -- and so -- I mean, if you want to do a
16   courtesy call to us, that's great, too --
17            MR. ALTMAN:  No, we'll do that.
18            THE COURT:  -- but we will need the motion to
19   actually be withdrawn, you know, in order for us to --
20            MR. ALTMAN:  Of course.
21            THE COURT:  -- not have to do anything to resolve it.
22   So we'll wait and see how that goes.  I wish you good luck with
23   that.
24            MR. ALTMAN:  I don't know if they -- they may have a
25   statement.
```

1          MS. HERRINGTON:   Yeah, just a couple of quick things.

2          THE COURT:  Oh, okay.  Sure.

3          MS. HERRINGTON:   Just the defendant's position,

4     JPay's position, is that we do think that there is sufficient

5     basis for the Court to rule today and appoint substitute

6     arbitrator.   JPay believes that we should substitute --

7          THE COURT:  That's right, you were in your argument,

8     weren't you, when we took the recess?  I'm sorry, I didn't mean

9     to cut you off.  Go ahead.

10         MS. HERRINGTON:  No, that's fine.  No, no, that's

11    fine, but we think that we should substitute AAA and have the

12    consumer rules apply, and it sounds like we're not too -- it

13    sounds like the plaintiffs should be amenable to that.

14         THE COURT:  Yes.

15         MS. HERRINGTON:  I think that what the plaintiffs

16    want to do is they want to sort of micromanage or change some

17    aspects and come to additional agreements, and we'll certainly

18    be openminded to what counsel suggests, and we'll talk to him

19    over the next seven days to see if we can't, you know, reach an

20    agreement that he feels comfortable with.  But I think the

21    parties generally are in agreement walking away from today,

22    though, that the AAA and the consumer rules should apply if the

23    Court --

24         THE COURT:  And when you say that, do you also

25    include then that the rules on fees, the fee shifting thing,

1   would go away because that's not consistent with AAA rules?

2          MS. HERRINGTON:  Well, I think that's the -- what's

3   the argument that we're having.

4          THE COURT:  Okay.

5          MS. HERRINGTON:  We're talking about that, and we

6   said well --

7          THE COURT:  So those are two sticking points?

8          MS. HERRINGTON:  They are.  They are --

9          THE COURT:  Okay.  Got it.

10          MS. HERRINGTON:  -- because he's saying, well, you

11  know, we've got to excise that from the contract, and I don't

12  think I can commit to that until the client -- I talk to the

13  client.

14          THE COURT:  Okay.  Very good.

15          MS. HERRINGTON:  Yes.

16          THE COURT:  I understand now, then, both of your

17  positions and I thank you very much.  Good luck with working it

18  out; and, if not, we'll do something about it.

19          MS. HERRINGTON:  Thank you so much.

20          MS. PARKER:  Your Honor, thank you very much for you

21  time.

22          THE COURT:  All right.  Thank you.

23          (At 10:56 a.m., court recessed.)

24

25

1                              * * * * *

2                        C E R T I F I C A T E

3        I certify that the foregoing is a correct transcript
         from the digital sound recording of the proceedings in
4        the above-entitled matter.

5

6                              *Carol M. Harrison*
                               _____
7        Date: 2-18-2020       Carol M. Harrison, RMR, FCRR
                               Official Court Reporter
8                              United States District Court
                               Eastern District of Michigan
9                              1000 Washington Avenue
                               Bay City, MI  48708
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25